FILED

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT 2003 NOV 19  A  9: 46

US DISTRICT COURT
HARTFORD CT

JULIE DILLON RIPLEY MILLER,

        Plaintiff and Counterclaim
        Defendant,

- against -

MERRILL LYNCH CREDIT CORPORATION,

        Defendant and Counterclaimant.

NO. 3:03-CV-1016 (RNC)(DFM)

November 18, 2003

**SUPPLEMENTAL AFFIDAVIT OF THOMAS P. FRIEDMAN**
**IN SUPPORT OF DEFENDANT'S MOTION TO COMPEL**

In accordance with Rule 37 of the Local Civil Rules of the District of Connecticut, Thomas P. Friedman hereby certifies as follows:

1.     I am an associate with the law firm of Paul, Hastings, Janofsky & Walker, LLP, counsel of record for Defendant and Counterclaimant Merrill Lynch Credit Corporation ("MLCC") in the above-captioned action.

2.     I have worked on discovery matters for Defendant and am personally familiar with the efforts made to obtain information and documents from Plaintiff responsive to Defendant's First Set of Interrogatories and First Requests for Production of Documents. I submit this Supplemental Affidavit in further support of MLCC's Motion to Compel.

3.     In an effort to narrow this discovery dispute, Defendant suggested during the parties' "meet and confer" on September 19, 2003, that Plaintiff produce documents concerning "significant" expenses incurred, or purchases made, by Plaintiff after construction was complete in response to certain discovery requests. Plaintiff has not produced a single document since that discussion.

4.    Attached as Exhibit 1 are relevant portions of the transcript of the deposition taken of Julie Dillon Ripley Miller, as received from Brandon Smith Court Reporting.  (See p. 71.)  This deposition transcript includes testimony provided on October 20 and October 21, 2003.  The deposition has been recessed.

5.    Attached as Exhibit 2 is the summary page of Plaintiff's December 1999 account statement from Merrill Lynch, Pierce, Fenner & Smith Incorporated.

6.    Attached as Exhibit 3 are relevant portions of the transcript of the deposition taken of Julie Dillon Ripley Miller, as received from Brandon Smith Court Reporting.  (See p. 299.)

7.    Attached as Exhibit 4 is the Affidavit of Joseph L.A. Tesoriere filed in support of Plaintiff's motion for prejudgment remedy.

8    Attached as Exhibit 5 is a copy of a letter from Patrick Begos to Thomas Friedman dated October 15, 2003.

9    Attached as Exhibit 6 is a copy of a letter from Thomas Friedman to Patrick Begos dated October 27, 2003.

10    Attached as Exhibit 7 are relevant portions of the transcript of the deposition taken of Julie Dillon Ripley Miller, as received from Brandon Smith Court Reporting.  (See p. 250.)

11    Attached as Exhibit 8 are relevant portions of the transcript of the deposition taken of Jay K. Falini, as received from Ellen Grauer Court Reporting.  (See p. 70.)

12.    Attached as Exhibit 9 is a billing statement for window treatments on 21 Point Road, the property at issue, produced by Plaintiff in this matter.

13.     Attached as Exhibit 10 is a copy of a letter from Patrick Begos to Thomas Friedman dated September 17, 2003.

DATED: November 18, 2003.

_Thomas P. Fried_
Thomas P. Friedman

## CERTIFICATE OF SERVICE

This is to certify that on this 18th day of November, 2003, a copy of the foregoing SUPPLEMENTAL AFFIDAVIT OF THOMAS P. FRIEDMAN IN SUPPORT OF DEFENDANT'S MOTION TO COMPEL was delivered via U.S. first class mail to:

> Patrick W. Begos, Esq.
> BEGOS & HORGAN, LLP
> 327 Riverside Avenue
> Westport, CT 06880

Thomas P. Friedman

STM/263292.1
11413.00021

4

1

Miller vs Merrill Lynch

10/20/2003                                                    Julie Dillon Ripley Miller

Page 70

```
 1      Q    Did you understand that seven and a half
 2  million dollars was going to be on top of that?
 3      A    Yes.
 4      Q    So that the entire construction project was
 5  going to be $1,500,000?
 6          MR. BEGOS:  Ten million.
 7          MR. CONROY:  $10,500,000.
 8          MR. BEGOS:  Are you asking her understanding
 9  in October of --
10  BY MR. CONROY:
11      Q    -- of 1999, yes.
12      A    Yes, that's why I asked him how, you know,
13  it seemed like a lot of money.
14      Q    Did Mr. Falini tell you that, in fact, the
15  $7,500,000 was going to be used, number one, to pay off
16  your earlier mortgage?
17      A    No.
18      Q    Did he tell you that, number two, it was
19  going to be used to pay off the loan had you taken out
20  margin at Merrill Lynch?
21      A    No.
22      Q    And did he tell that you the remainder was
23  going to be used to pay Mr. Brown for the completion of the
24  construction?
25      A    No, he did not.
```

Page 71

```
 1      Q    Well, you learned at some point in time the
 2  $7.5 million was not going to -- all that money wasn't
 3  going to go to Mr. Brown, didn't you?
 4      A    No, I never learned that until -- I don't
 5  even -- actually, no.  I don't know that I even knew that
 6  until now.  I was always under the impression it was the
 7  construction loan.
 8      Q    Just so we clear, you understood this was
 9  going to be an additional $7.5 million on top of everything
10  you already paid?
11      A    Yes.
12      Q    And that all of that was going to go to
13  Condon-Brown?
14      A    Yes.
15      Q    Do you recall that after the construction
16  loan was provided, that you were asked to sign various
17  approvals for checks to be made payable to Condon-Brown?
18      A    Every month there would be a disbursement.
19  I think I have copies of some of them --
20      Q    Okay.
21      A    -- from Merrill Lynch's schedule for the
22  construction.
23      Q    And you would be asked to sign those,
24  correct?
25      A    I believe so.  I'm not sure I remember that
```

Page 72

```
 1  I signed every single one.
 2      Q    But you do recall signing some?
 3      A    Yes.
 4      Q    Do you recall as you sit here today, being
 5  generally aware of the amounts of those disbursement
 6  approvals?
 7      A    Not really.
 8      Q    Did you ever read them before you signed
 9  them?
10      A    Again, I trusted Jay to have read all of
11  these things.  I'm not sure I really read them all.  There
12  was also another name, John Fontana, who I believe was part
13  of Merrill Lynch.  I'm not sure who he was.  He would come
14  out and actually do all of the check off on the
15  disbursements with Mr. Brown.
16      Q    Did Mr. Falini ever tell you he was reading
17  these disbursement approvals?
18      A    I don't know if I ever asked him.
19      Q    So you just assumed that he was reading
20  them?
21      A    I assumed he was reading them.
22      Q    But do you know that Mr. Fontana would come
23  out and work with Mr. Brown and go over the work that had
24  been done?
25      A    Correct.
```

Page 73

```
 1      Q    So that is it fair to state, based on your
 2  earlier testimony, that you believe as you sit here today,
 3  after the construction loan was approved, an additional
 4  $7.5 million was paid to Condon-Brown?
 5      A    That's what I believe.
 6      Q    After the construction loan was approved,
 7  did Mr. Falini come up to meet with you?
 8      A    No.
 9      Q    I'm excluding the January '01 meeting.
10      A    Right.  Not very often, because then it was
11  sort of out of his hands.
12      Q    Did you ever meet a gentleman named
13  Greenbaum?
14      A    No.
15          MR. BEGOS:  Rosenbloom?
16  BY MR. CONROY:
17      Q    You ever meet anyone named Rosenbloom?
18      A    No, I never met Mr. Rosenbloom.
19      Q    Did you ever ask Mr. Fontana any questions
20  about the progress of the construction?
21      A    Yes.
22      Q    This would be during his visits?
23      A    During his visits, yes.
24      Q    And would he respond to your questions?
25      A    Yes, he'd show me -- if I was there, he
```

19 (Pages 70 to 73)

5b39f20e-6470-438f-8eda-eed63b9530d3

2

# Merrill Lynch

## PRIORITY CLIENT SERVICES



**YOUR FINANCIAL CONSULTANT:**
JAY K FALINI
(610) 878-8411

**For Client Service Questions Call:**
1-877-2PRIORITY(1-877-277-4674)

**Office Serving Your Account**
455 S GULPH PO BOX 61580
KINGOFPRUSSIA PA 19406

Illι.ιιιιιllιllιιllιιιllιιllιι.ιl
MS JULIE D R MILLER
FC# 6057
IA
P.O. BOX 233
ROWAYTON CT 06853

**JDRM 001966**

### Total Value as of December 31, 1999
### $8,116,984.00

### Asset Allocation Summary

Fixed Income
18%

Equities
82%

May not reflect all holdings

### Total Value Comparison (in $ millions)

10/97 12/97 12/98 10/99 12/99 03/99 10/99 10/99 09/11 09/11 09/12 09/12/99

9.10  10.4  8.92  8.74  7.29  4.92  4.72  4.79  8.12

*Link relationship change

### Statement Information

| Account No. | Account Name | Page |
|---|---|---|
| 881-32512 | MS JULIE D R MILLER | 1 to 28 |
| 881-32513 | MS JULIE D R MILLER | 29 to 56 |
| 881-32569 | MS JULIE D R MILLER | 57 to 62 |
| 881-32781 | MS JULIE D R MILLER | 63 to 70 |
| 881-33217 | JULIE D R MILLER | 71 to 72 |
| 881-33218 | JULIE D R MILLER | 73 to 78 |

### Account(s)

| Account No. | Account Type | Page |
|---|---|---|
| 881-32512 | 1 Master CMA | 1 |
| 881-32513 | 2 CMA Sub Account | 2 |
| | 3 Cash | |
| | Sub Total | |
| 881-32569 | 4 CMA | |
| 881-32781 | 5 CMA | |
| 881-33217 | 6 CMA | |

### Activity Summary

| | Dec 99 | Jan 99 To Date |
|---|---|---|
| Beginning Value | 4,789,064 | 8,921,126 |
| Net Deps/Wthdrwls | 3,769,057 | -928,941 |
| Div/Int Income | 32,369 | 245,383 |
| Chg in Market Value | -473,506 | -120,584 |
| Ending Value | 8,116,984 | 8,116,984 |

### Summary of Account(s)

| | Total Value This Month | Total Value Last Month | Gains and Losses YTD Realized | Gains and Losses Unrealized |
|---|---|---|---|---|
| 1 | 707,874 | 1,888,074 | 450,786 | |
| 2 | 6,004,075 | 771,614 | 760,029 | |
| 3 | 6,711,949 | 2,659,688 | 1,211,715 | |
| | 6,402,839 | 2,104,095 | | |
| 4 | -6,708 | 17,403 | | |
| 5 | 0 | 0 | | 628 |
| 6 | 94 | 466 | 3,307 | |

### Statement Period
### SUMMARY   12/01/99 TO 12/31/99

Page 1

**Account No.**
881-32512

PLEASE SEE REVERSE SIDE



001025

3

Miller vs Merrill Lynch

10/21/2003                                                    Julie Dillon Ripley Miller

Page 298

1    where it says "Barry Newman" in your handwriting.
2        A    Correct.
3        Q    When you received this, was Julie Dillon
4    Ripley Miller already typed in?
5        A    Yes, it was.
6        Q    And prior to this, you had already discussed
7    with Mr. Falini the fact that it was going to be Newman who
8    was going to be the person acting with the power of
9    attorney?
10       A    That's correct.
11       Q    Okay.  And then you've written on the
12   right-hand side, "approval of all contractor's long address
13   advance to Condon-Brown Inc. JDRM, initial each one,"
14   correct?
15       A    That's correct.
16       Q    And then it's your recollection that you put
17   your initials in each of the boxes the middle of the middle
18   portion of the document or brackets?
19       A    Yes, correct.
20       Q    Did you do it where it says "all other
21   matters?"
22       A    No.
23       Q    And you didn't put your initials where it
24   said "special provision," correct?
25       A    Correct.

Page 299

1        Q    Is that in an effort to ensure that this
2    professional value of all contractor loan advances to
3    Condon-Brown Inc. was covered by the authority?
4        MR. BEGOS:  Object to the form.
5        MRS. MILLER:  I believe that was why.
6    BY MR. CONROY:
7        Q    And when Mr. Falini showed up, you showed
8    the form to him, correct?
9        A    That's correct.
10       Q    And what did he say?
11       A    He told me that I needed to white out part A
12   and part D, at which point he whited it out.
13       Q    This was at your house?
14       A    Yes.
15       Q    Where did he get the white out?
16       A    That's what I've been trying to remember
17   whether I had it or he had it in his briefcase.  I don't
18   remember.
19       Q    Do you recall that you had put a slash mark
20   through real estate transactions, as you had with the other
21   --
22       A    I don't recall.
23       Q    -- B through L?
24       A    I don't remember.  It looks like I forgot
25   that one.

Page 300

1        Q    But it's your recollection -- is it your
2    recollection that it was Mr. Falini that whited out the box
3    next to real estate transactions?
4        A    Correct.
5        Q    And the box next to bank transactions?
6        A    Correct.
7        Q    And there appears to be something that was
8    whited out next to banking transactions, between it and the
9    box.  Do you see that?
10       A    I see that, and I'm not sure what that is.
11   Although, it looks like it may have been my initials.
12       Q    And the other portion where white out
13   appears to occur is around the "D" over to the left;
14   is that correct?
15       A    Correct.
16       Q    Okay.  Did Mr. Falini tell you why he was
17   whiting out those two portions?
18       A    I don't remember.  The banking transactions,
19   I don't remember; and the real estate transactions, I don't
20   remember.  He just said they needed to be whited out so
21   that all of the loan advances could go through.
22       Q    He didn't give you any further details?
23       A    No.
24       MR. CONROY:  I'm going to ask the reporter
25   to mark the exhibit next in order, an affidavit that Mrs.

Page 301

1    Ripley Dillon Miller executed on the 23rd of April, 2003,
2    witnessed by Christopher Brown of Mr. Begos's office.
3        (Defendant's Exhibit Number 45 was marked
4        for identification)
5    BY MR. CONROY:
6        Q    Do you recall signing that affidavit?
7        A    Yes.
8        Q    Okay.  And did you read it through for
9    accuracy before you signed it?
10       A    Yes.
11       Q    Would you look at paragraph six, please, and
12   read through that paragraph.
13       A    (Witness complies)
14       Q    While you are reading through, I'm going to
15   ask the reporter to mark as Exhibit 45 --
16       Mrs. Miller, at the top of page three, you
17   say, "I followed the instructions on the form and crossed
18   out and initialed every power except for real estate
19   transactions, in order that I wanted Mr. Newman to be able
20   to pay my contractors."  Do you see that?
21       A    I did initial.  If you see the original, I
22   did initial, originally, the real estate.
23       Q    Why then did you say on that date that you
24   had not?
25       MR. BEGOS:  Object to the form.

29 (Pages 298 to 301)

Brandon Smith Reporting Service

4

BEGOS & HORGAN, LLP
25 Ford Road ● Westport, Connecticut 06880 ● (203) 226-9990 ● Fax: (203) 222-4833
Juris No. 418336

RETURN DATE:

| | |
|---|---|
| JULIE DILLON RIPLEY MILLER, | :    S U P E R I O R    C O U R T    O F CONNECTICUT COURT |
| Plaintiffs, | : |
| — against — | :    JUDICIAL DISTRICT OF STAMFORD |
| MERRILL LYNCH CREDIT CORPORATION, | : |
| Defendant. | :    April 23, 2003 |

## AFFIDAVIT OF JOSEPH L.A. TESORIERE

1.     I am a financial advisor with Omni Solo, Inc. The Applicant has hired us to help her resolve the financial problems created by Merrill Lynch Credit Corporation's (MLCC) seizure and liquidation of her Merrill Lynch, Pierce, Fenner & Smith, Inc. (MLPFS) brokerage account. I submit this affidavit in support of Mrs. Miller's application for a prejudgment remedy in this action against MLCC.

2.     I have over 25 years experience in business and personal financial management including Crisis Management/Turnaround; Bankruptcy and Liquidation Management; Creditor and Debtor Representation; Debt Restructuring; Dispute Management; Finance; Solving Family Business Problems; Trustee Examiner and Workouts.

3.     According to MLPFS's statement for Mrs. Miller's brokerage account, she had a cost basis $227,250 in the stocks in her account. When MLCC liquidated those stocks in February 2003, for $4,726,500.90, she had a capital gain of $4,499,250.90. The federal long term capital gains tax rate is

20% and the State of Connecticut's is 5%. MLCC's liquidation of Mrs. Miller's account therefore incurred for her a capital gains tax liability of approximately $1,125,000.

Joseph L.A. Tesoriere

Sworn to before me this
23rd day of April, 2003

Commissioner of the Superior Court

BEGOS & HORGAN, LLP
25 Ford Road ● Westport, Connecticut 06880 ● (203) 226-9990 ● Fax: (203) 222-4833
Juris No. 418336

5

 **BEGOS & HORGAN, LLP**

ATTORNEYS AT LAW

PATRICK W. BEGOS *
CHRISTOPHER G. BROWN *
MICHAEL F. HORGAN, JR. *
BRIAN G. KANNER †

* ADMITTED IN NY AND CT
† ADMITTED IN NY AND ME

327 RIVERSIDE AVENUE
WESTPORT, CONNECTICUT 06880
TEL: (203) 226-9990
FAX: (203) 222-4833
WWW.BEGOSHORGAN.COM

7 PONDFIELD ROAD
P.O. BOX 369
BRONXVILLE, NEW YORK 10708-0369
TEL: (914) 961-4441
FAX: (914) 961-4442

October 15, 2003

**BY TELECOPIER**

Thomas P. Friedman, Esq.
Paul, Hastings, Janofsky & Walker, LLP
1055 Washington Boulevard
Stamford, CT 06901-2217

   **Re: Miller v. MLCC**

Dear Thomas:

  I am writing to follow up on: our September 19, 2003 telephone conference; your October 6, 2003 letter; and your motion to compel. Given the pendency of your motion, we obviously reserve all our rights to oppose; however, I believe that we should be able to substantially narrow, if not entirely eliminate, the outstanding disputes.

**Plaintiff's Financial Condition**

  The majority of the disputed discovery requests concerned issues relating to Ms. Miller's finances, particularly including documents and information relating to her income, her assets, and trusts and/or estates in which she may be a beneficiary (*see, e.g.* Interrogatory 6; Requests 4-18). Though we will discuss certain of these requests in more detail below, we believe that most of the disputed items can be dealt with as a group.

  Ms. Miller has already produced all bank and brokerage statements in her possession, as well as all financial statements. MLCC already has Ms. Miller's tax returns for pertinent years up through 1999. Our primary concern at this point relates to the date through which financial information should be produced. In our view, you are not entitled to information up through the present. For example, even if Ms. Miller earned substantial income in 2003, or received substantial distributions from estates or trusts in 2003, it would not be relevant to the issues raised by our claims or your counterclaims.

  In order to resolve most of the disputes regarding Ms. Miller's finances, we are prepared to agree to produce Ms. Miller's tax returns through tax year 2001 (or provide authorizations if copies of the returns cannot be located), and all documents concerning any trusts or estates in which Ms. Miller is a beneficiary created on or before December 31, 2001. We believe this would provide all information arguably within the scope of discovery in this matter. If that is acceptable to you, please

Thomas P. Friedman, Esq.
October 15, 2003
Page 2

let me know. If, instead, you desire to seek documents for more recent periods, we will have to let
the Court resolve the dispute.

**Plaintiff's Emotional Distress and Medical Condition**

A significant portion of the disputed discovery requests relate to Ms. Miller's emotional
distress and medical condition (*see, e.g.*, Interrogatories 1-4; Document Requests 51, 53, 54). You
asserted that these were relevant because of Ms. Miller's emotional distress claim. As we discussed,
we do not want a damages issue to become the focus of burdensome and time consuming discovery
in this case. For that reason, we are prepared to withdraw Ms. Miller's claim for emotional distress,
solely: (i) to narrow the issues in the case; (ii) in exchange for MLCC's agreement not to seek
discovery into Ms. Miller's medical/emotional condition, and not to rely on the withdrawal to any
advantage. I have prepared a proposed stipulation and proposed Second Amended Complaint to that
effect, which I am enclosing.[1] Please let me know if it is acceptable.

**Specific Requests**

There were certain issues that related to specific requests. We will now discuss our
understanding of disputes MLCC has dropped, and Ms. Miller's attempts to resolve pending
disputes.

**Request 4.** Ms. Miller has produced all non-privileged documents responsive to this request.[2] As we
discussed, Omni Solo, Inc. was retained for litigation purposes, and any communications with its
representatives are privileged. Obviously, if any representative of Omni Solo is expected to testify
at trial, appropriate disclosures will be made. To anticipate your question about a privilege log,
because Omni Solo, like Begos & Horgan, and, indeed, your firm, were retained contemporaneously
with this litigation, and continue to provide services, I believe that preparing privilege logs for these
entities will be unduly burdensome and not terribly helpful. We note, in this regard, that you have
not provided us with any privilege log.

**Requests 5, 6, 8, 10, 11, 12, 13 and 41.** Any dispute regarding these requests would be resolved in
accordance with our discussion of financial issues above.

---

[1] The formatting of the complaint made redlining unhelpful. To make your review easier, I
can tell you that the only changes made to the Amended Complaint are: the document name; the
removal of Counts VIII (Intentional Infliction of Emotional Distress) and IX (Negligent Infliction
of Emotional Distress); renumbering Counts X and XI; and corresponding changes to the Wherefore
clause.

[2] In order to prevent any misunderstanding, any statement about the completeness of Ms.
Miller's production should be assumed to be limited to responsive documents or information in her
possession, custody or control that she has discovered upon a reasonable, good faith search for same.

Thomas P. Friedman, Esq.
October 15, 2003
Page 3

**Requests 14, 15 and 17.** You have dropped any dispute regarding these requests.

**Request 16.** Ms. Miller has produced all documents responsive to this request.

**Requests 23-30.** Our dispute here relates to matters after the 1999 Loan was converted from construction to permanent. You advised that you are looking for documents relating to "significant expenses." As so limited, Ms. Miller has produced all documents responsive to these requests.

**Requests 31, 32, 33, 36 and 43.** Ms. Miller has produced all documents responsive to these requests.

**Request 39.** This request, seeking documents on any litigation in which Ms. Miller has been a party, without limitation of time or subject, is hopelessly overbroad. We are prepared to respond provided that MLCC agrees to provide similar disclosure regarding claims asserted against it by borrowers.

**Request 44.** You stated that this request related to Ms. Miller's claim for emotional distress. Therefore, any dispute would be resolved by the enclosed stipulation.

Based on my notes, these are all the disputes you raised. Please let me know your views on these proposals so that we can avoid further court involvement.

Sincerely yours,

Patrick W. Begos

PWB:mtf
Enclosures

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

----------------------------------------------------x

JULIE DILLON RIPLEY MILLER,                    :

    Plaintiff,                                 :        Case No.03-CV-1016 (RNC)(DFM)

    – against –                               :        October 15, 2003

MERRILL LYNCH CREDIT CORPORATION,              :

    Defendant.                                 :

----------------------------------------------------x

### STIPULATION

    WHEREAS plaintiff has asserted a claim in this action for damages resulting from emotional distress; and

    WHEREAS defendant has sought substantial discovery relevant only to that emotional distress claim; and

    WHEREAS the parties desire to narrow the issues in this action for discovery and trial;

    NOW THEREFORE, IT IS HEREBY STIPULATED AND AGREED, between the undersigned counsel for both parties to this action:

1.   Plaintiff shall amend her Amended Complaint by serving and filing the annexed Second Amended Complaint, and will withdraw any claim for emotional distress. Defendant consents to the amendment of Plaintiff's Amended Complaint.

2.   Defendant shall withdraw any document requests and/or interrogatories relevant only to Plaintiff's emotional distress claims, including, but not limited to, requests and/or interrogatories seeking medical records or information. Defendant will not pursue any additional discovery concerning plaintiff's medical condition or emotional state.

3.    The parties agree that this stipulation is entered into solely to narrow issues and expedite the

prosecution of this action. Accordingly, neither party shall use introduce any evidence or

argument in this action concerning this stipulation and/or the withdrawal of Plaintiff's claim

for emotional distress.



PAUL, HASTINGS, JANOFSKY &amp;    BEGOS &amp; HORGAN, LLP
WALKER, LLP


By:_____    By:_____
    Thomas P. Friedman, Esq.        Patrick W. Begos (ct19090)
Attorneys for Defendant          Attorneys for Plaintiff
1055 Washington Boulevard     327 Riverside Avenue
Stamford, CT 06901-2217       Westport, CT 06880
(203) 961-7400              (203) 226-9990
(203) 359-3031 (fax)        (203) 222-4833 (fax)

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
HARTFORD

--------------------------------------------------x
JULIE DILLON RIPLEY MILLER,                        :
                                                   :
                        Plaintiff,                 :     Case No. 03-CV-1016 (RNC)
                                                   :
        – against –                                :     SECOND AMENDED
                                                   :     COMPLAINT
MERRILL LYNCH CREDIT CORPORATION,                  :
                                                   :
                        Defendant.                 :
--------------------------------------------------x

## ALLEGATIONS COMMON TO ALL COUNTS

1.      Plaintiff is a natural person residing at 21 Point Road, Norwalk, Connecticut.

2.      Upon information and belief, Defendant, Merrill Lynch Credit Corporation
("MLCC") is, and at all relevant times was, a corporation duly organized and existing under and by
virtue of the laws of the State of Delaware and authorized to transact and transacting the business
of lending money in the State of Connecticut.

3.      This action arises out of MLCC's conversion of approximately $5 million of Plaintiff's
stocks held by MLCC's affiliate, Merrill Lynch, Pierce, Fenner & Smith ("MLPFS"). MLCC has
claimed that its sale of those assets and seizure of the proceeds was authorized pursuant to a Pledge
Agreement executed as part of a $7.5 million construction loan transaction (the "Loan"). However,
plaintiff never executed that Pledge Agreement, and, specifically withheld authority from her
purported attorney-in-fact to sign it on her behalf.

4.      Plaintiff has a brokerage account with MLPFS (the "Account") and the bulk of the
stocks in the Account were acquired by Plaintiff's family before 1950. When Plaintiff inherited these
stocks in 1996, she acquired her ancestors' cost basis in them for capital gains tax purposes.

5.    Plaintiff's MLPFS stock broker, Jay Falini ("Falini"), knew that the Account was Plaintiff's primary source of income and that liquidating the stocks would expose Plaintiff to substantial capital gains tax liability.

6.    In May 1998, Plaintiff began building a house on a piece of property that she owns on Wilson Point on the Norwalk waterfront. In or about the fall of 1999, Falini arranged for Plaintiff to take the Loan from MLCC. Falini never disclosed to Plaintiff that the Loan involved a pledge of Plaintiff's Account. Falini's actions in arranging the Loan, obtaining documents necessary to close, and orchestrating the closing demonstrate that, at all relevant times, he had actual, implied and/or apparent authority to act as MLCC's agent.

7.    Thereafter, Falini advised Plaintiff that the Loan had been scheduled to close on December 7, 1999. Falini knew that Plaintiff was going to be in Africa from December 2 through December 22, 1999 but advised her that she did not need to have a lawyer present at the closing. Falini later asked Plaintiff to sign a document waiving her right to have a lawyer at the closing.

8.    Falini advised Plaintiff that because her contractors purportedly needed to be paid while she was away, she needed to give Barry Newman ("Newman") (the accountant to whom Falini had referred Plaintiff in 1998) power of attorney to use the Loan money to pay them. Falini sent Plaintiff a blank Connecticut Statutory Short Form Power of Attorney ("POA") form and told her that he would come up from his office in Philadelphia to pick it up on December 2, 1999, the day she was leaving for Africa.

9.    On or about December 2, 1999, Plaintiff took the blank POA form that she received from Falini to her local bank to have it notarized. Newman was identified as the attorney in fact and, with the notary watching, Plaintiff followed the instructions on the form and crossed out and initialed

- 2 -

every power except "real estate transactions" and wrote in that she wanted Newman to be able to pay her contractors.

10. After Plaintiff signed the power of attorney in front of two witnesses and a notary public at the bank, she gave it to Falini, who "whited out" some of Plaintiff's markings on the form. The changes made by Falini after the POA had been signed and acknowledged, which purported to expand the authority delegated by Plaintiff, left it not in compliance with the Connecticut Statutory Short Form Power of Attorney Act, and invalidated it.

11. Falini did not alter Plaintiff's elimination of the power to act with respect to "bond, share and commodity transactions" because, he said, Newman should not have authority to sell Plaintiff's stock. Therefore, to the extent the POA is a valid document, it specifically withholds from Plaintiff's purported attorney-in-fact, Barry Newman, the power to act for the Plaintiff with respect to, *inter alia*, "bond, share and commodity transactions".

12. The POA specifically provides that the definitions of the Connecticut Statutory Short Form Power of Attorney Act apply to the subdivisions of the POA. Thus, as executed, the POA specifically withheld authority to "pledge . . . any bond, share [or] instrument of similar character," CGS § 1-46.

13. Upon information and belief, the Loan purportedly closed on or about December 7, 1999 and Newman, Falini and other as-yet-unidentified representative or representatives of MLCC were in attendance. Newman purported to obligate Plaintiff on an agreement with MLCC whereby Newman purportedly pledged Plaintiff's Account as security for the Loan ("Pledge Agreement"). MLCC accepted the POA as evidencing Newman's authority to enter the Pledge Agreement on

- 3 -

behalf of Plaintiff and ignored the changes to the document and Plaintiff's clear and unambiguous withholding of authority to pledge securities.

14.     In or about February 2003, pursuant to a right it claimed by virtue of the Pledge Agreement, MLCC had the Account, which at the time had a value of approximately $5,000,000, liquidated and the proceeds frozen to the exclusion of Plaintiff.

15.     In addition to the loss of the stocks and cash in the Account, the liquidation damaged the Plaintiff including exposure to substantial tax liability.

## COUNT I - CONVERSION

16.     Plaintiff repeats and realleges paragraphs 1 through 15.

17.     Newman was not authorized to enter into the Pledge Agreement for Plaintiff. Therefore, MLCC was not authorized to assume and exercise the right of ownership over the Account to the exclusion of Plaintiff.

18.     Plaintiff has been damaged by MLCC's conversion of Plaintiff's Account to its own use, in an amount to be determined at trial, but in excess of $7 million.

## COUNT II - FRAUDULENT NONDISCLOSURE

19.     Plaintiff repeats and realleges paragraphs 1 through 18.

20.     MLCC, through Falini and its other agent or agents who attended the purported closing and any agent or agents who reviewed the POA and/or Pledge Agreement as part of any "post-closing" activities, knew or should have known that the POA was invalid and/or that Newman was not authorized to enter into the Pledge Agreement for Plaintiff.

21.     In addition, MLCC, never disclosed to Plaintiff, before the loan closing, that the Loan included a pledge of Plaintiff's Account. MLCC, through Falini, knew or should have known that

- 4 -

Plaintiff was incommunicado in Africa at the time of the closing, and had no reasonable opportunity to learn of or authorize the Pledge Agreement contemporaneously with the closing.

22.     MLCC failed to disclose to Plaintiff that the POA was invalid, that the Pledge Agreement was not authorized and that she could disavow and/or rescind it.

23.     Indeed, MLCC did not advise Plaintiff that the Pledge Agreement existed. She finally learned of its existence from MLPFS in 2001, more than a year after it was purportedly executed.

24.     MLCC took the invalid Pledge Agreement as unauthorized security for the Loan and withheld from Plaintiff advice of its existence and her right to disavow and/or rescind it to protect its, and/or Falini's, and/or other MLCC agents' and representatives', pecuniary benefit.

25.     In claiming rights under the Pledge Agreement with the knowledge that Plaintiff had not authorized Newman to bind her to the Pledge Agreement and that Plaintiff was not likely to learn of the existence of the Pledge Agreement absent advice from MLCC, MLCC assumed the duty to advise Plaintiff that the Pledge Agreement was not authorized and that she could disavow and/or rescind it.

26.     As a result of MLCC's non-disclosures, Plaintiff did not disavow or seek to rescind the Pledge Agreement until the Account was liquidated and Plaintiff incurred substantial tax liabilities.

## COUNT III - RECKLESSNESS

27.     Plaintiff repeats and realleges Paragraphs 1 through 26.

28.     MLCC knew that Plaintiff was dependent on the Account for income and that her tax basis in the securities in the Account was small compared to their market value, such that MLCC knew there was a substantial likelihood that liquidating the Account and withholding the liquidation

- 5 -

proceeds from Plaintiff would leave her unable to pay her creditors, damage her credit and incur for her a substantial capital gains tax liability which she would be unable to pay.

29.    MLCC maliciously, wantonly and recklessly caused the liquidation of Plaintiff's Account and withheld the proceeds of the liquidation from Plaintiff.

30.    Plaintiff was injured by MLCC's malicious, wanton and reckless conduct in that Plaintiff foreseeably and unnecessarily incurred a substantial capital gains tax liability, and suffered damages to her credit and from her inability to pay her creditors, and incurred and will incur additional expenses to repair such damage and pay the capital gains tax.

## COUNT IV - CONNECTICUT UNFAIR TRADE PRACTICE ACT, DECEPTIVE ACTS OR PRACTICES

31.    Plaintiff repeats and realleges Paragraphs 1 through 30.

32.    The conduct of MLCC constituted a deceptive act or practice within the meaning of Conn. Gen. Stat. § 42-110b(a) in the conduct of the trade or commerce alleged in Paragraph 2 in that said conduct violates public policy, is immoral, unethical or unscrupulous and is substantially injurious to consumers, including Plaintiff.

33.    As a result of the conduct of MLCC alleged in this Count, Plaintiff has suffered an ascertainable loss of money or property, including the Account and capital gains tax.

## COUNT V - CONNECTICUT UNFAIR TRADE PRACTICES ACT, EXACERBATING CIRCUMSTANCES, DECEPTIVE ACTS OR PRACTICES

34.    Plaintiff repeats and realleges Paragraphs 1 through 33.

35.    The conduct of MLCC constituted an intentional and wanton violation of Plaintiff's rights or was done with reckless indifference to those rights in that MLCC knew that its deceptive

- 6 -

acts or practices were substantially likely to leave Plaintiff unable to pay her creditors, damage her

credit and incur for her a substantial capital gains tax liability which she would be unable to pay.

## COUNT VI - CONNECTICUT UNFAIR TRADE PRACTICES ACT, UNFAIR ACTS OR PRACTICES

36.     Plaintiff repeats and realleges Paragraphs 1 through 35.

37.     The conduct of MLCC constituted an unfair act or practice within the meaning of

Conn. Gen. Stat. § 42-110b(a) in the conduct of the trade or commerce alleged in Paragraph 2 in that

said conduct violates public policy, is immoral, unethical or unscrupulous and is substantially

injurious to consumers, including Plaintiff.

38.     As a result of the conduct of MLCC alleged in this Count, Plaintiff has suffered an

ascertainable loss of money or property, including the Account and capital gains tax.

## COUNT VII - CONNECTICUT UNFAIR TRADE PRACTICES ACT, EXACERBATING CIRCUMSTANCES, UNFAIR ACTS OR PRACTICES

39.     Plaintiff repeats and realleges Paragraphs 1 through 38.

40.     The conduct of MLCC constituted an intentional and wanton violation of Plaintiff's

rights or was done with reckless indifference to those rights in that MLCC knew that its unfair acts

or practices were substantially likely to leave Plaintiff unable to pay her creditors, damage her credit

and incur for her a substantial capital gains tax liability which she would be unable to pay.

## COUNT VIII - NEGLIGENCE

41.     Plaintiff repeats and realleges paragraphs 1 through 40.

42.     A reasonable lender would have known that the POA and/or Pledge Agreement was

invalid.  Therefore, MLCC was negligent in causing the liquidation of the Account pursuant to the

invalid Pledge Agreement.

- 7 -

43.     As a result of MLCC's negligence, Plaintiff foreseeably and unnecessarily forfeited the Account to MLCC and incurred a substantial tax liability.

## COUNT IX - RESPONDEAT SUPERIOR

44.     Plaintiff repeats and realleges paragraphs 1 through 43.

45.     At all relevant times, Falini was the MLPFS registered representative assigned to the Account.

46.     Acting as an employee or agent of the MLPFS-affiliated MLCC, and within the scope of his employment or agency in furtherance of MLCC's business, Falini arranged for the Loan, including Pledge Agreement, and engaged in the conduct alleged in Counts II through X.

47.     Falini's negligence and/or recklessness was generally foreseeable.

48.     At all relevant times, MLCC put Falini in a position which enabled Falini, while apparently acting within his authority, to engage in the conduct alleged in Counts II through X and Falini did engage in such conduct.

49.     As a result, MLCC is vicariously liable for Falini's liability to Plaintiff, in addition to its own direct liability to Plaintiff.

**WHEREFORE,** Plaintiff demands relief in an amount greater than fifteen thousand dollars, exclusive of interest and costs.

As to Counts I through VII and IX, Plaintiff claims:

(i)     Money Damages;

(ii)    Punitive Damages;

(iii)   Attorney's Fees;

(iv)    Statutory Interest; and

- 8 -

(v)    Costs of Suit.

As to Count VIII, Plaintiff claims:

(i)    Money Damages;

(ii)    Statutory Interest; and

(iii)    Costs of Suit.

THE PLAINTIFF
JULIE DILLON RIPLEY MILLER

By: _____
    Christopher G. Brown, Esq. (ct 18216)
    Begos & Horgan LLP
    327 Riverside Avenue
    Westport, CT 06880
    (203) 226-9990

- 9 -

## CERTIFICATE OF SERVICE

This certifies that on October 15, 2003, a copy of the foregoing Amended Complaint was delivered via first-class mail to:

Douglas C. Conroy, Esq.
Paul, Hastings, Janofsky & Walker LLP
1055 Washington Boulevard
Stamford, CT 06901-2217



_____
Christopher G. Brown

- 10 -

6

Paul, Hastings, Janofsky    /alker LLP
1055 Washington Boulevard, Stamford, CT 06901-2216
telephone 203-961-7400 / facsimile 203-359-3031 / internet www.paulhastings.com

**Paul**Hastings

(203) 961-7498
thomasfriedman@paulhastings.com

October 27, 2003                                                11413.00021

Atlanta
Beijing
Hong Kong
London
Los Angeles
New York
Orange County
San Diego
San Francisco
Stamford
Tokyo
Washington, D.C.

**VIA FACSIMILE AND U.S. MAIL**

Patrick W. Begos, Esq.
Begos & Horgan, LLP
327 Riverside Avenue
Westport, CT 06880

Re:    Miller v. MLCC

Dear Patrick:

I write in response to your letter of October 15, 2003 concerning various discovery disputes. First, with respect to tax returns, Mrs. Miller's claims have put those returns squarely at issue. As you will recall, she is claiming damages caused by liquidation in the form of increased capital gains tax liability. Her tax returns for the missing years bear directly on several issues, including whether she has losses, credits, or other advantages based on earlier returns which could be carried forward and allow her to reduce the amount of any alleged damages in the form of capital gains taxes. We note, for example, that her earlier returns sometimes reflected the impact of gains or losses reflected in K-1s provided to her by various family trusts or partnerships. However, this issue now seems academic given her testimony about the 2002 return and we will not pursue this issue at this juncture if we receive the 2000 and 2001 returns.

Certainly, Mrs. Miller's financial situation is also pertinent to her actions in allowing the mortgage to go into default not only by failure to pay her monthly payments but also by failure to pay taxes. While she evidently disputes the validity of the pledge, there is no question that she failed, on numerous occasions, to pay substantial property taxes, a separate and independent ground for declaring her default under the mortgage. The existence of other sources of income or funds to make these payments, separate and apart from amounts she claims were improperly liquidated, bear directly on whether she can properly avoid foreclosure based on that separate and independent ground. We believe it also bears on her claims of emotional distress, which she has placed in issue both in her original affidavit and original amended complaint in this action. When we spoke about the discoverability of Mrs. Miller's trust and estate situation, you stated that you objected on the ground that such discovery would create an "ongoing burden." Accordingly, we are prepared to limit the relevant requests to documents created or received prior to the date of this letter.

On the emotional distress issue, while we now have your proposed stipulation, it leaves open the possibility that Plaintiff will attempt to pursue these claims in the future which we find troubling. We don't believe your proposed stipulation truly takes these issues off the table.

Paul*Hastings*

Patrick W. Begos, Esq.
October 27, 2003
Page 2

As to specific items, we add the following:

Request No. 4 -- Since an Affidavit from a representative of Omni Solo was already provided with your original filing any privilege with respect to their retention and work is waived, we believe our request is proper and should be complied with.

Requests Nos. 5, 6, 8, 10, 11, 12 and 13 -- See also our response with respect to the emotional distress stipulation.

Request No. 33 -- Plaintiff testified at deposition that she is in possession of appraisals that "could fill a book," but has produced only two appraisals of the property at issue. The remainder of the appraisal should be produced as well. We note that your letter indicates that Mrs. Miller "has produced all documents responsive" to this Request.

Request No. 39 -- We are willing to narrow this request to two areas of particular types of litigation. Those two areas are litigation since December, 1999 including the residence in question, its construction and improvements particularly since you yourself questioned the propriety of certain expenditures on the property during our conference with Magistrate Judge Martinez, and litigation of any kind, including, probate court proceedings, regarding the various family trusts and partnerships, again since December, 1999. We believe both of these areas are fairly subject to inquiry. If we understand correctly, based on Mrs. Miller's testimony, that there has been no such litigation, we would appreciate confirmation this issue is moot.

Finally, as to your proposal this last Friday to amend your affirmative defenses to the counterclaim, we will be in touch in the near future.

Very truly yours,

Thomas P. Friedman
of PAUL, HASTINGS, JANOFSKY & WALKER LLP

TPF/slm

cc:     Douglas C. Conroy, Esq.

7

Miller vs Merrill Lynch

Page 250

1    A    I may have. I believe I -- again, when you
2  approach another organization, they usually want their own
3  appraisals done. So I had so many appraisals done of this
4  property, they could fill a book.
5    Q    My question to you is: Do you recall
6  providing copies of these to anybody else?
7    A    Again, I don't remember. I may have
8  provided these to Eric Lutz from Webster Bank in December
9  of 2002, but I'm not sure.
10   Q    Okay. But you didn't provide them to Ms.
11 Kamhi, I assume.
12   A    No, I didn't.
13   Q    Or to Steve Crowe?
14   A    No.
15   Q    Do you ever recall sending copies of them to
16 anybody at Merrill Lynch Credit Corp?
17   A    No, I never talked to anybody at Merrill
18 Lynch Credit Corp.
19   Q    Ever?
20   A    Other than at the end, towards the end with
21 Mr. McEnerney; but it was never about any aspects other
22 than payment.
23   Q    Do you recall that at one point in time
24 there was an attempt to auction your home?
25   A    Yes, of course, I do.

Page 251

1    Q    And when did that come about?
2    A    That was between October of 2002 and
3  November of 2002.
4    Q    And did you hire an auctioneer?
5    A    I did; Sheldon Good.
6    Q    Who recommended Sheldon Good?
7    A    Joann Stone, who is a real estate agent in
8  Greenwich.
9    Q    And were the brochures prepared in
10 connection with the proposed auction?
11   A    Yes.
12   Q    And were people brought through the house to
13 look at it?
14   A    Yes. We had six open houses, maybe eight
15 open houses; and it was a period of time for six weeks.
16 And it was supposed to be fair market auction in this area.
17 Maybe it works in the Midwest; but in this area, everybody
18 thinks of a bargain. So it really was like a fire sale,
19 and people were trying to just get the property whatever
20 bargain they could.
21   Q    Did you have formal bids submitted?
22   A    We had one, basically, what I would call a
23 joke bid of a million two, I think it was; and then we had
24 one at 4.5, and that was it.
25   Q    Do you recall who bid 4.5?

Page 252

1    A    No, I don't remember the names of the
2  people.
3    Q    Was it rejected?
4    A    Yes.
5    Q    Did you consult with anybody before deciding
6  to reject it?
7    A    I may have talked to Mr. Ballen about it,
8  and he --
9         MR. BEGOS:  Don't talk about what he told
10 you.
11        MRS. MILLER:  Okay. I believe I talked to
12 Mr. Ballen.
13 BY MR. CONROY:
14   Q    And that was it?
15   A    Yes.
16   Q    Okay.
17        MR. CONROY:  I'm going to take a break.
18 Okay.
19        (A recess was taken)
20        MR. CONROY:  I'm going to mark as exhibit
21 next in order, 33, another document apparently from Mrs.
22 Miller's files. We've marked as JDRM 3473, 3474. It
23 appears to be a two-page letter to Mrs. Miller from Laurie
24 Kamhi and Steve Crowe, dated October 2, 2001.
25        (Defendant's Exhibit Number 33 was marked

Page 253

1        for identification)
2  BY MR. CONROY:
3    Q    Mrs. Miller, do you recognize this
4  document?
5    A    I recognize it vaguely, yes.
6    Q    Do you recall receiving it from Laurie Kamhi
7  and Steve Crowe?
8    A    Again, I received a letter -- a lot of
9  different documents and options from them, but this is just
10 another one.
11   Q    So you don't specifically recall this one?
12   A    Not specifically, no. I mean, obviously, I
13 remember reading it.
14   Q    Is any of the handwriting on Exhibit 33
15 yours?
16   A    No.
17   Q    Do you recognize --
18   A    Excuse me. The top page is my writing for
19 Bernie Palmer, that's the PriceWaterHouse accountant, and
20 his fax number, his fax numbers.
21   Q    Okay. What about over on the second page?
22   A    Or Laurie's fax numbers. I don't know whose
23 fax numbers those are. Laurie's fax and Steve's fax.
24   Q    What about over on the second page, is any
25 of that handwriting yours?

17 (Pages 250 to 253)

2e443a25-67b3-4061-b7a7-6a451ffa8ef4

1  Q. Okay. Had you decided in your own mind?

2  A. I thought it was asking of me more than what

3  would be appropriate.

4  Q. Appropriate given your relationship as her

5  financial consultant?

6  A. Right.

7  Q. Okay. But it was at or about this time, in

8  December of 1999, that she asked you to be

9  godfather; is that correct?

10  A. I don't remember the exact time period, but it

11  did occur.

12  Q. Okay. In arranging for the construction loan

13  through Merrill Lynch Credit Corporation, did you

14  tell Mrs. Miller how much of a construction loan she

15  could afford?

16  A. No, I did not.

17  Q. As part of your duties as a financial consultant

18  in describing Mrs. Miller's options for financing

19  the construction of her home, didn't you have to

20  advise her as to how much she could afford?

21  A. No, I didn't.

22  Q. Did you advise her how much of a loan -- strike

23  that. Did the size of the loan affect the pros and cons of the various financing options that you

24

1  presented to Mrs. Miller?

2  A. Yes.

3  Q. How large was the loan -- what was the size of

4  the loan that you ultimately arranged for her

5  through Merrill Lynch Credit Corporation?

6  A. Referring to the first one, or the second one?

7  Q. The second one, and that would be the one in

8  December of 1999.

9  A. 7.5 million.

10  Q. Did you discuss with Mrs. Miller her ability to

11  make the payments on a seven and a half million

12  dollar loan when you presented her financing options

13  to her?

14  A. Yes.

15  Q. And what did you say about her ability to make

16  the payments on a seven and a half million dollar

17  loan?

18  A. She was informed of what her monthly

19  requirements would be, an estimate of her monthly

20  requirements. She was informed of the terms of the

21  loan.

22  Q. The December, 1999 loan through Merrill Lynch

23  Credit Corporation was the second loan; correct? A. Correct.

24

69

70

1  Q. How much was the first loan?

2  A. 1.35 million.

3  Q. Did you ever tell Mrs. Miller that a con of the

4  seven and a half million dollar loan was that she

5  was already spending more than the income reflected

6  in her December, 1998 financial foundation report?

7  A. I discussed with Julie the cost of the project

8  and the amount of dollars that she was spending and

9  expressed concerns that she was overextending

10  herself.

11  Q. What did she say when you expressed those

12  concerns?

13  A. She, in many cases, when I mentioned anything

14  which would be considered discouraging towards her

15  dreams or goals, would become frustrated, angry and

16  suggest that I was not being creative enough and

17  that there must be a way.

18  Q. Did you document your concerns that she was

19  overextending herself by taking a seven and a half

20  million dollar loan?

21      MR. CONROY: Objection, misstates

22  prior testimony.

23      MR. BROWN: What was the prior testimony?

24

1      MR. CONROY: You asked him about

2  discussions he had concerning the cost of the

3  project and concerns about -- and he said, I

4  discussed, and he referred to multiple occasions, I

5  believe, the cost of the project and concerns about

6  overextending herself. So I think it was more a

7  generic question than in the context of the

8  $7.5 million loan. He was referring to multiple

9  discussions.

10  BY MR. BROWN:

11  Q. Let's clear that up. Did you express your

12  concerns about Mrs. Miller overextending herself in

13  connection with your discussions with her about

14  taking a seven and a half million dollar

15  construction loan through Merrill Lynch Credit

16  Corporation?

17  A. Yes, but at that time, the project was 60

18  percent complete and it was a question, I believe to

19  leave the house 40 percent incomplete or finish the

20  job, and her desire was to finish the job the way

21  she wanted it to be finished. The solution being

22  7.5 million, Mortgage 100 interest only, live or

23  based-pledged loan. Q. Okay. Did you document the concerns that you

24

71

72

**PULLAM'S**

104 Wall Street
NORWALK, CT 06850
(203) 853-3691

NAME _Mrs Miller_     DATE _12/8/00_     ORDER NO. _____

ADD: _Wilson Point_     PHONE _838-0773_     DATE ORDERED _/ /_

CITY _Norwalk_     STATE _CT_     ZIP _06854_     DATE RECEIVED _/ /_

| QTY | PRODUCT | √ ONE WIDTH/LENGTH | IN INCHES WIDTH | LENGTH | STACK | CONT | VAL | SILL | MATERIAL | DISTR | PRICE | AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Bathroom | Valance | | | | | | | | | | 468.00 |
| 25 | Living Room | St Ling | | | | | | | | | | 748.00 |
| | Saloon Valance | Baby's Rm | | | | | | | | | | 2,125.00 |
| | W&K... wall... installment... Linstons Curtard | | | | | | | | | | | 18,544.00 |
| | Furniture Tal... Woods | | | | | | | | | | | 488.00 |
| 25 | Drives Hard 2/5 891-318 | | | | | | | | | | | 3,250.00 |
| | 2 wood Blind... Living Room | | | | | | | | | | | 5,590.00 |

SPECIAL INSTRUCTIONS:

TX _040.00_

TOTAL _435.00_

DEPOSIT _15.000_

BAL DUE _775.787_

| FACTORY DEDUCTIONS: | INSIDE: 1=INSIDE | -½" FM. WIDTH -½" FM. LENGTH | OUTSIDE: NO DEDUCTIONS | VALANCE: | DATE BALANCE PAID: _/ /_ |
|---|---|---|---|---|---|

RCD. BY

**DISCLAIMERS:** Customer is responsible for their measurements. Measurements may not be changed. Not responsible for manufacture's shortages or delays.

# WINDOW TREATMENTS

**NOTE:** THIS IS FOR CUSTOM MADE PRODUCTS NOT SUBJECT TO RETURN OR CANCELLATION.

JDRM 003827

10

# BH  BEGOS & HORGAN, LLP

ATTORNEYS AT LAW

PATRICK W. BEGOS *
CHRISTOPHER G. BROWN *
MICHAEL F. HORGAN, JR. *
BRIAN G. KANNER †

* ADMITTED IN NY AND CT
† ADMITTED IN NY AND ME

327 RIVERSIDE AVENUE
WESTPORT, CONNECTICUT 06880

TEL: (203) 226-9990
FAX: (203) 222-4833

WWW.BEGOSHORGAN.COM

7 PONDFIELD ROAD
P.O. BOX 369
BRONXVILLE, NEW YORK 10708-0369
TEL: (914) 961-4441
FAX: (914) 961-4442

September 17, 2003

**BY OVERNIGHT MAIL**

Thomas P. Friedman, Esq.
Paul, Hastings, Janofsky & Walker, LLP
1055 Washington Boulevard
Stamford, CT 06901-2217

         Re:    **Miller v. MLCC**

Dear Thomas:

         Enclosed please find additional documents that are being produced in response to MLCC's first document request.

                                        Sincerely yours,

                                        Patrick W. Begos

PWB:mtf
Enclosures