UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
HARTFORD

-------------------------------------------------------------------x

JULIE DILLON RIPLEY MILLER,                  :
                                             :   Case No. 3:03CV1016 (RNC) (DFM)
                Plaintiff,                   :
                                             :
            — against —                      :   December 3, 2003
                                             :
MERRILL LYNCH CREDIT CORPORATION,            :
                                             :
                Defendant.                   :

-------------------------------------------------------------------x

### PLAINTIFF'S MOTION TO COMPEL

Upon the annexed Declaration of Patrick W. Begos, and all prior papers and proceedings in this action, plaintiff, Julie Dillon Ripley Miller, hereby moves the Court for an order, pursuant to Fed. R. Civ. P. 37 and Local Rule 37, compelling defendant, Merrill Lynch Credit Corporation ("MLCC"), to: (a) identify and produce copies of its lending and/or underwriting manual or guidelines; (b) comply with Ms. Miller's deposition notice to produce a witness or witnesses in Connecticut; and (c) awarding such other relief as the Court deems just.

Dated:      Westport, Connecticut
            December 3, 2003

                                        BEGOS & HORGAN, LLP

                                        By: _____
                                            Patrick W. Begos (ct19090)
                                        Attorneys for Plaintiff
                                        327 Riverside Avenue
                                        Westport, CT 06880
                                        (203) 226-9990
                                        (203) 222-4833 (fax)

**ORAL ARGUMENT IS REQUESTED**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
HARTFORD

---------------------------------------------------------------x

JULIE DILLON RIPLEY MILLER,           :

                                    :      Case No. 3:03CV1016 (RNC) (DFM)

       Plaintiff,               :

                                      :

       – against –            :      December 3, 2003

                                        :

MERRILL LYNCH CREDIT CORPORATION,    :

                                      :

       Defendant.             :

---------------------------------------------------------------x

**DECLARATION OF PATRICK W. BEGOS IN SUPPORT OF MOTION TO COMPEL**

PATRICK W. BEGOS declares the following to be true under penalty of perjury:

1.     I am a member of the firm of Begos & Horgan, LLP, attorneys for plaintiff, Julie Dillon Ripley Miller, in this action. I submit this declaration in support of Ms. Miller's motion to compel defendant, Merrill Lynch Credit Corporation ("MLCC"), to: (a) identify and produce copies of its lending and/or underwriting manual or guidelines; and (b) comply with Ms. Miller's deposition notice to produce a witness or witnesses in Connecticut.

2.     Annexed hereto as Exhibit A is a true copy of Plaintiff's First Set of Interrogatories, dated October 10, 2003.

3.     Annexed hereto as Exhibit B is a true copy of Defendant's Responses and Objections to Plaintiff's First Set of Interrogatories, dated November 11, 2003 ("Responses").

4.     The day after receiving MLCC's Responses, I forwarded a proposed Confidentiality Agreement to Thomas Friedman, counsel for MLCC. A copy of the forwarding email, and the attached proposed Confidentiality Agreement, are annexed as Exhibit C. MLCC neither requested any changes to the Confidentiality Agreement, nor agreed to execute it.

5.    On October 10, 2003, Ms. Miller served a Notice of Deposition, seeking to depose five named MLCC employees who were involved in either the underwriting and approval of the Loan, or in the subsequent sale of Ms. Miller's securities. MLCC responded that three of those five were no longer employees, and objected to producing the other two in Connecticut. Through negotiation, we learned that one of the two remaining employees (James Avery) worked in New Jersey, and MLCC agreed to produce him in Connecticut. Mr. Avery was deposed on November 14, 2003. Because Mr. Avery disclaimed virtually any knowledge of MLCC's underwriting and lending practices in general, or the underwriting of the Loan in particular, it became necessary to seek additional deponents. To that end, we served a second Notice of Deposition on November 17, 2003, a true copy of which is annexed hereto as Exhibit D.

6.    Annexed hereto as Exhibit E is a true copy of Thomas Friedman's November 19, 2003 letter to me.

7.    Mr. Friedman and I had discussions on November 20, 2003 and November 25, 2003 in an effort to resolve the disputes surrounding Interrogatory 8 and the deposition notice..

8.    In our first conversation, Mr. Friedman made clear that MLCC would not reconsider its position that any deposition would have to be held in Florida. I suggested that we would agree to hold the deposition(s) in Florida if MLCC paid our costs; Mr. Friedman rejected that proposal. I discussed with Mr. Friedman the fact that this action arose out of MLCC's decision to make a loan to a Connecticut resident allegedly secured by Connecticut real estate, and that MLCC could not avoid producing a witness just because it had decided, for its convenience, to underwrite Connecticut loans in Florida. Mr. Friedman state that it was MLCC's position that it did not need to produce a witness in every location where a mortgage loan was being foreclosed.

2

9.     Mr. Friedman and I discussed Interrogatory 8 in both conversations. Specifically, we discussed the following:

(a)     Mr. Friedman confirmed that MLCC maintains one or more a compilations of information that could fairly be described as a lending or underwriting manual or guidelines. Though MLCC may refer to it by a different name or names, I will, for convenience sake, refer to it as the "Manual."

(b)     Mr. Friedman asserted that the Manual is kept only in computer form and, apparently, when it is updated no original copies are kept. Thus, Mr. Friedman asserted, it would be unduly burdensome to recreate from its current form the Manual as it existed in 1999. I offered to accept the Manual as it exists today, in order to eliminate any such burden. Mr. Friedman responded that today's version is irrelevant, and declined to produce it.

(c)     Mr. Friedman asserted that the Interrogatory was over-broad, as the Manual dealt with subjects (unspecified by MLCC) that did not relate to this action. I suggested that MLCC produce a table of contents, allowing us to specify the portions that should be produced. Mr. Friedman stated that no table of contents exists, and he did not offer any solutions to MLCC's overbreadth objections.

10.     Annexed hereto as Exhibit F is a true copy of the expert report of Richard Homberger.

Dated:     Westport, Connecticut
           December 3, 2003

Patrick W. Begos (ct19090)
BEGOS & HORGAN, LLP
Attorneys for Plaintiff
327 Riverside Avenue
Westport, CT 06880
(203) 226-9990
(203) 222-4833 (fax)

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was mailed via first class mail, postage prepaid, on December 3, 2003 to:

Thomas P. Friedman, Esq.
Paul, Hastings, Janofsky & Walker, LLP
1055 Washington Boulevard
Stamford, CT 06901-2217

Patrick W. Begos

EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

-------------------------------------------------------------------x

JULIE DILLON RIPLEY MILLER,                  :
                                             :     Case No.03-CV-1016 (RNC)(DFM)
                    Plaintiff,               :
                                             :
          – against –                        :     October 10, 2003
                                             :
MERRILL LYNCH CREDIT CORPORATION,            :
                                             :
                    Defendant.               :

-------------------------------------------------------------------x

## PLAINTIFF'S FIRST SET OF INTERROGATORIES

C O U N S E L :

PLEASE TAKE NOTICE that, pursuant to Rule 33 of the Federal Rules of Civil Procedure, plaintiff hereby requests that defendant answer, separately and fully in writing under oath, each of the following interrogatories, within thirty days after the service of these Interrogatories.

### DEFINITIONS AND INSTRUCTIONS

A.    The definitions and rules of construction set forth in D. Conn. L. Civ. R. 26, shall be incorporated herein by reference.

B.    "MLCC" shall mean defendant, Merrill Lynch Credit Corporation, and its officers, directors, employees, agents and representatives.

C.    "LCS Document" shall mean the document produced in this action by MLCC with bates numbers MLCC001024 through 1053.

D.    "Approval Summary" shall mean the document produced in this action by MLCC with bates number MLCC000417.

E.    "Pledge Approval Summary" shall mean the document produced in this action by MLCC with bates number MLCC000723.

## INTERROGATORIES

1.   Describe MLCC's policies and procedures relating to the creation of the LCS Document.

2.   For each set of initials on the LCS Document (such initials appearing under the column heading "INIT"):

    a.   state the full name of the person to whom the initials refer;

    b.   state the person's title and job description in 1999;

    c.   state whether the person is still employed by MLCC;

    d.   if the person is still employed by MLCC, state his current job title; and

    e.   if the person is not still employed by MLCC, provide his last known address.

3.   For each person who signed the Approval Summary:

    a.   state the full name of the person to whom the initials refer;

    b.   state the person's title and job description in 1999;

    c.   state whether the person is still employed by MLCC;

    d.   if the person is still employed by MLCC, state his current job title; and

    e.   if the person is not still employed by MLCC, provide his last known address.

4.   For each person who signed the Pledge Approval Summary:

    a.   state the full name of the person to whom the initials refer;

    b.   state the person's title and job description in 1999;

    c.   state whether the person is still employed by MLCC;

    d.   if the person is still employed by MLCC, state his current job title; and

    e.   if the person is not still employed by MLCC, provide his last known address.

2

5.  Describe MLCC's policies and procedures concerning applications for construction loans in 1999, including, but not limited to: the information requested from potential borrowers and the procedures, if any, for verifying its accuracy.

6.  Describe MLCC's policies and procedures concerning the approval of construction loans in 1999, including, but not limited to:

    a.  any maximum loan to value ratio;

    b.  any maximum OTI (as that term is used in the Approval Summary);

    c.  any minimum required Disposable Income (as that term is used in the Approval Summary); and

    d.  when exceptions for OTI, LTV, income, credit, tenure, appraisal, or "pymt shock" (as these terms are used in the Approval Summary) can be made and/or are appropriate, and their effect on loan approval;

    e.  when mitigating factors for liquidity, credit, LTV, NSI, job stability, OTI or reserves (as those terms are used in the Approval Summary) will be found, and their effect on loan approval;

    f.  the approvals required for loans up to $7,500,000, including approvals by Senior Underwriters/Lending Officers, CCOs or SVP; and/or Loan Committees.

7.  Describe MLCC's policies and procedures concerning the application for, and/or approval of, a construction and/or mortgage loan when MLCC has concluded the applicant has insufficient Disposable Income (as that term is used in the Approval Summary) to make the monthly loan payments that would be required if the loan is approved.

3

8.      Identify any lending manuals, underwriting manuals or other statements of procedure referring

        or relating to the procedures described in interrogatories 5, 6 and/or 7

9.      State whether MLCC was licensed by the State of Connecticut as a first mortgage lender

        and/or a secondary mortgage lender in 1997 and 1999.

        a.      If the answer is yes, provide a copy of MLCC's application for license.

10.     If the answer to the previous interrogatory is no, state whether MLCC contends that it was

        exempt from licensing pursuant to 36a-487 and/or 36a-512, and, if so, describe the particular

        exemption(s) MLCC contends was applicable.

                                                BEGOS & HORGAN, LLP


                                        By: _____
                                                Patrick W. Begos (ct19090)
                                        Attorneys for Plaintiff
                                        327 Riverside Avenue
                                        Westport, CT 06880
                                        (203) 226-9990
                                        (203) 222-4833 (fax)


                         **CERTIFICATE OF SERVICE**

        This is to certify that a copy of the foregoing was mailed via first class mail, postage prepaid,
on October 10, 2003 to:

Thomas P. Friedman, Esq.
Paul, Hastings, Janofsky & Walker, LLP
1055 Washington Boulevard
Stamford, CT 06901-2217


                                        _____
                                        Patrick W. Begos


                                        4

| EXHIBIT B |
| --- |

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JULIE DILLON RIPLEY MILLER, | CIVIL ACTION NO. 3:03-CV-1016 (RNC) |
| Plaintiff and Counterclaim Defendant, | |
| - against - | |
| MERRILL LYNCH CREDIT CORPORATION, | November 11, 2003 |
| Defendant and Counterclaimant. | |

### DEFENDANT'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Defendant and Counterclaimant Merrill Lynch Credit Corporation ("MLCC"), by and through its attorneys Paul, Hastings, Janofsky & Walker LLP, responds to Plaintiff's First Set of Interrogatories, as follows:

### GENERAL OBJECTIONS

1.    Nothing herein shall be construed as an admission of (i) the admissibility or the relevance of any facts or documents, (ii) the existence of documents or information, or (iii) the truth or accuracy of any characterization or assertion contained in any interrogatory .

2.    MLCC expressly reserves: (i) the right to object to the use of any information provided on the ground of inadmissibility; and (ii) the right to object on any and all proper grounds, at any time, to any other discovery involving or relating to any information provided.

3.    MLCC objects to each instruction, definition and interrogatory to the extent that it imposes, attempts to impose, or purports to impose obligations different from or beyond those

imposed by the Federal Rules of Civil Procedure, the Local Rules of the District of Connecticut, and/or other applicable law.

4.    MLCC objects to each instruction, definition and interrogatory to the extent that it seeks the production of documents or information without time limitations, or for time periods that are irrelevant to the claims at issue in this action.

5.    MLCC objects to each instruction, definition and interrogatory to the extent that the information sought is not in the possession, custody or control of MLCC, and/or cannot be located after a good faith search of those sources and locations likely to have responsive documents or information.

7.    MLCC objects to each instruction, definition and interrogatory to the extent it seeks information or documents subject to the attorney-client privilege, attorney work product doctrine, or any other applicable privilege, that constitute or reflect communication subject to such privilege, or that are encompassed within any other privilege.  Inadvertent production or disclosure of any such information shall not constitute a waiver of any such privilege or immunity, and MLCC reserves the right to demand the return of any such document from, or destruction of any information by, the party to whom it was inadvertently produced.

8.    MLCC objects to each instruction, definition and interrogatory to the extent it does not seek the discovery of facts relevant to the claim or defense of any party and is not material to and/or necessary to the prosecution of this action, or is not reasonably calculated to lead to the discovery of admissible evidence, and to the extent that it is overly broad, ambiguous and/or would impose unreasonable and undue burden and expense on MLCC.

9.    MLCC objects that the interrogatories and their purported subparts exceed the maximum number permitted by the Federal Rules of Civil Procedure.

10.    These general objections are hereby incorporated into each specific response and objection as if fully set forth therein, and citation to a particular general objection in the specific objections below is not a waiver of any general objection not cited therein.

11.    MLCC reserves the right to supplement, correct or amend these responses and objections in the event future discovery or events reveal information or documents that would justify such supplementation, correction or amendment.

## SPECIFIC RESPONSES AND OBJECTIONS

**INTERROGATORY NO. 1:**  Describe MLCC's policies and procedures relating to the creation of the LCS Document.

**Response:**

MLCC hereby incorporates each of the foregoing General Objections into its response to this interrogatory.  Subject to and without waiving its objections, MLCC responds:

There is no formal policy and procedure regarding the LCS Document.  All loans are set up in MLCC's loan tracking system.  The DOCCTL notes are notes entered during the processing stage of the loan.

**INTERROGATORY NO. 2:**  For each set of initials on the LCS Document (such initials appearing under the column heading "INIT"):

a.    state the full name of the person to whom the initials refer;

b.    state the person's title and job description in 1999;

c.    state whether the person is still employed by MLCC;

-3-

d.    if the person is still employed by MLCC, state his current job title; and

e.    if the person is not still employed by MLCC, provide his last known address.

**Response:**

MLCC hereby incorporates each of the foregoing General Objections into its

response to this interrogatory.  MLCC further objects to subsection (b) on the grounds that (i) it

is unduly burdensome; and (ii) it seeks job descriptions that are self-evident from the job titles

provided.  Subject to and without waiving its objections, MLCC responds:

Below is the information for the initials on the LCS Document that could be

identified:

(1) a.  RL = Robert Leroux
   b.  Construction Lending Supervisor
   c.  No
   d.  N/a
   e.  293 Hickory Hollow Drive, South, Jacksonville, Florida  32225

(2) a.  BSD = Bernice Davis
   b.  Construction Lending Associate
   c.  No
   d.  N/a
   e.  206 Hollywood Forrest, Orange Park, Florida  32073

(3) a.  HLR = Harvey Rosenblum
   b.  Construction Lending Officer
   c.  No
   d.  N/a
   e.  2509 St. Johns Blvd, Jacksonville Beach, Florida  32250

(4) a.  AXD = Albert J. Dimoush
   b.  Vice President, Construction Lending Department
   c.  No
   d.  N/a
   e.  122 Oceanwalk Drive South, Atlantic Beach, Florida  32233

(5) a.  MEF = Maureen Foster
   b.  Review Appraiser

   c.  Yes
   d.  Underwriter
   e.  N/a

(6) a.  SYS = System generated note
   b.  N/a
   c.  N/a
   d.  N/a
   e.  N/a

(7) a.  AXJ = Andrew M. Jones
   b.  Underwriter
   c.  No
   d.  N/a
   e.  6624 Lampone Court, Jacksonville, Florida  32244

(8) a.  RKL = Ronschelle Laidler
   b.  Construction Lending Closer
   c.  No
   d.  N/a
   e.  3540 Wentworth Circle West, Jacksonville, Florida  32277

(9) a.  SMH = Shirley Hawk
   b.  Construction Lending Closer
   c.  No
   d.  N/a
   e.  4759 Charwood Drive, Callahan, Florida  32011

(10) a.  C1M = Cindy Miller
   b.  Construction Lending Servicing
   c.  No
   d.  N/a
   e.  12761 Sun Dance Lane, Jacksonville, Florida  32246

(11) a.  AXM = Ayanna Mitchell
   b.  Construction Lending Associate - Disburser
   c.  No
   d.  N/a
   e.  4221 San Bernado Drive, Jacksonville, Florida  32217

(12) a.  CXS = Cathy Strickland
   b.  Construction Lending Supervisor
   c.  No

    d.  N/a
    e.  3874 Chapelgate Road, Jacksonville, Florida  32223

(13) a.  T1Z = Teresa Sheppard
    b.  Construction Lending Associate - Disburser
    c.  No
    d.  N/a
    e.  4360 Sidewater Trail, Middleburg, Florida  32068

(14) a.  JKR = Joseph Kevin Rupinta
    b.  Construction Lending Supervisor
    c.  No
    d.  N/a
    e.  1116 5th Avenue North, Jacksonville Beach, Florida  32250

(15) a.  SZP = Shelley Paulk
    b.  Construction Lending Associate - Servicing
    c.  No
    d.  N/a
    e.  3740 Bessent Road, Jacksonville, Florida  32218

(16) a.  PAH = Peggy Hott
    b.  Specialist
    c.  No
    d.  N/a
    e.  10252 Pine Breeze Road, Jacksonville, Florida  32257

(17) a.  CAD = Candy Drury
    b.  Construction Lending Senior Servicing Specialist
    c.  No
    d.  N/a
    e.  849 West Cumberland Court, Jacksonville, Florida  32259

(18) a.  R1W = Robert Williams
    b.  Specialist
    c.  No
    d.  N/a
    e.  4460 Hodges Blvd., #323, Jacksonville, Florida  32224

**INTERROGATORY NO. 3:**  For each person who signed the Approval Summary:

        a.     state the full name of the person to whom the initials refer;

        b.     state the person's title and job description in 1999;

        c.     state whether the person is still employed by MLCC;

        d.     if the person is still employed by MLCC, state his current job title; and

        e.     if the person is not still employed by MLCC, provide his last known address.

**Response:**

        MLCC hereby incorporates each of the foregoing General Objections into its

response to this interrogatory.  Subject to and without waiving its objections, MLCC responds:

(1) a. Andrew M. Jones
    b. Underwriter
    c. No
    d. N/a
    e. 6624 Lampone Court, Jacksonville, Florida  32244

(2) a. Robert J. Smith
    b. Senior Vice President and Group Manager
    c. No
    d. N/a
    e. 8261 Seven Mile Drive Pointe, Vedra Beach, Florida, 32082

(3) a. Michael A. Johnston
    b. Chairman, President and CEO
    c. No
    d. N/a
    e. 342 Royal Tern Road, Ponte Vedra Beach, Florida  32082

**INTERROGATORY NO. 4:**  For each person who signed the Pledge Approval Summary:

  a. state the full name of the person to whom the initials refer;

  b. state the person's title and job description in 1999;

  c. state whether the person is still employed by MLCC;

  d. if the person is still employed by MLCC, state his current job title; and

  e. if the person is not still employed by MLCC, provide his last known address.

**Response:**

  MLCC hereby incorporates each of the foregoing General Objections into its

response to this interrogatory.  Subject to and without waiving its objections, MLCC responds:

(1) a. Robert J. Smith
 b. Senior Vice President and Group Manager
 c. No
 d. N/a
 e. 8261 Seven Mile Drive Pointe, Vedra Beach, Florida, 32082

(2) a. Michael A. Johnston
 b. Chairman, President and CEO
 c. No
 d. N/a
 e. 342 Royal Tern Road, Ponte Vedra Beach, Florida  32082

3) a. Rebeka Land
 b. Securities Based Lending Officer
 c. No
 d. N/a
 e. 305 Branch Wood Lane, Jacksonville, Florida  32256

4) a. Heather McKeown
 b. Securities Based Lending Supervisor
 c. Yes
 d. Securities Based Lending Assistant Vice President
 e. N/a

**INTERROGATORY NO. 5:** Describe MLCC's policies and procedures concerning applications for construction loans in 1999, including, but not limited to: the information requested from potential borrowers and the procedures, if any, for verifying its accuracy.

**Response:**

MLCC hereby incorporates each of the foregoing General Objections into its response to this request. MLCC further objects to this interrogatory in that it is vague and unduly burdensome in that it purports to seek information concerning "policies and procedures" concerning applications for construction loans in 1999, and without further explanation regarding the information sought, the interrogatory is unanswerable. MLCC further objects to this interrogatory to the extent it purports to be a single interrogatory under the Federal Rule of Civil Procedure – the "including but not limited to" clause of this interrogatory alone consists of at least two distinct questions, demonstrating the vagueness and over-breadth of the Interrogatory.

**INTERROGATORY NO. 6:** Describe MLCC's policies and procedures concerning the approval of construction loans in 1999, including, but not limited to:

      a.     any maximum loan to value ratio;

      b.     any maximum OTI (as that term is used in the Approval Summary);

      c.     any minimum required Disposable Income (as that term is used in the Approval Summary); and

      d.     when exceptions for OTI, LTV, income, credit, tenure, appraisal, or "pymt shock" (as these terms are used in the Approval Summary) can be made and/or are appropriate, and their effect on loan approval;

e.    when mitigating factors for liquidity, credit, LTV, NSI, job stability, OTI or reserves (as those terms are used in the Approval Summary) will be found, and their effect on loan approval;

f.    the approvals required for loans up to $7,500,000, including approvals by Senior Underwriters/Lending Officers, CCOs or SVP; and/or Loan Committees.

**Response:**

MLCC hereby incorporates each of the foregoing General Objections into its response to this interrogatory. MLCC objects to this interrogatory as plainly overbroad and unduly burdensome in that it seeks a brief written explanation of a significant and complex portion of MLCC's operations. MLCC further objects to this interrogatory on the ground that it purports to be a single interrogatory under the Federal Rules of Civil Procedure. Subsections (a), (b) and (c) are each distinct interrogatories. Subsections (d) and (e) each consist of numerous distinct interrogatories. MLCC further objects to this "Interrogatory" on the ground that it assumes that there is a specific "maximum" or "minimum" figure for a particular variable that is required or accepted by MLCC in any specific lending decision, or that any single factor would or would not "mitigate" a risk or justify an "exception" to one of MLCC's underwriting guidelines. Subject to and without waiving its objections, MLCC responds:

Besides complying with applicable laws, MLCC extends credit based on the application of guidelines and discretion, not requirements. MLCC's lending decisions are neither mechanical, not driven by a single factor. MLCC's lending decisions require that MLCC and its employees apply discretion in balancing the many variables that are material to any specific lending decision. MLCC further responds:

-10-

a.    There was no maximum loan to value ratio for MLCC's extension of
constructions loans in 1999.  As a general matter, under the Mortgage 100
program, in the absence of mitigating factors such as additional collateral,
MLCC considered extending 100% of the lesser of the cost to complete a
construction project or the appraised fair market value, as completed.

b.    There was no maximum OTI as that term is used in the Approval
Summary.  As a general matter, in the absence of mitigating factors such
as liquidity, MLCC sought to limit Obligations to Income to 50%.

c.    There was no minimum Disposable Income as that term is used in the
Approval Summary.  Like many underwriting variables, consideration of
Disposable Income required the application of the discretion of MLCC
and its employees in the context of a particular credit decision.

d.    Exceptions for OTI, LTV, income, credit, tenure, appraisal and payment
shock were determined in the discretion of MLCC and its underwriters.  In
reaching a credit decision, exceptions, which generally have a negative
impact on an application, and mitigating factors, which generally have a
positive impact on an application, were considered in conjunction with
one another and other underwriting variables in the context of the
applicant's overall financial position and the entire loan scenario.

e.    Mitigation for OTI, LTV, income, credit, tenure, appraisal and payment
shock were determined in the discretion of MLCC and its underwriters.  In
reaching a credit decision, mitigating factors, which generally have a

-11-

positive impact on an application, and exceptions, which generally have a

negative impact on an application, were considered in conjunction with

one another along with other underwriting variables in the context of the

applicant's overall financial position and the entire loan scenario.

f.     Loans up to $5,000,000 required the approval of MLCC's Loan

Committee.  Loans up to $10,000,000 required the approval of MLCC's

Chief Executive Officer.  These approvals were exclusive.

**INTERROGATORY NO. 7:**  Describe MLCC's policies and procedures concerning the

application for, and/or approval of, a construction and/or mortgage loan when MLCC has

concluded the applicant has insufficient Disposable Income (as that term is used in the Approval

Summary) to make the monthly loan payments that would be required if the loan is approved.

**<u>Response</u>:**

MLCC hereby incorporates each of the foregoing General Objections into its

response to this interrogatory.  MLCC further objects to this interrogatory on the ground that it

assumes that any single factor is determinative in MLCC's decision making process to extend

credit in any particular instance.  Subject to and without waiving its objections, MLCC responds

that Disposable Income is one of many variables considered by MLCC in its lending decisions

and that these decisions are neither mechanical, nor driven by a single variable, such as

Disposable Income.

**INTERROGATORY NO. 8:**  Identify any lending manuals, underwriting manuals or other statements of procedure referring or relating to the procedures described in interrogatories 5, 6 and/or 7.

**Response:**

MLCC hereby incorporates each of the foregoing General Objections into its response to this interrogatory.  MLCC objects to this interrogatory on the ground that it plainly seeks confidential and proprietary information.  Without an appropriate confidentiality order, MLCC will neither identify, nor provide lending manuals, underwriting manuals or other statements of procedure.

**INTERROGATORY NO. 9:**  State whether MLCC was licensed by the State of Connecticut a first mortgage lender and/or a secondary mortgage lender in 1997 and 1999.

a.      If the answer is yes, provide a copy of MLCC's application for license.

**Response:**

MLCC hereby incorporates each of the foregoing General Objections into its response to this interrogatory. MLCC further objects to subsection "a." of this Interrogatory as not reasonably calculated to lead to admissible evidence.  Subject to and without waiving its objections, MLCC responds:

Yes.  MLCC was licensed by the State of Connecticut as a first mortgage lender and a secondary mortgage lender in 1997 and 1999.

-13-

**INTERROGATORY NO. 10:**  If the answer to the previous interrogatory is no, state whether

MLCC contends that it was exempt from licensing pursuant to 36a-487 and/or 36a-512, and, if

so, describe the particular exemption(s) MLCC contends was applicable.

**Response:**

        MLCC's answer to Interrogatory No. 9 is yes.

Dated: November 11, 2003
Stamford, Connecticut

                            PAUL, HASTINGS, JANOFSKY & WALKER LLP

           By:     *Thomas P. Fried*

                           Douglas C. Conroy, ct11555
                           Thomas P. Friedman, ct24947
                           1055 Washington Boulevard
                           Stamford, CT  06901-2217
                           Telephone:  (203) 961-7400
                           Facsimile:   (203) 359-3031
                           Email:   douglasconroy@paulhastings.com
                                   thomasfriedman@paulhastings.com

                           Counsel for Defendant and Counterclaimant
                           MERRILL LYNCH CREDIT CORPORATION

NOV-11-2003  15:29    M   REDIT CORP                    904 218 8848    P.02/02

## VERIFICATION

STATE OF FLORIDA            )
                            )    ss.: Jacksonville
COUNTY OF Duval             )

Donald McEnerney, being duly sworn, deposes and says:

On behalf of the Defendant in this action, I have read the foregoing DEFENDANT'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, and based upon my personal knowledge and a review of business records, it is true to the best of my knowledge, except as to matters stated to be alleged upon information and belief, and as to those matters, I believe it to be true.

_____
Donald McEnerney

Sworn to before me this
10th day of November , 2003

_____
Notary Public/Commissioner of
Superior Court

Holly H. Mruz
MY COMMISSION # DD158423 EXPIRES
November 21, 2006
BONDED THRU TROY FAIN INSURANCE INC.

-15-

TOTAL P.02

## CERTIFICATE OF SERVICE

This is to certify that on this 12th day of November, 2003, a copy of the foregoing

Defendant's Responses and Objections to Plaintiff's First Set of Interrogatories was delivered via

U.S. first class mail to:

> Patrick W. Begos, Esq.
> BEGOS & HORGAN, LLP
> 327 Riverside Avenue
> Westport, CT 06880

_Thomas P. Friedman_

Thomas P. Friedman

STM/261827.1
11413.00021

-16-

EXHIBIT C

12/02/2003

**From:**  BEGOS
**To:**  "Friedman, Thomas P." <thomasfriedman@paulhastings.com>
**Sent:**  11/12/2003 12:29PM
**Subject:**  RE: Re: MLCC/Miller

Here is a pretty standard confidentiality agreement, which I have used in the past.

Patrick W. Begos
Begos & Horgan, LLP
NY and CT
pwb@begoshorgan.com
http://www.begoshorgan.com
Member, Riverside West, LLC
http://www.riversidewest.net


--- Original Message---
To: "'pwb@begoshorgan.com'"
From: "Friedman, Thomas P."
Sent: 11/12/2003 11:06AM
Subject: Re: MLCC/Miller

>> I will send attachment a when I get back to the office. If you have a
>> confidentiality order, please send it.
>>
>> Tom
>> -------------------------
>> Sent from my BlackBerry Wireless Handheld
>>
>> _____
>> This message is sent by a law firm and may contain information that is
>> privileged or confidential. If you received this transmission in error,
>> please notify the sender by reply e-mail and delete the message and any
>> attachments.
>>
>> For additional information, please visit our website at www.paulhastings.com.
>>
>>
>>

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------------------------------x

JULIE DILLON RIPLEY MILLER,                    :

              Plaintiff,                               :    Case No.03-CV-1016 (RNC)(DFM)

                             :

          – against –                          :    November 12, 2003

                             :

MERRILL LYNCH CREDIT CORPORATION,               :

                             :

           Defendant.                               :

---------------------------------------------------------------x

## STIPULATION REGARDING CONFIDENTIALITY

IT IS HEREBY STIPULATED AND AGREED by the parties hereto through their undersigned counsel, that:

1.    In connection with discovery proceedings in the above-captioned action (the "Litigation"), the parties have agreed to treat as confidential: (a) MLCC's lending manuals, underwriting manuals and/or other statements of procedure; and (b) other documents which either party reasonably believes contains confidential and/or proprietary information ("Confidential Material").

2.    Documentary or written discovery material shall be designated confidential by marking or stamping the material "Confidential." Testimony at a deposition may be designated confidential by a statement to that effect at the time of the giving of such testimony or by written notice within five (5) days of receipt of a deposition transcript.

3.    Confidential Material shall be used by the parties to this action solely for the purposes of preparing for and conducting the Litigation, and shall not be disclosed to any person except:

    a.    any named party to the Litigation, or his, her or its representatives;

b.    counsel of record to the parties in the Litigation and attorneys, clerical, paralegal and secretarial staff regularly employed by such counsel;

c.    the Court and its officers;

d.    any stenographer or court reporter transcribing or recording the testimony at a hearing, trial or deposition in the Litigation;

e.    any trial and/or deposition witness, for the purpose of conducting his examination in this Litigation;

f.    any expert retained by counsel in connection with the Litigation; and

g.    any other person as to whom the producing party agrees in writing.

4.    If any party objects to the designation of any Discovery Material as "Confidential," the party shall state the objection by writing to counsel for the party making the designation. If the parties are then unable to resolve the objection, any party may move the Court to do so. Until the Court rules on any such motion, the Confidential Material shall continue to be treated as such under the terms of this Stipulation.

5.    Each person entitled to access to Confidential Material or information derived therefrom pursuant to this Stipulation shall be bound by the terms of this Stipulation. Each such person shall receive a copy of the Stipulation and be advised that the material or information is being disclosed pursuant and subject to its terms and may not be disclosed other than pursuant to the terms set forth herein. Each person to whom Confidential Material has been disclosed prior to the date of this Stipulation shall promptly be sent a copy of this Stipulation and shall promptly be advised that such material or information shall thereafter be subject to its terms and not disclosed other than pursuant to the terms set forth herein.

2

6.  In the event that any person or party subject to this Stipulation having possession, custody or control of any Confidential Material receives from a non-party a subpoena or other process or order to produce such information, such person or party shall promptly send notice and a copy of said subpoena, process or order by hand delivery to the attorneys of record of the party producing such Confidential Material. The person or party receiving the subpoena shall cooperate with the party whose interest may be affected in defending against such subpoena, process or order and in good faith provide ample opportunity for the submission of a defense against such subpoena, process or order. The party producing the Confidential Material shall have the burden of defending against such subpoena, process or order.

7.  Within sixty (60) days after termination of this Litigation, counsel and any experts retained by counsel shall return all Confidential Material to counsel for the producing party, or, in lieu thereof, certify in writing that such Confidential Material has been destroyed.

8.  Entering into, agreeing to and/or producing or receiving materials or otherwise complying with the terms of this Stipulation shall not:

    a.  operate as an admission by any party that any particular Confidential Material contains or reflects trade secrets, proprietary or sensitive commercial information or other confidential matter; or

    b.  prejudice in any way the rights of any party to object to the production of documents it considers not subject to discovery, or operate as an admission by any party that the restrictions and process set forth herein constitute adequate protection for any particular information deemed by such party to be confidential; or

3

    c.      prejudice in any way the rights of any party to object to authenticity or admissibility into

evidence of any document covered under the terms of this Stipulation; or

    d.      prejudice in any way the rights of a party to seek a Court determination whether such

material should be subject to the terms of this Stipulation.

9.    Any party may move the Court for a modification of this Stipulation at any time upon notice

to all parties.

10.    This Stipulation shall remain in force and effect until modified, superseded, or terminated by

consent of all parties or by order of the Court made upon motion, with notice.

PAUL, HASTINGS, JANOFSKY &amp;    BEGOS &amp; HORGAN, LLP
WALKER, LLP


By:_____    By:_____
    Thomas P. Friedman, Esq.         Patrick W. Begos (ct19090)
Attorneys for Defendant             Attorneys for Plaintiff
1055 Washington Boulevard        327 Riverside Avenue
Stamford, CT 06901-2217          Westport, CT 06880
(203) 961-7400                 (203) 226-9990
(203) 359-3031 (fax)           (203) 222-4833 (fax)

EXHIBIT D

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

--------------------------------------------------------------------x

JULIE DILLON RIPLEY MILLER,      :

                                :    Case No.03-CV-1016 (RNC)(DFM)

        Plaintiff,            :

                                :

      – against –          :    November 17, 2003

                                :

MERRILL LYNCH CREDIT CORPORATION,   :

                                :

        Defendant.          :

--------------------------------------------------------------------x

### NOTICE OF DEPOSITION

COUNSEL:

    PLEASE TAKE NOTICE THAT, pursuant to Fed. R. Civ. P. 30, the undersigned attorneys for plaintiff will take the deposition(s) of one or more officers, directors or managing agents of defendant, Merrill Lynch Credit Corp ("MLCC"), or other persons who consent to testify on MLCC's behalf, concerning the matters set forth below. The deposition(s) will be taken before officer(s) authorized to administer oaths, at the offices of Begos & Horgan, LLP, 327 Riverside Avenue, Westport, Connecticut, beginning on December 1, 2003, at 9:30 a.m., and will continue from day to day until completed. The testimony will be recorded by stenographic means.

1.    MLCC's underwriting policies, procedures and guidelines in 1999;

2.    The underwriting and approval of the $7,500,000 loan to plaintiff that is the subject of this action ("Loan"), including, but not limited to:

    a.    The preparation and content of the following documents: Underwriting Worksheets (MLCC 418 and 419); Source of Funds Worksheets (MLCC720-722); Mortgage 100 Securities Worksheet (MLCC 725); Approval Summary (MLCC 417); Securities Based Lending Pledge Approval Summary (MLCC 723); Oscar Pre-Closing Exception Report (MLCC314);

    b.    The analysis of Ms. Miller's income;

3.    The appraisal(s) of the property at 21 Point Road conducted by or for MLCC;

4.    MLCC's review and/or approval of the Power of Attorney dated December 2, 1999, including but not limited to the copies produced at MLCC307-309 and MLCC327;

5.    Communications between MLCC and Kevin Huben concerning the Loan;

6.    MLCC/Margin Department Collateral Calls issued in connection with the Loan;

7.    Ms. Miller's loan application that was the subject of the Statement of Credit Denial (MLCC1819-20);

8.    Any alleged default on the Loan, and workout steps taken by MLCC in response to such alleged default;

9.    MLCC's directions to Merrill Lynch Pierce Fenner & Smith concerning account 5AX-12860, including, but not limited to, any directions to prevent plaintiff from withdrawing funds, and the direction to sell assets in or about February 2003.


BEGOS & HORGAN, LLP


By: _____
        Patrick W. Begos (ct19090)
        Christopher G. Brown, Esq. (ct 18216)
Attorneys for Plaintiff
327 Riverside Avenue
Westport, CT 06880
(203) 226-9990
(203) 222-4833 (fax)

2

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was mailed via first class mail, postage prepaid, on November 17, 2003 to:

Thomas P. Friedman, Esq.
Paul, Hastings, Janofsky & Walker, LLP
1055 Washington Boulevard
Stamford, CT 06901-2217

Patrick W. Begos

3

EXHIBIT E

**Paul Hastings**

Paul, Hastings, Janofsky & Walker LLP
1055 Washington Boulevard, Stamford, CT 06901-2216
telephone 203-961-7400 / facsimile 203-359-3031 / internet www.paulhastings.com

Atlanta
Beijing
Hong Kong
London
Los Angeles
New York
Orange County
San Diego
San Francisco
Stamford
Tokyo
Washington, D.C.

(203) 961-7498
thomasfriedman@paulhastings.com

November 19, 2003                                                                                                   11413.00021

**VIA FACSIMILE AND U.S. MAIL**

Patrick W. Begos, Esq.
Begos & Horgan, LLP
327 Riverside Avenue
Westport, Connecticut 06880

Re:    <u>Julie Dillon Ripley Miller v. Merrill Lynch Credit Corporation ("MLCC")</u>

Dear Patrick:

We are in the process of locating corporate representatives in response to Plaintiff's Notice of Deposition dated November 17, 2003.  Given the scope of the subjects designated for questioning, MLCC will likely need to produce more than one employee.  Further, we object to the location of the deposition(s) in Westport, Connecticut, as Defendant's employees likely to have knowledge on the designated subjects live and work in the Jacksonville, Florida area.

Second, MLCC is supplementing its objections to Interrogatory No. 8 of Plaintiff's First Set of Interrogatories in that it is vague, overbroad and unduly burdensome, in part, for the reasons identified in MLCC's objections to Interrogatories 5, 6 and 7.

We will be in touch shortly regarding additional discovery issues that you have raised.

Sincerely,

*Thomas P. Fried*

Thomas P. Friedman
of PAUL, HASTINGS, JANOFSKY & WALKER LLP

cc:    Douglas C. Conroy, Esq.
STM/262413.1
11413.00021

EXHIBIT F

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------------------------------------x

JULIE DILLON RIPLEY MILLER,                 :

          Plaintiff,                    :        Case No.03-CV-1016 (RNC)(DFM)

                                  :

      – against –                        :        November 26, 2003

                                    :

MERRILL LYNCH CREDIT CORPORATION,           :

          Defendant.                    :

------------------------------------------------------------------x

## EXPERT DISCLOSURE

Plaintiff, Julie Dillon Ripley Miller, hereby discloses, pursuant to Fed. R. Civ. P. 26(a)(2), that

Richard J. Homberger may be used at trial to present evidence under Rules 702, 703 or 705 of the

Federal Rules of Evidence. Mr. Homberger's expert report is attached hereto

BEGOS & HORGAN, LLP

By: _____

       Patrick W. Begos (ct19090)
       Christopher G. Brown, Esq. (ct 18216)
Attorneys for Plaintiff
327 Riverside Avenue
Westport, CT 06880
(203) 226-9990
(203) 222-4833 (fax)

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was mailed via first class mail, postage prepaid,
on November 26, 2003 to:

Thomas P. Friedman, Esq.
Paul, Hastings, Janofsky & Walker, LLP
1055 Washington Boulevard
Stamford, CT 06901-2217

_____
Patrick W. Begos



The following is provided as my expert report in the matter of Dillon Ripley Miller vs Merrill Lynch Credit Corporation. This testimony generally concerns the circumstances of the mortgage provided to Julie Dillon Ripley Miller on residential real estate located at 21 Point Road, Norwalk, CT on December 7,1999:

## MORTGAGE UNDERWRITING PRACTICES

### Standard Mortgage Industry Practices

While Freddie Mac/Fannie Mae guidelines, requirements and recommendations regarding the underwriting process are considered to be the mortgage industry standard for mortgage practices, most lenders have adopted specific guidelines, requirements and procedures which are specially adapted to their individual organization. My understanding is that as of the date of this report Merrill Lynch Credit Corporation (MLCC) has not produced its Loan Manual or Underwriting Guidelines or any other material detailing MLCC loan procedures, other than the information contained in the MLCC Interrogatories. Therefore, I cannot draw any conclusions about the extent to which MLCC follows FNMA/FHLMC and/or Industry standards, particularly with respect to the respective responsibilities of the Financial Consultant, the processing and underwriting staff, documentation procedures, underwriting guidelines, quality control or any other areas of concern regarding the processing and underwriting of investment quality mortgages. Nor can I draw any conclusions about the extent to which MLCC followed, or did not follow, its own procedures and guidelines in connection with this loan. For the purposes of this report, I have relied on FNMA/FHLMC guidelines and standard secondary mortgage market requirements in order to examine procedures of Merrill Lynch Credit Corporation (MLCC) in terms of general conformity with standard secondary market practices. If I receive any additional documents or information regarding MLCC's practices in the future, I reserve the right to modify or supplement my opinions.

### The Three C's of Credit Underwriting

The goal of underwriting is the determination of the borrower's credit worthiness or risk to insure that proposed mortgage loans are of investment quality. In order to determine the investment quality of a specific mortgage, lenders must use objective criteria to evaluate the applicant's Credit, Capacity to repay the loan, and the investment quality and value of the available Collateral. These are generally referred to as the "Three Cs" of underwriting.

*Credit* is used to determine the applicant's willingness and ability to repay the debt under the terms of the loan. Towards this end, a credit report is generally obtained from one or more of the credit-repositories which provide credit reports to lenders. Most lenders require a triple-merged residential mortgage report which contains credit (FICO) scores (obtained from three independent credit bureaus) that assigns a numeric value to the borrower's credit history.




*Capacity* is used to determine the borrower's ability and willingness to repay the proposed debt. It is determined by verifying and evaluating the applicant's employment, income, assets, liabilities and net worth. This information is generally collected by the loan originator, compiled by the loan Processor and ultimately reviewed by an Underwriter before making an underwriting decision.

*Collateral* generally consists of residential real estate that is pledged as security for satisfaction of the mortgage debt, but may also include other pledged assets. The collateral must be deemed to be of investment quality, providing sufficient value to recover the lender's investment if default occurs.

 The mortgage industry standard for residential real estate is the completion of at least one appraisal by a certified and licensed appraiser on the specific appraisal form (i.e. Fannie Mae or Freddie Mac) and all applicable addenda, schedules and exhibits. The appraisal should be done within 120 days of the closing and must be performed by an appraiser with no financial interest in the transaction.

The appraisal(s) must be reviewed by the underwriter for accuracy and completeness, with special emphasis on the comparable sales used to derive a market valuation.  Some of the variables used to determine the appropriateness of the comparables are proximity to the subject property, the amount of adjustments required to compensate for structural differences between the subject and comparables, and timing differences between the sale dates of the subject and comparables.

Special consideration must be given to properties which are subject to appraisal upon completion, i.e. construction loans. Construction loans carry more risk both in terms of appraisal valuation based on plans and specifications, and credit risk due to cost overruns, compliance with local building codes and zoning requirements.

**Documentation**

Types of underwriting review generally fall into several categories based on the amount of documentation and verification required. These may be summarized as follows:

1    Full Documentation—referring to loans that document credit information using standard Fannie Mae/Freddie Mac forms for Verification of Employment, Deposit and Mortgage. These forms are sent directly by the lender to the applicant's employer, depository and existing mortgagor.

2    Alternative Documentation—referring to loans which rely on documentation of the applicant's credit information by applicant-provided documents such as paystubs and bank statements.

3    Reduced Documentation—referring to loans which allow applicants with difficult-to-document income (e.g. self-employment or passive income



sources) to be qualified with limited income and employment documentation. Due to the reduced requirement for documentation of income, these loans rely more on the collateral provided as security for the loan.

4          Speciality Reduced Documentation—referring to loans which vary according to the level of required disclosure of income and/or assets and verification of the applicant's' credit information. These loan types are known variously as Stated Income/Stated Asset, No Income /No Asset , No Ratio, Streamlined, etc.  Again, because these types of loans rely less on verification of income, the emphasis of the underwriting review is on the analysis of the collateral. In general, these "no income verification" loans require that the lender verify employment but not income. Income which appears on the borrower's application must be deemed to be "reasonable" for the borrower's occupation. Applications which contain overstated income -- which overstatement the lender has verified from tax returns or other means -- may be considered fraudulent and are not eligible for this type of loan product

**Exceptions/Compensating Factors/Approval Procedures**

Deficiencies in Credit, Capacity or Collateral are considered "exceptions" to the FNMA/FHLMC guidelines or the lender's internal guidelines. Exceptions may be offset by "compensating" or "mitigating" factors. To the extent that a loan application does not conform to a lender's guidelines or requirements, it is industry practice to document in the loan file any information used to support the decision, including the nature of the exception, all compensating or mitigating factors, and the overall justification regarding the underwriting decision.

Exceptions to policy and compensating factors are generally specified on a FNMA Transmittal Summary (form1008) or the lender's own Approval Summary, which becomes the basis for the underwriting decision and approval (or decline).

**Other Underwriting Issues**

The Underwriter (or Processing staff) must take such measures as deemed necessary by the Lender to assure that the possibility of fraud is minimized. Fraud is an act of intentional misrepresentation, concealment or omission of the truth for the purpose of deception or manipulation with the intention of taking advantage of another. The presence of one or more fraud indicators or "red flags" may not indicate fraud, but a pattern may emerge to which the underwriter and Lender should be sensitive.

The Lender must also assure that the loan conforms with all federal and state compliance requirements, in particular, Good Faith Estimates and Truth in Lending disclosures. The TIL Statement specifically requires that the borrower be given the basic terms and conditions of the loan including any pledged collateral.



## ANALYSIS OF MLCC CREDIT PROCEDURES

I have reviewed the following documents for the purpose of evaluating the MLCC underwriting and processing procedures in connection with the loan provided to Julie Dillon Ripley Miller on 12/7/1999:

Merrill Lynch Loan Application (undated)
Commitment Letter (dated 11/17/1999)
Tax Returns for 1996 through 1999
Merrill Lynch Pierce Fenner and Smith (MLPFS) Priority Client statements (through 8/31/1999)
Underwriting Worksheet (dated 11/17/1999)
Approval Worksheet (dated 11/17/1999)
Appraisals
Docctl Notes
Credit Report

Merrill Lynch Mortgage Application # 4312716 indicates that the applicant, Julie D. Miller, applied for a $6,200,000 Construction-Permanent Loan from MLCC. The MLCC Approval Summary in connection with this loan application indicates that a counteroffer in the amount of $7,500,000 was approved on 11/1799 and 12/1/99. The following factors directly affect the investment quality of the subject loan and provide insight into the overall underwriting policies of MLCC:

### Credit

The MLCC Approval Summary indicated "Credit" as an "Exception". Specifically, it listed a Credit Score of 620 which is considered "marginal". Marginal credit (i.e. below average or substandard) generally requires additional mitigating factors to offset the additional risk associated with loans to borrowers with a history of credit issues.

### Capacity

The application does not include any information regarding Ms. Miller's income, debts or assets. It refers to the applicant's tax return for income substantiation, "print-outs" for asset verification and "credit report" for information on "Outstanding Credit Obligations". I have reviewed Ms. Miller's Tax Returns, MLPF&S statements, and credit report in order to attempt to determine her capacity to repay this loan.

Standard secondary mortgage market procedures require that a borrower "must have a history of receiving stable income from employment or other sources and a reasonable expectation that the income will continue to be received in the foreseeable future (usually three years)." (FNMA Section 401)

4



*Ms. Miller's Capacity*

My review of Ms. Miller's tax returns for 1998, 1997 and 1996, and her MLPFS brokerage statements for the 12 months preceding December 1999, indicate that Miller's stable and verifiable income consisted solely of interest and dividends which were derived from the assets at MLPFS.

Ms. Miller's annual income from interest and dividends totaled $230,498 and $259,918 respectively, according to her 1997 and 1998 tax returns. For underwriting purposes, therefore, Ms. Miller's stable, verifiable income was $21,434 per month. It is also reasonable to calculate year-to-date income based on the statements of Estimated Annual Income in the MLPFS statements in addition to actual income verified on the 1997 and 1998 Tax Returns. [?YTD Income was] According to the MLPFS statement dated August 31, 1999, Ms. Miller's Estimated Annual Income for 1999 was $236,057, and therefore could be considered immaterial in terms of providing additional verifiable income.

The Capital Gains reported on Ms. Miller's 1998 1040 tax return in the amount of $2,414,704 cannot be considered stable reoccurring income. Capital Gains, which are by their nature non-recurring, are generally not considered stable income unless substantiated by two or more years' tax returns. In this regard, FNMA Section 503.04 provides:

> Income received from a capital gain is generally a one-time transaction; therefore, it should not be usually considered as part of the borrower's stable monthly income. However, if the income calculated on the Capital Gains and Losses (Schedule D) shows that the borrower has realized capital gains for the last two years, the recurring gains may be considered in determining the borrower's stable monthly income—as long as the borrower provides evidence that he or she owns additional assets which can be sold if extra income is needed to make future mortgage payments.

Ms. Miller's 1998 Capital Gains are the result of the liquidation of low-basis equities which the Ms. Miller inherited and which could not be relied on to continue. Ms. Miller's deposition demonstrates that she had no intention selling any more of her low-basis equities.

Therefore, in my opinion, based on my review of the applicant's tax returns and Merrill Lynch Priority Client Services monthly statements, income in the range of $21,611 to $22,500 could appropriately have been considered stable monthly income as of December 1999.



*MLCC's Calculation of Ms. Miller's Capacity*

In contrast, MLCC calculated an income figure of $69,679 per month on its November 17, 1999 Underwriting Sheet. It did so: (i) by arbitrarily allocating an "Opportunity Cost" of 6.1% on $5,021,900 in "pledged" funds; and (ii) by performing what appears to be an annuity calculation on $5,198,748 in "IRA" funds, at 6.1% compounded annually and disbursed in equal monthly payments over 180 months. The Income on the Underwriting Sheet was then apparently re-computed and reduced from $69,679/month to $63,576/month.

Use of such projected income calculations significantly overstates Ms. Miller's actual income and is not in compliance with industry underwriting practice. As discussed above, the MLPFS statements stated Ms. Miller's assets were earning only $236,057 per year or $ 19,671 per month, which is less than 30% of the income figure MLCC calculated.

The inflated nature of that income calculation loan is further underscored by the use of much lower income calculations from the 2001/2002 Underwriting Worksheets prepared by MLCC in connection with an application to refinance the 1999 loan. Specifically, underwriting Worksheets #7276336 and 6020457 indicate that MLCC determined Ms. Miller's monthly income to be $22,500 in 2001 and $21,611 (plus "Opp. Cost" of $11,249 for a total of $32,860) in 2002. These Underwriting Worksheets were prepared in 2001 and 2002 in connection with a $5,000,000 mortgage application which was ultimately declined on April 10, 2002, citing insufficient income.

The MLCC Approval Summary indicates that Ms. Miller had income of $69,679/month, a proposed monthly housing expense (which would be the payment on the $7,500,000 loan under consideration) of $50,781/month, and other monthly liabilities of $13,045/month. The monthly income was apparently derived from the Underwriting Worksheet but both documents contain cross-overs and there are discrepancies as to the borrower's income.

From these estimates -- including the unsubstantiated "monthly income" figure -- MLCC calculated an OTI (Obligations to Income)of 92% (which was crossed out and re-calculated at 100%) and a disposable income of an amount which appears to be **negative** $250.00/month. OTI is a MLCC approximation of the total debt to income ratio which is used by the mortgage industry to determine capacity to repay the loan. Industry standards (i.e. FNMA and FHLMC) typically refer to an acceptable total Debt-To-Income ratio in the range of 36% to 38%. Total Debt-To-Income ratios may be expanded to 50% to 55% if certain compensating or mitigating factors are present. However, under no circumstances can the total Debt-To-Income ratio or OTI approach (or exceed) 100% for the simple reason that the borrower's monthly obligations will exceed their monthly income making default all but inevitable.

Using Ms. Miller's properly calculated stable, verifiable income (of approximately $22,000 per month), the true OTI or Debt-To-Income for this loan was more than 290%.



The excessive and unacceptable OTI is further undermined by the difficulty in establishing stable, verifiable income. Although not specifically mentioned as an exception on the Approval Summary, the impact of "payment shock" (i.e. a greater than 50% increase in the monthly housing payment), and the lack of any demonstrated ability of the borrower to carry the increased level of debt, is also a significant indicator of future inability to service the new loan.

Finally, as discussed above, Ms. Miller's credit score was marginal. Underwriters generally may not use low OTI or Debt-to-Income ratios (which are certainly not present here), reserves (or liquidity) or low Loan-to-Value to offset unacceptable credit. In some cases, good credit (i.e. credit score of 660 or greater) can be used as a mitigating factor to offset OTI or Debt-to-Income ratios of greater than 28%/36%. In this case an OTI of 92% or 100.4% (as calculated by MLCC) or 290% (as calculated by the undersigned) cannot be mitigated by any compensating factors.

Thus, it is obvious that based on a reconstruction of Ms. Miller's actual cash flow at the time of the loan approval in November 1999, Ms. Miller could not reasonably be expected to be capable of making the monthly payments on this loan.

**Collateral**

This file is particularly noteworthy in that the appraised value of the property is significantly lower than the borrower's estimate. The appraisal summary (on the Approval Summary) states that the borrower's estimated market value was $6,200,000 while the lesser of the two MLCC appraisals was $3,800,000. In addition to the substantial discrepancy between the applicant's estimate and the appraisals, the appraisals contained material exceptions to generally accepted appraisal standards in terms of the comparables used. As indicated on the Approval Summary, several of the comparables were actually not comparable at all due to distance (actually in different towns) and other adjustments that exceeded the normal guidelines of Freddie Mac/Fannie Mae and most other mortgage investors.

In good conscience, the lender should have informed the borrower of the appraisal discrepancy because it impacts the amount of pledged assets required and the ability to restructure or refinance the loan or sell the property in the future.

Coupled with the credit and capacity issues addressed above, and the additional risk associated with construction loans the discrepancy between the appraisal and the borrower's estimate of the subject property represents a significant risk factor which should have been addressed by the lender.
I conclude that these appraisals were flawed by use of inappropriate comparables and that the MLCC underwriting decision disregarded these defects. Instead the use of pledged MLPFS securities were used as compensating factors to assure repayment of the loan.





**Analysis of MLCC Approval Summary:**

The MLCC Approval Summary (dated 11/17/1999) contains the underwriter's assessment of the borrower's income, assets and liabilities and expenses, and the requisite signatures needed for loan approval. The Approval Summary enumerates the following "Exceptions":

> OTI
> Income
> Credit

Based on my review of the file, I would add that this Approval Summary is deficient in not listing "Appraisal" and "Payment Shock" as additional exceptions, which are material risk factors and which are notable for their absence.

The level of "payment shock" is truly extraordinary. The borrower contemplated moving from a residence with a $145,000 mortgage to a new home with a $1,350,000 mortgage which then becomes a $7,500,000 obligation.

Mitigating Factors on the Approval Summary were identified as Liquidity, NSI and Reserves.

The Total Monthly Income figures were inflated, resulting in an understated OTI and overstated Disposable Income. Further, the Approval Summary contains cross-outs of the Loan Amount, OTI and Disposable Income which were not initialed by any of the parties approving the loan.


**Power of Attorney**

Regarding the Power of Attorney, most lenders and investors will accept a Limited (or Specific) Power of Attorney that references the property and authorizes the attorney–in-fact to enter into a real estate transaction and to mortgage the property. Because the 1999 loan included a purported pledge of securities, the Power of Attorney form would also have to authorize the attorney-in-fact to execute the Pledge Agreement. In addition, if the loan documents were signed by the attorney- in-fact, the Power of Attorney should be approved by the Title Insurance company issuing the title policy.

In my experience, the Power of Attorney form must clearly indicate that the mortgagor is appointing an attorney-in-fact and it must clearly and unambiguously indicate the nature and scope of the transactions which are to be transacted on behalf of the borrower. In my experience, most closing attorneys will contact the borrower on the day of the closing to clarify the borrower's intention to mortgage the property.

In my experience, the presence of "white-out" on the Power of Attorney form makes it impossible to know with certainty the borrower's intention. In my opinion, it appears that it was the borrower's intention to grant a Power of Attorney to Mr. Newman for the sole purpose reviewing and approving construction advances. In any event, under no circumstances should a loan be closed with alterations of such a material nature to a Power of Attorney. I cannot conceive of a Title Insurer knowingly issuing a Title Policy with such documentation.

**Other Matters**

The Commitment Letter was not signed by the borrower, indicating lack of receipt by Ms. Miller. In my experience, prudent closing procedures require prior receipt of a fully executed Commitment Letter containing all of the terms and conditions of the loan in order to minimize any exceptions due to misunderstandings regarding the terms of the loan.

Correspondence in the file and in MLCC's DOCCTL system indicates that the Financial Consultant emphatically restricted all contact between MLCC and the borrower. This is a "red flag" to most loan processors and underwriters. In my experience, no lender would tolerate a commissioned sales consultant issuing a directive not to contact the borrower during processing. It is the lender's responsibility to know its customer; to do otherwise is to potentially open the door to fraud. I am not sure from my review of this file that Ms. Miller received any correspondence or relevant information regarding the terms of this loan from the date she signed the MLCC application through the closing of the loan in her absence.

I cannot reconcile the fact that MLCC approved and closed this loan in the amount of $7,500,000 in December 1999 and subsequently declined an application to refinance this debt in 2001 for $5,000,000 due to insufficient income and credit history. As Ms. Miller's income and credit history did not appear to materially change from 1999 to 2001, either the initial loan should not have been made or the subsequent refinance should have been approved.

I cannot understand the urgency to close this loan in early December 1999 given the circumstances. Specifically, the loan commitment did not expire until February 2000 and the borrower was out of the country.

## CONCLUSIONS REGARDING UNDERWRITING

There is clearly a lack of involvement of the borrower from the inception of this transaction through the closing of the loan, which closing took place in her absence by means of a questionable Power of Attorney. This was fostered by the interposition of the MLPFS Financial Consultant between MLCC (processing, underwriting and closing staff) and the borrower, and by the apparent acquiescence of MLCC in all aspects of the

processing of this transaction right through the closing which was co-ordinated by the Financial Consultant.

It is clear to me that an objective review of the borrower's financial condition, as evidenced by Ms. Miller's tax returns and MLPFS Priority Client Services monthly statements, indicates that MLCC knew or should have known that the Ms. Miller could not make the scheduled payments required by the loan. My analysis of the "Three C's" indicate clear evidence of lending practices which are beyond the realm of standard industry lending practices and which are demonstrably unsound and predatory.

According to the Federal Deposit Insurance Corporation PR-9-2001, "loans to borrowers who do not demonstrate the capacity to repay the loan, as structured, from sources other that the collateral pledged are generally considered unsafe and unsound."

It continues, "Typically, predatory lending involves at least one, and perhaps all three, of the following elements:

"--Making unaffordable loans based on the assets of the borrower rather than on the borrower's ability to repay an obligation;
"--Inducing a borrower to refinance a loan repeatedly in order to charge high points and fees each time the loan is refinanced ("loan flipping"); or
"--Engaging in fraud or deception to conceal the true nature of the loan obligation, or ancillary products, from an unsuspecting or unsophisticated borrower."

This borrower, while a substantial client of MLPFS, was considerably less sophisticated in financial matters than her MLPFS Consultant. The role played by the MLPFS Financial Consultant, combined with the obvious lack of capacity of the borrower to afford the loan payments, the reliance by MLCC on additional security in the form of pledged assets, and the measures used by the Financial Consultant to conceal the nature of the loan from the borrower constitute predatory and abusive lending practices. In my opinion the MLPFS Financial Consultant fraudulently concealed the true nature of this transaction for his personal enrichment and MLCC was complicit in not having sufficient policies and procedures in place to detect and deter such abuses, or in ignoring any such policies and procedures that did exist at MLCC.

### THE WORKOUT

Given the history of this loan, it is obvious to me that a default was foreseeable, and that some manner of a loan workout would ultimately be required. The initial MLCC workout effort (which is what I would consider the 2001 /2002 refinance application) was terminated when the loan was declined. In my opinion, based on the facts of the 1999 mortgage, there was no effort to mitigate the consequences of the impending default and foreclosure. Furthermore, there are steps which could have been taken by MLCC to lessen the potential losses to MLCC and the borrower. From my examination of the file, no reasonable efforts were made to salvage this loan.

10

Similarly, when MLCC ultimately liquidated Ms. Miller's securities in February 2003, it sold **all** of the securities, valued at almost $5,000,000, even though, at the time, the shortfall between the loan balance and the most-recent value MLCC had placed on the house was substantially less than that amount. Compounding the damage caused by that liquidation, MLCC then let the cash sit in a MLPFS account, earning significantly less than the interest MLCC was charging on the loan, and not using the money (or allowing Ms. Miller to use it) to either make the payments on the loan as they came due, or to reduce the principal balance. Therefore, even if MLCC's actions had been authorized by the loan documents (and I am informed that Ms. Miller's counsel has taken the position they were not), MLCC made no effort to mitigate the injury to Ms. Miller.

### SPECIFIC QUESTIONS

Counsel for Ms. Miller has asked me to answer the following questions. My answers, which are based on the facts, conclusions and opinions set forth in this report, are set forth below:

1. **Did Ms. Miller's financial situation make is apparent that she could not reasonably expect to pay the 1999 loan?**

   Ms. Miller's financial situation made it abundantly clear that she could not repay the 1999 loan from her income sources. By MLCC's own calculation of disposable income from its Underwriting Worksheet, Ms. Miller's Disposable Income was negative $250 per month.

2. **Did MLCC know, or should it have known from the information available to it, before December 7, 1999 that Ms. Miller did not have the financial ability to comply with the payment terms of the note?**

   Yes, MLCC had access to Ms. Miller's 1040 tax returns for 1996, 1997, and 1998 as well as the MLPFS statements from the inception of the account.

   This information was sufficient to determine Ms. Miller's financial condition and her capacity to repay the loan from her income. And, as described in answer to question 1, MLCC calculated a negative Disposable Income for her.

   In my opinion, MLCC relied totally on the potential liquidation of her MLPFS assets and the subject property for the repayment of the loan.

3. **Was it appropriate to close the loan on December 7, 1999?**

   No. Ms. Miller was not present at the closing, and the closing agent relied on a specific Power of Attorney that had been altered in material ways in order to permit a person (with little knowledge of the nature of the transaction and his

11

duties -- Ms. Miller's CPA) to execute a highly complex and risky loan transaction. Under these the circumstances either the lender or the closing attorney should have postponed the closing until Ms. Miller's return.

There is no reason that I am aware of to not postpone the 12/7/99 closing and there are several good reasons why the closing should not have gone forward in Ms. Miller's absence.

4.    **Was Ms. Miller informed, before December 7, 1999, of MLCC's conclusions about the valuation of the house and her disposable income?**

I was not able to find any evidence (in the Discovery material) that Ms. Miller was informed of the shortfall in her disposable income relative to her monthly mortgage obligation. I am not sure that she knew what her monthly mortgage obligation would be – I did not see any evidence on the MLCC application or any signed Good Faith Estimate, or Truth in Lending disclosures.

I do not see any evidence that Ms. Miller received a copy of the appraisal prior to closing the loan. Given the nature of this transaction (a mortgage with pledge of assets) Ms. Miller needed this information to make an informed decision.

5.    **Was MLCC's conduct in connection with the 1999 loan (including underwriting, approval and workout) fair, equitable and honest?**

MLCC's conduct was not equitable and honest in terms of MLCC's design of the loan product, which shifted all or most of the risk associated with the loan from MLCC to the borrower. Additionally, MLCC failed to have systems in place which address these issues, or failed to administer such procedures..

6.    **Would you conclude that Ms. Miller was unsophisticated?**

I have never met Ms. Miller but I can conclude that in terms of financial matters she was certainly unsophisticated. It is clear that Ms. Miller's MLPFS portfolio was conservative –primarily municipal bonds and Dow Jones "Blue Chips" largely inherited from her grandfather. Prior to her association with MLPFS, Ms. Miller's apparent financial experience consisted of making payments on a $145,000 mortgage and managing to mis-manage the payment of several small obligations (according to her credit report).

7.    **In light of the general commercial background of the parties, and the commercial needs of the mortgage industry, were the terms of the 1999 loan so one-sided as to be unconscionable under the circumstances existing at the time the loan was made?**

The terms of the 1999 loan (and the underlying circumstances) were designed to

protect the MLCC from risk -- interest rate risk and default risk. This was an adjustable loan rate loan, adjusted monthly based on changes on the LIBOR index. This effectively transferred most, if not all, interest rate risk from MLCC to Ms. Miller. Regarding credit (or default) risk, although this was more than a 100% "LTV", MLCC was able to shift the risk of loss from default from MLCC to the borrower.

Although MLCC has a responsibility to reduce the risk to itself, it also has an obligation to the borrower. Ideally one of the goals of a mortgage product should be to reduce overall risk. In this case an unacceptable level of risk was created -- and shifted to a relatively unsophisticated borrower.

**8.    Was the 1999 loan a transaction that no person in her senses and not under a delusion would make, and no honest and fair person would accept?**

I am at a loss to explain why a lender would make such a loan, and why a borrower would accept such terms and acquiesce to closing the loan in their absence.

**9.    Was MLCC's conduct unfair?**

MLCCs conduct was unfair both in terms of the manner in which this transaction was structured, and in the processing, underwriting and closing of the transaction. This loan was structured to transfer almost all of the risk from MLCC to the borrower, and the actions of individuals at MLCC and MLPFS had the result (and intention, I believe) of concealing the nature of the transaction from the borrower as evidenced by the memorandum from Jay Falini and the lack of any other evidence to the contrary.

**10.   Was MLCC's conduct immoral, unethical, oppressive or unscrupulous?**

MLCC's conduct was oppressive and unscrupulous. I am reluctant to extensively characterize MLCC's conduct at this time because I have not had the opportunity to review MLCC's Loan Manual, Guidelines and Procedures due to MLCC's unresponsiveness to Discovery efforts.

I can conclude, however, that the conduct of certain individuals at MLPFS and MLCC was immoral and unethical, in particular with the directive to restrict contact with the borrower and the obvious "doctoring" of the Power of Attorney.

**11.   Did MLCC's actions cause substantial injury to Ms. Miller?**

Ms. Miller has been financially devastated.

## DOCUMENTS AND MATERIALS REVIEWED

In addition to the documents specifically identified in the Report, I have reviewed all documents made available to me by Ms. Miller's Counsel, which, he informs me, includes all documents produced by either party in this case. If additional relevant documents are subsequently produced, I expect to review them as well.

I have also reviewed MLCC's Interrogatory Responses, and Ms. Miller's and Jay Falini's Deposition Transcripts. I have attended the Deposition of James Avery.

## QUALIFICATIONS

My curriculum vitae is attached. I have not testified as an expert witness within the previous four years.

## COMPENSATION

Compensation has been established at an hourly rate of $150.00 per hour for the preparation of this report and testimony.

## ADDITIONAL EXHIBITS

Attached are two charts summarizing Ms. Miller's monthly income.

Dated: November 26, 2003

RICHARD J. HOMBERGER

## RICHARD J. HOMBERGER

## WORK HISTORY

2002-Present  **CONSULTANT**
Fairfield, CT

Employed by Cornerstone Bank on a consulting basis to assist with the development of a new residential mortgage lending department.

Duties included development of Residential Mortgage SOP and implementation and oversight of the following functions:

--Processing Residential Mortgages in accordance with FNMA/FHLMC and private investor guidelines
--Underwriting to Bank and Investor guidelines
--Closing Procedures
--Post-Closing Audit
--Investor Relations
--Regulatory Compliance
--General Ledger Accounting and Reconciliation
--Quality Assurance

1999-2001  **CONNECTICUT HOUSING FINANCE AUTHORITY**
Rocky Hill, CT
Loan Portfolio Manager

Managed residential mortgage servicing portfolio.

Responsibilities included co-ordination of secondary market sales of government-backed mortgages, servicing sales, FHA/VA claims administration.

Managed CHFA Real Estate Owned portfolio from oversight of foreclosure through disposition of REO properties.

**1985-1999**  **NSS BANK/SUMMIT BANK**
Norwalk, CT

1995-1999  Vice President, Loan Origination Department

Managed residential mortgage origination department.

Responsibilities included managing all origination activities including processing, underwriting, closings, secondary market sales, post-closing audit, regulatory compliance including compliance with FNMA/FHLMC, State and Federal and private investor guidelines.

1985-1995        Vice President, Loan Servicing Department

Managed residential, commercial and consumer loan servicing department.

Responsibilities included oversight of all servicing activities including investor accounting, quality control, collections and loan workout, preparation of management reports with added emphasis on extensive participation in loan workout of non-performing mortgages in the period from 1990 through 1995.

**1983-1985**      **MERRILL LYNCH MORTGAGE CORPORATION**
West Hartford, CT

Residential Mortgage Originator
National #1 originator of residential mortgages in 1984

**1983**      **OLD STONE MORTGAGE CORPORATION**
Originated residential loans for 3 months

**1975-1983**      **NORWALK SAVINGS SOCIETY**
Norwalk, CT

Assistant Vice President
Managed Main Office and Consumer Loan Department

**EDUCATION**

Boston College
Chestnut Hill, MA
AB- English 1973

University of Connecticut
Stamford, CT
MBA- Finance 1979

National School of Banking
Fairfield University
Fairfield, CT 1981



Julie Miller Monthly Income

