UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JULIE DILLON RIPLEY MILLER,<br><br>    Plaintiff and Counterclaim<br>    Defendant,<br><br>- against -<br><br>MERRILL LYNCH CREDIT CORPORATION,<br><br>    Defendant and Counterclaimant. | NO. 3:03-CV-1016(RNC)(DFM)<br><br><br><br>January 13, 2004 |

### REPLY IN SUPPORT OF DEFENDANT'S MOTION TO COMPEL

Defendant Merrill Lynch Credit Corporation ("MLCC") respectfully submits this Reply Memorandum in support of its Motion to Compel Plaintiff to provide responses to MLCC's First Requests for Production of Documents and First Set of Interrogatories ("Motion to Compel"). Plaintiff makes two arguments throughout her Opposition -- neither has any merit.

**Documents Created Post-Closing** Plaintiff argues that documents created after the closing of the 1999 Loan are not reasonably calculated to lead to the discovery of admissible evidence. See, e.g., Opp. at 3. This argument is unsupportable. One of the issues in this litigation is the extent of Mrs. Miller's knowledge of the loan at issue. In her deposition, she claimed to have a lack of knowledge regarding the terms of the loan. MLCC seeks to establish Mrs. Miller's knowledge, in part, through her acts and admissions before (i.e. completing a loan application), and after the Loan closing (retaining the proceeds, acknowledging the loan).

Statements regarding her finances generally, and her knowledge of the terms of the Loan, are reasonably likely to be found in documents sent to her accountants, advisors and sisters (with whom she admits to having financial disputes and with whom she shared an interest

in various trusts and estates, <u>see</u> Motion to Compel at 4.) For example, in a letter dated February 21, 2001, sent by Mrs. Miller to Andrew Bilotta of Merrill Lynch, Pierce, Fenner & Smith, Inc. ("MLPF&S"), she writes "Please accept this as my authorization to transfer $60,453 from <u>my pledge collateral account</u> number 881-32513." <u>See</u> Ex 1 to Supp. Aff. of T. Friedman attached hereto as Ex. A. There are likely other admissions in documents sent to or from her accountants, advisors and siblings which will also bear on Mrs. Miller's alleged lack of knowledge.

Documents created after the loan closing are relevant for an additional reason -- both Plaintiff and Defendant have set forth claims stemming from conduct up to and including 2003.[1] The inconsistency in Plaintiff's position is undeniable – in describing his view of the "Nature of the Case," Attorney Begos has attached to his Declaration a document dated <u>July 3, 2001</u> as Exhibit E in opposition to <u>this</u> Motion. Because both parties have set forth claims involving post-closing events, and because Plaintiff seeks to rely on them as well, Plaintiff cannot reasonably argue that documents created post-closing are not reasonably calculated to lead to the discovery of admissible evidence.

**Causation, Mitigation, Contributory Negligence** Plaintiff's second major theme is that MLCC is not entitled to information regarding Mrs. Miller's financial affairs following the closing of the Loan. <u>See</u>, <u>e.g.</u>, Opp. at 9. This argument is similarly flawed. Mrs. Miller applied for and received a $1.35 million mortgage loan from MLCC in 1997. She then accrued over $5.8 million in margin loans reconstructing the residence and taking expensive

---

[1] Defendant's counter-claim for "Foreclosure" is the result of Mrs. Miler's failure to pay property taxes for 2001 and 2002, and for her failure to make mortgage payments in 2003. <u>See</u> Answer and Counterclaims. Mrs. Miller has alleged "Conversion" and "Recklessness" with regard to MLCC's management of the pledge aspect of the Loan in 2003. <u>See</u> Counts I and III of Amended Complaint. While Plaintiff is content to use post-closing events as a sword, she claims irrelevance when MLCC seeks to discover information relevant to these claims.

2

vacations, in addition to other expenses. In 1999, pursuant to the Loan at issue, MLCC paid down her debt and provided the funds to complete her home. Meanwhile, she continued her incredible spending habits, eating through at least another $3.86 million from funds which she chose to liquidate. See Motion to Compel at 4.

Mrs. Miller seeks to lay blame for her financial situation on MLCC's shoulder's – "the facts will show that, even if Mrs. Miller did not spend a penny on anything other than her mortgage payments, the loan would still have gone into default, and MLCC knew this." Opp. at 2. MLCC strongly disagrees and is entitled to the discovery necessary to establish the truth, including its assertions that, irrespective of what else happened, liquidation of the pledged account and of the sought after foreclosure, resulted from Mrs. Miller's continued spendthrift habits. Moreover, even if Plaintiff could establish her claims, Plaintiff has a general duty to keep damages as low as reasonably possible. See Richard et al. v. A. Waldman and Sons, Inc., 155 Conn. 343 (1967). Evidence that Mrs. Miller exacerbated, rather than mitigated her financial problems, is relevant. Although MLCC maintains that it is not liable on any theory, it is entitled to discovery to assure that reasonable mitigation efforts were taken.

## DOCUMENT REQUESTS

Tellingly, Plaintiff's Opposition does not, and could not, dispute the truth of Paragraph 6 of the Affidavit of Thomas P. Friedman filed in support of the Motion, which states:

> During the September 19, 2003 [meet and confer] teleconference, counsel agreed on a number of basic premises regarding the proper scope of discovery in this matter. Specifically, counsel agreed that (i) Plaintiff had placed her finances at issue by making allegations in this litigation that MLCC's alleged wrongdoing has impacted her finances and credit; [] (iii) discovery regarding Plaintiff's mitigation efforts and causation were generally proper given the allegations in the lawsuit and her discovery responses to date.

Aff. of T. Friedman in Support of Motion to Compel at ¶6.; cf Opp. at 2 (disputing assertion that

3

"Plaintiff concedes that nearly all of the discovery is relevant" but not that paragraph 6 of the Friedman Affidavit is inaccurate). Defendant now addresses the specific requests as grouped by Plaintiff.

**Document Request No. 4:** Please produce all documents concerning or containing your communications with any individual or entity whom you have used and/or employed as a financial advisor, tax planner, financial consultant or any similar profession, including all notes, drafts, and analyses created by, and communications with, Omni Solo, Inc. and/or its agents and employees.

**Plaintiff's Response:** Plaintiff objects to this request as over-broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and improperly seeking information protected by attorney work-product and/or attorney-client privileges.

**MLCC's Argument:**

Plaintiff argues that the documents provided to and created by Omni Solo, Inc. and its representative, Mr. Tesoriere, are not discoverable because they are irrelevant and privileged. The documents sought from this financial consulting group are relevant for the reasons stated in the two introductory sections above. Moreover, these documents are not privileged. Mr. Tesoriere can fit into one of three categories: a non-party, a trial consultant or a testifying witness. If he is a non-party, then information created by him or provided to him is discoverable. If he is a trial consultant, then Plaintiff should be able to substantiate this claim. She has not and can not because Mr. Tesoriere put forth expert testimony in connection with Plaintiff's Motion for Prejudgment Remedy, both in state court and in this Court. Mr. Tesoriere testified as an expert, waiving any privilege that may have attached.[2]

---

[2] Plaintiff argues that if the Court finds that she has waived any privilege, that the waiver should be limited to Mrs. Miller's capital gains tax liability. MLCC is entitled to all the information that Mr. Tesoriere reviewed. Disclosure of materials to a testifying expert in connection with his testimony assumes that the material will be made public and effects a waiver to the same extent as any other disclosure. See In re Pioneer Hi-Bred Int'l, Inc., 238 F.3d 1370, 1375-76 (Fed. Cir. 2001).

4

**Document Request No. 5:**   Please produce all documents concerning or reflecting communications with your siblings or other family members, other than your husband or children, regarding your financial situation since January, 2000 and/or access to funds or accounts, whether held in trust or otherwise.

**Plaintiff's Response**: Plaintiff objects to this request as over-broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

**MLCC's Argument**:

The arguments in the two introductory sections are applicable here.  Plaintiff also showed a willingness "to produce documents concerning trusts and estates in which Ms. Miller is a beneficiary created on or before December 31, 2001."  See Ex. 6 to Friedman Aff. at 1.  She has failed to articulate any reasonable basis for this apparently arbitrary cut-off date.  Moreover, Plaintiff's defaults for which MLCC is seeking foreclosure occurred in 2003.  Her access to, and use of, funds during this period, leading up to and including this period, and any period for which Plaintiff might seek damages, are relevant to causation and mitigation of those damages.  See also argument with respect to Document request Nos. 6, 11, 12 and 13.

Request No. 5 is another excellent example of Plaintiff's inconsistent discovery positions.  On the one hand, Plaintiff claims that her "financial situation" post-closing is "irrelevant." Opp. at 5-6.  On the other hand, Plaintiff's damages expert relies upon, and cites to, her 2000 and 2001 tax returns in his analysis.  Supp. Aff. of T. Friedman at ¶3.  Once again, it is apparent that Plaintiff is cherry-picking the documents she deems relevant, and arbitrarily objecting to MLCC's requests relating to the same issues and the same time period.

**Document Request No. 6:**   Please produce all documents concerning any disputes or proceedings relating to trust fund or similar assets in which you claim or claimed a right or interest.

**Plaintiff's Response**: Plaintiff objects to this request as over-broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

5

**Document Request No. 11:** Please produce all documents concerning the disposition of your father's estate, including but not limited to documents concerning your entitlement to assets, income or any form of property interest or inheritance.

**Plaintiff's Response**: Plaintiff objects to this request as vague, ambiguous, over-broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

**Document Request No. 12:** Please produce all documents concerning the disposition of your mother's estate, including but not limited to documents concerning your entitlement to assets, income or any form of property interest or inheritance.

**Plaintiff's Response**: Plaintiff objects to this request as vague, ambiguous, over-broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

**Document Request No. 13:** Please produce all documents concerning the disposition of any estate in which you have claimed or currently claim any interest.

**Plaintiff's Response**: Plaintiff objects to this request as vague, ambiguous, over-broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

**MLCC's Argument for Request Nos. 6, 11, 12, 13:**

The arguments concerning Request No. 5 and including the introductory sections are applicable here. Moreover, to the extent MLCC is seeking to discover what assets Mrs. Miller has to satisfy a deficiency judgment, Plaintiff has conceded relevance and cited no authority for her assertion that such discovery is improper.

**Document Request No. 8:** Please produce all documents concerning or reflecting any source of your income or distributions to you of money or property of any kind.

**Plaintiff's Response**: Plaintiff objects to this request as vague, ambiguous, over-broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

**Document Request No. 10:** Please produce all documents reflecting or describing all of your personal assets and/or belongings, including but not limited to any real estate in which you have an interest, whether in Connecticut or elsewhere.

**Plaintiff's Response**: Plaintiff objects to this request as vague, ambiguous, over-broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

**MLCC's Argument for Request Nos. 8 and 10**:

Once again, Mrs. Miller has chosen to cherry-pick what is relevant and what is not. In her Amended Complaint, Mrs. Miller alleges that "Plaintiff's MLPF&S stock broker [] knew that the Account was her primary source of income and that liquidating the stocks would expose Plaintiff to substantial capital gains liability." See Amended Complaint at ¶5. Plaintiff's allegations relate to a liquidation that occurred in 2003. Plaintiff should not be permitted to make assertions regarding "her primary source of income" while simultaneously refusing MLCC the discovery required to assess this allegation – namely whether she had other sources of income, and to what extent the funds from those sources compare to those in her trusts and estates.[3]

**Document Request No. 22**: Please produce all documents concerning any loan, credit or cash advance (whether secured or unsecured) from any entity for which you owe any balance.

**Plaintiff's Response**: Plaintiff objects to this request as over-broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

**MLCC's Argument**:

This request bears directly on the issue of whether MLCC has caused Plaintiff any financial duress, and if so, to what extent (although MLCC certainly contends that it is not the proximate cause of any of her alleged damages). Further, if Plaintiff has opted to keep other financial obligations current to the detriment of MLCC, MLCC is entitled to this information.

**Document Request No. 23**: Please produce all documents concerning any improvements or renovation to the Land, the Residence and/or the Premises, including but not limited to any communications between you and MLCC, MPPF&S and/or any other entity or individual relating thereto.

---

[3] Plaintiff argues that MLCC has her tax returns, but she has failed to file and/or make available her 2002 returns and has not filed her 2003 returns. Moreover, Plaintiff may not *designate* which documents she prefers to produce. See Opp. at 8. If documents exist relating to her sources of income, she has placed them at issue, and she should produce them.

See Motion to Compel at 12-17 for Requests Nos. 23, 24, 25, 26, 27, 29 and 30.

**MLCC's Argument for Request Nos. 23, 24, 25, 26, 27, 29 and 30**:

Plaintiff has agreed to provide documents "after the 1999 loan was converted from construction to permanent" for "significant" expenses and or payments. See Ex. 6 to Friedman Aff. at 1. This request must be viewed in the context of Plaintiff's receipt and evident disposition of $3.5 million reported on Schedule D-1 to her 2000 return.[4]

**Document Request No. 39**: Please produce all pleadings, discovery requests and responses thereto, deposition transcripts, and all other litigation materials served or filed by any party, in any suit filed by or against you at any time.

**Plaintiff's Response**: Plaintiff objects to this request as over-broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

**MLCC's Argument**:

For the reasons stated in the section above entitled "Documents Created Post-Closing," Plaintiff should be compelled to produce these documents.

**Document Request No. 40**: Please produce all documents concerning or relating to any dispute or disagreement between you and any advisor, accountant, attorney or other professional of any kind.

**Plaintiff's Response**: Plaintiff objects to this request as over-broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

**MLCC's Argument**:

---

[4] A close reading of Plaintiff's Opposition indicates why MLCC is pressing on this issue: "Ms. Miller maintained, in one place, a substantial number of documents relating to expenses incurred and purchases made in connection with her house. We have produced those documents without culling anything that fell below the limit." Opp. at 12. Plaintiff does not state that she has produced all relevant documents after a good faith reasonable search. She states that she handed over what she found in one location. Moreover, these Requests seek documents relating to more than expenses and payments.

Plaintiff has a documented history of disputes with, or post-hoc criticisms of, the professionals and advisors whom she employs, see Supp. Aff. of T. Friedman at ¶5, and Defendant is entitled to these probative documents.

**Document Request No. 41:** Please produce all correspondence between you and any accounting firm or representative thereof.

**Plaintiff's Response**: Plaintiff objects to this request as over-broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

**MLCC's Argument**:

Please see section above entitled "Documents Created Post-Closing."

**Document Request No. 44:** Please produce all documents reflecting any attempt by any alleged creditor, whether written or oral, to collect a debt from you, whether liquidated or otherwise.

**Plaintiff's Response**: Plaintiff objects to this request as over-broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

**MLCC's Argument**:

Please see Motion to Compel at 19.

**Document Request No. 45:** Please produce all documents concerning any trips or vacations you have taken.

**Plaintiff's Response**: Plaintiff objects to this request as over-broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

**MLCC's Argument**:

Please see Motion to Compel at 19.

## INTERROGATORY RESPONSES

**Interrogatory No. 6:** For the period from January 1, 1999 until the date on which you respond to these Interrogatories, please identify all sources of income received by you from any source, including but not limited to allowances, stipends, governmental benefits, disability benefits, salaries and wages, and, with respect to each such source, state the amount of income received from that source and identify the period during which you received income from that source.

**Plaintiff's Response**: Plaintiff objects to this interrogatory as over-broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence.

**MLCC's Argument**:

The arguments for Document Request Nos. 5, 8 and 10 are equally applicable here.

**Interrogatory No. 7**: If you claim that any portion(s) of the Power of Attorney form where whited-out (or otherwise manipulated), please describe (a) which portions you claim were whited-out or manipulated; (b) who whited-out or manipulated any such portions; (c) whether you consented to any such whiting-out or manipulation, and if so, to which portions; and (d) who was present during the whiting-out or manipulation.

**Plaintiff's Response**: The Power of Attorney was whited-out, and the portions that were whited-out are obvious on the face of the document (to attempt to describe, in narrative fashion, the location of white-out on a paper would be nonsensical). All of the white-out was applied by Jay Falini. Mr. Falini did not ask for plaintiff's consent to his actions, and therefore plaintiff did not consent. Mr. Falini whited-out the document in plaintiff's house; plaintiff was with Mr. Falini at the time. Various other people, including plaintiff's husband and various contractors, were in the house at the same time. Plaintiff does not presently recall whether anyone else observed Mr. Falini adding the white-out to the power of attorney.

**MLCC's Argument**:

There is nothing nonsensical to this Interrogatory. MLCC is entitled to Plaintiff's final version of the facts surrounding the execution of the POA. Plaintiff's citation to her various responses in other discovery, which are inconsistent, only proves that a complete, cogent response to this Interrogatory should be provided.

Dated: December 13, 2004
Stamford, Connecticut

PAUL, HASTINGS, JANOFSKY & WALKER LLP

By: *Thomas P. Friedman*
Douglas C. Conroy, ct11555
Thomas P. Friedman, ct24947
1055 Washington Boulevard
Stamford, CT 06901-2217
Telephone: (203) 961-7400
Facsimile: (203) 359-3031

Counsel for Defendant and Counterclaimant
MERRILL LYNCH CREDIT CORPORATION

10

## CERTIFICATE OF SERVICE

      This is to certify that on this 13th day of December, 2003, a copy of the foregoing REPLY IN SUPPORT OF DEFENDANT'S MOTION TO COMPEL was delivered via first class U.S. mail and facsimile to:

      Patrick W. Begos, Esq.
      BEGOS & HORGAN, LLP
      327 Riverside Avenue
      Westport, CT 06880

                                                    _____
                                                    Thomas P. Friedman

STM/266533.1
11413.00021

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JULIE DILLON RIPLEY MILLER,<br><br>        Plaintiff and Counterclaim Defendant,<br><br>  - against -<br><br>MERRILL LYNCH CREDIT CORPORATION,<br><br>        Defendant and Counterclaimant. | NO. 3:03-CV-1016 (RNC)(DFM)<br><br>January 13, 2004 |

### SUPPLEMENTAL AFFIDAVIT OF THOMAS P. FRIEDMAN IN SUPPORT OF DEFENDANT'S MOTION TO COMPEL

Thomas P. Friedman hereby certifies as follows:

1. I am an associate with the law firm of Paul, Hastings, Janofsky & Walker, LLP, counsel of record for Defendant and Counterclaimant Merrill Lynch Credit Corporation ("MLCC") in the above-captioned action.

2. I have worked on pre-trial matters for Defendant and am personally familiar with the issues regarding discovery in this matter.

3. Plaintiff's damages expert relies upon, and cites to, Plaintiff's 2000 and 2001 tax returns in his analysis.

4. Attached hereto as Exhibit 1 is a letter from Plaintiff to Andrew Bilotta of Merrill Lynch, Pierce, Fenner & Smith, Inc.

5. Plaintiff has a documented history of disputes with, or post-hoc criticisms of, the professionals whom she employs. See Miller Transcript at Ex. 2, p. 19 ("I was really thrilled with Howard Kramer [of Payne Webber]. I liked him as a person, but I felt he was too involved with my sister Rosemary."); see also p. 34 (as to Jay Falini managing her account, aside from the

Mortgage 100 issues, "I don't have particulars but I don't think he managed it correctly."); see also p. 104 (with regard to Barry Newman (whom Plaintiff is suing in state court) "I don't think he'd given me good advice."); see also p. 180 ("I don't know that I would use Condon-Brown Builders again . . . They are very slow . . . and expensive").

DATED: January 13, 2004.

                                       */s/ Thomas P. Friedman*
                                       Thomas P. Friedman

STM/266556.1
11413.00021

2

February 21, 2001

Mr. Andrew J. Bilotta, Jr.
Merrill Lynch
P. O. Box 61580
455 South Gulph Rd.
King of Prussia, PA 19406

Dear Mr. Bilotta,

Please accept this as my authorization to transfer $60,453.60 from my pledge collateral account number 881-32513 to pay my February mortgage payment. The loan number for the mortgage is 4312716. My loan is due to transfer to permanent on March 1.

Thank you for your assistance in the matter. If you have any questions, please do not hesitate to call.

Sincerely,

*Julie R. Miller*

Julie R. Miller
P. O. Box 233
Rowayton, CT 06853

Page 18

1   Q   Okay.
2   A   And then we had Howard Kramer, K-r-a-m-e-r.
3   Q   And was Mr. Kramer the advisor on that
4   account in 1997?
5   A   Yes, he was with my sisters as well. We all
6   three had a combined account with Howard Kramer.
7   Q   Did you have a separate account with Howard
8   Kramer?
9   A   I had a small little account with Howard
10  Kramer.
11  Q   And was the account that all three of you
12  had an account that came from a trust?
13  A   That came from my grandfather's trust, which
14  was then referred to as it GML, Gerald Moncrieffe
15  Livingston, M-o-n-c-r-i-e-f-f-e.
16  Q   And did there come a point in time when that
17  trust was distributed to its beneficiaries?
18  A   Yes. It was after my mother's death that
19  that was -- came down to us, and then we kept it a combined
20  account. I then wanted to separate in '97.
21  Q   So your mother died in April of '96; and by
22  1997, you wanted it separate; is that correct?
23  A   Right.
24  Q   What were your reasons for wanting to
25  separate?

Page 19

1   A   Well, it was very confusing with three
2   different sisters and three different needs and opinions;
3   and I wasn't really thrilled with Howard Kramer. I liked
4   him as a person, but I felt that he was too involved with
5   my sister Rosemary.
6   Q   You mean "involved" in the sense of
7   listening to her more than you or your other sister?
8   A   Exactly.
9   Q   Did you feel that Rosemary was deciding what
10  was to be done with the account?
11  A   Yes.
12  Q   Various filings that had been made by your
13  attorney and affidavits by you indicate that the stock in
14  the account had a very low basis, what lawyers refer to as
15  basis.
16  A   Low-cost basis.
17  Q   Is that true of the entire account, even
18  when it was controlled by the three of you?
19  A   Yes.
20  Q   Okay. Did you have any disagreements with
21  your sister Rosemary as to what should be done with the
22  stock in that account that related to the low basis of the
23  stock?
24  A   No, we never disagreed with that.
25  Q   What was the nature of your disagreement,

Page 20

1   then?
2   A   I think basically just wanting to have
3   independence.
4   Q   So you wanted to be able to call the shots
5   with respect to your portion of the corpus?
6   A   Yes.
7   Q   Do you know if any of that stock had been
8   liquidated or sold while Mr. Kramer was the account
9   representative at Payne Weber?
10  A   I don't know.
11  Q   Other than the accounts that we've been
12  talking about at Payne Weber and the accounts that you
13  opened at Merrill, Lynch, Pierce, Fenner, and Smith, have
14  you had any other brokerage accounts since, say, 1990?
15  A   Since 1990?
16  Q   1990.
17  A   1990?
18  Q   Yes.
19  A   No.
20  Q   How did you first have an occasion to have
21  any contacts with Mr. Falini? That is F-a-l-i-n-i.
22  A   I had a friend who referred me to him in
23  August of 1997.
24  Q   Who was the friend?
25  A   Her name is Frances -- French name -- small

Page 21

1   d-e, then G-a-n-a-y.
2   Q   How did she refer you to Mr. Falini?
3   A   We were just talking, and she said that he
4   had some ideas about stocks that were interesting. She
5   thought I might be interested to talk to him.
6   Q   Did she tell you that she was a client of
7   Mr. Falini?
8   A   No.
9   Q   Did she say how she had come in to contact
10  herself?
11  A   No.
12  Q   Were you introduced to Mr. Falini by her
13  during a telephone conversation?
14  A   Telephone, yes.
15  Q   And do you recall what was said during that
16  telephone conversation?
17  A   Not really.
18  Q   You don't recall anything that anybody said
19  during the telephone conversation?
20  A   Well, she was interested in trying to
21  purchase a house somewhere in Poughkeepsie; and she wanted
22  my help to help her with the down payment. And I could not
23  do that at that point, so she had Mr. Falini on the phone;
24  and he sounded like an interesting, more vibrant, person
25  than Mr. Kramer was, so I thought maybe he might be able to

6 (Pages 18 to 21)

Miller vs Merrill Lynch
10/20/2003
Julie Dillon Ripley Miller

Page 34

1    MR. BEGOS: Object to the form of the
2 question. You can answer.
3    MRS. MILLER: Yes.
4 BY MR. CONROY:
5    Q    And what's that?
6    A    I'm not really sure I can go into details.
7    Q    I mean, give me a general answer, then.
8    A    I don't know. I just don't feel that he was
9 doing the right thing for me.
10   Q    I'm trying to isolate the Mortgage 100
11 incident from this. You understand that?
12   A    Yes.
13   Q    So I would -- what I am focusing on is his
14 day-to-day management or advice concerning stocks in your
15 account, what to invest in, and what not to invest in. Do
16 you have any reason to believe that he mismanaged that
17 portion of the account relationship?
18       MR. BEGOS: Object to the form. You can
19 answer.
20       MRS. MILLER: I don't have particulars, but
21 I don't feel that he managed it correctly.
22 BY MR. CONROY:
23   Q    What gives rise to that opinion?
24   A    Just feelings.
25   Q    But you can't give me any particulars other

Page 35

1 than a general feeling that he didn't manage it correctly?
2    A    No, I can't.
3    Q    You can't?
4    A    I can't give you any details.
5    Q    Did you ever visit Mr. Falini down in
6 Philadelphia?
7    A    No.
8    Q    After the account was opened, would Mr.
9 Falini call you on a recurring basis?
10   A    Once a week, maybe, I think.
11   Q    So you recall receiving calls on a regular
12 basis from him?
13   A    Yes.
14   Q    And what was the nature of the calls he was
15 making?
16   A    Mostly just chatting, saying hello, and that
17 was -- it was not much.
18   Q    So as you understood it, it seemed just to
19 be an effort to stay in touch with you?
20   A    Yes.
21   Q    Between November 1997, if I got the date
22 correct -- let me rephrase the question.
23       Between the time you first opened an account
24 at Merrill Lynch, Pierce, Fenner, and Smith in November
25 1999, did you have any further face-to-face meetings with

Page 36

1 Mr. Falini?
2    A    Yes.
3    Q    Okay. And on roughly how many occasions?
4    A    Well, when we were -- when we started
5 construction of the house, he came up at least once a week,
6 maybe every other week.
7    Q    And you started construction on the house in
8 November 1997?
9    A    No, May, 1998.
10   Q    I'm sorry.
11       MR. BEGOS: Off the record for a second.
12       (An off-the-record discussion was held)
13 BY MR. CONROY:
14   Q    So this begins in May, 1998?
15   A    Yes.
16   Q    So would come up -- he would come up at
17 least twice a month?
18   A    Yes.
19   Q    Would this be on a regular schedule?
20   A    We had meetings about every other week to go
21 over the construction with the architect, the decorator,
22 myself, builders.
23   Q    So this was a regular meeting?
24   A    Yeah.
25   Q    And you'd have all of these people together?

Page 37

1    A    He wasn't there all the time, but he was
2 there at least twice a month. At least once a month,
3 sometimes twice a month.
4    Q    So he was up visiting you from May 1998 at
5 least once a month and sometimes twice a month, correct?
6    A    Correct.
7    Q    And his visits would coincide with these
8 meetings that you had with the architects and others
9 involved?
10   A    Yes.
11   Q    Had you invited him to these meetings?
12   A    Yes.
13   Q    And did you tell him why you wanted him at
14 these meetings?
15   A    Yes, to go over advice on finances.
16   Q    How were these -- did these meetings talk
17 about finances?
18   A.   No. I will rephrase that. Not finances but
19 on the financing of the construction.
20   Q    Was the purpose of inviting him to these
21 meetings so he could understand what was going on at the
22 construction and then give you advice?
23   A    That was my idea of what was supposed to
24 happen.
25   Q    Did something different happen?

10 (Pages 34 to 37)

Page 102

1   A   Yes.
2   Q   And that he was with a law firm?
3   A   Yes.
4   Q   Okay. And did Mr. Ballen deal with third
5   parties on your behalf concerning the Merrill Lynch
6   mortgage loan?
7   A   Yes.
8   Q   And what third parties did he deal with?
9   A   That would have been Laurie Kamhi and Steve
10  Crowe who took over from the Merrill Lynch, they are in the
11  New York office, the "Gem group" I think they call
12  themselves. I'm not sure and they were in consultation
13  with Mr. Ballen in March of 2001.
14  Q   And was Mr. Ballen, in turn, in consultation
15  with others on your behalf?
16  A   I don't know. That, I don't know. You
17  asked a third party that's all I know, that he talked to
18  them.
19  Q   You're not aware of them talking to anyone
20  else to try to help you in connection with your mortgage?
21  A   I believe he talked to Mr. Palmer from
22  PriceWaterHouse accounting firm, who I used after Barry
23  Newman. That's the only third party I know of.
24  Q   What office of PriceWaterHouse is Mr. Palmer
25  in?

Page 103

1   A   In New York.
2   Q   I'm sure they are have more than one office
3   in New York. Do you know where it is physically located?
4   A   I can get the information for you.
5   Q   I will maybe ask your counsel for it. Let's
6   talk about that for a minute a little bit of a diversion,
7   and get back to other subjects. You stopped using Mr.
8   Newman's firm's services in January of 2001?
9   A   Correct.
10  Q   Why did you stop using his services?
11  A   Because at that point, it became more
12  complicated with all of these different entities going on
13  and Laurie Kamhi actually referred me to Mr. Palmer.
14  Q   And you stayed with Mr. Palmer, correct?
15  A   Correct. I actually -- Mark Abramson is his
16  associate, who I am currently involved with.
17  Q   And are you using PriceWaterHouse generally
18  for tax advice?
19  A   Yes.
20  Q   And Mr. Palmer is a partner, if you know?
21  A   I think he's a partner, yes.
22  Q   Did you change accountants at that time
23  because you were unhappy with Mr. --
24  A   Yes.
25  Q   -- Newman's services and any other

Page 104

1   particular --
2   A   Because I didn't think Mr. Newman had done a
3   good job for me.
4   Q   In what sense?
5   A   I don't think he'd given me very good
6   advice.
7   Q   On what subjects?
8   A   Taxes.
9   Q   And what in particular on taxes?
10  A   Just taxes. I didn't think he was -- I
11  didn't think he was a good accountant.
12  Q   Was there anything in particular with your
13  tax returns that led to you believe he was not a good
14  accountant?
15  A   I'm not sure. After the January 2001
16  meeting, he became very panicky about the Merrill Lynch
17  situation, loan, and kept asking me to sell the house and
18  calling me weekly, "have you sold the house yet? Have you
19  sold the house yet?" And my father was ill and I felt that
20  an emotional panic was not what I needed, so I looked
21  elsewhere for an accountant.
22  Q   And you asked Laurie Kamhi?
23  A   Yes.
24  Q   Were there any other reasons why you decided
25  at that point to stop using the services of Mr. Newman or

Page 105

1   his firm?
2   A   That was the primary reason.
3   Q   Were there any others, even if they weren't
4   primary?
5   A   No.
6       MR. CONROY: I'm going to ask the reporter
7   to mark the exhibit next on order, Exhibit 4, a multi-page
8   document that appears to concern the Mortgage 100 program.
9   Marked again by our office with JDRM 316 through 320.
10      (Defendant's Exhibit Number 4 was marked for
11      identification)
12  BY MR. CONROY:
13  Q   Mrs. Miller, I will represent to you this
14  document came from your files and was provided to us by
15  your counsel. And my first question to you is whether you
16  recall ever seeing it before?
17  A   No, not really. I may have glanced at it,
18  but I don't remember perusing it.
19  Q   You see at the top it shows a fax line,
20  indicating provided on or about July 1, 1997?
21  A   Yes, I see that.
22  Q   Did you have a fax machine at home?
23  A   Yes, I do.
24  Q   Is that -- I've seen various Dixie
25  Plantation?

27 (Pages 102 to 105)

Page 178

appraisal for the property and better interest rate for the mortgage.
Q And you've already testified about those two issues?
A Yes.
Q Did you discuss refinancing the property with Laurie or Steve at this point this time?
A Yes.
Q And tell us to the best of your recollection what you recall being said on the subject of refinancing?
A With Merrill Lynch?
Q Yes.
A Basically, Lori Kamhi said that their hands were tied because of the pledge account; and they couldn't get rid of the pledge account, so that's why I had to go elsewhere.
Q Did Lori or Steve suggest that you consider selling the property?
A Yes, that's always been a consideration.
Q Did you, in fact, go out and look at another home to buy in anticipation of selling that property?
A Yes.
Q And did you find other homes?
A No.
Q You did not?

Page 179

A No.
Q Do you recall having a discussion with Steve Crowe that you indicated that you had found a house for a million and a half dollars?
A I don't remember that conversation.
Q Okay. So as far as you know, you never told Mr. Crowe or Lori Kamhi that you found another house?
A Not that I remember, no.
Q Did you, in fact --
A I couldn't find another house until I sold this one.
Q Well, I'm asking, did you look for another house in anticipation in selling 21 Point Road?
A I may have; but I mean, yes -- but I don't remember specifically an amount of -- purchase price of another property.
Q Did you have any discussions with Kevin Brown about buying another house?
A Who is Kevin Brown?
Q Keith, I'm sorry. I told you I was bad with names.
A I don't remember discussing another house with him.
Q Did you have any discussions during this period of time with anybody from Condon-Brown about perhaps

Page 180

building you another house?
A Oh, we talked about -- all of us enjoyed working together, so we talked about lots of different refinishing projects that we could go into but nothing in specific detail about any particular property.
Q Was this in anticipation that you would move into a finished property?
A No. Just an investment proposition where we can find a property, redo it, and resell it. Nothing to do with -- if I ever did any more renovations for another property for my own use, I don't know that I would use Condon-Brown builders again.
Q Why do you say that?
A They are very slow.
Q And expensive?
A And expensive, yes.
Q So these discussions were more along the lines of basically taking a house and fixing it up with the anticipation of reselling it?
A Right.
Q You next indicated -- the next you can recall was CIBC and Joanne O'Rourke, and that would have been March of '02?
A I believe that is right.
Q Is there any reason as you sit here today --

Page 181

I haven't shown you any documents or anything that might help refresh your recollection -- but as you sit here today, is there any reason why you think there was no effort on the refinancing front between June of 2001 and March of 2002?
A Again, there may be a gap there with another company and I just -- I'd have to go back and refresh myself on who else we talked to, but I don't remember.
Q Do you recall there being any discussions with anyone at Merrill Lynch about coming up with a new loan of less than seven point five million dollars?
A Yes.
Q And who did you have such discussions with?
A The only people at Merrill Lynch I talked to at that point would have been Laurie Kamhi and Steve Crowe.
Q Okay. And do you recall what amount was discussed for a new loan on the property?
A I am not sure, but I believe we talked about trying to get it down to five million or less.
Q And do you recall that there was actually a proposal made to provide you with a loan of five million or less?
A I don't remember if there was.
Q Do you recall there being any other alternative being discussed where Merrill Lynch would still