## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JULIE DILLON RIPLEY MILLER,

                    Plaintiff

    - against -

MERRILL LYNCH CREDIT CORPORATION,

                Defendant and
                Counterclaimant.

CIVIL ACTION NO. 3:03-CV-1016 (RNC)

March 19, 2004

## MEMORANDUM OF LAW IN SUPPORT OF
## MERRILL LYNCH CREDIT CORPORATION'S MOTION
## FOR A PREJUDGMENT ORDER OF ATTACHMENT

PAUL, HASTINGS, JANOFSKY &
WALKER, LLP
1055 Washington Boulevard
Stamford, CT 06901-2217
(203) 961-7400

BRYAN CAVE LLP
1290 Avenue of the Americas
New York, New York 10104
(212) 541-2000

*Attorneys for Defendant*

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| JULIE DILLON RIPLEY MILLER, <br><br>              Plaintiff <br><br>   - against - <br><br> MERRILL LYNCH CREDIT CORPORATION, <br><br>              Defendant and <br>              Counterclaimant. | CIVIL ACTION NO. 3:03-CV-1016 (RNC) <br><br> March 19, 2004 |

### MEMORANDUM OF LAW IN SUPPORT OF
### MERRILL LYNCH CREDIT CORPORATION'S MOTION
### FOR A PREJUDGMENT ORDER OF ATTACHMENT

Defendant and counterclaimant, Merrill Lynch Credit Corporation ("MLCC"), respectfully submits this Memorandum of Law and the accompanying affidavit of Donald J. McEnerney, sworn to March 16, 2004 (the "McEnerney Affidavit"), in support of its motion pursuant to Fed. R. Civ. P. 64 and Local Rule 4(c) for a prejudgment order attaching certain assets of the plaintiff, Julie Dillon Ripley Miller ("Miller"), in accordance with the laws of the State of Connecticut.  MLCC also seeks a temporary restraining order enjoining and restraining Miller, and any other persons in possession, control or custody of any of Miller's property, from transferring, disposing or encumbering such property pending the hearing of this motion.

### PRELIMINARY STATEMENT

MLCC is entitled to an order of attachment because there is "probable cause to believe that a judgment will be rendered" in its favor.  *See* CONN. GEN. STAT. ANN. § 52-278i. Indeed, MLCC's claim represents precisely the type of factual scenario anticipated by the statute

-- the attachment of assets to secure a judgment to be rendered in favor of a lender for the repayment of monies due pursuant to a note.

As set forth in the McEnerney Affidavit, Miller borrowed $7,500,000 in principal from MLCC in December of 1999 (the "1999 Loan"). The 1999 Loan consolidated existing indebtedness in the amount of $5,150,000 and provided additional sums in the amount of $2,350,000. The proceeds of the 1999 Loan were used, among other things, for the construction of the 9,300 square foot custom built home in Norwalk, Connecticut (the "Premises") in which Miller and her family now reside. It is undisputed that Miller is in default of her obligation to repay the substantial sums which she borrowed from MLCC. The amount of the indebtedness, including principal, interest, penalties, delinquent property taxes and ongoing attorneys' fees (for which Miller is also contractually responsible) now totals $8,680,233.57.[1/] Based upon the foregoing, MLCC has met its burden and is entitled to a prejudgment order of attachment to secure payment of the judgment which will be rendered in favor of MLCC.

The parties' relationship began in 1997 when Miller opened an account with Merrill Lynch Pierce Fenner & Smith, Incorporated (MLPF&S") in the amount of approximately $10,500,000. Coincident with her purchase of the Premises, Miller also applied for and received a loan from MLCC in the amount of $1,350,000 (the "1997 Loan"). Miller financed the entire purchase price of the Premises and as a result, the loan for which she applied was part of the "Mortgage 100" Loan Program. The 1997 Loan was secured by a mortgage on the Premises. In

---

[1/]    A copy of MLCC's Answer to Amended Complaint and Counterclaim (the "Answer and Counterclaim") is attached to the McEnerney Affidavit as Exhibit 1. Attached to the Answer and Counterclaim are the following exhibits: Exhibit A, Legal Description of Premises; Exhibit B, the Note; Exhibit C, the Mortgage; Exhibit D, the Modification Agreement; Exhibit E, Notice of Default.

addition, Miller also executed a pledge agreement pursuant to which she pledged securities as additional collateral. Miller also opened margin facilities in 1997 which were tied to two cash management accounts which she used primarily to fund her renovation of the Premises.

Two years later, in December 1999, Miller, having decided to dramatically expand the scope of her renovation, consolidated the 1997 Loan and the borrowings under the margin facilities into a single construction loan from MLCC in the amount of $7,500,000. The $7,500,000 Loan was also approved as part of the "Mortgage 100" Loan Program. Accordingly, just like the 1997 Loan, the 1999 Loan was again secured by both a mortgage on the Premises and a pledge of securities in Miller's brokerage account.

The 1999 Loan to Miller closed on December 7, 1999. Because Miller allegedly planned to be overseas on vacation with her family at the time of the closing, she executed a power of attorney appointing her accountant, Barry Newman, to execute the necessary closing documents as her attorney-in-fact. Newman attended the closing and executed the Adjustable Rate Note (the "Note"), the First Mortgage on the Premises (the "Mortgage") and the Pledge Agreement for Securities Account (the "Pledge Agreement") (collectively referred to as the "1999 Loan Transaction Documents") on Miller's behalf. More than a year later, on January 30, 2001, Miller reaffirmed the 1999 Loan by personally executing a Modification Agreement in her own handwriting. The Modification Agreement reaffirmed the 1999 Loan and modified certain repayment terms of the Note and corresponding portions of the Mortgage.

Miller defaulted on her obligation to repay the 1999 Loan by failing to make the interest payment due on February 1, 2003 and by failing to pay her property taxes. Thereafter, Miller contested the enforceability of the 1999 Loan Transaction Documents that Newman had executed on her behalf. Miller challenged the enforceability of those documents notwithstanding

-3-

the fact she reaffirmed that very transaction in January 2001 by personally executing the Modification Agreement. In addition to the fact that Miller personally executed the Modification Agreement, she claimed that Newman, who was her accountant and, indeed, continued to act as her accountant following the 1999 Loan closing, was not authorized to execute the Mortgage or the Pledge Agreement, which granted MLCC a first priority lien and security interest in certain securities in Miller's account as additional collateral for the 1999 Loan. Miller further alleges that notwithstanding her defaults, MLCC did not have authority to declare a default, accelerate the indebtedness and liquidate the securities which were subject to the terms of the Pledge Agreement.

Miller's belated attempt to challenge the validity of the 1999 Loan Transaction Documents has no bearing upon MLCC's request for an attachment. Even if Miller were to persist with, and succeed upon, her claim to invalidate the Mortgage and Pledge Agreement, she nevertheless will still be obligated to repay MLCC the substantial sums she has borrowed. Miller cannot retain the benefits of the 1999 Loan by simply keeping the proceeds of the $7,500,000 she borrowed, and at the same time attempt to repudiate the 1999 Loan Transaction Documents by arguing that MLCC does not have the right to obtain security for the amounts she admittedly borrowed and used, among other things, to construct her new custom built home. Indeed, Miller's attempted repudiation of the 1999 Loan must be rejected in light of the fact that the 1999 Loan Transaction Documents (the Mortgage and Pledge) are substantively identical to those Miller personally executed for the 1997 Loan as well as the fact that she subsequently reaffirmed the 1999 Loan by personally signing the Modification Agreement.

MLCC is entitled to an order attaching sufficient assets to secure the total indebtedness, which continues to accrue interest and penalties as well as attorneys' fees. The

-4-

statute, CONN. GEN. STAT. ANN. § 52-278d, provides that the attachment sought must exceed the value of any set off or counterclaim. The amount Miller owes to MLCC exceeds the amount of her alleged damages. Moreover, for purposes of the attachment, the $8,680,233.57 due and owing to MLCC, should not be off set by the amount of damages she allegedly sustained. Miller has argued that she is entitled to the return of $4,800,000, which represents the amount of the securities which were liquidated upon her default (the "Funds"). She also claims that MLCC is responsible for the capital gains tax liability triggered by the sale of the securities which were liquidated pursuant to the Pledge Agreement. Miller, however, is secured in the event she were to establish liability against MLCC. The parties previously stipulated that pending resolution of this litigation, the Funds would be held by MLPF&S in a separate account (the "Account") and a bond would be posted for the balance of any other alleged damages.[2/] Simply, stated, the amount owed to MLCC cannot be reduced by the amount of Miller's alleged damages because she is fully secured with respect to her claim for damages. Indeed, without an attachment issued in favor of MLCC for the full amount of the indebtedness, the anomaly will be that the debtor, Miller -- who borrowed $7,500,000 from MLCC and is in default of her obligations to repay -- has security for her claims while the lender, MLCC, is not fully secured and is vulnerable to the claims of intervening creditors.

Accordingly, MLCC requests a prejudgment order of attachment in accordance with the laws of the State of Connecticut. In addition, MLCC also requests an order, pursuant to

---

[2/]    Although the Funds are held in a separate account, they may be subject to the claims of intervening creditors. In addition, it is possible that Miller could attempt to pledge the Funds as security for another indebtedness. Accordingly, the attachment is necessary to prevent an intervening creditor from obtaining a priority over MLCC.

CONN. GEN. STAT. ANN. § 52-278n, requiring Miller to identify and disclose all property and other assets in which she has an interest sufficient to satisfy said attachment.

## STATEMENT OF FACTS

A.     The First Loan

Julie Dillon Ripley Miller opened investment accounts with MLPF&S in May 1997. Miller is a graduate of Duke University where she received a Bachelor of Science degree. Miller was also awarded a Masters degree from Yale University. At the time Miller opened the accounts, the balance of the investment accounts totaled approximately $10,500,000. McEnerney Affidavit, ¶ 4.

Shortly thereafter, in November 1997, Miller purchased the Premises. The purchase price was $1,350,000, which was equal to the appraised value of the property. *Id.* at ¶ 5. At the time of the purchase, Miller opened margin facilities tied to two separate Cash Management Accounts ("CMA") and CMA Subaccounts: one to fund improvements in her existing house and a second to fund improvements at the Premises. *See* CMA Agreement, McEnerney Affidavit, Exhibit 2. At that time, Miller applied and was approved for a $1,350,000 loan under the terms of MLCC's "Mortgage 100" Loan Program (the "1997 Loan").[3] McEnerney Affidavit, ¶ 5. The original amount borrowed was equal to 100% of the purchase price. *Id.* Pursuant to the "Mortgage 100" Loan Program, Miller granted MLCC a first mortgage on the Premises and pledged approximately 30% of the purchase price, or $405,000 in

---

[3]     The "Mortgage 100" Loan Program generally affords qualified investors the opportunity to finance up to 100% of the purchase price of their home by pledging securities as additional collateral.

securities, as additional collateral for the downpayment. *See* 1997 Pledge Agreement, McEnerney Affidavit, Exhibit 3.

B.      The Consolidation Loan

Over the next two years, Miller expanded the scope of her renovation project in order to construct a totally new 8,500 square foot custom built home at the Premises.[4/] McEnerney Affidavit, ¶ 6.  In October 1999, Miller applied for a construction loan in the amount of $6,200,000.  Then, upon receipt of the plans and specifications from the general contractor, the loan amount was increased to $7,500,000.  The proceeds of the loan were dispersed as follows: $1,350,000 (representing the original loan amount for the purchase of the Premises); $3,800,000 (representing the balance under the margin loan facilities used to fund construction costs); and, $2,350,000 (representing the amount needed to complete the construction). *Id.*  The 1999 Loan was issued pursuant to the "Mortgage 100" Loan Program.  As was the case with the 1997 Loan, the collateral securing the 1999 Loan was comprised of a first mortgage on the Premises and a pledge of securities valued at $5,162,500, against which MLCC had recourse. *Id.* at ¶ 7.

The 1999 Loan was closed on December 7, 1999. *Id.* at ¶ 8.  Because Miller had allegedly planned a family vacation overseas, she appointed her accountant Barry Newman, to act as her attorney-in-fact.  Newman attended the closing on behalf of Miller and executed the Note (Exhibit B to the Answer and Counterclaim) and Mortgage (Exhibit C to the Answer and

---

[4/]     The construction was later expanded yet again and the Premises now totals 9,300 square feet.

Counterclaim) and Pledge Agreement (McEnerney Affidavit, Exhibit 4) (collectively referred to as the "1999 Loan Transaction Documents"). *Id.*

C.    The Modification Agreement

On January 30, 2001, more than a year following the December 7, 1999 closing, Miller entered into an agreement which reaffirmed the 1999 Loan Transaction and modified certain repayment terms of the Note and corresponding portions of the Mortgage (the "Modification Agreement"). McEnerney Affidavit, ¶ 9. *See* Modification Agreement, Exhibit D to the Answer and Counterclaim. Miller personally executed the Modification Agreement in her own handwriting.

Paragraph 3 of the Modification Agreement states that "Miller warrants that she has no existing right of offset, counterclaim, or other defenses against enforcement of the Note [and Mortgage] by MLCC and that, if any such right or defenses do exist, they are hereby waived and released." Modification Agreement, p. 3 ¶ 3.

Pursuant to Paragraph 1(a) of the Modification Agreement, Miller is required to pay interest under the Note on the first day of each month, beginning March, 2001, until February, 2011. Paragraph 4 of the Modification Agreement provides that "[t]he Note and the [Mortgage] shall continue to evidence and secure [Miller's] indebtedness thereunder as modified herein" and, except as modified therein, "neither the Note nor the [Mortgage] is modified by this Agreement and they shall remain in full force and effect until the obligations secured thereunder are paid in full and the [Mortgage] is satisfied of record." *Id.*, p. 3, ¶ 4.

Under its terms, the Mortgage secures: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extensions and modifications of the Note; (b) the payment of all other sums, with interest, advanced under Paragraph 7 (Protection of Lender's

-8-

Rights in the Property) to protect the security of the Mortgage; and (c) the performance of Miller's covenants and agreements under the Mortgage and the Note. *See* Mortgage, Exhibit C to the Answer and Counterclaim, p. 1. As discussed in the following paragraphs, Miller is in default under the Mortgage by (i) failing to make timely payments under the Mortgage and Note; and (ii) failing to pay property taxes for the Premises to the City of Norwalk.

D.    Miller's Defaults

In breach of Miller's obligations under the terms of the Mortgage, as amended, Miller failed to make interest payments due on the first of the month from February 1, 2003 to the present, and now owes MLCC interest in the aggregate sum of $312,655.69. McEnerney Affidavit, ¶ 13. Pursuant to Paragraph 8 of the Note, if the full amount of any monthly payment is not received by MLCC at the end of 15 calendar days after its due date, Miller owes a 6% late fee for each such late payment. The penalties now total $14,641.60.

Paragraph 4 of the Mortgage further requires Miller to pay all taxes attributable to the Premises. In breach of Miller's obligations under the terms of the Mortgage, Miller failed to remit to the City of Norwalk property taxes on the Premises for the years 2000 and 2001, resulting in the filing of tax liens in the amount of $26,533.77 and $39,854.24, respectively. McEnerney Affidavit, ¶ 14.

The City of Norwalk filed suit on January 14, 2003 to satisfy its tax lien. *Id.* at ¶ 15. Pursuant to Paragraph 7 of the Mortgage, which permits MLCC to make payments to safeguard its interest in the Premises, MLCC paid the City of Norwalk $67,733.96 in costs and fees to satisfy Miller's property tax obligations. *Id.* Paragraph 7 of the Mortgage further provides that these costs and fees, with interest from the date of demand for reimbursement, are to be treated as additional debt secured by the Mortgage.

-9-

MLCC has satisfied all of its obligations under the Note and Mortgage, as amended. McEnerney Affidavit, ¶ 16. MLCC provided notice to Miller of these defaults by letter dated May 16, 2003 via U.S. First Class Mail, U.S. Registered Mail (Return Receipt Requested) and Express Mail Overnight Delivery (the "Notice of Default"). *See* Notice of Default, Exhibit E to the Answer and Counterclaim. The Notice of Default complied with all applicable notice requirements of the Mortgage with regard to MLCC's subsequent right to foreclose upon the Premises and accelerate the debt secured by the Mortgage without further notice. Miller has failed to cure her defaults in accordance with the Notice of Default. McEnerney Affidavit, ¶ 16.

Paragraph 20 of the Mortgage, which provides for acceleration of the debt secured by the Mortgage, states that MLCC "shall be entitled to collect all expenses incurred in pursuing the remedies provided for in this paragraph 20 [any remedy permitted by law], including, but not limited to, reasonable attorneys' fees and costs of title evidence."

As evidenced by the Note and Mortgage, Miller borrowed $7,500,000 from MLCC and MLCC is entitled to be repaid that principal amount in addition to penalties, interest, taxes, ongoing attorneys' fees and expenses in the current amount of $8,680,233.57.

ARGUMENT

AN ORDER OF ATTACHMENT
SHOULD BE GRANTED

MLCC moves this Court, pursuant to Fed. R. Civ. P. 64 and Local Rule 4(c), for a prejudgment order of attachment in accordance with the laws of the State of Connecticut.[5]

Pursuant to CONN. GEN. STAT. ANN. § 52-278i (West 2004), a defendant may apply for a prejudgment remedy, such as an order of attachment, "in any civil action, upon filing a set-off or counterclaim containing a claim for money damages ... at any time during the pendency of such action." Under CONN. GEN. STAT. ANN. § 52-279 (West 2004), "[a]ttachments may be granted upon all complaints containing a money demand...." The purpose of the attachment statute is to enable a creditor, such as MLCC, to "'forestall any dissipation of assets'" and to bring those assets "'into the custody of the law to be held as security for the satisfaction of such judgment'" as the claimant shall recover. *Cahaly v. Benistar Prop. Exch. Trust Co., Inc.*, 812 A.2d 1, 7 (Conn. App. Ct. 2002), (quoting *E.J. Hansen Elevator, Inc. v. Stoll*, 356 A.2d 893, 896 (Conn. 1975)).

A.    An Order of Attachment Will Be Granted
      Upon a Showing of "Probable Cause"

Upon the filing of a motion for attachment, a hearing shall be held in accordance with the requirements of CONN. GEN. STAT. ANN. § 52-278d (West 2004),[6] to determine whether

---

[5]    Pursuant to Fed. R. Civ. P. 64, an order of attachment is available to MLCC "under the circumstances and in the manner provided by the law of the state in which the district court is held." Pursuant to Local Rule 4(c), "a party may secure a pre-judgment remedy, as permitted by, and in accordance with, the laws of the State of Connecticut."

[6]    Pursuant to CONN. GEN. STAT. ANN. § 52-278d, "[t]he hearing shall be limited to a determination of (1) whether or not there is probable cause that a judgment in the amount
                                                                    (...continued)

"the defendant has shown probable cause to believe that judgment will be rendered in the matter in favor of the defendant...." CONN. GEN. STAT. ANN. § 52-278i. The courts of Connecticut have repeatedly defined "probable cause" as a "flexible common sense standard that does not demand that a belief be correct or more likely true than false." *Dunleavey v. Paris Ceramics USA, Inc.*, 819 A.2d 945, 948 (Conn. Super. Ct. 2002) (finding probable cause existed to support a prejudgment order of attachment). Instead, as this Court has held, "probable cause" is merely a "*bona fide* belief in the existence of the facts essential under the law for the action...." *Amatulli v. People's Bank*, 965 F.Supp. 1, 2 (D.Conn. 1997) (granting prejudgment remedy upon finding of "probable cause") (quoting *Three S Development Co. v. Santore*, 474 A.2d 795, 796 (Conn. 1984)).

        As the Appellate Court of Connecticut summarized in *Benton v. Simpson*, 829 A.2d 68, 72 (Conn. App. Ct. 2003), (quoting *Bank of Boston Connecticut v. Schlesinger*, 595 A.2d 872, 874 (Conn. 1991)):

> The role of the trial court in considering an award of a prejudgment remedy is well established. "Pursuant to our prejudgment remedy statutes ... the trial court's function is to determine whether there is probable cause to believe that a judgment will be rendered in favor of the plaintiff in a trial on the merits .... **The hearing in probable cause for the issuance of a prejudgment remedy is not contemplated to be a full scale trial on the merits of the plaintiff's claim. The plaintiff does not have to establish that he will prevail, only that there is probable cause to sustain the validity of the claim ... The court's role in such a hearing is to determine probable success by weighing probabilities"** (emphasis added).

---

(...continued)
        of the prejudgment remedy sought, or in an amount greater than the amount of the prejudgment remedy sought, taking into account any defenses, counterclaims or set-offs, will be rendered in the matter...."

B.    There is Probable Cause to Sustain The
      Validity of MLCC's Claim for Repayment

A prejudgment order of attachment should be granted because there is "probable cause to believe that a judgment will be rendered" in MLCC's favor. *See* CONN. GEN. STAT. ANN. § 52-278i. It is undisputed that Miller originally borrowed $1,350,000 from MLCC in 1997 to finance 100% of the purchase price of the Premises,[7] that the loan was subsequently consolidated into a loan for $7,500,000 which MLCC made to Miller on December 7, 1999, that the 1999 Loan was <u>personally</u> reaffirmed by Miller on January 30, 2001 when she entered into the Modification Agreement, and that as part of the Modification Agreement Miller represented and warranted that the 1999 Loan was not subject to any defense or counterclaim and that Miller is in default because she failed to make payments to MLCC as required by the Note and Mortgage and pay the property taxes for the Premises, resulting in the filing of a lien. The amount of the indebtedness totals $8,680,233.57.

Miller has challenged the validity of the 1999 Loan Transaction Documents. If Miller were to succeed on those claims (which MLCC disputes), she nevertheless would remain obligated to repay MLCC the substantial sums she borrowed. However, MLCC would not have any security for its debt and would be vulnerable to intervening claims by other creditors. The risk of intervening creditors is not merely theoretical, it is real, as evidenced by the filing of the tax lien by the City of Norwalk. Although the debt owed to MLCC along with MLCC's demand are sufficient to satisfy the statutes' prerequisites, the risk that MLCC would not have access to the Mortgage or the Funds as sources of repayment provides an additional basis for issuing an

---

[7]    At no time has Miller challenged the validity of the 1997 Loan documents.

order of attachment in the full amount of the indebtedness. Moreover, because Miller is contesting the validity of the 1999 Pledge Agreement, it is possible that she could attempt to pledge the Funds held in the Account as collateral for another indebtedness.

The use of a prejudgment attachment order to secure payment of an anticipated deficiency judgment and establish priority over competing creditors was firmly established by the Appellate Court of Connecticut in *People's Bank v. Bilmor Building Corp.*, 614 A.2d 456, 457 (Conn. App. Ct. 1992). The fact that judgment has not been entered, and the precise amount of the deficiency not known, will not prevent this Court from entering an order of attachment.

In *People's Bank*, a lender sought a prejudgment attachment as security for a deficiency judgment in a mortgage foreclosure action. In opposition, the borrower asserted that a prejudgment attachment is not available to the lender because a claim for a deficiency judgment does not accrue unless and until judgment is entered.

The Court rejected that argument and held that an attachment may be obtained because a claim for a deficiency judgment matures once the borrower defaults on the underlying loan. *See id.* at 460. Upon default, the lender is then free to pursue the amount due on the loan or to foreclose on the mortgage, or, "pursue both of these remedies simultaneously in one consolidated foreclosure suit." *Id.* at 460.

"[U]pon the requisite showing of probable cause," the lender may also obtain a prejudgment attachment for the amount of the anticipated deficiency in order to secure payment and establish priority over competing creditors. *Id.* at 462. Indeed, the Court noted, the "likelihood of a deficiency judgment and the probable amount of such a judgment are much easier to ascertain ... than in many other cases where prejudgment relief is routinely granted." *Id.* at 461. Furthermore, the Court explained,

-14-

> ... there is nothing in [CONN. GEN. STAT. ANN. §§ 52-278 and 52-279] that specifically prohibits the granting of a prejudgment attachment to secure the payment of a deficiency judgment. If the legislature intended to prevent the use of prejudgment attachments to secure the payment of deficiency judgments in foreclosure cases, then presumably it would have done so. It has not.

*Id.* at 461.

The Superior Court of Connecticut reached the same result in *Ameriquest Mortgage Co. v. Hutwohl*, No. CV0103445305, 2003 WL 21007904 (Conn. Super. Ct. Apr. 17, 2003), holding that a prejudgment attachment order may be granted to secure an anticipated deficiency judgment since "Connecticut law allows the plaintiff to avail itself of the commonly used procedural device of a prejudgment remedy in order to improve its chances to receive full recovery of a debt owed it." *Id.*

Like the lenders in *People's Bank* and *Ameriquest*, MLCC is entitled to a prejudgment attachment order to secure recovery of an anticipated deficiency judgment and establish priority over the claims of competing creditors. Absent such an order, a judgment in MLCC's favor may prove hollow as there may be nothing to prevent Miller from disposing of her assets in the interim or attempting to pledge the Funds in the Account as collateral for another indebtedness. Nor may there be anything to prevent competing creditors from gaining a priority interest in Miller's assets over MLCC.

As shown above, MLCC is not the first creditor to make a claim against Miller. Indeed, in January, 2003, the City of Norwalk brought suit to foreclose on a tax lien which it had previously filed against the Premises arising from Miller's failure to pay her property taxes for 2000 and 2001. McEnerney Affidavit, ¶ 15. Miller has also failed to make interest payments due on the first of the month from February 1, 2003 to the present. *Id.* at ¶ 13. Even if Miller

-15-

concedes as part of this motion that the Mortgage is valid and that MLCC has a security interest in the Funds, MLCC is nevertheless entitled to attach such additional assets sufficient to cover the amount of any deficiency created by accruing interest, penalties, attorneys' fees and expenses. The most recent appraisal values the Premises at $4,850,000. McEnerney Affidavit, ¶ 2. The Funds held in the Account total approximately $5,000,000.

Judgment will be rendered in MLCC's favor and accordingly, a prejudgment attachment order is necessary to secure MLCC's recovery. In addition, MLCC also seeks a temporary restraining order enjoining and restraining Miller and any other persons in possession, control or custody of the Premises or the Funds from transferring or disposing such property pending the hearing of this motion and an order, pursuant to CONN. GEN. STAT. ANN. § 52-278n, directing Miller to disclose all property in which she has an interest sufficient to satisfy a prejudgment attachment.

CONCLUSION

For all of the foregoing reasons, MLCC respectfully requests that this Court grant

its motion in its entirety.

Dated:    New York, New York
          March /9, 2004

PAUL, HASTINGS, JANOFSKY &
WALKER, LLP

By: _____
    Douglas C. Conroy, ct11555
    Thomas P. Friedman, ct24947
    1055 Washington Boulevard
    Stamford, CT 06901-2217
    (203) 961-7400

BRYAN CAVE LLP

By: _____
    Dennis C. Fleischmann, ct11013
    1290 Avenue of the Americas
    New York, New York 10104
    (212) 541-2000

*Attorneys for Defendant*

-17-

<u>CERTIFICATE OF SERVICE</u>

This is to certify that on this 19th day of March, 2004, a copy of the

foregoing MEMORANDUM OF LAW IN SUPPORT OF MERRILL LYNCH CREDIT

CORPORATION'S MOTION FOR A PREJUDGMENT ORDER OF ATTACHMENT

was delivered via U.S. first class mail to:

Patrick W. Begos, Esq.
BEGOS & HORGAN, LLP
327 Riverside Avenue
Westport, CT 06880

Thomas P. Friedman