UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
HARTFORD

-----------------------------------------------------------------x
JULIE DILLON RIPLEY MILLER,          :
                                      :   Case No. 3:03CV1016(RNC)(DFM)
        Plaintiff,                    :
                                      :
    – against –                       :   April 22, 2004
                                      :
MERRILL LYNCH CREDIT CORPORATION,    :
                                      :
        Defendant.                    :
-----------------------------------------------------------------x

FILED
2004 APR 23  A 10: 53
U.S. DISTRICT COURT
HARTFORD, CT

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
MOTION FOR PREJUDGMENT REMEDY**

Plaintiff, Julie Dillon Ripley Miller, by her attorneys, Begos & Horgan, LLP, submits this brief in opposition to defendant's motion for a prejudgment remedy of attachment

**PRELIMINARY STATEMENT**

Defendant, Merrill Lynch Credit Corporation ("MLCC") seeks an attachment in connection with its counterclaim, which asserts a claim for foreclosure of a mortgage. Specifically, MLCC seeks an attachment in an amount exceeding $8.6 million against: (i) the real property which is presently burdened by the mortgage it seeks to foreclose; (ii) funds in which MLCC claims a security interest and which are presently being held by MLCC's affiliate pursuant to an order of this Court that precludes any disbursement; and (iii) "other property sufficient to secure the amount due[.]"

MLCC is not entitled to this relief. The evidence developed to date demonstrates that MLCC is **not** likely to succeed on the merits of its foreclosure counterclaim. Rather, the evidence demonstrates that MLCC made a loan that it knew Ms. Miller could not repay, for the purpose of building a house that it knew would be worth half of the construction cost. Though MLCC knew all this, it did not tell Ms. Miller. Moreover, MLCC allowed the loan documents to be executed by an

alleged attorney-in-fact pursuant to a power of attorney that it knew to be insufficient, that it should have known to be invalid, and that two handwriting experts found to have been altered by someone other than Ms. Miller. The weight of the evidence demonstrates that MLCC's loan was unconscionable, and that MLCC has acted in bad faith and with unclean hands (*see* Point I, *infra*).

Even if MLCC could establish probable cause for its counterclaim, it is not entitled to an attachment. Contrary to MLCC's assertion (MLCC Brief, at 1 and 2), its counterclaim does not seek "repayment of monies due pursuant to a note." Rather, it seeks foreclosure of a mortgage, which precludes an action on the note. It is well-settled that a mortgagee can seek an attachment only to the extent of any potential deficiency judgment (*see* Point II, *infra*).

Here, MLCC already has more than enough security for any such deficiency judgment Specifically, the appraisal MLCC obtained for this action concluded that the real property has a value of at least $4,850,000; MLCC has previously obtained appraisals showing significantly higher values. Moreover, MLCC has already claimed a security interest in $4.8 million being held by Merrill Lynch, Pierce, Fenner & Smith ("MLPFS") pursuant to order of this Court. As MLCC already claims security in assets far exceeding the amount of any deficiency judgment, it is not entitled to an attachment.

To be sure, there are significant over-statements of the debt MLCC claims it is owed. For example, MLCC is seeking to recover an astounding $766,000 in legal fees, which cannot meet any test of reasonableness.

For these reasons, MLCC's motion should be denied.

## STATEMENT OF FACTS

**Background**

Ms. Miller was born in 1951. Though her parents had substantial assets, Ms. Miller's assets and income were, for most of her adult life, modest. She was a Registered Nurse, and her husband owned a bait shop. At all times relevant to this action, Ms. Miller had stopped working to raise her five children. Until 1997, Ms. Miller and her family lived in a modest house with a mortgage of approximately $100,000, and had few investment assets.

Ms. Miller's financial circumstances changed dramatically in 1996 with the death of her mother, following which she inherited various assets and trust interests. Most significantly, she inherited securities valued at approximately $10 million ("Inherited Securities"), as a distribution of a trust that had been established by her grandfather. The bulk of the Inherited Securities were blue-chip stocks, such as Coca-Cola, DuPont, Kodak, Exxon, Johnson & Johnson, and Weyerhauser. Due to the manner in which Ms. Miller inherited them, her cost basis in many of the Inherited Securities was very low. For example, as of August 1997, PaineWebber (where the assets were then held) reported that Ms. Miller's cost basis in Inherited Securities with a market value of more than $8 million was less than $200,000.

Despite her significant inherited wealth, Ms. Miller was, and remains, very unsophisticated regarding investments. Virtually her only operating principal with regard to the Inherited Securities was something that had been repeated to her since she was a child: "don't sell the stock."

In or about the summer of 1997, Ms. Miller began exploring the possibility of buying a new house. In that context, she spoke to Jay Falini, a broker with MLPFS. Mr. Falini attempted to interest Ms. Miller in the possibility of letting MLPFS finance the purchase of her new home. Specifically,

Mr. Falini discussed various financing options offered by MLCC, which was, like MLPFS, a subsidiary of Merrill Lynch & Co., Inc.

MLCC and MLPFS use the marketing phrase "Liability Management" to refer to their alleged expertise in assisting customers in planning and structuring their borrowing, much the same as they would plan and structure investing. As MLCC says on its website: "MLCC provides clients with liability management solutions that assist them in meeting their overall wealth management goals. ... [MLPFS] Financial Advisors recommend MLCC products and services to help clients manage what they owe as effectively as what they own." (http://mlcc.ml.com/public/products/AboutMLCC).

Robert Smith, MLCC's former Senior Vice President, confirmed that MLCC's role within the Merrill Lynch family included creating liabilities in order to make it difficult for customers to leave MLPFS; he referred to this as creating *stickiness*: "I think it was widely understood that liabilities created sort of a stickiness to the client relationship and, you know, helped to centralize all of the client's financial matters in one place[.] ... [I]nherently it would be more difficult for a person with a pledge account at the firm to move those assets without satisfying the terms of the related pledge agreement." (Smith Tr. at 17-19).

The Inherited Securities, properly managed, should have been sufficient to allow Ms. Miller and her family a comfortable lifestyle for many years, and most likely for the rest of her life. For example, in January 1998, MLPFS estimated that the Inherited Securities, if left alone, would produce annual income of almost $175,000. Unfortunately, MLCC's and MLPFS's "liability management," put their own interests far ahead of Ms. Miller's interests, resulting in her financial devastation.

**The 1999 Construction Loan**

When MLCC first began underwriting the loan at issue in this case, Ms. Miller's liabilities had already been substantially *mismanaged* by Mr. Falini and MLPFS. Most significantly, they recommended that she fund the construction of her house by writing checks drawn on her MLPFS account. Mr. Falini arranged things so that those checks were paid by margin debits against the Inherited Securities and other securities in the Account. By the Fall of 1999, as a result of Mr. Falini's "liability management," Ms. Miller was deeply in debt to MLPFS. Her assets in the Account totaled $10.6 million, but her margin debt was $5.8 million. Almost $4 million of that margin had been used for the construction project, though the house was not nearly finished. MLPFS was charging her approximately $40,000 a month in interest on the margin debt.[1]

Mr. Falini apparently began to realize at this time that the construction project was going to exhaust the margin capacity of the Inherited Securities. The "best" case scenario was that Ms. Miller would be unable to spend any more money on the half-finished house. The worst case scenario was that margin and/or maintenance calls would begin to be issued against the Account.

Mr. Falini did not say any of this to Ms. Miller, however. Instead, he advised and encouraged Ms. Miller to seek a new loan from MLCC. He completed an application, for Ms. Miller's signature, seeking a construction loan in the amount of $6,200,000. In discussing the "need" for this loan, Mr. Falini never mentioned that Ms. Miller was about to run out of money. Instead, he told her that

---

[1] The monthly statements that MLPFS was sending to Ms. Miller at that time were 50 to 60 pages long. Though there was a summary page, that summary did not disclose the level of margin debt, or the interest charges. Ms. Miller would only uncover that information by analyzing the statements in detail, which she was not sophisticated enough to do.

MLCC's oversight of the construction process would assist her in completing the project in a timely and cost-effective manner.

When Mr. Falini submitted the application to MLCC, he did so with a note instructing MLCC: "No calls directly to client. ... Client highly sensitive." In an introductory conversation with MLCC's loan officer, Mr. Falini reiterated: "Do not call client." MLCC, which saw its role as assisting MLPFS in obtaining and keeping "Key" clients like Ms. Miller, followed Mr. Falini's instruction.

### *MLCC's Underwriting*

MLCC's underwriting process demonstrated that it completely ignored both industry-standard underwriting procedures, as well as its own procedures, in its efforts to "qualify" Ms. Miller for the loan and create the *stickiness* MLCC desired.

First, the clear evidence shows that MLCC knew Ms. Miller was earning less than half of the income needed to make the payments on a $6.2 million loan, which MLCC estimated to be approximately $42,000 a month. MLCC solved this problem by calculating an income figure that its underwriter has admitted was "made up." Specifically, MLCC obtained Ms. Miller's tax returns for 1995 through 1998. These returns showed Ms. Miller's total annual income (including tax exempt interest and excluding capital gains), varied from $7,116 (in 1995) to $259,918 (in 1998). Her 1998 income would translate to $21,667 per month, or half of the sum needed to make the payments on the proposed loan.[2] Ms. Miller's actual income was so deficient that MLCC completely ignored it in the underwriting process.

---

[2] Ms. Miller reported a large capital gain in 1998, resulting from Mr. Falini's sale of approximately $2,500,000 in Inherited Securities. MLCC's underwriters conceded that such one-time capital gains could not be considered income for underwriting purposes, as MLCC's underwriting guidelines required a showing that capital gains were consistent over several years. Ms. Miller's were not.

Rather than denying the loan for insufficient income, MLCC made up a higher income number that would make the loan appear more credible on its books. Specifically, MLCC assumed that Ms. Miller was earning a return of 6.1% per year on all of her Inherited Securities, and further assumed that she would sell the Inherited Securities not pledged to MLCC as security in equal installments over a fifteen year period. In this manner, MLCC's underwriters concluded that Ms. Miller had a hypothetical income of almost $70,000 a month.

MLCC did this despite its knowledge that Ms. Miller was not earning a 6.1% return on her Securities. MLCC also knew that she could never achieve the hypothetical income it calculated, because its calculations incorrectly assumed: (i) that the proposed loan would be used to pay all the margin debt that had accumulated against the securities that would have to be reinvested; and (ii) that Ms. Miller would not have any capital gains tax liability if she sold the Inherited Securities. But none of that really mattered to MLCC, because MLCC never told her that the only way she could make the payments on the loan was to sell all of the securities and reinvest them in some vehicle paying a 6.1% return. Had they done so, Ms. Miller would have refused to allow the loan process to go forward.

Even worse, MLCC obtained two appraisals showing that Ms. Miller's house, when finished, would be worth less than $4 million. When it received those appraisals, MLCC knew that Ms. Miller had already spent $1,350,000 on the property, and almost $4 million on construction. MLCC concluded that an additional $2.3 million would be needed to finish the house. MLCC never told Ms. Miller about this "appraisal problem."

After MLCC approved the loan, its loan officer determined that $6.2 million would not provide enough money to pay off the existing mortgage and finish the house, and he unilaterally increased

the loan amount from $6.2 million to $7.5 million. Even though the loan officer was not an underwriter, he changed the underwriting documents reflecting approval of the $6.2 million loan, to make it appear as if the underwriters had, in fact, approved a $7.5 million loan. This increase had the effect of making even the wildly inflated "calculated" income insufficient to make the monthly payments. Specifically, MLCC estimated Ms. Miller's total monthly obligations with a $7.5 million loan to be $63,826, and it calculated her "made up" monthly income at $63,576. Thus, even if Ms. Miller were able to generate a 6.1% return on all her investment assets, her obligations would still exceed her income.[3]

In reality, as discussed above, Ms. Miller's actual income was only about $22,000 a month. Using Ms. Miller's actual income, the disposable income MLCC should have calculated was a *negative* $41,000 a month. But MLCC never told Ms. Miller any of this.

In sum, MLCC knew that, if the loan closed, Ms. Miller would quickly default, and MLCC would foreclose. Naturally, MLCC did not want to have to recover a $7.5 million loan out of a house that it expected to be worth less than $4 million, so MLCC insisted on a first priority security interest in more than $5 million of the Inherited Securities. However, MLCC did not tell Ms. Miller about this requirement.

**The Power of Attorney**

The approval of a construction loan that MLCC knew would end in default was, unfortunately, only the first act of the real misconduct. When MLCC approved the loan in late November 1999, it notified Mr. Falini that the loan could be closed at any time up to February 1, 2000.

---

[3] The "obligations" were limited to those directly related to the property, such as mortgage payments, insurance and taxes. Ms. Miller's true monthly obligations, which would include her living expenses and discretionary expenses, would be higher, thus increasing the monthly shortfall.

As Mr. Falini knew, Ms. Miller had plans to be out of the country from December 2, 1999 through the end of the year. This was not a problem for MLCC, nor was it a problem for Ms. Miller, as none of the people involved in the construction of the house needed any substantial funds before January 2000. Therefore, there was every reason for the loan to be closed in January, upon Ms. Miller's return.

Mr. Falini apparently saw things differently. He advised MLCC that the loan *had* to close before the end of December 1999. Mr. Falini claims he did so because the interest rate on the loan would be lower than the interest being charged on the margin debits; in reality, however, the interest rate on the loan was *higher*. Thus, the only possible reason for Mr. Falini's insistence is that he wanted to receive, before the end of the year, the production credits that he knew he was going to get if and when the loan closed.

MLCC advised Mr. Falini that Ms. Miller would need to sign a power of attorney for the loan to close before the end of the year. Mr. Falini obtained a Statutory Short Form Power of Attorney, and forwarded it to Ms. Miller. Ms. Miller completed the form, signed it before two witnesses, and had it acknowledged by a notary, as the statute requires. She did this on December 2, 1999, the day she was leaving the country.

Unfortunately for Mr. Falini's plans, the power of attorney Ms. Miller signed did not authorize the attorney-in-fact to enter into real estate transactions. Rather than ask Ms. Miller to sign a new document (which would have made closing in December impossible, as Ms. Miller was leaving the country the day she signed the power of attorney), Mr. Falini altered the power of attorney until it was acceptable to MLCC. Among other things, Mr. Falini whited out portions of the form where Ms. Miller withheld authority, and added language to other portions of the power of attorney.

9

Mr. Falini's changes to the power of attorney can be seen on the original, and also by reviewing a series of faxes that Mr. Falini sent to the title agent. Expert handwriting analysis of the power of attorney confirm that a significant portion of the writing on the form was not by Ms. Miller, and the faxes show that the alterations were made by Mr. Falini or someone acting on his behalf.[4]

Even if the power of attorney, as altered by Mr. Falini, authorized Mr. Newman to sign a mortgage and note on Ms. Miller's behalf (which it did not), it expressly, and clearly, withheld authority for anyone to pledge Ms. Miller's securities. Nonetheless, Mr. Falini had Mr. Newman sign a Pledge Agreement purporting to do exactly that.

It must be emphasized that, prior to the closing, Mr. Falini had specifically instructed MLCC not to communicate with Ms. Miller. Accordingly, she had no idea about the true terms of the loan Mr. Falini had procured. Moreover, because Mr. Falini arranged for the loan to close while Ms. Miller was out of the country, she did not have an opportunity to read or understand the commitments that MLCC was insisting she make. Had MLCC or Mr. Falini told Ms. Miller, at any time before the loan closed, that the end result of the loan would be a sale of some or all of the Inherited Securities, Ms. Miller would have rejected it out of hand. In this regard, MLCC's expert recently testified that the most likely result of the loan would be: (i) the sale of virtually all the securities not pledged as collateral; (ii) the sale of the house; and (iii) the liquidation of the securities pledged as collateral. Thus, MLCC knew when it agreed to make the loan that it would most likely end up taking all of Ms. Miller's assets.

---

[4] In deposition testimony given before these faxes were produced by the title closing agent, Mr. Falini claimed that he never saw the power of attorney after Ms. Miller signed it (Falini Tr. at 139-40). These faxes prove Mr. Falini's testimony to be false. Moreover, MLCC's lending officer testified that he had a conversation with Mr. Falini about the inadequacy of the power of attorney as executed by Ms. Miller, and Mr. Falini "took care of it." (Rosenblum Tr. at 15-17)