Finally, Mr. Falini had advised Ms. Miller that she did not need to be represented by counsel in connection with the loan. Following his advice, Ms. Miller had no independent representation at the closing.

**Post Closing**

After the loan closed, Mr. Falini continued insulating Ms. Miller from information about the terms of the loan.

He asked MLCC to tell him directly what payments were due each month, so he could wire the payments directly from the Account to MLCC without having to discuss the amount with Ms. Miller. As Mr. Falini told MLCC : "I do not want to get behind on this. There are many moving parts which I need to juggle." In fact, several months after the closing, Mr. Falini confirmed that Ms. Miller had never received monthly interest statements on the loan. The monthly payments on the construction loan were in excess of $40,000 a month. Mr. Falini "juggled" this payment by, once again, borrowing against whatever Inherited Securities were available. He had to borrow even more because, as with any construction loan, there are costs that MLCC did not pay. Thus, in addition to the monthly payment to MLCC, Ms. Miller continued to spend money on the construction project. Now, however, Ms. Miller had less "borrowing power," because more than $6 million in her Inherited Securities had been transferred into a "Pledge Account" controlled by MLCC. Within months after the construction loan closed, Ms. Miller was in default.

**The Phantom Liquidation and Repurchase**

Following Ms. Miller's initial default on the construction loan, there ensued a months-long "workout process" among Ms. Miller, MLCC and MLPFS. In April 2002, MLCC mistakenly

11

directed MLPFS to liquidate all of the Inherited Securities in the Pledge Account. MLPFS followed that direction, even though MLCC did not have any legitimate right to do so.

MLCC's vice president has confirmed that the direction was a mistake, and he has testified that MLCC promptly acted to "correct" it. For purposes of this proceeding, what is most disturbing about this event is that, according to MLPFS's monthly statements, *it never happened*. More specifically, MLCC's documents confirm that the liquidation occurred on or about May 3, 2002. This was the forced sale of more than $6 million in Inherited Securities. MLCC's executive testified that MLCC realized its error and directed MLPFS to reverse the sale. The monthly statement Ms. Miller received from MLPFS for May 2002, however, shows none of this activity (with the exception of a sale of Weyerhauser stock, which MLCC, or respondents, apparently forgot to reverse until several weeks later).

A little less than a year later, MLCC again liquidated the securities in the Pledge Account, and this time did not repurchase them. Instead of using the proceeds to make the monthly payments that were due, or to reduce the principal balance, MLCC directed MLPFS to keep the funds in the account, earning approximately 1% interest, while accruing interest and late fees on the loan balance at a much higher rate.

## ARGUMENT

**I.    MLCC CANNOT SHOW PROBABLE CAUSE THAT JUDGMENT WILL BE RENDERED IN ITS FAVOR ON ITS FORECLOSURE COUNTERCLAIM**

MLCC agrees that it is not entitled to an order of attachment unless it "has shown probable cause to believe that judgment will be rendered in the matter in [its] favor" (MLCC Br. at 11-12,

12

*quoting* C.G.S.A. § 52-278i). We submit that the undisputed evidence and the law demonstrates that MLCC cannot demonstrate probable cause of success.

### A.   The 1999 Loan Was Unconscionable

"The classic definition of an unconscionable contract is one which no man in his senses, not under delusion, would make, on the one hand, and which no fair and honest man would accept, on the other." *Smith v. Mitsubishi Motors Credit of America*, 247 Conn. 342, 349, 721 A.2d 1187 (1998) (internal quotes omitted).

> As applied to real estate mortgages, the doctrine of unconscionability draws heavily on its counterpart in the Uniform Commercial Code which, although formally limited to transactions involving personal property, furnishes a useful guide for real property transactions. ... The basic test is whether, in the light of the general commercial background and commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract.

*Cheshire Mort. Service, Inc. v. Montes*, 223 Conn. 80, 88-89, 612 A.2d 1130 (1992). "The determination of unconscionability is to be made on a case-by-case basis, taking into account all of the relevant facts and circumstances." *Id.*

In practice, courts "have come to divide this definition into two aspects of unconscionability, one procedural and the other substantive, the first intended to prevent unfair surprise, and the other intended to prevent oppression." *Smith v. Mitsubishi*, 247 Conn. at 349. Establishing substantive unconscionability alone is sufficient. *Id.* at 353 ("Even in the absence of procedural unconscionability, Moore might avoid liability ... if he could establish that the clause was substantively unconscionable.").

Because determining unconscionability is a fact-specific exercise, a discussion of the facts that courts have found sufficient to establish unconscionability is warranted.

13

In *Family Financial Services, Inc. v. Spencer*, 41 Conn. App. 754, 763, 677 A.2d 479 (Ct. App. 1996), the court affirmed a finding that a mortgage was unconscionable, and specifically found that the trial court had properly concluded that the mortgage was both procedurally and substantively unconscionable. *Family Financial* found that the mortgage was procedurally unconscionable because:

> (1) the defendant had a limited knowledge of the English language, was uneducated and did not read very well; (2) **the defendant's financial situation made it apparent that she could not reasonably expect to repay the second mortgage**; (3) at the closing, the defendant was not represented by an attorney and was rushed by the plaintiff's attorney to sign the documents; (4) the defendant was not informed until the last moment that, as a condition of credit, she was required to pay one year's interest in advance; and (5) there was an absence of meaningful choice on the part of the defendant. Finally, in determining unconscionability, the court also took into account the fact that the plaintiff failed to disclose to the defendant that the real lenders in this transaction were the Masottas.

41 Conn. App. at 763-64 (emphasis supplied).

All of these findings are either directly applicable to Ms. Miller, or analogous to her situation. First, and most importantly, MLCC knew that Ms. Miller did not have sufficient income to repay the Loan; even the spurious "opportunity cost" income it calculated was insufficient to make the monthly payments (item 2). Ms. Miller was not represented by an attorney at the closing (at Mr. Falini's suggestion), and, indeed, MLCC's agent, Mr. Falini, scheduled the closing at a time when she could not attend at all (item 3). Ms. Miller was not informed at any time before the loan closed that: the loan amount had increased from $6.2 million to $7.5 million; her income was insufficient to make the payments on the loan; MLCC's underwriting showed that she would have to sell the Inherited Shares to make monthly payments; and MLCC concluded that the house, when completed, would be worth less than half of the construction cost (items 4 and 5). Though Ms. Miller was fluent

14

in English and college educated, she did not have an opportunity to review any of the documents concerning the loan before or at the closing (item 1).

*Family Financial* also found that the transaction at issue was substantively unconscionable, on the following grounds:

> The trial court found that the terms of the mortgage were unreasonably favorable to the plaintiff. The trial court also found that the defendant's monthly income was $1126.67 and that she owed $1011 monthly to People's Bank on her first mortgage. **On the basis of those findings, the trial court concluded that it was obvious that the defendant would not be able to make the required balloon payment at the end of the year.** Finally, the trial court found that the defendant lacked a reasonable opportunity to understand the terms of the contract. We conclude that the trial court's findings are supported by the record and the determination of substantive unconscionability is appropriate.

41 Conn. App. at 764 (emphasis supplied). Once again, the parallels to this case are significant.

The facts in *Montary Funding Group, Inc. v. Pluchino*, 2003 Conn. Super. Lexis 2442 (Super. Ct. Sep. 3, 2003) also demonstrate that the mortgage in this case was unconscionable. Significantly, the loan in that case was a commercial loan, which would ordinarily presume a more-sophisticated borrower. Nonetheless, the court summarized its findings as follows:

> In summary, the court relies on the following findings to conclude that the circumstances as a whole establish that the transaction was unconscionable: the defendant was unsophisticated and unrepresented by legal counsel; **he was financially unable to comply with the terms of the $ 25,000 note and this fact was known by the plaintiff when the loan was extended**; he was misled about the total, up-front expenses of the transaction, believing that they would be between the $ 4,000 and $ 5,000 estimate as represented by the plaintiff; he was not informed until the second closing that the loan amount would increase from $ 25,000 to $ 80,000; and he was not informed about the additional fees and expenses associated with the refinancing until he attended this closing. The transaction was unreasonably designed to benefit the plaintiff and created an absence of meaningful choice on the part of the defendant.

2003 Conn. Super. Lexis 2442 at *18 (emphasis supplied).

15

*Family Financial* and *Montary Funding* both confirm that a finding of unconscionability is warranted when the lender knew or should have known that the borrower will be unable to comply with the payment terms of the loan. This was underscored by "guidance" regarding "subprime lending" issued by four federal agencies overseeing banking (Office of the Comptroller of the Currency, Board of Governors of the Federal Reserve System, FDIC, and Office of Thrift Supervision) (available at http://www.fdic.gov/news/news/press/2001/pr0901a.html; a copy is annexed). In that "guidance, these agencies noted that predatory or abusive lending can occur "when the lender structures a loan to a borrower who has little or no ability to repay the loan from sources other than the collateral pledged." (*Id.* at 7). The agencies confirmed that one of the hallmarks of predatory lending is "making unaffordable loans based on the assets of the borrower rather than on the borrower's ability to repay an obligation." (*Id.* at 8).

This is further exemplified in *Ameriquest Mort. Co. v. McCorkle*, 2003 Conn. Super. Lexis 2087 at *8 (Ct. Super. July 16, 2003), in which the court refused to dismiss a defense of unconscionability, holding:

> Similar to *Family Financial Services*, it has been alleged in the present case that Ameriquest was aware McCorkle's financial situation was such that he would be unable to repay the loan. McCorkle has also alleged that Ameriquest prepared "grossly inaccurate" documents in order to make the loan appear reasonable. Such allegations, if proven, would establish that there were improprieties in the formation of the contract and that the terms of the contract were overly favorable to one of the parties. These allegations relate to the making of the loan, as well as the terms of the loan, and are sufficient to support a cause of action for procedural and substantive unconscionability.

*Ameriquest* additionally introduces the significance of finding that the lender created inaccurate documents to make the loan appear reasonable. As discussed previously, MLCC underwriting documents were certainly grossly inaccurate. Among other things, MLCC used a "made up" income

16

figure instead of Ms. Miller's actual income, and relied on untrue assumptions in to inflate even the made up income; made a $7.5 million loan when the underwriters had analyzed and approved only a $6.2 million loan; reported a loan-to-value ratio of only 100%, when the actual loan to value was closer to 200%. Perhaps most significantly, MLCC relied on a power of attorney that had been substantially changed by its agent, Jay Falini.

We submit that MLCC's actions in this case are such that Ms. Miller is likely to succeed on her defense of unconscionability. At the very least, the facts preclude MLCC from demonstrating probable cause for success on the merits.[5]

### B.   MLCC Has Unclean Hands, Precluding Foreclosure

The foreclosure of a mortgage is an equitable proceeding. *Montary Funding v. Pluchino, supra.* "It is a fundamental principle of equity jurisprudence that for a complainant to show that he is entitled to the benefit of equity he must establish that he comes into court with clean hands. ... The doctrine of unclean hands expresses the principle that where a plaintiff seeks equitable relief, he must show that his conduct has been fair, equitable and honest as to the particular controversy in issue." *Thompson v. Orcutt*, 257 Conn. 301, 310, 777 A.2d 670 (2001).

*Montary Funding*, 2003 Conn. Super. Lexis 2442 at *14 found the mortgagee's hands to be unclean:

---

[5] MLCC appears to claim that a "Modification Agreement" that MLCC insisted Ms. Miller sign when the 1999 Loan was converted from "construction to permanent" prevents her from asserting defenses to foreclosure (*see* MLCC Br. at 8). Such a claim is flawed for two reasons. First, such "waiver of defense" clauses are void as against public policy in consumer transactions. *Fairfield Credit Corp. v. Donnelly*, 158 Conn. 543, 264 A.2d 547 (1969). Second, under the terms of the original note, the loan *automatically* converted from a construction loan to a permanent mortgage, without any need for Ms. Miller or anyone else to execute any document. It is well-settled that "a modification of an agreement must be supported by valid consideration and requires a party to do, or promise to do, something further than, or different from, that which he is already bound to do." *New England Rock Services, Inc. v. Empire Paving, Inc.*, 53 Conn. App. 771, 776, 731 A.2d 784 (Ct. App. 1999). Because MLCC gave Ms. Miller nothing it was not already obligated to give when it asked her to sign the Modification Agreement, any waiver of rights in that agreement is ineffective.

17

> Under these particular circumstances, where the borrower was unsophisticated, was misled, and was unquestionably unable to comply with the terms of the note, the plaintiff has attempted to take advantage of the debtor in order to charge arbitrarily high fees as part of a transaction structured by the plaintiff precisely for this purpose. The court's enforcement of this loan according to its terms would involve the court in this unfair transaction in a manner that would run afoul of the unclean hands doctrine.

Unlike unconscionability, which looks at the circumstances at the time the loan was made, the doctrine of unclean hands also considers acts occurring thereafter. Therefore, MLCC's misconduct in connection with the phantom liquidation and then actual liquidation of Ms. Miller's securities also support a finding of unclean hands.

### C. MLCC Has Not Demonstrated it Was Licensed by Connecticut to Make the 1999 Loan, Precluding MLCC from Enforcing It

Connecticut law provides: "no person shall engage in the business of making first mortgage loans .... in this state unless such person has first obtained the required license[.]" C.G.S.A. § 36a-486(a). Though MLCC has asserted it was licensed, it has not produced any documents in this case showing that it had any license in 1999. Moreover, MLCC's web page, which discloses its "licensing information," does not disclose any Connecticut license (http://www.mlcc.com/public/products/licensinginfo.asp).

The Connecticut Supreme Court has held that a mortgage loan made by an unlicensed lender is unenforceable as against public policy. *Solomon v. Gilmore*, 248 Conn. 769, 791, 731 A.2d 280, 292 (1999) ("In reaching this conclusion, we join several of our sister states that similarly have held that loan contracts issued by moneylenders or creditors in violation of statutory licensing requirements are not enforceable, even though the applicable statutes did not expressly so provide"). Though *Solomon* concerned a second mortgage, rather than a first mortgage, licenses are required for each, and there is no reason why they should be treated differently.

18

Therefore, unless MLCC can prove that it was licensed to make the 1999 Loan in Connecticut, it cannot enforce the terms of that loan.

## II. EVEN IF MLCC COULD DEMONSTRATE PROBABLE CAUSE, IT IS NOT ENTITLED TO AN ATTACHMENT

"It is well established that a mortgagee has two separate and distinct causes of action against a defaulting mortgagor. A mortgagee may pursue an action at law for the amount due on the promissory note, or it may pursue its remedy in equity and foreclose on the mortgage." *People's Bank v. Bilmor Building Corp.*, 28 Conn. App. 809, 816-17, 614 A.2d 456 (Ct. App. 1992). However, C.G.S.A. § 49-1 establishes an important election-of-remedies provision: "The foreclosure of a mortgage is a bar to any further action upon the mortgage debt, note or obligation against the person or persons who are liable for the payment thereof who are made parties to the foreclosure[.]"

MLCC has chosen the equitable course – to foreclose on the mortgage – rather than pursuing an action for a money judgment on the promissory note. Under these circumstances, MLCC can seek an attachment only to the extent of any deficiency judgment that it has probable cause of obtaining. *People's Bank v. Bilmor Building Corp., supra.*

MLCC admits that the property on which it seeks a judgment of foreclosure has a value of no less than $4,850,000. However, an earlier appraisal procured by MLCC returned a value of $6,000,000. We submit that, assuming MLCC obtains a judgment of foreclosure and that it proves a debt of $8,680,000, the maximum deficiency judgment it can establish at this time is between and $2,680,000 and $3,830,000.

But MLCC has asserted that it has additional security for Ms. Miller's alleged debt: its alleged security interest in the $4,870,000 in the Pledge Account. As the funds in the Pledge Account are

19

more than enough to secure payment of any deficiency judgment (assuming MLCC succeeds on the merits of its claims), MLCC is not entitled to any additional security through an attachment:

> In the usual case, where one party sues another and no security has been posted to ensure payment of the probable ultimate judgment, a trial court need determine only whether there is probable cause to sustain the validity of a plaintiff's claim, and, if so, set a dollar amount for the attachment that will provide the security.
>
> In cases where some security exists for the payment of the debt, however, as in mortgage foreclosure actions, the question for a trial court is enlarged. In such cases, the court not only must determine what the amount of the judgment will probably be, but what additional security, beyond the security the plaintiff has already, will be necessary to equal that probable judgment. ... **Thus, a plaintiff may be entitled to a prejudgment remedy because it has demonstrated the requisite probable cause, but it may still be denied the remedy if its interest is already adequately secured.**

*Blakeslee v. E.I. Constructors Inc.*, 32 Conn. App. 118, 131, 628 A.2d 601 (Ct. App. 1993) (emphasis supplied).

Because MLCC is already adequately secured, it is not entitled to an attachment even if it can establish probable cause for success on its foreclosure claim.

As a final point, MLCC appears to argue that it is entitled to an attachment to the extent that Ms. Miller is successful (either on her main claims or on her defenses to MLCC's counterclaim) in invalidating the mortgage and/or the pledge agreement. Though such an event would certainly remove some or all of MLCC's present security, MLCC is not entitled to an attachment to cover that eventuality, for several reasons. First, a presumption that Ms. Miller will have succeeded in her claims against MLCC would certainly preclude a finding that MLCC is likely to succeed on the merits of its counterclaim.

Second, C.G.S.A. § 52-278c and 278d both provide that the amount of any attachment must "tak[e] into account any defenses, counterclaims or set-offs." In this case, Ms. Miller has significant

defenses and claims against MLCC, including claims for conversion of the $4,870,000 in the pledge account, damages for liquidation of the securities in that account, and claims seeking recovery of additional compensatory and punitive damages. The value of those claims (especially if we are to presume that MLCC fails to prove it has a valid mortgage and/or pledge, is at least as much as the $8.8 million MLCC seeks to recover on its counterclaim.

## CONCLUSION

For the reasons set forth above, MLCC's motion for an attachment should be denied.

BEGOS & HORGAN, LLP

By: _____
Patrick W. Begos (ct19090)
Attorneys for Plaintiff
327 Riverside Avenue
Westport, CT 06880
(203) 226-9990
(203) 222-4833 (fax)

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was mailed via first class mail, postage prepaid, on April 22, 2004 to:

Thomas P. Friedman, Esq.
Paul, Hastings, Janofsky & Walker, LLP
1055 Washington Boulevard
Stamford, CT 06901-2217

_____
Patrick W. Begos