

**FEDERAL DEPOSIT INSURANCE CORPORATION**
**INSURING AMERICA'S FUTURE**

## Press Releases

Office of the Comptroller of the Currency
Board of Governors of the Federal Reserve System
Federal Deposit Insurance Corporation
Office of Thrift Supervision

**Subject: Subprime Lending**   **Description: Expanded Guidance for Subprime Lending Programs**

### Purpose of Guidance

The Office of the Comptroller of the Currency, the Federal Reserve Board, the Federal Deposit Insurance Corporation, and the Office of Thrift Supervision (the Agencies) are expanding previously issued examination guidance for supervising subprime lending activities.[1] The Agencies continue to believe that responsible subprime lending can expand credit access for consumers and offer attractive returns. However, we expect institutions to recognize that the elevated levels of credit and other risks arising from these activities require more intensive risk management and, often, additional capital.

This expanded guidance discusses supervisory expectations for the Allowance for Loan and Lease Losses (ALLL), regulatory capital, examination review of subprime activities, classification of risk, and documentation for re-aging, renewing, or extending delinquent accounts. This guidance also discusses regulatory expectations for the review and treatment of certain potentially abusive lending practices.

### Contents

Purpose of Guidance                                                       1
Applicability of Guidance                                                 2
Risk Management Expectations                                              3
Allowance for Loan and Lease Losses (ALLL) and Capital Expectations       3
ALLL Adequacy                                                             4
Capital Adequacy                                                          5
Examination Review and Analysis                                           7
Transaction-Level Testing                                                 8
Classification Guidelines for Subprime Lending                            9
Individual Loans                                                          9
Portfolios                                                                9
Required Documentation for Cure Programs                                 10
Predatory or Abusive Lending Practices                                   10
Summary                                                                  11

### Applicability of Guidance

This expanded guidance applies specifically to those institutions that have subprime lending programs

with an aggregate credit exposure greater than or equal to 25% of tier 1 capital.[2] Aggregate exposure includes principal outstanding and committed, accrued and unpaid interest, and any retained residual assets[3] relating to securitized subprime loans. The Agencies may also apply these guidelines to certain smaller subprime portfolios, such as those experiencing rapid growth or adverse performance trends, those administered by inexperienced management, and those with inadequate or weak controls.

This guidance is meant to intensify examination scrutiny of institutions that systematically target the subprime market through programs that employ tailored marketing, underwriting standards, and risk selection. In accordance with previously issued guidance, such lending should be conducted in a segregated program, portfolio, and/or portfolio segment. The term **"program"** refers to the process of acquiring on a regular or targeted basis, either through origination or purchase, subprime loans to be held in the institution's own portfolio or accumulated and packaged for sale. The average credit risk profile of such programs or portfolios will likely display significantly higher delinquency and/or loss rates than prime portfolios.

**Exclusions** - For purposes of this guidance, subprime lending does not refer to individual subprime loans originated and managed, in the ordinary course of business, as exceptions to prime risk selection standards. The Agencies recognize that many prime loan portfolios will contain such accounts. Additionally, this guidance will generally not apply to: prime loans that develop credit problems after acquisition; loans initially extended in subprime programs that are later upgraded, as a result of their performance, to programs targeted to prime borrowers; and community development loans as defined in the CRA regulations that may have some higher risk characteristics, but are otherwise mitigated by guarantees from government programs, private credit enhancements, or other appropriate risk mitigation techniques.

The term **"subprime"** refers to the credit characteristics of individual borrowers. Subprime borrowers typically have weakened credit histories that include payment delinquencies, and possibly more severe problems such as charge-offs, judgments, and bankruptcies. They may also display reduced repayment capacity as measured by credit scores, debt-to-income ratios, or other criteria that may encompass borrowers with incomplete credit histories. Subprime loans are loans to borrowers displaying one or more of these characteristics at the time of origination or purchase. Such loans have a higher risk of default than loans to prime borrowers. Generally, subprime borrowers will display a range of credit risk characteristics that may include one or more of the following:

- Two or more 30-day delinquencies in the last 12 months, or one or more 60-day delinquencies in the last 24 months;
- Judgment, foreclosure, repossession, or charge-off in the prior 24 months;
- Bankruptcy in the last 5 years;
- Relatively high default probability as evidenced by, for example, a credit bureau risk score (FICO) of 660 or below (depending on the product/collateral), or other bureau or proprietary scores with an equivalent default probability likelihood; and/or
- Debt service-to-income ratio of 50% or greater, or otherwise limited ability to cover family living expenses after deducting total monthly debt-service requirements from monthly income.

This list is illustrative rather than exhaustive and is not meant to define specific parameters for all subprime borrowers. Additionally, this definition may not match all market or institution specific subprime definitions, but should be viewed as a starting point from which the Agencies will expand examination efforts.

Risk Management Expectations

The Agencies' March 1999 guidance outlined the risks associated with subprime lending, examination objectives for supervisory reviews, and the Agencies' expectations for risk management standards necessary to manage and control subprime lending activities.

Examiners should continue to carefully assess management's ability to administer the higher risk in subprime portfolios using the March 1999 Interagency Guidance and any supplemental Agency-specific

guidelines issued in conjunction with that document. In particular, management's ability should be judged by the quality of the risk management and control processes in place, and more importantly, the extent to which management is adhering to those processes. When examiners determine that risk management practices are deficient, they should criticize management and initiate corrective action. Such actions may include formal or informal enforcement actions and/or a plan to achieve adequate capitalization. **When a primary supervisor determines that an institution's risk management practices are materially deficient, the primary supervisor may instruct the institution to discontinue its subprime lending programs.**

**Allowance for Loan and Lease Losses (ALLL) and Capital Expectations**

Examiners should perform specific evaluations of the ALLL and regulatory capital allocated to support subprime lending programs. The total protection for subprime asset programs should consist of adequate levels of each component. Expectations for sound risk management programs include the ability to determine and quantify appropriate levels for each component. **ALLL Adequacy**

Examiners should assess the adequacy of the ALLL to ensure that the portion allocated to the subprime portfolio is sufficient to absorb estimated credit losses for this portfolio. Consistent with interagency policy,[4] the term "estimated credit losses" means an estimate of the amount that is not likely to be collected; that is, net charge-offs that are likely to be realized given the facts and circumstances as of the evaluation date.[5] These estimated losses should meet the criteria for accrual of loss contingency set forth under generally accepted accounting principles, consistent with supervisory ALLL policy.

Classified and Other Problem Loans

Examiners should classify subprime loans and portfolios in accordance with the guidelines contained herein and other applicable Agency guidelines. Classified loans are loans that are not protected adequately by the current sound worth and paying capacity of the borrower or the collateral pledged. As such, full liquidation of the debt may be in jeopardy. Pools of classified subprime loans (to include, at a minimum, all loans past due 90 days or more) should be reviewed for impairment, and an adequate allowance should be established consistent with existing interagency policy.

Pools of Subprime Loans - Not Classified

The ALLL required for subprime loans should be sufficient to absorb at least all estimated credit losses on outstanding balances over the current operating cycle, typically 12 months. The board of directors and management are expected to ensure that the institution's process for determining an adequate level for the ALLL is based on a comprehensive and adequately documented analysis of all significant factors. The consideration factors should include historical loss experience, ratio analysis, peer group analysis, and other quantitative analysis, as a basis for the reasonableness of the ALLL. To the extent that the historical net charge-off rate is used to estimate expected credit losses, it should be adjusted for changes in trends, conditions, and other relevant factors, including business volume, underwriting, risk selection, account management practices, and current economic or business conditions that may alter such experience. The allowance should represent a prudent, conservative estimate of losses that allows a reasonable margin for imprecision. Institutions should clearly document loss estimates and the allowance methodology in writing. This documentation should describe the analytical process used, including:

- Portfolio segmentation methods applied;
- Loss forecasting techniques and assumptions employed;
- Definitions of terms used in ratios and model computations;
- Relevance of the baseline loss information used;
- Rationale for adjustments to historical experience; and
- A reconciliation of forecasted loss rates to actual loss rates, with significant variances explained.

New Entrants to the Business

In some instances an institution (for example, a newly chartered institution or an existing institution

entering the subprime lending business) may not have sufficient previous loss experience to estimate an allowance for subprime lending activities. In such cases, industry statistics or another institution's loss data for similar loans may be a better starting point than the institution's own data for developing loss rates to determine the ALLL. When an institution uses loss rates developed from industry statistics or from other institutions to determine its ALLL, it should demonstrate and document that the attributes of the loans in its portfolio or portfolio segment are similar to those in the other institution's (or industry's) portfolio.

*Capital Adequacy*

The Agencies' minimum capital requirements generally apply to portfolios that exhibit substantially lower risk profiles than exist in subprime loan programs. Therefore, these requirements may not be sufficient to reflect the risks associated with subprime portfolios. Each subprime lender is responsible for quantifying the amount of capital needed to offset the additional risk in subprime lending activities, and for *fully documenting* the methodology and analysis supporting the amount specified.

Examiners will evaluate the capital adequacy of subprime lenders on a case-by-case basis, considering, among other factors, the institution's own documented analysis of the capital needed to support its subprime lending activities. Examiners should expect capital levels to be risk sensitive, that is, allocated capital should reflect the level and variability of loss estimates within reasonably conservative parameters. Examiners should also expect institutions to specify a direct link between the expected loss rates used to determine the required ALLL, and the unexpected loss estimates used to determine capital.

The sophistication of this analysis should be commensurate with the size, concentration level, and relative risk of the institution's subprime lending activities and should consider the following elements:

- Portfolio growth rates;
- Trends in the level and volatility of expected losses;
- The level of subprime loan losses incurred over one or more economic downturns, if such data/analyses are available;
- The impact of planned underwriting or marketing changes on the credit characteristics of the portfolio, including the relative levels of risk of default, loss in the event of default, and the level of classified assets;
- Any deterioration in the average credit quality over time due to adverse selection or retention;
- The amount, quality, and liquidity of collateral securing the individual loans;
- Any asset, income, or funding source concentrations;
- The degree of concentration of subprime credits;
- The extent to which current capitalization consists of residual assets or other potentially volatile components;
- The degree of legal and/or reputation risk associated with the subprime business line(s) pursued; and
- The amount of capital necessary to support the institution's other risks and activities.

Given the higher risk inherent in subprime lending programs, examiners should reasonably expect, as a starting point, that an institution would hold capital against such portfolios in an amount that is one and one half to three times greater than what is appropriate for non-subprime assets of a similar type. Refinements should depend on the factors analyzed above, with particular emphasis on the trends in the level and volatility of loss rates, and the amount, quality, and liquidity of collateral securing the loans. Institutions with subprime programs affected by this guidance should have capital ratios that are well above the averages for their traditional peer groups or other similarly situated institutions that are not engaged in subprime lending.

Some subprime asset pools warrant increased supervisory scrutiny and monitoring, but not necessarily additional capital. For example, well-secured loans to borrowers who are slightly below what is considered prime quality may entail minimal additional risks compared to prime loans, and may not require additional capital if adequate controls are in place to address the additional risks. On the other

hand, institutions that underwrite higher-risk subprime pools, such as unsecured loans or high loan-to-value second mortgages, may need significantly higher levels of capital, perhaps as high as 100% of the loans outstanding depending on the level and volatility of risk. Because of the higher inherent risk levels and the increased impact that subprime portfolios may have on an institution's overall capital, examiners should document and reference each institution's subprime capital evaluation in their comments and conclusions regarding capital adequacy.

Stress Testing

An institution's capital adequacy analysis should include stress testing as a tool for estimating unexpected losses in its subprime lending pools. Institutions should project the performance of their subprime loan pools under conservative "stress test" scenarios, including an estimation of the portfolio's susceptibility to deteriorating economic, market, and business conditions. Portfolio stress testing should include "shock" testing of basic assumptions such as delinquency rates, loss rates, and recovery rates on collateral. It should also consider other potentially adverse scenarios, such as: changing attrition or prepayment rates; changing utilization rates for revolving products; changes in credit score distribution; and changes in the capital markets demand for whole loans, or asset-backed securities supported by subprime loans.

These are representative examples; actual factors will vary by product, market segment, and the size and complexity of the portfolio relative to the institution's overall operations. Whether stress tests are performed manually, or through automated modeling techniques, the Agencies will expect that:

- The process is clearly documented, rational, and easily understood by the institution's board and senior management;
- The inputs are reliable and relate directly to the subject portfolios (for example, baseline loss history or default probabilities should reflect each segment of the institution's portfolio and not just a blend of prime and subprime borrowers);
- Assumptions are well documented and conservative; and
- Any models are subject to a comprehensive validation process.

The results of the stress test exercises should be a documented factor in the analysis and determination of capital adequacy for the subprime portfolios.

Institutions that engage in subprime lending programs without adequate procedures to estimate and document the level of capital necessary to support their activities should be criticized. Where capital is deemed inadequate to support the risk in subprime lending activities, examiners should consult with their supervisory office to determine the appropriate course of action. Such actions may include requiring additional capital in accordance with their Agency's respective capital adequacy rules, or requiring the institution to submit an acceptable capital plan in accordance with the Agency's safety and soundness guidelines.

Examination Review and Analysis

The heightened risk levels and potential volatility in delinquency and loss rates posed by subprime lending programs warrant increased ongoing attention by examiners. Consistent with each of the Agencies' risk-based examination approach, the risks inherent in subprime lending programs call for frequent reviews. There are generally two levels of review appropriate for subprime activities:

    **Portfolio-level reviews** - including assessments of underwriting standards, marketing practices, pricing, management information and control systems (quality control, audit and loan review, vendor management, compliance), portfolio performance, and the appropriate application of regulatory and internal allowance and capital policies.

    **Transaction-level testing** - including testing of individual loans for compliance with underwriting and loan administration guidelines, appropriate treatment of loans under delinquency, re-aging and cure programs, and the appropriate application of regulatory

and internal allowance and capital policies.

Examiners should incorporate the findings of both transaction-level testing and portfolio-level reviews into their conclusions about overall asset quality, the adequacy of the ALLL and capital, and the adequacy of portfolio risk management practices.

Examiners should perform a portfolio-level review and some transactional testing at each institution engaged in subprime lending during each regularly scheduled examination cycle. The Agencies will also perform regular offsite monitoring and may require subprime lenders to supply supplementary information about their subprime portfolios between examinations.

### Transaction-Level Testing

Subprime loan portfolios contain elevated risks and actual subprime lending practices often can deviate from stated policy and procedural guidance. Therefore, portfolio-level examination procedures should be supplemented with transaction-level testing. This testing should determine whether:

- Individual loans adhere to existing policy, underwriting, risk selection, and pricing standards;
- Individual loans and portfolios are classified in accordance with the guidelines contained herein, or in other Agency guidance;
- Management, board, and regulatory reporting is accurate and timely;
- Existing loans conform to specified account management standards (over-limits, line increases, reductions, cancellations, re-scoring, collections, etc.);
- Key risk controls and control processes are adequate and functioning as intended;
- Roll rates and other loss forecasting methods used to determine ALLL levels are accurate and reliable; and
- Lending practices exist that may appear unsafe, unsound, or abusive and unfair.

Examiners should follow their Agency's guidance on statistical or judgmental sampling when choosing loans for this transaction-level review.

### Classification Guidelines for Subprime Lending

The evaluation of consumer loans is governed by the Uniform Retail Credit Classification and Account Management Policy (Retail Classification Policy) issued by the FFIEC on June 12, 2000. This policy establishes general classification thresholds based on delinquency, but also grants examiners the discretion to classify individual retail loans that exhibit signs of credit weakness regardless of delinquency status. An examiner may also classify retail portfolios, or segments thereof, where underwriting standards are weak and present unreasonable credit risk, and may criticize account management practices that are deficient. Well-managed subprime lenders should recognize the heightened loss characteristics in their portfolios and internally classify their delinquent accounts well before the timeframes outlined in the interagency policy.

### Individual Loans

Examiners should not automatically classify or place loans in special mention merely because they are subprime. Rather, classifications should reflect the borrower's capacity and willingness to repay and the adequacy of collateral pledged.

Loans to borrowers that do not have the capacity to service their loans generally will be classified substandard. Where repayment capacity is insufficient to support orderly liquidation of the debt, and the collateral pledged is insufficient to mitigate risk of loss, then a more severe classification and non-accrual is warranted. Subprime loans that are past due 90 days, or more, should be classified at least substandard based on a reasonable presumption that their past due status is indicative of inadequate capacity and/or unwillingness to repay. A more stringent classification approach may be appropriate based on the historical loss experience of a particular institution. Classification of other subprime loans

as doubtful or loss will be based on examiners' analysis of the borrower's capacity to repay, and the quality of institution underwriting and account management practices as contained in the loan file or other documentation.

In some cases, the repayment of principal, interest, and fees on some subprime loans may be overly dependent on collateral pledged. This occurs when risk of default is so high that an abundance of collateral is taken to mitigate risk of loss in the event of default. From a safety and soundness perspective the Agencies discourage lending solely on the basis of collateral pledged, and will generally classify such loans substandard. Further, when the borrower does not demonstrate the capacity to service the loan from sources other than collateral pledged, the loan may be placed on non-accrual.

**Portfolios**

When the portfolio review or loan sample indicate serious concerns with credit risk selection practices, underwriting standards, or loan quality, examiners should consider classifying or criticizing the entire portfolio or segments of the portfolio. Such a decision may be appropriate in cases where risk is inordinately high or delinquency reports reflect performance problems. Some subprime lending portfolios may pose very high risk. These may include portfolios of unsecured loans, or secured high loan-to-value loans to borrowers who clearly exhibit inadequate capacity to repay the debt in a reasonable timeframe. Most such portfolios should be classified at least substandard.

**Required Documentation for Cure Programs**

Cure programs, including such practices as re-aging, extensions, renewals, rewrites, or other types of account restructuring are subject to the standards outlined in the Retail Classification Policy. In accordance with that policy, cure programs should be used only when the institution has substantiated the customer's renewed willingness and ability to repay. Examiners will expect institutions to maintain documentation supporting their analysis of the customer's renewed ability and willingness to repay the loan at the time it is extended, renewed, or deferred. When the institution cannot demonstrate both the willingness and ability of the customer to repay, the loan should not be renewed, extended, deferred, or rewritten, and the loan should be moved back to its pre-cure delinquency status. Documentation should include one or more of the following:

- A new verification of employment;
- A recomputed debt-to-income ratio indicating sufficient improvement in the borrower's financial condition to support orderly repayment;
- A refreshed credit score or updated bureau report;
- A file memo evidencing discussion with the customer;

Where documentation of the customer's renewed willingness and ability to repay the loan is absent or deficient, management practices should be criticized.

**Predatory or Abusive Lending Practices**

The term subprime is often misused to refer to certain "predatory" or "abusive" lending practices. The Agencies have previously expressed their support for lending practices designed to responsibly service customers and enhance credit access for borrowers with special credit needs. Subprime lending that is appropriately underwritten, priced, and administered can serve these goals. However, the Agencies also recognize that some forms of subprime lending may be abusive or predatory. Some such lending practices appear to have been designed to transfer wealth from the borrower to the lender/loan originator without a commensurate exchange of value. This is sometimes accomplished when the lender structures a loan to a borrower who has little or no ability to repay the loan from sources other than the collateral pledged. When default occurs, the lender forecloses or otherwise takes possession of the borrower's property (generally the borrower's home or automobile). In other cases, the lender may use the threat of foreclosure/repossession to induce duress upon the borrower for payment. Typically, predatory lending involves at least one, and perhaps all three, of the following elements:

- Making unaffordable loans based on the assets of the borrower rather than on the borrower's ability to repay an obligation;
- Inducing a borrower to refinance a loan repeatedly in order to charge high points and fees each time the loan is refinanced ("loan flipping"); or
- Engaging in fraud or deception to conceal the true nature of the loan obligation, or ancillary products, from an unsuspecting or unsophisticated borrower.

Loans to borrowers who do not demonstrate the capacity to repay the loan, as structured, from sources other than the collateral pledged are generally considered unsafe and unsound. Such lending practices should be criticized in the Report of Examination as imprudent. Further, examiners should refer any loans with the aforementioned characteristics to their Agency's respective consumer compliance/fair lending specialists for additional review.

## Summary

Although subprime lending is generally associated with higher inherent risk levels, properly managed this can be a sound and profitable business. Because of the elevated risk levels, the quality of subprime loan pools may be prone to rapid deterioration, especially in the early stages of an economic downturn. Sound underwriting practices and effective control systems can provide the lead time necessary to to deteriorating conditions, while sufficient allowance and capital levels can reduce its impact.

###

[1] Interagency Guidance on Subprime Lending, March 1, 1999.

[2] Tier 1 capital as defined in the Agencies' risk-based capital standards: 12 CFR part 3, Appendix A (OCC); 12 CFR part 208, Appendix A (Federal Reserve); Part 325, Appendix A (FDIC); 12 CFR 565.2(h) (OTS).

[3] Residual interests are on-balance sheet assets that represent interests (including beneficial interests) in transferred financial assets retained by a seller (or transferor) after a securitization or other transfer of financial assets; and are structured to absorb more than a pro rata share of credit loss related to the transferred assets through subordination provisions or other credit enhancement techniques.

[4] Interagency Policy Statement on the Allowance for Loan and Lease Losses, December 21, 1993.

[5] Estimates of credit losses should include accrued interest and other accrued fees (e.g., uncollected credit card fees or uncollected late fees) that have been added to the loan balances and, as a result, are reported as part of the institution's loans on the balance sheet. An institution may include these types of estimated losses in either the ALLL or a separate valuation allowance, which would be netted against the aggregated loan balance for regulatory reporting purposes. When accrued interest and other accrued fees are not added to the loan balances and are not reported as part of loans on the balance sheet, the collectability of these accrued amounts should nevertheless be evaluated to assure that the institution's income is not overstated.

Last Updated 01/31/2001

communications@fdic.gov

Home    Contact Us    Search    Help    SiteMap    Forms
Freedom of Information Act    Website Policies    FirstGov.gov