UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JULIE DILLON RIPLEY MILLER<br><br>      Plaintiff and Counterclaim<br>      Defendant,<br><br>  - against -<br><br>MERRILL LYNCH CREDIT CORPORATION<br><br>      Defendant and Counterclaimant. | NO. 3:03-CV-1016 (RNC)(DFM)<br><br><br><br>May 20, 2005 |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF DEFENDANT AND COUNTERCLAIMANT MERRILL LYNCH CREDIT CORPORATION

FILED
2005 MAY 20  P 4: 36
US DISTRICT COURT
HARTFORD CT

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF FACTS .................................................................................................... 5

    A.    The 1997 Loan ................................................................................................. 5

    B.    The 1999 Loan ................................................................................................. 7

          1.    The Application .................................................................................. 7

          2.    The Approval Letter ........................................................................... 8

          3.    The Note ............................................................................................. 8

          4.    The Mortgage ..................................................................................... 9

          5.    The Pledge Agreement ....................................................................... 9

          6.    The Account Statement ...................................................................... 10

          7.    The Modification Agreement .............................................................. 11

          8.    Miller's Admissions ............................................................................ 12

    C.    The Default ...................................................................................................... 12

ARGUMENT ....................................................................................................................... 13

I. SUMMARY JUDGMENT SHOULD BE  GRANTED ON MLCC'S
    COUNTERCLAIMS ...................................................................................................... 13

    A.    MLCC Is Entitled To A Judgment of Foreclosure .................................................. 14

    B.    Alternatively, MLCC Should Be Granted Judgment On The Note ........................... 15

    C.    Miller's Affirmative Defenses Are Without Merit ................................................... 17

          1.    Miller's First and Second Affirmative Defenses ......................................... 18

          2.    Miller's Third Affirmative Defense ............................................................. 19

          3.    Miller's Fourth Affirmative Defense ........................................................... 19

          4.    Miller's Fifth Affirmative Defense .............................................................. 20

          5.    Miller's Sixth Affirmative Defense ............................................................. 21

          6.    Miller's Seventh Affirmative Defense ......................................................... 23

          7.    Miller's Eighth Affirmative Defense ........................................................... 24

II.    MILLER'S COMPLAINT SHOULD BE DISMISSED AS A MATTER OF LAW ........... 24

    A.    Plaintiff's Action is Time-Barred ......................................................................... 24

          1.    Section 52-577 is Construed to Avoid Delaying the Limitations
                Period ................................................................................................ 25

          2.    Plaintiff's Fraud Claim is Time-Barred ....................................................... 26

          3.    Plaintiff's Negligence Claim is Time-Barred ............................................... 27

**TABLE OF CONTENTS**
**(continued)**

4.     Plaintiff's Recklessness and Conversion Claims are Time-Barred ............. 28

5.     Plaintiff's CUTPA Claims are Time-Barred ................................................ 28

B.     Each Of Plaintiff's Claims Is Defective As A Matter Of Law ................................. 29

In addition to Plaintiff's failure to file her claims in a timely manner, her action
    also fails on its merits ............................................................................................. 29

1.     Plaintiff's Fraudulent Non-Disclosure Claim Cannot Survive
Summary Judgment Because MLCC Did Not Owe Miller a Duty ............. 29

2.     Plaintiff's Negligence and Recklessness Claims Cannot Survive
Summary Judgment Because MLCC Did Not Owe a Duty to
Plaintiff To Review the Power of Attorney For Her Benefit or to
Refrain from Liquidating her Pledge Account ............................................. 30

3.     Plaintiff's Conversion Claim Cannot Survive Summary Judgment
Because Plaintiff Ratified the 1999 Loan Thereby Authorizing
MLCC to Take Possession of the Pledge Funds ......................................... 31

4.     Plaintiff's CUTPA Claims Cannot Survive Summary Judgment
Because She Could Have Avoided All of Her Alleged Damages
and There Is No Genuine Issue of Material Fact as to That ......................... 33

5.     Plaintiff's Respondeat Superior Claim Cannot Survive Summary
Judgment Because Falini was Not MLCC's Agent ..................................... 34

CONCLUSION ........................................................................................................................... 37

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*A-G Foods, Inc. v. Pepperidge Farm, Inc.,*
  216 Conn. 200, 217 (1990) ............................................................................................ 33

*Albany Ins. Co. v. United Alarm Services, Inc.,*
  194 F. Supp. 2d 87 (D. Conn., 2002) ............................................................................ 32

*Alco Standard Corp. v. Charnas,*
  56 Conn. App. 568 (2000) ............................................................................................. 16

*Ameriquest Mortgage Company v. Hutwohl,*
  No. CV010344530S, 2003 WL 21007904 (Conn. Super. Apr. 17, 2003) ........................ 15

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242, 256 (1986) ............................................................................................... 13

*Armatino v. Romano,*
  1 Conn. L. Rptr. 60, 61 (Nov. 27, 1989) ........................................................................ 20

*Bartha v. Waterbury House Wrecking Co.,*
  190 Conn. 8, 13 (1983) .................................................................................................. 27

*Beal Bank, F.S.B. k v. Brown,* No. CV000180773S,
  2001 Conn. Super. Lexis 1454, *3 (May 22, 2001) ....................................................... 14

*Bond Rubber Corp. v. Oates Bros.,*
  136 Conn. 248, 251 (1949) ............................................................................................ 23

*Cheshire Mortgage Service, Inc. v. Montes,*
  223 Conn. 80, 87 (1992) ................................................................................................ 21

*Cohen v. Holloways', Inc.,*
  158 Conn. 395 (1969) .................................................................................................... 35

*Collum v. Chapin,*
  40 Conn. App. 449, 451 (1996) ............................................................................. 25, 26, 28

*Commercial Financial/SPC Acquisitions, Inc. v. Mallozzi,*
  No. CV950144819S, 1995 Conn. Super. LEXIS 3420 (Dec. 6, 1995) .............................. 15

*Connecticut Nat'l Bank v. Douglas,*
  221 Conn. 530 (1992) ............................................................................................ 17, 19, 33

*Dichello v. Societa Libero Pensiere,*
  111 Conn. 412 (1930) .................................................................................................... 23

*DiMartino v. City of Hartford,*
  636 F.Supp. 1241, 1252 (D.Conn., 1986) ..................................................................... 18

*Dubinsky v. Citicorp Mortgage, Inc.,*
  48 Conn. App. 52, 58, *cert. den.* 244 Conn. 926 (1998) ........................................... 30, 31

*Fichera v. Mine Hill Corp.,*
  207 Conn. 204 (1988) ........................................................................................ 25, 26, 28, 29

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Fidelity Bank v. Krenisky,*
  72 Conn. App. 700, 716-17, cert. den. 262 Conn. 915 (2002).........................16, 20

*Fishman v. Connecticut Suites, LLC,*
  No. CV03089475, 2004 WL 114455 (Conn. Super. Jan. 8, 2004).......................14

*Gagliardi v. Williams,*
  No. CV020175272S, 2003 Conn. Super. LEXIS 1300 (May 5, 2003).................16

*Gelinas v. Gelinas,*
  10 Conn. App. 167, 173, *cert. den.* 204 Conn. 802 (1987)............................29, 30

*Gerber and Hurley, Inc. v. CCC Corp.,*
  36 Conn. App. 539, 542 (1995) ...............................................................17

*Gibbons v. NER Holdings, Inc.,*
  983 F. Supp. 310, 314 (D. Conn., 1997)...............................................25, 26, 28

*Graham v. Long Island R.R.,*
  230 F.3d 34, 38 (2d Cir. 2000)..................................................................13

*Hallas v. Boehmke and Dobosz, Inc.,*
  239 Conn. 658, 673 (1997).......................................................................34

*Hartford National Bank and Trust Co. v. Kotkin,*
  185 Conn. 579 (1981)..............................................................................23

*Hartford National Bank and Trust Company v. Kotkin,*
  185 Conn. 579 (1981)..............................................................................15

*Hat City Commons, Ltd. v. Connecticut Hous. Fin. Auth.,*
  No. CV970326706S, 2002 WL 230911, at * 3 (Conn. Super. Jan. 24, 2002).....................31

*Hensley v. Commissioner of Transp.,*
  211 Conn. 173 (1989)..........................................................................35, 36

*Hi-Ho Tower, Inc. v. Com-Tronics, Inc.,*
  255 Conn. 20, 44 (2000) ...........................................................................32

*Kocsis v. Standard Ins. Co.,*
  142 F. Supp. 2d 241, 250 (D. Conn. 2001)..............................................13

*Marvel Characters, Inc. v. Simon,*
  310 F.3d 280, 286 (2d Cir. 2002)..........................................................13

*Naven v. Essex,*
  82 Conn. App. 255, 261, *cert. den.* 271 Conn. 902 (2004)..........................25

*Opticare Centers v. Aaron,*
  No. 01111491, 1994 Conn. Super. LEXIS 543 (Feb. 24, 1994)......................20

*Parker v. Shaker Real Estate, Inc.,*
  47 Conn. App. 489, 493 (1998) ..........................................................29, 30

-iv-

**TABLE OF AUTHORITIES**
(continued)

Page

*People's Bank v. Bilmor Building Corp.,*
   28 Conn. App. 809, 816 (1992) ........................................................................................ 15

*Roach v. Ivari Int'l Centers, Inc.,*
   77 Conn. App. 93, 99 (2003) .......................................................................................... 31

*Russell v. Dean Witter Reynolds, Inc.,*
   200 Conn. 172, 185 (1986) ............................................................................................ 17

*Shawmut Mortgage Co. v. Febbroriello,*
   No. 0056522, 1992 Conn. Super. LEXIS 2881, *4 (Sept. 29, 1992).................................. 20

*Southbridge Associates LLC v. Garofalo,*
   53 Conn. App. 11, 19 (1999), *cert. den.* 249 Conn. 919 (1999) .............................. 30, 31

*Sovereign Bank v. Bradley,*
   2002 Conn. Super. LEXIS 957 (March 26, 2002) ............................................................ 23

*T.F.T.F. Capital Corp. v. Marcus Dairy, Inc.,*
   33 F. Supp. 2d 122, 126 (D. Conn., 1998) *aff'd* 312 F.3d 90 (2d Cir. 2002) ........... 25, 26, 28

*Tamm v. Gangitano,*
   No. CV990145640S, 2001 Conn. Super. Lexis 571, * 28 (Mar. 2, 2001)........................... 14

*Thompson v. Orcutt,*
   257 Conn. 301 (2001) .................................................................................................... 20

*Unifirst Corp. v. Mark Ford Mercury, Inc.,*
   No. CV920293643S, 1997 Conn. Super. LEXIS 1674, *8 (June 27, 1997)........................ 18

*University of New England d/b/a Westbrook College v. Leeman,*
   No. CV000082767S, 2002 Conn. Super. LEXIS 1350 (Apr. 29, 2002).............................. 16

*Ursini v. Goldman,*
   118 Conn. 554 (1934) .................................................................................................... 22

*Webster Bank v. Flanagan,*
   51 Conn. App. 733, 750-51 (1999) ................................................................................ 14

*Williams Ford, Inc. v. Hartford Courant Co.,*
   232 Conn. 559, 593 (1995) ............................................................................................ 34

**STATUTES**

§ 52-577 ..........................................................................................................................29

§ 52-584 ..........................................................................................................................29

C.G.S.A. § 49-1.................................................................................................................23

C.G.S.A. § 49-14...............................................................................................................23

*Conn. Gen. Stat.* § 42-110g(f)..........................................................................................28

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Conn. Gen. Stat.* § 52-577.................................................................................25, 26, 27, 28

*Conn. Gen. Stat.* § 52-584.................................................................................26, 28

Connecticut Unfair Trade Practices Act .........................................................24, 33

Fed. R. Civ. P. 56...................................................................................................... 1

Fed. R. Civ. P. 56(c) ............................................................................................... 13

Section 52-577 ......................................................................................................... 26

## TREATISES

*J. Calamari & J. Perillo*, Contracts (3d Ed.) § 9-37.............................................. 21

Defendant Merrill Lynch Credit Corporation ("MLCC"), the owner of a note and mortgage securing an unpaid $7,500,000 loan to plaintiff Julie Dillon Ripley Miller ("Miller"), respectfully submits this Memorandum of Law in support of its motion, made pursuant to Fed. R. Civ. P. 56, for summary judgment (i) awarding MLCC the relief requested in its first counterclaim for strict foreclosure of the mortgage or, alternatively, the relief requested in its second counterclaim for judgment on the note; and (ii) dismissing with prejudice Miller's Second Amended Complaint (the "Complaint").

## PRELIMINARY STATEMENT

In 1997, Miller inherited approximately $11,000,000 in securities and very little cash from the distribution of a trust established by her late grandfather. Almost immediately after inheriting the securities, Miller began looking for a new home. Within only a few months, Miller made the decision to buy a house overlooking the Long Island Sound in the gated community of Wilson Point in Norwalk, Connecticut for $1,350,000. In order to finance the house, Miller applied, and was approved for, a loan through MLCC's Mortgage 100 Program, which allows qualified home buyers to borrow the entire purchase price without a down payment (the "1997 Loan"). Miller executed a note. To further secure the borrowing, Miller also executed a mortgage and a pledge agreement pledging a portion of the securities she inherited from her grandfather.

Shortly after closing on her new residence, Miller started to renovate. While the initial scope of work was relatively modest, Miller expanded the renovation and completely gutted and rebuilt the house, eventually transforming it into what is now a 9,300 square foot sprawling mansion with 7 bedrooms, 8 full bathrooms, 6 fireplaces, a pool, pool house, library, elevator, service kitchen and staff apartment on 1.4 acres. This substantial structure is only outmatched by

1

its extravagant interior décor.  To fund the renovations and decoration, Miller borrowed

extensively through a Flexible Credit Account she established with Merrill Lynch, Pierce, Fenner

& Smith Incorporated ("MLPFS"), which provides access to cash through margining securities

that Miller had provided to MLPFS as collateral.

By 1999, after nearly two years of construction and renovation, the home was not yet

complete.  Miller needed to commit additional funds to complete the construction.  As a result,

she sought to consolidate her existing debt with new borrowing from MLCC in order to finish

the construction (the "1999 Loan").  Miller again applied for a loan pursuant to the Mortgage

100 Program, which was the very same program she had used for the 1997 Loan.  The Mortgage

100 Program facilitated the consolidation of her existing borrowing from both MLCC and

MLPFS, and provided her with the additional funds necessary to complete the construction and

renovation of her house without requiring her to liquidate assets.  After consolidating the existing

indebtedness, including paying off the existing $1,350,000 mortgage and determining what was

needed to complete her home, Miller was approved for a loan in the amount of $7,500,000.

Consistent with the terms of the 1997 Loan, Miller's 1999 Loan was to be secured by a mortgage

and pledge of securities.  The only difference between the closing of the 1997 Loan and the 1999

Loan was the fact that Miller planned to be on safari in Africa during December 1999.  As a

result, she signed a power of attorney authorizing her accountant to execute the transaction

documents on her behalf.

During the course of the next three years, Miller made monthly payments on the 1999

Loan.  In February 2003, however, Miller did not make her monthly payment.  Since that time,

Miller has failed to make any additional payments.  On April 24, 2003, Miller commenced this

2

lawsuit[1/] claiming that she is not obligated to repay any of the $7,500,000 she borrowed because

the power of attorney she personally signed allegedly did not give her accountant the authority to

execute the 1999 Loan documents. Indeed, it is Miller's contention that she should be relieved

of her liability to repay the 1999 Loan and also be permitted to continue to reside in her home,

which was renovated and furnished with the loan proceeds of $7,500,000 she refuses to repay.[2/]

In suggesting that the loan documentation does not obligate her to repay the sums she admittedly

borrowed and spent, Miller ignores the documentary evidence which conclusively establishes her

liability.

First, Miller ratified the 1999 Loan transaction in 2001 by negotiating and personally

signing an entirely new contract (entered into solely for her benefit) modifying the loan terms by

lowering the interest rate on the note (the "Modification Agreement"). In the Modification

Agreement, Miller specifically affirmed the validity of the note and mortgage executed in 1999

and waived and released any defense or claim as to the enforceability of those documents. It is

undisputed that Miller personally signed the Modification Agreement. Moreover, the

Modification Agreement postdates (by more than one year): (i) the execution of the power of

attorney that Miller has alleged is defective, and (ii) her knowledge of the existence of the pledge

she now disputes.

---

[1/]    Miller originally filed this action before the Connecticut Superior Court. On June 6, 2003, this lawsuit was removed from state to federal court.

[2/]    This lawsuit against MLCC is actually one of <u>three</u> proceedings commenced by Miller with respect to these transactions. In addition to this action, Miller also brought suit against her accountant, Barry Newman, before the Connecticut Superior Court (Docket CV-03-0194261-S) and commenced an arbitration against Merrill Lynch, Pierce, Fenner & Smith Incorporated and investment advisor, Jay K. Falini ("Falini"), before the New York Stock Exchange (NYSE Docket No. 2004-015205).

Second, Miller made payments pursuant to the terms of the 1999 Loan until she defaulted in February 2003. She did so without objecting to the terms of the loan or the pledge of securities. During that period, Miller accepted the benefits of the 1999 Loan by using the proceeds to repay debts she had previously incurred on the Flexible Credit Account provided by MLPFS and to complete the construction and furnishing of the home.

Third, although Miller claims that she did not understand the terms governing the 1999 Loan, her allegations are disproved by her demonstrated familiarity with the Mortgage 100 Program. It is undisputed that in 1997, Miller executed a note, a mortgage and a pledge agreement in order to finalize her 1997 Loan and, in the interim period from 1997 to 1999, Miller received numerous account statements and other documentation evidencing her pledge of securities. When she obtained the 1999 Loan, the collateral requirements of the loan were familiar territory. Her account statements post-closing evidenced existence of the pledged securities in an account shown as "FBO"/MLCC. Having personally signed the same loan documentation and accompanying pledge agreement two years earlier, Miller was fully familiar with the pledge requirements as well as the written disclosures explaining the possibility that her securities would be liquidated in the event she defaulted on the loan.

Any financial hardship experienced by Miller as a consequence of her decisions has no bearing on the validity of the underlying loan transaction. Miller is an intelligent, highly educated person, with degrees from Duke and Yale. It was Miller's decision to purchase her home on Wilson Point. It was also her decision to expand dramatically the renovation of that existing residence. Simply stated, Miller made certain choices about the type of home she wanted and how much she would spend to build, decorate and furnish it. The fact that she failed

to control her own spending, whether it was due to sheer neglect or blissful ignorance, does not relieve her of the obligation to repay MLCC.

Moreover, as will be demonstrated below, all claims in Miller's Complaint are time-barred by the applicable statute of limitations.

For the reasons set forth herein, MLCC respectfully requests that the Court award summary judgment on its first and second counterclaims, as well as dismiss Miller's Complaint in its entirety.

## STATEMENT OF FACTS

### A.      The 1997 Loan

MLCC is a provider of home financing programs throughout the United States.  Affidavit of Tara Stewart ("Stewart Aff.") at ¶ 2.  In 1997, Miller obtained a loan from MLCC in the amount of $1,350,000 to finance the purchase of her home at 21 Point Road, Norwalk, Connecticut.  *Id.*  Miller obtained the loan through MLCC's Mortgage 100 Program which offers qualified borrowers the ability to finance 100% of the value of their home by both mortgaging the property they are purchasing and pledging eligible securities in an account with MLPFS in lieu of a cash down payment.  *Id.*  The Mortgage 100 Program provided certain advantages to Miller.  *Id.*  Although she had inherited $11,000,000 in trust assets, most of the assets were comprised of low basis securities and very little cash.  *Id.*

On or about September 16, 1997, Miller signed a mortgage application for the 1997 loan.  Affidavit of Douglas C. Conroy ("Conroy Aff."), Ex. C.  On the cover of the application, a box marked "Pledged securities" was checked under the section titled "Source of Funds for Down Payment and/or Closing Costs."  The application also included a special supplement requiring

5

the applicant to "[c]omplete this section or attach a copy of a current statement from your

securities brokerage firm indicating the securities to be pledged as additional collateral[.]"

(emphasis added)  Conroy Aff., Ex. C.  Under that section, which is entitled "Eligible

Securities/CD's," were listed the ticker symbols and current market values of four different

stocks in Miller's MLPFS account.  Miller does not dispute that she signed this special

supplement.[3/]  (Conroy Aff., Ex. A at 110 (relevant pages of the Miller deposition)).

By letter dated October 3, 1997, MLCC notified Miller that it had approved her loan

application. (Conroy Aff., Ex. D).  It is undisputed that Miller received this letter.[4/]  Attached to

the letter Miller received from MLCC was a document entitled "Important Information."  This

document plainly discloses the fact that a Mortgage 100 loan is secured by securities held in a

MLPFS account.  The document reads, as follows:

> If your loan is being made in connection with the Mortgage 100
> program, your loan will also be secured by assets deposited in a
> special brokerage account at Merrill Lynch, Pierce, Fenner &
> Smith Incorporated.  The account must be opened and the
> securities delivered at least seven (7) business days prior to your
> closing.  Failure to do so may cause a delay in your mortgage
> closing.  You may request a copy of the Mortgage 100 Pledge
> Agreement for Securities Account and Mortgage 100 Securities
> Account Agreement which you will be required to sign when you
> open your brokerage account (emphasis added).

On November 13, 1997, Miller closed on the 1997 Loan.  (Conroy Aff., Ex. B at 10-15

(Depo. of T. Cullen, Plaintiff's attorney for the 1997 closing)).  Miller personally attended the

closing and, among other documents, executed a mortgage, note and pledge agreement.  *Id.*  (A

---

[3/]    Nor can it be disputed that Miller received this application since it was produced by
Miller as part of her document production in this matter (Document # JDRM 000288-000311).
[4/]    Miller also produced this document as part of her document production in this action
(JDRM 000312-000315).

copy of the note, mortgage, and pledge agreement Miller signed are attached to the Conroy Aff. as Exhibits E, F and G, respectively). *Id.* At or about the time of the closing, approximately $400,000 worth of Miller's securities were transferred to a segregated pledge account at MLPFS to serve as collateral for the loan. (Stewart Aff. at ¶ 3). Soon after the closing, Miller was sent her December 1997 statement which reflected the transfer of securities into the segregated account. (Affidavit of Laurie Kamhi ("Kamhi Aff."), Ex. 1). It is undisputed that Miller received the statement. The statement, itself, explicitly provides that it "shall be deemed conclusive if not objected to within ten (10) days." (*Id.* at ¶ 8).

### B.    **The 1999 Loan**

Over the next two years, Miller made interest payments on the 1997 Loan. (Stewart Aff. at ¶ 3). In addition, each month Miller received account statements reflecting the value of the pledged securities. By 1999, however, Miller needed additional funds in order to complete construction of her house. As a result, in December 1999, Miller applied for and obtained a loan in the amount of $7,500,000 from MLCC, in order to consolidate existing indebtedness and to obtain the funds necessary to complete her home (the "1999 Loan"). Because she was taking her family on safari to Africa at the time of the closing, Miller signed a Power of Attorney in favor of her accountant, Barry Newman, who thereafter executed the loan documents. (*Id.* at ¶¶ 3-4; Conroy Aff., Ex. A at 274).

#### 1.    The Application

Just as she had done with the 1997 Loan, Miller personally signed a mortgage application for the 1999 Loan. (Conroy Aff., Ex. H). On the cover of the application, a box marked "Pledged securities" was checked under the section titled "Source of Funds for Down Payment

7

and/or Closing Costs." Precisely as had been the case with the 1997 Loan, the application for the 1999 Loan included a supplement specifically requiring the applicant to "[c]omplete this section or attach a copy of a current statement from your securities brokerage firm <u>indicating the securities to be pledged as additional collateral</u>" (emphasis added). (Conroy Aff., Ex. I). Miller admits to signing the supplement. (*Id.*, Ex. A at 266-267).

### 2.  The Approval Letter

By letter dated November 17, 1999, MLCC notified Miller that her application had been approved. (Stewart Aff., Ex. A). Attached to MLCC's approval letter was a document plainly disclosing that a Mortgage 100 loan is secured by securities held in a MLPFS account. This letter, which Miller received as part of the 1999 Loan, is similar to the letter she received in connection with her 1997 Loan.[5/]

### 3.  The Note

In connection with the 1999 Loan, Newman as attorney-in-fact executed an adjustable rate note (the "Note"). (Stewart Aff., Ex. C). Once again, with the exception of the amount borrowed, the Note was identical to the note Miller <u>personally</u> signed as part of the 1997 Loan.

Paragraph 1 of the Note states that "[i]n return for a loan that I have received, I promise to pay U.S. $7,500,000 … plus interest, to the order of the Lender." Pursuant to paragraph 8 of the Note, Miller also agreed to pay a 6 % late charge on any payment not received "by the end of

---

[5/]     Although Miller denied receiving this letter, a copy of the Truth-in-Lending Statement ("TIL") dated November 17, 1999 which accompanied this letter, was produced by her attorneys at Duane Morris, a firm which she had retained with respect to certain estate matters. Mr. Grohman of that firm testified that letter had been received in files identified as "Merrill Lynch" forwarded to Duane Morris by another lawyer used by Miller on other matters, Eric Vaughn-Flam. (See Paragraphs 17-21 of the Conroy Aff. regarding the deposition of Michael Grohman and Exhibits N through S thereto, including two copies of the November 17, 1999 TIL included as part of Exhibit O (stating that securities are to be pledged in connection with the 1999 Loan).

15 days after the date is due." In the event Miller fails to "pay the full amount of each monthly payment on the date it is due," Paragraph 8(B) of the Note states that MLCC may notify Miller that she is in default and has 30 days to pay the full amount of principal and all interest that is owed. (Stewart Aff., Ex. C).[6]

### 4.    The Mortgage

As required by the 1999 Loan, Miller also mortgaged her residence (the "Mortgage"). (*Id.*, Ex. B). With the exception of the amount borrowed, the Mortgage was identical to the mortgage Miller had personally signed as part of the 1997 Loan. Paragraph 1 of the Mortgage states that "Borrower shall promptly pay when due the principal and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note." Paragraph 20 of the Mortgage provides that in the event of a default under the Mortgage, MLCC shall give Miller notice of the default. If, however, "the default is not cured by the date specified in the notice," MLCC "may require immediate payment in full … and may invoke any of the remedies permitted by applicable law" and shall also be entitled to collect all costs and reasonable attorneys' fees incurred by MLCC as a result.

### 5.    The Pledge Agreement

In addition to the Note and Mortgage, on December 7, 1999, Miller also entered into a "Mortgage 100 Pledge Agreement for Securities Account" (the "Pledge Agreement") identical (except for the amount and some immaterial stylistic changes) to the pledge she signed in 1997.

---

[6]    Copies of the 1999 Mortgage and Pledge, marked "Borrower's Copy" in each instance, were also produced by Duane Morris in connection with Mr. Grohman's deposition and identified as received by that firm from attorney Eric Vaughn-Flam. Also produced were numerous other documents exchanged as part of the 1999 Loan closing including the closing statement. (See Conroy Aff. at Exhibits P, Q, R, and S, including a standard real estate closing
(continued...)

9

(Stewart Aff., Ex. D). Pursuant to the Pledge Agreement, Miller expressly agreed that, as an

"inducement for MLCC to make the loan," she "assigns, pledges, grants and conveys to MLCC a

continuing first priority lien and security interest in the Collateral,"[7/] including all assets set forth

on Exhibit "A."[8/] (*Id.* at ¶ 3).

Paragraph 4(a) of the Pledge Agreement further provides that "prior to acceleration,"

MLCC shall give Miller notice "of such breach and the opportunity to cure" and that in the event

she fails to timely cure, Miller:

> authorizes MLCC and MLCC shall be entitled to liquidate and/or
> withdraw any Collateral from the Account, up to the Maximum
> Amount, to be applied first to accrued and unpaid interest on the
> Loan and then to the outstanding principal balance of the Loan.

6.    The Account Statement

In precisely the same manner as the 1997 Loan's closing mechanics, the pledge of

approximately $6,000,000 in securities was made in order to borrow the $7,500,000 from

MLCC. The securities were transferred to the same MLPFS segregated account which held the

securities Miller previously pledged to secure the 1997 Loan, MLPF&S Account No. 881-32513.

(Kahmi Aff. at ¶¶ 5-6, Exs. 1-2). On or about December 31, 1999, Miller was sent a detailed

statement from MLPFS (similar to the statements she had been sent for the two years prior)

---

(...continued)

statement showing disposition of proceeds (Ex. R) and a copy of a Control Agreement between
Miller, MLPF&S and MLCC identifying the pledge account by number 881-32153 (Ex. S)).

[7/]    Paragraph 1(d) defines "Collateral" to mean the Account together with "all stocks, bonds
or other securities held in the Account now or in the future." Paragraph 1(a) defines "Account"
as "... those certain Cash Securities Accounts, collectively (if more than one), in the name of the
Borrower with Merrill Lynch, Pierce, Fenner & Smith Incorporated listed below. ... 881-32513."

[8/]    Exhibit A to the Pledge Agreement, entitled "List of Securities in Account As Of the
Date of This Agreement," indicates that Account Number 881-32513 contains 2,420 shares of
"Coca Cola Com," 2,344 shares of "Exxon Corporation," 2,586 shares of "Johnson & Johnson"
and 2,500 shares of "Weyerhaeuser Co."

10

showing the transfer of additional securities into the pledge account.  (*Id.* at ¶ 6, Ex. 2).  Notably, Miller's December 1999 statement plainly shows the increase in the value of the pledge account from $771,614 in the month prior to the loan closing to $6,004,075 in the month that the 1999 Loan closed.

       7.    <u>The Modification Agreement</u>

      Over the next two years, Miller made the required interest payments on the 1999 Loan and received monthly account statements listing those securities that she had pledged as collateral for the loan.  (Kamhi Aff., Ex. 3).  In February 2001, following construction completion, Miller entered an agreement converting the loan from a construction loan to a permanent loan of 25 years and reducing the interest rate payable under the Note from 9% to 8.125% (the "Modification Agreement").[9]  (Stewart Aff. at ¶ 6).  The Modification Agreement was entered into solely for Miller's benefit.  In executing the Modification Agreement, Miller specifically acknowledged and agreed that:

        a.    The unpaid principal balance due under the Note as of the date of this Agreement was $7,500,000.

        b.    She had no existing right of offset, counterclaim, or other defenses against enforcement of the Note and Security Instrument by MLCC and that, if any such right or defenses do exist, she waived and released them.

        c.    The Note and Security Agreement would continue to evidence and secure her indebtedness and the Note and mortgage would remain in full force and effect until her obligations were paid in full.

(Stewart Aff., Ex. F).  Over the next two years, until February 1, 2003, Miller Made payments under the Note and in accordance with the Modification Agreement.  (Stewart Aff. at ¶ 7).

---

[9]    Again to Miller's benefit, the effective loan rate under that note was later reduced to 3.75%.  (Stewart Aff. at ¶ 6).

8.    Miller's Admissions

Importantly, the foregoing is not simply MLCC's gloss on the facts.  In correspondence written by one of her attorneys, and on her behalf, in an effort to refinance the property at issue, Miller set forth these same facts.  In 2002, Miller stated unequivocally that "[i]n December 1999, I took out a mortgage with Merrill Lynch in the amount of Seven Million Five Hundred Thousand Dollars ($7,500,000)."  (Conroy Aff., Ex. K).  She explained the pledge aspect of the loan as well by stating that "[t]he loan . . .was partly secured by a pre-construction appraisal of my home and further secured pursuant to a pledge of the assets in my securities brokerage account with Merrill Lynch." *Id.*  These crucial admissions confirm that Miller sought a loan with no down-payment from MLCC, understood the mechanics of the loan and is merely seeking to reinvent history to devise a colorable litigation strategy.

C.    **The Default**

Miller breached her obligations under the Note and Mortgage by failing to make interest payments due on the first of the month from February 1, 2003 to the present.  In addition, Miller defaulted by failing to remit the property taxes due to the City of Norwalk for the years 2000 and 2001.  This resulted in the filing of tax liens in the amount of $26,533.77 and $39,854.24, respectively.  Pursuant to Paragraph 7 of the Mortgage, MLCC subsequently paid the City of Norwalk $67,733.96 in costs and fees to satisfy Miller's property tax obligations and to prevent a foreclosure by the City of Norwalk for unpaid property taxes.  (Stewart Aff. at ¶ 8).

By "Notice of Default" dated May 16, 2003 (the "Default Notice"), MLCC gave Miller written notice that she was "in default under the terms of the Note and Mortgage" by reason of her "failure to pay real estate taxes due to the City of Norwalk" and her failure to make her

12

"monthly payments due on the first days of February, March, April and May, 2003." In addition, MLCC further notified Miller that in order for her to "cure all defaults, payment in the amount of $174,521.19 must be made by June 18, 2003" which was at least thirty days from the date the notice was given. The Default Notice further provided that failure to pay the past due amount may require payment of the entire indebtedness. (Stewart Aff. at ¶ 9, Ex. G).

Miller has failed and refused to make any payments due under the Note and Mortgage and currently remains indebted in excess of $9,609,134.30. (*Id.* at ¶ 10).

## ARGUMENT

### I.     SUMMARY JUDGMENT SHOULD BE GRANTED ON MLCC'S COUNTERCLAIMS

Summary judgment is appropriate where there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002). Once the moving party makes such a showing, the party opposing summary judgment "must set forth specific facts showing that there is a genuine issue [of fact] for trial" and that such evidence would allow a jury to find in his favor. *Anderson*, 477 U.S. at 249; *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000). If the opposing party "fail[s] to make a sufficient showing on an essential element of [his] case ... to which [he] has the burden of proof, summary judgment is appropriate." *Kocsis v. Standard Ins. Co.*, 142 F. Supp. 2d 241, 250 (D. Conn. 2001) (citations omitted.)

13

A.    **MLCC Is Entitled To A Judgment of Foreclosure**

Summary judgment should be granted on MLCC's first counterclaim for a strict foreclosure of the Mortgage. In order to establish a claim for foreclosure, MLCC must show (i) that it is the owner of the Note and Mortgage; (ii) that Miller defaulted on the Note; and (iii) that it gave Miller proper notice of her default. *See Webster Bank v. Flanagan*, 51 Conn. App. 733, 750-51 (1999) (elements of a foreclosure action); *Beal Bank, F.S.B. k v. Brown*, No. CV000180773S, 2001 Conn. Super. Lexis 1454, *3 (May 22, 2001) (granting summary judgment where the plaintiff was the owner of the note and the defendant defaulted); *Tamm v. Gangitano*, No. CV990145640S, 2001 Conn. Super. Lexis 571, * 28 (Mar. 2, 2001) (*prima facie* foreclosure claim requires proof that the plaintiff is the owner of the note and that the defendant has defaulted); *Fishman v. Connecticut Suites, LLC*, No. CV03089475, 2004 WL 114455 (Conn. Super. Jan. 8, 2004) (granting summary judgment where the mortgagee had satisfied the mortgage's notice requirements).

It is undisputed that MLCC satisfies each of these elements. First, as demonstrated in the Stewart Affidavit, MLCC is the owner of the Mortgage and Note. Indeed, both the Mortgage and the Note specifically identify "Merrill Lynch Credit Corporation" as the "Lender." The Modification Agreement also identifies MLCC as the "Lender." At no time has MLCC transferred or assigned its interest in either of these instruments. (Stewart Aff. at ¶ 11).

Second, Miller is in default of her obligations under the Note. It is undisputed that Miller has failed to make interest payments due on the first of the month from February 1, 2003 to the present. It is also undisputed that Miller failed to pay the property taxes for tax years 2001 and 2002. As a result, Miller now owes MLCC in excess of a total of $9,609,134.30 in principal, interest, escrow, late charges, costs and attorneys' fees.

14

Third, in accordance with the terms of the Note, MLCC notified Miller of the default. Paragraph 8(c) of the Note expressly provides that in the event of a default, MLCC may notify Miller that if she does not "pay the overdue amount by a certain date," MLCC may require her to immediately pay the full amount of principal due as well as all the interest owed.

MLCC sent Miller a "Notice of Default" dated May 16, 2003 notifying her that she was "in default under the terms of the Note and Mortgage" and that if she did not cure the defaults by June 18, 2003, MLCC would require payment of all sums secured by the Note and Mortgage. (Stewart Aff. at ¶ 9, Ex. G).

MLCC has satisfied all the necessary elements to foreclosure.

B.    **Alternatively, MLCC Should Be Granted Judgment On The Note**

Connecticut law is well settled that, upon a mortgagor's default, a mortgagee has two separate and distinct causes of action. *See Commercial Financial/SPC Acquisitions, Inc. v. Mallozzi,* No. CV950144819S, 1995 Conn. Super. LEXIS 3420 (Dec. 6, 1995); *Hartford National Bank and Trust Company v. Kotkin,* 185 Conn. 579 (1981). "A mortgagee may pursue an action at law for the amount due on the promissory note, or it may pursue its remedy in equity and foreclose on the mortgage." *People's Bank v. Bilmor Building Corp.,* 28 Conn. App. 809, 816 (1992). Alternatively, the mortgagee may "pursue both of these remedies simultaneously in one consolidated foreclosure suit." *Id.,* 28 Conn. App. at 817. *Ameriquest Mortgage Company v. Hutwohl,* No. CV010344530S, 2003 WL 21007904 (Conn. Super. Apr. 17, 2003). That is precisely the course of action pursued by MLCC in this case. Thus, in the event the Court denies MLCC summary judgment on its foreclosure counterclaim, the Court nevertheless is permitted to grant summary judgment on MLCC's counterclaim on the Note.

15

In order to establish a *prima facie* case on the Note, MLCC must demonstrate the same elements that would exist in a breach of contract case, namely, (i) the existence of a contract or agreement, (ii) a breach of that contract or agreement, and (iii) damages resulting from that breach. *University of New England d/b/a Westbrook College v. Leeman*, No. CV000082767S, 2002 Conn. Super. LEXIS 1350 (Apr. 29, 2002). As the Court explained in *Alco Standard Corp. v. Charnas*, 56 Conn. App. 568 (2000), "[a] promissory note is nothing more than a written contract for the payment of money, and, as such, contract law applies." *See also Gagliardi v. Williams*, No. CV020175272S, 2003 Conn. Super. LEXIS 1300 (May 5, 2003), *quoting Fidelity Bank v. Krenisky*, 72 Conn. App. 700, 707 (2002); *D'Amore v. Carfiro*, No. CV030091341, 2003 Conn. Super. LEXIS 3179 (Nov. 17, 2003).

In this case, the existence of a contract, *i.e.*, the Note, is undisputed. In addition, Miller personally signed the Modification Agreement in February 2001, which was more than one year after the closing of the 1999 Loan. As discussed above, the Modification Agreement was a separate contract, the terms of which were freely bargained for and negotiated by the parties. The Modification Agreement also involved the exchange of new and different consideration. In exchange for a conversion from a construction to permanent loan accompanied a reduction in the interest rate under the Note, Miller expressly agreed and acknowledged that:

- the "unpaid principal balance due under the Note … is $7,500,000";

- she "has no existing right of offset, counterclaim, or other defenses against enforcement" of the Note and Mortgage;

- to the extent she had a defense to the Note and Mortgage, those defenses were "hereby waived and released"; and

- the Note and Mortgage "shall continue to evidence and secure" her indebtedness and, except as modified, "shall remain in full force and effect."

16

Thus, Miller expressly agreed that the note and mortgage were valid, expressly waived any and all defenses to the enforceability of the Note, and expressly agreed that the Note and Mortgage "shall continue to evidence and secure [her] indebtedness thereunder as modified herein." Moreover, by entering into the Modification Agreement, Miller also ratified and evidenced her understanding that she is bound by the terms of the 1999 Loan transaction. A party will be deemed to have ratified a prior act by accepting "the results of the act with an intent to ratify, and with full knowledge of all of the material circumstances." *Russell v. Dean Witter Reynolds, Inc.,* 200 Conn. 172, 185 (1986) (citations omitted). *See Gerber and Hurley, Inc. v. CCC Corp.*, 36 Conn. App. 539, 542 (1995) (affirming trial court's finding of ratification where the defendant, "with knowledge of the facts, accepted and retained the benefits of the goods and supplies provided by the unauthorized act"); *Connecticut Nat'l Bank v. Douglas*, 221 Conn. 530 (1992) (enforcing written waiver provision).

Miller's material breach is undisputed. She has failed to make any payments due under the Note from February 1, 2003 to the present. MLCC is, accordingly, entitled to judgment on the Note in the amount then due, which presently is in excess of $9,609,134.30.

C.     **Miller's Affirmative Defenses Are Without Merit**

Miller's affirmative defenses in her Reply attempt to excuse her from the responsibility to repay the substantial sums she admittedly borrowed and spent or used to discharge pre-existing debt. As addressed below, each of those defenses is disproved by Miller's admitted execution of the Modification Agreement, her acceptance of the benefits of the borrowing, and her performance under the contractual agreements she now seeks to disavow.

17

1.    <u>Miller's First and Second Affirmative Defenses</u>

Miller contends, first, that the Note and Mortgage were "fraudulently procured" and are, therefore, unenforceable, and, second, that her attorney-in-fact was not authorized to enter into the Note and Mortgage.  By personally signing the Modification Agreement, however, Miller expressly agreed to waive and release all "defenses against enforcement of the Note and Mortgage," and acknowledged that the Note and Mortgage "shall continue to evidence and secure the Borrower's indebtedness thereunder as modified."  Moreover, Miller ratified the 1999 Loan transaction by accepting the benefits of the borrowing (including discharge of a pre-existing mortgage and repayment of margin debt she incurred in the period 1997 through 1999 to improve her house and engage in a wide array of other activities) and performing in accordance with the terms of the Note and Mortgage for several years before defaulting on her payments to MLCC.

The cases are clear that you cannot retain the benefits of a transaction and at the same time repudiate the obligations attendant to that transaction.  Miller continues to live in the 9,300 square foot house which she acquired, renovated, decorated and furnished with the money she borrowed.  Plainly stated, Miller cannot retain the benefits of the 1999 Loan and at the same time attempt to disavow the transaction by alleging fraud.  She is barred from repudiating the 1999 Loan documents because of her ratification of them.  *See Unifirst Corp. v. Mark Ford Mercury, Inc.,* No. CV920293643S, 1997 Conn. Super. LEXIS 1674, *8 (June 27, 1997); *DiMartino v. City of Hartford,* 636 F.Supp. 1241, 1252 (D.Conn., 1986) ("Ratification results if the party who executed the contract accepts the benefits flowing from it or remains silent or acquiesces in the contract for any considerable length of time after opportunity is afforded to annul or void it.")

18

2.    Miller's Third Affirmative Defense

Miller also alleges that her default under the Mortgage and Note was caused by MLCC's "improper and unlawful" acts. As indicated in Section B, supra, Miller has waived any such claim through the execution of the Modification Agreement. *See Connecticut Nat'l Bank v. Douglas*, 221 Conn. 530, 545 (1992) ("clear and definitive contract language can establish waiver as a matter of law").

Moreover, it is undisputed that over the course of three plus years, Miller borrowed monies which she then spent to acquire, renovate, decorate and furnish her Wilson Point home. Miller also met her repayment obligations for several years. Miller's subsequent payment default was caused by her failure to control her spending. Miller was in complete control of the amount she spent and her spending had nothing to do with the loan documentation. Indeed, it was only in response to MLCC's decision to declare a default (following Miller's failure to make her scheduled loan payments and pay her property taxes) that she alleged for the first time in the context of this litigation that her default resulted from some allegedly improper conduct on the part of MLCC. To the extent Miller is referring to the sale of her securities, that sale took place after repeated payment defaults and in accordance with the terms of the Pledge Agreement. As already demonstrated, Miller ratified the Pledge Agreement by, among other things, entering into the Modification Agreement and accepting the benefits of the $7,500,000 she borrowed from MLCC without objecting to the terms of the 1999 Loan. *See Gerber,* 36 Conn. App. at 542.

3.    Miller's Fourth Affirmative Defense

Miller alleges that MLCC's counterclaims are barred by the doctrine of "unclean hands and the failure to act in good faith." However, MLCC owed no duty to Miller to verify the legality of the POA. In the absence of such a duty, MLCC could not have acted with unclean

19

hands and could not have breached the covenant of good faith. Further, breach of the covenant of good faith is not recognized as a defense to a foreclosure claim in Connecticut. *See Fidelity Bank v. Krenisky*, 72 Conn. App. 700, 716-17, *cert. den.* 262 Conn. 915 (2002). Furthermore, even absent Miller's January 2001 waiver of defenses, breach of the unclean hands doctrine is not a viable legal defense to MLCC's claim on the Note. *See Thompson v. Orcutt*, 257 Conn. 301 (2001). Moreover, in order to invoke the doctrine of unclean hands, Miller must not only show that MLCC has engaged in willful misconduct, but that she, herself, has come to court with clean hands. *See Thompson*, 257 Conn. at 318. Miller took the money, executed the modification, accepted lower interest rates, made payments and suddenly, to devise a litigation strategy, she disavows the POA.

4.    <u>Miller's Fifth Affirmative Defense</u>

Miller has also alleged that she is entitled to the right of set off. This defense must also be dismissed since Miller fails to allege that she is owed any debt which is currently due. "'A proper setoff alleges a debt that is presently due and arising from a contract or liquidated claim.'" *Opticare Centers v. Aaron*, No. 01111491, 1994 Conn. Super. LEXIS 543 (Feb. 24, 1994), *quoting Armatino v. Romano,* 1 Conn. L. Rptr. 60, 61 (Nov. 27, 1989). A claim of setoff may not be "based on the possible outcome of an ongoing court case." *Shawmut Mortgage Co. v. Febbroriello*, No. 0056522, 1992 Conn. Super. LEXIS 2881, *4 (Sept. 29, 1992) (granting summary judgment). Here, Miller's alleged right of setoff is neither a debt presently due nor a liquidated claim. This alleged right is contingent upon her ability to successfully prove her pending claims against MLCC.

5.     Miller's Sixth Affirmative Defense

Miller alleges, in conclusory terms, that "the Note and Mortgage were, and are unconscionable, and are therefore unenforceable." These assertions should be rejected based on the 2001 Modification Agreement. Even absent that modification, Miller's defense is not factually or legally supportable.

There are two types of unconscionability defenses, substantive and procedural. Substantive unconscionability focuses on the "content of the contract" and procedural unconscionability focuses on the "process by which [the] allegedly offensive terms found their way into the agreement." *Cheshire Mortgage Service, Inc. v. Montes*, 223 Conn. 80, 87 (1992), *quoting J. Calamari & J. Perillo*, Contracts (3d Ed.) § 9-37.

Miller cannot establish a claim of unconscionability because, as a matter of law, the "content" of the contracts she entered into was neither unfair nor unconscionable. It is undisputed that she executed the 1997 Loan documents, including a pledge agreement, and that this arrangement enabled her initial purchase of the house on 21 Point Road. Not only did the documents clearly disclose the workings of the Mortgage 100 Program, Miller plainly understood the concept in 1997. She obtained a loan secured by her home and leveraged the value of her securities in order to borrow without the necessity of liquidating her own capital. When Miller later sought to consolidate existing debt and to obtain enough funds to complete her Wilson Point home, she once again availed herself of the Mortgage 100 Program.[10] Although Miller now contends that she was unaware of the fact that she was pledging securities as

---

[10]     As mentioned above, Miller's home, referred to in one auctioneer's brochure, as "Chateau a la Point," contains as many as 7 bedrooms, 8 full bathrooms, 6 fireplaces, a pool, pool house, library, elevator, service kitchen and staff apartment on 1.4 acres overlooking the Long Island Sound. (Kamhi Aff. at Ex. 5.)

collateral for the 1999 Loan, the pledge requirements were disclosed and explained in numerous documents and reflected in every monthly account statement. (Kamhi Aff., Exs. 1-4). Absent her agreement to pledge her securities, Miller would not have been approved for the 1999 Loan, and she knew it. Although the amount of the 1999 Loan was more than the 1997 Loan, the mechanics of the loans (both of which were under the Mortgage 100 Program) were precisely the same:

- as an inducement for MLCC to make the loan, the borrower agrees to pledge securities in a MLPFS account as collateral;

- the pledge account containing the securities must be opened and the securities transferred prior to the loan closing;

- once the loan closes, the amount of the loan is transferred to the borrower at which time the borrower must start making monthly payments toward the interest on the loan;

- in the event the borrower fails to make a payment, MLCC is entitled to liquidate and/or withdraw the securities from the account, the proceeds of which are then applied to satisfy any unpaid interest and then to pay off the outstanding principal.

In short, although Miller has alleged that she was unaware that her securities were pledged as collateral for the 1999 Loan, MLCC properly disclosed to Miller in writing, that the Mortgage 100 Program required a pledge of securities. Miller testified that it was her usual habit to read documents of this type. (Conroy Aff., Ex. A at 292-293). While Miller also has testified that she did not take the time to read many of these documents or has no recollection of doing so (*Id.* at 106, 111, 115-116), the consequences of Miller's indolence cannot be visited upon MLCC. *See Ursini v. Goldman*, 118 Conn. 554 (1934) (failure to read a document one signs is not an excuse to avoid it). As the Connecticut Supreme Court has found, "imputed knowledge" of the material circumstances is sufficient for a finding of ratification. *Bond Rubber Corp. v.*

*Oates Bros.*, 136 Conn. 248, 251 (1949); *Dichello v. Societa Libero Pensiere*, 111 Conn. 412 (1930) (ratification exists where either "actual or imputed" knowledge is established).

Finally, it does not require any specialized expertise to understand that a lender does not extend millions of dollars in credit without collateral. Miller had the necessary background, education, augmented with experience with a prior MLCC loan, to understand that the 1999 Loan required a pledge. If there was any doubt in her mind, her receipt in January 2000 of the December 1999 statement for account 881-32513 removed it.

### 6. Miller's Seventh Affirmative Defense

Miller also alleges that MLCC's second claim for relief "is barred by C.G.S.A. § 49-1." Pursuant to C.G.S.A. § 49-1, the "foreclosure of a mortgage is a bar to any further action upon the mortgage debt, note or obligation against the person or persons who are liable for the payment thereof." C.G.S.A. § 49-14, however, provides an exception to C.G.S.A. § 49-1 by permitting a mortgagee who is foreclosing on a mortgage to also assert a claim for a deficiency judgment.

In the event MLCC obtains full payment of the debt by enforcing the Note, MLCC's mortgage foreclosure claim will, accordingly, be "gone." *See Hartford National Bank and Trust Co. v. Kotkin*, 185 Conn. 579 (1981). If, on the other hand, MLCC's claim for foreclosure is granted, MLCC will be able to pursue a deficiency judgment for the difference between the property value and the balance due on the Note. Connecticut law does not preclude MLCC from pursuing its rights on the Mortgage and on the Note "simultaneously." *Sovereign Bank v. Bradley*, 2002 Conn. Super. LEXIS 957 (March 26, 2002) (striking affirmative defense alleging that mortgagee was required to choose between pursuing its legal and equitable remedies).

23

7.    <u>Miller's Eighth Affirmative Defense</u>

Equally unavailing is Miller's claim that MLCC's attorneys' fees are "outrageous and unreasonable." Under Paragraph 8(E) of the Note, MLCC is entitled to be reimbursed "for all of its costs and expenses," including reasonable attorneys' fees, incurred "in enforcing this Note to the extent not prohibited by applicable law." MLCC is entitled to a judgment that Miller is liable for MLCC's attorneys' fees with the reasonableness of those fees to be separately determined by this Court.

## II.    <u>MILLER'S COMPLAINT SHOULD BE DISMISSED AS A MATTER OF LAW</u>

Summary judgment should also be granted dismissing Counts I through IX of Miller's Complaint. As demonstrated below, Miller's claims were brought more than three years after "the date of the acts" complained of, and, are thus barred by the applicable Connecticut statute of limitations. Further, Miller cannot satisfy the requisite elements of her claims for conversion (Count I), fraudulent nondisclosure (Count II), recklessness (Count III), negligence (Count VIII), violation of the Connecticut Unfair Trade Practices Act ("CUTPA") (Counts IV, V, VI and VII) and respondeat superior (Count IX).

### A.    <u>Plaintiff's Action is Time-Barred</u>

Plaintiff's claims are all subject to summary judgment as barred by the applicable statute of limitations. "A statute of limitation or of repose is designed to (1) prevent the unexpected enforcement of stale and fraudulent claims by allowing persons after the lapse of a reasonable time, to plan their affairs with a reasonable degree of certainty, free from the disruptive burden of protracted and unknown potential liability, and (2) to aid in the search for truth that may be

impaired by the loss of evidence[.]" *Naven v. Essex*, 82 Conn. App. 255, 261, *cert. den.* 271

Conn. 902 (2004). As MLCC demonstrates below, Connecticut's various statutes of limitation

provided her until as late as December of 2002 to assert her claims, but she failed to do so. They

are now barred as a matter of law.

        1.      <u>Section 52-577 is Construed to Avoid Delaying the Limitations Period</u>

Section 52-577 of the Connecticut General Statutes states that: "No action founded upon

a tort shall be brought but within three years from the date of the act or omission complained of."

*Conn. Gen. Stat.* § 52-577. Accordingly, under Connecticut law, a tort brought more than three

years from the date of the act or omission complained of is barred. *See Collum v. Chapin,* 40

Conn. App. 449, 451 (1996); *T.F.T.F. Capital Corp. v. Marcus Dairy, Inc.,* 33 F. Supp. 2d 122,

126 (D. Conn., 1998) (applying Connecticut law) *aff'd* 312 F.3d 90 (2d Cir. 2002); *Gibbons v.*

*NER Holdings, Inc.*, 983 F. Supp. 310, 314 (D. Conn., 1997) (applying Connecticut law).

Notably, "Section 52-577 is an occurrence statute, meaning that the time period within

which a plaintiff must commence an action begins to run at the moment the act or omission

complained of occurs." *Collum,* 40 Conn. App. at 451 (internal quotation marks omitted);

*Gibbons*, 983 F. Supp. at 314 (same). Citing one another, federal courts agree that:

> The Connecticut Supreme Court [has] held that the language
> selected by the legislature in drafting § 52-577 precludes <u>any</u>
> construction thereof delaying the start of the limitations period
> until the cause of action accrued or the injury occurred.

*Gibbons*, 983 F. Supp. at 314 (emphasis added) (citing *Fichera v. Mine Hill Corp.,* 207 Conn.

204 (1988); *Marcus Dairy*, 33 F. Supp. 2d at 126 (citing *Fichera*); *Collum,* 40 Conn. App. at

25

451.[11] Accordingly, Plaintiff cannot rely on the accrual of any particular cause of action or any alleged injury to toll the statute of limitations under Section 52-577.

     2.    <u>Plaintiff's Fraud Claim is Time-Barred</u>

Plaintiff alleges in Count II that MLCC committed fraud by failing to disclose that the POA used to consummate the 1999 Loan was defective. (Complaint at ¶¶ 19-26). While Plaintiff disputes that the POA used to consummate the 1999 Loan was valid, she does not dispute that the closing at issue occurred on <u>December 7, 1999</u>. Plaintiff alleges that MLCC's agent(s) who attended the closing or agent(s) who reviewed the POA as part of the post-closing review were under a duty to disclose to Miller that the pledge of securities existed and, assuming she had not consented to them already, that she had a right to rescind or disavow the terms of the 1999 Loan. (<i>Id.</i> at ¶¶ 20-26).

Pursuant to Section 52-577's three-year statute of limitations, any claim for fraud Plaintiff may have had for any pre-closing conduct has been barred since December 7, 2002, or three years since the closing at issue. Similarly, MLCC's post-closing review ceased on or about December 14, 1999. (Stewart Aff. at ¶ 5). Pursuant to Section 52-577's three-year statue of limitations, any claim for fraud Plaintiff may have had for any post-closing review in connection with the 1999 Loan has likewise been barred since December 2002. <i>Collum,</i> 40 Conn. App. 449 at 451 (1996); <i>Marcus Dairy,</i> 33 F. Supp. 2d 122 at 126; <i>Gibbons v. NER Holdings, Inc.,</i> 983 F. Supp. at 314. Because Plaintiff filed her action, including this claim for fraudulent non-

---

[11] To the extent Plaintiff's alleged damages could be interpreted by the Court as injury to "property," Section 52-584, like Section 52-577, bars such claims filed more than three years following the date "of the occurrence of the act or omission complained of," and is interpreted in the same manner as Section 52-577. <i>Fichera,</i> 207 Conn. at 204.

disclosure on April 23, 2003, Count II is barred by the applicable statute of limitations and should be dismissed.

### 3. Plaintiff's Negligence Claim is Time-Barred

Like the claim for fraud, Section 52-577's three-year tort limitation also bars Plaintiff's eighth count for negligence. *Conn. Gen. Stat.* § 52-577. Plaintiff alleges that the liquidation, *based on an allegedly invalid power of attorney and/or pledge agreement*, which were executed and reviewed in 1999, constituted negligence. (Complaint at ¶¶ 41-43).

Plaintiff seeks to artfully plead around the three-year limitation period by alleging that the liquidation, which occurred more than three years after the closing, was a continuation of the pre-closing misconduct. Essentially, Plaintiff is seeking to toll the statute of limitations for what happened before or shortly after closing in December 1999, by imposing a fictitious and amorphous duty on a lender to *continually* monitor the legal documents securing a loan, post-closing, to ensure their validity. No such duty exists. Therefore, the Court should reject Plaintiff's attempt to plead around the statute of limitations and dismiss the Negligence Count as time-barred. *See, e.g., Bartha v. Waterbury House Wrecking Co.*, 190 Conn. 8, 13 (1983) (dismissing negligence claim brought three years after conduct complained of). Moreover, even if MLCC had such a duty, that duty can be waived and was waived. *See* discussion on pp. 34-35, infra.

Because Plaintiff failed to bring this case within three years of the act or omission complained of, her negligence claim is time-barred.

4.    <u>Plaintiff's Recklessness and Conversion Claims are Time-Barred</u>

The graveman of Plaintiff's Complaint is that MLCC permitted the use of an allegedly

defective POA in connection with the 1999 Loan.[12]  Under Connecticut law, conversion and

recklessness are subject to three year statute of limitations. *Conn. Gen. Stat.* §§ 52-577, 52-584.

For statute of limitations purposes, the act or omission complained of in this case is

MLCC's acceptance of the POA with its alleged defects.  MLCC's liquidation of Miller's

account was merely the alleged injury suffered as a result of accepting the allegedly defective

POA.  "The Connecticut Supreme Court [has] held that the language selected by the legislature

in drafting § 52-577 [and § 52-584] precludes any construction thereof delaying the start of the

limitations period until the cause of action accrued <u>or the injury occurred.</u>" *Gibbons*, 983 F.

Supp. at 314 (emphasis added) (citing *Fichera v. Mine Hill Corp.*, 207 Conn. 204 (1988);

*Marcus Dairy*, 33 F. Supp. 2d at 126 (citing *Fichera*); *Collum,* 40 Conn. App. at 451.  Because

Plaintiff failed to bring this case within three years of the act or omission complained of

(acceptance of an allegedly defective POA), her recklessness and conversion claims are time-

barred.

5.    <u>Plaintiff's CUTPA Claims are Time-Barred</u>

Counts IV, V, VI and VII allege that MLCC's conduct was unfair and/or deceptive under

CUTPA as set forth in Plaintiff's other counts.  However, "an action under [CUTPA] may not be

brought more than three years after the occurrence of a violation of this chapter." *Conn. Gen.*

*Stat.* § 42-110g(f).  In *Fichera*, 207 Conn. at 204, the court held that the statutory language of

Section 42-110g(f) also: "precludes any construction thereof delaying the start of the limitation

---

[12] As pointed out on pages 32-33 of this Memorandum, Plaintiff has admitted being aware, on
the day she signed the POA, of the alleged "defects" of which she is now complaining.

period until the cause of action has accrued or the injury has occurred." The Supreme Court

further described the parameters of the statute of limitations for CUTPA claims as follows:

> We are unable to perceive any significant distinction applicable to this case between the "act or omission" reference, denoting the start of the limitation period in §§ 52-577 and 52-584, and the "occurrence of a violation" phrase in § 42-110g(f), setting the time when the three year period begins for bringing an action alleging a CUTPA violation.

*Fichera*, 207 Conn. at 204. Because each of the claims underlying the CUTPA Counts were

brought more than three years after the act or omissions complained of, the CUTPA claims must

also be dismissed. *Id.*


B.  **Each Of Plaintiff's Claims Is Defective As A Matter Of Law**

In addition to Plaintiff's failure to file her claims in a timely manner, her action also fails

on its merits. As set forth below, Plaintiff cannot prove one or more elements of each of her

claims and they should, therefore, be dismissed as matter of law.

1.  Plaintiff's Fraudulent Non-Disclosure Claim Cannot Survive Summary
    Judgment Because MLCC Did Not Owe Miller a Duty

Miller complains in this action about alleged defects in the Power of Attorney ("POA")

she executed on December 7, 1999 before departing for Africa. This claim has no basis either in

law or in fact.

"The four essential elements of fraud are (1) that a false representation of fact was made;

(2) that the party making the representation knew it to be false; (3) that the representation was

made to induce action by the other party ; and (4) that the other party did so act to her

detriment." *See, e.g., Gelinas v. Gelinas*, 10 Conn. App. 167, 173, *cert. den.* 204 Conn. 802

(1987); *Parker v. Shaker Real Estate, Inc.,* 47 Conn. App. 489, 493 (1998) (quoting *Gelinas* for

fraud standard).  "Fraud by non-disclosure, which expands on the first three of these four

elements, involves the failure to make a full and fair disclosure of *known facts* connected with a

matter about which a party has assumed to speak, *under circumstances where there is a duty to*

*speak*." *Gelinas*, 10 Conn. App. at 173 (emphasis added); *Parker*, 47 Conn. App. at 494

(quoting *Gelinas*).  Plaintiff erroneously claims that MLCC committed fraud by failing to

disclose that the POA used to close the 1999 Loan transaction was defective.  (Complaint at ¶¶

21-22).

As a matter of law, MLCC owed no duty to inform Plaintiff of the *alleged* defects in the

POA.  "A lender has the right to further its own interest in a mortgage transaction and is not

under a duty to represent the customer's interests." *Southbridge Associates LLC v. Garofalo*, 53

Conn. App. 11, 19 (1999), *cert. den.* 249 Conn. 919 (1999).  "Generally there exists no fiduciary

relationship merely by virtue of a borrower lender relationship between a bank and its customer."

*Id.*; *see also Dubinsky v. Citicorp Mortgage, Inc.*, 48 Conn. App. 52, 58, *cert. den.* 244 Conn.

926 (1998) (lender owes no common law duty to perform appraisal with reasonable care).

Because MLCC had no duty to Miller, her claim for fraudulent non-disclosure fails as a matter of

law.   In any event, Miller has admitted to knowing of the "whiting out" on the POA prior to the

closing.  (Conroy Aff., Ex. A at 299-300, 306-07, 467; Ex. L (Plaintiff's Response to

Defendant's Interrogatory No. 7 dated Sept. 12, 2003; and Ex. M (Plaintiff's Affidavit submitted

in connection with PJR hearing, ¶ 7, dated April 23, 2003)).

       2.     <u>Plaintiff's Negligence and Recklessness Claims Cannot Survive Summary</u>
                  <u>Judgment  Because MLCC Did Not Owe a Duty to Plaintiff To Review</u>
                  <u>the Power of Attorney For Her Benefit or to Refrain from Liquidating her</u>
                  <u>Pledge Account</u>

Plaintiff claims that MLCC is liable for negligence because it failed to determine that the

POA was invalid and consummated the 1999 Loan.  (Complaint at ¶¶ 41-43).  Plaintiff further

30

claims that MLCC was reckless because it liquidated the Pledge Account pursuant to the allegedly invalid Pledge Agreement knowing that Plaintiff would incur financial harm as a result. (*Id.* at ¶¶ 28-30).

Putting aside, for the moment, Miller's admissions concerning the act of "whiting out," allegedly by Mr. Falini, Connecticut law is well settled that an essential element in any claim for recklessness or negligence is the existence of a "duty" between the parties. *Roach v. Ivari Int'l Centers, Inc.*, 77 Conn. App. 93, 99 (2003); *Hat City Commons, Ltd. v. Connecticut Hous. Fin. Auth.*, No. CV970326706S, 2002 WL 230911, at * 3 (Conn. Super. Jan. 24, 2002). When a bank acts as a lender, "there exists no fiduciary relationship merely by virtue of a borrower lender relationship between a bank and its customer." *Southbridge Associates LLC v. Garofalo*, 53 Conn. App. 11, 19 (1999), *cert. denied* 249 Conn. 919 (1999). *See also Dubinsky v. Citicorp Mortgage, Inc.*, 48 Conn. App. 52, 58 (1998) (lender owes no common law duty to perform appraisal with reasonable care). Rather, a "lender has the right to further its own interest in a mortgage transaction and is not under a duty to represent the customer's interests." *Southbridge*, 53 Conn. App. at 19.

At all relevant times, MLCC acted within the rights granted to it by the Mortgage, Note and Pledge Agreement. Even assuming MLCC had a duty, if MLCC had checked with Plaintiff, she would have confirmed her awareness of the whiting out and what Falini said to her on the subject. These claims must therefore be dismissed.

3.   Plaintiff's Conversion Claim Cannot Survive Summary Judgment Because Plaintiff Ratified the 1999 Loan Thereby Authorizing MLCC to Take Possession of the Pledge Funds

Miller erroneously claims in Count I of the Complaint that MLCC committed conversion "by exercising the right of ownership" over the securities which she had pledged as collateral for

31

the 1999 Loan. (Complaint at ¶ 17). However, conversion only "occurs when one, <u>without</u>

<u>authorization</u>, assumes and exercises ownership over property belonging to another, to the

exclusion of the owner's rights." *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.,* 255 Conn. 20, 44

(2000) (emphasis added). Here, in contrast, Miller was fully aware that the Pledge Agreement

permitted MLCC "to liquidate and/or withdraw any Collateral from the Account" in the event of

a default and acceleration of the Note. (Stewart Aff., Ex. D at ¶ 4(a)). Moreover, Miller, by her

acts and conduct, later ratified the 1999 Loan transaction by entering into an entirely new

contract (the "Modification Agreement") "waiving and releasing" any defenses to the

enforceability of the Note and Mortgage. Indeed, Miller's signing of the Modification

Agreement is just one of several factors establishing her ratification of the Pledge Agreement.

As the documentary evidence conclusively demonstrates:

- Miller was aware of the changes made to the power of attorney in the form of white-outs at the time they were made on the same day she signed the power of attorney (Conroy Aff., Ex. A at 299-300, 306-07, 467; Ex. L (Plaintiff's Response to Defendant's Interrogatory No. 7 dated Sept. 12, 2003; and Ex. M (Plaintiff's Affidavit submitted in connection with PJR hearing, ¶ 7, dated April 23, 2003));

- After the loan closed, Miller received an account statement from MLPFS showing an increase in the value of the pledge account from $771,614 in the month prior to the loan closing to $6,004,075 in the month that the loan closed (Kamhi Aff. at ¶ 6, Ex. 2);

- Prior to signing the Modification Agreement, and no later than late 2000, Miller was aware of the pledge arrangement by her own admission, separate and apart from any documents she signed later (Conroy Aff., Ex. A at 152-153).

It is undisputed that Miller personally executed the Modification Agreement which

waived any defenses to the enforceability of the Note and the Mortgage. Connecticut law is

clear that such waivers are enforceable and are routinely upheld. *See Albany Ins. Co. v. United*

*Alarm Services, Inc.,* 194 F. Supp. 2d 87 (D. Conn., 2002) ("Under Connecticut law, a party to a

contract may waive any defenses or rights it has against the other party to the contract, and such a waiver will be enforced if it is clear and unambiguous."). In *Connecticut Nat'l Bank v. Douglas*, 221 Conn. 530 (1992), for example, the guarantor of a loan claimed that the bank's conduct had impaired the secured collateral in such a way as to discharge him as guarantor. *See id.* at 542. The Supreme Court of Connecticut upheld the trial court's conclusion that the guarantor's special defenses were barred as a matter of law because the guarantor had expressly waived such a right in the guaranties he had signed. *See id.* at 543. The documents the guarantor signed each contained an express waiver of the right to assert any claim with regard to any action the bank might take, or not take, with regard to the borrower's collateral. *See id.* The court noted that the guaranties were executed for the benefit of the bank "in order to induce it to extend credit to [the borrower], [guarantor] manifested, definitively and unequivocally, his intent to waive any rights that he might have had as guarantor to challenge the bank's conduct with regard to the second collateral." *Id.* at 544. The court explained that "[w]hile a determination about a party's intent to waive his rights ordinarily poses a question of fact, clear and definitive contract language can establish waiver as a matter of law." *Id.* at 545 (citations omitted).

      4.      **Plaintiff's CUTPA Claims Cannot Survive Summary Judgment Because She Could Have Avoided All of Her Alleged Damages and There Is No Genuine Issue of Material Fact as to That**

For Counts IV, V, VI and VII of the Complaint, Miller alleges, in conclusory terms, that MLCC's "conduct" was unfair and/or deceptive in violation of Connecticut's Unfair Trade Practices Act. In order to make out a CUTPA claim, Miller must demonstrate that the injury she suffered was one which she *"could not reasonably have avoided." See A-G Foods, Inc. v. Pepperidge Farm, Inc.*, 216 Conn. 200, 217 (1990) (emphasis in original) (no liability where CUTPA plaintiff is at least partially responsible for injury); *Williams Ford, Inc. v. Hartford*

*Courant Co.*, 232 Conn. 559, 593 (1995) (no liability under CUTPA where plaintiff failed to prove that it "could not reasonably have avoided any injury"). It is undisputed that the decision to acquire, renovate, furnish and decorate Miller's Wilson Point house resulted from personal choices which she alone made. The amount of money Miller spent and what she spent it on were totally within her control. Thus, if Miller has experienced economic injury as a result of her decision to build a 9,300 square foot home in a gated community overlooking the Long Island Sound -- it is an injury she could have avoided.

5.     <u>Plaintiff's Respondeat Superior Claim Cannot Survive Summary Judgment Because Falini was Not MLCC's Agent</u>

Count IX of Miller's Complaint must also be dismissed because Falini was not acting as an agent of MLCC. Connecticut law is clear that an agency relationship requires "(1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking." *Hallas v. Boehmke and Dobosz, Inc.*, 239 Conn. 658, 673 (1997).

MLCC did not express a "manifestation" that Falini act as its agent. Instead, it is undisputed that Falini was employed by MLPFS as a financial advisor. (Stewart Aff. at ¶ 13). Falini was not under the supervision or control of MLCC, but rather was supervised by the branch managers in the Pennsylvania office of MLPFS where he worked. *Id.* Moreover, Falini played no role in the review or underwriting of the 1999 Loan. *Id.* Instead, the 1999 Loan was reviewed by, among others, MLCC's Construction Loan Officer, Harvey Rosenblum, who worked in MLCC's Jacksonville office. *Id.*

Even if this court finds that a genuine issue of fact exists with regard to Falini's agency, MLCC cannot be liable for his acts because Plaintiff waived her right to challenge them. Miller alleges that Falini altered the POA used to consummate the 1999 Loan transaction by applying

34

white-out to certain sections on the form in her presence, but without her consent. (Complaint at ¶10). Miller waived any claim based on this alleged conduct. "Waiver need not be express, but may consist of acts or conduct from which a waiver may be implied . . . In other words, waiver may be inferred from the circumstances if it is reasonable to do so." *Hensley v. Commissioner of Transp.*, 211 Conn. 173 (1989) (internal quotation marks and citations omitted).

Here, the only reasonable interpretation of the facts is that Miller waived any claims she may have had in connection with the application of the white-out. With admitted knowledge of the pledge aspect of the 1999 Loan, Miller signed a Modification Agreement ratifying the transaction. A party may not ratify only a portion of the transaction. *See Cohen v. Holloways', Inc.*, 158 Conn. 395 (1969) ("[A principal] cannot separate the transaction and ratify the part that is beneficial to him, repudiating the remainder; but if he, of his own election and with full knowledge, accepts and retains the benefits of an unauthorized transaction, he must also accept the part that is not beneficial, and will be held to have ratified the whole."). Miller executed the Modification Agreement, had it witnessed and sent it to MLCC acknowledging the validity of the 1999 Loan. Following its recordation on the Norwalk land records, she had received the POA from the Town Clerk years before. She cannot disavow the Modification Agreement, or the transaction it ratified, at this late juncture.

Moreover, the Plaintiff was present for the alleged application of the white-out. (Conroy Aff., Ex. L (Miller Responses and Objections to Interrogatory No. 7)). Plaintiff claims she did not authorize the alterations to the POA, but she never took any action to stop Mr. Falini, if in fact he was the one who applied the white-out, and never told him that she did not want the white-out to be applied. (Conroy Aff., Ex. A at 299-300, 306-307.) After Falini allegedly applied white-out to the document, Plaintiff then permitted the POA to be used to close the

transaction. (Conroy Aff., Ex. M at ¶¶ 7-8.)  She received it back from the Town Clerk after it was recorded and never disputed its validity until this litigation (over four years later).  (*Id.*) Here, the conclusion that Miller intended to waive any objection to Falini's acts is not only reasonable, it is inescapable. *See e.g., Hensley,* 211 Conn. 173.

## **CONCLUSION**

The core facts are not in dispute. Miller borrowed, and spent, $7,500,000 and defaulted on her obligation to repay that amount. It is also undisputed that she accepted the benefits of the 1999 Loan, performed under the 1999 Loan by meeting her repayment schedule from 1999 through 2003, and, consistent with her understanding of her obligations, specifically reaffirmed the 1999 Loan transaction by personally executing the Modification Agreement in 2001. Despite these undisputed facts, Miller now alleges that the loan is unconscionable and that she is excused from a liability she specifically reaffirmed in 2001.

Miller is a highly educated individual (B.S. from Duke and an M.A. from Yale) who possesses the ability to understand a lending transaction. Her post default claims alleging the invalidity of the 1999 Loan and her ignorance of the Mortgage 100 Program, including the requisite pledge of securities, are conclusively disproved by the loan application, the written disclosures provided by MLCC, the transaction documents, the account statements she received each month and the performance of her 1999 Loan obligations until 2003. In addition to the clear and unambiguous documentation as well as her performance under the 1999 Loan, there is another factor which not only disproves her claims but establishes the duplicity of Miller's arguments. She currently resides in a 9,300 square foot house with an accompanying pool and pool house overlooking Long Island Sound. Miller planned the purchase and subsequent renovation and decoration of that Wilson Point property and, simply stated, it is neither a matter of unfairness nor surprise that she must repay the sums she used to build the house in which she lives.

Miller took the loan proceeds, used them for her purposes, made monthly payments for over three years, and is now attempting to avoid paying it back. This she cannot do.

For all of the foregoing reasons, MLCC respectfully requests that summary judgment be granted on its first or second Counterclaims and that Counts I through IX of the Miller's Complaint be dismissed in their entirety.

Dated: May 20, 2005

PAUL, HASTINGS, JANOFSKY &
WALKER LLP

By: _Douglas C. Conroy_
Douglas C. Conroy (ct 11555)
Matthew R. Paul (ct 21036)
1055 Washington Boulevard
Stamford, CT 06901-2217
Telephone: (203) 961-7400
Facsimile: (203) 359-3031
Email: douglasconroy@paulhastings.com
      matthewpaul@paulhastings.com

COHEN AND WOLF
Jonathan S. Bowman (ct 08526)
Ari Hoffman (ct 22516)
1115 Broad Street
Bridgeport, CT 06604
Tel: 203-368-0211
Fax: 203-576-8504
Email: jbowman@cohenandwolf.com
      ahoffman@cohenandwolf.com

Counsel for Defendant and Counterclaimant
MERRILL LYNCH CREDIT
CORPORATION

38

**CERTIFICATE OF SERVICE**

This is to certify that on this _20th_ day of May 2005, a copy of the foregoing Memorandum

of Law In Support of Motion For Summary Judgment of Defendant And Counterclaimant

Merrill Lynch Credit Corporation was delivered via U.S. first class mail to:

> Patrick W. Begos, Esq.
> BEGOS & HORGAN, LLP
> 327 Riverside Avenue
> Westport, CT 06880
>
> Jonathan S. Bowman, Esq.
> Ari Hoffman, Esq.
> COHEN AND WOLF
> 1115 Broad Street
> Bridgeport, CT  06604

Douglas C. Conroy

STM/292188.6

39