UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JULIE DILLON RIPLEY MILLER,<br><br>Plaintiff and Counterclaim<br>Defendant,<br><br>- against -<br><br>MERRILL LYNCH CREDIT CORPORATION,<br><br>Defendant and Counterclaimant. | NO. 3:03-CV-1016 (RNC)(DFM)<br><br><br><br><br><br>May 20, 2005 |

## LOCAL RULE 56(a)1 STATEMENT OF MERRILL LYNCH CREDIT CORPORATION

Pursuant to Local Rule 56(a)1, Defendant and Counterclaimant Merrill Lynch Credit Corporation ("MLCC") hereby submits this statement of material facts as to which MLCC contends there is no genuine issue to be tried.

| | Material Facts Not in Dispute | Evidence in Support |
|---|---|---|
| 1. | Merrill Lynch Credit Corporation ("MLCC") is a provider of home financing programs throughout the United States. | • Affidavit of Tara Stewart ("Stewart Aff.") at ¶ 2. |
| 2. | In 1997, Julie Dillon Ripley Miller ("Miller") obtained a loan from MLCC in the amount of $1,350,000 (the "1997 Loan") to finance the purchase of her home at 21 Point Road, Norwalk, Connecticut. | • Stewart Aff. at ¶ 2. |
| 3. | Miller obtained the 1997 Loan through MLCC's Mortgage 100 Program. | • Stewart Aff. at ¶ 2. |

| | Material Facts Not in Dispute | Evidence in Support |
|---|---|---|
| 4. | MLCC's Mortgage 100 Program offers qualified borrowers the ability to finance 100% of a loan by both mortgaging the property they are purchasing and pledging eligible securities in an account with Merrill Lynch Pierce Fenner & Smith, Inc. ("MLPFS") in lieu of a cash down payment. | • Stewart Aff. at ¶ 2. |
| 5. | In 1997, Miller inherited approximately $11,000,000 in trust assets.  Most of the assets were comprised of low basis securities and very little cash. | • Stewart Aff. at ¶ 2. |
| 6. | On or about September 16, 1997, Miller signed a mortgage application for the 1997 Loan. | • Conroy Aff. at Ex. C and Ex. A (Miller Depo. at 110). |
| 7. | On the cover of the application, a box marked "Pledged securities" was checked under the section titled "Source of Funds for Down Payment and/or Closing Costs." | • Conroy Aff. at Ex. C and Ex. A (Miller Depo. at 110). |
| 8. | The application also included a special supplement requiring the applicant to "[c]omplete this section or attach a copy of a current statement from your securities brokerage firm indicating the securities to be pledged as additional collateral." | • Conroy Aff. at Ex. C and Ex. A (Miller Depo. at 110). |
| 9. | In this special supplement, under a section titled "Eligible Securities/CD's," the ticker symbols and current market values of four different stocks in Miller's MLPFS account were listed. Miller does not dispute that she signed this special supplement. | • Conroy Aff. at Ex. C and Ex. A (Miller Depo. at 110). |

| | Material Facts Not in Dispute | Evidence in Support |
|---|---|---|
| 10. | By letter dated October 3, 1997, MLCC notified Miller that it had approved her loan application. | • Conroy Aff. at Ex. D. |
| 11. | Attached to the October 3, 1997 letter Miller received from MLCC was a document entitled "Important Information," which states: <br><br> If your loan is being made in connection with the Mortgage 100 program, <u>your loan will also be secured by assets deposited in a special brokerage account at Merrill Lynch, Pierce, Fenner & Smith Incorporated.</u>  The account must be opened and the <u>securities</u> delivered at least seven (7) business days prior to your closing.  Failure to do so may cause a delay in your mortgage closing.  <u>You may request a copy of the Mortgage 100 Pledge Agreement for Securities Account and Mortgage 100 Securities Account Agreement which you will be required to sign when you open your brokerage account</u> (emphasis added). | • Conroy Aff. at Ex. D. |
| 12. | On November 13, 1997, Miller closed on the 1997 Loan. | • Conroy Aff. at Ex. B (Cullen Depo. at 11). |
| 13. | Miller personally attended the closing of the 1997 Loan and, among other documents, executed a mortgage, note and pledge agreement. | • Conroy Aff. at ¶¶ 8-10 and Exs. E, F, G. |
| 14. | At or about the time of the closing of the 1997 Loan, approximately $400,000 worth of Miller's securities were transferred to a segregated pledge account at MLPFS to serve as collateral for the loan. | • Stewart Aff. at ¶ 3. |
| 15. | After the closing of the 1997 Loan, Miller was sent her Pledge Account statement which reflected the transfer of securities into the segregated account. | • Affidavit of Laurie Kahmi ("Kahmi Aff.") at ¶ 5, Ex. 1. |

| | Material Facts Not in Dispute | Evidence in Support |
|---|---|---|
| 16. | Over the next two years, Miller made the required interest payments on the 1997 Loan. | • Stewart Aff. at ¶ 3. |
| 17. | In addition, each month Miller received account statements reflecting the value of the pledged securities. | • Kahmi Aff at ¶¶ 4-8, Exs. 1, 2, 3. |
| 18. | By 1999, Miller needed additional funds in order to complete construction of her house.  As a result, in the fall of 1999, Miller applied for, and in December 1999 obtained, a loan in the amount of $7,500,000 from MLCC, in order to consolidate existing indebtedness and to obtain the funds necessary to complete her home (the "1999 Loan"). | • Stewart Aff. at ¶ 4. |
| 19. | Just as she had done with the 1997 Loan, Miller personally signed a mortgage application for the 1999 Loan. | • Conroy Aff. at Ex. H and Ex. A (Miller Depo. at 264). |
| 20. | On the cover of the application, a box marked "Pledged securities" was checked under the section titled "Source of Funds for Down Payment and/or Closing Costs." | • Conroy Aff. at Ex. H and Ex. A (Miller Depo. at 264). |
| 21. | Precisely as had been the case with the 1997 Loan, the application for the 1999 Loan included a supplement specifically requiring the applicant to "[c]omplete this section or attach a copy of a current statement from your securities brokerage firm indicating the securities to be pledged as additional collateral" (emphasis added). | • Conroy Aff. at Ex. I and Ex. A (Miller Depo. at 266-267). |
| 22. | Miller signed this supplement. | • Conroy Aff. at Ex. A (Miller Depo. at 266-267). |

| | Material Facts Not in Dispute | Evidence in Support |
|---|---|---|
| 23. | By letter dated November 17, 1999, MLCC notified Miller that her application had been approved. | • Stewart Aff. at Ex. A. |
| 24. | Attached to MLCC's approval letter was a document plainly disclosing that a Mortgage 100 loan is secured by securities held in a MLPFS account. | • Stewart Aff. at Ex. A. |
| 25. | The language in the November 17, 1999 MLCC loan approval letter was identical to the language in the October 3, 1997 MLCC loan approval letter. | • Compare Stewart Aff. at Ex. A to Conroy Aff. at Ex. D. |
| 26. | At the time of the scheduled closing of the 1999 Loan in December 1999, Miller planned to be on safari in Africa with her family. | • Conroy Aff. at Ex. A (Miller Depo. at 274). |
| 27. | Miller signed a Power of Attorney in favor of her personal accountant, Barry Newman, to sign the necessary loan documents in her absence. | • Stewart Aff. at ¶ 5. |
| 28. | Miller was aware of "whiting out" on the Power of Attorney prior to the closing of the 1999 Loan. | • Conroy Aff. at Ex. A (Miller Depo. at 299-300, 306-307, 467); Ex. L; and Ex. M at ¶ 7. |
| 29. | In connection with the 1999 Loan, Miller, through her attorney-in-fact Newman, executed an adjustable rate note (the "1999 Note"). | • Stewart Aff. at Ex. C. |
| 30. | Once again, with the exception of the amount borrowed, the 1999 Note was substantially identical to the note Miller had personally signed as part of the 1997 Loan. | • Compare Stewart Aff. at Ex. C to Conroy Aff. at Ex. E. |

| | Material Facts Not in Dispute | Evidence in Support |
|---|---|---|
| 31. | Paragraph 1 of the 1999 Note states that "[i]n return for a loan that I have received, I promise to pay U.S. $7,500,000 … plus interest, to the order of the Lender." | • Stewart Aff. at Ex. C. |
| 32. | Pursuant to Paragraph 8 of the 1999 Note, Miller also agreed to pay a 6 % late charge on any payment not received "by the end of 15 days after the date is due." | • Stewart Aff. at Ex. C. |
| 33. | In the event Miller fails to "pay the full amount of each monthly payment on the date it is due," the 1999 Note states that MLCC may notify Miller that she is in default and has 30 days to pay the full amount of principal and all interest that is owed. | • Stewart Aff. at Ex. C. |
| 34. | As required by the 1999 Loan, Miller also mortgaged her Point Road residence in Norwalk (the "1999 Mortgage"). | • Stewart Aff. at Ex. B. |
| 35. | With the exception of the amount borrowed, the 1999 Mortgage was substantially identical to the mortgage Miller had personally signed as part of the 1997 Loan. | • Compare Stewart Aff. at Ex. B to Conroy Aff. at Ex. F. |
| 36. | Paragraph 1 of the 1999 Mortgage states that "Borrower shall promptly pay when due the principal and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note." | • Stewart Aff. at Ex. B. |

| | Material Facts Not in Dispute | Evidence in Support |
|---|---|---|
| 37. | Paragraph 20 of the 1999 Mortgage provides that in the event of a default under the 1999 Mortgage, MLCC shall give Miller notice of the default. | • Stewart Aff. at Ex. B. |
| 38. | If, however, "the default is not cured by the date specified in the notice," MLCC "may require immediate payment in full … and may invoke any of the remedies permitted by applicable law" and shall also be entitled to collect all costs and reasonable attorneys' fees incurred by MLCC as a result. | • Stewart Aff. at Ex. B. |
| 39. | In addition to the 1999 Note and 1999 Mortgage, on December 7, 1999, Miller also entered into a "Mortgage 100 Pledge Agreement for Securities Account" (the "1999 Pledge Agreement"). | • Stewart Aff. at Ex. D. |
| 40. | The 1999 Pledge Agreement was substantially identical (except for the amount and some immaterial stylistic changes) to the pledge Miller signed in connection with the 1997 Loan. | • Compare Stewart Aff. at Ex. D to Conroy Aff. at Ex. G. |
| 41. | Pursuant to the 1999 Pledge Agreement, Miller expressly agreed that, as an "inducement for MLCC to make the loan," she "assigns, pledges, grants and conveys to MLCC a continuing first priority lien and security interest in the Collateral," including all assets set forth on Exhibit "A." | • Stewart Aff. at Ex. D. |

| Material Facts Not in Dispute | Evidence in Support |
|---|---|
| 42. | Paragraph 1(d) of the 1999 Pledge Agreement defines "Collateral" to mean the Account together with "all stocks, bonds or other securities held in the Account now or in the future." | • Stewart Aff. at Ex. D. |
| 43. | Paragraph 1(a) defines "Account" as "… those certain Cash Securities Accounts, collectively (if more than one), in the name of the Borrower with Merrill Lynch, Pierce, Fenner & Smith Incorporated listed below. … 881-32513." | • Stewart Aff. at Ex. D. |
| 44. | Exhibit A to the 1999 Pledge Agreement, entitled "List of Securities in Account As Of the Date of This Agreement," indicates that Account Number 881-32513 contains 2,420 shares of "Coca Cola Com," 2,344 shares of "Exxon Corporation," 2,586 shares of "Johnson & Johnson" and 2,500 shares of "Weyerhaeuser Co." | • Stewart Aff. at Ex. D. |
| 45. | Paragraph 4(a) of the 1999 Pledge Agreement further provides that "prior to acceleration," MLCC shall give Miller notice "of such breach and the opportunity to cure" and that in the event she fails to timely cure, Miller: "authorizes MLCC and MLCC shall be entitled to liquidate and/or withdraw any Collateral from the Account, up to the Maximum Amount, to be applied first to accrued and unpaid interest on the Loan and then to the outstanding principal balance of the Loan." | • Stewart Aff. at Ex. D. |

| | Material Facts Not in Dispute | Evidence in Support |
|---|---|---|
| 46. | In precisely the same manner as the 1997 Loan's closing mechanics, in the 1999 Loan the pledge of approximately $6,000,000 in securities was made in order to borrow the $7,500,000 from MLCC. | • Stewart Aff. at ¶ 4. |
| 47. | The securities were transferred to the same MLPFS segregated account which held the securities Miller previously pledged to secure the 1997 Loan. | • Kahmi Aff. at ¶¶ 5-7 and Exs. 1-3. |
| 48. | Copies of the Mortgage and Pledge Agreement for the 1999 Loan, bearing the stamp "borrower's copy," were located during discovery via subpoena in the possession of Michael Grohman, Esq., one of Miller's attorneys. | • Conroy Aff. at ¶¶ 17-20 and Exs. P and Q. |
| 49. | On or about December 31, 1999, Miller was sent a detailed statement from MLPFS showing the transfer of securities. | • Kamhi Aff. at ¶ 6, and Ex. 2. |
| 50. | Miller's December 31 statement plainly shows the increase in the value of the pledge account from $771,614 in the month prior to the loan closing to $6,004,075 in the month that the 1999 Loan closed. | • Kamhi Aff. at ¶ 6, and Ex. 2. |
| 51. | Following the closing of the 1999 Loan, Miller received monthly account statements listing those securities that she had pledged as collateral for the loan. | • Kamhi Aff. at ¶7, and Ex. 3. |

| | Material Facts Not in Dispute | Evidence in Support |
|---|---|---|
| 52. | In February 2001, Miller executed an agreement with MLCC lowering the interest rate payable under the Note from 9% to 8.125% (the "Modification Agreement"). | • Stewart Aff. at ¶ 6. |
| 53. | Miller has admitted that she had knowledge of the pledge aspect of the 1999 Loan no later than the Fall of 2000, long before executing the Modification Agreement. | • Conroy Aff. at Ex. A (Miller Depo. at 152-153). |
| 54. | Miller also evidenced knowledge regarding the pledge by periodically requesting special withdrawal payments from the pledge account. Payments from that source totaled over $694,000 in 2001. | • Kamhi Aff. ¶ 9. |
| 55. | In executing the Modification Agreement, Miller specifically acknowledged and agreed that:<br><br>a.    The unpaid principal balance due under the Note as of the date of this Agreement was $7,500,000.<br><br>b.    She had no existing right of offset, counterclaim, or other defenses against enforcement of the Note and Security Instrument by MLCC and that, if any such right or defenses do exist, she waived and released them.<br><br>c.    The Note and Security Agreement would continue to evidence and secure her indebtedness and the Note and mortgage would remain in full force and effect until her obligations were paid in full. | • Stewart Aff. at Ex. F. |
| 56. | Miller defaulted under the 1999 Note and 1999 Mortgage by failing to make interest payments due on the first of the month from February 1, 2003 to the present. | • Stewart Aff. at ¶ 8. |

| | Material Facts Not in Dispute | Evidence in Support |
|---|---|---|
| 57. | In addition, Miller defaulted by failing to remit the property taxes due to the City of Norwalk for the years 2000 and 2001. | • Stewart Aff. at ¶ 8. |
| 58. | This resulted in the filing of tax liens in the amount of $26,533.77 and $39,854.24, respectively. | • Stewart Aff. at ¶ 8. |
| 59. | Pursuant to Paragraph 7 of the 1999 Mortgage, MLCC subsequently paid the City of Norwalk $67,733.96 in costs and fees to satisfy Miller's property tax obligations and to prevent a foreclosure by the City of Norwalk for unpaid property taxes. | • Stewart Aff. at ¶ 8. |
| 60. | By "Notice of Default" dated May 16, 2003 (the "Default Notice"), MLCC gave Miller written notice that she was "in default under the terms of the Note and Mortgage" by reason of her "failure to pay real estate taxes due to the City of Norwalk" and her failure to make her "monthly payments due on the first days of February, March, April and May, 2003." | • Stewart Aff. at ¶ 9, and Ex. G. |
| 61. | In addition, MLCC further notified Miller that in order for her to "cure all defaults, payment in the amount of $174,521.19 must be made by June 18, 2003" which was at least thirty days from the date the notice was given. | • Stewart Aff. at ¶ 9, and Ex. G. |
| 62. | The Default Notice further provided that failure to pay the past due amount may require payment of the entire indebtedness. | • Stewart Aff. at ¶ 9, and Ex. G. |

| | **Material Facts Not in Dispute** | **Evidence in Support** |
|---|---|---|
| 63. | As of March 24, 2005, Miller owed MLCC $7,497,995.94 in principal, $632,347.05 in interest, $26,736.88 in late fees, $154,636.86 for taxes and insurance paid by MLCC, and $1,297,417.57 in attorneys' fees, for a total amount due of $9,609,134.30. | • Stewart Aff. at ¶ 10. |

PAUL, HASTINGS, JANOFSKY &
WALKER LLP


By: _____
Douglas C. Conroy, ct14555
Matthew R. Paul, ct21036
1055 Washington Boulevard
Stamford, CT  06901-2217
Telephone:  (203) 961-7400
Facsimile:  (203) 359-3031
Email:  douglasconroy@paulhastings.com
        matthewpaul@paulhastings.com

Jonathan S. Bowman (ct 08526)
Ari Hoffman (ct 22516)
COHEN AND WOLF
1115 Broad Street
Bridgeport, CT  06604
Tel: 203-368-0211
Fax: 203-576-8504
Email: jbowman@cohenandwolf.com
       ahoffman@cohenandwolf.com

Counsel for Defendant and Counterclaimant
MERRILL LYNCH CREDIT
CORPORATION

13

## CERTIFICATE OF SERVICE

This is to certify that on this 20th day of May 2005, a copy of the foregoing Rule 56(a)1

Statement was delivered via U.S. first class mail to:

> Patrick W. Begos, Esq.
> BEGOS & HORGAN, LLP
> 327 Riverside Avenue
> Westport, CT 06880
>
> Jonathan S. Bowman, Esq.
> Ari Hoffman, Esq.
> COHEN AND WOLF
> 1115 Broad Street
> Bridgeport, CT 06604

_____
Douglas C. Conroy

STM/290843.4

14