UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JULIE DILLON RIPLEY MILLER, | NO. 3:03 CV 1016 (RNC) |
| Plaintiff and Counterclaim Defendant, | |
| - against - | |
| MERRILL LYNCH CREDIT CORPORATION, | |
| Defendant and Counterclaimant. | |

### AFFIDAVIT OF TARA STEWART

STATE OF FLORIDA            )
                            )  ss: Jacksonville
COUNTY OF JACKSONVILLE      )

Tara Stewart, being first duly sworn, deposes and states:

1. I am a Vice President of Merrill Lynch Credit Corporation ("MLCC"). I have been employed by MLCC in various capacities since 1983. I submit this affidavit in support of MLCC's Motion for Summary Judgment. I am familiar with the facts and circumstances involved in the above-referenced litigation in my capacity as head of mortgage underwriting which provided me with personal knowledge concerning certain loans made to Plaintiff Julie Dillon Ripley Miller ("Miller") by MLCC.

2. MLCC is a provider of home financing programs throughout the United States. In 1997, Miller obtained a loan from MLCC in the amount of $1,350,000 to finance the purchase of her home at 21 Point Road, Norwalk, Connecticut. Miller obtained the loan through MLCC's Mortgage 100 Program which offers qualified borrowers the ability to finance the purchase of their home by both mortgaging the property they are purchasing and pledging

eligible securities in an account with Merrill Lynch, Pierce, Fenner & Smith, Inc. ("MLPFS") in lieu of a cash down payment. The Mortgage 100 Program provided certain advantages to Miller. Although Miller had inherited approximately $11,000,000 in trust assets, most of the assets were comprised of low basis securities and very little cash. Among other things, the program allows a borrower to avoid selling securities to provide a down payment and to defer or avoid the payment of capital gains taxes on that sale.

3. At or about the time of the closing, approximately $400,000 worth of Miller's securities were transferred to a segregated pledge account at MLPFS to serve as collateral for the loan. Over the next two years, Miller made interest payments on the 1997 Loan.

4. By 1999, Miller needed additional funds in order to complete construction of her house. As a result, in the fall of 1999, Miller applied for and, on December 7, 1999, obtained a loan in the amount of $7,500,000 from MLCC, in order to consolidate existing indebtedness and to obtain the funds necessary to complete her home (the "1999 Loan"). A true and correct copy of a letter dated November 17, 1999 from MLCC to Miller approving the 1999 Loan application is attached hereto as Exhibit A. In precisely the same manner as the 1997 Loan's closing mechanics, the pledge of approximately $6,000,000 in securities was made in order to borrow the $7,500,000 from MLCC.

5. Miller signed a Power of Attorney in favor of her accountant, Barry Newman, who thereafter executed the loan documents, including a pledge of securities. True and correct copies of the Mortgage (Exhibit B), Note (Exhibit C), and Pledge Agreement (Exhibit D) for the 1999 Loan are attached hereto. MLCC's internal review of the 1999 Loan for Miller ended no later than three business days after closing per MLCC's standard post closing procedure.

6. Upon completion of construction of her house, and pursuant to the terms of the construction loan, Miller was sent, under cover of a letter dated February 2001, a Note Modification Agreement which modified the construction loan to a permanent loan, of 25 years duration. A true and correct copy of the letter is attached as Exhibit E and the Modification Agreement as Exhibit F. Miller signed and returned the Note Modification Agreement, dated February 7, 2001. Subsequent to her signing this modification, and as a result thereof, she received a reduction in her loan rate, which had been 9% (percent), down to 8.125% (percent). She also benefited from subsequent reductions in the loan rate provided because of later reductions in the index used, the so-called LIBOR rate, which by January 2003 reduced the effective rate to 3.75% (percent).

7. Over the next two years, Miller made the required interest payments on the 1999 Loan. Miller also received numerous accommodations from MLCC with regard to payment of the 1999 Loan. Specifically, MLCC permitted Miller to draw from the MLPFS account pledged as security for the loan, the account designated "FBO/MLCC," on 3 occasions and for a total of $152,600.00 to make her mortgage payments. These accommodations reduced MLCC's collateral securing the 1999 Loan and were not balanced out by any corresponding increase in the markets.

8. Miller has failed to make interest payments due on the loan the first of the month from February 1, 2003 to the present. In addition, Miller defaulted by failing to remit the property taxes due to the City of Norwalk for the years 2000 and 2001. This resulted in the filing of tax liens in the amount of $26,533.77 and $39,854.24, respectively. Pursuant to Paragraph 7 of the Mortgage, MLCC subsequently paid the City of Norwalk $67,733.96 in

costs and fees to satisfy Miller's property tax obligations and to prevent a foreclosure by the City of Norwalk for unpaid property taxes.

9. By "Notice of Default" dated May 16, 2003 (the "Default Notice"), a copy of which is attached hereto as Exhibit G, MLCC gave Miller written notice that she was "in default under the terms of the Note and Mortgage" by reason of her "failure to pay real estate taxes due to the City of Norwalk" and her failure to make her "monthly payments due on the first days of February, March, April and May, 2003." In addition, MLCC further notified Miller that in order for her to "cure all defaults, payment in the amount of $174,521.19 must be made by June 18, 2003" which was at least thirty days from the date the notice was given. The Default Notice further provided that failure to pay the past due amount may require payment of the entire indebtedness.

10. As of March 24, 2005, Miller owed MLCC $7,497,995.94 in principal, $632,347.05 in interest, $26,736.88 in late fees, $154,636.86 for taxes and insurance paid by MLCC, and $1,297,417.57 in attorneys' fees, for a total of $9,609,134.30. Each day, attorneys' fees increase and the interest amount owed on the loan increases at a rate of $1,027.12 per day.

11. With regard to the ownership of the debt, the Mortgage and the Note of the 1999 Loan specifically identify "Merrill Lynch Credit Corporation" as the "Lender." The Modification Agreement also identifies MLCC as the "Lender." At no time has MLCC transferred or assigned its interest in either of these instruments.

12. It has come to my attention that Plaintiff in this action has alleged that Jay K. Falini ("Falini") was acting on behalf of MLCC with regard to the 1999 Loan for $7,500,000. For the reasons set forth below, this is simply untrue.

4

13. Falini was employed by Merrill Lynch, Pierce, Fenner & Smith, Inc. ("MLPFS") as a financial advisor. Falini was not under the supervision or control of MLCC, but rather was supervised by the branch managers in the Pennsylvania office of MLPFS where he worked. Moreover, Falini played no role in MLCC's review or underwriting of the 1999 Loan. Instead, the 1999 Loan was reviewed by MLCC's Construction Loan Officer, Harvey Rosenblum, and various underwriting personnel, who worked in MLCC's Jacksonville office.

TARA STEWART

Subscribed and sworn to
before me this 19TH day of
May 2005.

Notary Public
My Commission Expires: Nov 21, 2006

Holly H. Mruz
MY COMMISSION # DD158423 EXPIRES
November 21, 2006
BONDED THRU TROY FAIN INSURANCE, INC.