UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
HARTFORD

------------------------------------------------------------x
JULIE DILLON RIPLEY MILLER,                :
                                           :  Case No. 3:03CV1016 (RNC) (DFM)
      Plaintiff,                           :
                                           :
– against –                                :  May 20, 2005
                                           :
MERRILL LYNCH CREDIT CORPORATION,          :
                                           :
      Defendant.                           :
------------------------------------------------------------x

**PLAINTIFF'S BRIEF IN SUPPORT OF HER
MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Julie Dillon Ripley Miller, by her attorneys, Begos & Horgan, LLP, submits this brief in support of her motion for summary judgment as to the liability of the defendant, Merrill Lynch Credit Corporation ("MLCC").

**PRELIMINARY STATEMENT**

On December 2, 1999, plaintiff signed a partially completed Statutory Short Form Power of Attorney ("POA") before two witnesses and acknowledged her execution of the document to be her free act and deed before a notary public. By MLCC's own admission, it reviewed the POA as executed by plaintiff and rejected it as not authorizing an attorney-in-fact to bind plaintiff to a loan transaction with MLCC consisting of a Note, Mortgage and Pledge Agreement. After MLCC rejected it, the POA was altered by, *inter alia*, adding the name of a purported attorney-in-fact, whiting-out plaintiff's initials in some places and inserting her initials in others ("Altered POA"). MLCC accepted the Altered POA as conferring authority on the purported attorney-in-fact to bind plaintiff to the loan transaction. Plaintiff, however, never acknowledged the Altered POA to be her

free act and deed, rendering it void *ad initio*. Accordingly, the documents signed by the purported attorney-in-fact are without legal effect. (See Point I, *infra*.)

Moreover, the unaltered POA cannot supply the necessary authority because MLCC admitted that the unaltered POA was invalid to authorize an attorney-in-fact to bind plaintiff to the loan transaction. Among other things, it is indisputable that a power of attorney that does not identify the holder of the power, and withholds authority to engage in "real estate transactions" and "banking transactions," is invalid to confer authority on an unidentified person to bind plaintiff to a $7.5 million construction loan. (See Point II, *infra*.)

In any event, the Altered POA did not authorize an attorney-in-fact to enter the Pledge Agreement with MLCC. The Altered POA withheld authority to engage in "bond, share and commodity transactions," which includes the pledging of securities. Withholding this specific authority overrides any general grant that might be encompassed by other powers. (See Point III, *infra*.)

## BACKGROUND

As set forth in the accompanying Local Civil Rule 56(a)(1) Statement, which is incorporated herein by reference, the facts necessary to decide this motion are comparatively few. The history of the events giving rise to the litigation is considerably more extensive and, to give the undisputed material facts context, we set forth here the background of the claims.

**A.    Events Leading Up to the 1999 Loan**

Though Ms. Miller's parents had substantial assets, her assets and income were, for most of her adult life, modest. She is a Registered Nurse, and her husband owns a bait shop. At all times relevant to this action, she had stopped working to raise her children. Until the events giving rise to

this action, Ms. Miller and her family lived in a modest house with a mortgage of approximately $100,000, and had few investment assets.

Ms. Miller's financial circumstances changed dramatically in 1996 when, at forty-five years of age, she inherited various assets and trust interests, including securities with a market value of approximately $10 million ("Inherited Securities"). Ms. Miller's cost basis in these Securities was practically $0, meaning that any sale would generate substantial capital gains tax liability for her.

In or about the summer of 1997, Ms. Miller first spoke to Mr. Falini, who attempted to interest her in using Merrill Lynch Pierce Fenner & Smith ("MLPFS") (really MLCC) to finance the purchase of a new home. MLCC ultimately approved a loan in the amount of $1,375,000, and required Ms. Miller to pledge a specified amount of securities as collateral in addition to the home, which securities would be held by MLPFS. Thus, Mr. Falini succeeded in having the Inherited Securities transferred from PaineWebber to MLPFS.

After Ms. Miller purchased her house (financed with MLCC's $1,350,000 mortgage), Mr. Falini advised her to fund a substantial renovation by simply writing checks against her MLPFS Account. Though Mr. Falini did not say so, each check was posted by MLPFS as a margin debit against the Inherited Securities.

By the end of November 1999, as a result of Mr. Falini's "management," Ms. Miller was deeply in debt to MLPFS. Her assets in the Account totaled $10.6 million, but her margin debt was $5.8 million. Almost $4 million of that margin had been used for the construction project, though the house was not nearly finished. MLPFS was charging her approximately $40,000 a month ($480,000 a year) in margin interest. As Ms. Miller's income (mostly from inherited investments)

was in the range of $250,000 a year, she did not have the income to pay that interest, let alone to pay any other basic living expenses.

### B.    The 1999 Loan

Mr. Falini evidently began to realize that the construction project was going to exhaust the margin debt limit of the Account. The "best" case scenario was that Ms. Miller would be unable to spend any more money on the half-finished house, or to support her family. The worst case was that MLPFS would begin to be issue calls against the Account for additional capital which Ms. Miller did not have. Either way, Ms. Miller would quickly learn that Mr. Falini's advice and management had been terrible.

It was at this time, and in response to these developments, that Mr. Falini advised and encouraged Ms. Miller to seek a new loan from MLCC. He completed an application, for Ms. Miller's signature, seeking a construction loan in the amount of $6,200,000. In discussing the "need" for this loan, Mr. Falini never mentioned that Ms. Miller was about to run out of money. Instead, he told her that MLCC's oversight of the construction process would assist her in completing the project in a timely and cost-effective manner.

When Mr. Falini submitted the application to MLCC, he did so with a note (that Ms. Miller never saw) instructing MLCC: "No calls directly to client. ... Client highly sensitive." In an introductory conversation with MLCC's loan officer, Mr. Falini reiterated: "Do not call client." MLCC, which saw its role as assisting MLPFS in keeping clients like Ms. Miller, followed Mr. Falini's instruction. MLCC's underwriting process demonstrated that it completely ignored both industry-standard underwriting procedures, as well as its own procedures, in its efforts to "qualify" Ms. Miller for the loan Mr. Falini wanted for her.

4

The details of MLCC's underwriting transgressions are not at issue on this motion. Suffice it to say that there was absolutely no question that Ms. Miller would inevitably default on this loan. Though MLCC was not concerned about the effect the loan would have on Ms. Miller's finances, it surely was concerned about its own security. Because it knew the house would never be worth enough to secure the loan, it required a pledge of more than $6,700,000 in Inherited Securities. (Not only would such a pledge secure MLCC when the inevitable default happened, but it would increase the "stickiness" between Ms. Miller and MLPFS to an extraordinary degree).

By insisting that MLCC not communicate directly with Ms. Miller, Mr. Falini insured that no one from MLCC told Ms. Miller any of these details. Thus, Ms. Miller had no opportunity to understand the true nature of the transaction Mr. Falini was urging on her.

### C. The Power of Attorney

When MLCC approved the loan in late November 1999, it notified Mr. Falini that the loan could be closed at any time up to February 1, 2000. Neither MLCC nor Mr. Falini, however, advised Ms. Miller of the expiration date.

As Mr. Falini knew, Ms. Miller had plans to be out of the country from December 2, 1999 through the end of the year. Because no one involved in the construction needed any substantial funds before January 2000, there was no reason to close the loan while Ms. Miller was away. However, Mr. Falini apparently saw things differently. He advised MLCC and Ms. Miller that the loan *had* to close before the end of December 1999 (of course, Ms. Miller did not know that MLCC's commitment was good until February).

MLCC advised Mr. Falini that Ms. Miller would need to sign a power of attorney for the loan to close while Ms. Miller was away. Ms. Miller partially completed a Statutory Short Form Power

of Attorney, signed it before two witnesses, and acknowledged it before a notary, as the statute requires. She did this on December 2, 1999, the day she was leaving the country.

The power of attorney Ms. Miller signed did not authorize Mr. Newman to enter into real estate transactions. Indeed, the power of attorney Ms. Miller signed did not even name an attorney-in-fact. Mr. Falini conceded that MLCC's closing agent, Kevin Huben, told him that the power of attorney was inadequate. Rather than ask Ms. Miller to sign a new document, Mr. Falini altered the power of attorney until it was acceptable to MLCC and its closing agent. Among other things, Mr. Falini whited-out portions of the form where Ms. Miller withheld authority, and added language to other portions of the power of attorney.

After Ms. Miller left the country, Mr. Falini attended the closing, along with Mr. Newman, who was purportedly Ms. Miller's attorney-in-fact pursuant to the altered – and invalid – power of attorney. Ms. Miller had never spoken to Mr. Newman about any loan or the power of attorney. Mr. Falini made all the arrangements with Mr. Newman but did not tell him that the papers he was signing would obligate Ms. Miller to pay $7.5 million to MLCC, or to pledge Inherited Assets to MLCC. Instead, Mr. Falini told Mr. Newman that he was needed to review contractors' bills and approve disbursements while Ms. Miller was away. Mr. Falini did, in fact, arrange to have Mr. Newman review contractors' bills at the closing. Mr. Newman has testified that he never saw even a copy of the power of attorney, much less the original (showing Mr. Falini's white-outs). Mr. Falini and Mr. Newman both confirmed that the original power of attorney was not at the closing.

Even if the power of attorney, as altered by Mr. Falini, authorized Mr. Newman to sign a mortgage and note on Ms. Miller's behalf (which it did not), it expressly, and clearly, withheld authority for anyone to pledge Ms. Miller's securities. Nonetheless, MLCC had Mr. Newman sign

6

a Pledge Agreement purporting to do exactly that. MLPFS, despite its broker's knowledge that the pledge was ineffective, granted MLCC rights in the Inherited Securities.

### D. Post-Closing Events

Within months after the construction loan closed, Ms. Miller was in default. Following Ms. Miller's initial default, there ensued a months-long "workout process" among Ms. Miller, MLCC and MLPFS. At one time, in April 2002, MLCC mistakenly directed MLPFS to liquidate all of the Inherited Securities in the Pledge Account. MLPFS followed that direction, even though MLCC did not have any legitimate right to do so. MLCC's vice president has confirmed that the direction was a mistake, and he has testified that MLCC promptly acted to "correct" it. For purposes of this proceeding, what is most disturbing about this event is that, according to MLPFS's monthly statements, *it never happened.* It is difficult to imagine how $6 million in securities can be liquidated by MLPFS and then repurchased, all on instructions from MLCC, without any indication of these activities in the account records. Clearly, MLPFS did not notify Ms. Miller about what was being done with her assets.

In February 2003, MLCC again directed MLPFS to liquidate Ms. Miller's Inherited Securities. This time, MLCC did not reverse the sale. Ms. Miller commenced this action shortly thereafter.

## ARGUMENT

Summary judgment is appropriate where there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). As the Second Circuit succinctly explained:

> A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When viewing the evidence,

> the court must "assess the record in the light most favorable to the non-movant and ... draw all reasonable inferences in [the non-movant's] favor." *Delaware & Hudson Railway Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 177 (2d Cir.1990)... Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact, once such a showing is made, the non-movant must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. When the motion is made, we go beyond the paper allegations of the pleadings, which were enough to survive the common law demurrer. The time has come, as James and Hazard put it, "to put up or shut up." Fleming James, Jr. & Geoffrey C. Hazard, Jr., Civil Procedure 150 (2d ed.1977). Accordingly, unsupported allegations do not create a material issue of fact. *See Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995); *see also Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991)

*Weinstock v. Columbia University*, 224 F.3d 33, 41 (2d Cir. 2000).

Though plaintiff has the burden of proof on this motion of showing that there are no genuine issues of material fact, MLCC has the burden of proof as to the ultimate question of whether Newman was authorized to bind plaintiff to the transaction. *General Products Co., Inc. v. Bezzini*, 33 Conn.Supp. 654, 658, 365 A.2d 843, 845-46 (App. Session 1976).

## I.   THE POWER OF ATTORNEY IS VOID

The POA purports to be a Connecticut Statutory Short Form Power of Attorney. (Ex. M).[1] The Connecticut Short Form Power of Attorney Act, C.G.S. § 1-42 *et seq.*, requires that the "statutory short form power of attorney shall be duly acknowledged by the principal in the manner prescribed for the acknowledgment of a conveyance of real property." C.G.S. § 1-43. A conveyance must be "acknowledged by the grantor ... to be his free act and deed." C.G.S. § 47-5(a)(3). "The acknowledgment ... may be made before ... a notary public." C.G.S. § 47-5a.

---

[1] References to "Ex. ___" and "¶ ___" are to the exhibits to, and paragraphs of, plaintiff's Local Rule 56(a)(1) Statement.

8

As the Connecticut Supreme Court observed: "an acknowledgment is a public declaration or a formal statement of the person executing an instrument made to the official authorized to take the acknowledgment that the execution of that instrument was his free act and deed." *J.C. Penney Properties, Inc. v. Peter M. Santella Company, Inc.*, 210 Conn. 511, 513 (1989) (quoting *State v. Wolfe*, 156 Conn. 199, 205 (1968)).

It is undisputed that the POA was altered *after* plaintiff signed and acknowledged the POA as her free act and deed (and her execution of the document was attested by two witnesses). (¶¶ 9-34). It is also undisputed that plaintiff did not acknowledge the Altered POA to be her free act and deed before an official authorized to take an acknowledgment (and did not re-execute it before two witnesses).[2] (¶ 47; Ex. N). The acknowledgment requirement would be meaningless if material changes could be validly made to an instrument after the maker acknowledged the instrument to be her free act and deed (and after it was attested by two witnesses). In *Coit v. Starkweather*, 8 Conn. 289 (1830), the Connecticut Supreme Court, with respect to an altered deed, confirmed:

> It is a positive requirement of our law, that all deeds of land shall be attested by two witnesses, and acknowledged before a magistrate. . . . No such deed can be valid without a compliance with these requisites. It follows, that if the alteration be material, the deed is fatally defective, without a new attestation and acknowledgment.

*Id.* at 292 (citation omitted).

---

[2] An acknowledgment must be in writing. *J.C. Penney Properties, Inc. v. Peter M. Santella Company, Inc.*, 210 Conn. at 517 (citing *Pendleton v. Button*, 3 Conn. 406, 412 (1820)). Thus, even if plaintiff had orally acknowledged the altered POA to be her free act and deed to anyone (which she did not), such a purported "acknowledgment" is invalid.

9

Indeed, "[w]here a deed has been acknowledged before a magistrate appointed by law to take and certify the acknowledgment, in order that the deed may be recorded, the parties have no right to make the most trifling alteration. An altered deed is not the same which is certified. The act of the magistrate is independent of the parties, and no consent of theirs can warrant them in falsifying it." 67 A.L.R. § 364 (quoting *Moore v. Bickham* (1811) 4 Binn. (Pa.) 1); *see* Tiffany on Real Property § 989 (2003) ("to give innocent third parties notice of the alteration by the subsequent recording of the instrument after the changes have been made, acknowledgment after the alteration is required wherever the statute makes such formality a prerequisite to recording altered instruments. In other words, there must be, in effect, a new execution and delivery of the instrument.").[3]

Here, the alterations to the POA were indisputably material. Falini testified that plaintiff sent him the POA after she executed and acknowledged it. (Ex. A 246). Rosenblum (MLCC's loan officer) and Huben (MLCC's closing agent and a Connecticut attorney) both told Falini that the POA as executed by plaintiff did not authorize an attorney-in-fact to bind Ms. Miller to the loan transaction. (¶¶ 18-27). Dounda (another MLCC loan officer) said that plaintiff would have to execute a new, proper power of attorney upon her return from Africa. (¶¶ 28-31). The existing ineffective POA was then altered. (¶¶ 32-34). Rosenblum and Huben accepted the Altered POA as proper authorization for Barry Newman to close the transaction. (¶¶ 35-37). Indeed, MLCC closed

---

[3]C.G.S. § 47-10 provides that "[n]o conveyances shall be effectual . . . against any other person but the grantor and his heirs, unless recorded on the records of the town in which the land lies. When a conveyance is executed by a power of attorney, the power of attorney shall be recorded with the deed . . . ." Because C.G.S. § 1-43 requires the power of attorney to be acknowledged, and C.G.S. § 47-10 requires the power of attorney to be recorded in the land records of the town in which the property lies, the Connecticut statutes required the Altered POA to be acknowledged before recording — and it was not.

the transaction relying on Barry Newman's execution of loan documents as plaintiff's "attorney-in-fact." (¶ 38; Exs. B, C, D).

Further, plaintiff's original acknowledgment is not a "pre-acknowledgment" of the Altered POA. *See Skapnit v. Skapnit*, 7 Conn. Super. 285, 288 (New Haven 1939) (citing *Coit v. Starkweather*, 8 Conn. 289 (1830)) ("The insertion of the life estate without a new attestation and reacknowledgment, even with the consent of the parties, makes the deed inoperative as to the life estate"). Changing the substance of a power of attorney after it is executed and acknowledged makes the document a new, unexecuted and unacknowledged, power of attorney. That "new" document is ineffective to grant power of attorney unless and until it is executed and acknowledged. Plaintiff neither executed nor acknowledged the Altered POA.

Accordingly, the Altered POA was void under the Statutory Short Form Power of Attorney Act. As such, all of Barry Newman's acts — his execution of the Note, Mortgage and Pledge Agreement — were void.

## II. THE POWER OF ATTORNEY AS EXECUTED DID NOT AUTHORIZE THE PLEDGE OR THE MORTGAGE

Even if the subsequent alterations did not void the POA as executed by Ms. Miller, the unaltered POA did not authorize an attorney-in-fact to bind her to the transaction. Rosenblum and Huben rejected the POA as executed and acknowledged by plaintiff as proper authorization for Barry Newman to bind plaintiff to the transaction. (¶¶ 18, 25). Specifically, Rosenblum said that the "X" (it was actually initials) in the box opposite "real estate transactions" on the POA as executed by plaintiff was enough to eliminate the attorney-in-fact's authority to enter the transaction. (¶¶ 18-19). Huben said that the POA as executed by plaintiff "was initialed where it should not have been

initialed and not initialed where it should have been initialed." (¶ 23). Huben also said the POA had to identify the attorney-in-fact. (¶¶ 26-27). Neither Rosenblum nor Huben accepted the POA as conveying authority to anyone until *after* Falini added "Barry Newman" to the POA, obliterated the initials Ms. Miller wrote on the POA and inserted Ms. Miller's initials where she had not.[4] (¶¶ 32-37).

In addition, as noted, when Falini, Rosenblum and Huben first received the POA from plaintiff, the space for identifying the name and address of the attorney-in-fact was blank. Thus, the POA as executed by plaintiff did not identify the person that plaintiff was purportedly vesting with power of attorney. "A written power of attorney constitutes a formal contract of agency and creates a principal-agent relationship." *Bank of Montreal v. Gallo*, 3 Conn. App. 268, 273 (1985) (citing *Long v. Schull*, 184 Conn. 252, 256 (1981)). "Agency is the fiduciary relationship which results from manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other to so act." *Long v. Schull*, 184 Conn. 252, 256 (1981) (quoting Restatement (Second), 1 Agency § 1). A power of attorney that does not identify an attorney-in-fact is not the principal's "manifestation of consent" that some unidentified person may act on the principal's behalf; such a power of attorney is invalid. *State v. Ferris*, 42 Conn. 560

---

[4] The POA and statute both instruct the principal to "[s]trike out and initial in the opposite box any one or more of the subdivisions as to which the principal does NOT desire to give the agent authority. . . . To strike out any subdivision the principal must draw a line through the text of that subdivision AND write his initials in the box opposite." C.G.S. § 1-43; Ex. M. The POA as executed by plaintiff includes her initials in the boxes opposite "real estate transactions" and "banking transactions" and lines through the letters associated with the other powers. (Exs. H-I). Regardless of whether the POA as executed by plaintiff was sufficient under the statute to withhold authority for any enumerated power, MLCC admitted (through Rosenblum and Huben) that MLCC did not accept the POA as executed by plaintiff as authorizing Barry Newman to enter the transaction on behalf of plaintiff. (¶¶ 18-19, 22-27).

(1875) (power of attorney purporting to authorize a proxy to vote corporate shares "did not confer upon [the proxy] that right, because his name was not inserted in it").

If the rule were otherwise, a principal could create a fiduciary relationship on a bearer basis — whoever had the document would be the principal's attorney-in-fact. Certainly a fiduciary is more than a mere bearer. Indeed, a fiduciary relationship requires that "[The fiduciary] . . . act honestly, and with the finest and undivided loyalty to the trust, not merely with that standard of honor required of men dealing at arm's length and the workaday world, but with a punctilio of honor the most sensitive." *Konover Development Corp. v. Zeller*, 228 Conn. 206, 220 (1994). The law cannot allow such a relationship to be created on a bearer basis. Indeed, as a New York Court observed:

> In our case the choice of an attorney was not only not the independent, uncontrolled choice of the husband, there was not even an attorney named in the so called Power of Attorney when he signed it. To hold that an attorney thus appointed is authorized to represent [the husband] . . . would be a travesty on justice and repugnant to our public policy.

*Kurman v. Kurman*, 11 Misc.2d 1035, 1038, 174 N.Y.S.2d 128, 131 (1958).

Moreover, "[t]he scope of [the agent's] authority [is] defined by the power of attorney. . . . The . . . principal . . . could limit the powers of his agent, and all parties who dealt with the agent knowing of the limitations were bound by its terms." *Bank of Montreal*, 3 Conn. App. at 273 (citing *Conte v. Dwan Lincoln-Mercury, Inc.*, 172 Conn. 112, 125 (1976)) (other citations omitted). Where, as here, the agent is not identified in the power of attorney, no party dealing with the "agent" could possibly know the scope of his authority — the document may circumscribe someone's authority, but whose? In other words, no one dealing with an attorney-in-fact can accept, as proof of the

attorney-in-fact's authority, a power of attorney that does not identify the attorney-in-fact. Thus, the POA as executed by the plaintiff did not authorize Barry Newman to do anything.[5]

### III. THE POWER OF ATTORNEY AS ALTERED DID NOT AUTHORIZE THE PLEDGE

Power C of the POA is "bond, share and commodity transactions." (Ex. M). "In a statutory short form power of attorney, the language conferring general authority with respect to bond, share and commodity transactions shall be construed to mean that the principal authorizes the agent . . . to . . . pledge . . . any bond, share [or] instrument of similar character." C.G.S. § 1-46(2).

As noted above, two MLCC representatives (Rosenblum and Huben) rejected the POA as executed by plaintiff as conferring authority on an attorney-in-fact to enter the transaction on plaintiff's behalf. The version of the POA so rejected contained Ms. Miller's initials in the boxes opposite "real estate transactions" and "banking transactions" but neither the letters associated with these powers nor the text of the powers were struck out. (Exs. H-I). It is thus effectively undisputed that MLCC understood initials in the box opposite a power to be plaintiff's elimination of authority with respect to that power — regardless of whether there was also a line through the text of the power.

On the Altered POA, plaintiff's initials appear in the box opposite power C *and* there is a line through the letter "C." (Exs. K, M). As MLCC found initials alone sufficient to withhold authority, there is no question that the initials and line withheld power C from Barry Newman. Moreover, though the parties may dispute who made these markings on the Altered POA, there is no dispute

---

[5]The altered POA includes Barry Newman's name, but not his address, as required by the form and the statute. C.G.S. § 1-43; Exs. K, M). Accordingly, even ignoring the facially apparent alterations (i.e. "white-outs"), the altered POA was invalid.

14

that Falini, not plaintiff, made these markings on the version of the POA that Rosenblum and Huben accepted as conveying the necessary authority to Barry Newman. (¶¶ 16-37). Nor is there any dispute that Huben advised Falini that plaintiff initialed the wrong boxes (i.e. withheld necessary authority) and did not initial the right boxes (i.e. granted unnecessary authority). (¶ 23). It is thus effectively undisputed that Falini marked up the POA as executed by Ms. Miller with the intention of withholding from Barry Newman, *inter alia*, the authority contemplated by power C, which included the authority to pledge plaintiff's securities; and that MLCC acknowledged that Barry Newman neither needed, nor had, authority to pledge plaintiff's securities.

Indeed, from MLCC's perspective, Barry Newman did not need authority to pledge plaintiff's securities because MLCC required plaintiff to execute the pledge agreement and fund the pledge account prior to her departure — a requirement that was not met. (Ex. E MLCC 408; ¶¶ 9-10). The commitment letter for the loan required the Pledge Agreement to be executed "prior to closing," and the Pledge Account to be funded seven business days prior to closing. (Ex. E MLCC 408). This could have been accomplished as plaintiff was scheduled to leave for Africa on December 2, 1999 and the closing was scheduled for December 7, 1999. (¶¶ 7-8). In fact, there was no reason why the Pledge Agreement could not have been executed before plaintiff left the country. (¶ 10). Accordingly, the POA was necessary, if at all, only to execute the Note and Mortgage — the Pledge was to have been completed beforehand by the plaintiff herself.

In addition, the altered POA purports to grant Barry Newman the power to engage in "banking transactions" which is statutorily defined to include the power "to borrow money . . . by promissory note of the principal [and] to give such security out of the assets of the principal as the agent deems desirable or necessary for any such borrowing." C.G.S. § 1-47(7); Exs. K, M. To the extent that the

withholding of the specific authority "to . . . pledge . . . any bond, share [or] instrument of similar character," C.G.S. § 1-46(2), conflicts with the purported grant of general authority to "borrow money . . . [and] to give such security out of the assets of the principal as the agent deems desirable," C.G.S. § 1-47(7), the specific withholding prevails over the general grant. "Powers of attorney are to be construed in accordance with the rules for the interpretation of other contracts . . . " *Wosczyna v. Antone*, 12 Conn. L. Rptr. 253 (Hartford 1994) (citing 2A C.J.S. *Agency* § 151 (1955); *Long v. Schull, supra*, 184 Conn. 256). In construing a contract, "the particular language of a contract must prevail over the general." *Miller Brothers Construction Co. v. Maryland Casualty Co.* 113 Conn. 504, 514 (1931) (citing 2 Elliott, Contracts, § 1532; 2 Williston, Contracts, § 619); Connecticut Civil Jury Instructions § 3.21. Accordingly, the Altered POA's withholding of specific authority for the Pledge eliminated authority for the Pledge that might otherwise have been included with the general authority to give security for a loan.

## CONCLUSION

For the reasons set forth above, plaintiff's motion for summary judgment as to MLCC's liability should be granted and the matter set down for a hearing in damages.

Dated:   Westport, Connecticut
         May 20, 2005

                                        BEGOS & HORGAN, LLP


                                        By: /s/ Christopher G. B.
                                        Christopher G. Brown (ct18216)
                                        Patrick W. Begos (ct19090)
                                        Attorneys for Plaintiff
                                        327 Riverside Avenue
                                        Westport, CT 06880
                                        (203) 226-9990
                                        (203) 222-4833 (fax)

## CERTIFICATE OF SERVICE

      This is to certify that a copy of the foregoing was mailed via first class mail, postage prepaid, on May 20, 2005 to:

Douglas C. Conroy, Esq.
Paul, Hastings, Janofsky & Walker, LLP
1055 Washington Boulevard
Stamford, CT 06901-2217

Jonathan S. Bowman, Esq.
Cohen & Wolf
1115 Broad Street
Bridgeport, CT 06604

                                                      Christopher G. Brown