UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
HARTFORD

-------------------------------------------------------------- x

JULIE DILLON RIPLEY MILLER,       :

         Plaintiff,        :

         – against –        :

MERRILL LYNCH CREDIT CORPORATION    :

         Defendant.        :

-------------------------------------------------------------- x

Case No. 3:03CV1016 (RNC) (DFM)

June 24, 2005

## LOCAL RULE 56(a)2 STATEMENT

Plaintiff, Julie Dillon Ripley Miller, submits this Statement in compliance with Local Civil Rule 56, in opposition to defendant's motion for summary judgment and in further support of her motion for summary judgment.

## I.    Response to Defendant's Local Rule 56(a)(1) Statement

1.      Admitted.

2.      Admitted.

3.      Admitted, except as to the assertion that Ms. Miller was aware she "obtained" the 1997 loan "through MLCC's Mortgage 100 Program;" Ms. Miller admits that MLCC contends that it made the 1997 loan through that program.  (*See* Conroy Aff., Ex. A at 110)

4.      Admitted.

5.      Admitted.

6.      Admitted.

7.      Admitted.

8.      Admitted.

9.      Admitted, except to the extent the assertion implies that Ms. Miller listed the ticker symbols and current market values.  (Conroy Aff., Ex. A at 111).

10.     Admitted.

11.     Admitted.

12.     Admitted.

13.     Admitted.

14.     Admitted.

15.     Admitted, except to the extent the assertion implies that Ms. Miller was sent a statement captioned "Pledge Account."  (Kahmi Aff. Ex. 1).

16.     Admitted.

17.     Admitted.

18.     Denied, except admits the assertion that Ms. Miller applied for a construction loan in the fall of 1999.  (E.g., Section II, ¶¶ 7-10, *infra*).

19.     Admitted.

20.     Admitted.

21.     Denied as to the assertion that the circumstances of the loan were "precisely" the same in 1999 as they were in 1997.  (E.g., Section II, ¶¶ 7-10, *infra*).

22.     Admitted.

23.     Denied.

24.     Denied.  the referenced document may have been attached to the approval letter but as discussed in paragraph 31 of Section II below, Ms. Miller did not receive the letter before the loan closed.

25.    Denied.  Compare Stewart Aff. at Ex. A to Conroy Aff. at Ex. D.

26.    Denied as to the allegation that Ms. Miller planned to be in Africa "on safari."

27.    Denied.  As discussed at paragraph 13 of the Local Rule 56(a)(1) Statement Ms. Miller submitted in connection with her motion for summary judgment, the power of attorney that Ms. Miller signed did not identify an attorney-in-fact.

28.    Admitted.

29.    Denied.  As discussed at pages 8 through 14 of Plaintiff's Brief in Support of her Motion for Summary Judgment, dated May 20, 2005 ("Pl. Moving Br."), which includes factual references, and in paragraphs 50-54 of Section II below, Mr. Newman was not authorized to execute the note.

30.    Admitted, except as to paragraph 2 of the notes and as to the assertion, through the definition of the term in paragraph 29, that Ms. Miller executed the "1999 Note."

31.    Admitted, except as to the assertion, through the definition of the term in paragraph 29, that Ms. Miller executed the "1999 Note."

32.    Denied.  The note is void because Mr. Newman was not authorized to execute it.  (Pl. Moving Br. 8-14; Section II ¶¶ 50-54, *infra*).

33.    Denied to the extent that allegation implies that Ms. Miller could be in default of the 1999 note (Pl. Moving Br. 8-14; Section II ¶¶ 50-54, *infra*) and as to the assertion, through the definition of the term in paragraph 29, that Ms. Miller executed the "1999 Note."

34.    Denied. The mortgage is void because Mr. Newman was not authorized to execute it. (Pl. Moving Br. 8-14; Section II ¶¶ 50-54, *infra*).

35.     Admitted, except as to the assertion, through the definition of the term in paragraph 34, that Ms. Miller gave the "1999 Mortgage." (Pl. Moving Br. 8-14; Section II, ¶¶ 50-54, *infra*).

36.     Admitted, except as to the assertion, through the definition of the term in paragraph 34, that Ms. Miller gave the "1999 Mortgage." (Pl. Moving Br. 8-14; Section II, ¶¶ 50-54, *infra*).

37.     Admitted, except as to the assertion, through the definition of the term in paragraph 34, that Ms. Miller gave the "1999 Mortgage." (Pl. Moving Br. 8-14; Section II, ¶¶ 50-54, *infra*).

38.     Admitted, except as to the assertion, through the definition of the term in paragraph 34, that Ms. Miller gave the "1999 Mortgage." (Pl. Moving Br. 8-14; Section II, ¶¶ 50-54, *infra*).

39.     Denied.  The pledge agreement is void because Mr. Newman was not authorized to execute it. (Pl. Moving Br. 8-16; Section II, ¶¶ 50-54, *infra*).

40.     Admitted, except as to the assertion, through the definition of the term in paragraph 39, that Ms. Miller entered the "1999 Pledge Agreement." (Pl. Moving Br. 8-16; Section II, ¶¶ 50-54, *infra*).

41.     Denied.  The pledge agreement is void because Mr. Newman was not authorized to execute it.  (Pl. Moving Br. 8-16; Section II, ¶¶ 50-54, *infra*).

42.     Admitted, except as to the assertion, through the definition of the term in paragraph 39, that Ms. Miller entered that "1999 Pledge Agreement." (Pl. Moving Br. 8-16; Section II, ¶¶ 50-54, *infra*).

43.     Admitted, except as to the assertion, through the definition of the term in paragraph 39, that Ms. Miller entered that "1999 Pledge Agreement." (Pl. Moving Br. 8-16; Section II, ¶¶ 50-54, *infra*).

44.     Admitted, except as to the assertion, through the definition of the term in paragraph 39, that Ms. Miller entered that "1999 Pledge Agreement." (Pl. Moving Br. 8-16; Section II, ¶¶ 50-54, *infra*).

45.     Admitted, except as to the assertion, through the definition of the term in paragraph 39, that Ms. Miller entered that "1999 Pledge Agreement" (Pl. Moving Br. 8-16; Section II, ¶¶ 50-54, *infra*), and as to the assertion that the liquidation authorization appears in paragraph 4(a). (Stewart Aff., Ex. D).

46.     Denied. According to MLCC, it took the 1997 pledge for a different reason than it took the 1999 pledge. (Section II, ¶¶ 9 & 30, *infra*).

47.     Admitted, except to the extent the allegation implies that Ms. Miller transferred securities.

48.     Admitted.

49.     Admitted.

50.     Admitted.

51.     Admitted.

52.     Admitted as to the assertion that, in February 2001, Ms. Miller signed a document entitled "Modification Agreement" but denies that the Modification Agreement lowered the 1999 note's interest rate. (Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment ["Pl. Opp. Br."] at 25 [which includes factual citations]).

53.     Denied. Ms. Miller testified in her deposition (Conroy Aff., Ex. A, pp. 152-53) that she learned of the pledge around the time she received the February 1, 2001 letter (Stewart Aff., Ex. E) regarding the conversion of the loan from construction to permanent.

5

54.     Denied as to the assertion that Ms. Miller "requested special withdrawal payments" prior to learning of the existence of the pledge in or about 2001 as discussed in the response to paragraph 53. (Kamhi Aff. ¶ 9 "withdrawals from the Pledge Account for the year 1991").

55.     Denied as to the assertion that Ms. Miller "specifically acknowledged and agreed" to the referenced terms (Pl. Opp. Br. 25) but admits that the document labeled "Modification Agreement" that Ms. Miller signed in February 2001 contains the referenced terms.

56.     Admits that Ms. Miller did not make payments on the 1999 loan from February 1, 2003 to the present but denies that Ms. Miller is in default of the 1999 loan. (See Section II, *infra*, *passim*; Pl. Moving Br., *passim*).

57.     Admits that Ms. Miller did not pay property taxes for the years 2000 and 2001 but but denies that Ms. Miller defaulted under the 1999 loan.  (See Section II, *infra*, *passim*; Pl. Moving Br., *passim*).

58.     Admits that the referenced tax liens were filed but denies that it was the result of Ms. Miller's default under the 1999 loan.  (See Section II, *infra*, *passim*; Pl. Moving Br., *passim*).

59.     Admitted, except as to the assertion, through the definition of the term in paragraph 34, that Ms. Miller gave the "1999 Mortgage." (Pl. Moving Br. 8-14; Section II ¶¶ 50-54, *infra*).

60.     Admitted.

61.     Admitted.

62.     Admitted.

63.     Denied.

6

**II.    Material Facts Requiring Summary Judgment Dismissing Defendant's Counterclaims or as to which there is a Genuine Issue to be Tried**

1.       Though Ms. Miller's parents had substantial assets, her assets and income were, for most of her adult life, modest. She is a Registered Nurse, and her husband owns a bait shop. At all times relevant to this action, she had stopped working to raise her children. Until the events giving rise to this action, Ms. Miller and her family lived in a modest house and had few investment assets. (Affidavit of Julie Dillon Ripley Miller, dated June 24, 2005 ("Miller Aff."), ¶¶ 2-3).

2.       Ms. Miller's financial circumstances changed dramatically in 1996 when, at forty-five years of age, she inherited various assets and trust interests, including securities with a market value of between $7 million and $10 million ("Inherited Securities"). Ms. Miller's basis in these Securities was very low, meaning that any sale would cause a substantial capital gains tax liability. (*Id.* ¶ 4).

3.       In or about the summer of 1997, Ms. Miller first spoke to Jay Falini, a broker with MLPFS, who attempted to persuade Ms. Miller to use MLCC to finance the purchase of a new home (Miller Aff. ¶¶ 4-5). MLCC ultimately approved a loan in the amount of $1,375,000 ("1997 Loan"), and required Ms. Miller to pledge approximately $600,000 in securities as collateral in addition to the home (*see* Affidavit of Laurie Kamhi ("Kamhi Aff."), Ex. 1). By arranging this transaction, which required MLPFS to hold the pledged securities, Mr. Falini succeeded in having the Inherited Securities transferred from PaineWebber to MLPFS (Miller Aff., ¶ 5).

4.       The 1997 transaction was an outgrowth of the "liability management" expertise that ML & Co. and its subsidiaries, which included MLCC and MLPFS (collectively "Merrill Lynch"), held itself out as possessing. As Merrill Lynch's website represents: "Your Financial Advisor, working with Merrill Lynch credit and lending specialists, will help you make smart choices and

ensure both sides of your balance sheet work together to achieve your goals." (Declaration of Patrick

W. Begos, Ex.1; hereafter, "Begos Ex. __"). Mr. Falini confirmed that he considered it his

responsibility to advise clients on the appropriateness of financing for the purchase or construction

of a home (Falini Deposition ("Falini Tr.") at 7, Begos Ex. 2; *see also* Smith Deposition ("Smith

Tr.") at 17, Begos Ex. 4).

    5.    MLCC's former Senior Vice President, Robert Smith, confirmed that MLCC's role

was to "provide mortgages as a prospecting tool for [MLPFS] financial advisors to attract and retain

new clients" (Smith Tr. at 16). He confirmed that MLCC could make it difficult for customers to

leave MLPFS by lending money to them: "it was widely understood that liabilities created a sort of

*stickiness* to the client relationship" (Smith Tr. at 18; emphasis added). Thus, MLCC's mandate was

to approve loans for MLPFS customers whenever possible (Jones Deposition ("Jones Tr.") at 29-30,

Begos Ex. 3; Avery Deposition ("Avery Tr.") at 65, Begos Ex. 6).

    6.    Ms Miller was, by far, Mr. Falini's largest client (Falini Tr. at 10), and he quickly set

about to make their relationship as "sticky" as possible. Among other things, he advised her about

real estate purchases and loans; he referred her to an accountant; he traveled frequently from his

office in Pennsylvania to Ms. Miller's house in Connecticut for construction-related meetings; and

he drafted letters for Ms. Miller to send to professionals involved in the construction (*see* Falini Tr.

at 54, 68, 125, 146, 301-308; *see also*, Begos Exs. 26 and 27). Indeed, Ms. Miller's contract with

her general contractor (which contract was entered into at MLCC's insistence) provides: "The

General Contractor agrees to work with the owner's financial agent, Jay Fellini *[sic]*, to attempt to

budget and anticipate monthly cash flow requirements." (Begos Ex. 25). Mr. Falini made himself

such a part of Ms. Miller's life that she asked him to be Godfather to her twins (Falini Tr. at 69).

8

7.    After Ms. Miller purchased her house (financed with the 1997 Loan) Mr. Falini advised her to fund a substantial renovation simply by writing checks against her MLPFS accounts (Falini Tr. at 30-34). Each check was posted by MLPFS as a margin debit against the Inherited Securities (*id.*).

8.    By the end of November 1999, as a result of Mr. Falini's "liability management," Ms. Miller was deeply in debt to MLPFS. The assets in her accounts totaled $10.6 million, but her margin debt was $5.8 million (Begos Ex. 16). Almost $4 million of that margin had been used for the construction project, though the house was not nearly finished (Falini Tr. at 78).

9.    Mr. Falini's response to this situation was to advise Ms. Miller to seek a new loan from MLCC (Falini Tr. at 58). He completed an application, for Ms. Miller's signature, seeking a construction loan in the amount of $6,200,000 (Conroy Declaration, Ex. H; Rosenblum Deposition ("Rosenblum Tr.") at 54-55, Begos Dec., Ex. 5). The application stated that Ms. Miller estimated the *current* value of the house to be $6,200,000, and the only mention of any pledged securities was as a "Source of Funds for Down Payment and/or Closing Costs." (Conroy Ex. H). As Ms. Miller already owned the house, no down payment would be required. Therefore, there was nothing in the loan application suggesting that a substantial pledge would be required (Falini Tr. 179-181).

10.    When Mr. Falini submitted the application to MLCC, he did so with a note (that Ms. Miller never requested, saw or approved (Miller Aff., ¶ 8), instructing MLCC: "No calls directly to client. ... Client highly sensitive." (Begos Ex. 12). In an introductory conversation with MLCC's loan officer, Mr. Falini reiterated: "Do not call client." (Begos Ex. 13, p. 1025). MLCC claims that it was Ms. Miller's decision to have all communication routed through Mr. Falini, but there is no dispute that the loan application – the only document Ms. Miller signed – did not direct MLCC *not* to

communicate with her (Smith Tr. at 21-24). And Ms. Miller did *not* otherwise instruct MLCC not to contact her (Miller Aff., ¶ 8).

11.     Nonetheless, following Mr. Falini's instruction, MLCC did not communicate with Ms. Miller, **at all**, before the Loan closed (Smith Tr. at 24-25; Rosenblum Tr. at 36, 49-50, 122-23). Thus, MLCC allowed Mr. Falini – who would earn a significant commission if and when the Loan was made (Falini Tr. at 121-24) – to exercise total control over what Ms. Miller was told about the Loan. Significantly, MLCC did so even though Mr. Falini admits he was not "qualified to explain the terms of the loan to Ms. Miller" (Falini Tr. at 129).

12.     Thus, it is plain that **no one** explained the terms of the loan to Ms. Miller before it closed. Yet MLCC now asserts that Ms. Miller fully understood what was happening. Ms. Miller's lending expert, Richard Homberger, confirmed that the way in which MLCC mishandled communications with Ms. Miller was a significant failure: "In my experience, no lender would tolerate a commissioned sales consultant issuing a directive not to contact the borrower during processing. It is the lender's responsibility to know its customer[.]" (Homberger Declaration, ¶ 4, Ex. A, p. 9).

13.     Mr. Falini encouraged Ms. Miller to trust Merrill Lynch's alleged "liability management" expertise, telling her she did not need to seek advice from anyone else (Falini Tr. at 111).

14.     Unfortunately, while Mr. Falini relied on MLCC to ensure that the Loan would be beneficial for Ms. Miller, MLCC thought that was Mr. Falini's job. MLCC relied entirely on what Mr. Falini said Ms. Miller needed and wanted (Smith Tr. at 20-21, 25: "we trusted and relied upon the relationship that the broker or financial consultant had with the particular client"). Indeed,

**MLCC's policy was not to advise a borrower that she did not have sufficient income to make the payments on a loan** (Smith Tr. at 26-27, 44). A senior MLCC officer testified that MLCC expected borrowers to "know how they intend to repay the loan, whether or not its from, you know, disposing of current assets, reducing other obligations that they currently have." (McEnerney Deposition ("McEnerney Tr.") at 61, Begos Ex. 7).

15.    In contrast, Mr. Falini relied on MLCC to determine whether Ms. Miller would be able to repay the Loan he was seeking for her (Falini Tr. at 296). In fact, he concluded the loan would not become "a noose" around Ms. Miller's neck solely because MLCC "was willing to underwrite the loan and extend it to her." (Falini Tr. at 97-98).

16.    MLCC's underwriter, Andrew Jones, confirmed that a key part of underwriting was ascertaining "whether or not this client will be able to make [the loan] payments" (Jones Tr. at 18). In order to do this, lenders use objective criteria to evaluate the applicant's Capacity to repay the loan, the value of the Collateral, and her Credit history. Capacity, Collateral and Credit are generally referred to as the "Three Cs" of underwriting (Homberger Dec., Ex. A, p. 1; Smith Tr. at 45).

17.    *Capacity* refers to a borrower's ability to repay the proposed debt (Homberger Dec., Ex. A, p. 2). In order to assess Ms. Miller's capacity, MLCC had her tax returns, and it had access to what her Inherited Securities were earning at MLPFS (Avery Tr. at 76; Jones Tr. at 88). MLCC evaluated that data, and concluded that Ms. Miller's actual income was so minimal, compared to the size of the loan, that it disregarded it entirely in its underwriting analysis. Mr Jones, MLCC's underwriter, agreed that Ms. Miller's tax returns did not reveal income sufficient to make the payments on a $6,200,000 loan (Jones Tr. at 51, 58-59).

18.     Lenders will frequently describe capacity by calculating the borrower's obligations-to-income ratio ("OTI"). It is standard in the mortgage industry that OTI not exceed 38%, meaning that the total mortgage obligations should be no more than 38% of the borrower's income (Homberger Aff., Ex. A, p. 6). MLCC's guidelines said that OTI should not exceed 50% (*id.*, Ex. B, p. 3). Ms. Miller's OTI, based on MLCC's calculations of her actual income, was **324%**.[1] This meant that the loan obligations would be more than *three times larger* than her income. Thus, MLCC quickly calculated that Ms. Miller could not make the payments on a $6,200,000 loan. Because Ms. Miller had directed MLCC to look to her tax returns for her income (Conroy Ex. H, p. MLCC 679), this calculation should have ended the underwriting.

19.     However, MLCC's senior management had already decided to approve the loan, presumably to enhance the *stickiness* that MLCC desired, and directed Mr. Jones, the underwriter, to paper the file (Jones Tr. at 110-11, 113-14: MLCC's "senior management team" gave him "specific instructions about how to prepare this loan"). Following his instructions, Mr. Jones calculated a *hypothetical* income stream using "opportunity cost" and "IRA" calculations (Jones Tr. at 86; Begos Ex. 15). He conceded that this income was "made up," and did not reflect Ms. Miller's actual income (Jones Tr. at 86, 170-72). Indeed, these calculations hypothesized that Ms. Miller's Inherited Securities would be sold (which Ms. Miller had told Mr. Falini she refused to consider), and the proceeds converted into fixed-income investments. MLCC's own underwriting guidelines

---

[1] Specifically, MLCC calculated the total obligations on a $6,200,000 mortgage to be $55,024 per month, or approximately $660,000 per year (MLCC 10, 20). In contrast, MLCC's "Income Analysis" based on Ms. Miller's 1998 tax return, showed that her income was $203,993 (Begos Ex. 14). Thus, Ms. Miller's OTI would be $660,000/$203,993, or 324%.

precluded Mr. Jones from using these calculations for Ms. Miller's loan (Homberger Aff., Ex. B, pp. 1-3).

20.    Even assuming MLCC's guidelines permitted these calculations, Mr. Jones performed them improperly, and, in so doing, dramatically overstated Ms. Miller's *hypothetical* income.[2] He used his incorrect, hypothetical income calculation to conclude that the OTI was "only" 79% (Begos Ex. 15). As set forth above, this was still significantly higher than industry and MLCC guidelines permitted. When the opportunity cost and IRA calculations are performed the way MLCC's guidelines specified (assuming the guidelines permitted the calculations at all, which it did not), the result is a *hypothetical* monthly income of only $12,254 (Homberger Dec., Ex. B, pp. 2-3). Ms. Miller's OTI, using that number, would be **449%**.

21.    An underwriting measure that is closely related to OTI is *Disposable Income*. Specifically, it is the borrower's net monthly income after deducting loan payments and other housing expenses, including property taxes and insurance (McEnerney Tr. at 57-58; Smith Tr. at 100-01). Obviously, a borrower's Disposable Income must be high enough to allow for payment of non-housing expenses, such as food, education, income taxes and the like. Using his flawed and inflated hypothetical income calculation, Mr. Jones reported that Ms. Miller's disposable income would be $14,655 a month (Begos Ex. 15).

---

[2] The most significant error concerned Ms. Miller's substantial MLPFS margin debt. Mr. Jones calculated Ms. Miller's hypothetical income based on the assumption that all her MLPFS margin debt would be paid off (Jones Tr. at 65-66). Accordingly, he required, as a condition of closing, that the margin debt be paid off (*id.* at 68-69, 77-78). In fact, however, MLCC allowed at least $2,000,000 of margin debt to remain outstanding after the loan closed (*id.* at 76-78). Mr. Jones confirmed that ignoring this condition rendered his hypothetical income calculation incorrect, and he said the loan "should have been basically resubmitted to the underwriting department" to re-do the calculation (*id.* at 78, 91-92, 95, 128-29).

22.     However, if Ms. Miller's actual income were used, her disposable income on a

$6,200,000 loan was **negative $38,000** a month – ($203,993-$660,000)/12. Thus, each month Ms.

Miller would be spending $38,000 more on the loan than she was earning (*see* Jones Tr. at 101-02).

Mr. Jones testified that he could not recall ever approving a loan where he calculated a negative

disposable income (*id.*). Donald McEnerney, who was, for a time, in charge of MLCC's entire

wholesale lending operation, confirmed that MLCC would not make a loans where the borrower did

not have sufficient income to make the payments, or where disposable income was a negative

number (McEnerney Tr. at 12, 18-19).

23.     Thus, to summarize Ms. Miller's Capacity:

| Source | OTI | Disposable Income |
|---|---|---|
| Mortgage industry standard | 38% or less | No standard, but >0 |
| MLCC underwriting guidelines | 50% or less | |
| Hypothetical income, as calculated by MLCC | 79% | $14,655/month |
| Actual income, as calculated by MLCC | 324% | -$38,000/ month |
| Hypothetical income, calculated according to MLCC guidelines | 449% | -$42,770/ month |

24.     MLCC did not tell Ms. Miller that her income was insufficient to make the payments

on a $6,200,000 loan (Miller Aff., ¶ 7). MLCC did not tell her that her actual income was less than

the estimated monthly obligations. Indeed, MLCC's Senior Vice President, who approved the

$6,200,000 loan, confirmed that he did not recall even thinking about where Ms. Miller would get

the money to make the payments (Smith Tr. at 98).

25.     Thus, without telling Ms. Miller, MLCC assumed that she would make the payments

on a $6,200,000 by selling her assets (Jones Tr. at 48: "This client had the assets to basically support

a large loan amount"; 87: "the only source of her income is being generated from her assets"). It made this assumption even though Ms. Miller had expressed her intention *not* to sell them. The FDIC has described this type of loan as **predatory** (Homberger Dec., Ex. A, p. 10: according to the FDIC, predatory lending includes "[m]aking unaffordable loans based on the assets of the borrower rather than on the borrower's ability to repay an obligation").

26.    Loan to value ratio ("LTV") is a comparison of the amount of the loan to the value of the real property pledged as security. MLCC's "Mortgage 100" program allows a borrower to finance 100% of a house's value – *i.e.*, it allows an LTV of 100% (*see* Falini Tr. at 175-76). MLCC prohibits LTVs of more than 100% (McEnerney Tr. at 19-20). The Mortgage application and MLCC's underwriting Approval Summary both state that Ms. Miller believed her house was worth at least $6,200,000 (MLCC 6, p. 2; MLCC 20), which would yield a 100% LTV on a $6,200,000 loan.

27.    MLCC obtained two independent appraisals of the property, *both* of which concluded that the house, *when construction was finished*, would be worth *less than $4,000,000* (Jones Tr. at 108, 117-18). MLCC picked the lower appraisal, $3,800,000, as its estimated value of the house (Begos Ex. 18). A $6,200,000 loan on a house that would be worth only $3,800,000 when completed results in an LTV of **163%** ($6,200,000 / $3,800,000).

28.    Mr. Jones, the underwriter, testified that a determination that a property was worth less than the owner thought "definitely will get relayed to the client" (Jones Tr. at 118). Nonetheless, Ms. Miller was never told that MLCC's appraisals had valued the house at only $3,800,000 (Rosenblum Tr. at 146). MLCC's lending officer went so far as to say: "as long as we do the loan,

if they're building a million-dollar home in a $2,000 neighborhood, that's not our concern." (*Id.* at 67).

29.    MLCC was not content merely to keep this information from Ms. Miller. Mr. Jones, the underwriter, purposely misstated the LTV on the underwriting documents. As stated above, MLCC's appraisal yielded an LTV of $163%. Mr. Jones, however, based his underwriting on the assertion that the LTV for the loan was 100% (Begos Exs. 15, 18). Mr. Jones conceded that this was wrong:

> Q.    When you signed off on this underwriting worksheet –
> A.    Yes,
> Q.    – that we've marked as Exhibit 10 [Begos Ex. 15] and you signed off on the calculation that the loan to value ratio was 100 percent –
> A.    Uh-huh (affirmative).
> Q.    – that was based on an assumption of the fixed value of the property that MLCC's appraisals told you wasn't going to be there; is that correct?
> A.    That's correct.

(Jones Tr. at 110). Mr. Jones said MLCC's "senior management team" had told him to do it that way (*Id.* at 110-11, 113-14). Richard Homberger concluded this intentional misstatement of the LTV was "a transparent attempt to deceive [and] ... a deliberate attempt to 'fudge' the numbers to make the loan appear more acceptable." (Homberger Aff., Ex. B, p.2).

30.    Though it misrepresented the LTV in its internal documents, MLCC nonetheless acted to obtain substantial additional collateral from Ms. Miller, in direct contradiction to the statement in its mortgage application that "pledged securities" would be used only as a "Source of Funds for Down Payment and/or Closing Costs" (Conroy Ex. H, p. 1). MLCC concluded that it needed a pledge of more than $5,000,000 to offset the difference between the loan amount and the

expected value of the house (Begos Ex. 15; Smith Tr. at 78: The "pledge would be additional collateral to make up the difference between that market value ... and the ultimate loan amount").

31.    MLCC did not tell Ms. Miller that it had dramatically increased the pledge requirement (Rosenblum Tr. at 71-72, 84). MLCC now claims that the pledge requirement was disclosed to Ms. Miller through a November 17, 1999 "approval letter" or "commitment letter" (MLCC Br. at 8; Stewart Aff., Ex. A). It is noteworthy that MLCC does not submit any evidence that the letter was ever sent to Ms. Miller (*see* Stewart Aff., ¶ 4), because Ms. Miller denies receiving it (Miller Aff. ¶ 9), and there is substantial evidence that it never was sent to her:

- MLCC never obtained a signed copy of the letter, even though that is standard industry practice (Homberger Dec., Ex. A, p. 9: "prudent closing procedures require prior receipt of a fully executed Commitment Letter containing all of the terms and conditions of the loan in order to minimize any exceptions due to misunderstandings regarding the terms of the loan").

- James Avery, a Mortgage and Credit Specialist for MLCC, testified that commitment letters were not typically sent to borrowers (Avery Tr. at 117). Robert Smith, who approved the loan, could not state that the commitment letter was sent to Ms. Miller (Smith Tr. at 121-22).

- The letter was addressed to Ms. Miller at 3 Winter Street, her former residence. Mr. Falini subsequently told MLCC that this address "has always been wrong" for mail delivery to Ms. Miller (Falini Tr. at 218).

- MLCC claims to find significance in the fact that one of Ms. Miller's attorneys produced a copy of the letter in this action, stating that he had received it from Eric Vaughn-Flam, another lawyer for Ms. Miller (MLCC Br. at 8) MLCC does not claim to have any evidence that Mr. Vaughn-Flam received the commitment letter *before* the loan closed.

32.    Ms. Miller also has denied that anyone told her before the loan closed that she would need to make a $5,000,000 pledge (Miller Aff., ¶ 7). Thus, MLCC: failed to advise Ms. Miller that it had appraised her house at approximately half what she allegedly thought it was worth;

17

intentionally misstated the LTV on the underwriting documents; insisted on a huge pledge to offset the low valuation; but did not disclose any of this to Ms. Miller before it closed the loan.

33.    MLCC determined that Ms. Miller's credit rating was "marginal" (Jones Tr. at 46; Homberger Aff., Ex. A, p. 4). Because MLCC's guidelines required a credit score of 680 or higher (Homberger Aff., Ex. B, p. 4) MLCC designated credit as an *exception – i.e.*, a failure to meet the guidelines (Begos Ex. 18). "Marginal credit (i.e. below average or substandard) generally requires additional mitigating factors to offset the additional risk associated with loans to borrowers with a history of credit issues." (Homberger Aff., Ex. A, p. 4). Given Ms. Miller's OTI, Disposable Income, and LTV, there were, of course, no mitigating factors to offset the credit risk.

34.    As important as the credit score itself, MLCC saw that Ms. Miller's credit reports showed "minimal outstanding debt" (Jones Tr. at 46-47). He conceded that "flags would be raised" when someone with such a history asked to borrow $6,200,000 (Jones Tr. at 48). This type of increase in borrowing is called *payment shock* (Homberger Aff., Ex. A, p. 7). Here, "The level of 'payment shock' is truly extraordinary. The borrower contemplated moving from a residence with a $145,000 mortgage to a new home with a $1,350,000 mortgage which then becomes a $7,500,000 obligation" (*id.* at 8).

35.    Thus, by every underwriting measure, this $6,200,000 loan should not have been approved. Ms. Miller had insufficient income to make the required payments; the house would never be worth what MLCC proposed to lend to complete construction; and Ms. Miller's credit history showed that she had never before undertaken this level of debt. Yet MLCC approved this loan, and then, as we will now discuss, unilaterally increased it to $7,500,000.

18

36.     After MLCC's underwriter (Mr. Jones) and Senior Vice President (Mr. Smith), approved the $6,200,000 loan on or about November 17, 1999, Harvey Rosenblum, MLCC's lending officer, increased the loan amount to $7,500,000, even though he was not an underwriter and did not have that authority (Rosenblum Tr. at 56, 95, 98-101; *see also id.* at 112: "Q. So you couldn't say it was appropriate for MLCC to make a loan of $7.5 million instead of $6.2 million? A. Absolutely not").

37.     Specifically, Mr. Rosenblum modified MLCC's Underwriting Worksheet. and the signed Approval Summary, to increase the loan amount (Begos Ex. 15, 18; Rosenblum Tr. at 102-03; 107). Mr. Jones confirmed that these handwritten changes were not on the forms when he signed off on them, and he consequently did not underwrite or approve a $7,500,000 loan (Jones Tr. at 71, 83, 98, 104, 121-25).  Mr. Jones agreed that the increase in the loan amount "substantially changed the loan being considered" (*id.* at 163-64). Mr. Smith, who also signed off on the underwriting, but who did not have a specific recollection of doing so, conceded that the documentation "heavily implies" that he approved only the $6,200,000 loan (Smith Tr. at 65). MLCC does not claim that any officer or underwriter approved the $7,500,000 loan, and Mr. Jones conceded there is no evidence that *anyone* with authority approved Mr. Rosenblum's changes (Jones Tr. at 165-66).

38.     There is no evidence that MLCC told Ms. Miller about the increase in the loan amount from $6,200,000 to $7,500,000 at any time before the loan closed. MLCC does not claim, on its motion, that it disclosed that change (*see also*, McEnerney Tr. at 55-57). Moreover, when it increased the loan amount, MLCC also increased the pledge it required to $6,700,000 (Begos Ex. 17). MLCC did not tell Ms. Miller about this either.

39.    Mr. Rosenblum's unilateral decision to increase the loan to $7,500,000 made the already bad numbers even worse:

| Calculation | $6,200,000 Loan | $7,500,000 Loan[3] |
|---|---|---|
| OTI (actual income) | 324% | 520% |
| Disposable Income (actual income) | - $38,000/month | - $51,572/month |
| LTV | 163% | 197% |

40.    As with the $6,200,000 loan, however, MLCC attempted to make the loan appear better on paper than it actually was. Thus, for example, Mr. Rosenblum calculated an OTI of 100.4% (Begos Ex. 15; Rosenblum Tr. at 108, 113-14), using the same erroneous income calculations that Mr. Jones had used to approve the $6,200,000 loan. Even if this OTI had been correctly calculated, MLCC's guidelines prohibited an OTI greater than 50% (Homberger Dec., Ex. B, p. 3).

41.    Mr. Rosenblum also calculated a Disposable Income of **negative** $250 a month (Begos Ex. 15; Rosenblum Tr. at 108; Smith Tr. at 105-06). Thus, even Ms. Miller's artificially inflated hypothetical income would be insufficient to repay a $7,500,000 loan (Rosenblum Tr. at 109). Mr. Jones agreed that this disposable income was a problem, but, as discussed above, he was not given an opportunity to review the changed loan (Jones Tr. at 132-33).

42.    Thus, MLCC knew that Ms. Miller had insufficient income to make the payments that would be required on a $6,200,000 loan, much less a $7,500,000 loan. It did not take long for Ms. Miller to run out of money. On August 10, 2000 – eight months after the loan closed – Mr. Falini advised Mr. Rosenblum that "the client has only enough funds for three more construction

---

[3] *See* Homberger Dec., Ex. B, pp. 1-3.

payments" (Rosenblum Tr. at 169-70). Mr. Rosenblum confirmed it was "an unusual development" for a client to run out of money that quickly (*id.*).

43.     Ms. Miller's parents had continually instilled in her the notion that she should never sell the Inherited Securities (Miller Aff., ¶ 4). She made clear to Mr. Falini, and she has reiterated in this action, that she did not want to do anything that would result in the sale of the Inherited Securities (*id.*). She has confirmed that, if anyone told her that she would have to sell those Inherited Securities to make payments on the 1999 Loan, she would have refused the Loan (*id.* ¶ 7).

44.     MLCC asserts that Ms. Miller went into this transaction with her eyes open. However, the evidence shows that MLCC did **not** tell Ms. Miller **any** of the key conclusions it reached about the loan. In fact, MLCC confirmed that it did not give any clients this information:

> Q.     But is it your view that the borrower needs to understand if the loan MLCC is considering would require the sale of assets in order to make the monthly payments?
> A.     Typically we don't share with the borrower the basis for our credit decision.
> Q.     Do you assume that the borrower knows how the loan is going to be repaid?
> A.     Borrowers generally do not care, if they're approved, what the criteria and considerations were in making that loan decision.

(Smith Tr. at 27).

45.     Even the lending expert MLCC retained in this action cannot swallow Mr. Smith's approach to borrowers. He confirmed that "it wouldn't be appropriate to enter into a transaction that the borrower doesn't understand." (Keller Tr. at 64, Begos Dec., Ex. 8). He cotinued: "I can't imagine a situation where I would know a loan was going to go into default, and make the loan" (*id.*. at 68).

46.     Moreover, Mr. Keller punctures MLCC's claim that Ms. Miller is necessarily sophisticated, due to her college education and large inheritance:

Q.     In your experience, was there in dealing with the people that you dealt with a CitiGroup, was there a difference in the level of sophistication comparing the people who had just inherited ten million dollars or so, versus the bulk of the people you dealt with, these self-made multi-millionaires?

MR. FRIEDMAN:     Objection. You can answer.

A.     Yes

Q.     Did you find yourself having to educate the people who had just inherited money, about how to manage their assets and liabilities?

A.     We felt we were educating all of our clients all the time, yes.

Q.     Did you find that there was specific information that you had to impart to the people who had just inherited a bunch of money that you tended not to have to give the people who made one hundred million dollars on their own?

A.     Yes.

(Keller Tr. at 32-33).

47.     Mr. Homberger stated: "[A]n objective review of the borrower's financial condition ... indicates that MLCC knew or should have known that Ms. Miller could not make the scheduled payments required by the loan. My analysis ... indicate[s] clear evidence of lending practices which are beyond the realm of standard industry lending practices and which are demonstrably unsound and predatory." (Homberger Dec., ¶ 5, Ex. A, p. 10). He went on to conclude:

> MLCC falsified Income, OTI, Disposable Income and Market Value in order to justify approving a loan which was based solely on the borrower's assets and which was never adequately disclosed or explained to Ms. Miller. This deception as to the terms of the loan which concealed the true nature of the obligation, the reliance on asset-based lending rather than the borrower's ability to repay the loan and the lack of voluntariness ... are all components of predatory origination, sales and servicing processes which inevitably resulted in catastrophic financial loss to the borrower which MLCC made no effort to mitigate.

(*id.* ¶ 6, Ex. B, p. 7).

48.     The approval of a predatory loan that MLCC knew would end in default was, unfortunately, only the first act of its misconduct. When MLCC approved the loan in late November 1999, it committed to allow the loan to be closed at any time up to February 1, 2000, or even later

22

(Stewart Dec., Ex. A, p.3; Rosenblum Tr. at 116-17, 121-22). Because Ms. Miller did not receive that letter, Ms. Miller did not know this expiration date.

49.    Mr. Falini knew about it, however, and he also knew that Ms. Miller had plans to be out of the country from December 2, 1999 through the end of the year. The General Contractor had no bills that needed to be paid before Ms. Miller returned from her trip (Brown Tr. at 122-24; Begos Ex. 11). Therefore,   there was no reason to close the loan while Ms. Miller was away (*see* Rosenblum Tr. at 121-22: the loan "did not have to close before the end of December 1999"). However, Mr. Falini apparently saw things differently. He advised MLCC and Ms. Miller that the loan *had* to close before the end of December 1999 (Miller Aff., ¶ 10; Rosenblum Tr. at 122-23).[4] MLCC advised Mr. Falini that Ms. Miller would need to sign a power of attorney for the loan to close while Ms. Miller was away (Rosenblum Tr. at 122).

50.    MLCC claims that Ms. Miller appointed Barry Newman as her attorney-in-fact to execute the loan documents. The evidence shows that it was Mr. Falini, not Ms. Miller, who contacted Mr. Newman about the possibility of acting as Ms. Miller's attorney-in-fact, but only for purposes of approving contractor invoices while Ms. Miller was out of the country (Newman Tr. at 18-19; Begos Ex. 10). At the "closing" of the 1999 Loan, Mr. Newman thought he was signing authorizations to pay invoices; no one told him he was purportedly mortgaging Ms. Miller's property or pledging securities (Newman Tr. at 35-47).

---

[4] In his deposition, Mr. Falini attempted to assert that he advised Ms. Miller to close the loan as quickly as possible because the interest rate on the loan was lower than the interest being charged on her margin debt (Falini Tr. at 135). In reality, however, the loan had a higher interest rate; specifically, the initial interest rate on the 1999 loan was 8.5% (Stewart Aff., Ex. C, p. MLCC 350), while MLPFS was charging Ms. Miller 8.125% on the margin debt (*see* Begos Ex. 16, p. 13 of 48. 11/17 "margin interest" entry).

51.    MLCC cannot dispute that the power of attorney Ms. Miller signed (Seifer Declaration, Ex. C), was not sufficient to allow the 1999 Loan to close. Harvey Rosenblum testified: "I recall receiving the first power of attorney, and I noticed that the box for mortgage-related items was crossed off. And with an X in that box, to me that meant that it did not authorize the power of attorney to execute mortgage documentation." (Rosenblum Tr. at 15, 27). Mr. Rosenblum relayed this conclusion to Mr. Falini (Rosenblum Tr. at 16-17). Mr. Falini confirms that he also faxed a copy of the power of attorney to MLCC's closing agent, Kevin Huben, who told him that it was "executed completely opposite the way it needed to be for the purpose of closing a loan" (Falini Tr. at 247).

52.    Mr. Falini then "marked up" a copy of the power of attorney, and re-sent it to Mr. Huben (Falini Tr. at 251-52; Seifer Dec., Ex. D). The faxes from Mr. Falini to Mr. Huben (Seifer Dec., Exs. C, D), when compared to the "original" power of attorney that was recorded (*id.*, Ex. E), allow one to track the changes Mr. Falini made to the document Ms. Miller signed.

53.    There is no dispute that the power of attorney that was recorded by MLCC's title agent contains significant alterations and additions made by someone other than Ms. Miller. A handwriting analysis performed by Dr. Marc Seifer, Ms. Miller's handwriting expert, confirms this (Seifer Dec., ¶ 3, Exs. A and B). Dennis Ryan, MLCC's handwriting expert, concluded that there were "indications or evidence to suggest that Miller ... did not write the questioned" text on the recorded power of attorney, but claimed that there was insufficient written material to reach a definitive conclusion (Begos Ex. 28, pp. 5-6).[5]

---

[5] Significantly, based on the particular scale that Mr. Ryan used to express his conclusions, he considered and rejected conclusions that Ms. Miller *definitely* wrote the questioned writing on the recorded power of attorney, or that there was a *strong probability* she wrote it, or that that were *indications* she wrote it (Ryan Tr. at 157-58, Begos Ex. 9). He also considered and rejected the possibility of stating that he could not reach any conclusion at all regarding the author of the question writing (*id.* at 158-59). Instead, he

54.     Dr. Seifer also compared the questioned writing on the recorded power of attorney with Mr. Falini's writing on his faxes to Mr. Huben, after Mr. Falini acknowledged the writing on the faxes to be his (Seifer Dec., Ex. B; Falini Tr. at 250-52). That comparison led to the conclusion that Mr. Falini wrote the questioned writing on the recorded power of attorney (Seifer Aff., ¶ 3, Ex. B). MLCC's expert has not disagreed with that conclusion. Mr. Falini, nonetheless, has testified, under oath, that he never saw the original power of attorney (Falini Tr. 246); therefore, Mr. Falini's credibility is suspect.[6]

55.     Mr. Falini made every effort to insulate Ms. Miller from knowledge about interest payments that were being made on the 1999 Loan. On December 8, 1999 – the day after the Loan "closed" – Mr. Falini wrote to Mr. Rosenblum: "Please inform me as to how we can set up procedure to wire $$ from [account no.] 32512 to MLCC for Miller loan" (Begos Ex. 24, pp. 145-46). Mr. Rosenblum testified that it was common for MLPFS brokers to make arrangements to wire money from clients' accounts directly to MLCC, without the clients' involvement (Rosenblum Tr. at 159). Mr. Falini continued to write emails to MLCC about making the monthly payments directly, and told MLCC: *I do not want to get behind on this. There are many moving parts which I need to juggle.*" (Begos Ex. 24, p. 142; emphasis added).

---

concluded that there were indications that someone other than Ms. Miller wrote the questioned writing (*id.*).

[6] There is also a question of fact as to whether the original (altered) power of attorney ever made it to the closing. Barry Newman, the alleged attorney-in-fact, testified that the original power of attorney was not at the closing, and that, in fact, he *never* saw the power of attorney (Newman Tr. at 37). Mr. Falini testified that MLCC's closing agent told him it had not arrived in time (Falini Tr. at 262). Mr. Rosenblum testified that, if the power of attorney was not at the closing, the loan should not have closed (Rosenblum Tr. at 39).

56.    Mr. Falini did quite a bit of juggling. The payments on the 1999 Loan were made, by him, directly from Ms. Miller's accounts at MLPFS, and he often needed to move funds around to cover the monthly payments (Falini Tr. at 317-18). More ominously, within months, Mr. Falini was forced to borrow money (on margin), to make the interest payments due on the loan (Begos Ex. 20). Mr. Falini's successor at MLPFS confirmed that Ms. Miller "has not once paid the loan out of any source but [her MLPFS accounts]" (McEnerney Tr. at 153; Begos Ex. 21).

57.    By August 2000 – eight months after the loan "closed" – Mr. Falini advised Mr. Rosenblum that Ms. Miller would run out of money in three months, and he asked MLCC about refinancing (Rosenblum Tr. at 170, 175-76). Remarkably – given MLCC's lack of concern with Ms. Miller's actual income when it underwrote the 1999 loan – its response was to say that it needed "a statement of cash flow and earnings" to even consider a refinance (Rosenblum Tr. at 177-78). Ms. Miller again asked MLCC to refinance the loan in 2001, this time for only $5 million. Again MLCC rejected the request, citing problems with Ms. Miller's Credit, and the fact that "[her] income is insufficient to sustain payments of the amount of credit requested." (Begos Ex. 19; *see also* Homberger Dec., Ex. A, p. 6).

58.    MLCC rejected both attempts to refinance even though it conceded that there was no indication that Ms. Miller's cash flow and earnings had changed from 1999 to 2001 (McEnerney Tr. at 219). Mr. Homberger described MLCC's refusal to finance without proof of income as follows:

> I cannot reconcile the fact that MLCC approved and closed this loan in the amount of $7,500,000 in December 1999 and subsequently declined an application to refinance this debt in 2001 for $5,000,000 due to insufficient income and credit history. As Ms. Miller's income and credit history did not appear to materially change from 1999 to 2001, either the initial loan should not have been made or the subsequent refinance should have been approved.

(Homberger Aff., Ex. A, p. 9; *see also*, McEnerney Tr. at 216-17: "there was ... no reasonable prospect of the client repaying the debt[;] ... **the client had no income to support any sort of restructuring of the loan**"[emphasis added]).

59.    In 2000, MLCC changed the way it handled withdrawals from the so-called "pledge account." Prior to the change, MLCC allowed withdrawals as long as the balance in the account was at least $5,678,000. After the change, MLCC prohibited withdrawals unless the balance exceeded $6,711,000 (McEnerney Tr. at 113-117). By April 2002, MLCC understood that "all the money [Ms. Miller] had in the world was in that pledge account." (*id.* at 155-57). Nonetheless, MLCC refused to allow Ms. Miller to use the pledge account to make the monthly payments on the loan, thereby making a default inevitable (*id.*. at 178-79, 196).

60.    Additionally, in May 2002, MLCC "mistakenly" liquidated all of the securities in the so-called "pledge account," and, upon realizing the mistake, it "reversed" the liquidation (McEnerney Tr. at 76-78). Most significantly, MLCC arranged with MLPFS that the "mistaken" liquidation did not show up on Ms. Miller's monthly statement for the pledge account (Begos Exs. 22, 23).

61.    In 2003, MLCC again liquidated the Inherited Securities in the pledge account, and, this time, did not reverse the liquidation. This liquidation caused Ms. Miller in excess of $1,500,000 in damages (DePanfilis Declaration, ¶ 3).

Dated:  Westport, Connecticut
        June 24, 2005

                                BEGOS & HORGAN, LLP


                                By: _____
                                       Christopher G. Brown (ct18216)
                                       Patrick W. Begos (ct19090)
                                Attorneys for Plaintiff
                                327 Riverside Avenue
                                Westport, CT 06880
                                (203) 226-9990
                                (203) 222-4833 (fax)

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was served via Federal Express overnight delivery, on June 24, 2005 on:

Douglas C. Conroy, Esq.
Paul, Hastings, Janofsky & Walker, LLP
1055 Washington Boulevard
Stamford, CT 06901-2217

Jonathan S. Bowman, Esq.
Cohen & Wolf
1115 Broad Street
Bridgeport, CT 06604

_____
Patrick W. Begos