UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

-------------------------------------------------------------x

JULIE DILLON RIPLEY MILLER,                 :

         Plaintiff,                        :     Case No.03-CV-1016 (RNC)(DFM)

         – against –                        :     June 24, 2005

MERRILL LYNCH CREDIT CORPORATION,            :

         Defendant.                         :

-------------------------------------------------------------x


**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**


BEGOS & HORGAN, LLP
Attorneys for Plaintiff
327 Riverside Avenue
Westport, CT 06880
(203) 226-9990

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

   1.    Merrill Lynch, "Liability Management," and "Stickiness" . . . . . . . . . . . . . . . . . . . . 2

   2.    The 1999 Loan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
       A.   MLCC Allowed Mr. Falini To Control What Ms. Miller Was Told
           About the Loan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
       B.   MLCC and MLPFS Each Relied on the Other to "Manage" the Liability . . . . 6
       C.   The $6,200,000 Loan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
           1.   MLCC Confirmed That Ms. Miller Lacked Capacity to Repay the Loan 7
           2.   MLCC Confirmed That The House Was Insufficient Collateral . . . . . . 11
           3.   MLCC Confirmed that Ms. Miller's Credit Failed to Meet its
               Guidelines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
       D.   The $7,500,000 Loan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

   3.    Ms. Miller Would Not Have Taken The Loan if She Knew The Truth . . . . . . . . . 16

   4.    The Power of Attorney Was Invalid . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

   5.    Merrill Lynch Continued to Act Improperly and Deceptively After the Loan
       Closed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

   I.    MLCC IS NOT ENTITLED TO JUDGMENT ON ITS CLAIMS . . . . . . . . . . . . . . 23
       A.   The Loan Documents Are Not Binding on Ms. Miller . . . . . . . . . . . . . . . . . 23
       B.   Ms. Miller Did Not Ratify the Loan Documents . . . . . . . . . . . . . . . . . . . . . 24
       C.   The Loan Is Unconscionable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
       D.   Ms. Miller Did Not Waive Her Defenses . . . . . . . . . . . . . . . . . . . . . . . . . . 31
       E.   MLCC's Unclean Hands Preclude Summary Judgment . . . . . . . . . . . . . . . . 33
       F.   Plaintiff's Claims Preclude Summary Judgment . . . . . . . . . . . . . . . . . . . . . 34

   II.    PLAINTIFF'S CONVERSION CLAIM IS VALID AND TIMELY . . . . . . . . . . . 34

   III.    PLAINTIFF'S CUTPA CLAIMS ARE VALID AND TIMELY . . . . . . . . . . . . . . 36

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Plaintiff, Julie Dillon Ripley Miller, by her attorneys, Begos & Horgan, LLP, submits this brief in opposition to the summary judgment motion of defendant, Merrill Lynch Credit Corp. ("MLCC").

## PRELIMINARY STATEMENT

MLCC made the loan at issue after *confirming* that Ms. Miller could not make the payments required. Indeed, every underwriting measure MLCC considered showed that a default was inevitable. MLCC then falsified its underwriting documentation to make the loan appear less unreasonable than it actually was (though even the falsified calculations showed the inevitability of a default. Then it unilaterally loaned $1,300,000 *more* than Ms. Miller asked for, yet failed to pay off approximately $2,000,000 in debt owed to its sister corporation, Merrill Lynch Pierce Fenner & Smith ("MLPFS"), that was supposed to have been retired.

Thus, though Ms. Miller applied for a loan that would consolidate her total debt to both Merrill Lynch entities into a $6,200,000 mortgage, and though MLCC concluded that Ms. Miller could not afford to repay $6,200,000, MLCC made a loan that increased her total Merrill Lynch debt to *$9,500,000.*

MLCC did not tell Ms. Miller it had increased the loan amount. It did not tell her that it was not going to pay off $2,000,000 in margin debt. It did not tell her that the interest payments on the loan would far exceed her income, or that the value of the house she was building would never be worth anything close to what MLCC was lending to complete construction. To the contrary, MLCC allowed an MLPFS broker, who would receive a substantial commission only if the loan closed, to control all communications to Ms. Miller, and to arrange for the loan to close when Ms. Miller was out of the country. He then altered Ms. Miller's power of attorney to give the attorney-in-fact powers that Ms. Miller had not delegated, and misled the attorney-in-fact about what he was signing.

1

Ms. Miller never would have gone through with this transaction if she had been told the truth about it. Indeed, no reasonable person, knowing the truth, would have taken this loan. The loan was unconscionable, and it is therefore unenforceable. Accordingly, and for numerous other reasons, MLCC is *not* entitled to summary judgment on its counterclaims (*see* Point I, *infra*).

Moreover, MLCC's attempts to obtain summary judgment on Ms. Miller's affirmative claims should fail. Ms. Miller's conversion and CUTPA claims are timely, and otherwise meritorious (*see* Points II, and III, *infra*).

## STATEMENT OF FACTS

Though Ms. Miller's parents had substantial assets, her assets and income were, for most of her adult life, modest. She is a Registered Nurse, and her husband owns a bait shop. At all times relevant to this action, she had stopped working to raise her children. Until the events giving rise to this action, Ms. Miller and her family lived in a modest house and had few investment assets. (Affidavit of Julie Dillon Ripley Miller, dated June 24, 2005 ("Miller Aff."), ¶¶ 2-3).

Ms. Miller's financial circumstances changed dramatically in 1996 when, at forty-five years of age, she inherited various assets and trust interests, including securities with a market value of between $7 million and $10 million ("Inherited Securities"). Ms. Miller's basis in these Securities was very low, meaning that any sale would cause a substantial capital gains tax liability. (*Id.* ¶ 4).

## 1.    Merrill Lynch, "Liability Management," and "Stickiness"

In or about the summer of 1997, Ms. Miller first spoke to Jay Falini, a broker with MLPFS, who attempted to persuade Ms. Miller to use MLCC to finance the purchase of a new home (Miller Aff. ¶¶ 4-5). MLCC ultimately approved a loan in the amount of $1,375,000 ("1997 Loan"), and required Ms. Miller to pledge approximately $600,000 in securities as collateral in addition to the

2

home (*see* Affidavit of Laurie Kamhi ("Kamhi Aff."), Ex. 1). By arranging this transaction, which required MLPFS to hold the pledged securities, Mr. Falini succeeded in having the Inherited Securities transferred from PaineWebber to MLPFS (Miller Aff., ¶ 5).

That 1997 transaction was an outgrowth of the "liability management" expertise that ML & Co. and its subsidiaries, which included MLCC and MLPFS (collectively "Merrill Lynch"), held itself out as possessing. As Merrill Lynch's website represents: "Your Financial Advisor, working with Merrill Lynch credit and lending specialists, will help you make smart choices and ensure both sides of your balance sheet work together to achieve your goals." (Declaration of Patrick W. Begos, Ex.1; hereafter, "Begos Ex. __"). Mr. Falini confirmed that he considered it his responsibility to advise clients on the appropriateness of financing for the purchase or construction of a home (Falini Deposition ("Falini Tr.") at 7, Begos Ex. 2; *see also* Smith Deposition ("Smith Tr.") at 17, Begos Ex. 4).

MLCC's former Senior Vice President, Robert Smith, confirmed that MLCC's role was to "provide mortgages as a prospecting tool for [MLPFS] financial advisors to attract and retain new clients" (Smith Tr. at 16). He confirmed that MLCC could make it difficult for customers to leave MLPFS by lending money to them: "it was widely understood that liabilities created a sort of *stickiness* to the client relationship" (Smith Tr. at 18; emphasis added). Thus, MLCC's mandate was to approve loans for MLPFS customers whenever possible (Jones Deposition ("Jones Tr.") at 29-30, Begos Ex. 3; Avery Deposition ("Avery Tr.") at 65, Begos Ex. 6).

Ms Miller was, by far, Mr. Falini's largest client (Falini Tr. at 10), and he quickly set about to make their relationship as "sticky" as possible. Among other things, he advised her about real estate purchases and loans; he referred her to an accountant; he traveled frequently from his office

3

in Pennsylvania to Ms. Miller's house in Connecticut for construction-related meetings; and he drafted letters for Ms. Miller to send to professionals involved in the construction (*see* Falini Tr. at 54, 68, 125, 146, 301-308; *see also*, Begos Exs. 26 and 27). Indeed, Ms. Miller's contract with her general contractor (which contract was entered into at MLCC's insistence) provides: "The General Contractor agrees to work with the owner's financial agent, Jay Fellini *[sic]*, to attempt to budget and anticipate monthly cash flow requirements." (Begos Ex. 25). Mr. Falini made himself such a part of Ms. Miller's life that she asked him to be Godfather to her twins (Falini Tr. at 69).

After Ms. Miller purchased her house (financed with the 1997 Loan) Mr. Falini advised her to fund a substantial renovation simply by writing checks against her MLPFS accounts (Falini Tr. at 30-34). Each check was posted by MLPFS as a margin debit against the Inherited Securities (*id.*).

By the end of November 1999, as a result of Mr. Falini's "liability management," Ms. Miller was deeply in debt to MLPFS. The assets in her accounts totaled $10.6 million, but her margin debt was $5.8 million (Begos Ex. 16). Almost $4 million of that margin had been used for the construction project, though the house was not nearly finished (Falini Tr. at 78).

## 2.    The 1999 Loan

Mr. Falini's response to this situation was to advise Ms. Miller to seek a new loan from MLCC (Falini Tr. at 58). He completed an application, for Ms. Miller's signature, seeking a construction loan in the amount of $6,200,000 (Conroy Declaration, Ex. H; Rosenblum Deposition ("Rosenblum Tr.") at 54-55, Begos Dec., Ex. 5). The application stated that Ms. Miller estimated the *current* value of the house to be $6,200,000, and  the only mention of any pledged securities was as a "Source of Funds for Down Payment and/or Closing Costs." (Conroy Ex. H). As Ms. Miller already owned the

4

house, no down payment would be required. Therefore, there was nothing in the loan application suggesting that a substantial pledge would be required (Falini Tr. 179-181).

### A.   MLCC Allowed Mr. Falini To Control What Ms. Miller Was Told About the Loan

When Mr. Falini submitted the application to MLCC, he did so with a note (that Ms. Miller never requested, saw or approved (Miller Aff., ¶ 8), instructing MLCC: "No calls directly to client. ... Client highly sensitive." (Begos Ex. 12). In an introductory conversation with MLCC's loan officer, Mr. Falini reiterated: "Do not call client." (Begos Ex. 13, p. 1025). MLCC claims that it was Ms. Miller's decision to have all communication routed through Mr. Falini, but there is no dispute that the loan application – the only document Ms. Miller signed – did not direct MLCC *not* to communicate with her (Smith Tr. at 21-24). And Ms. Miller did *not* otherwise instruct MLCC not to contact her (Miller Aff., ¶ 8).

Nonetheless, following Mr. Falini's instruction, MLCC did not communicate with Ms. Miller, **at all**, before the Loan closed (Smith Tr. at 24-25; Rosenblum Tr. at 36, 49-50, 122-23). Thus, MLCC allowed Mr. Falini – who would earn a significant commission if and when the Loan was made (Falini Tr. at 121-24) – to exercise total control over what Ms. Miller was told about the Loan. Significantly, MLCC did so even though Mr. Falini admits he was not "qualified to explain the terms of the loan to Ms. Miller" (Falini Tr. at 129).

Thus, it is plain that **no one** explained the terms of the loan to Ms. Miller before it closed. Yet MLCC now asserts that Ms. Miller fully understood what was happening. Ms. Miller's lending expert, Richard Homberger, confirmed that the way in which MLCC mishandled communications with Ms. Miller was a significant failure: "In my experience, no lender would tolerate a

5

commissioned sales consultant issuing a directive not to contact the borrower during processing. It is the lender's responsibility to know its customer[.]" (Homberger Declaration, ¶ 4, Ex. A, p. 9).

**B.    MLCC and MLPFS Each Relied on the Other to "Manage" the Liability**

Mr. Falini encouraged Ms. Miller to trust Merrill Lynch's alleged "liability management" expertise, telling her she did not need to seek advice from anyone else (Falini Tr. at 111). Unfortunately, while Mr. Falini relied on MLCC to ensure that the Loan would be beneficial for Ms. Miller, MLCC though that was Mr. Falini's job.

MLCC relied entirely on what Mr. Falini said Ms. Miller needed and wanted (Smith Tr. at 20-21, 25: "we trusted and relied upon the relationship that the broker or financial consultant had with the particular client"). Indeed, **MLCC's policy was not to advise a borrower that she did not have sufficient income to make the payments on a loan** (Smith Tr. at 26-27, 44). A senior MLCC officer testified that MLCC expected borrowers to "know how they intend to repay the loan, whether or not its from, you know, disposing of current assets, reducing other obligations that they currently have." (McEnerney Deposition ("McEnerney Tr.") at 61, Begos Ex. 7).

In contrast, Mr. Falini relied on MLCC to determine whether Ms. Miller would be able to repay the Loan he was seeking for her (Falini Tr. at 296). In fact, he concluded the loan would not become "a noose" around Ms. Miller's neck solely because MLCC "was willing to underwrite the loan and extend it to her." (Falini Tr. at 97-98).

Thus, Mr. Falini's quest for a commission, and MLCC's desire to make loans that brokers like Mr. Falini wanted, resulted in a loan that was disastrous for Ms. Miller.

### C.   The $6,200,000 Loan

MLCC, in its summary judgment motion, attempts to convey the impression that the $7,500,000 loan it ultimately made was what Ms. Miller had asked for. In fact, however, she applied for a $6,200,000 loan, and all of MLCC's underwriting concerned a $6,200,000 debt. After approving the $6,200,000 (even though it concluded that Ms. Miller could not make the payments on that sum), MLCC then increased it to $7,500,000 at the last minute, without performing any additional underwriting, and without informing Ms. Miller about the change.

MLCC's underwriter, Andrew Jones, confirmed that a key part of underwriting was ascertaining "whether or not this client will be able to make [the loan] payments" (Jones Tr. at 18). In order to do this, lenders use objective criteria to evaluate the applicant's Capacity to repay the loan, the value of the Collateral, and her Credit history. Capacity, Collateral and Credit are generally referred to as the "Three Cs" of underwriting (Homberger Dec., Ex. A, p. 1; Smith Tr. at 45).

### 1.   MLCC Confirmed That Ms. Miller Lacked Capacity to Repay the Loan

*Capacity* refers to a borrower's ability to repay the proposed debt (Homberger Dec., Ex. A, p. 2). In order to assess Ms. Miller's capacity, MLCC had her tax returns, and it had access to what her Inherited Securities were earning at MLPFS (Avery Tr. at 76; Jones Tr. at 88). MLCC evaluated that data, and concluded that Ms. Miller's actual income was so minimal, compared to the size of the loan, that it disregarded it entirely in its underwriting analysis. Mr Jones, MLCC's underwriter, agreed that Ms. Miller's tax returns did not reveal income sufficient to make the payments on a $6,200,000 loan (Jones Tr. at 51, 58-59).

Lenders will frequently describe capacity by calculating the borrower's obligations-to-income ratio ("OTI"). It is standard in the mortgage industry that OTI not exceed 38%, meaning that the

total mortgage obligations should be no more than 38% of the borrower's income (Homberger Aff., Ex. A, p. 6). MLCC's guidelines said that OTI should not exceed 50% (*id.*, Ex. B, p. 3). Ms. Miller's OTI, based on MLCC's calculations of her actual income, was **324%**.[1] This meant that the loan obligations would be more than *three times larger* than her income. Thus, MLCC quickly calculated that Ms. Miller could not make the payments on a $6,200,000 loan. Because Ms. Miller had directed MLCC to look to her tax returns for her income (Conroy Ex. H, p. MLCC 679), this calculation should have ended the underwriting.

However, MLCC's senior management had already decided to approve the loan, presumably to enhance the *stickiness* that MLCC desired, and directed Mr. Jones, the underwriter, to paper the file (Jones Tr. at 110-11, 113-14: MLCC's "senior management team" gave him "specific instructions about how to prepare this loan"). Following his instructions, Mr. Jones calculated a *hypothetical* income stream using "opportunity cost" and "IRA" calculations (Jones Tr. at 86; Begos Ex. 15). He conceded that this income was "made up," and did not reflect Ms. Miller's actual income (Jones Tr. at 86, 170-72). Indeed, these calculations hypothesized that Ms. Miller's Inherited Securities would be sold (which Ms. Miller had told Mr. Falini she refused to consider), and the proceeds converted into fixed-income investments. MLCC's own underwriting guidelines precluded Mr. Jones from using these calculations for Ms. Miller's loan (Homberger Aff., Ex. B, pp. 1-3).

---

[1] Specifically, MLCC calculated the total obligations on a $6,200,000 mortgage to be $55,024 per month, or approximately $660,000 per year (MLCC 10, 20). In contrast, MLCC's "Income Analysis" based on Ms. Miller's 1998 tax return, showed that her income was $203,993 (Begos Ex. 14). Thus, Ms. Miller's OTI would be $660,000/$203,993, or 324%.

Even assuming MLCC's guidelines permitted these calculations, Mr. Jones performed them improperly, and, in so doing, dramatically overstated Ms. Miller's *hypothetical* income.[2] He used his incorrect, hypothetical income calculation to conclude that the OTI was "only" 79% (Begos Ex. 15). As set forth above, this was still significantly higher than industry and MLCC guidelines permitted. When the opportunity cost and IRA calculations are performed the way MLCC's guidelines specified (assuming the guidelines permitted the calculations at all, which it did not), the result is a *hypothetical* monthly income of only $12,254 (Hornberger Dec., Ex. B, pp. 2-3). Ms. Miller's OTI, using that number, would be **449%**.

An underwriting measure that is closely related to OTI is *Disposable Income*. Specifically, it is the borrower's net monthly income after deducting loan payments and other housing expenses, including property taxes and insurance (McEnerney Tr. at 57-58; Smith Tr. at 100-01). Obviously, a borrower's Disposable Income must be high enough to allow for payment of non-housing expenses, such as food, education, income taxes and the like. Using his flawed and inflated hypothetical income calculation, Mr. Jones reported that Ms. Miller's disposable income would be $14,655 a month (Begos Ex. 15).

However, if Ms. Miller's actual income were used, her disposable income on a $6,200,000 loan was **negative $38,000** a month – ($203,993-$660,000)/12. Thus, each month Ms. Miller would be spending $38,000 more on the loan than she was earning (*see* Jones Tr. at 101-02). Mr. Jones

---

[2] The most significant error concerned Ms. Miller's substantial MLPFS margin debt. Mr. Jones calculated Ms. Miller's hypothetical income based on the assumption that all her MLPFS margin debt would be paid off (Jones Tr. at 65-66). Accordingly, he required, as a condition of closing, that the margin debt be paid off (*id.* at 68-69, 77-78). In fact, however, MLCC allowed at least $2,000,000 of margin debt to remain outstanding after the loan closed (*id.* at 76-78). Mr. Jones confirmed that ignoring this condition rendered his hypothetical income calculation incorrect, and he said the loan "should have been basically resubmitted to the underwriting department" to re-do the calculation (*id.* at 78, 91-92, 95, 128-29).

9

testified that he could not recall ever approving a loan where he calculated a negative disposable income (*id.*). Donald McEnerney, who was, for a time, in charge of MLCC's entire wholesale lending operation, confirmed that MLCC would not make a loans where the borrower did not have sufficient income to make the payments, or where disposable income was a negative number (McEnerney Tr. at 12, 18-19).

Thus, to summarize Ms. Miller's Capacity:

| Source | OTI | Disposable Income |
|--------|-----|-------------------|
| Mortgage industry standard | 38% or less | No standard, but >0 |
| MLCC underwriting guidelines | 50% or less | |
| Hypothetical income, as calculated by MLCC | 79% | $14,655/month |
| Actual income, as calculated by MLCC | 324% | -$38,000/ month |
| Hypothetical income, calculated according to MLCC guidelines | 449% | -$42,770/ month |

MLCC did not tell Ms. Miller that her income was insufficient to make the payments on a $6,200,000 loan (Miller Aff., ¶ 7). MLCC did not tell her that her actual income was less than the estimated monthly obligations. Indeed, MLCC's Senior Vice President, who approved the $6,200,000 loan, confirmed that he did not recall even thinking about where Ms. Miller would get the money to make the payments (Smith Tr. at 98).

Thus, without telling Ms. Miller, MLCC assumed that she would make the payments on a $6,200,000 by selling her assets (Jones Tr. at 48: "This client had the assets to basically support a large loan amount"; 87: "the only source of her income is being generated from her assets"). It made this assumption even though Ms. Miller had expressed her intention *not* to sell them. The FDIC has described this type of loan as **predatory** (Homberger Dec., Ex. A, p. 10: according to the FDIC,

10

predatory lending includes "[m]aking unaffordable loans based on the assets of the borrower rather than on the borrower's ability to repay an obligation").

### 2.    MLCC Confirmed That The House Was Insufficient Collateral

Loan to value ratio ("LTV") is a comparison of the amount of the loan to the value of the real property pledged as security. MLCC's "Mortgage 100" program allows a borrower to finance 100% of a house's value – *i.e.*, it allows an LTV of 100% (*see* Falini Tr. at 175-76). MLCC prohibits LTVs of more than 100% (McEnerney Tr. at 19-20). The Mortgage application and MLCC's underwriting Approval Summary both state that Ms. Miller believed her house was worth at least $6,200,000 (MLCC 6, p. 2; MLCC 20), which would yield a 100% LTV on a $6,200,000 loan.

MLCC obtained two independent appraisals of the property, *both* of which concluded that the house, *when construction was finished*, would be worth *less than $4,000,000* (Jones Tr. at 108, 117-18). MLCC picked the lower appraisal, $3,800,000, as its estimated value of the house (Begos Ex. 18). A $6,200,000 loan on a house that would be worth only $3,800,000 when completed results in an LTV of **163%** ($6,200,000 / $3,800,000).

Mr. Jones, the underwriter, testified that a determination that a property was worth less than the owner thought "definitely will get relayed to the client" (Jones Tr. at 118). Nonetheless, Ms. Miller was never told that MLCC's appraisals had valued the house at only $3,800,000 (Rosenblum Tr. at 146). MLCC's lending officer went so far as to say: "as long as we do the loan, if they're building a million-dollar home in a $2,000 neighborhood, that's not our concern." (*Id.* at 67).

MLCC was not content merely to keep this information from Ms. Miller. Mr. Jones, the underwriter, purposely misstated the LTV on the underwriting documents. As stated above, MLCC's

appraisal yielded an LTV of $163%. Mr. Jones, however, based his underwriting on the assertion

that the LTV for the loan was 100% (Begos Exs. 15, 18). Mr. Jones conceded that this was wrong:

> Q.    When you signed off on this underwriting worksheet –
> A.    Yes,
> Q.    – that we've marked as Exhibit 10 [Begos Ex. 15] and you signed off on the
> calculation that the loan to value ratio was 100 percent –
> A.    Uh-huh (affirmative).
> Q.    – that was based on an assumption of the fixed value of the property that MLCC's
> appraisals told you wasn't going to be there; is that correct?
> A.    That's correct.

(Jones Tr. at 110). Mr. Jones said MLCC's "senior management team" had told him to do it that way

(*Id.* at 110-11, 113-14). Richard Homberger concluded this intentional misstatement of the LTV was

"a transparent attempt to deceive [and] ... a deliberate attempt to 'fudge' the numbers to make the

loan appear more acceptable." (Homberger Aff., Ex. B, p.2).

Though it misrepresented the LTV in its internal documents, MLCC nonetheless acted to

obtain substantial additional collateral from Ms. Miller, in direct contradiction to the statement in

its mortgage application that "pledged securities" would be used only as a "Source of Funds for

Down Payment and/or Closing Costs" (Conroy Ex. H, p. 1). MLCC concluded that it needed a

pledge of more than $5,000,000 to offset the difference between the loan amount and the expected

value of the house (Begos Ex. 15; Smith Tr. at 78: The "pledge would be additional collateral to

make up the difference between that market value ... and the ultimate loan amount").

MLCC did not tell Ms. Miller that it had dramatically increased the pledge requirement

(Rosenblum Tr. at 71-72, 84). MLCC now claims that the pledge requirement was disclosed to Ms.

Miller through a November 17, 1999 "approval letter" or "commitment letter" (MLCC Br. at 8;

Stewart Aff., Ex. A). It is noteworthy that MLCC does not submit any evidence that the letter was

12

ever sent to Ms. Miller (*see* Stewart Aff., ¶ 4), because Ms. Miller denies receiving it (Miller Aff.

¶ 9), and there is substantial evidence that it never was sent to her:

‣ MLCC never obtained a signed copy of the letter, even though that is standard industry practice (Homberger Dec., Ex. A, p. 9: "prudent closing procedures require prior receipt of a fully executed Commitment Letter containing all of the terms and conditions of the loan in order to minimize any exceptions due to misunderstandings regarding the terms of the loan").

‣ James Avery, a Mortgage and Credit Specialist for MLCC, testified that commitment letters were not typically sent to borrowers (Avery Tr. at 117). Robert Smith, who approved the loan, could not state that the commitment letter was sent to Ms. Miller (Smith Tr. at 121-22).

‣ The letter was addressed to Ms. Miller at 3 Winter Street, her former residence. Mr. Falini subsequently told MLCC that this address "has always been wrong" for mail delivery to Ms. Miller (Falini Tr. at 218).

‣ MLCC claims to find significance in the fact that one of Ms. Miller's attorneys produced a copy of the letter in this action, stating that he had received it from Eric Vaughn-Flam, another lawyer for Ms. Miller (MLCC Br. at 8) MLCC does not claim to have any evidence that Mr. Vaughn-Flam received the commitment letter *before* the loan closed.

Ms. Miller also has denied that anyone told her before the loan closed that she would need to make a $5,000,000 pledge (Miller Aff., ¶ 7). Thus, MLCC: failed to advise Ms. Miller that it had appraised her house at approximately half what she allegedly thought it was worth; intentionally misstated the LTV on the underwriting documents; insisted on a huge pledge to offset the low valuation; but did not disclose any of this to Ms. Miller before it closed the loan.

### 3.    MLCC Confirmed that Ms. Miller's Credit Failed to Meet its Guidelines

MLCC determined that Ms. Miller's credit rating was "marginal" (Jones Tr. at 46; Homberger Aff., Ex. A, p. 4). Because MLCC's guidelines required a credit score of 680 or higher (Homberger Aff., Ex. B, p. 4) MLCC designated credit as an *exception – i.e.*, a failure to meet the guidelines (Begos Ex. 18). "Marginal credit (i.e. below average or substandard) generally requires additional mitigating factors to offset the additional risk associated with loans to borrowers with a history of

13

credit issues." (Homberger Aff., Ex. A, p. 4). Given Ms. Miller's OTI, Disposable Income, and LTV, there were, of course, no mitigating factors to offset the credit risk.

As important as the credit score itself, MLCC saw that Ms. Miller's credit reports showed "minimal outstanding debt" (Jones Tr. at 46-47). He conceded that "flags would be raised" when someone with such a history asked to borrow $6,200,000 (Jones Tr. at 48). This type of increase in borrowing is called *payment shock* (Homberger Aff., Ex. A, p. 7). Here, "The level of 'payment shock' is truly extraordinary. The borrower contemplated moving from a residence with a $145,000 mortgage to a new home with a $1,350,000 mortgage which then becomes a $7,500,000 obligation" (*id.* at 8).

Thus, in summary, by every underwriting measure, this $6,200,000 loan should not have been approved. Ms. Miller had insufficient income to make the required payments; the house would never be worth what MLCC proposed to lend to complete construction; and Ms. Miller's credit history showed that she had never before undertaken this level of debt. Yet MLCC approved this loan, and then, as we will now discuss, unilaterally increased it to $7,500,000.

**D.    The $7,500,000 Loan**

After MLCC's underwriter (Mr. Jones) and Senior Vice President (Mr. Smith), approved the $6,200,000 loan on or about November 17, 1999, Harvey Rosenblum, MLCC's lending officer, increased the loan amount to $7,500,000, even though he was not an underwriter and did not have that authority (Rosenblum Tr. at 56, 95, 98-101; *see also id.* at 112: "Q. So you couldn't say it was appropriate for MLCC to make a loan of $7.5 million instead of $6.2 million? A. Absolutely not").

Specifically, Mr. Rosenblum modified MLCC's Underwriting Worksheet. and the signed Approval Summary, to increase the loan amount (Begos Ex. 15, 18; Rosenblum Tr. at 102-03; 107).

14

Mr. Jones confirmed that these handwritten changes were not on the forms when he signed off on them, and he consequently did not underwrite or approve a $7,500,000 loan (Jones Tr. at 71, 83, 98, 104, 121-25). Mr. Jones agreed that the increase in the loan amount "substantially changed the loan being considered" (*id.* at 163-64). Mr. Smith, who also signed off on the underwriting, but who did not have a specific recollection of doing so, conceded that the documentation "heavily implies" that he approved only the $6,200,000 loan (Smith Tr. at 65). MLCC does not claim that any officer or underwriter approved the $7,500,000 loan, and Mr. Jones conceded there is no evidence that *anyone* with authority approved Mr. Rosenblum's changes (Jones Tr. at 165-66).

There is no evidence that MLCC told Ms. Miller about the increase in the loan amount from $6,200,000 to $7,500,000 at any time before the loan closed. MLCC does not claim, on its motion, that it disclosed that change (*see also*, McEnerney Tr. at 55-57). Moreover, when it increased the loan amount, MLCC also increased the pledge it required to $6,700,000 (Begos Ex. 17). MLCC did not tell Ms. Miller about this either.

Mr. Rosenblum's unilateral decision to increase the loan to $7,500,000 made the already bad numbers even worse:

| Calculation | $6,200,000 Loan | $7,500,000 Loan[3] |
|---|---|---|
| OTI (actual income) | 324% | 520% |
| Disposable Income (actual income) | - $38,000/month | - $51,572/month |
| LTV | 163% | 197% |

As with the $6,200,000 loan, however, MLCC attempted to make the loan appear better on paper than it actually was. Thus, for example, Mr. Rosenblum calculated an OTI of 100.4% (Begos

---

[3] *See* Homberger Dec., Ex. B, pp. 1-3.

15

Ex. 15; Rosenblum Tr. at 108, 113-14), using the same erroneous income calculations that Mr. Jones had used to approve the $6,200,000 loan. Even if this OTI had been correctly calculated, MLCC's guidelines prohibited an OTI greater than 50% (Hornberger Dec., Ex. B, p. 3).

Mr. Rosenblum also calculated a Disposable Income of **negative** $250 a month (Begos Ex. 15; Rosenblum Tr. at 108; Smith Tr. at 105-06). Thus, even Ms. Miller's artificially inflated hypothetical income would be insufficient to repay a $7,500,000 loan (Rosenblum Tr. at 109). Mr. Jones agreed that this disposable income was a problem, but, as discussed above, he was not given an opportunity to review the changed loan (Jones Tr. at 132-33).

Mr. Rosenblum calculated an LTV of 100%, without any indication as to how he reached that result. Because Mr. Jones conceded that his 100% LTV calculation was incorrect, Mr. Rosenblum's is necessarily incorrect as well.

Thus, MLCC knew that Ms. Miller had insufficient income to make the payments that would be required on a $6,200,000 loan, much less a $7,500,000 loan. It did not take long for Ms. Miller to run out of money. On August 10, 2000 – eight months after the loan closed – Mr. Falini advised Mr. Rosenblum that "the client has only enough funds for three more construction payments" (Rosenblum Tr. at 169-70). Mr. Rosenblum confirmed it was "an unusual development" for a client to run out of money that quickly (*id.*).

## 3.  Ms. Miller Would Not Have Taken The Loan if She Knew The Truth

Ms. Miller's parents had continually instilled in her the notion that she should never sell the Inherited Securities (Miller Aff., ¶ 4). She made clear to Mr. Falini, and she has reiterated in this action, that she did not want to do anything that would result in the sale of the Inherited Securities

16

(*id.*). She has confirmed that, if anyone told her that she would have to sell those Inherited Securities to make payments on the 1999 Loan, she would have refused the Loan (*id.* ¶ 7).

MLCC asserts that Ms. Miller went into this transaction with her eyes open. However, the evidence shows that MLCC did **not** tell Ms. Miller **any** of the key conclusions it reached about the loan. In fact, MLCC confirmed that it did not give any clients this information:

> Q.    But is it your view that the borrower needs to understand if the loan MLCC is considering would require the sale of assets in order to make the monthly payments?
>
> A.    Typically we don't share with the borrower the basis for our credit decision.
>
> Q.    Do you assume that the borrower knows how the loan is going to be repaid?
>
> A.    Borrowers generally do not care, if they're approved, what the criteria and considerations were in making that loan decision.

(Smith Tr. at 27).

Even the lending expert MLCC retained in this action cannot swallow Mr. Smith's approach to borrowers. He confirmed that "it wouldn't be appropriate to enter into a transaction that the borrower doesn't understand." (Keller Tr. at 64, Begos Dec., Ex. 8). He cotinued: "I can't imagine a situation where I would know a loan was going to go into default, and make the loan" (*id.*. at 68).

Moreover, Mr. Keller punctures MLCC's claim that Ms. Miller is necessarily sophisticated, due to her college education and large inheritance:

> Q.    In your experience, was there in dealing with the people that you dealt with a CitiGroup, was there a difference in the level of sophistication comparing the people who had just inherited ten million dollars or so, versus the bulk of the people you dealt with, these self-made multi-millionaires?
>
> MR. FRIEDMAN:    Objection. You can answer.
>
> A.    Yes
>
> Q.    Did you find yourself having to educate the people who had just inherited money, about how to manage their assets and liabilities?
>
> A.    We felt we were educating all of our clients all the time, yes.

17

> Q.    Did you find that there was specific information that you had to impart to the people who had just inherited a bunch of money that you tended not to have to give the people who made one hundred million dollars on their own?
>
> A.    Yes.

(Keller Tr. at 32-33).

Mr. Homberger stated: "[A]n objective review of the borrower's financial condition ... indicates that MLCC knew or should have known that Ms. Miller could not make the scheduled payments required by the loan. My analysis ... indicate[s] clear evidence of lending practices which are beyond the realm of standard industry lending practices and which are demonstrably unsound and predatory." (Homberger Dec., ¶ 5, Ex. A, p. 10). He went on to conclude:

> MLCC falsified Income, OTI, Disposable Income and Market Value in order to justify approving a loan which was based solely on the borrower's assets and which was never adequately disclosed or explained to Ms. Miller. This deception as to the terms of the loan which concealed the true nature of the obligation, the reliance on asset-based lending rather than the borrower's ability to repay the loan and the lack of voluntariness ... are all components of predatory origination, sales and servicing processes which inevitably resulted in catastrophic financial loss to the borrower which MLCC made no effort to mitigate.

(*id.* ¶ 6, Ex. B, p. 7).

## 4.    The Power of Attorney Was Invalid

The approval of a predatory loan that MLCC knew would end in default was, unfortunately, only the first act of its misconduct. When MLCC approved the loan in late November 1999, it committed to allow the loan to be closed at any time up to February 1, 2000, or even later (Stewart Dec., Ex. A, p.3; Rosenblum Tr. at 116-17, 121-22). Because Ms. Miller did not receive that letter, Ms. Miller did not know this expiration date.

Mr. Falini knew about it, however, and he also knew that Ms. Miller had plans to be out of the country from December 2, 1999 through the end of the year. The General Contractor had no bills that

18

needed to be paid before Ms. Miller returned from her trip (Brown Tr. at 122-24; Begos Ex. 11).

Therefore, there was no reason to close the loan while Ms. Miller was away (*see* Rosenblum Tr. at

121-22: the loan "did not have to close before the end of December 1999"). However, Mr. Falini

apparently saw things differently. He advised MLCC and Ms. Miller that the loan *had* to close before

the end of December 1999 (Miller Aff., ¶ 10; Rosenblum Tr. at 122-23).[4] MLCC advised Mr. Falini

that Ms. Miller would need to sign a power of attorney for the loan to close while Ms. Miller was

away (Rosenblum Tr. at 122).

MLCC claims that Ms. Miller appointed Barry Newman as her attorney-in-fact to execute the

loan documents. The evidence shows that it was Mr. Falini, not Ms. Miller, who contacted Mr.

Newman about the possibility of acting as Ms. Miller's attorney-in-fact, but only for purposes of

approving contractor invoices while Ms. Miller was out of the country (Newman Tr. at 18-19; Begos

Ex. 10). At the "closing" of the 1999 Loan, Mr. Newman though he was signing authorizations to

pay invoices; no one told him he was purportedly mortgaging Ms. Miller's property or pledging

securities (Newman Tr. at 35-47).

MLCC cannot dispute that the power of attorney Ms. Miller signed (Seifer Declaration, Ex.

C), was not sufficient to allow the 1999 Loan to close. Harvey Rosenblum testified: "I recall

receiving the first power of attorney, and I noticed that the box for mortgage-related items was

crossed off. And with an X in that box, to me that meant that it did not authorize the power of

attorney to execute mortgage documentation." (Rosenblum Tr. at 15, 27). Mr. Rosenblum relayed

---

[4] In his deposition, Mr. Falini attempted to assert that he advised Ms. Miller to close the loan as
quickly as possible because the interest rate on the loan was lower than the interest being charged on her
margin debt (Falini Tr. at 135). In reality, however, the loan had a higher interest rate; specifically, the initial
interest rate on the 1999 loan was 8.5% (Stewart Aff., Ex. C, p. MLCC 350), while MLPFS was charging
Ms. Miller 8.125% on the margin debt (*see* Begos Ex. 16, p. 13 of 48. 11/17 "margin interest" entry).

19

this conclusion to Mr. Falini (Rosenblum Tr. at 16-17). Mr. Falini confirms that he also faxed a copy of the power of attorney to MLCC's closing agent, Kevin Huben, who told him that it was "executed completely opposite the way it needed to be for the purpose of closing a loan" (Falini Tr. at 247).

Mr. Falini then "marked up" a copy of the power of attorney, and re-sent it to Mr. Huben (Falini Tr. at 251-52; Seifer Dec., Ex. D). The faxes from Mr. Falini to Mr. Huben (Seifer Dec., Exs. C, D), when compared to the "original" power of attorney that was recorded (*id.*, Ex. E), allow one to track the changes Mr. Falini made to the document Ms. Miller signed.

There is no dispute that the power of attorney that was recorded by MLCC's title agent contains significant alterations and additions made by someone other than Ms. Miller. A handwriting analysis performed by Dr. Marc Seifer, Ms. Miller's handwriting expert, confirms this (Seifer Dec., ¶3, Exs. A and B).Dennis Ryan, MLCC's handwriting expert, concluded that there were "indications or evidence to suggest that Miller ... did not write the questioned" text on the recorded power of attorney, but claimed that there was insufficient written material to reach a definitive conclusion (Begos Ex. 28, pp. 5-6).[5]

Dr. Seifer also compared the questioned writing on the recorded power of attorney with Mr. Falini's writing on his faxes to Mr. Huben, after Mr. Falini acknowledged the writing on the faxes to be his (Seifer Dec., Ex. B; Falini Tr. at 250-52). That comparison led to the conclusion that Mr. Falini wrote the questioned writing on the recorded power of attorney (Seifer Aff., ¶ 3, Ex. B).

---

[5] Significantly, based on the particular scale that Mr. Ryan used to express his conclusions, he considered and rejected conclusions that Ms. Miller *definitely* wrote the questioned writing on the recorded power of attorney, or that there was a *strong probability* she wrote it, or that that were *indications* she wrote it (Ryan Tr. at 157-58, Begos Ex. 9). He also considered and rejected the possibility of stating that he could not reach any conclusion at all regarding the author of the question writing (*id.* at 158-59). Instead, he concluded that there were indications that someone other than Ms. Miller wrote the questioned writing (*id.*).

MLCC's expert has not disagreed with that conclusion. Mr. Falini, nonetheless, has testified, under oath, that he never saw the original power of attorney (Falini Tr. 246); therefore, Mr. Falini's credibility is suspect.[6]

As discussed at length in Ms. Miller's summary judgment brief, even if the power of attorney, as altered by Mr. Falini, was present at the closing, and even if it authorized Mr. Newman to sign the note and mortgage on Ms. Miller's behalf (which it did not), it expressly, and clearly, withheld authority for anyone to pledge Ms. Miller's securities. Nonetheless, MLCC had Mr. Newman sign a Pledge Agreement at the closing purporting to do exactly that.

**5.    Merrill Lynch Continued to Act Improperly and Deceptively After the Loan Closed**

Mr. Falini made every effort to insulate Ms. Miller from knowledge about interest payments that were being made on the 1999 Loan. On December 8, 1999 – the day after the Loan "closed" – Mr. Falini wrote to Mr. Rosenblum: "Please inform me as to how we can set up procedure to wire $$ from [account no.] 32512 to MLCC for Miller loan" (Begos Ex. 24, pp. 145-46). Mr. Rosenblum testified that it was common for MLPFS brokers to make arrangements to wire money from clients' accounts directly to MLCC, without the clients' involvement (Rosenblum Tr. at 159). Mr. Falini continued to write emails to MLCC about making the monthly payments directly, and told MLCC: *I do not want to get behind on this. There are many moving parts which I need to juggle.*" (Begos Ex. 24, p. 142; emphasis added).

---

[6] There is also a question of fact as to whether the original (altered) power of attorney ever made it to the closing. Barry Newman, the alleged attorney-in-fact, testified that the original power of attorney was not at the closing, and that, in fact, he *never* saw the power of attorney (Newman Tr. at 37). Mr. Falini testified that MLCC's closing agent told him it had not arrived in time (Falini Tr. at 262). Mr. Rosenblum testified that, if the power of attorney was not at the closing, the loan should not have closed (Rosenblum Tr. at 39).

Mr. Falini did quite a bit of juggling. The payments on the 1999 Loan were made, by him, directly from Ms. Miller's accounts at MLPFS, and he often needed to move funds around to cover the monthly payments (Falini Tr. at 317-18). More ominously, within months, Mr. Falini was forced to borrow money (on margin), to make the interest payments due on the loan (Begos Ex. 20). Mr. Falini's successor at MLPFS confirmed that Ms. Miller "has not once paid the loan out of any source but [her MLPFS accounts]" (McEnerney Tr. at 153; Begos Ex. 21).

By August 2000 – eight months after the loan "closed" – Mr. Falini advised Mr. Rosenblum that Ms. Miller would run out of money in three months, and he asked MLCC about refinancing (Rosenblum Tr. at 170, 175-76). Remarkably – given MLCC's lack of concern with Ms. Miller's actual income when it underwrote the 1999 loan – its response was to say that it needed "a statement of cash flow and earnings" to even consider a refinance (Rosenblum Tr. at 177-78). Ms. Miller again asked MLCC to refinance the loan in 2001, this time for only $5 million. Again MLCC rejected the request, citing problems with Ms. Miller's Credit, and the fact that "[her] income is insufficient to sustain payments of the amount of credit requested." (Begos Ex. 19; *see also* Homberger Dec., Ex. A, p. 6).

MLCC rejected both attempts to refinance even though it conceded that there was no indication that Ms. Miller's cash flow and earnings had changed from 1999 to 2001 (McEnerney Tr. at 219). Mr. Homberger described MLCC's refusal to finance without proof of income as follows:

> I cannot reconcile the fact that MLCC approved and closed this loan in the amount of $7,500,000 in December 1999 and subsequently declined an application to refinance this debt in 2001 for $5,000,000 due to insufficient income and credit history. As Ms. Miller's income and credit history did not appear to materially change from 1999 to 2001, either the initial loan should not have been made or the subsequent refinance should have been approved.

22

(Homberger Aff., Ex. A, p. 9; *see also*, McEnerney Tr. at 216-17: "there was ... no reasonable prospect of the client repaying the debt[;] ... **the client had no income to support any sort of restructuring of the loan**"[emphasis added]).

In 2000, MLCC changed the way it handled withdrawals from the so-called "pledge account." Prior to the change, MLCC allowed withdrawals as long as the balance in the account was at least $5,678,000. After the change, MLCC prohibited withdrawals unless the balance exceeded $6,711,000 (McEnerney Tr. at 113-117). By April 2002, MLCC understood that "all the money [Ms. Miller] had in the world was in that pledge account." (*id.* at 155-57). Nonetheless, MLCC refused to allow Ms. Miller to use the pledge account to make the monthly payments on the loan, thereby making a default inevitable (*id..* at 178-79, 196).

Additionally, in May 2002, MLCC "mistakenly" liquidated all of the securities in the so-called "pledge account," and, upon realizing the mistake, it "reversed" the liquidation (McEnerney Tr. at 76-78). Most significantly, MLCC arranged with MLPFS that the "mistaken" liquidation did not show up on Ms. Miller's monthly statement for the pledge account (Begos Exs. 22, 23).

Finally, in 2003, MLCC again liquidated the Inherited Securities in the pledge account, and, this time, did not reverse the liquidation. This liquidation caused Ms. Miller in excess of $1,500,000 in damages (DePanfilis Declaration, ¶ 3).

## ARGUMENT

## I.    MLCC IS NOT ENTITLED TO JUDGMENT ON ITS CLAIMS

### A.    The Loan Documents Are Not Binding on Ms. Miller

MLCC's assertion that it "is the owner of the Mortgage and Note" (MLCC Br. at 14), assumes that the Mortgage and Note are valid. However, as set forth in Ms. Miller's Motion for Summary

23

Judgment, and above, Barry Newman, the alleged attorney-in-fact, did not have authority to bind Ms. Miller to those documents.

Because MLCC is relying on Mr. Newman's agency in its counterclaims, MLCC has the burden of proving that an agency relationship existed and that Mr. Newman's authority extended to entering into the 1999 Loan. *Botticello v. Stefanovicz* ,177 Conn. 22, 26, 411 A.2d 16, 19 (1979); *City of West Haven v. U. S. Fidelity & Guaranty Co.*, 174 Conn. 392, 395-396, 389 A.2d 741, 744 (1978). MLCC cannot establish, on this record, that Mr. Newman was Ms. Miller's agent authorized to sign the loan documents.

### B.    Ms. Miller Did Not Ratify the Loan Documents

MLCC claims that, by signing the Modification Agreement in 2001, Ms. Miller ratified the invalid loan documents (MLCC Br. at 17). The very cases MLCC cites confirm that it cannot prove ratification on this record.

"Ratification requires 'acceptance of the results of the act with an *intent* to ratify, and with *full knowledge of all the material circumstances*." *Russell v. Dean Witter Reynolds, Inc.*, 200 Conn. 172, 185, 510 A.2d 972, 979 (1986) (emphasis in original). The existence of a ratification is a question of fact because "ratification in a given case depends ultimately upon the intention with which the act or acts, from which ratification is claimed, were done, and [because] intention is a mental fact[.]" *Bridgeport Comm. Collaborative v. Ganim*, 241 Conn. 546, 562 (1997).

In *Russell*, the Supreme Court specifically approved a jury instruction stating that, before a party can be found to have ratified a transaction, "it is essential that [he] ... was given an opportunity to repudiate [the] transaction ... without any cost ... or damage ... as a result of the unauthorized

24

transaction if he chose to repudiate it." 200 Conn. at 185-86, 510 A.2d at 980. The Court explained

the basis for this instruction:

> [I]t served ... to clarify the requirement that the jury may find that a party ratified a transaction only if the jury finds an intent to ratify it. ... The challenged instructions cautioned the jurors that **they could not permissibly infer such an intent from the plaintiff's inaction if he lacked the ability by his action to undo the disputed transaction.** We have emphasized in the past that the finding of a free and informed decision to ratify is a prerequisite to a finding of ratification.

*Id.* (emphasis added). *See also DiMartino v. City of Hartford,* 636 F. Supp 1241, 1252 (D. Conn.

1986) (MLCC Br. at 18) (ratification requires "an opportunity ... to annul or void" the agreement).

MLCC does not claim that it informed Ms. Miller of the invalidity of the 1999 Loan

Documents, much less told her she could *undo* the 1999 loan without cost or damage to her. Even

today, MLCC is unwilling to allow Ms. Miller to undo the transaction without cost; it has collected

almost $2,000,000 in interest, yet it wants more; it is demanding $1,000,000 in attorneys' fees; and

it has refused to reverse the devastating effect of its liquidation of the pledge account.

In any event, the 2001 "Modification Agreement," on which MLCC bases its ratification

argument, does not support its claim. MLCC claims that it was entered into "solely for Miller's

benefit." (MLCC Br. at 11). That is completely untrue, as Ms. Miller received absolutely no

consideration for signing that agreement. The Modification Agreement stated that interest (and no

principal) would be payable on the loan each month for ten years, with amortizing payments

thereafter, and that the interest rate could change each month, with the amount of the payments

"determined precisely in the manner stated in the [1999] Note" (Stewart Aff., Ex. F, p. 358). This

is precisely what the 1999 Note provided (Stewart Aff., Ex. C, §§ 2, 3).[7]

---

[7] The evidence also shows that, despite the fact that the original Note provided the mechanism for
(continued...)

The notion that MLCC can insist that a borrower sign an "Agreement" that does not require MLCC to do anything it was not already obligated to do, and then rely on a term hidden in that agreement to claim a ratification of an invalid loan transaction is outrageous. *New England Rock Services, Inc. v. Empire Paving, Inc.*, 53 Conn. App. 771, 776, 731 A.2d 784, 787, *cert. denied*, 250 Conn. 921 (1999) ("A promise to do that which one is already bound by the contract to do is insufficient consideration to support enforcement of an additional term by the other party to the contract"). MLCC has not cited any law suggesting that ratification should, or even can, be found in these circumstances. As discussed below, this is part of its pattern of unfair and deceptive conduct.

## C.    The Loan Is Unconscionable

Even if Ms. Miller "ratified" the loan documents (which she did not), the loan transaction itself is unconscionable, and therefore unenforceable.

"The question of unconscionability is a matter of law to be decided by the court based on all the facts and circumstances of the case." *Cheshire Mortg. Service, Inc. v. Montes*, 223 Conn. 80, 87-88, 612 A.2d 1130,1135 (1992). *Cheshire* continued, stating: "the basic test is whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract. *The determination of unconscionability is to be made on a case-by-case basis, taking into account all of the relevant facts and circumstances.*" 223 Conn. at 88-89, 612 A.2d at 1135 (citations omitted; emphasis added).

---

[7](...continued)
calculating the interest rate, and the Modification Agreement adopted the identical mechanism, MLCC mistakenly told Ms. Miller, around January 2001, that it would use a different formula to calculate interest (McEnerney Tr. at 145-151). MLCC ultimately agreed to calculate interest using the formula that yielded the lower rate on the loan, notwithstanding what the Note and Modification Agreement provided (*id.*).

"There are two elements of unconscionability: unfair surprise and oppression. The element of unfair surprise has frequently been termed ... 'procedural unconscionability' and is implicated by bargaining improprieties in the contract formation process. The element of oppression has been termed 'substantive unconscionability' and is implicated by overly harsh contract terms." *Emlee Equip. Leasing Corp. v. Waterbury Trans., Inc.*, 31 Conn. App. 455, 463, 626 A.2d 307 (1993).

Given the nature of the doctrine, it is not possible to list specific procedural improprieties or contract terms that are necessary or sufficient to find a transaction unconscionable. A review of cases applying the doctrine to mortgage transactions, however, provides guidance as to the characteristics that render a loan unconscionable. These cases confirm that Ms. Miller's unconscionability defense is more than supported by the evidence, and that MLCC is not entitled to summary judgment.

In *Family Fin. Services, Inc. v. Spencer*, 41 Conn. App. 754, 763-64, 677 A.2d 479, 485 (1996), "the trial court properly determined that this transaction was procedurally unconscionable" under the following circumstances:

> (1) the defendant had a limited knowledge of the English language, was uneducated and did not read very well; (2) *the defendant's financial situation made it apparent that she could not reasonably expect to repay the second mortgage*; (3) *at the closing, the defendant was not represented by an attorney* and was rushed by the plaintiff's attorney to sign the documents; (4) *the defendant was not informed until the last moment* that, as a condition of credit, she was required to pay one year's interest in advance; and (5) there was an absence of meaningful choice on the part of the defendant. Finally, in determining unconscionability, the court also took into account the fact that *the plaintiff failed to disclose* to the defendant that the real lenders in this transaction were the Masottas [emphasis added].

*Family Financial* also found that the transaction was substantively unconscionable because:

> [T]he *defendant's monthly income was $ 1126.67 and ... she owed $ 1011 monthly to People's Bank on her first mortgage*. On the basis of those findings, the trial court concluded that *it was obvious that the defendant would not be able to make the*

27

***required balloon payment*** at the end of the year. Finally, the trial court found that the defendant lacked a reasonable opportunity to understand the terms of the contract.

*Id.* 41 Conn. App. at 764, 677 A.2d at 485 (emphasis added).

In *Monetary Funding Group, Inc. v. Pluchino*, 2003 WL 22133826, *6 (Conn. Super., Sep. 3, 2003), *aff'd*, 87 Conn. App. 401, 867 A.2d 841 (2005), the Court found that a mortgage transaction was unconscionable under the following circumstances:

> [T]he defendant was unsophisticated and ***unrepresented by legal counsel***; he was ***financially unable to comply with the terms of the $ 25,000 note and this fact was known by the plaintiff when the loan was extended***; he was misled about the total, up-front expenses of the transaction, believing that they would be between the $ 4,000 and $ 5,000 estimate as represented by the plaintiff; ***he was not informed*** until the second closing that the loan amount would increase from $ 25,000 to $ 80,000; and ***he was not informed*** about the additional fees and expenses associated with the refinancing until he attended this closing. ***The transaction was unreasonably designed to benefit the plaintiff and created an absence of meaningful choice on the part of the defendant*** [emphasis added].

In *Ocwen Federal Bank v. Rivas*, 2002 WL 442099, *8 (Conn. Super. Feb. 21, 2002), the court denied a motion to strike an unconscionability defense which asserted that:

> the lender, by knowingly making false representations, induced the defendants to ***execute the loan documents "on terms that were not fair, reasonable, nor fully disclosed and transmitted in writing to them***, nor in a manner that could be reasonably understood by them." (Para. 29.) The defendants also allege that the lender knew that they were unsophisticated lay persons (Paras. 16-17), and that the mortgage note contained a balloon payment that they did not understand or appreciate (Paras. 23-26) [emphasis added].

*Cheshire Mortg. Service, Inc. v. Montes, supra*, which upheld a finding that the loan in question was *not* unconscionable, also provides guidance as to what will prove unconscionability:

> The defendants argue that because of their illiteracy in English and their ***lack of business acumen***, the terms of the mortgages unfairly surprised them and that, therefore, there was a "lack of voluntariness" in the transactions. The defendants bolster this claim by the fact that they were ***unrepresented by counsel*** in both loan transactions. They contend, moreover, that ***they did not know*** that they would have to pay off the prior liens

28

on their home in order to obtain the November, 1987 mortgage loan. *Were the defendants' arguments based upon favorable factual findings, they might well have prevailed on appeal.* Their assertions, however, are contrary to the facts found by the trial court.

223 Conn. at 89-90, 612 A.2d at 1135-36 (emphasis added). The Court then found that the

transaction was not substantively unconscionable because, *inter alia*: "the trial court did not find

either that the plaintiff believed that the defendants would fail to make their mortgage payments, or

that the plaintiff intended simply to reap the defendants' equity in the home by making a loan to

them that the plaintiff knew they could not repay." 223 Conn. at 92, 612 A.2d at 1137.

In *Maxwell v. Fairbanks Capital Corp.*, 281 Bankr. 101, 131 (Bankr. D. Mass. 2002), the court

found a mortgage transaction unconscionable under the following circumstances:

> *[T]he Debtor would not have entered into the 1991 transaction had she been fully cognizant of its ramifications.* More importantly, *no fair lender would have accepted a loan requiring virtually 100% of the incomes of the co-obligors to satisfy the monthly payments.* Additionally, in this case, there was no allocation of risk based on "superior bargaining power." The Debtor appears to have been powerless and assumed all the risk; *ITT assumed no risk. If the Debtor made her monthly payments and the balloon payment, it would greatly benefit from the high interest rate it charged. If the Debtor defaulted, it could foreclose on her home and recoup its money that way* [emphasis added, citations omitted].

These cases demonstrate that the following factors will support a finding of unconscionability:

- ▸ The lender knows, or should have known, before the loan is funded that the borrower will not be able to comply with the terms of the loan.

- ▸ Key provisions of the loan transaction are not disclosed to the borrower, or are "minimized by deceptive ... practices[.]" *Cheshire*, 223 Conn. at 117, 612 A.2d at 1149 (Berdon, dissenting).

- ▸ The lender does not assume any risk in the transaction, but passes substantially all of the risk of default onto the borrower.

- ▸ The terms of the loan, taken as a whole, are not fair and reasonable.

All of these factors are present in this case. MLCC confirmed that Ms. Miller could not make

the payments required on the loan, yet falsified her Income, OTI and Disposable Income to make it

29

look like she could (Homberger Dec., Ex. B, p. 7). MLCC kept Ms. Miller in the dark about virtually every aspect of the loan transaction. Among other things, MLCC did not tell her: how much of a pledge it was requiring; that it had increased the loan from $6,200,000 to $7,500,000; and that it was not going to pay off $2,000,000 in margin debt that was supposed to be retired. Thus, where Ms. Miller sought to have, at most, $6,200,000 in debt, MLCC left her with $9,500,000 in debt.

Additionally, Ms. Miller's lending expert has confirmed that MLCC passed all, or substantially all, of the risk of the loan to Ms. Miller; and (iii) the loan was a transaction that no person in her senses and not under a delusion would make, and no honest and fair person would accept (Homberger Aff., ¶ 7, pp. 5-6).

MLCC premises its entire argument against Ms. Miller's unconscionability claim on the existence of the 1997 Loan, and the fact that Ms. Miller allegedly knew that a pledge would be required for the 1999 Loan. The 1997 Loan cannot provide a defense, because there is no evidence that the 1997 Loan suffered from the same defects as the 1999 Loan. For instance, there is no evidence that Ms. Miller could not afford the payments on the 1997 loan (and she in fact made those payments), that the value of the house would not support the loan amount (the evidence shows it was worth more), or that Mr. Falini forced the loan to close while Ms. Miller was away, using a forged power of attorney.

Additionally, MLCC required a pledge of only $600,000 for the 1997 Loan (Kamhi Aff., Ex. 1), and required $6,000,000 more for the 1999 Loan. There is no evidence that the size of the 1997 pledge was withheld from Ms. Miller, in contrast to the 1999 Loan. Thus, MLCC's argument regarding the 1997 loan essentially asks the Court to conclude that, having once made a reasonable

30

loan to Ms. Miller that required a pledge, MLCC is forever insulated from liability for making an unconscionable loan. The argument is meritless.[8]

In sum, having chosen to make an unconscionable loan that it knew Ms. Miller could not repay, MLCC is precluded from attempting to recoup that money. "It does not seem too much to say that one who voluntarily extends credit by disregarding a known risk, or risks which could be discovered by a reasonable effort, should bear the loss when loss occurs." *Cheshire*, 223 Conn. at 121, 612 A.2d at 1151 (Berdon, J., dissenting).

### D.    Ms. Miller Did Not Waive Her Defenses

MLCC claims that the Modification Agreement compels the Court to reject Ms. Miller's defenses to MLCC's counterclaims. However, a waiver-of-defense clause "in consumer-goods-conditional-sales contracts, chattel mortgages and other instruments of like character is void as against public policy." *Fairfield Credit Corp. v. Donnelly*, 158 Conn. 543, 550, 264 A.2d 547, 549 (1969). The Court continued: "There can be no question that there exists in Connecticut a very strong public policy in favor of protecting purchasers of consumer goods and that for a court to enforce a waiver of defense clause in a consumer-goods transaction would be contrary to that policy." 158 Conn. at 551, 264 A.2d at 551. The same rationale is applicable to a consumer real-property mortgage transaction. *See Cheshire Mortg. Service, Inc. v. Montes*, 223 Conn. at 88, 612 A.2d at 1135 ("Uniform Commercial Code which, although formally limited to transactions involving personal property, furnishes a useful guide for real property transactions").

Even if a waiver were enforceable in a consumer transaction, MLCC cannot establish one here.

---

[8] MLCC also argues that Ms. Miller cannot avoid being imputed with knowledge of the information in documents she signed (MLCC Br. at 22-23). But MLCC does not point to a single document Ms. Miller signed that disclosed the amount of the pledge MLCC was requiring.

31

> Waiver involves the "intentional relinquishment of a known right." *Jenkins v. Indemnity Ins. Co.*, 152 Conn. 249, 257, 205 A.2d 780 (1964). There cannot be a finding of waiver unless the party has "both knowledge of the existence of the right and intention to relinquish it." *Breen v. Aetna Casualty & Surety Co.*, 153 Conn. 633, 645, 220 A.2d 254 (1966).

*National Casualty Ins. Co. v. Stella*, 26 Conn. App. 462, 464, 601 A.2d 557 (1992).

MLCC does not submit any evidence to support a claim that, when Ms. Miller signed the Modification Agreement, she was aware of the MLCC's deceptive conduct in making the 1999 Loan, or that she was aware of her right to attempt to undo the transaction. As the case law clearly holds, absent knowledge of the existence the defects in the 1999 Loan, Ms. Miller could not have waived her claims.

Even if she had knowledge when she signed the Modification Agreement, MLCC did not give Ms. Miller any consideration for entering into it, thereby making it unenforceable. *State Nat. Bank of Connecticut v. Dick*, 164 Conn. 523, 529, 325 A.2d 235, 238 (1973), ruled that a borrower could not enforce an alleged agreement to extend the payment terms of an existing mortgage loan, because the borrower did not give any consideration for the extension: "It is also basic contract law that any agreement extending the time of payment of a loan must be supported by valid consideration and requires the debtor to do, or to promise to do, something further or different from that which he is already bound to do." *See also, New England Rock Services, Inc. v. Empire Paving, Inc., supra*, 53 Conn. App. at 776, 731 A.2d at 787 ("A promise to do that which one is already bound by the contract to do is insufficient consideration to support enforcement of an additional term by the other party to the contract").

MLCC does not provide any evidence that it gave Ms. Miller anything of value that it was not already obligated to give. The term and amortization specified in the Modification Agreement were

32

the same are the original note, and the interest rate was to be calculated exactly as the original note provided.

Even if MLCC were able to argue that it provided some peppercorn of consideration to Ms. Miller, the unconscionability that infects the original 1999 loan transaction was equally present, if not more so, when it insisted that Ms. Miller sign the Modification Agreement. To allow a lender to avoid the consequences of an unconscionable loan by persuading the borrower, who the lender already has mistreated, to sign an agreement waiving her rights, makes the whole transaction that much more unreasonable and unconscionable. It is not as if MLCC, in the Modification Agreement, reduced the monthly payments on the loan, or reduced the principal balance, or gave up some security, or did anything to relieve Ms. Miller from the unreasonable burdens of the 1999 Loan. It appears to have acted solely to shift even *more* risk onto Ms. Miller.

### E.    MLCC's Unclean Hands Preclude Summary Judgment

> [A]n action to foreclose a mortgage is an equitable proceeding. It is a fundamental principle of equity jurisprudence that for a complainant to show that he is entitled to the benefit of equity he must establish that he comes into court with clean hands. The clean hands doctrine is applied not for the protection of the parties but for the protection of the court.

*Thompson v. Orcutt*, 257 Conn. 301, 310, 777 A.2d 670, 676-77 (2001) (internal quotes, citations and ellipses omitted). In *Monetary Funding Group, Inc. v. Pluchino, supra*, 87 Conn. App. at 410, 867 A.2d at 848, the Appellate Court affirmed a finding that the lender's unclean hands precluded foreclosure "where the borrower was unsophisticated, was misled and was unquestionably unable to comply with the terms of the note[.]" That holding is directly applicable here.

33

**F.    Plaintiff's Claims Preclude Summary Judgment**

MLCC's claims against Ms. Miller are asserted as counterclaims to Ms. Miller's complaint.

Accordingly, Ms. Miller asserted, in reply to MLCC's counterclaims, the defense that "[t]he

Counterclaims are barred, in whole or in part, by plaintiff's rights of setoff and recoupment." (Reply,

Fifth Defense). The gravamen of this defense is that, while Ms. Miller's claims against MLCC

remain pending, MLCC should not be able to obtain, and enforce, a judgment on its counterclaims.

The law on this subject is clear.

> Traditionally, the distinction between a setoff and a counterclaim centers around
> whether the claim arises from the same transaction described in the complaint. If the
> claim involves a debt which is mutual and liquidated, even though it arises from separate
> transactions, it is characterized as a setoff. If the claim arises out of the same transaction
> described in the complaint, it is characterized as a counterclaim. The title of the pleading
> is not controlling. The issue is, rather, whether sufficient facts are pleaded that would
> allow recovery either as a setoff or as a counterclaim.

*225 Assoc. v. Conn. Housing Fin. Auth.*, 65 Conn. App. 112, 121, 782 A.2d 189, 195 (2001). Ms.

Miller already had claims pending against MLCC arising out of the same transaction as described

in the counterclaims. There was no need for Ms. Miller to re-assert those claims as "counterclaims"

to MLCC's counterclaims. Ms. Miller's Fifth Defense, therefore, merely alerted MLCC, and the

Court, to the fact that Ms. Miller's claims arose "out of the same transaction described in" MLCC's

counterclaims, and therefore needed to be addressed before MLCC could obtain a judgment on its

counterclaims.

**II.    PLAINTIFF'S CONVERSION CLAIM IS VALID AND TIMELY**

"Conversion is usually defined to be an unauthorized assumption and exercise of the right of

ownership over goods belonging to another, *to the exclusion of the owner's rights*." *Falker v.*

*Samperi,* 190 Conn. 412, 419, 461 A.2d 681, 685 (1983) (internal quotes omitted).

34

MLCC's statute of limitations defense "is an affirmative defense, which the defendant must prove by a preponderance of the evidence" *State v. Aloi*, 86 Conn. App. 363, 380, 861 A.2d 1180, 1190 (2004). *cert granted*, 273 Conn. 901 (2005). Thus, MLCC must demonstrate that there are no genuine issues of material fact regarding the date Ms. Miller's claim accrued. This it cannot do.

Ms. Miller's conversion claim did not accrue, for statute of limitations purposes, until MLCC excluded Ms. Miller from **all** of Ms. Miller's rights to the pledged securities. *Falker, supra.* As the evidence MLCC submitted in support of its motion shows, when the 1999 Loan closed, the pledged securities were placed in an MLPFS account *in Ms. Miller's name* (Kamhi Aff., Ex. 2). The Pledge Agreement permitted Ms. Miller to withdraw cash or securities from the account, so long as the balance did not fall below a "Minimum Amount;" and it permitted Ms. Miller "without the consent of MLCC," to "buy or sell, any securities in the Account at any time," so long as the value of the securities did not fall below a "Liquidation Value" (Stewart Aff., Ex. D, § 5(b)).

More importantly, from the inception of the pledge until some time "around April of 2000," Ms. Miller and Mr. Falini had the ability to withdraw funds in the account in excess of the Liquidation Value (McEnerney Tr. at 112-117). Before MLCC made this change – whenever the date of the change was – Ms. Miller retained substantial rights to the Inherited Securities in the pledge account. For example, Ms. Kamhi has stated that she was able to arrange withdrawals of almost $700,000 from the pledge account in 2001 (Kamhi Aff., ¶ 9).

In sum, MLCC's conversion occurred in 2003, when MLCC liquidated the assets in the account. Ms. Miller's damages expert, Ralph DePanfilis, has calculated that the liquidation resulted in liability for capital gains taxes and commissions charged by MLPFS, as well as "lost opportunity

35

cost," in excess of $1,500,000 (DePanfilis Dec., ¶ 3). As the price of the stocks that MLCC liquidated has grown since 2003, Ms. Miller's damages today are significantly higher.

With that background, MLCC's timeliness argument must fail. MLCC bases its claim on the unsupported and conclusory assertion that "[f]or statute of limitations purposes, the act or omission complained of in this case is MLCC's acceptance of the POA with its alleged defects" (MLCC Br. at 28). MLCC has not attempted to establish that, when it accepted the power of attorney, it exercised the right of ownership over the pledged assets, *to the exclusion of Ms. Miller's rights. Falker, supra.* Therefore, there is no basis to find the conversion claim untimely.

MLCC's argument that the conversion claim is otherwise defective is based entirely on the notion that the Modification Agreement ratified the defective pledge agreement and waived Ms. Miller's claim (MLCC Br. at 31-33). The discussions of ratification and waiver (*see* Points I.B and I.D, *supra*) are entirely applicable here. However, there is a separate reason why MLCC's assertion is particularly meritless with respect to the conversion claim: There is nothing in the Modification Agreement purporting to ratify the Pledge Agreement, or to waive Ms. Miller's rights arising out of the invalidity of that agreement (Stewart Aff., Ex. F).

## III.   PLAINTIFF'S CUTPA CLAIMS ARE VALID AND TIMELY

There can be little question that, because Ms. Miller's unconscionability and unclean hands defenses remain valid, Ms. Miller's CUTPA claims must survive summary judgment: "In the present case, the court determined that the plaintiff acted with unclean hands and engaged in an unconscionable transaction. The conduct of the plaintiff, therefore, was unfair, oppressive and unscrupulous, and constituted a violation of CUTPA." *Monetary Funding Corp. v. Pluchino, supra,* 87 Conn. App. at 413, 867 A.2d at 850.

36

MLCC argues that it is entitled to summary judgment because Ms. Miller cannot demonstrate that the injury she suffered could not reasonably have been avoided (MLCC Br. at 33-34). That argument is flawed as a matter of law, as it suggests that a failure to establish any one of the three elements of the "cigarette rule" is fatal to a CUTPA claim. *See A-G Foods, Inc. v. Pepperidge Farm, Inc.* 216 Conn. 200, 217, 579 A.2d 69 (1990) (plaintiff's ability to avoid harm relevant only to third element of cigarette rule). As *Monetary Funding*, 87 Conn. App. at 413, 867 A.2d at 849-50, confirmed: "our Supreme Court has stated that '[a]ll three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three' [*citing Journal Publishing Co. v. Hartford Courant Co.*, 261 Conn. 673, 695-96, 804 A.2d 823 (2002)]."

MLCC's argument that Ms. Miller's CUTPA claims are untimely must also be rejected, because MLCC engaged in a continuing course of misconduct from December 1999 until at least 2003. *Fichera v. Mine Hill Corp.*, 207 Conn. 204, 208, 541 A.2d 472 (1988) ("when the wrong sued upon consists of a continuing course of conduct, the statute does not begin to run until that course of conduct is completed [internal quotes omitted]").

"The doctrine is particularly suited to claims where the situation keeps evolving after the act complained of is complete[.]" *Sanborn v. Greenwald,* 39 Conn. App. 289, 297-98, 664 A .2d 803, *cert. denied*, 235 Conn. 925, 666 A.2d 1186 (1995) (internal quotes omitted). As the Supreme Court explained in *Blanchette v. Barrett*, 229 Conn. 256, 275, 640 A.2d 74, 84 (1994):

> [I]n order to support a finding of a continuing course of conduct that may toll the statute of limitations there must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto. ...  Where we have upheld a finding that a duty continued to exist after the cessation of the act or omission relied upon, there has been evidence of either a special relationship between the parties giving

37

rise to such a continuing duty **or some later wrongful conduct of a defendant related to the prior act**. (emphasis added).

The Court went on to explain that the doctrine is "conspicuously fact-bound." *Id.*

Here, MLCC engaged in significant misconduct after December 1999 that was related to its

misconduct in underwriting and making the 1999 Loan:

- ▸ MLCC "liquidated" Ms. Miller's pledged assets in 2000, and then, "reversed" the liquidation, in such a manner that there was no indication that the sale and repurchase of millions of dollars of securities had ever taken place.

- ▸ MLCC refused to refinance the loan in 2000, and again in 2001, for a lower principal amount, because Ms. Miller lacked income to make the payments, even though her income had not materially changed after December 1999.

- ▸ MLCC insisted on having Ms. Miller execute a "modification agreement" in January 2001, when there was no need for any modification, and where Ms. Miller received no benefit from doing so. MLCC did not disclose to Ms. Miller the unconscionable nature of its lending decision before it asked her to execute the agreement, and it did not give her an opportunity to undo the 1999 Loan without cost to her.

- ▸ MLCC again liquidated the pledged assets in 2003, and kept the cash proceeds in the pledge account, earning substantially less interest than it has been charging Ms. Miller on the principal balance of the 1999 loan.

Because of MLCC's continuing course of unfair and deceptive conduct, Ms. Miller's CUTPA

claims are timely. At the very least, questions of fact about the existence of a continuing course of

conduct preclude summary judgment.

38

## CONCLUSION

For the reasons set forth in Ms. Miller's summary judgment motion, and above, MLCC's

motion should be denied.

BEGOS & HORGAN, LLP

By:_____
      Patrick W. Begos (ct 19090)
      Christopher G. Brown (ct18216)
Attorneys for Plaintiff
327 Riverside Avenue
Westport, CT 06880
(203) 226-9990
(203) 222-4833 (fax)
Email:     pwb@begoshorgan.com
           cgb@begoshorgan.com

39

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was served via Federal Express overnight delivery, on June 24, 2005 on:

Douglas C. Conroy, Esq.
Paul, Hastings, Janofsky & Walker, LLP
1055 Washington Boulevard
Stamford, CT 06901-2217

Jonathan S. Bowman, Esq.
Cohen & Wolf
1115 Broad Street
Bridgeport, CT 06604

Patrick W. Begos