UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------------------------------x
JULIE DILLON RIPLEY MILLER,  :

            Plaintiff,  :  Case No.03-CV-1016 (RNC)(DFM)

      – against –  :  June 24, 2005

MERRILL LYNCH CREDIT CORPORATION,  :

            Defendant.  :
---------------------------------------------------------------x

**DECLARATION OF RICHARD J. HOMBERGER**

RICHARD J. HOMBERGER declares the following to be true under penalty of perjury:

1.    I have been retained by counsel for plaintiff, Julie Miller, to analyze and testify regarding the circumstances surrounding the mortgage loan made by Merrill Lynch Credit Corp. ("MLCC" to Ms. Miller in December 1999. True copies of my report, dated November 26, 2003, and my supplemental report, dated January 27, 2005, are annexed hereto as Exhibits A and B, respectively. My background, experience and qualifications are set forth in my *curriculum vitae*, which is annexed to my original report, Exhibit A.

2.    I prepared my original report before MLCC produced its underwriting manual; my supplemental report addresses additional conclusions I reached following my review of that underwriting manual. These reports reflect the information I reviewed, the analyses I performed, and the conclusions I reached regarding the loan at issue. I respectfully incorporate these reports by reference in this Declaration, in their entirety.

3.    A couple of conclusions bear emphasizing.

4.    MLCC's decision to allow Jay Falini, Ms. Miller's financial consultant at Merrill Lynch, Pierce, Fenner & Smith ("MLPFS"), to restrict contact between MLCC and Ms. Miller amounted

to a significant deficiency in the processing and underwriting of the loan. As I stated in my report (Ex. A, p. 9):

> [Mr. Falini] emphatically restricted all contact between MLCC and the borrower. This is a "red flag" to most loan processors and underwriters. In my experience, no lender would tolerate a commissioned sales consultant issuing a directive not to contact the borrower during processing. It is the lender's responsibility to know its customer; to do otherwise is to potentially open the door to fraud. I am not sure from my review of this file that Ms. Miller received any correspondence or relevant information regarding the terms of this loan from the date she signed the MLCC application through the closing of the loan in her absence.

5.    After my review of pertinent documents, I reached the following conclusions regarding the underwriting process (Ex. A, pp. 9-10), which I will repeat here in its entirety:

> There is clearly a lack of involvement of the borrower from the inception of this transaction through the closing of the loan, which closing took place in her absence by means of a questionable Power of Attorney. This was fostered by the interposition of the MLPFS Financial Consultant between MLCC (processing, underwriting and closing staff) and the borrower, and by the apparent acquiescence of MLCC in all aspects of the processing of this transaction right through the closing which was co-ordinated by the Financial Consultant.
>
> It is clear to me that an objective review of the borrower's financial condition, as evidenced by Ms. Miller's tax returns and MLPFS Priority Client Services monthly statements, indicates that MLCC knew or should have known that Ms. Miller could not make the scheduled payments required by the loan. My analysis of the "Three C's" indicate clear evidence of lending practices which are beyond the realm of standard industry lending practices and which are demonstrably unsound and predatory.
>
> According to the Federal Deposit Insurance Corporation PR-9-2001, "loans to borrowers who do not demonstrate the capacity to repay the loan, as structured, from sources other that the collateral pledged are generally considered unsafe and unsound."
>
> It continues, "Typically, predatory lending involves at least one, and perhaps all three, of the following elements:
>
>> "--Making unaffordable loans based on the assets of the borrower rather than on the borrower's ability to repay an obligation;
>> "--Inducing a borrower to refinance a loan repeatedly in order to charge high points and fees each time the loan is refinanced ("loan flipping"); or

> "--Engaging in fraud or deception to conceal the true nature of the loan obligation, or ancillary products, from an unsuspecting or unsophisticated borrower."
>
> This borrower, while a substantial client of MLPFS, was considerably less sophisticated in financial matters than her MLPFS Consultant. The role played by the MLPFS Financial Consultant, combined with the obvious lack of capacity of the borrower to afford the loan payments, the reliance by MLCC on additional security in the form of pledged assets, and the measures used by the Financial Consultant to conceal the nature of the loan from the borrower constitute predatory and abusive lending practices. In my opinion the MLPFS Financial Consultant fraudulently concealed the true nature of this transaction for his personal enrichment and MLCC was complicit in not having sufficient policies and procedures in place to detect and deter such abuses, or in ignoring any such policies and procedures that did exist at MLCC.

6. Following my review of MLCC's underwriting manual, I amplified my conclusions regarding the underwriting process, as follows (Ex. B, pp. 6-7):

> In conclusion, the entire loan origination process from application to approval and closing, was so seriously and consciously flawed that it allowed an insufficiently-trained MLPFS FA [Mr. Falini] to oversee and push (with inadequate MLCC oversight) the origination of a Construction-Permanent loan which did not meet MLCC, Fannie Mae or mortgage industry standards. The fact that this was a refinance of the combination of an existing MLCC loan and a subsequent conglomeration of MLPFS margin loans does not create an extenuating circumstance wherein MLCC tried to help out a client, but rather is evidence of an on-going breakdown in the loan origination process which began when the MLPFS FA began funding the Miller construction loan with MLPFS margin loans and resulted in a refinance loan in which MLCC personnel attempted to cover their tracks and further secure their own position.
>
> Towards this end, MLCC falsified Income, OTI, Disposable Income and Market Value in order to justify approving a loan which was based solely on the borrower's assets and which was never adequately disclosed or explained to Ms. Miller. This deception as to the terms of the loan which concealed the true nature of the obligation, the reliance on asset-based lending rather than the borrower's ability to repay the loan and the lack of voluntariness due to the fact that the MLPFS FA had facilitated a series of margin loans to an unsuspecting borrower to initiate the construction process which culminated in this unaffordable obligation are all components of predatory origination, sales and servicing processes which inevitably resulted in catastrophic financial loss to the borrower which MLCC made no effort to mitigate.

7. In my original report, I provided the following answers to these questions posed by Ms.

I am at a loss to explain why a lender would make such a loan, and why a borrower would accept such terms and acquiesce to closing the loan in their absence.

9. **Was MLCC's conduct unfair?**

MLCCs conduct was unfair both in terms of the manner in which this transaction was structured, and in the processing, underwriting and closing of the transaction. This loan was structured to transfer almost all of the risk from MLCC to the borrower, and the actions of individuals at MLCC and MLPFS had the result (and intention, I believe) of concealing the nature of the transaction from the borrower as evidenced by the memorandum from Jay Falini and the lack of any other evidence to the contrary.

10. **Was MLCC's conduct immoral, unethical, oppressive or unscrupulous?**

MLCC's conduct was oppressive and unscrupulous. I am reluctant to extensively characterize MLCC's conduct at this time because I have not had the opportunity to review MLCC's Loan Manual, Guidelines and Procedures due to MLCC's unresponsiveness to Discovery efforts.

I can conclude, however, that the conduct of certain individuals at MLPFS and MLCC was immoral and unethical, in particular with the directive to restrict contact with the borrower and the obvious "doctoring" of the Power of Attorney.

11. **Did MLCC's actions cause substantial injury to Ms. Miller?**

Ms. Miller has been financially devastated.

Dated:    Fairfield, Connecticut
          June 23, 2005

_____
RICHARD J. HOMBERGER

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was served via Federal Express overnight delivery, on June 24, 2005 on:

Douglas C. Conroy, Esq.
Paul, Hastings, Janofsky & Walker, LLP
1055 Washington Boulevard
Stamford, CT 06901-2217

Jonathan S. Bowman, Esq.
Cohen & Wolf
1115 Broad Street
Bridgeport, CT 06604

_____
Patrick W. Begos