The following is provided as my expert report in the matter of Dillon Ripley Miller vs Merrill Lynch Credit Corporation. This testimony generally concerns the circumstances of the mortgage provided to Julie Dillon Ripley Miller on residential real estate located at 21 Point Road, Norwalk, CT on December 7,1999:

## MORTGAGE UNDERWRITING PRACTICES

### Standard Mortgage Industry Practices

While Freddie Mac/Fannie Mae guidelines, requirements and recommendations regarding the underwriting process are considered to be the mortgage industry standard for mortgage practices, most lenders have adopted specific guidelines, requirements and procedures which are specially adapted to their individual organization. My understanding is that as of the date of this report Merrill Lynch Credit Corporation (MLCC) has not produced its Loan Manual or Underwriting Guidelines or any other material detailing MLCC loan procedures, other than the information contained in the MLCC Interrogatories. Therefore, I cannot draw any conclusions about the extent to which MLCC follows FNMA/FHLMC and/or Industry standards, particularly with respect to the respective responsibilities of the Financial Consultant, the processing and underwriting staff, documentation procedures, underwriting guidelines, quality control or any other areas of concern regarding the processing and underwriting of investment quality mortgages. Nor can I draw any conclusions about the extent to which MLCC followed, or did not follow, its own procedures and guidelines in connection with this loan. For the purposes of this report, I have relied on FNMA/FHLMC guidelines and standard secondary mortgage market requirements in order to examine procedures of Merrill Lynch Credit Corporation (MLCC) in terms of general conformity with standard secondary market practices. If I receive any additional documents or information regarding MLCC's practices in the future, I reserve the right to modify or supplement my opinions.

### The Three C's of Credit Underwriting

The goal of underwriting is the determination of the borrower's credit worthiness or risk to insure that proposed mortgage loans are of investment quality. In order to determine the investment quality of a specific mortgage, lenders must use objective criteria to evaluate the applicant's Credit, Capacity to repay the loan, and the investment quality and value of the available Collateral. These are generally referred to as the "Three Cs" of underwriting.

*Credit* is used to determine the applicant's willingness and ability to repay the debt under the terms of the loan. Towards this end, a credit report is generally obtained from one or more of the credit-repositories which provide credit reports to lenders. Most lenders require a triple-merged residential mortgage report which contains credit (FICO) scores (obtained from three independent credit bureaus) that assigns a numeric value to the borrower's credit history.

*Capacity* is used to determine the borrower's ability and willingness to repay the proposed debt. It is determined by verifying and evaluating the applicant's employment, income, assets, liabilities and net worth. This information is generally collected by the loan originator, compiled by the loan Processor and ultimately reviewed by an Underwriter before making an underwriting decision.

*Collateral* generally consists of residential real estate that is pledged as security for satisfaction of the mortgage debt, but may also include other pledged assets. The collateral must be deemed to be of investment quality, providing sufficient value to recover the lender's investment if default occurs.

The mortgage industry standard for residential real estate is the completion of at least one appraisal by a certified and licensed appraiser on the specific appraisal form (i.e. Fannie Mae or Freddie Mac) and all applicable addenda, schedules and exhibits. The appraisal should be done within 120 days of the closing and must be performed by an appraiser with no financial interest in the transaction.

The appraisal(s) must be reviewed by the underwriter for accuracy and completeness, with special emphasis on the comparable sales used to derive a market valuation. Some of the variables used to determine the appropriateness of the comparables are proximity to the subject property, the amount of adjustments required to compensate for structural differences between the subject and comparables, and timing differences between the sale dates of the subject and comparables.

Special consideration must be given to properties which are subject to appraisal upon completion, i.e. construction loans. Construction loans carry more risk both in terms of appraisal valuation based on plans and specifications, and credit risk due to cost overruns, compliance with local building codes and zoning requirements.

## Documentation

Types of underwriting review generally fall into several categories based on the amount of documentation and verification required. These may be summarized as follows:

1    Full Documentation—referring to loans that document credit information using standard Fannie Mae/Freddie Mac forms for Verification of Employment, Deposit and Mortgage. These forms are sent directly by the lender to the applicant's employer, depository and existing mortgagor.

2    Alternative Documentation—referring to loans which rely on documentation of the applicant's credit information by applicant-provided documents such as paystubs and bank statements.

3    Reduced Documentation—referring to loans which allow applicants with difficult-to-document income (e.g. self-employment or passive income

sources) to be qualified with limited income and employment documentation. Due to the reduced requirement for documentation of income, these loans rely more on the collateral provided as security for the loan.

4    Speciality Reduced Documentation—referring to loans which vary according to the level of required disclosure of income and/or assets and verification of the applicant's' credit information. These loan types are known variously as Stated Income/Stated Asset, No Income /No Asset , No Ratio, Streamlined, etc. Again, because these types of loans rely less on verification of income, the emphasis of the underwriting review is on the analysis of the collateral. In general, these "no income verification" loans require that the lender verify employment but not income. Income which appears on the borrower's application must be deemed to be "reasonable" for the borrower's occupation. Applications which contain overstated income -- which overstatement the lender has verified from tax returns or other means -- may be considered fraudulent and are not eligible for this type of loan product

**Exceptions/Compensating Factors/Approval Procedures**

Deficiencies in Credit, Capacity or Collateral are considered "exceptions" to the FNMA/FHLMC guidelines or the lender's internal guidelines. Exceptions may be offset by "compensating" or "mitigating" factors. To the extent that a loan application does not conform to a lender's guidelines or requirements, it is industry practice to document in the loan file any information used to support the decision, including the nature of the exception, all compensating or mitigating factors, and the overall justification regarding the underwriting decision.

Exceptions to policy and compensating factors are generally specified on a FNMA Transmittal Summary (form1008) or the lender's own Approval Summary, which becomes the basis for the underwriting decision and approval (or decline).

**Other Underwriting Issues**

The Underwriter (or Processing staff) must take such measures as deemed necessary by the Lender to assure that the possibility of fraud is minimized. Fraud is an act of intentional misrepresentation, concealment or omission of the truth for the purpose of deception or manipulation with the intention of taking advantage of another. The presence of one or more fraud indicators or "red flags" may not indicate fraud, but a pattern may emerge to which the underwriter and Lender should be sensitive.

The Lender must also assure that the loan conforms with all federal and state compliance requirements, in particular, Good Faith Estimates and Truth in Lending disclosures. The TIL Statement specifically requires that the borrower be given the basic terms and conditions of the loan including any pledged collateral.

## ANALYSIS OF MLCC CREDIT PROCEDURES

I have reviewed the following documents for the purpose of evaluating the MLCC underwriting and processing procedures in connection with the loan provided to Julie Dillon Ripley Miller on 12/7/1999:

Merrill Lynch Loan Application (undated)
Commitment Letter (dated 11/17/1999)
Tax Returns for 1996 through 1999
Merrill Lynch Pierce Fenner and Smith (MLPFS) Priority Client statements (through 8/31/1999)
Underwriting Worksheet (dated 11/17/1999)
Approval Worksheet (dated 11/17/1999)
Appraisals
Docctl Notes
Credit Report

Merrill Lynch Mortgage Application # 4312716 indicates that the applicant, Julie D. Miller, applied for a $6,200,000 Construction-Permanent Loan from MLCC. The MLCC Approval Summary in connection with this loan application indicates that a counteroffer in the amount of $7,500,000 was approved on 11/1799 and 12/1/99. The following factors directly affect the investment quality of the subject loan and provide insight into the overall underwriting policies of MLCC:

**Credit**

The MLCC Approval Summary indicated "Credit" as an "Exception". Specifically, it listed a Credit Score of 620 which is considered "marginal". Marginal credit (i.e. below average or substandard) generally requires additional mitigating factors to offset the additional risk associated with loans to borrowers with a history of credit issues.

**Capacity**

The application does not include any information regarding Ms. Miller's income, debts or assets. It refers to the applicant's tax return for income substantiation, "print-outs" for asset verification and "credit report" for information on "Outstanding Credit Obligations". I have reviewed Ms. Miller's Tax Returns, MLPF&S statements, and credit report in order to attempt to determine her capacity to repay this loan.

Standard secondary mortgage market procedures require that a borrower "must have a history of receiving stable income from employment or other sources and a reasonable expectation that the income will continue to be received in the foreseeable future (usually three years)." (FNMA Section 401)

*Ms. Miller's Capacity*

My review of Ms. Miller's tax returns for 1998, 1997 and 1996, and her MLPFS brokerage statements for the 12 months preceding December 1999, indicate that Miller's stable and verifiable income consisted solely of interest and dividends which were derived from the assets at MLPFS.

Ms. Miller's annual income from interest and dividends totaled $230,498 and $259,918 respectively, according to her 1997 and 1998 tax returns. For underwriting purposes, therefore, Ms. Miller's stable, verifiable income was $21,434 per month. It is also reasonable to calculate year-to-date income based on the statements of Estimated Annual Income in the MLPFS statements in addition to actual income verified on the 1997 and 1998 Tax Returns. [?YTD Income was] According to the MLPFS statement dated August 31, 1999, Ms. Miller's Estimated Annual Income for 1999 was $236,057, and therefore could be considered immaterial in terms of providing additional verifiable income.

The Capital Gains reported on Ms. Miller's 1998 1040 tax return in the amount of $2,414,704 cannot be considered stable reoccurring income. Capital Gains, which are by their nature non-recurring, are generally not considered stable income unless substantiated by two or more years' tax returns. In this regard, FNMA Section 503.04 provides:

> Income received from a capital gain is generally a one-time transaction; therefore, it should not be usually considered as part of the borrower's stable monthly income. However, if the income calculated on the Capital Gains and Losses (Schedule D) shows that the borrower has realized capital gains for the last two years, the recurring gains may be considered in determining the borrower's stable monthly income—as long as the borrower provides evidence that he or she owns additional assets which can be sold if extra income is needed to make future mortgage payments.

Ms. Miller's 1998 Capital Gains are the result of the liquidation of low-basis equities which the Ms. Miller inherited and which could not be relied on to continue. Ms. Miller's deposition demonstrates that she had no intention selling any more of her low-basis equities.

Therefore, in my opinion, based on my review of the applicant's tax returns and Merrill Lynch Priority Client Services monthly statements, income in the range of $21,611 to $22,500 could appropriately have been considered stable monthly income as of December 1999.

*MLCC's Calculation of Ms. Miller's Capacity*

In contrast, MLCC calculated an income figure of $69,679 per month on its November 17, 1999 Underwriting Sheet. It did so: (i) by arbitrarily allocating an "Opportunity Cost" of 6.1% on $5,021,900 in "pledged" funds; and (ii) by performing what appears to be an annuity calculation on $5,198,748 in "IRA" funds, at 6.1% compounded annually and disbursed in equal monthly payments over 180 months. The Income on the Underwriting Sheet was then apparently re-computed and reduced from $69,679/month to $63,576/month.

Use of such projected income calculations significantly overstates Ms. Miller's actual income and is not in compliance with industry underwriting practice. As discussed above, the MLPFS statements stated Ms. Miller's assets were earning only $236,057 per year or $ 19,671 per month, which is less than 30% of the income figure MLCC calculated.

The inflated nature of that income calculation loan is further underscored by the use of much lower income calculations from the 2001/2002 Underwriting Worksheets prepared by MLCC in connection with an application to refinance the 1999 loan. Specifically, underwriting Worksheets #7276336 and 6020457 indicate that MLCC determined Ms. Miller's monthly income to be $22,500 in 2001 and $21,611 (plus "Opp. Cost" of $11,249 for a total of $32,860) in 2002. These Underwriting Worksheets were prepared in 2001 and 2002 in connection with a $5,000,000 mortgage application which was ultimately declined on April 10, 2002, citing insufficient income.

The MLCC Approval Summary indicates that Ms. Miller had income of $69,679/month, a proposed monthly housing expense (which would be the payment on the $7,500,000 loan under consideration) of $50,781/month, and other monthly liabilities of $13,045/month. The monthly income was apparently derived from the Underwriting Worksheet but both documents contain cross-overs and there are discrepancies as to the borrower's income.

From these estimates -- including the unsubstantiated "monthly income" figure -- MLCC calculated an OTI (Obligations to Income)of 92% (which was crossed out and re-calculated at 100%) and a disposable income of an amount which appears to be **negative** $250.00/month. OTI is a MLCC approximation of the total debt to income ratio which is used by the mortgage industry to determine capacity to repay the loan. Industry standards (i.e. FNMA and FHLMC) typically refer to an acceptable total Debt-To-Income ratio in the range of 36% to 38%. Total Debt-To-Income ratios may be expanded to 50% to 55% if certain compensating or mitigating factors are present. However, under no circumstances can the total Debt-To-Income ratio or OTI approach (or exceed) 100% for the simple reason that the borrower's monthly obligations will exceed their monthly income making default all but inevitable.

Using Ms. Miller's properly calculated stable, verifiable income (of approximately $22,000 per month), the true OTI or Debt-To-Income for this loan was more than 290%.

The excessive and unacceptable OTI is further undermined by the difficulty in establishing stable, verifiable income. Although not specifically mentioned as an exception on the Approval Summary, the impact of "payment shock" (i.e. a greater than 50% increase in the monthly housing payment), and the lack of any demonstrated ability of the borrower to carry the increased level of debt, is also a significant indicator of future inability to service the new loan.

Finally, as discussed above, Ms. Miller's credit score was marginal. Underwriters generally may not use low OTI or Debt-to-Income ratios (which are certainly not present here), reserves (or liquidity) or low Loan-to-Value to offset unacceptable credit. In some cases, good credit (i.e. credit score of 660 or greater) can be used as a mitigating factor to offset OTI or Debt-to-Income ratios of greater than 28%/36%. In this case an OTI of 92% or 100.4% (as calculated by MLCC) or 290% (as calculated by the undersigned) cannot be mitigated by any compensating factors.

Thus, it is obvious that based on a reconstruction of Ms. Miller's actual cash flow at the time of the loan approval in November 1999, Ms. Miller could not reasonably be expected to be capable of making the monthly payments on this loan.

**Collateral**

This file is particularly noteworthy in that the appraised value of the property is significantly lower than the borrower's estimate. The appraisal summary (on the Approval Summary) states that the borrower's estimated market value was $6,200,000 while the lesser of the two MLCC appraisals was $3,800,000. In addition to the substantial discrepancy between the applicant's estimate and the appraisals, the appraisals contained material exceptions to generally accepted appraisal standards in terms of the comparables used. As indicated on the Approval Summary, several of the comparables were actually not comparable at all due to distance (actually in different towns) and other adjustments that exceeded the normal guidelines of Freddie Mac/Fannie Mae and most other mortgage investors.

In good conscience, the lender should have informed the borrower of the appraisal discrepancy because it impacts the amount of pledged assets required and the ability to restructure or refinance the loan or sell the property in the future.

Coupled with the credit and capacity issues addressed above, and the additional risk associated with construction loans the discrepancy between the appraisal and the borrower's estimate of the subject property represents a significant risk factor which should have been addressed by the lender.
I conclude that these appraisals were flawed by use of inappropriate comparables and that the MLCC underwriting decision disregarded these defects. Instead the use of pledged MLPFS securities were used as compensating factors to assure repayment of the loan.

**Analysis of MLCC Approval Summary**:

The MLCC Approval Summary (dated 11/17/1999) contains the underwriter's assessment of the borrower's income, assets and liabilities and expenses, and the requisite signatures needed for loan approval. The Approval Summary enumerates the following "Exceptions":

> OTI
> Income
> Credit

Based on my review of the file, I would add that this Approval Summary is deficient in not listing "Appraisal" and "Payment Shock" as additional exceptions, which are material risk factors and which are notable for their absence.

The level of "payment shock" is truly extraordinary. The borrower contemplated moving from a residence with a $145,000 mortgage to a new home with a $1,350,000 mortgage which then becomes a $7,500,000 obligation.

Mitigating Factors on the Approval Summary were identified as Liquidity, NSI and Reserves.

The Total Monthly Income figures were inflated, resulting in an understated OTI and overstated Disposable Income. Further, the Approval Summary contains cross-outs of the Loan Amount, OTI and Disposable Income which were not initialed by any of the parties approving the loan.


**Power of Attorney**

Regarding the Power of Attorney, most lenders and investors will accept a Limited (or Specific) Power of Attorney that references the property and authorizes the attorney–in-fact to enter into a real estate transaction and to mortgage the property. Because the 1999 loan included a purported pledge of securities, the Power of Attorney form would also have to authorize the attorney-in-fact to execute the Pledge Agreement. In addition, if the loan documents were signed by the attorney- in-fact, the Power of Attorney should be approved by the Title Insurance company issuing the title policy.

In my experience, the Power of Attorney form must clearly indicate that the mortgagor is appointing an attorney-in-fact and it must clearly and unambiguously indicate the nature and scope of the transactions which are to be transacted on behalf of the borrower. In my experience, most closing attorneys will contact the borrower on the day of the closing to clarify the borrower's intention to mortgage the property.

In my experience, the presence of "white-out" on the Power of Attorney form makes it impossible to know with certainty the borrower's intention. In my opinion, it appears that it was the borrower's intention to grant a Power of Attorney to Mr. Newman for the sole purpose reviewing and approving construction advances. In any event, under no circumstances should a loan be closed with alterations of such a material nature to a Power of Attorney. I cannot conceive of a Title Insurer knowingly issuing a Title Policy with such documentation.

### Other Matters

The Commitment Letter was not signed by the borrower, indicating lack of receipt by Ms. Miller. In my experience, prudent closing procedures require prior receipt of a fully executed Commitment Letter containing all of the terms and conditions of the loan in order to minimize any exceptions due to misunderstandings regarding the terms of the loan.

Correspondence in the file and in MLCC's DOCCTL system indicates that the Financial Consultant emphatically restricted all contact between MLCC and the borrower. This is a "red flag" to most loan processors and underwriters. In my experience, no lender would tolerate a commissioned sales consultant issuing a directive not to contact the borrower during processing. It is the lender's responsibility to know its customer; to do otherwise is to potentially open the door to fraud. I am not sure from my review of this file that Ms. Miller received any correspondence or relevant information regarding the terms of this loan from the date she signed the MLCC application through the closing of the loan in her absence.

I cannot reconcile the fact that MLCC approved and closed this loan in the amount of $7,500,000 in December 1999 and subsequently declined an application to refinance this debt in 2001 for $5,000,000 due to insufficient income and credit history. As Ms. Miller's income and credit history did not appear to materially change from 1999 to 2001, either the initial loan should not have been made or the subsequent refinance should have been approved.

I cannot understand the urgency to close this loan in early December 1999 given the circumstances. Specifically, the loan commitment did not expire until February 2000 and the borrower was out of the country.

### CONCLUSIONS REGARDING UNDERWRITING

There is clearly a lack of involvement of the borrower from the inception of this transaction through the closing of the loan, which closing took place in her absence by means of a questionable Power of Attorney. This was fostered by the interposition of the MLPFS Financial Consultant between MLCC (processing, underwriting and closing staff) and the borrower, and by the apparent acquiescence of MLCC in all aspects of the

processing of this transaction right through the closing which was co-ordinated by the Financial Consultant.

It is clear to me that an objective review of the borrower's financial condition, as evidenced by Ms. Miller's tax returns and MLPFS Priority Client Services monthly statements, indicates that MLCC knew or should have known that the Ms. Miller could not make the scheduled payments required by the loan. My analysis of the "Three C's" indicate clear evidence of lending practices which are beyond the realm of standard industry lending practices and which are demonstrably unsound and predatory.

According to the Federal Deposit Insurance Corporation PR-9-2001, "loans to borrowers who do not demonstrate the capacity to repay the loan, as structured, from sources other that the collateral pledged are generally considered unsafe and unsound."

It continues, "Typically, predatory lending involves at least one, and perhaps all three, of the following elements:

"--Making unaffordable loans based on the assets of the borrower rather than on the borrower's ability to repay an obligation;

"--Inducing a borrower to refinance a loan repeatedly in order to charge high points and fees each time the loan is refinanced ("loan flipping"); or

"--Engaging in fraud or deception to conceal the true nature of the loan obligation, or ancillary products, from an unsuspecting or unsophisticated borrower."

This borrower, while a substantial client of MLPFS, was considerably less sophisticated in financial matters than her MLPFS Consultant. The role played by the MLPFS Financial Consultant, combined with the obvious lack of capacity of the borrower to afford the loan payments, the reliance by MLCC on additional security in the form of pledged assets, and the measures used by the Financial Consultant to conceal the nature of the loan from the borrower constitute predatory and abusive lending practices. In my opinion the MLPFS Financial Consultant fraudulently concealed the true nature of this transaction for his personal enrichment and MLCC was complicit in not having sufficient policies and procedures in place to detect and deter such abuses, or in ignoring any such policies and procedures that did exist at MLCC.

## THE WORKOUT

Given the history of this loan, it is obvious to me that a default was foreseeable, and that some manner of a loan workout would ultimately be required. The initial MLCC workout effort (which is what I would consider the 2001/2002 refinance application) was terminated when the loan was declined. In my opinion, based on the facts of the 1999 mortgage, there was no effort to mitigate the consequences of the impending default and foreclosure. Furthermore, there are steps which could have been taken by MLCC to lessen the potential losses to MLCC and the borrower. From my examination of the file, no reasonable efforts were made to salvage this loan.

Similarly, when MLCC ultimately liquidated Ms. Miller's securities in February 2003, it sold **all** of the securities, valued at almost $5,000,000, even though, at the time, the shortfall between the loan balance and the most-recent value MLCC had placed on the house was substantially less than that amount. Compounding the damage caused by that liquidation, MLCC then let the cash sit in a MLPFS account, earning significantly less than the interest MLCC was charging on the loan, and not using the money (or allowing Ms. Miller to use it) to either make the payments on the loan as they came due, or to reduce the principal balance. Therefore, even if MLCC's actions had been authorized by the loan documents (and I am informed that Ms. Miller's counsel has taken the position they were not), MLCC made no effort to mitigate the injury to Ms. Miller.

## SPECIFIC QUESTIONS

Counsel for Ms. Miller has asked me to answer the following questions. My answers, which are based on the facts, conclusions and opinions set forth in this report, are set forth below:

1.  **Did Ms. Miller's financial situation make is apparent that she could not reasonably expect to pay the 1999 loan?**

    Ms. Miller's financial situation made it abundantly clear that she could not repay the 1999 loan from her income sources. By MLCC's own calculation of disposable income from its Underwriting Worksheet, Ms. Miller's Disposable Income was negative $250 per month.

2.  **Did MLCC know, or should it have known from the information available to it, before December 7, 1999 that Ms. Miller did not have the financial ability to comply with the payment terms of the note?**

    Yes, MLCC had access to Ms. Miller's 1040 tax returns for 1996, 1997, and 1998 as well as the MLPFS statements from the inception of the account.

    This information was sufficient to determine Ms. Miller's financial condition and her capacity to repay the loan from her income. And, as described in answer to question 1, MLCC calculated a negative Disposable Income for her.

    In my opinion, MLCC relied totally on the potential liquidation of her MLPFS assets and the subject property for the repayment of the loan.

3.  **Was it appropriate to close the loan on December 7, 1999?**

    No. Ms. Miller was not present at the closing, and the closing agent relied on a specific Power of Attorney that had been altered in material ways in order to permit a person (with little knowledge of the nature of the transaction and his

duties -- Ms. Miller's CPA) to execute a highly complex and risky loan transaction. Under these the circumstances either the lender or the closing attorney should have postponed the closing until Ms. Miller's return.

There is no reason that I am aware of to not postpone the 12/7/99 closing and there are several good reasons why the closing should not have gone forward in Ms. Miller's absence.

4. **Was Ms. Miller informed, before December 7, 1999, of MLCC's conclusions about the valuation of the house and her disposable income?**

I was not able to find any evidence (in the Discovery material) that Ms. Miller was informed of the shortfall in her disposable income relative to her monthly mortgage obligation. I am not sure that she knew what her monthly mortgage obligation would be – I did not see any evidence on the MLCC application or any signed Good Faith Estimate, or Truth in Lending disclosures.

I do not see any evidence that Ms. Miller received a copy of the appraisal prior to closing the loan. Given the nature of this transaction (a mortgage with pledge of assets) Ms. Miller needed this information to make an informed decision.

5. **Was MLCC's conduct in connection with the 1999 loan (including underwriting, approval and workout) fair, equitable and honest?**

MLCC's conduct was not equitable and honest in terms of MLCC's design of the loan product, which shifted all or most of the risk associated with the loan from MLCC to the borrower. Additionally, MLCC failed to have systems in place which address these issues, or failed to administer such procedures..

6. **Would you conclude that Ms. Miller was unsophisticated?**

I have never met Ms. Miller but I can conclude that in terms of financial matters she was certainly unsophisticated. It is clear that Ms. Miller's MLPFS portfolio was conservative –primarily municipal bonds and Dow Jones "Blue Chips" largely inherited from her grandfather. Prior to her association with MLPFS, Ms. Miller's apparent financial experience consisted of making payments on a $145,000 mortgage and managing to mis-manage the payment of several small obligations (according to her credit report).

7. **In light of the general commercial background of the parties, and the commercial needs of the mortgage industry, were the terms of the 1999 loan so one-sided as to be unconscionable under the circumstances existing at the time the loan was made?**

The terms of the 1999 loan (and the underlying circumstances) were designed to

protect the MLCC from risk -- interest rate risk and default risk. This was an adjustable loan rate loan, adjusted monthly based on changes on the LIBOR index. This effectively transferred most, if not all, interest rate risk from MLCC to Ms. Miller. Regarding credit (or default) risk, although this was more than a 100% "LTV", MLCC was able to shift the risk of loss from default from MLCC to the borrower.

Although MLCC has a responsibility to reduce the risk to itself, it also has an obligation to the borrower. Ideally one of the goals of a mortgage product should be to reduce overall risk. In this case an unacceptable level of risk was created -- and shifted to a relatively unsophisticated borrower.

8.  **Was the 1999 loan a transaction that no person in her senses and not under a delusion would make, and no honest and fair person would accept?**

I am at a loss to explain why a lender would make such a loan, and why a borrower would accept such terms and acquiesce to closing the loan in their absence.

9.  **Was MLCC's conduct unfair?**

MLCCs conduct was unfair both in terms of the manner in which this transaction was structured, and in the processing, underwriting and closing of the transaction. This loan was structured to transfer almost all of the risk from MLCC to the borrower, and the actions of individuals at MLCC and MLPFS had the result (and intention, I believe) of concealing the nature of the transaction from the borrower as evidenced by the memorandum from Jay Falini and the lack of any other evidence to the contrary.

10. **Was MLCC's conduct immoral, unethical, oppressive or unscrupulous?**

MLCC's conduct was oppressive and unscrupulous. I am reluctant to extensively characterize MLCC's conduct at this time because I have not had the opportunity to review MLCC's Loan Manual, Guidelines and Procedures due to MLCC's unresponsiveness to Discovery efforts.

I can conclude, however, that the conduct of certain individuals at MLPFS and MLCC was immoral and unethical, in particular with the directive to restrict contact with the borrower and the obvious "doctoring" of the Power of Attorney.

11. **Did MLCC's actions cause substantial injury to Ms. Miller?**

Ms. Miller has been financially devastated.

## DOCUMENTS AND MATERIALS REVIEWED

In addition to the documents specifically identified in the Report, I have reviewed all documents made available to me by Ms. Miller's Counsel, which, he informs me, includes all documents produced by either party in this case. If additional relevant documents are subsequently produced, I expect to review them as well.

I have also reviewed MLCC's Interrogatory Responses, and Ms. Miller's and Jay Falini's Deposition Transcripts. I have attended the Deposition of James Avery.

## QUALIFICATIONS

My curriculum vitae is attached. I have not testified as an expert witness within the previous four years.

## COMPENSATION

Compensation has been established at an hourly rate of $150.00 per hour for the preparation of this report and testimony.

## ADDITIONAL EXHIBITS

Attached are two charts summarizing Ms. Miller's monthly income.

Dated: November 26, 2003

RICHARD J. HOMBERGER



# RICHARD J. HOMBERGER

## WORK HISTORY

2002-Present

**CONSULTANT**
Fairfield, CT

Employed by Cornerstone Bank on a consulting basis to assist with the development of a new residential mortgage lending department.

Duties included development of Residential Mortgage SOP and implementation and oversight of the following functions:

--Processing Residential Mortgages in accordance with FNMA/FHLMC and private investor guidelines
--Underwriting to Bank and Investor guidelines
--Closing Procedures
--Post-Closing Audit
--Investor Relations
--Regulatory Compliance
--General Ledger Accounting and Reconciliation
--Quality Assurance

1999-2001

**CONNECTICUT HOUSING FINANCE AUTHORITY**
Rocky Hill, CT
Loan Portfolio Manager

Managed residential mortgage servicing portfolio.

Responsibilities included co-ordination of secondary market sales of government-backed mortgages, servicing sales, FHA/VA claims administration.

Managed CHFA Real Estate Owned portfolio from oversight of foreclosure through disposition of REO properties.

**1985-1999**

**NSS BANK/SUMMIT BANK**
Norwalk, CT

1995-1999

Vice President, Loan Origination Department

Managed residential mortgage origination department.



Responsibilities included managing all origination activities including processing, underwriting, closings, secondary market sales, post-closing audit, regulatory compliance including compliance with FNMA/FHLMC, State and Federal and private investor guidelines.

1985-1995    Vice President, Loan Servicing Department

Managed residential, commercial and consumer loan servicing department.

Responsibilities included oversight of all servicing activities including investor accounting, quality control, collections and loan workout, preparation of management reports with added emphasis on extensive participation in loan workout of non-performing mortgages in the period from 1990 through 1995.

**1983-1985**    **MERRILL LYNCH MORTGAGE CORPORATION**
West Hartford, CT

Residential Mortgage Originator
National #1 originator of residential mortgages in 1984

**1983**    **OLD STONE MORTGAGE CORPORATION**
Originated residential loans for 3 months

**1975-1983**    **NORWALK SAVINGS SOCIETY**
Norwalk, CT

Assistant Vice President
Managed Main Office and Consumer Loan Department

**EDUCATION**

Boston College
Chestnut Hill, MA
AB- English 1973

University of Connecticut
Stamford, CT
MBA- Finance 1979

National School of Banking
Fairfield University
Fairfield, CT 1981

The following is provided as a supplement to my Expert Report in the matter of Julie Dillon Ripley Miller vs Merrill Lynch Credit Corporation which was submitted November 26, 2003.

**MLCC Underwriting Manual**    I have reviewed the MLCC Underwriting Manual and other supplemental documentation received in connection with outstanding Production requests and purported to be the Underwriting Manual in effect at the time that MLCC extended the loan dated 12/7/1999.

At the time of my original report, I did not have access to the MLCC Underwriting manual and therefore based my analysis and conclusions on my knowledge of general residential mortgage lending practices and, in particular, the Federal National Mortgage Association (Fannie Mae) and other generally accepted mortgage industry underwriting guidelines and practices.

Fannie Mae is a federally chartered NYSE company and according to their website, "the largest non-Bank financial services company in the world…the nation's largest source of financing for home mortgages". Fannie Mae is the biggest issuer of mortgage-backed securities and corporate securities in the world, the biggest buyer and hedger in the world and the source of liquidity for more than 75% of conventional and conforming home mortgages in the U.S. Together with the Federal Home Loan Mortgage Corporation (Freddie Mac) they constitute the industry standard for loan origination and underwriting.

In many respects the MLCC Underwriting is similar to Fannie Mae Guidelines and for some products it directly references Fannie Mae Guidelines as the primary source for the required documentation and analysis of the credit file.

Based on my review of the MLCC Underwriting manual, I conclude that while there are differences between MLCC and Fannie Mae guidelines, the underlying risk evaluation and analysis processes are quite similar.

**Exceptions to MLCC Underwriting Manual**

The following are exceptions to MLCC's own Underwriting Manual which directly impact the potential of default risk of the Miller loan.

**Ineligible Loan to Value**    Based on my calculations, the gross Loan-to-Value (LTV) of the Miller loan was 197% (MLCC Market Value $3,800,000 /$7,500,000 Loan Amount). Sections 3-1.6 and 4-7 of MLCC Underwriting guidelines require that the loan have a gross LTV not over 100%.

Also, according to the MLCC Closed-End Loan-to-Value addendum, the Miller loan exceeds MLCC Loan Amount guidelines which provide for a maximum LTV of 50% and an Estimated Market Value of >$5,000,000.

2

This is a particularly large variance from MLCC policy. This exception was not specifically addressed on the MLCC Loan Approval which incorrectly indicates that the Miller loan LTV was 100%. Although this loan actually exceeded MLCC guidelines by almost double the accepted MLCC standard, the Approval Summary deliberately understates the LTV. In what appears to be a transparent attempt to deceive, it appears that the MLCC underwriter used the borrower's anticipated value of $6,200,000 instead of the actual appraisal to contrive the 100% LTV which appears on the Underwriting Worksheet and the Approval Summary. This appears to be a deliberate attempt to "fudge" the numbers to make the loan appear more acceptable.

It is apparent that shortfall in the market value of the property was compensated for by increasing the amount of pledged assets required from Ms. Miller. This had the effect of moderating the risk of loss due to default to MLCC while increasing the risk of loss of Ms. Miller's financial assets. I saw no evidence that either the appraisal nor the required Pledge amount was provided to or discussed with the borrower.

This understatement of LTV and the corresponding increase in the pledged assets required of Ms. Miller is indicative of the reliance on asset-based lending which, along with misleading marketing and processing tactics, is a component of predatory lending.

**Income Calculation**  MLCC Section 4-11.6 provides that an "opportunity cost" can be calculated to determine a hypothetical rate of return for a given class of assets if "there is reasonable expectation that the subject investment could be rolled over into a new conservative investment and a known rate of return and/or stream of payments, such as a Certificate of Deposit." In addition, "opportunity cost should be used only in lieu of Schedule B income if the assets are newly acquired, diversified and likely to be retained; or the assets are held in a growth stock that currently does not pay a dividend."

MLCC used an Opportunity Cost rate of return of 6.1% on the pledged assets of $6,711,250 in violation of MLCC guidelines which indicated that the lesser of the 6 Month CD rate or 4% should be used to impute a hypothetical income. Furthermore, no allowance was made for capital gains taxes which, according to Mr. Keller's Expert Report, could be expected to reduce Ms. Miller's investable assets and income by 20%.

In another exception to MLCC Underwriting guidelines, MLCC used an "IRA-Calculation" on the non-pledged amount of $3,508,748, instead of the required Opportunity Cost calculation. This had the effect of significantly overstating the borrower's income. The IRA-Calculation only applies when the borrower is at least 58 1/2 years old, according to MLCC guidelines (Section 4-11.5). It also entirely depletes Ms. Miller's assets before the loan is paid off, leaving nothing other than pledged assets (which were under Merrill Lynch's control) to make loan payments.

Finally, Section 4-11.7 requires that Margin Interest paid by the borrower be deducted from gross monthly income. This further reduces gross monthly income by approximately $15,000 /month, because MLCC knew that Ms. Miller was going to be left with a substantial margin debt when the loan closed.

3

By my calculations (using the opportunity cost calculation provided for in the MLCC guidelines) Ms. Miller's gross monthly income was $12,254:

| | |
|---|---|
| Opportunity Cost (@4% on $10,219,998) | $34,067 |
| Less 20% Capital Gains | ($6,813) |
| Less Margin | ($15,000) |
| Gross Monthly Income | $12,254 |

By not following its own guidelines MLCC overstated the borrower's income by more than $50,000 per month and directly impacted Ms. Miller's OTI and Disposable Income (as discussed below).

These miscalculations represent serious violations of MLCC Underwriting guidelines which are especially significant since the guidelines often justify exceptions to loan policy concerning higher OTI by referring to adequate Disposable Income as a mitigating factor.

This inflation of income is a conscious manipulation and circumvention of MLCC requirements and has the effect of disguising a serious problem –Ms. Miller's lack of capacity to repay the loan as agreed.

**Debt-to-Income Ratio**        MLCC Section 4-11.9 requires that the debt-to-income generally should not exceed 50%.  By means of the dubious income calculations referred to above (i.e. using an IRA calculation instead of Opportunity Cost or tax returns, using an incorrect rate of return for opportunity cost and IRA calculation and not deducting margin expense), MLCC understated OTI as 79%, later increased to 100% by handwritten alteration of the original typed Approval Summary when the loan amount was increased to $7,500,000. Those values, though incorrect, are themselves higher than MLCC's guidelines allow.

By my calculations, the Debt-to-Income ratio (OTI) for the $7,500,000 loan should have been 520% (total monthly liabilities of $13,045 plus monthly loan payment of $50,781 divided by gross monthly income of $12,254).

**Disposable Income**   MLCC Section 4- "any debt-to-income ratio which exceeds 38% should exhibit adequate income to manage additional living expenses." By means of the dubious income calculations referred to above, disposable income as stated on the Underwriting Worksheet and Approval Summary was initially overstated as $14,655/month and subsequently lowered to **negative** $250/month by handwritten alteration of the original typed Approval Summary when the loan amount was increased to $7,500,000. While the Approval Summary indicates **negative** $250/mo. Disposable Income, my calculations indicate a disposable income of **negative** $51,572/mo.   Again, this mis-statement is a serious underwriting violation which directly impacts Ms. Miller's lack of capacity to repay the loan and which MLCC underwriters and loan officers had, or should have had, knowledge of.

4

**Appraisal**       Section 4-26.1 requires that any stated overimprovement of a subject property must be reviewed by Underwriting and may require reduced LTV. Other deviations from standard MLCC appraisal guidelines involve the appropriateness of the comparables and include lack of proximity to the subject property, excessive net adjustments, excessive gross adjustments, date of comparable sales > 1 year,  price range of subject significantly exceeding comparables and indicated value of the subject significantly exceeding 10%.

These seven exceptions to the desired characteristics of the appraisal suggest that the market value of the subject property could not be substantiated by comparables which met MLCC or any other reasonable standards.

This appraisal is deficient in so many areas that it represents a significant exception to MLCC Underwriting guidelines.  Appraisal was not checked off as an exception on the Approval Summary, and the Underwriting Comments therein generally referred to these exceptions in such a manner as to understate their significance.

There is no indication that a copy of any of the appraisals or the as-built valuation was shared with the borrower, as required by MLCC Sections 3-2.3 and 4-25.

**Credit**       According to the MLCC Underwriting Program Parameters for Non-Conforming Products, the "borrower should generally exhibit a credit score of 680 or higher… [and] all payments 30 days or more past due in the previous 24 months must be satisfactorily explained."

Ms. Miller's median credit score of 620 with late payments within several months of underwriting is a significant violation of MLCC Underwriting guidelines. The MLCC noted the exceptions but downplayed the significance as "relatively small so no major concern."

This ignores the real issue which is the borrower's lack of experience with large amounts and the potential payment shock associated with a loan of this size. No mention of Payment Shock appears on the Underwriting Worksheet or Approval Summary though there is a box for this risk factor on the Approval Summary which was not checked off.

**Power of Attorney**       Exceptions to MLCC Power of Attorney requirements include the lack of a property description, the lack of authorization of the Attorney to pledge stock and the previously-mentioned alteration of the document.

The MLCC POA Checklist requires that "questionable Powers of Attorney…be submitted to Legal and Compliance Group for review."

In my opinion, this POA is highly questionable and should have been submitted to Compliance and Legal with a written acknowledgement of acceptability. Absent formal written approval, MLCC should have postponed the closing. Even a cursory review of

5

this loan file and accompanying documentation would have been sufficient for Compliance, Legal or other MLCC Closing staff to recognize that there were numerous violations and exceptions of MLCC policy to exercise caution.

MLCC policy regarding extensions indicates that an extension could have easily been provided at minimal or no cost to the borrower, especially for a valuable, high net worth client for a loan which was not being sold to another investor in the secondary market.

These exceptions indicate the quality assurance systems in effect at MLCC were insufficient to assure that required documentation was obtained in accordance with MLCC guidelines. The absence of procedures to assure the validity of required loan documentation combined with the absence of Ms. Miller or an attorney representing her without conflict led to an environment in which fraud or misrepresentation could readily occur.

**Underwriting Exceptions**          There are without question multiple exceptions to MLCC Underwriting policy—the MLCC Loan Approval Summary cites the following:

- Excessive OTI
- Insufficient Income
- Marginal Credit

Based on MLCC's own Underwriting guidelines, I would add Appraisal, Payment Shock and LTV.

While there is no MLCC policy regarding the documentation of exceptions and there are no procedures for determining the overall acceptable (or unacceptable) level of default risk specified in the MLCC Underwriting Manual, Fannie Mae does provide specific guidelines for determining the overall or comprehensive risk assessment for a given loan.

Although the Miller loan is non-conforming with respect to loan amount, the principles of risk assessment generally remain the same for conforming and non-conforming loans. According to the MLCC Manual, MLCC underwriters are directed to follow Fannie Mae guidelines for many conforming loan programs.

According to Fannie Mae (Chapter 3) guidelines, the compounding or layering of risk factors, such as indicated above, increases the comprehensive level of risk. This comprehensive risk is not mitigated by any significant factors, including the borrower's imputed liquidity or reserves, as Ms. Miller's assets were entirely pledged or used as a source of loan repayment and therefore could not be double-counted as reserves as was indicated on the Approval Summary.

According to Fannie Mae (Section 303.01), "a mortgage that has a high comprehensive risk is likely to have a high probability of default". Therefore, in my opinion, this loan should not have been approved, regardless of any mitigating factors.

6

## MLCC Underwriting Manual

The MLCC Underwriting Manual is unusual in that it does not generally indicate the date of issuance or revision or the individual or department responsible for issuing and updating each guideline. The Manual, instead, indicates that the manual is "intended as a guide to be used with common sense underwriting".

It is obvious that there is no formal MLCC procedure for issuing revisions and archiving previous policy and procedures of the MLCC Underwriting Manual, or assuring effective distribution of up-to-date policies and procedures. Without such documentation procedures, it is not possible to assure a system of accountability for MLCC loan origination staff which can be relied upon to assure that loans are originated in compliance with MLCC requirements.

Other significant omissions include a lack of overall detail for processing and underwriting procedures, lack of requirements for state and federal disclosures and issuance of commitment letters, Quality Assurance requirements and other operational issues.

## Conclusion

Based on my review of the MLCC Underwriting Manual and accompanying documentation provided in connection with outstanding Production requests, I conclude that the MLCC Manual is seriously deficient in terms of overall documentation of the underwriting, origination and quality assurance processes.

The MLCC Underwriting Manual is sufficiently deficient as to call into question MLCC's ability to originate investment-quality mortgages. This is significant regardless whether MLCC originates mortgages for its own portfolio or for the secondary market, and whether the loans are originated according to MLCC guidelines, Fannie Mae guidelines or a combination of both.

In attempt to address these and other origination issues which was characterized as an "effort to focus on core capabilities…[in] January 2001, MLCC entered into a long-term outsourcing arrangement with Cendant Mortgage Corporation ("Cendant"). Pursuant to this arrangement, Cendant perform[s] certain mortgage origination services for MLCC on a private-label basis in addition to certain mortgage-servicing activities. According to the 2001 10-K "MLCC will continue to market mortgages to Merrill Lynch clients through Merrill Lynch Financial Consultants." This is an implicit acknowledgement that MLCC did not have the technical capability to process and originate loans on their own.

In conclusion, the entire loan origination process from application to approval and closing, was so seriously and consciously flawed that it allowed an insufficiently-trained MLPFS FA to oversee and push (with inadequate MLCC oversight) the origination of a Construction-Permanent loan which did not meet MLCC, Fannie Mae or mortgage industry standards. The fact that this was a refinance of the combination of an existing

7

MLCC loan and a subsequent conglomeration of MLPFS margin loans does not create an extenuating circumstance wherein MLCC tried to help out a client, but rather is evidence of an on-going breakdown in the loan origination process which began when the MLPFS FA began funding the Miller construction loan with MLPFS margin loans and resulted in a refinance loan in which MLCC personnel attempted to cover their tracks and further secure their own position.

Towards this end, MLCC falsified Income, OTI, Disposable Income and Market Value in order to justify approving a loan which was based solely on the borrower's assets and which was never adequately disclosed or explained to Ms. Miller. This deception as to the terms of the loan which concealed the true nature of the obligation, the reliance on asset-based lending rather than the borrower's ability to repay the loan and the lack of voluntariness due to the fact that the MLPFS FA had facilitated a series of margin loans to an unsuspecting borrower to initiate the construction process which culminated in this unaffordable obligation are all components of predatory origination, sales and servicing processes which inevitably resulted in catastrophic financial loss to the borrower which MLCC made no effort to mitigate.

Dated: January 27, 2005

Richard J. Homberger

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was served via Federal Express overnight delivery, on June 24, 2005on:

Douglas C. Conroy, Esq.
Paul, Hastings, Janofsky & Walker, LLP
1055 Washington Boulevard
Stamford, CT 06901-2217

Jonathan S. Bowman, Esq.
Cohen & Wolf
1115 Broad Street
Bridgeport, CT 06604

_____
Patrick W. Begos