UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JULIE DILLON RIPLEY MILLER, | NO. 3:03-CV-1016 (RNC)(DFM) |
| Plaintiff and Counterclaim Defendant, | |
| - against - | |
| MERRILL LYNCH CREDIT CORPORATION, | JULY 1, 2005 |
| Defendant and Counterclaimant. | |

## DEFENDANT MERRILL LYNCH CREDIT CORPORATION'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF JULIE DILLON RIPLEY MILLER'S MOTION FOR SUMMARY JUDGMENT

Defendant and Counterclaimant Merrill Lynch Credit Corporation ("MLCC") respectfully submits this Memorandum of Law in Opposition to Plaintiff and Counterclaim-Defendant Julie Dillon Ripley Miller's ("Plaintiff" or "Miller") Motion for Summary Judgment. Accompanying this Memorandum of Law in Opposition, MLCC submits the Supplemental Affidavit of Douglas C. Conroy and MLCC's Local Rule 56(a)2 Statement. For the reasons stated herein, Plaintiff's Motion for Summary Judgment should be denied in its entirety and MLCC's Motion for Summary Judgment should be granted.

## **PRELIMINARY STATEMENT**

Plaintiff's motion for summary judgment is entirely predicated on a single contention: the Power of Attorney executed by Plaintiff in December 1999 in connection with the closing of the MLCC loan was either defective or insufficient. As a result, Plaintiff argues, all the loan documents signed by her accountant Barry Newman pursuant to that allegedly defective Power of Attorney are void and unenforceable, and she has no liability to MLCC on the Mortgage, the Note, or related documents. Plaintiff's argument fails on multiple grounds and her motion must be denied.

First, assuming a colorable defense based on a defective Power of Attorney ever existed, such a defense was specifically waived by Plaintiff in the Modification Agreement she personally signed in February 2001. Second, and in any event, Plaintiff ratified the Power of Attorney by taking MLCC's money pursuant to the loan documents, spending that money for the exact purposes for which she took the loan, and making more than three years of payments under the loan without a single complaint or protest to MLCC until after she defaulted. Furthermore, even if the Power of Attorney had never existed, Plaintiff's subsequent actions constituted knowing waiver and/or ratification of all the obligations incurred on her behalf by Newman in signing the loan documents. In that sense, any alleged defects in the Power of Attorney are a classic "red herring." Third, even assuming there was no written waiver or ratification, Plaintiff's admissions regarding the Power of Attorney, the most damning of which are deleted from her recitals, including its preparation, execution, and Plaintiff's intent in executing the document, call for entry of judgment in favor of MLCC.

Furthermore, Plaintiff's motion is pervaded by numerous additional defects. She asks the Court to grant summary judgment as to MLCC's "liability," but at no point in her brief does Plaintiff ever identify what count of her Second Amended Complaint ("Complaint") she believes she has proven as a matter of law. In addition to the numerous foundational defects of the motion papers, others of which will be alluded to, Plaintiff also fails to specify the necessary elements of any cause of action she relies upon, and she fails to discuss what undisputed facts have been established to support summary judgment as to that claim. Indeed, Plaintiff never even mentions or addresses any of MLCC's affirmative defenses to her Complaint. Plaintiff's motion is purely an abstract discussion of a single issue without any application of that issue to the actual legal claims asserted by her in this case, or to the counterclaims and affirmative defenses of MLCC.

For the reasons set forth herein and in MLCC's Memorandum of Law in Support of its Motion for Summary Judgment, MLCC respectfully requests that the Court (i) deny Plaintiff's Motion for Summary Judgment, (ii) award MLCC summary judgment on its first or second Counterclaims, and (iii) dismiss Plaintiff's Complaint in its entirety.

## STATEMENT OF FACTS

For a complete recitation of the pertinent facts, the Court is respectfully referred to the Statement of Facts section of MLCC's Memorandum of Law in Support of Its Motion for Summary Judgment (pp. 5-12), as well as the Affidavit of Douglas C. Conroy ("Conroy Aff."), the Affidavit of Tara Stewart ("Stewart Aff."), the Affidavit of Laurie Kamhi ("Kamhi Aff."), and MLCC's Local Rule 56(a)1 Statement, all filed in support of MLCC's Motion for Summary

Judgment.  The Court is further referred to MLCC's Local Rule 56(a)2 Statement and the

Supplemental Affidavit of Douglas C. Conroy ("Supp. Conroy Aff.") filed with this Opposition.

With respect to Plaintiff's "Background" section in her memorandum of law (pp. 2-

7), which purports to provide the factual background of the case, that section should be disregarded

by the Court in its entirety.  The six page section is completely argumentative, inaccurate,

misleading, and devoid of even a single citation.  Similarly, Plaintiff has failed to submit any

affidavit or other evidentiary foundation for the documents referenced in her Rule 56(a)1 Statement,

as contemplated by Rule 56 of the Federal Rules of Civil Procedure.


## ARGUMENT

### POINT I

### MILLER SPECIFICALLY WAIVED ANY DEFENSES RELATING TO THE POWER OF ATTORNEY WHEN SHE PERSONALLY EXECUTED THE MODIFICATION AGREEMENT IN FEBRUARY 2001

Fourteen months after the closing of the 1999 Loan, Miller personally executed the

Modification Agreement.  Therein, Miller specifically and unequivocally affirmed and

acknowledged in writing that she had no defenses to the enforceability of either the Note or the

Mortgage.  Furthermore, in that same written instrument, Miller waived and released any defenses

to the enforcement of those agreements to the extent they existed.  This written acknowledgement,

waiver, and release encompass, and thereby negate, Miller's present claim that the 1999 Loan is

void because the Power of Attorney was defective.  Since Miller has waived and released her ability

to assert defects or limitations in the Power of Attorney as a defense, Miller's motion must be

denied.

The relevant facts on Miller's waiver of her present claim are few and uncontested. Miller executed the Power of Attorney on December 2, 1999. (Conroy Aff. at ¶ 13 and Ex. J). The closing of the 1999 Loan took place on December 7, 1999, during which Barry Newman, as Miller's attorney-in-fact, executed a Note, Mortgage, and Pledge Agreement. (Stewart Aff. at ¶¶ 4-5 and Exs. B, C, and D). The original Power of Attorney used during the closing was filed on the Norwalk land records that same month and thereafter returned directly to Miller, putting Miller in physical possession of the very document she now complains about. (Conroy Aff. at ¶ 13 and Ex. J). On February 7, 2001, Miller personally executed a written Modification Agreement which was supported by new consideration, including a substantial reduction in Miller's interest rate on the Note. (Stewart Aff. at ¶ 6 and Ex. F). Miller does not dispute that she personally signed the Modification Agreement. (Supp. Conroy Aff., Ex. A at 349-351 (Miller Depo.)). Miller has also admitted that she was aware of the pledge of her securities associated with the 1999 Loan well before February 7, 2001. (See discussion infra). She also has admitted that prior to her default she never complained to anyone at MLCC concerning any alleged improprieties in the loan or its related documentation. (Supp. Conroy Aff., Ex. A at 163-165).

In the Modification Agreement, Miller expressly agreed to a number of terms including the following:

- "The unpaid principal balance due under the Note as of the date of this Agreement is $7,500,000.00." (Paragraph 2)

- "Borrower warrants that Borrower has no existing right of offset, counterclaim, or other defenses against enforcement of the Note and Security Instrument [Mortgage] by Lender and that, if any such right or defenses do exist, they are hereby waived and released." (Paragraph 3)

- "[N]either the Note nor the Security Instrument [Mortgage] is modified by this Agreement and they shall remain in full force and effect until the

obligations secured thereunder are paid in full and the Security Instrument is satisfied of record." (Paragraph 4)

Accordingly, in 2001, fourteen months after the 1999 Loan closing, Miller expressly waived any and all defenses to the enforceability of the Note or the Mortgage, which would have included any defense that the 1999 Loan was unauthorized either due to Newman exceeding his authority or due to a technical defect in the execution of the Power of Attorney. Connecticut law is clear that such written waivers are enforceable. See Connecticut Nat'l Bank v. Douglas, 221 Conn. 530, 545 (1992) (enforcing written waiver provision noting that "clear and definitive contract language can establish waiver as a matter of law"); Albany Ins. Co. v. United Alarm Services, Inc., 194 F. Supp. 2d 87, 91 (D. Conn. 2002) ("Under Connecticut law, a party to a contract may waive any defenses or rights it has against the other party to the contract, and such a waiver will be enforced if it is clear and unambiguous"). Miller has waived her present claims through the execution of the Modification Agreement.

Under the circumstances, the only reasonable interpretation of the cited provisions in the Modification Agreement is that Miller has waived any claims or defenses she may have had in connection with the Power of Attorney. Accordingly, since any and all defenses or claims based upon the Power of Attorney have been waived and released, Miller's motion for summary judgment must be denied.

**POINT II**

**MILLER ALSO RATIFIED THE POWER OF ATTORNEY BY TAKING THE**
**FINANCIAL PROCEEDS OF THE LOAN, SPENDING THOSE PROCEEDS**
**FOR HER OWN BENEFIT, AND MAKING PAYMENTS FOR OVER**
**THREE YEARS WITHOUT PROTEST UNTIL SHE DEFAULTED IN 2003**

In addition to Miller's specific acknowledgement of no defenses and the explicit

waiver of defenses in the Modification Agreement, wherein Miller expressly acknowledged her

continuing obligations under the Note and Mortgage, Miller also ratified Newman's acts taken

pursuant to the Power of Attorney by virtue of her subsequent actions and inactions. As discussed

at length in MLCC's Memorandum of Law in Support of Its Motion for Summary Judgment, until

her payment default in 2003 which precipitated this litigation, every action Miller took was

consistent with the fact that the 1999 Loan transaction, including the Note, Mortgage, and Pledge

Agreement, were fully authorized and approved. Accordingly, any issues regarding the Power of

Attorney are immaterial and inconsequential.

Ratification is defined as "the affirmance by a person of a prior act which did not

bind him but which was done or professedly done on his account." Updike, Kelly, and Spellacy,

P.C. v. Beckett, 269 Conn. 613, 640 (2004). A party will be deemed to have ratified a prior act by

accepting "the results of the act with an intent to ratify, and with full knowledge of all the material

circumstances." Russell v. Dean Witter Reynolds, Inc., 200 Conn. 172, 185 (1986) (citations

omitted). See Gerber and Hurley, Inc. v. CCC Corp., 36 Conn. App. 539, 542 (1995) (affirming

trial court's finding of ratification where the defendant, "with knowledge of the facts, accepted and

retained the benefits of the goods and supplies provided by the unauthorized act").

As stated in Point I herein, through the Modification Agreement, Miller expressly

waived and released any defenses to and accepted the terms of the 1999 Loan transaction.

- 7 -

Significantly, Miller's acknowledgment of the transaction includes the Note and Mortgage, as well as the Pledge Agreement.  Miller has admitted that she was aware of the pledge arrangement by no later than late 2000, which was months prior to her signing of the Modification Agreement. (Conroy Aff., Ex. A at 152-153).  A party may not accept only a portion of a transaction, rejecting what it later claims is unacceptable.  See Cohen v. Holloways', Inc., 158 Conn. 395, 409 (1969) ("[A principal] cannot separate the transaction and ratify the part that is beneficial to him, repudiating the remainder; but if he, of his own election and with full knowledge, accepts and retains the benefits of an unauthorized transaction, he must also accept the part that is not beneficial, and will be held to have ratified the whole").  See also In re Greenwich Showboat Limited Partnership, 117 B.R. 54, 57 (D. Conn. 1990) ("When a contract is modified, the contract as modified becomes a new contract between the parties"); Stone v. Stone, 358 N.Y.S.2d 641, 642 (N.Y. Supr. 1974) (the effect of modification is the production of a new contract, which consists not only of the terms agreed upon but as many of the terms of the original contract as the parties have not abrogated by their modification).  As a result, with admitted knowledge of the pledge aspect of the 1999 Loan, Miller proceeded to sign the Modification Agreement, thereby ratifying the entire transaction.

Even independent of her execution of the Modification Agreement, Miller's actions, both prior thereto and later, served to ratify the entire 1999 Loan transaction.  Miller made monthly loan payments pursuant to the terms of the 1999 Loan every month in 2000, 2001, and 2002, until she defaulted in February 2003.  She did so without objecting to the terms of the loan or the pledge of securities.  During that period, Miller accepted the benefits of the 1999 Loan by using the proceeds to repay debts she had previously incurred on the Flexible Credit Account provided by

- 8 -

MLPFS and to complete the construction and furnishing of the home.  Not only did Miller make the required interest payments on the 1999 Loan, but she received monthly account statements listing those securities that had been pledged as collateral for the loan, and their total value.  (Kamhi Aff. at ¶¶ 6-8  and Ex. 3; Stewart Aff. at ¶¶ 4, 6-7).

Miller consciously and intentionally accepted the benefits of the 1999 Loan and performed in accordance with the terms of the Note and Mortgage for several years before defaulting on her payments to MLCC.  Miller thus ratified the 1999 Loan transaction and is barred from repudiating the transaction.  See DiMartino v. City of Hartford, 636 F.Supp. 1241, 1252 (D.Conn., 1986) ("Ratification results if the party who executed the contract. . . accepts the benefits flowing from it or remains silent or acquiesces in the contract for any considerable length of time after opportunity is afforded to annul or void it.").

Notably, months before initiating this litigation, Miller admitted the exact contours of the 1999 Loan transaction to another potential lender.  In correspondence written by one of her prior attorneys, on her behalf and with her approval, Miller stated unequivocally that "[i]n December 1999, I took out a mortgage with Merrill Lynch in the amount of Seven Million Five Hundred Thousand Dollars ($7,500,000)." (Conroy Aff., Ex. K).  Miller explained the pledge aspect of the loan as well by stating that "[t]he loan . . .was partly secured by a pre-construction appraisal of my home and further secured pursuant to a pledge of the assets in my securities brokerage account with Merrill Lynch." Id.   These crucial admissions confirm that Miller sought a loan with no down-payment from MLCC, understood the mechanics of the loan, and is merely seeking to reinvent history to devise a colorable litigation strategy.

To the extent Miller now contends that she was unaware of the fact that she was pledging securities as collateral for the 1999 Loan, the pledge requirements were disclosed and explained in numerous documents and reflected in every monthly account statement. (Kamhi Aff., Exs. 1-4). Absent her agreement to pledge her securities, Miller would not have been approved for the 1999 Loan, and she knew it. As the Connecticut Supreme Court has found, "imputed knowledge" of the material circumstances is sufficient for a finding of ratification. See Bond Rubber Corp. v. Oates Bros. Inc., 136 Conn. 248, 251-52 (1949); Dichello v. Societa Libero Pensiere, 111 Conn. 412 (1930) (ratification exists where either "actual or imputed" knowledge is established). In any event, Miller has admitted the she was aware of the pledge no later than late 2000. (Conroy Aff., Ex. A at 152-153).

The rules governing the interpretation of powers of attorney are the same rules that govern interpretation of written instruments generally. See, e.g., Chase Manhattan Mortgage Corp. v. Beck, 2001 WL 950633, *3 (Conn. Super.). The doctrine of ratification, consequently, is applicable to acts or contracts made pursuant to a defective power of attorney. See, e.g., Finno Development, Inc. v. Landry, 1997 WL 162814, at *2 (Conn. Super.) (even if agent acted outside the scope of a power of attorney in selling certain real property, the plaintiff ratified the property sale since plaintiff later signed the warranty deed and accepted the sale proceeds); Hyatt v. Clark, 118 N.Y. 563, 570 (1890) (person ratified lease executed outside the scope of a power of attorney when the person accepted and retained the fruits of the unauthorized act, thus "having received the benefits of the contract, she could not, after years of acquiescence, suddenly invoke the aid of the courts to relieve her of any further obligation"); Smith v. Merritt Savings and Loan, Inc., 266 Md. 526, 537-39 (Md. 1972) (husband ratified a mortgage loan made on the basis of a power of attorney

forged by wife since husband received the loan proceeds and never renounced the fraud despite ample opportunity to do so); DiLorenzo v. Atlantic Nat'l Bank of Boston, 278 Mass. 321, 322-23 (1932) (where powers of attorney had been forged, plaintiff ratified the actions taken in his name pursuant to the powers of attorney because he remained silent and failed to repudiate the act for five years after he learned of the unauthorized act); Noon v. Bunker, 237 Mass. 585, 587 (Mass. 1921) (even if power of attorney was defective and did not include power to convey land, plaintiff ratified land sale by accepting and retaining the proceeds from that sale); Hefner v. Estate of Ingvoldson, 346 N.W.2d 204, 207 (Minn. Ct. App. 1984) (plaintiff ratified actions of agent who exceeded scope of power of attorney); Garrett v. Gonter, 42 Pa. 143, 1862 WL 5082, at *2 (Pa. 1862) (person may ratify a mortgage executed under an allegedly forged power of attorney while that person was abroad in Europe). Therefore, even if the Power of Attorney were indeed defective or limited as Miller argues, Miller still ratified the 1999 Loan transaction by her subsequent actions and agreements.

In fact, under the principles of ratification, Miller ratified this loan transaction even if there had never been a power of attorney in the first place. See Updike, Kelly, and Spellacy, P.C., 269 Conn. at 640. In other words, any defects or limitations in the Power of Attorney are completely immaterial and arguments attacking its validity are merely a red herring.

Assume, entirely hypothetically, that Newman had signed the 1999 Loan documents in Miller's name without Miller's knowledge, without Miller's authority, and in the complete absence of a power of attorney document (all of which is absolutely not the case here). If Miller, nevertheless, subsequently took those loan proceeds, spent them for her own benefit, made three years of loan payments on schedule without dispute or complaint, personally affirmed the

transaction in writing with MLCC, and admitted the details of the transaction to another lender, then Miller unquestionably ratified that original transaction. In fact, these are the very actions taken by Miller in this case. Accordingly, assuming there had never been a power of attorney, the situation would be the very definition of ratification: "the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account." Updike, Kelly, and Spellacy, P.C., 269 Conn. at 640. If Miller would be deemed to have ratified a transaction that was signed on her behalf in the absence of any power of attorney, then Miller surely should be held to have ratified a transaction where Miller did sign a power of attorney, regardless of any alleged defects or limitations.

## POINT III

### ASSUMING THE POWER OF ATTORNEY IS AN ISSUE, MILLER DISREGARDS HER BINDING ADMISSIONS REGARDING THE SCOPE OF THE POWER OF ATTORNEY, THE CIRCUMSTANCES OF ITS PREPARATION AND EXECUTION, AND MILLER'S INTENT IN EXECUTING THE DOCUMENT, WHICH ALSO SUPPORT DENIAL OF HER SUMMARY JUDGMENT MOTION

Given the evidence concerning waiver and ratification, the Court should deny Miller's summary judgment motion. If it chooses to reach the issue of the Power of Attorney's scope, Miller's own admissions also mandate denial of her motion. In her memorandum, Miller provides an incomplete and one-sided perspective on the circumstances surrounding the preparation of the Power of Attorney. Contrary to Miller's gloss on the facts, the admitted facts regarding the preparation of the Power of Attorney, the execution of the Power of Attorney, the scope of the Power of Attorney, and Miller's intent in executing the document are consistent with her later

express written waiver and continuing ratification of the validity of the loan documents and mandate denial of her summary judgment motion.

Powers of attorney are to be interpreted like any other written instrument. "The rules governing the interpretation of written instruments generally govern the construction of powers of attorney. First and foremost the intention of the parties as it existed at the time the powers were granted is to be ascertained. Next, and when ascertained, that intention is to be given effect. The intention is to be ascertained from the writing alone, if possible." Chase Manhattan Mortgage Corp. v. Beck, 2001 WL 950633, *3 (Conn. Super.) (internal quotation marks omitted); see also Gerardo v. Laraia, 2001 WL 283019, *5 (Conn. Super.) (same). "Construction of a mortgage deed is governed by the same rules of interpretation that apply to written instruments or contracts generally, and to deeds particularly. The primary rule of construction is to ascertain the intention of the parties. This is done not only from the face of the instrument, but also from the situation of the parties and the nature and object of their transactions." Connecticut Housing Finance Authority v. John Fitch Court Associates Limited Partnership, 49 Conn. App. 142, 149, cert. denied 247 Conn. 908 (1998).

"A written power of attorney constitutes a formal contract of agency and creates a principal-agent relationship." Bank of Montreal v. Gallo, 3 Conn. App. 268, 273 (1985). "The nature and extent of an agent's authority is a question of fact for the trier." Id. The scope of agency can depend on the construction of the terms of the power of attorney, the purpose of the agency, and the circumstances existing at the time of its creation. Id. at 273-274. Accordingly, the intent of Miller in preparing the Power of Attorney and the circumstances surrounding the document's creation are necessary starting points of analysis in interpreting the document.

It is revealing that Miller's memorandum of law never addresses the most pertinent question regarding the interpretation of the Power of Attorney – what was Miller's intent? Her skeletal affidavit (Ex. N to Plaintiff's Local Rule 56(a)1 Statement), which notably lacks even a copy of the Power of Attorney she now claims she did sign, is totally silent on the issue. Rather than discussing that key point, her memorandum instead concentrates on repetitive statements to the effect that the Power of Attorney ultimately did not authorize anyone to do anything. In reality, the intent of the parties in preparing the Power of Attorney is obvious and straightforward, and contrary to the incomplete scenario explicated in Miller's memorandum.

In short, since Miller was going to be in Africa at the time of loan closing, Miller determined that Miller's accountant, Barry Newman, should execute the 1999 Loan documents on her behalf. With that purpose in mind, Miller attempted to prepare a power of attorney consistent with that objective. Miller's own statements, either in her deposition, affidavits, or through filings submitted on her behalf with this Court, confirm this intent.[1]

According to Miller, "Falini told me that a loan closing had been scheduled for December 7, 1999." (Conroy Aff., Ex. M at ¶ 5 (PJR Affidavit)) (emphasis added).[2] Miller was scheduled to be in Africa on an extended family safari at that time. (Id., Ex. A at 274). Consequently, according to Miller, "Falini told me that I needed to give Barry Newman (the

---

[1] It is also telling that in the course of Miller's entire argument regarding the factual circumstances surrounding the preparation of the Power of Attorney the focus of the discussion is upon deposition testimony of other individuals, rather than Miller's own admissions in deposition sessions, a PJR Affidavit, and interrogatory responses.

[2] See Babaev v. Grossman, 312 F. Supp. 2d 407, 409 (E.D.N.Y. 2004) (plaintiffs' affidavits admitting actual knowledge of certain events may be treated as judicial admissions leading to dismissal of complaint); 32 Corpus Juris Secundum § 406 (June 2004) ("A judicial admission in an affidavit used in the case is admissible against the party making or adopting the affidavit").

- 14 -

accountant to whom Falini had referred me in 1998) my power of attorney for the closing." (Id., Ex. M at ¶ 6 (PJR Affidavit)).[3]    In fact, Miller testified in her deposition that she and Falini discussed who should serve as her designated agent and ultimately determined that Newman would best serve in that role. (Conroy Aff., Ex. A. at 293).

Miller's memorandum of law deliberately leaves an inaccurate impression on this point. Her memorandum suggests that Miller was preparing a power of attorney for an unknown agent and that she was perhaps unaware that Newman would serve in this capacity. (See, e.g., pp. 5-6: "Ms. Miller had never spoken to Mr. Newman about any loan or the power of attorney," "Mr. Newman, who was purportedly Ms. Miller's attorney-in-fact," and "the power of attorney Ms. Miller signed did not even name an attorney-in-fact"). However, Miller's own prior affidavit (and binding admission) submitted in connection with PJR proceedings in this matter and her later deposition testimony establish that she had previously discussed the appointment with Falini and they had agreed that Newman would serve as her attorney-in-fact in her absence. The record is undisputed that from the outset Miller intended Newman to be her agent for purposes of closing the 1999 Loan.

After making the decision to designate Newman, according to Miller, "Falini sent me a blank power of attorney." (Conroy Aff., Ex. M at ¶ 6). Miller then took the power of attorney to her local bank to execute it. (Id., Ex. M at ¶ 7). According to the PJR affidavit executed by Miller, "[a]fter I signed the power of attorney in front of two witnesses and a notary public at the bank, I gave it to Falini." (Id., Ex. M at ¶ 7.)

---

[3] In this regard, it should be noted that Miller has testified that while it was Falini that introduced her to Newman and another accountant in 1998, it was Miller herself who decided to hire Newman
(continued...)

At that time, according to Miller's own Rule 56(a)1 Statement, Miller essentially prepared the Power of Attorney in reverse. She initialed the boxes for the powers she intended to grant, real estate transactions and banking transactions, and did not initial the other boxes. (Paragraphs 14 and 15). The Connecticut Statutory Short Form Power of Attorney, on the form itself, instructs the principal to "[s]trike out and initial in the opposite box any more of the subdivisions as to which the principal does NOT desire to give the agent authority." (Conroy Aff., Ex. J). On that same day, Miller then provided the form to Falini, "[who] said that Mr. Newman did not need authority to sell my stock but he did need more authority than I had given him. Falini then "whited out" some of my markings." (Conroy Aff., Ex. M at ¶ 7). While Miller states that she did not put white-out on the Power of Attorney (see Pl. Rule 56(a)1 Statement at ¶ 46), Miller omits her own statement that Falini made the white-outs in her presence, <u>in her home</u>. (See Conroy Aff., Ex. A at 299-300; Ex. L, Interrogatory Response No. 7 verified by Miller: "Mr. Falini whited-out the document in plaintiff's house; plaintiff was with Mr. Falini at the time. . . . Plaintiff does not presently recall whether anyone else observed Mr. Falini adding the white-out to the power of attorney.")[4] Miller has admitted, at a minimum, that she was contemporaneously aware of the whiting-out, and its purpose, i.e., to allow the loan to close in her absence. Any basis for a contrary finding is absent from this record.

---

(...continued)

after meeting with both candidates. (Supp. Conroy Aff., Ex. A at 141-142).

[4] To the extent Miller complains about the advice or actions of Jay Falini, her financial consultant at MLPF&S, those complaints are the subject of a separate arbitration proceeding before the New York Stock Exchange. (NYSE Docket No. 2004-015205). As discussed more fully in MLCC's Memorandum of Law in Support of Its Motion for Summary Judgment, Falini was not acting as an agent of MLCC and, accordingly, any such actions or inactions by Falini do not concern MLCC. (<u>See</u> Stewart Aff. at ¶ 13).

Moreover, not only did Miller testify she was present for the alleged application of the white-out, she never took any action to stop Falini, if in fact he was the one who applied the white-out, and never told him that she did not want the white-out to be applied. (Conroy Aff., Ex. A at 299-300, 306-307.)   Indeed, after Falini allegedly applied white-out to the document, Miller then permitted the Power of Attorney to be used to close the transaction, which she acknowledges in her PJR Affidavit was a "loan closing." (Conroy Aff., Ex. M at ¶¶ 5, 7-8.)[5]  Miller subsequently received the Power of Attorney, with white-out, back from the Town Clerk after it was recorded and never disputed its validity until this litigation (over three years later).  All of these admissions compel the finding that any changes made to the Power of Attorney in her direct presence and without complaint were consistent with Miller's original intent to provide the required authority to Barry Newman to close the 1999 Loan in her absence.  Although Miller later amended certain portions of her interrogatory responses, this admission remains unchanged.  At best, they constitute issues of fact which mandate denial of her motion.

Furthermore, Miller's Rule 56(a)1 Statement states that: "The POA as originally executed by plaintiff did not include the name and address of an attorney-in-fact." (Paragraph 13),

---

[5] At the third session of her deposition on January 5, 2005, Miller suddenly attempted to testify, on examination by her own counsel, contrary to testimony she had given in October 21, 2003 that her Affidavit submitted in the PJR proceeding (Conroy Aff., Ex. M) was inaccurate insofar as she identified certain initialing on the Power of Attorney as hers. However, Miller reaffirmed under oath at the deposition that the remainder of her PJR Affidavit was accurate, which would include her statements that she discussed Newman's authority and the need for different authority with Falini after signing the Power of Attorney, that Falini then made white-outs with her knowledge and in her presence, and that Miller received the Power of Attorney back directly from the Norwalk Town Clerk. (Conroy Aff., Ex. M; Supp. Conroy Aff., Ex. A at 466-467). As stated earlier, Miller's earlier statements in her PJR affidavit are, under pertinent case law, binding admissions. Even were they not, her admitted knowledge of what occurred with the Power of Attorney are sufficient to waive her claim of invalidity.

and Miller suggests in her memorandum of law that Falini filled in Newman's name. However, in her deposition, Miller testified that the name Barry Newman in the version of the Power of Attorney filed with the City of Norwalk in fact resembled her handwriting. (Supp. Conroy. Aff., Ex. A at 297-298, 449-450).[6]

On a related point, Miller claims in her memorandum of law (pp.14-16) that Newman exceeded the scope of his authority in executing the Pledge Agreement because the Power of Attorney gave Newman authority to enter "real estate transactions" and "banking transactions" but not "bond, share and commodity transactions." Miller argues that the "bond, share and commodity transactions" power is more specific to securities pledge transactions than the "banking transactions" power, and thereby the lack of specific authority for pledge transactions defeats the grant of general authority for banking and real estate transactions. In making this argument, Miller totally misconstrues the transaction at issue and misreads the power of attorney statute.

The entire purpose of the 1999 Loan transaction, and the reason why Miller signed the Power of Attorney in the first place, was for Miller to *borrow money* from MLCC, a lending institution (*i.e.*, a banking transaction), to be used by Miller in the construction of her residence (*i.e.*, a real estate transaction). This particular *loan transaction* would require execution of a Note to evidence the debt, a Mortgage to secure MLCC's interest in the real property, and a Pledge

_____

[6] Miller attempts to moot her admissions by making an analogy to conveyance authorities to support a technical argument that the white-outs invalidate the Power of Attorney. However, even in the deed context, the parties' intent will control. See Cohen v. City of Hartford, 244 Conn. 206, 214-15 (1998) (a deed shall be construed as to effectuate the intent of the parties); Luce v. Niantic Menhaden Oil & Guano Co., 86 Conn. 147 (1912) (to ascertain proper construction to be given a deed, court should discover the intent of the parties to the deed). She was aware of the white-outs when they occurred, they were explained to her, and Miller made no objection. The alterations conformed the document to reflect her intent.

Agreement as additional security for the loan.  It is difficult to imagine a transaction which fits more closely within the description of "banking transactions" as provided in Conn. Gen. Stat. § 1-47(7): "to borrow money. . . by promissory note of the principal given for such period and at such interest rate as the agent may select; to give security out of the assets of such principal as the agent deems desirable or necessary for any such borrowing. . . and to procure for the principal a loan. . . by any other procedure made available by such banker or institution." [7]

Here, Miller, through Newman as her attorney-in-fact, borrowed money by promissory note and gave security out of the assets of Miller, specifically a mortgage on her real estate and a pledge of securities, which was a necessary component of the borrowing transaction. The entire 1999 Loan transaction is squarely within the express purview of the banking transaction identified in § 1-47(7).  The 1999 Loan transaction at issue was not an isolated transaction in pledged securities, which might fall within the intended scope of the bond, share, and commodity power described in Conn. Gen. Stat. § 1-46(2), as opposed to the banking transactions power of § 1-

---

[7] With respect to "real estate transactions," Conn. Gen. Stat. § 1-44 provides, in pertinent part, as follows: "[i]n a statutory short form power of attorney, the language conferring general authority with respect to real estate transactions shall be construed to mean that the principal authorizes the agent . . . (2) to sell, to exchange, to convey either with or without covenants, to quit claim, to release, to surrender, to mortgage, to encumber, to partition or to consent to the partitioning, to revoke, create or modify a trust, to grant options concerning, to lease or sublet, or otherwise to dispose of, any estate or interest in land. . ."

47.[8]  Accordingly, the Note, Mortgage, and Pledge Agreement were all originally authorized and contemplated by the Power of Attorney.

In summary, any issue of fact which might exist regarding the intent of the Power of Attorney, its preparation and execution, and the scope of its authority, are caused only by Miller's failure to place before the Court her own sworn admissions.  Even assuming there were issues of fact with respect to the Power of Attorney, they are wholly academic.  Miller (i) waived claims about the Power of Attorney in the Modification Agreement (Point I above) and, separately (ii) ratified the 1999 Loan transaction by her subsequent actions and inactions (Point II above ).  Given the Modification Agreement and its related waiver and the ratification by Miller of these transactions, both prior to January 2001 and thereafter, any alleged defects in the Power of Attorney are of no consequence.  As mentioned, the same result should be reached, under these facts, even if Miller had never executed a power of attorney.

---

[8] In Paragraph 3 of her Local Rule 56(a)(1) Statement, Miller admits and agrees that the securities pledge was simply a component part of the overall loan transaction with MLCC: "The Loan was for $7.5 million to be evidenced by a promissory note ("Note") and secured by a mortgage on plaintiff's property at 21 Point Road, Norwalk, Connecticut ("Mortgage") in addition to a pledge ("Pledge") of plaintiff's marketable securities in a certain value to be held by MLPFS for the benefit of MLCC ("Pledge Account")." [internal exhibit references omitted].  This is a binding admission. See In re Worldcom, Inc. Securities Lit., 308 F. Supp. 2d 214, 232 (S.D.N.Y. 2004) ("judicial efficiency demands that a party not be allowed to controvert what it has already unequivocally told a court by the most formal and considered means possible").

## CONCLUSION

In her motion for summary judgment, Miller boldly attempts to avoid her obligation to repay the $7,500,000 that she borrowed from MLCC in December 1999 and subsequently spent for her own benefit. Miller does not dispute that she got the money from MLCC. Miller does not even dispute that she spent that money for her own purposes, mainly to construct the mansion in which she currently resides and has lived without payment for over two years. Unable to dispute the fact she got the money, spent it, and has not given it back, Miller argues that she owes MLCC nothing because the Power of Attorney she executed in December 1999 suffers from alleged technical defects or that her attorney-in-fact exceeded his authority. For the reasons stated herein, this argument is of no avail.

First, in 2001, Miller personally signed a Modification Agreement affirming the validity of the Note and Mortgage and waiving any defenses to enforceability, which would necessarily include the waiver of a defense based upon defects in the Power of Attorney or lack of authority by her agent. Second, by both her earlier and subsequent actions and inactions, Miller ratified the entire 1999 Loan transaction, including the Note, Mortgage, and Pledge Agreement, and may not now disavow her obligations in this litigation. In short, Miller took the loan proceeds, used them for her purposes, made monthly payments for over three years, without complaint as to the propriety of the transaction, and is now attempting to avoid paying it back. This she cannot do. Third, her admissions under oath indicate that her arguments concerning the scope of the Power of Attorney are baseless. She knew Newman was to execute loan documents on her behalf, was aware of the whiting-out which she stated occurred in her presence and the reasons for which were explained to her, and her intent could not be more clear. Fourth, as mentioned, the same results

flow from these facts irrespective of whether any power of attorney form was ever executed. At worst, Miller's motion for summary judgment presents disputed issues of material fact. Those questions of fact, however, have nothing to do with Miller's acknowledgment, waiver of defenses to, and ratification of the 1999 Loan.

For all of the foregoing reasons, MLCC respectfully requests that (i) Miller's motion for summary judgment be denied; (ii) MLCC's motion for summary judgment be granted on its first or second Counterclaims; and (iii) Counts I through IX of Miller's Complaint be dismissed in their entirety.

Dated: July 1, 2005

PAUL, HASTINGS, JANOFSKY &
WALKER LLP

By: _Douglas C. Conroy_
Douglas C. Conroy (ct 11555)
Matthew R. Paul (ct 21036)
1055 Washington Boulevard
Stamford, CT 06901-2217
Telephone: (203) 961-7400
Facsimile: (203) 359-3031
Email: douglasconroy@paulhastings.com
        matthewpaul@paulhastings.com

COHEN AND WOLF
Jonathan S. Bowman (ct 08526)
Ari Hoffman (ct 22516)
1115 Broad Street
Bridgeport, CT 06604
Tel: 203-368-0211
Fax: 203-576-8504
Email: jbowman@cohenandwolf.com
        ahoffman@cohenandwolf.com

Counsel for Defendant and Counterclaimant
MERRILL LYNCH CREDIT CORPORATION

## CERTIFICATE OF SERVICE

This is to certify that on this 1st day of July 2005, a copy of the foregoing Defendant's

Opposition to Plaintiff's Motion for Summary Judgment was delivered via U.S. first class mail to:

Patrick W. Begos, Esq.
Christopher Brown, Esq.
BEGOS & HORGAN, LLP
327 Riverside Avenue
Westport, CT 06880

Jonathan S. Bowman, Esq.
Ari Hoffman, Esq.
COHEN AND WOLF
1115 Broad Street
Bridgeport, CT  06604

Douglas C. Conroy

STM/297207.5

- 23 -