UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JULIE DILLON RIPLEY MILLER,

        Plaintiff and Counterclaim
        Defendant,

- against -

MERRILL LYNCH CREDIT CORPORATION,

        Defendant and Counterclaimant.

NO. 3:03 CV 1016 (RNC)

JULY 1, 2005

## SUPPLEMENTAL AFFIDAVIT OF DOUGLAS C. CONROY

STATE OF CONNECTICUT)
            )       ss:  Stamford
COUNTY OF FAIRFIELD  )

Douglas C. Conroy, being first duly sworn, deposes and states:

1.     I am a member of Paul, Hastings, Janofsky & Walker LLP, 1055 Washington Boulevard, Stamford, Connecticut, 06901, and a member of the bar of this Court.

2.     I make this Affidavit in my capacity as counsel of record for Merrill Lynch Credit Corporation ("MLCC"), defendant and counterclaimant in the above-entitled action.

3.     In further support of MLCC's motion for summary judgment and in opposition to Plaintiff's motion for summary judgment, the purpose of this Supplemental Affidavit is to place before the Court true and correct copies of additional portions of deposition testimony.

4.     The deposition of Plaintiff Julie Dillon Ripley Miller ("Miller") was taken on three separate occasions at my firm's office in Stamford, Connecticut: October 20, 2003, October 21, 2003, and January 5, 2005.  Attached hereto as **Exhibit A** are the following pages from

Miller's deposition transcript: 141-142, 163-165, 297-298, 349-351, 449-450, and 466-467.

5.     The deposition of Harvey Rosenblum ("Rosenblum") was taken in Jacksonville, Florida on February 13, 2004.  Attached hereto as **Exhibit B** are the following pages from Rosenblum's deposition transcript: 15-18.

6.     The deposition of Jay Falini ("Falini") was taken in Philadelphia, Pennsylvania on January 11, 2005.  Attached hereto as **Exhibit C** are the following pages from Falini's deposition transcript: 253-256.


DOUGLAS C. CONROY


Subscribed and sworn to
before me this 1st day of
July 2005.


Notary Public
My Commission Expires: 12/31/09


SCARLETT LEE MOORE
Notary Public of Connecticut
My Commission Expires
December 31, 2009
Notary # 140049

2

## CERTIFICATE OF SERVICE

This is to certify that on this July 1, 2005, a copy of the foregoing SUPPLEMENTAL

AFFIDAVIT OF DOUGLAS C. CONROY was delivered via first class U.S. mail to:

> Patrick W. Begos, Esq.
> Christopher Brown, Esq.
> BEGOS & HORGAN, LLP
> 327 Riverside Avenue
> Westport, CT 06880

> Jonathan S. Bowman, Esq.
> Ari Hoffman, Esq.
> COHEN AND WOLF
> 1115 Broad Street
> Bridgeport, CT  06604

Douglas C. Conroy

STM/297929.1

3

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

**COPY**

_____X

JULIE DILLON RIPLEY MILLER,    :    CIVIL ACTION

          Plaintiff    :    NO: 3:03-CV-1016

VS.    :    (RNC)(DFM)

MERRILL LYNCH CREDIT CORPORATION, :

          Defendant    :

_____X

VOLUME I, PAGES 1 - 188

DEPOSITION OF:  JULIE DILLON RIPLEY MILLER

DATE:  OCTOBER 20, 2003

HELD AT:  PAUL, HASTINGS, JANOFSKY & WALKER

          1055 WASHINGTON BOULEVARD

          STAMFORD, CONNECTICUT

Reporter:  Margaret A. Sharpe, LSR 00023

BRANDON SMITH REPORTING SERVICE

44 Capitol Avenue

Hartford, CT  06106

(860) 549-1850

John@brandonreporting.com

BRANDON SMITH REPORTING SERVICES

5b39f20e-6470-438f-8eda-eed63b9530

Miller vs Merrill Lynch

Page 141

1    Q    And your father died in May of 2001?

2    A    March 2001.

3    Q    March 2001.  How did you come to retain Mr.

4  Newman as an accountant?

5    A    Mr. Falini introduced me to Mr. Newman.

6    Q    Did Mr. Falini tell you how he knew of Mr.

7  Newman?

8    A    No, I don't know the details of that.

9    Q    Did you -- did Mr. Falini introduce you to

10  other potential accountants also?

11   A    He introduced me to Mr. Bill Miller; and I

12  think his office is in Darien, yeah, Darien.  And he was

13  actually a neighbor of mine, and I liked Mr. Newman better.

14   Q    Who did you use before Mr. Newman?

15   A    I didn't really need to use anybody.  We had

16  a friend of my husband's; but he was just a friend, so

17  really wasn't an official -- he did not actually sign our

18  returns.

19   Q    Did he have an accounting background?

20   A    Yes, he did.

21   Q    And who was that?

22   A    Peter Lyew, I think it's L-y-e-w, but I'm

23  not sure.  He's in Stamford.

24   Q    And you chose Mr. Newman because you liked

25  him better than Mr. Miller?

5b39f20e-6470-438f-8eda-eed63b9530d

Miller vs Merrill Lynch

10/20/2003                                    Julie Dillon Ripley Miller

Page 142

1       A      Yes.

2       Q      Do you recall the name of Mr. Miller's firm?

3       A      I believe he's a private firm in Darien but

4  I don't remember.

5       Q      Is he -- do you understand he was just a

6  solo practitioner, so to speak?

7       A      I don't recall.

8       Q      Who made the choice between Mr. Miller and

9  Mr. Newman?

10      A      I did.

11      Q      You did.

12             MR. CONROY:  I'm going to mark as exhibit

13  next in order what's called the Merrill Lynch Annual

14  Statement 1999, annual summary, consisting of fourteen

15  pages and addressed to Ms. Julie D.R. Miller.

16             (Defendant's Exhibit Number 9 was marked for

17             identification)

18  BY MR. CONROY:

19      Q      Mrs. Miller, I'd like -- look at as much of

20  that document as you would like.  I would like to refer you

21  to page 9 of 14.  Do you recall receiving year-end

22  statements called annual summary from Merrill Lynch Pierce

23  Fenner and Smith?

24      A      I don't remember.  I received a lot of

25  statements.  I don't remember specifically annual

5b39f20e-6470-438f-8eda-eed63b9530d

Miller vs Merrill Lynch

Page 163

1       Q     -- for the purposes of making loan payments?

2       A     Yes.

3       Q     Do you recall how much?

4       A     Twenty-five thousand a month, I think.

5       Q     Per month?

6       A     Yes.

7       Q     Did she tell you how she made those

8 arrangements?

9       A     She made -- she knew someone in Merrill

10 Lynch Credit Corp, someone higher up in Merrill Lynch

11 Credit Corp.

12      Q     Who had approved this?

13      A     I don't remember the name.

14      Q     Did she tell you that this was possible

15 because of the increased appraisal?

16      A     I don't remember her telling me details.

17      Q     And you recall that the rate was lower?

18      A     Yes.

19      Q     Did you tell Ms. Kamhi or Mr. Crowe that you

20 thought that the pledge was unauthorized?

21      A     No, I don't remember telling them that.

22      Q     Did you deal yourself with Mr. McEnerney at

23 any point in time?

24      A     I've never met Mr. McEnerney.  I only talked

25 to him a few times over the telephone.

5b39f20e-6470-438f-8eda-eed63b9530c

Miller vs Merrill Lynch

10/20/2003                                          Julie Dillon Ripley Miller

Page 164

| | | |
|---|---|---|
| 1 | Q | Do you understand he was with Merrill Lynch |

2  Credit Corp?

3          A       Yes.

4          Q       At any time did you tell Mr. McEnerney that

5  you believe that the pledge was unauthorized?

6          A       No, I never discussed it with him.

7          Q       Okay.  Other than your discussions with Mr.

8  Falini in late 2000 that you told us about, did you ever

9  tell anybody at Merrill, Lynch, Pierce, Fenner, and Smith

10  that you did not understand how the pledge agreement had

11  been entered into?

12         A       No.

13         Q       Okay.  And other than your -- strike that.

14                 Did you ever tell anybody at Merrill Lynch

15  Credit Corp that you did not understand how the pledge

16  agreement had been entered into?

17         A       I never talked to anybody at Merrill Lynch

18  Credit Corp until John McEnerney in fall of whatever --

19  that fall of -- that would have been 2002.

20         Q       Did you ever tell him that you thought --

21  did you ever have a discussion with -- strike that.

22                 Did you ever have a discussion with Mr.

23  McEnerney telling him that you did not understand how the

24  pledge agreement had been entered into?

25         A       One really doesn't have discussions with Mr.

5b39f20e-6470-438f-8eda-eed63b9530d

Miller vs Merrill Lynch

Page 165

1    McEnerney.  He tells you what he wants you to do, period.

2    So, no, I did not.

3          Q       You did not.  Okay.  Once you learned that

4    the pledge agreement had been entered into, did you make

5    any attempts, from any source, to obtain a copy of the

6    pledge agreement?

7          A       No, I did not.

8          Q       Did you talk to Mr. Newman about the pledge

9    agreement after this discussion with Mr. Falini?

10         A       No.

11         Q       Did you ever, yourself, tell Mr. Newman that

12   he had not been authorized to execute a pledge agreement on

13   your behalf?

14         A       Again, with Mr. Newman, I thought -- and he

15   thought as well -- that he was signing for a construction

16   loan.  There was never any mention of a pledge agreement

17   between us.

18         Q       I'm talking about once you knew that a

19   pledge agreement had evidently been entered into -- strike

20   that.

21               Did Mr. Falini tell you that there had been

22   -- that the reason that the account was shown as being for

23   the benefit of Merrill Lynch Credit Corporation was that a

24   pledge agreement had been entered into?

25         A       I don't remember if he said that.

5b39f20e-6470-438f-8eda-eed63b9530d

Miller vs Merrill Lynch

10/21/2003                                          Julie Dillon Ripley Miller

Page 189

1                    UNITED STATES DISTRICT COURT

2                    DISTRICT OF CONNECTICUT                COPY

3

4    _____X

5    JULIE DILLON RIPLEY MILLER,       :    CIVIL ACTION

6              Plaintiff              :    NO: 3:03-CV-1016

7    VS.                               :    (RNC)(DFM)

8    MERRILL LYNCH CREDIT CORPORATION, :

9              Defendant              :

10   _____X

11             VOLUME II, PAGES 189 - 318

12             DEPOSITION OF:  JULIE DILLON RIPLEY MILLER

13             DATE:  OCTOBER 21, 2003

14             HELD AT:  PAUL, HASTINGS, JANOFSKY & WALKER

15                       1055 WASHINGTON BOULEVARD

16                       STAMFORD, CONNECTICUT

17

18

19             Reporter:  Margaret A. Sharpe, LSR 00023

20             BRANDON SMITH REPORTING SERVICE

21                  44 Capitol Avenue

22                  Hartford, CT  06106

23                  (860) 549-1850

24                  john@brandonreporting.com

25

2e443a25-67b3-4061-b7a7-6a451ffa8e1

Miller vs Merrill Lynch

10/21/2003                                          Julie Dillon Ripley Miller

Page 297

1    copy of the power of attorney as recorded in the land

2    records of the City of Norwalk or Town of Norwalk and

3    appears to be dated December 2nd.

4                    (Defendant's Exhibit Number 44 was marked

5                    for identification)

6    BY MR. CONROY:

7            Q       Do you recognize that power of attorney,

8    Mrs. Miller?

9            A       Yes, I do.

10           Q       And --

11           A       Excuse me.  For the record, it's Nancy

12   Borchetta.

13           Q       I was going to ask you about that.  There

14   appears to be two witnesses here.

15           A       Both at First Country -- Fairfield County

16   Savings Bank.

17           Q       And Theresa Marson is also a person there?

18           A       Correct.  I'm not sure she is still there

19   but --

20           Q       Do you believe Ms. Borchetta still is?

21           A       Yes.

22           Q       And your signature appears in the lower

23   right-hand corner?

24           A       Correct.

25           Q       And using this copy only for the moment

2e443a25-67b3-4061-b7a7-6a451ffa8ef

Miller vs Merrill Lynch

Julie Dillon Ripley Miller

Page 298

1    where it says "Barry Newman" in your handwriting.

2          A      Correct.

3          Q      When you received this, was Julie Dillon

4    Ripley Miller already typed in?

5          A      Yes, it was.

6          Q      And prior to this, you had already discussed

7    with Mr. Falini the fact that it was going to be Newman who

8    was going to be the person acting with the power of

9    attorney?

10         A      That's correct.

11         Q      Okay.  And then you've written on the

12   right-hand side, "approval of all contractor's long address

13   advance to Condon-Brown Inc. JDRM, initial each one,"

14   correct?

15         A      That's correct.

16         Q      And then it's your recollection that you put

17   your initials in each of the boxes the middle of the middle

18   portion of the document or brackets?

19         A      Yes, correct.

20         Q      Did you do it where it says "all other

21   matters?"

22         A      No.

23         Q      And you didn't put your initials where it

24   said "special provision," correct?

25         A      Correct.

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

COPY

-------------------------------X

JULIE DILLON RIPLEY MILLER        :

            Plaintiff             :

        VS.                       :  NO. 3:03CV1016(RNC)

MERRILL LYNCH CREDIT CORP.        :      Volume III

            Defendant             :

-------------------------------X

D E P O S I T I O N


THE DEPOSITION OF JULIE DILLON RIPLEY

MILLER, taken on behalf of the Defendant,

pursuant to the Federal Rules of Civil

Procedure, before Melodie Ajello, Registered

Professional Reporter, Notary Public within the

State of Connecticut, on the 5th day of January,

2005, at 10:10 a.m, at the offices of PAUL,

HASTINGS, JANOFSKY & WALKER, 1055 Washington

Boulevard, Stamford, Connecticut 06902.


GOLDFARB AND AJELLO REPORTING SERVICES
24 East Avenue #1372
New Canaan, Connecticut  06840

DISK
ENCLOSED

Goldfarb & Ajello

0197b9f0-b299-4d79-9f8e-888ec71a0d79

Page 349

1    the Merrill Lynch February 2001 letter said about the

2    interest rate --

3         A.     Yes.

4         Q.     -- and what the note said about the interest

5    rate?

6         A.     Yes.

7         Q.     And how had that come to your attention?

8         A.     Through Laurie Kamhi.

9         Q.     Had you had any discussions directly with

10   Merrill Lynch Credit Corporation concerning that statement

11   prior to receipt of this letter from Mr. Dimoush?

12        A.     No.

13        Q.     So that -- and is it fair to state that as a

14   result of Ms. Kamhi's efforts, the note rate was reduced

15   down to the rate that had been reflected in the letter you

16   had received?

17        A.     That's correct.

18               MR. CONROY:  I'm going to ask the

19               Reporter to mark next in order, document

20               entitled "Modification Agreement."  Consists

21               of MLCC 357 through 362, appears to be

22               executed by Mrs. Miller on February 7, 2001.

23                    (Marked Defendant's 53 for I.D.)

24        Q.     Do you recognize your signature on

25   Exhibit 53, Mrs. Miller?

Goldfarb & Ajello

Page 350

1          A.      I do recognize my signature, I don't
2    remember all these other people on here.
3          Q.      We'll get to that in a minute, but on page
4    MLCC 360, that is your signature in the upper right?
5          A.      It appears to be.
6          Q.      It appears that your signature was witnessed
7    by a Notary Public in the District of Columbia, does that
8    refresh your recollection that you took the document down
9    with you to Washington?
10         A.      I may have, I don't remember.
11         Q.      On page MLCC 360 there are two names to the
12   left of your signature?
13         A.      I see that.
14         Q.      Do you recognize either of those names?
15         A.      No.
16         Q.      Do you recall where you were when you signed
17   this document in terms of an office or a bank or someplace
18   else?
19         A.      I don't recall.
20         Q.      The first name appears to be Morris, I may
21   have this wrong, Brown.  Does the name Morris Brown ring a
22   bell with you?
23         A.      No.
24         Q.      Do you recall returning this document to
25   Merrill Lynch?

Goldfarb & Ajello

0197b9f0-b299-4d79-9f8e-888ec71a0d79

Page 351

1      A.      No, I don't recall.  Obviously did, but I

2  don't recall.

3      Q.      Did you read through before you signed it?

4      A.      I don't remember that.

5      Q.      Would you ordinarily read through legal

6  documents before you signed them?

7      A.      Yes.

8      Q.      Do you recall discussing the contents of

9  this document with anyone before you signed it?

10     A.      No, I don't recall.

11                  MR. CONROY:  We've been running for

12             about an hour, why don't we take a short

13             break?

14                  MR. BEGOS:  Okay.

15                  (RECESS)

16     Q.      Mrs. Miller, do you have an email system

17  that you use?

18     A.      I am not very computer literate, but I'm

19  getting there.

20     Q.      How long have you had an email address?

21     A.      I'm not sure I can remember exactly.  Since

22  2000, maybe, I don't remember if I had one in 1999.

23     Q.      Have you gone back as part of any effort to

24  retrieve files in this matter and checked your email

25  system to see if you have any responsive documents?

0197b9f0-b299-4d79-9f8e-888ec71a0d79

Page 449

1  office.

2        Q.    Well, let me ask you this having seen

3  Exhibits 104 and 105, can you tell us now your best

4  recollection as to what writing on the original Power of

5  Attorney -- and Defendant's Exhibit 44 is a copy of the

6  Power of Attorney, the original Power of Attorney that was

7  actually filed with the Norwalk Land Records.  Can you

8  walk us through that and tell us what parts of the

9  handwriting are yours to the best of your recollection?

10        A.    This is my handwriting.

11        Q.    Okay.  Let's look at, I want you to look at

12  Exhibit 44.

13        A.    This is my handwriting.

14        Q.    I think for the record --

15        A.    Excuse me.

16              MR. CONROY:  I think for the record

17              we better indicate what she's referring to.

18        A.    I'm pointing to what is, I believe,

19  Exhibit 44.

20        Q.    The paragraph you pointed to is the

21  statement approval of all contractor loan advances to

22  Condon-Brown, Inc. JDRM and its the top writing of that

23  phrase, correct?

24        A.    That's correct.

25        Q.    How about, there's a second writing of that

Page 450

1    phrase underneath it?

2         A.      That's not my writing.

3         Q.      All right.  There are a series of JDRM

4    initials in brackets --

5         A.      Those are not my initials, and I remember in

6    October of 2003, before my deposition, before coming here

7    saying that to you at length.

8         Q.      Let's not talk about anything that you had,

9    any conversations you had with me or any counsel.

10              The Barry Newman written in on the top, to

11   the best of your knowledge is that your handwriting?

12        A.      It looks similar to my handwriting, but I

13   don't ever remember writing that.

14        Q.      Is the name Barry Newman written in on

15   Exhibit 104?

16        A.      No.

17        Q.      Okay.  Now, on Exhibit 104 there are several

18   JDRMs that have been whited out on Exhibit 44; do you know

19   who wrote those JDRMs?

20        A.      Which ones?

21        Q.      The -- I'm looking at Exhibit 44 -- I'm

22   sorry, Exhibit 104.  There's a JDRM in brackets on line A?

23        A.      Yes.

24        Q.      Do you know who wrote that?

25        A.      I did.

Goldfarb & Ajello

Page 466

1      A.      No, I don't remember that.  When I signed

2  the affidavit or signed the Power of Attorney?

3      Q.      Signed the affidavit?

4      A.      I don't remember.

5      Q.      So you don't know as of the time you signed

6  the affidavit whether you understood that your initials in

7  the brackets withheld authority as opposed to granting it?

8                  MR. BEGOS:  Object to the form.

9                  You're asking her recollection today about

10                 what she recalled when she signed the

11                 affidavit?

12                 MR. CONROY:  Correct.

13     A.      I don't remember if I understood it

14  completely.

15     Q.      Do you have an understanding now as to what

16  the initialing in the brackets signifies?

17     A.      Yes.

18     Q.      And what do you understand that to mean?

19                 MR. BEGOS:  Objection, to the extent

20                 it calls for a legal conclusion, but you can

21                 answer based on your understanding.

22     A.      Where it's initialed the person who has

23  Power of Attorney is not supposed to be able to do

24  anything with those decisions or reports.

25     Q.      Okay.  So it's your present belief that your

Goldfarb & Ajello

Page 467

1    affidavit is inaccurate insofar as it identifies the

2    initialing as yours; is that correct?

3         A.    That's correct.  And I realized that right

4    before my deposition, it bothered me and I did mention it

5    that --

6                        MR. BEGOS:  Don't talk about any

7                   communications with counsel, Mrs. Miller.

8         Q.    So your statement is that you realized it

9    before your earlier deposition?

10        A.    Correct.  But I had already signed the

11   affidavit at that point.

12        Q.    Is any other portion of your affidavit

13   inaccurate to your knowledge?

14        A.    No.

15                        MR. CONROY:  I have no further

16                   questions.

17                        MR. BEGOS:  Let me ask you a couple

18                   of questions.

19                   RECROSS-EXAMINATION

20   BY MR. BEGOS:

21        Q.    Is your affidavit, when you signed your

22   affidavit, was it accurate to the best of your knowledge?

23        A.    To the best of my knowledge at that time,

24   yes.

25        Q.    And prior to the last session of your

Goldfarb & Ajello

0197b9f0-b299-4d79-9f8e-888ec71a0d79

**Exhibit B**

1

# COPY

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JULIE DILLON RIPLEY MILLER,

    Plaintiff,

vs.                    CASE NO. 03-CV-1016(RNC)(DFM)

MERRILL LYNCH CREDIT CORPORATION,

    Defendant.
_____

STATE OF FLORIDA    )
COUNTY OF DUVAL      )

    Videotaped Deposition of HARVEY ROSENBLUM, taken on

behalf of the Plaintiff herein, pursuant to Amended

Notice of Deposition and subpoena, at the Omni

Jacksonville Hotel, Miami Room, 245 Water Street,

Jacksonville, Duval County, Florida, on Friday,

February 13, 2004, beginning at 9:42 a.m., before

Bobbie A. Umstead, RPR, a Notary Public in and for the

State of Florida at Large.

            - - -

ELLEN GRAUER COURT REPORTING CO.
133 EAST 58TH STREET, SUITE 1201
NEW YORK, NEW YORK 10022
(212) 750-6434
REF: 72884

15

1      Correct.

2      Q     Okay.  And you've agreed to testify on MLCC's

3  behalf concerning those subjects?

4      A     Correct.

5      Q     All right.  Now, Subject 4 is, quote, "MLCC's

6  review and/or approval of the power of attorney dated

7  December 2, 1999, including but not limited to the

8  copies produced at MLCC 307 to 309 and MLCC 327," close

9  quote.

10      Item 5 is, quote, "Communications between MLCC

11  and Kevin Huben regarding the loan," close quote.

12      Do you have -- before I show you any

13  documents, let me ask you:  Do you have any independent

14  recollection of the power of attorney that's referred to

15  in Item 4 of this deposition notice?

16      A     Yes.

17      Q     All right.  Tell me what you recall about the

18  power of attorney that was obtained by MLCC in

19  connection with the 1999 loan to Ms. Miller.

20      A     I recall receiving the first power of

21  attorney, and I noticed that the box for

22  mortgage-related items was crossed off.  And with an X

23  in that box, to me that meant that it did not authorize

24  that power of attorney to execute mortgage

25  documentation.

16

1    Q    You say you received the first power of

2  attorney.  Did you receive a second power of attorney?

3    A    Yes.

4    Q    Tell me what you did after you received the

5  first power of attorney.

6    A    I contacted Jay Falini.

7    Q    Was it Mr. Falini who had sent you the first

8  power of attorney?

9    A    That I don't know.

10    Q    All right.  Was it your responsibility to

11  review the power of attorney before the closing?

12    A    Yes.

13    Q    All right.  So you contacted Mr. Falini -- and

14  he was Ms. Miller's broker -- correct? -- financial

15  consultant?

16    A    Correct.

17    Q    And he worked for Merrill Lynch, Pierce,

18  Fenner & Smith?

19    A    Correct.

20    Q    What did you discuss with Mr. Falini?

21    A    I explained to Jay that that box for real

22  estate transactions had been X'd out, which indicated

23  that the power of attorney could not sign all the

24  documents required within this loan process.

25    Q    And what did you tell him you needed?

17

1    A    I needed a new power of attorney with that box
2    not X'd out if we wanted to proceed with a power of
3    attorney.
4    Q    Did you tell him you needed a new power of
5    attorney or you needed somebody to change the first
6    power of attorney?
7    A    I don't recall.
8    Q    Was your understanding -- withdrawn.
9        You then got -- withdrawn, that as well.
10       What, if anything, did Mr. Falini say to you?
11   A    He took care of it.
12   Q    Do you know if you called Mr. Falini the same
13   day that you received the power of attorney?
14   A    I don't recall.
15   Q    And what did -- what do you recall happening
16   next with respect to the power of attorney?
17   A    I received another fax of a power of attorney.
18   Q    From Mr. Falini?
19   A    I don't know where it came from.
20   Q    Was it a new or different power of attorney
21   than the first one?
22   A    It was different in the respect that the real
23   estate box was not X'd out.
24   Q    And what did you do when you received that
25   power of attorney?

18

1       A    I placed it in the file.

2       Q    Did you also place the first power of attorney

3   in the file?

4       A    I believe so.

5       Q    Did you -- am I correct that after you

6   received and reviewed the second power of attorney, you

7   were satisfied that it was sufficient to allow the

8   closing to go forward?

9       A.   Correct.

10      Q    All right.  Is there any notation or memo or

11  DOCCTL note entry that you made on confirming that the

12  power of attorney satisfied you?

13      A    Not to my knowledge.

14      Q    Was it the practice at MLCC to make some sort

15  of notation that a power of attorney had been reviewed

16  and approved?

17      A    No, because the ultimate -- we would review

18  it, but the ultimate decision as far as the approval of

19  that power of attorney would come from the title

20  company, to, you know, ensure that we were in first lien

21  position and this was a proper document that someone

22  could use at a closing.

23      Q    Were there any written guidelines or policies

24  or procedures at MLCC regarding the -- regarding powers

25  of attorney?

**Exhibit C**

171

COPY

1

2          VOLUME II

3      IN THE UNITED STATES DISTRICT COURT

4        FOR THE DISTRICT OF CONNECTICUT

5              -   -   -

6    JULIE DILLON RIPLEY MILLER,:
              Plaintiff          :
7                                :
          vs.                    :
8                                :
     MERRILL LYNCH CREDIT        : CASE NO.
9    CORPORATION,                : 03-CV-1016
              Defendant          : (RNC) (DFM)
10             -   -   -

11
          Philadelphia, Pennsylvania
12        Tuesday, January 11, 2005

13             -   -   -

14        Continued Pretrial Examination of

15   JAY K. FALINI, taken pursuant to notice, at

16   the law offices of Christie, Pabarue,

17   Mortensen & Young, P.C., 1880 JFK Boulevard,

18   10th Floor, on the above date, beginning at

19   approximately 10:15 a.m., before Debra Ann

20   Whitehead, a Court Reporter, an Approved

21   Reporter of the United States District Court,

22   and Notary Public.

23        ELLEN GRAUER COURT REPORTING, LLC.
           133 East 58th Street, Suite 1201
24              New York, New York
                   212-750-6434
25               Ref: 76246

253

Jay K. Falini

1

2    Q.    Did you make any attempt to contact

3    Mrs. Miller once you received the first

4    telephone call from Mr. Huben?

5    A.    I believe I did, yes.

6    Q.    What did you do?

7    A.    I eventually got ahold of Julie and

8    informed her that the Power of Attorney had

9    been completed incorrectly, and asked her if

10   she had already FedEx'd the original to

11   Merrill Lynch Credit Corp.  She had said she

12   had not done it yet.

13        I instructed her to make changes in

14   accordance with what needed to be done to make

15   it correct.

16        And, again, clarified with her that

17   she needed to FedEx that directly to Merrill

18   Lynch Credit Corp. that day so there would be

19   time to get it to closing.

20   Q.    Did you call Mrs. Miller before or

21   after you made corrections and sent the Power

22   of Attorney back to Mr. Huben?

23   A.    I don't recall the exact timing.

24   Q.    Do you recall if you confirmed with

25   Mr. Huben that the changes that you made were

254

                    Jay K. Falini

1

2    acceptable before you spoke to Mrs. Miller?

3        A.    I don't recall.

4        Q.    Did you say anything else to Mrs.

5    Miller in that telephone call?

6        A.    Not that I recall.

7        Q.    What did she say to you in that

8    telephone call?

9        A.    Sorry for completing it wrong,

10   she'll make the changes, and confirmed with me

11   she would FedEx it out to Merrill Lynch that

12   day.

13       Q.    Did she say anything else?

14       A.    Not that I recall.

15       Q.    Did you discuss the pledge agreement

16   with Ms. Miller in that telephone call?

17       A.    Not that I recall.

18       Q.    What did you do with the Power of

19   Attorney that you corrected after you faxed it

20   back to Kevin Huben?

21       A.    Put it in her file.

22       Q.    Was it a file that Merrill Lynch,

23   Pierce, Fenner & Smith maintained for Mrs.

24   Miller's account?

25       A.    Yeah.

1                    Jay K. Falini

2                    MR. CONROY:  Did you mean to

3          say, "yes"?

4                    THE WITNESS:  Yes.  Sorry.

5     BY MR. BROWN:

6          Q.    When you spoke with Mr. Huben the

7     second time about the Power of Attorney, did

8     you tell him how you effected the changes to

9     the Power of Attorney?

10         A.    I don't recall.

11         Q.    Did Mr. Huben ask you how you

12    effected the changes to the Power of Attorney?

13         A.    I don't recall.

14               I would like to add something here.

15    I believe during my call, I am remembering, as

16    part of my call to Huben, I informed him that

17    we're having the client correct the original,

18    and that the original will be at closing.

19         Q.    Did you ask Mrs. Miller in the

20    conversation that you had with her about the

21    Power of Attorney whether she could execute a

22    second Power of Attorney?

23         A.    No.

24               But since you bring that up, the

25    discussion was that she was in such a rush to

256

Jay K. Falini

1
2    get to the airport, and she had so much to do,
3    that she wouldn't have time to get back to the
4    bank to execute a new POA; that she would
5    rather make changes to the one that she had
6    there.
7        Q.   How did you tell her to correct the
8    Power of Attorney that she had?
9        A.   To just white-out where she had
10   initialed and reinitial where she didn't
11   initial.
12       Q.   Did you ask Mr. Huben if an original
13   Power of Attorney with white-out on it would
14   be acceptable?
15       A.   I don't recall.
16       Q.   Did Ms. Dounda tell you how you
17   should remove the initials from the places
18   where they should not have been?
19       A.   I don't recall whether she suggested
20   it or I suggested it.  But it was agreed that
21   I would white-out where she had initialed,
22   reinitial her initials where she should have,
23   and that I would notify the client to make the
24   changes on her document.  And that was it.
25       Q.   Did Ms. Dounda ask you if you could