UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JULIE DILLON RIPLEY MILLER,<br><br>    Plaintiff and Counterclaim Defendant,<br><br>- against -<br><br>MERRILL LYNCH CREDIT CORPORATION,<br><br>    Defendant and Counterclaimant. | NO. 3:03-CV-1016 (RNC)(DFM)<br><br><br><br><br><br>AUGUST 1, 2005 |

## DEFENDANT MERRILL LYNCH CREDIT CORPORATION'S REPLY BRIEF IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant and Counterclaimant Merrill Lynch Credit Corporation ("MLCC") respectfully submits this Reply Brief in further support of MLCC's Motion for Summary Judgment. Accompanying this Reply Brief, MLCC submits the Supplemental Affidavit of Tara Stewart, the Second Supplemental Affidavit of Douglas C. Conroy, as well as MLCC's Motion to Strike and Objections to Testimony and Related Arguments Submitted by Plaintiff. For the reasons stated herein as well as the reasons stated in MLCC's prior briefing, MLCC's Motion for Summary Judgment should be granted and Plaintiff's Motion for Summary Judgment should be denied in its entirety.

### I.   MILLER'S CONCLUSORY ALLEGATIONS DO NOT CREATE GENUINE ISSUES OF FACT

As an initial matter, Miller's Opposition and the declarations submitted therewith are littered with irrelevant and misleading factual allegations in an apparent attempt to create a "cloud of confusion" concerning MLCC's entitlement to summary judgment. This tactic, however, is

unavailing. "Genuine issues of fact are not created by conclusory allegations." Heublein, Inc. v. U.S., 996 F.2d 1455, 1461 (2d Cir. 1993). As discussed herein, Miller's conclusory allegations on collateral issues are insufficient to negate the meritorious points raised in MLCC's original memorandum of law.

## II. MILLER'S OPPOSITION DOES NOT DISCLOSE KEY ADMISSIONS REGARDING WHAT MILLER KNEW AND WHEN SHE KNEW IT

To analyze Miller's present assertions in opposition to MLCC's Motion for Summary Judgment (Opposition at pp. 2-23), the Court needs to be aware of crucial deposition admissions made by her which are totally inconsistent with the defenses she now asserts. As with her pending summary judgment motion, any hint of these admissions are missing from her second skeletal affidavit dated June 24, 2005. In her Opposition, Miller relies almost exclusively on the testimony of her purported experts, whose testimony is either inadmissible or irrelevant. (See Motion to Strike filed herewith). Ignoring her own admissions as to the deep financial hole she had dug for herself by November 1999, and knowledge of changes in the Power of Attorney, Miller seeks to make MLCC an insurer of her own ill-advised financial decisions bringing to mind the adage: "Let no good deed go unpunished." Miller's admissions directly undermine these assertions and establish waiver of any defenses to the loan documents as a matter of law.

While her present argument attempts to profess ignorance by her of the amount and conditions of the loan and criticizes MLCC for alleged acts of non-disclosure, while asserting she had no direct contact with MLCC, Miller has admitted that at the time of the December 1999 loan:

- She was told by Falini the loan was for $7.5 million. (Second Supplemental Conroy Affidavit ("Sec. Supp. Conroy Aff."), Ex A. at 59-74, 275).

- She believed these were additional funds on top of what she had already spent on the house and would also not pay off the old loan of $1,350,000, meaning that she was contemplating indebtedness of almost $9.5 million. (Id. at 69-70).

- She had access to counsel, in the form of Eric Vaughn-Flam, who had already advised her of a potential claim against Falini and MLPF&S before the 1999 Loan was arranged. (Id. at 201-212).

- She understood that, upon completion of construction, she could decide whether to convert to a permanent loan. (Id. at 273-274).[1]

Furthermore, Miller's deposition testimony in this action is replete with knowledge that she was fully aware of the true circumstances of her 1999 loan transaction after the closing, and was in fact advised by her counsel of potential claim against Falini, MLCC, and MLPF&S, all *before* she personally executed the Modification Agreement. Based on this record, Miller's knowledge and state of mind when she voluntarily signed the Modification Agreement in February 2001 was as follows:

- Miller knew of the existence of the pledge by no later than late 2000. (Sec. Supp. Conroy Aff., Ex. A. at 152-155).

- the pledge requirements were disclosed and explained in numerous documents including every monthly statement. (Kamhi Aff., Exs. 1-4).

- Miller was on notice of her negative financial situation no later than January 2001 based on cash flow reports by her accountant Newman showing massive shortfalls. (Sec. Supp. Conroy Aff., Ex. A at 173-175 and Ex. C).

---

[1] Contrary to the assertions in her Opposition, Miller has admitted that Falini had no expertise in any of the disciplines concerning her house improvements, that she never consulted him with respect to the amount or propriety of any expenditures and that, until MLCC provided the construction loan in late 1999, she had never received a budget from her builder, her interior decorator or architect which she could have provided him. (Sec. Supp. Conroy Aff., Ex. A at 43-46, 225-227). In fact, the MLCC loan allowed completion of her home on an agreed budget between her and the contractor, while avoiding the sale of her stock. Miller has admitted it was her decision to finish the house. (Id. at 67).

- So far as Miller knew, she had spent in excess of $4 million on top of the $1,350,000 she had paid for the house and was putting another $7.5 million into it, given her own admissions as to the loan amount. (Id. Ex. A at 69-70)

- She had access to counsel, in the form of Vaughn-Flam, who was present for a discussion between Miller and Falini regarding the pledge account in January 2001. At that same January 2001 meeting, Miller was advised by Newman and Vaughn-Flam to sell the house. (Id. at 158-161, 173-175).

- Miller's attorney Vaughn-Flam indisputably had the loan documents, as well as the appraisal for $3.8 million. (Conroy Aff., Exs. N to S).

- Miller had the Power of Attorney as recorded by the Norwalk Town Clerk.

The foregoing demonstrates what Miller admittedly knew and when she knew it. Nevertheless, despite this background, Miller signed the Modification Agreement waiving any and all defenses to enforcement of the loan documents. Consequently, that waiver was knowing and voluntary. See AFSCME, Council 4, Local 704 v. Department of Public Health, 277 Conn. 617, 623 (2005) ("Waiver is the intentional relinquishment or abandonment of a known right or privilege"); Gagne v. Vaccaro, 80 Conn. App. 436, 445 (2003) (waiver is based on the rule that "no one shall be permitted to deny that he intended the natural consequences of his acts and conduct"), cert. denied 268 Conn. 920 (2004).[2]

### III. THE MODIFICATION AGREEMENT WAS SUPPORTED BY NEW CONSIDERATION AND THE WAIVER OF DEFENSES THEREIN IS BINDING AND ENFORCEABLE

In her Opposition (pp. 31-33), Miller argues that the Modification Agreement was not supported by consideration and thus her waiver of claims and defenses contained therein is

---

[2] Even under Miller's strained interpretation of the case law on ratification, Miller also ratified the 1999 Loan as she testified to having made payments on the loan for three years, ignoring repeated advice to sell the house, and has further admitted that she understood she had a choice in whether to convert the loan to a permanent loan. (Sec. Supp. Conroy Aff, Ex. A at 63-64, 273-274).

unenforceable. To the contrary, the Modification Agreement was supported by new consideration in multiple respects. As detailed in the Supplemental Affidavit of Tara Stewart, Miller received consideration in the form of an extension of both the Construction Completion and Commencement Dates provided for in her original loan. (Supp. Stewart Aff. at ¶¶ 3-9, Exs. A-C). Miller also received a reduction of 75 basis points in her interest rate, as MLCC honored the lower margin rate quoted in the cover letter accompanying the unexecuted Modification Agreement. Id.[3] In return, Miller gave consideration by waiving and releasing any and all defenses to enforcement of the loan documents. As both parties to the Modification Agreement gave consideration, Miller's reliance on State Nat. Bank of Connecticut v. Dick, 164 Conn. 523, 529 (1973) (Opposition at 32) is misplaced. Consequently, the Modification Agreement is enforceable, and, for the reasons stated in MLCC's motion, applies to all the loan documents.

IV.  **MLCC'S INTERNAL UNDERWRITING GUIDELINES ARE IRRELEVANT AND CANNOT SERVE AS A DEFENSE TO MLCC'S CLAIMS AND CANNOT GIVE RISE TO ANY CAUSE OF ACTION OR LIABILITY**

For most of her Opposition (pp. 2-18), Miller argues that MLCC deviated from its own internal underwriting guidelines or other alleged industry standards, including FNMA "guidelines," in processing Miller's 1999 Loan. MLCC's internal guidelines or purported industry standards, however, are immaterial here and cannot serve as the basis of any defense to MLCC's claims nor as the basis of any liability for MLCC.

In De Kwiatkowski v. Bear, Stearns & Co., Inc., 306 F.3d 1293 (2d Cir. 2002), the Second Circuit held that neither industry guidelines nor a company's internal standards on the same

---

[3] By providing Miller a rate lower than originally agreed to, MLCC saved her over $100,000 during the life of the loan. Further, MLCC internally absorbed all costs in connection with an earlier
(continued...)

subject could serve as the basis for a cause of action or liability absent fraud. The Court cited approvingly <u>Farmland Indus. v. Frazier-Parrott Commodities, Inc.</u>, 871 F.2d 1402, 1407 (8th Cir. 1989) ("failure to follow the provisions of such a [commodities broker] manual will not give rise to a cause of action in the absence of independent facts establishing fraud"), <u>J.E. Hoetger & Co. v. Ascencio</u>, 572 F. Supp. 814, 822 (E.D. Mich. 1983) (finding brokerage firm could not be held liable for violating its own in-house rules and noting that this conclusion is supported by practical considerations, such as avoiding imposing greater liability on the most diligent firms and not encouraging firms to adopt more lax policies), and other authorities. Miller has not alleged, in her Second Amended Complaint or elsewhere, or adduced any independent evidence of fraud in connection with MLCC's underwriting or servicing of her loan arising from any purported deviation from MLCC's or other guidelines. (See accompanying Motion to Strike at pp. 11-12). Accordingly, Miller's assertions regarding guidelines and standards do not provide a defense to MLCC's claims, nor do they serve as a basis on which to impose liability on MLCC.

## V. MILLER'S UNCONSCIONABILITY ARGUMENT IS BASELESS

At pages 26 to 31 of her Opposition, Miller argues that the 1999 Loan was unconscionable and thus unenforceable. This argument is baseless and the authorities cited by Miller do not support her argument. To start, it should be noted that the "purpose of the doctrine of unconscionability is to prevent oppression and unfair surprise." <u>Family Financial Services, Inc. v. Spencer</u>, 41 Conn. App. 754, 763-64 (1996). Accordingly, cases applying the doctrine of unconscionability generally involve plaintiffs who are uneducated and who have few assets. Here,

---

(...continued)
reversed liquidation, which was $65,000 in out-of-pocket expenses. (Supp. Stewart Aff. at ¶¶ 5,11).

in contrast, Miller is well educated, had over $11 million in assets, and was in the midst of a multi-year, multi-million dollar renovation project at her waterfront property home. Miller's effort to apply the unconscionability doctrine to her situation is simply a transparent attempt to avoid liability for her lavish and irresponsible choices.

The undisputed facts of this case stand in stark contrast to the facts in the unconscionability cases relied upon by Miller. For example, in Family Financial Services, the defendant borrower: (i) was uneducated, (ii) had limited knowledge of the English language, (iii) had monthly income of $1,126, (iv) owed $1,011 a month on a first mortgage, and (v) was required to pay one year's interest in advance as a condition of credit. Id. Similarly, in Monetary Funding Group, Inc. v. Pluchino, 2003 WL 22133826 (Conn. Super. 2003), the lender added surprise fees of $5,000 to a $20,000 loan with a 90 day term and an annual percentage rate of 28 percent. The lender knew that the borrower was uneducated, had no means to repay the note, and the lender's fees were arbitrary and inconsistent with its other commercial loans. Finally, in Cheshire Mortgage Service, Inc. v. Montes, 223 Conn. 80, 90-94 (1992), the Connecticut Supreme Court found that the subject loan was neither procedurally nor substantively unconscionable, despite the borrower's claimed lack of sophistication. The Court concluded that "while the defendants may have been imprudent in entering into the ... transaction, we cannot conclude ... that the defendants were oppressed or unfairly surprised, or that the terms of the transactions were so one-sided as to be unconscionable as a matter of law." See also Ocwen Federal Bank, FSB v. Rivas, 2002 WL 442099 (Conn. Super. 2002) (defendant borrowers were unsophisticated and did not understand balloon payment).

In sum, the cases cited by Miller involved totally different facts and circumstances

than this case. The MLCC loan involved no high fees, no balloon payment, and involved similar terms to those offered to other MLCC customers.[4] Moreover, Miller was educated, had prior experience with MLCC loans and other mortgages, had access to counsel, and had enormous wealth. Miller made payments on the loan for over two years and executed the Modification Agreement affirming the loan. As a result, the unconscionability defense fails.[5]

## VI. MILLER'S CUTPA CLAIM IS TIME-BARRED

On pages 36 to 38 of her Opposition, Miller attempts to avoid the fact that her CUTPA claim is clearly time-barred by alleging that MLCC engaged in a continuing course of misconduct from December 1999 through 2003. However, it is axiomatic that CUTPA cannot be construed to delay the running of the statute of limitations until the cause of action has accrued or the injury has occurred. An action cannot be part of a continuing course of conduct unless there is "evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto." Fichera v. Mine Hill Corp., 207 Conn. 204, 209 (1988). Miller's allegations focus on the events surrounding the preparation and closing of the loan documents in December 1999. Miller has not alleged (nor could she) that MLCC owed her a duty after the closing of the 1999 loan. Accordingly, any post-closing events and transactions are irrelevant.[6]

---

[4] In contrast, over the course of the 1999 Loan, Miller's effective loan rate varied from an initial 9% down to as low as 3.75%. (Original Stewart Aff. ¶ 6).

[5] In addition, Miller waived her ability to bring an unconscionability defense by executing the Modification Agreement. Furthermore, even if the loan were unconscionable, Miller ratified the loan. See, e.g., Wilbur v. Griffins, 56 Cal. App. 668, 673, 676-77 (1922) ("If she believed that she had been victimized by an 'unconscionable' contract, she took no steps to relieve herself from it by a rescission or repudiation. . . . If she desired to rescind, she should have done so promptly and her failure to rescind promptly after a knowledge of the facts must be regarded as a ratification").

[6] While Miller appears to allege a breach of a purported duty to refinance, such an argument is also baseless. In any event, MLCC did offer to refinance the loan in November 2001 and Miller

(continued...)

The determination of whether a duty exists is a question of law. See Jaworski v. Kiernan, 241 Conn. 399, 404-05 (1997). It is well-established that there is generally no fiduciary duty existing between a borrower and lender. See Southbridge Associates, LLC v. Garofalo, 53 Conn. App. 11, 19 (1999) ("A lender has the right to further its own interest in a mortgage transaction and is not under a duty to represent the customer's interest. Generally there exists no fiduciary relationship merely by virtue of a borrower lender relationship between a bank and its customer.") (citations omitted); Ocwen Federal Bank, FSB v. Rivas, 2002 WL 442099, *10 (Conn. Super.) (striking counterclaim noting that "the defendants have not alleged any special circumstances to avoid the general rule that a lender in a loan transaction does not engage in a relationship with the borrower that creates legally cognizable, fiduciary duties"); LLP Mortgage, Ltd. v. Gurski, 2003 WL 231679, *3 (Conn.Super.) ("[N]either the plaintiff [lender] nor its predecessors owed a fiduciary duty to the defendant to advise her to retain independent counsel.")

MLCC was simply Miller's lender and nothing more. MLCC, as a lender, had no fiduciary duty to protect Miller's interests, and certainly no such duty existed after the loan closed in December 1999.[7] Miller has provided no authority or basis for why MLCC should be considered

---

(...continued)
declined. (Sec. Supp. Conroy Aff., Ex. A at 234, 241; Supp. Stewart Aff., Ex. D). See LLP Mortgage, Ltd. v. Gurski, 2003 WL 231679, *2 (Conn.Super.) (equitable defenses are proper "only when they, like their common law counterparts, attack the note itself rather than some act or procedure by the mortgagor"). The existence of any alleged duty to refinance is also unsupportable. See Southbridge Associates, LLC, supra.

[7] As discussed in the Supplemental Stewart Affidavit, MLCC has not applied the balance of Miller's account against the mortgage principal because MLCC has never received an instruction from Miller to do so, and the reversed liquidation of which Miller received no notice caused no damage to her and, in fact, cost MLCC $65,000. (Supp. Stewart Aff. at ¶ 10-11).

a fiduciary at any time, particularly post-closing. Accordingly, Miller's CUTPA claim was not tolled under a purported continuing course of conduct and is thus time-barred.

## CONCLUSION

For the foregoing reasons, MLCC respectfully requests that (i) MLCC's motion for summary judgment be granted on its first or second Counterclaims; (ii) Miller's motion for summary judgment be denied; and (iii) Counts I through IX of Miller's Complaint be dismissed in their entirety.

Dated: August 1, 2005

          PAUL, HASTINGS, JANOFSKY &
          WALKER LLP

          By: /s/ Douglas C. Conroy
          Douglas C. Conroy (ct 11555)
          Matthew R. Paul (ct 21036)
          1055 Washington Boulevard
          Stamford, CT 06901-2217
          Telephone: (203) 961-7400
          Facsimile: (203) 359-3031
          Email: douglasconroy@paulhastings.com
                  matthewpaul@paulhastings.com

          COHEN AND WOLF
          Jonathan S. Bowman (ct 08526)
          Ari Hoffman (ct 22516)
          1115 Broad Street
          Bridgeport, CT 06604
          Tel: 203-368-0211
          Fax: 203-576-8504
          Email: jbowman@cohenandwolf.com
                  ahoffman@cohenandwolf.com

          Counsel for Defendant and Counterclaimant
          MERRILL LYNCH CREDIT CORPORATION

**CERTIFICATE OF SERVICE**

This is to certify that on this 1st day of August 2005, a copy of the foregoing Reply Brief in Further Support of MLCC's Motion for Summary Judgment was delivered via first class United States mail to:

> Patrick W. Begos, Esq.
> Christopher Brown, Esq.
> BEGOS & HORGAN, LLP
> 327 Riverside Avenue
> Westport, CT 06880
>
> Jonathan S. Bowman, Esq.
> Ari Hoffman, Esq.
> COHEN AND WOLF
> 1115 Broad Street
> Bridgeport, CT 06604

_____
Douglas C. Conroy

STM/300497.3