UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JULIE DILLON RIPLEY MILLER, | NO. 3:03-CV-1016 (RNC)(DFM) |
| Plaintiff and Counterclaim Defendant, | |
| - against - | |
| MERRILL LYNCH CREDIT CORPORATION, | JULY 27, 2005 |
| Defendant and Counterclaimant. | |

## SUPPLEMENTAL AFFIDAVIT OF TARA STEWART

STATE OF FLORIDA          )
                          )          ss.  Jacksonville
COUNTY OF JACKSONVILLE    )

Tara Stewart, being first duly sworn, deposes and states:

1.      I am a Vice President of Merrill Lynch Credit Corporation ("MLCC").  I have been employed by MLCC in various capacities since 1983.  I submit this Supplemental Affidavit in support of MLCC's Motion for Summary Judgment.  I am familiar with the facts and circumstances involved in the above-referenced litigation in my capacity as head of mortgage underwriting which provided me with personal knowledge concerning certain loans made to plaintiff Julie Dillon Ripley Miller ("Miller") by MLCC.

2.        I make this Supplemental Affidavit to provide additional facts concerning Mrs.

Miller's assertion, through counsel, that the Modification Agreement executed by her on February 12,

2001 (Exhibit "F" to my Original Affidavit) lacked consideration.  I also make this Affidavit to

provide the Court certain facts and documents concerning the treatment of the shares maintained in

Account No. 5AX-12860 (the "Pledge Account") and the liquidation proceeds of the Pledge Account

totaling $4,965,070.70, as well as the offer by MLCC to Mrs. Miller of a possible refinancing

arrangement.

A.        The Modification Agreement and Related Consideration

3.        Mrs. Miller was extended a substantially lower interest rate in connection with

the modification of her loan obligations.  Under the original Adjustable Rate Note, (Exhibit "C" to

my Original Affidavit), Mrs. Miller obligated herself to pay an interest rate based on the so-called

LIBOR index plus 3.125%.

4.        In fact, when the Loan Modification Agreement was sent to Mrs. Miller for

signature, the covering letter dated February 1, 2001 (Exhibit "A" hereto) quoted her a much lower

rate of 2.375 added to the LIBOR index, a reduction of 75 basis points.  This lower rate remained in

effect thereafter.  This was the rate that was honored by MLCC and based upon which Mrs. Miller

made her mortgage payments as reflected in Exhibit "B," a true and correct copy of a letter sent to

Mrs. Miller dated May 25, 2001 confirming that this substantially lower rate had been charged

effective with the conversion of the loan from a construction loan to a permanent loan.

5.    As a result of Mrs. Miller receiving and accepting this lower margin of 2.375, her mortgage payments, until the time she defaulted, were in excess of $100,000 less than what would have been paid using the 3.125 margin provided by the original Note.

6.    Mrs. Miller also received consideration in the form of an extension of the Construction Completion and Commencement Dates provided for her loan.  As can be determined from the original adjustable rate note executed by Mrs. Miller (Exhibit "C" to my Original Affidavit), Mrs. Miller's payment obligations under the Permanent Loan following conversion from the Construction Loan was to commence on January 1, 2001, which was defined as the Commencement Date (Exhibit "C" – Adjustable Rate Note Section 2).  The Addendum to that note (MLCC 000350), which is the last page of Exhibit C, also provided, in pertinent part, as follows:

> Provided that no default exists under the terms of the loan documents and the borrower has first obtained Lender's prior written consent, <u>which consent may be withheld by Lender in its absolute discretion,</u> the date set for completion of construction may be extended on a one-time basis only for an additional period of up to six months. (emphasis added)

7.    Attached hereto as Exhibit "C" is the Construction Loan Agreement for Mrs. Miller's house.  As provided in Section 1.1 thereof:  "Construction of the Improvements will be completed not later than December 31, 2000 ("Construction Period")."  Section 6.6 of that Agreement is entitled "Time of the Essence" and provides "Time is considered of the essence of this Agreement and the satisfaction of the obligations of MLCC and owner hereunder."

8.    Section 6.7 of the Construction Loan Agreement (Exhibit "C") also provides in pertinent part:

> This Agreement is made on the basis of a borrower-lender relationship between OWNER and MLCC, and MLCC will not be considered to constitute a partner, agent, or joint venturer of or with OWNER or any other party associated with the construction of the Improvements or the ownership of the Property.

9.      In fact, because of delays in completion of the construction of Mrs. Miller's house and related delays by Mrs. Miller in delivering to MLCC the "Final Survey" required by Section 2.7 of the Construction Loan Agreement (Exhibit "C," page 4), she was granted a two-month extension by MLCC. This extension is reflected in the Modification Agreement signed by Mrs. Miller, paragraph 1.a (MLCC 000358) (Exhibit "F" to my Original Affidavit), providing that payments on the permanent loan were to commence March 1, 2001 rather than January 1, 2001.

B.      Facts as to the Treatment of Shares and Liquidation Proceeds in the Pledge Account and Possible Refinancing

10.      Since the liquidation of the shares in the Pledge Account No. 5AX-12860, maintained at Merrill, Lynch, Pierce, Fenner & Smith, the liquidation proceeds of $4,965,070.70 have been maintained in that account. They have not been applied to the principal balance of the loan because Mrs. Miller has not directed that they be so applied. Attached to my Original Affidavit as Exhibit D is a copy of the Pledge Agreement. Paragraph 8(b), under the subheading "Remedies," provides in pertinent part:

> Any income or loss allocable to the investment of the Cash Collateral shall be for the account of MLCC. . . .Notwithstanding anything to the contrary contained herein, the Borrower may elect, by causing written notice to be received by MLCC of such election, to have the funds from the liquidation applied to the outstanding principal balance of the loan.

Mrs. Miller has never made such an election, in writing or otherwise.

11.    I am informed that Mrs. Miller has also asserted, through her counsel, that there was some impropriety in failing to inform Mrs. Miller of an earlier liquidation of the securities in the Pledge Account. Putting to one side the fact that MLCC does not control how Merrill, Lynch, Pierce, Fenner & Smith prepares monthly statements and reports such an event, this liquidation took place in or about May 2002, when the value of the shares declined sharply during a market downturn, triggering liquidation under the Pledge Agreement. When the market shortly thereafter rebounded, management at MLCC repurchased the equivalent number of shares of the same issuers to reverse these sales. These transactions, given the intervening share price increases, cost MLCC approximately $65,000, which it absorbed.

12.    Also attached to this Affidavit, as Exhibit D is a true and correct copy of a letter sent to Mrs. Miller, which I have been informed was produced by Mrs. Miller during the course of this litigation, reflecting the fact that as of November 2001, MLCC offered a refinancing proposal for a $4.9 million loan, with the same margin rate of 2.375 plus LIBOR, as she had been paying on her original loan, with the proviso the loan close by December 31, 2001.

C.    The Decline in the Effective Rate Under Both Mrs. Miller's Loan and the Refinancing Proposal

13.    As of November 1, 2001, because of declines in the LIBOR rate since March 2001, the initial interest rate on such a refinanced loan would have been 6.00%. Similarly, because of continuing declines in the LIBOR rate, comparable rates as of December 1, 2001 and January 1, 2002, would have been 5.00% and 4.625%. Since November 2001, while LIBOR rates have

fluctuated slightly, the effective rate on Mrs. Miller's then existing loan (and any refinanced loan,

had she opted to accept it),  would also have varied in a range between a high of 6.00% and a low of

3.50%.

_Tara Stewart_

Tara Stewart

Subscribed and sworn to
before me this 2 7 day
of July 2005.

_Patricia A. Barnes_

Notary Public
My Commission Expires:_____

Patricia W. Barnes
MY COMMISSION # DD170422 EXPIRES
January 25, 2007
BONDED THRU TROY FAIN INSURANCE, INC.

Exhibit A

Merrill Lynch
Credit Corporation

Private Client Group

4802 Deer Lake Drive East
Jacksonville, Florida 32246-6484
904 218 6000
800 443 6184

 **Merrill Lynch**

February 1, 2001

Julie Dillon Ripley Miller
Po Box 233
Rowayton, Connecticut 06853

Re:     4312716
        21 Point Road, Norwalk, Connecticut 06854.

Dear Mrs. Miller:

Congratulations on the completion of your new home!

Now that your home is finished, your Construction-to-Permanent mortgage loan will convert to a PrimeFirst® Self-Directed™ mortgage. To ensure a smooth transition, allow me to review and update the terms of your permanent financing.

Your current construction interest rate is 9.00000%. This rate is based on Prime plus 00.00000%. Your initial permanent interest rate is set at 8.125% according to the options you selected prior to commencing construction. This rate is based on the One Month LIBOR plus 2.375% and may change April, 2001.

The principal balance of your loan is $7,500,000.00. Your initial monthly payment effective March, 2001 is $50,781.25 and includes:

        Payment (interest only). . . . . . . . . . $50,781.25
        Escrow Payment. . . . . . . . . . . . .      $0.00

Now that construction is completed, your tax assessor will reassess your property to determine the new taxable value. This may require an adjustment to the escrow payment amount indicated above. This escrow payment also includes any reserves which may have been required to pay your hazard insurance and flood insurance premiums when due (if applicable).

Information about your monthly payments will be sent to you soon. We will mail this information to your new home address unless you advise us of an alternate billing address immediately. If you have not received this information prior to the first payment date, you should still mail your payment, along with the coupon below, before the due date to Merrill Lynch Credit Corporation. Please show your loan number on your payment check.

Enclosed are three copies of a Note Modification Agreement ("Agreement") that modifies the terms of your construction loan to the terms of your permanent loan.   You must sign two copies of the Agreement where indicated, have your signature notarized and return them to Merrill Lynch in the enclosed overnight delivery envelope within 5 business days from the date of this letter. If you fail to return the Agreement within this time, your interest rate will remain at 9.00000% and may result in a default under your loan documents.

Welcome to Perm Letter
5/7/99) CLWELLTR (Y)
312716



**DM 0410
CONFIDENTIAL**

-2-

It has been my pleasure to assist you in the construction of your new home.  If you have any questions regarding the above information or your billing statement, please call our Customer Service Department at 1-800-452-3881.

Sincerely,

_____

Harvey Rosenblum
Construction Lending Officer

Enclosures

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - CUT HERE - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| ACCOUNT NUMBER | DUE DATE | PAYMENT DUE |
|---|---|---|
| 4312716 | March, 2001 | $50,781.25 |

Mail to:     Merrill Lynch Credit Corporation
             P.O. Box 4210
             Carol Stream, IL  60197-4210

**ADDITIONAL AMOUNTS REMITTED**
Principal $_____
Escrow $_____
Other $_____
(Include
Explanation)_____

         DO NOT INCLUDE CORRESPONDENCE
         WITH PAYMENT

DM 0411
CONFIDENTIAL

Exhibit B

Merrill Lynch
Credit Corporation

Private Client Group

4802 Deer Lake Drive East
Jacksonville, Florida 32246-6484
904-928-1000
888-421-0879

 **Merrill Lynch**

May 25, 2001

Julie Dillon Ripley Miller
P.O. Box 233
Rowayton, CT 06853

Re: Mortgage Loan Number 7074312716

Dear Ms Miller,

At the request of your Financial Advisor, Laurie Kamhi, I wanted to take a few minutes and clarify the origin for the confusion surrounding your interest rate margin. Further, summarized below you will find an explanation of your interest rate adjustments to date and an overview of the current status of your account. With respect to your interest rate margin, as you can see on the attached copy of your note, your interest rate adjusts monthly based on the one-month LIBOR plus a margin of 3.125%. The rate adjusts monthly based on the value of the index 25 days prior to each interest rate change date.

As you are aware Merrill Lynch incorrectly stated your margin as 2.375% in the "Welcome to Permanent Financing" letter that was mailed to you on February 1, 2001. Merrill Lynch will honor the lower margin represented in the February 1, 2001 correspondence and our servicing system has been changed to reflect the reduced margin. Our legal department is in the process of preparing a modification to your Note to reflect the lower margin. It will be forwarded to you for execution As soon as it is complete. An overview of your account activity dating back to effective date of your conversion from the construction to permanent phase is as follows:

| Due Date | Index Value | Margin | Rate | Payment Due | Payment Received | Balance Due |
|----------|-------------|--------|------|-------------|------------------|-------------|
| 3/1/01 | 5.7150 | 2.375 | 8.125 | $50,781.25 | 3/6/01 | 0.00 |
| 4/1/01 | 5.7150 | 2.375 | 8.125 | $50,781.25 | | $ 50,781.25 |
| 5/1/01 | 5.27125 | 2.375 | 7.625 | $47,656.25 | | $ 98,437.50 |
| 6/1/01 | 5.05250 | 2.375 | 7.375 | $46,093.75 | | |
| 7/1/01 | 4.350 | 2.375 | 6.750 | $42,187.50 | | |



DM 0408
CONFIDENTIAL

Please accept my personal apologies for any previous correspondence or explanation that might have been unclear. Should you have any questions concerning the foregoing information, please feel free to contact our Servicing Specialist, Cindy Miller, at 1-888-421-0879, extension 46154.

Sincerely,

Albert J. Dimoush
Director
Construction Lending

DM 0409
CONFIDENTIAL

Exhibit C

MERRILL LYNCH CREDIT CORPORATION                                    **ORIGINAL**

### CONSTRUCTION LOAN AGREEMENT

Loan No. 4312716                                              Date: <u>December 7, 1999</u>

THIS CONSTRUCTION LOAN AGREEMENT (the "<u>Agreement</u>") is executed by and between

Julie Dillon Ripley Miller     ("<u>OWNER</u>"), whose address is 3 Winter Street Rowayton, Connecticut 06853.
and

MERRILL LYNCH CREDIT CORPORATION, a Delaware corporation ("<u>MLCC</u>"), whose address is 4802 Deer Lake Drive East, Jacksonville, Florida 32246-6484 Attention: Harvey Rosenblum.

### WITNESSETH, THAT

WHEREAS MLCC has this date made a loan to OWNER in the aggregate principal amount of $7,500,000.00 (the "<u>Loan</u>"), as evidenced by a promissory note (the "<u>Note</u>") of even date, said Note being secured by a mortgage, deed to secure debt, or deed of trust of even date, encumbering the real property owned by OWNER located in Fairfield County/Parish, State of Connecticut
(the "<u>State</u>"), as more particularly described on attached <u>Exhibit A</u>, which by this reference is incorporated into and made a part of this Agreement (the "<u>Property</u>") and, for Mortgage 100 accounts, further secured by a Pledge Agreement for Securities Account and related documents (collectively referred to herein as the "<u>Security Documents</u>"); and

WHEREAS, MLCC has agreed to make the Loan subject to the terms, covenants and conditions set forth in this Agreement, and not otherwise.

NOW, THEREFORE, IN CONSIDERATION OF the mutual covenants and agreements contained herein, OWNER and MLCC hereby agree as follows:

### ARTICLE I. CONSTRUCTION LOAN AND DISBURSEMENTS

1.1 **Construction Loan.** MLCC makes the Loan to OWNER for the purpose of construction of improvements on the Property in accordance with the plans and specifications as hereinafter provided (the "<u>Improvements</u>"). The estimated cost of construction of the Improvements is $6,181,732.05 (the "<u>Construction Costs</u>"), as provided in the construction contract (the "<u>Construction Contract</u>") between OWNER and the Contractor named on the signature page of this Agreement (the "<u>Contractor</u>"). Construction of the Improvements will be completed not later than December 31, 2000 ("<u>Construction Period</u>").

1.2 **Costs.** OWNER will be responsible for all costs, fees, commissions, charges, taxes and other expenses incident to the evaluation, preparation and closing of the Loan and the construction of the Improvements, including, without limitation, fees and expenses of MLCC's legal counsel, preparation and examination of a title insurance commitment and policy insuring MLCC's interest in the Security Documents, surveys, appraisal, architectural and engineering services and inspection, note and security taxes, transfer taxes, tax service fees, construction inspection fees, and all recording fees and charges.

1.3 **Cost Balance.** Subject to the remaining provisions of this Agreement, OWNER will be responsible for funding the difference, if any, between the funds available for disbursement as net proceeds of the Loan (the "<u>Loan Proceeds</u>") and the Construction Costs (the "<u>Cost Balance</u>"). If required by MLCC, OWNER will deliver the Cost Balance to MLCC, and MLCC will hold the Cost Balance for subsequent disbursement, at MLCC's option, either for full application to the Construction Costs before disbursement of any Loan Proceeds, or for proportionate application to the Construction Costs as disbursements of Loan Proceeds are made, as provided on the disbursement schedule attached as <u>Exhibit B</u> (the "<u>Disbursement Schedule</u>"), which by this reference is incorporated into and made a part of this Agreement. MLCC will have no obligation to pay interest to OWNER for sums so held. OWNER releases MLCC from any loss resulting from the handling of the Cost Balance in the usual course of business. OWNER agrees that the holding, application and disbursement of the Cost Balance will be for the account of OWNER, however, it is expressly understood by OWNER and MLCC that the holding, application and disbursement of the Cost Balance is for the protection of MLCC.

1.4 **Construction Cost Deficiency.** Unless otherwise set forth in the Disbursement Schedule, OWNER will use the Loan Proceeds only for the payment of costs directly associated with the construction of the Improvements. OWNER represents and warrants to MLCC that the Loan Proceeds and the funds representing the Cost Balance, if any, will be sufficient to pay in full the cost of construction of the Improvements. If at any time during the term of the Loan, MLCC determines in its discretion that the actual cost to complete construction of the Improvements may or will exceed the sum of the Loan Proceeds and the funds representing the Cost Balance, if any, then OWNER will upon demand of MLCC deliver the amount of such excess cost to MLCC. Upon receipt thereof, MLCC will hold such amount for subsequent disbursement as provided in this Agreement.

Construction Loan Agreement - Standard
(6/18/99) CNLNAGST (Y)



E+ 20
9/10/03
Barry Newman

1.5 **Disbursement of Funds; Limit on Stored Materials.** The Loan Proceeds and funds representing the Cost Balance, if any, will be disbursed by MLCC in accordance with the Disbursement Schedule, and upon disbursement, will be applied to the Construction Costs as provided in the Construction Contract and the construction drawings, plans and specifications and addenda delivered by OWNER to MLCC for construction of the Improvements (the "**Plans and Specifications**"). Notwithstanding the foregoing, any sums delivered by OWNER to MLCC pursuant to section 1.4 above may be disbursed by MLCC in such order and in such proportion as MLCC determines in its sole discretion. MLCC may, in its sole discretion, make any construction loan disbursements: (a) directly to OWNER; (b) directly to the Contractor or to any of the Contractor's subcontractors or suppliers; (c) jointly to OWNER and the Contractor and/or subcontractors; or (d) through a construction loan escrow with the issuer of the title insurance policy to be issued pursuant to section 2.6 below. In the latter event, the expenses of any construction loan escrow shall be paid by OWNER. No funds will be disbursed for materials stored on the Property without MLCC's prior written consent, which may be granted or withheld in MLCC's sole discretion. Any materials stored on the Property for which MLCC has disbursed funds will be properly identified and inventoried, protected by adequate security measures to prevent theft, vandalism or damage, and properly insured for full replacement value. Furthermore, OWNER hereby grants MLCC a security interest in such stored materials, and will, upon MLCC's request, execute and deliver a financing statement meeting the requirements of the Uniform Commercial Code in the State, evidencing MLCC's first lien security interest in such stored materials.

1.6 **Requests for Disbursement.** MLCC will have no obligations to disburse funds out of the Loan Proceeds or the Cost Balance, if any, unless OWNER first has delivered to MLCC a signed request for disbursement in form and content previously approved by MLCC, and unless:

(a)     Material invoices and/or contracts will have been confirmed by OWNER to the satisfaction of MLCC;

(b)     Labor and materials will have been delivered to, used upon, and incorporated in the Improvements, in a manner satisfactory to MLCC and in compliance with the Plans and Specifications;

(c)     Such payment will be in accordance with any applicable laws of the State, subject to any rights of MLCC reserved to it herein;

(d)     At the time of OWNER's request for such disbursement, OWNER is in full compliance with, and is not in default under, this Agreement, the Note or the Security Documents, and no event had occurred that with the giving of notice and/or the passage of any applicable grace period would constitute a default of OWNER under this Agreement, the Note or the Security Documents;

(e)     MLCC will have received such additional documents and/or information as the title insurance company that is insuring the lien of the Security Documents reasonably may require;

(f)     At the option of MLCC, each Request for Disbursement will be accompanied by such waivers of lien, releases of lien, requisitions for payment for subcontractors, laborers, and materialmen, receipts and other documents as may be required by MLCC;

(g)     At the option of MLCC, MLCC will have received a current notice of title continuation or endorsement to the Title Policy, as described in section 2.6 below, which notice or endorsement will (i) increase the coverage of the Title Policy to the total amount of the Loan that will be outstanding after the requested advance, (ii) confirm that since the last preceding endorsement received by MLCC there has been no change in the state of the title approved by MLCC and (iii) contain such affirmative assurances as MLCC will require; and

(h)     MLCC will have received and approved the Foundation Survey, as described in section 2.7 below, before any disbursement of Loan Proceeds will be made for construction of structural (as opposed to foundation) Improvements.

In addition to the foregoing and prior to the first advance, unless waived by MLCC, the OWNER will have delivered to MLCC:

(i)     Evidence satisfactory to MLCC that all permits and/or approvals, including, without limitation, the building permit and zoning and subdivision approvals necessary for the construction of the Improvements have been obtained, are in full force and effect and will not expire prior to the termination of the Construction Period;

(ii)     A letter of the OWNER's architect, if any, in the form requested by MLCC;

(iii)     Satisfactory evidence that all utility services necessary for the construction of the Improvements or the use and operation thereof after completion are or will be available at the proper time to serve the Improvements;

(iv)     The Title Policy, as described in section 2.6 below;

(v)     The Boundary Survey, as described in section 2.7 below; and

(vi)     Satisfactory evidence of compliance with the requirements of state or local law regarding proper commencement of construction and/or mechanic's lien laws as more particularly set forth in Article III of this Agreement (the "**Lien Law**").

1.7 **Disbursement Schedule; Itemized Breakdown; Retainage; Set-off.** Disbursements will be made in accordance with the Disbursement Schedule, subject to the remaining terms and conditions of this Agreement. If MLCC and the OWNER have executed a Funding Agreement for Lot Acquisition, disbursements will be made as set forth therein until such time as a Disbursement Schedule is completed. OWNER and the Contractor have approved the Disbursement Schedule, subject to the provisions of the Lien Law. Upon MLCC's request, OWNER will promptly furnish MLCC with an itemized breakdown of the Construction Costs. MLCC may, in its discretion, elect to withhold from each disbursement 10% of the scheduled disbursement amount, as retainage. Such retainage, if withheld from each disbursement, will be disbursed with the final scheduled disbursement, subject to the remaining terms and conditions of this Agreement. MLCC may, in its discretion, elect to set off any and all sums due or to become due to MLCC from OWNER, including but not limited to unpaid interest, inspection fees, and/or appraisal fees from and against any disbursement(s).

1.8 **Payments to Lienors.** MLCC in its sole discretion may make payments for labor, services or materials due under the Construction Contract directly to the OWNER, the Contractor, any subcontractor, any lienor, or any other person who has furnished or performed the same.

1.9 **Inspection Rights.** MLCC, its agents and/or independent contractors, shall have the right to enter upon the Property at all times during the period of construction. Scheduled inspections will be required for each disbursement under the Disbursement Schedule. MLCC is under no obligation to supervise construction of the Improvements and any inspection

of the construction of the Improvements by MLCC, its agents and/or independent contractors, is for the sole purpose of protecting and preserving the security of MLCC, and such inspection is not to be construed as a representation or endorsement that the construction of the Improvements is in fact in compliance with the Plans and Specifications, that the construction will be free from defective material or workmanship, or that the construction is in compliance with limitations or requirements imposed by covenants and restrictions of record or by governmental authority.

1.10    **Correction of Defects.**  MLCC has the right to disapprove defective work and materials and may in its discretion, but it is not obligated to, withhold disbursements until any defects are corrected in a good and workmanlike manner and in compliance with applicable law and this Agreement.

1.11    **Inspection Fees.**  OWNER will pay the costs of any and all inspections conducted pursuant to <u>section 1.9</u> above.  The estimated cost of each inspection is $125.00.  At closing of the Loan, OWNER will pay to MLCC the sum of $1,000.00 representing the inspection fees payable for 8 inspections. If more than 8 inspections of work in progress are required, then prior to each such additional inspection OWNER will pay to MLCC the applicable fee for such inspection.  If OWNER fails to make such payment, MLCC may disburse to itself such inspection fee out of the Loan Proceeds, the Cost  Balance, if any, or such other funds delivered to MLCC pursuant to the terms hereof.

1.12    **Bond Requirements.**  At MLCC's option, the Construction Contract will be covered by payment and performance bonds furnished to and acceptable to MLCC in its sole discretion, in an amount not less than 110% of the Construction Costs.

1.13    **Signs.**  MLCC will have the right, at MLCC's expense, to place and maintain a sign or signs on the Property for the purpose of publicizing MLCC's involvement as construction lender for the Improvements.  MLCC's signs will be subject to applicable governmental requirements.

## ARTICLE II. CONSTRUCTION OF IMPROVEMENTS

2.1 **Plans and Specifications.**  The Plans and Specifications are by this reference incorporated into and made a part of this Agreement.  Any work shown on the construction drawings for the Improvements but not shown in the plans and specifications and addenda, or vice versa, is to be executed to the same extent as if such work were particularly specified or set forth in all construction drawings, plans and specifications and addenda constituting the Plans and Specifications according to the true meaning and intent of the Plans and Specifications.  All Plans and Specifications filed with MLCC are and remain the property of MLCC.  No change in the Plans and Specifications will be made without express written approval of MLCC.

2.2 **Construction Standards.**  OWNER certifies that the Improvements will be built and constructed in a first class and workmanlike manner, in accordance and in material compliance with the Plans and Specifications, and in full and strict compliance with all limitations, reservations, covenants and restrictions of record affecting the Property or the construction of the Improvements, and with the provisions of any and all applicable Federal, State, county or municipal building and zoning, land use, environmental, construction and mechanics lien law, and public safety codes, laws, ordinances, rules and regulations.

2.3 **Selection of Contractor.**  OWNER is solely responsible for selecting and retaining the Contractor at OWNER's sole risk and expense.  The Contractor will be a general contractor licensed in the State, if applicable, and will be subject to MLCC's prior evaluation and approval which may be granted or withheld in MLCC's reasonable discretion.  MLCC's right of evaluation and approval is given for the purpose of preserving and protecting the value of MLCC's security for the Loan, and is not an endorsement, guarantee or recommendation of the performance of the Contractor, the quality of his work or his financial condition.  OWNER accepts full responsibility for selection of the Contractor and any subcontractors and all materials, supplies and equipment to be used in the construction of the Improvements.  MLCC will have no liability or responsibility for completion of the Improvements, according to the Plans and Specifications and for the contract price, or for any loss, cost, damage or expense sustained by OWNER as a result of MLCC's approval or disapproval of any particular general contractor or otherwise.  OWNER will disclose to MLCC on a current and ongoing basis, the names of all persons with whom OWNER has contracted or intends to contract for the construction of the Improvements or for the furnishing of labor, materials or services therefor, and when required by MLCC, owner will obtain the approval by MLCC of all such persons, it being expressly understood that MLCC's review and approval of any such persons or parties is intended for the protection of MLCC's security, and is not an endorsement of the workmanship or financial condition of any such person or party.  MLCC shall in no way be liable for any acts or omissions of OWNER, the Contractor, any agent employed by OWNER, or any person furnishing labor, materials and/or services used in or related to the construction on the Property.

2.4 **Assignment of Construction Contract/Subordination of Vendee's Lien.**  The OWNER hereby assigns to MLCC all of the OWNER'S right, title and interest in and to the Construction Contract and all permits, Plans and Specifications.  It is hereby agreed that MLCC does not assume any of the obligations of the OWNER under the Construction Contract, all of which are expressly retained by the OWNER.  Upon payment in full of the Note and fulfillment of all obligations to MLCC under the terms of this Agreement, the Note, the Security Documents securing the Note and any other documents required to be delivered in connection herewith or therewith, this assignment will automatically become null and void.  Owner hereby subordinates any equitable lien which may arise under any purchase and sale contract to the lien of the Security Documents.

-3-

2.5 **Insurance.** OWNER will procure and maintain during the entire term of the Loan pre-paid All Risk Property insurance policies (and during the period of any construction on the Property, "Builder's Risk" All Risk policies) covering the Improvements to be constructed on the Property, including replacement cost coverage and inflation adjustment endorsements, comprehensive general liability policies and such other insurance policies as MLCC reasonably may require. All hazard insurance policies will be in an amount not less than the greater of (i) full replacement value of the Improvements, or (ii) the Loan amount, or (iii) for a Loan made in conjunction with the Mortgage 100 Program, the full replacement value of the Improvements. Liability insurance coverage will include single claim limits satisfactory to MLCC. All insurance policies will be issued by companies on forms and with deductibles all of which will be subject to MLCC's approval, and will recite MLCC's interest as mortgagee in standard non-contributory mortgagee clauses (New York standard) effective as of closing of the Loan, will be maintained throughout the term of the Loan without cost to MLCC, and will contain such provisions as MLCC deems necessary or desirable to protect its interest in the security, including without limitation a provision for thirty (30) days' prior written notice to MLCC of cancellation of or any change in the risk or coverage insured. Flood insurance naming MLCC as mortgagee is required if the Property is shown to be in a Special Flood Hazard Area (flood zone "A" or "V") by the Foundation Survey. OWNER will provide MLCC with current insurance certificates indicating MLCC's interest and the required insurance coverages in effect at all times and as provided above, and will furnish to MLCC, upon MLCC's request, verification that all insurance premiums have been paid on a timely basis.

2.6 **Title Insurance.** At or prior to closing of the Loan, OWNER will at OWNER's expense deliver to MLCC a current commitment for title insurance, committing to insure MLCC as the holder of a first lien on the Property pursuant to the Security Documents, and subject only to such matters as MLCC may approve in its sole discretion. Prior to disbursement of any Loan Proceeds, OWNER will at OWNER's expense cause a title insurance policy to be issued to MLCC on the basis of the title commitment as approved by MLCC (the "Title Policy").

2.7 **Surveys.** OWNER will at OWNER's expense deliver to MLCC the following surveys of the Property: (a) a current boundary survey (the "Boundary Survey"); (b) a foundation survey when the foundation of the Improvements has been substantially completed (the "Foundation Survey"); and (c) a final "as-built survey when the Improvements have been completed (the "Final Survey"). Unless otherwise set forth in the Disbursement Schedule, receipt by MLCC of the Boundary Survey and the Foundation Survey is required prior to the disbursement of any Loan Proceeds. Each survey will be certified to MLCC and the title insurer, will meet the minimum technical standards of the State, will include a certificate of whether the Property is located within a Special Flood Hazard Area, and otherwise will be subject to MLCC's approval, granted or withheld in its sole discretion.

2.8 **Commencement and Completion of Construction.** Construction of the Improvements will commence within 15 days following the date hereof or if OWNER and MLCC have executed a Funding Agreement for Lot Acquisition, within twelve (12) months from the date of such Funding Agreement. OWNER and the Contractor agree that construction of the Improvements will proceed continuously and diligently, and in a good and workmanlike manner, so that construction of the Improvements will be completed within the Construction Period, unless extended in writing in a manner acceptable to MLCC. For purposes of this Agreement and all other documents governing OWNER's mortgage loan, the Actual Completion Date is when the following conditions are satisfied: (i) an inspector approved by MLCC has certified to MLCC that (a) the physical construction of the Improvements has been completed in strict compliance with the Plans and Specifications and (b) all utilities serving the Property have been connected and are operating, (ii) the Final Survey shows that all improvements lie entirely within the boundary and setback lines of the Property and do not encroach upon any easements or rights-of-way on the Property and which is otherwise satisfactory to MLCC, (iii) a final certificate of occupancy (or its equivalent) has been issued for the Improvements by the governmental authorities having jurisdiction over the Improvements which confirms that construction of the Improvements has been completed in accordance with all applicable requirements, (iv) MLCC has received a final lender's policy of title insurance in form and substance satisfactory to MLCC in its sole discretion and OWNER agrees to execute any and all documents, instruments affidavits to induce title company to issue such policy; and (v) proof of hazard insurance listing MLCC as loss payee and flood insurance, if applicable. If a certificate of occupancy is not required by local law, evidence that the Improvements have passed all inspections and received all approvals which are conditions precedent to occupancy of the Improvements must be furnished. The "Commence Date" is the first day of the next calendar month following the Actual Completion Date and is the date OWNER's permanent loan interest rate commences.

2.9 **Compliance with Laws.** OWNER represents and warrants to MLCC, as of the date of this Agreement and at all times thereafter, that:

(a)      Utility service necessary for the issuance of a certification of occupancy or completion, or its equivalent, is available to the boundaries of the Property in sufficient capacity to serve the Improvements;

(b)      To the best of OWNER's knowledge, the Property does not contain any materials or substances that are prohibited or regulated by Federal, State or local laws, or that are known to pose a hazard to the environment or human health. The Property is not now being used nor, to the best of OWNER's knowledge, has ever been used for any activities directly or indirectly involving the generation, use, treatment, storage or disposal of any hazardous or toxic substance, except as customarily may be necessary or required for the construction of the Improvements.

2.10      **Power of Completion.** In the event of the death or bankruptcy of OWNER or the Contractor, or a general assignment for the benefit of creditors by OWNER or the Contractor during the period of construction of the Improvements and before completion thereof, or upon any other occasion that might result in cessation of work, MLCC will have full power to take charge of and complete the construction of the Improvements and make disbursements of the Loan Proceeds and funds representing the Cost Balance or such other funds delivered to MLCC as provided herein, for the benefit of OWNER or of Owner's estate, but nothing contained herein shall obligate MLCC to do so.

2.11      **Licenses/Permits.** OWNER has obtained or will have obtained prior to commencement of construction all licenses, permits and approvals of governmental authorities necessary or convenient for the construction of the Improvements, including without limitation, licenses, permits and approvals relating to building and construction, zoning, land use, environmental, and other regulations relating to the construction, ownership, development, use or occupancy of the Improvements and the Property.

## ARTICLE III. LIEN LAW COMPLIANCE

3.1 **Lien Law Compliance.** OWNER's payment of amounts due under the Construction Contract will be subject to the requirements of the Lien Law. OWNER accepts full responsibility for compliance, and will comply, with the Lien Law, and relieves MLCC from any and all liability thereunder of any nature whatsoever.

3.2 **MLCC Notification.** OWNER will notify MLCC immediately upon the filing of any notice or lien required or permitted under the Lien Law immediately upon OWNER's receipt of same.

3.3 **MLCC's Right to Disburse.** If MLCC has not received notice of any matters described in section 3.2 above at the time of any disbursement under this Agreement, then MLCC may disburse as directed by this Agreement without notice to OWNER and without regard to the provisions of the Lien Law, and without responsibility or liability to OWNER or the Contractor, or to any subcontractors, laborers or materialmen.

3.4 **Releases of Lien.** Prior to each disbursement, OWNER will furnish to MLCC releases of lien from all parties who have provided services or supplied materials in connection with the construction of the Improvements and, upon request, releases and waivers of any rights to equitable liens on the Property, the undisbursed Loan funds, and proceeds from any sale of the Property.

3.5 **Proof of Payment.** Upon completion of construction of the Improvements and contemporaneously with disbursement of the final payment due to the Contractor under the Construction Contract, OWNER will furnish to MLCC any documentation permitted or required under the Lien Law to evidence that all amounts due the Contractor and all subcontractors, laborers and materialmen have been paid to the parties entitled to such payments, and that there are no amounts remaining unpaid for which a lien against the Property could arise under the Lien Law. At the option of MLCC, MLCC may condition each disbursement, including the final disbursement, upon OWNER furnishing the written acknowledgement of the Contractor and/or any other party entitled to payment under the Construction Contract, certifying that all sums due and owing to each such party have been paid in full, or will be paid in full upon receipt of the proceeds from the next ensuing disbursement in connection with which the acknowledgement of payment is requested.

3.6 **Direct Payments.** Nothing in this Article III will in any way restrict MLCC's prerogative for protection of its security interest to make payments directly to subcontractors, laborers and materialmen.

3.7 **Priority of Security Documents.** OWNER acknowledges that the lien of the Security Documents is intended to be superior to any lien arising under the Lien Law. If any event will have occurred, including the filing of any notice under the Lien Law, that would cause the lien of the Security Documents to become secondary to any lien arising under the Lien Law, MLCC will have the right to cancel this Agreement and OWNER will reimburse MLCC for its costs and expenses incurred to date. OWNER certifies that there has been no construction activity or other actions taken on or with respect to the Property as of the date hereof for which a lien could attach to the Property pursuant to the Lien Law that would be superior to the lien of the Security Documents. OWNER agrees to execute any and all documents and do any and all further acts necessary to protect the superiority of MLCC's Security Documents as determined by MLCC in its sole discretion.

3.8 **Transfer of Lien.** If a lien is filed against the Property under the Lien Law, OWNER will at MLCC's request transfer such lien to bond or other security, or post a bond and obtain a release of the lien, as provided under the Lien Law within 10 days after such lien is filed.

3.9 **Contested Lien.** MLCC has the right to contest any lien filed or to transfer to other security if OWNER fails to do so in a timely manner, and the cost of such action will become part of the indebtedness under the Note and secured by the Security Documents.

## ARTICLE IV. REPRESENTATIONS AND WARRANTIES OF OWNER

4.1 **Existence.** OWNER, if a corporation, is duly authorized, validly existing and in good standing under the laws of the state of its incorporation and the laws of the State, and has all necessary corporate power to enter into these agreements. OWNER, if a partnership, is validly existing and in good standing under the laws of the state of its formation and, if required, is qualified to do business in the State, and the partners executing this Agreement and the Note and Security Documents have lawful authority to bind the partnership in accordance with the terms of this Agreement, the Note and Security Documents and any other documents being executed by the partnership for the benefit of OWNER.

4.2 **No Default.** OWNER is not in default and has not breached in any material respect any agreement or instrument to which it is a party or by which it may be bound, and the execution and delivery of this Agreement, the Note and Security Documents, and the consummation of the other transactions contemplated herein do not conflict with or result in (i) a violation of any regulation, order, writ, judgment, injunction or decree of any court or governmental or municipal instrumentality or (ii) the breach of or default under any agreement or instrument to which OWNER is a party or by which it may be bound.

4.3 **Compliance with Laws.** OWNER has obtained all necessary governmental approvals, including FHA and VA approvals, if applicable, necessary to commence construction of the Improvements.

4.4 **Utilities and Zoning.** Sewer or septic tank system, water and all other necessary utilities are available to serve the Property and the Improvements in sufficient quantity for their intended use, and the current zoning classification of the Property and any covenants and restrictions affecting the Property permit the construction and intended use of the Improvements without the necessity of obtaining further approvals, authorizations, waivers, consents, exceptions or variances.

4.5 **Absence of Proceedings and Actions.** There are no actions, suits or proceedings pending or, to the knowledge of OWNER, threatened against or affecting OWNER or the Property, or any guarantors of the Loan.

4.6 **Financial Statements.** All financial statements of OWNER and any guarantors of the Loan submitted to Lender are true and correct as of the date of this Agreement.

4.7 **Boundaries and Access.** The boundaries of the Property are clearly marked and there are no disputed concerning the location thereof. There exists in favor of the Property adequate means of ingress and egress to and from the Property, so as to provide adequate access to the Property to and from a publicly dedicated highway or roadway.

## ARTICLE V. DEFAULT AND REMEDIES

5.1 **Failure to Perform.** Upon the failure of OWNER or the Contractor to perform according to the terms of this Agreement, or in the event that MLCC should be prevented from so performing, or if conditions should arise so that performance would be rendered difficult or hazardous for MLCC, or in the event of the failure of any condition by OWNER, or if MLCC in good faith deems that OWNER may default or shows signs of inability to fulfill its contractual obligations, then OWNER will be deemed in default under this Agreement, and thereupon MLCC is authorized to withhold further disbursements of the Loan Proceeds and such other funds as have been delivered to MLCC pursuant to this Agreement until all objections are removed or cured to MLCC's satisfaction.

5.2 **Breach of Note/Security Documents.** Owner's violation or breach of any term, condition, covenant, representation or warranty contained in the Note or Security Documents shall constitute a default under this Agreement.

5.3 **Default.** In the event of any default as aforesaid, MLCC may give OWNER 10 days written notice to correct such default, and upon failure of OWNER to comply with such written notice, within said 10 day period and such reasonable extensions thereof as may be granted by MLCC, solely at its option, MLCC may either credit all funds of OWNER then in its control upon the indebtedness under the Note, and declare the Note and the Security Documents to be forthwith due and payable, and proceed to exercise its remedies under the Note and the Security Documents for the balance then remaining unpaid; or MLCC may assume full charge of the construction of the Improvements as agent of OWNER and the Contractor, and proceed to enter into a contract with the Contractor or a third party contractor for the completion of the Improvements. The remedies and rights of MLCC hereunder shall be cumulative.

5.4 **Payment to MLCC.** In the event MLCC completes the Improvements, OWNER will pay to MLCC upon demand all amounts that may be disbursed in completing the Improvements, together with reasonable compensation to MLCC for extra services rendered by it in completing the Improvements, in excess of the Loan Proceeds and such other funds as have been delivered to MLCC pursuant to this Agreement. OWNER's obligation to deliver such excess sum will be secured by the lien of the Security Documents. If said excess sum will not be paid immediately upon demand or arrangements satisfactory to MLCC made for the payment thereof, MLCC may declare the Note and the Security Documents immediately due and payable, and may proceed to exercise its remedies under the Note and the Security Documents, for said excess sum as well as for the principal sum named in the Note.

5.5 **Reimbursement of MLCC.** OWNER agrees to reimburse MLCC for all costs and expenses incurred by MLCC in connection with any controversy, claim, demand or suit filed in connection with construction of the Improvements, the performance by either party to this Agreement, or the Loan Proceeds and such other funds as have been delivered to MLCC pursuant to this Agreement, including all court costs and MLCC's reasonable attorneys' fees incurred in connection with any matter relating hereto.

## ARTICLE VI. MISCELLANEOUS

6.1 **Notices and Copies.** All notices or copies referred to herein will be sent certified mail, return receipt requested, to MLCC at the address as shown in the introductory paragraph of this Agreement.

6.2 **Amendments.** This Agreement may not be modified or amended except by written instrument signed by both MLCC and OWNER. No action or omission of MLCC, nor any waiver, acquiescence or course of dealing, will be deemed to affect the specific rights and obligations of the parties as set forth in this Agreement, or to constitute an amendment or modification of this Agreement.

6.3 **Severability.** If any of OWNER's covenants, promises and agreements in this Agreement should be held to be unenforceable for any reason, the remaining portions of this Agreement will remain in full force and effect, and interpreted to the same extent as if such unenforceable provisions originally had not been included in this Agreement.

6.4 **Successors and Assigns.** This Agreement will be binding upon, and inure to the benefit of, the heirs, personal representatives, successors and assigns of OWNER, and the successors and assigns of MLCC; provided, however, that if the Security Documents contain a prohibition against the transfer of OWNER's interest in the Property, then OWNER's interest in this Agreement will not be assignable without the express written consent of MLCC, which consent may be granted or withheld in MLCC's sole discretion, and any such assignment without MLCC's consent will constitute a default of OWNER under this Agreement.

6.5 **Governing Law.** This Agreement will be governed by and construed in accordance with the law of the State.

6.6 **Time of the Essence.** Time is considered of the essence of this Agreement and the satisfaction of the obligations of MLCC and OWNER hereunder.

6.7 **Borrower-Lender Relationship.** This Agreement is made on the basis of a borrower-lender relationship between OWNER and MLCC, and MLCC will not be considered to constitute a partner, agent or joint venturer of or with OWNER or any other party associated with the construction of the Improvements or the ownership of the Property. MLCC will in no manner or respect be liable or responsible by reason of the provisions hereof, or otherwise, for the payment of any claims growing out of the construction of the Improvements or the ownership of the Property by OWNER. No third parties, including any general contractor, subcontractors, suppliers or laborers, will have any rights or privileges hereunder, it being expressly understood that this Agreement is made for the sole protection and benefit of OWNER and MLCC, and their respective heirs, personal representatives, successors and assigns.

-6-

6.8 Reappraisal Provision.  Notwithstanding any term or provision hereof to the contrary, if at any time and for any reason MLCC in its sole discretion determines that the value of the Property may have declined or be less than MLCC previously anticipated, within three (3) days from MLCC's written request to OWNER therefor, OWNER shall provide to MLCC, at OWNER's sole cost and expense, a current appraisal of the Property to be ordered by MLCC from an appraiser designated by MLCC and in form and content as required by MLCC.  OWNER shall cooperate fully with any such appraiser.  OWNER'S failure to promptly and fully comply with Lender's requirements under this subsection shall, without further notice, constitute an event of default under this Agreement and the other loan documents.  If, based on the reappraisal value, MLCC determines that the value of the Property and the improvements when complete will not equal or exceed the original appraised value, MLCC reserves the right to require Owner to deposit cash, or other collateral acceptable to MLCC in its absolute discretion, in a pledged account or other similar credit vehicle in an amount equal to the decline in the appraised value of the Property, which shall remain pledged to MLCC as additional collateral until such time as MLCC is satisfied that the value of the Property and the improvements has increased to the original appraised value.

6.9 Waiver of Defaults.  Waiver by MLCC of any breach or default by Owner under any terms of the Note, Security Documents, or this Agreement shall not be deemed to constitute a waiver of any subsequent breach or default by OWNER.

6.10    Additional Provisions.  The following additional provisions are incorporated into this Agreement and will be controlling in the event of any inconsistency between such provisions and the pre-printed portions of this Agreement:

IN WITNESS WHEREOF, OWNER and MLCC have executed and delivered this Agreement under seal as of the date first above written.

Signed, sealed and delivered

in the presence of:

**OWNER:**

_____ (Seal)          _____ (Seal)


_____ (Seal)          _____ (Seal)

Julie Dillon Ripley Miller, By Barry Newman, Her Attorney-In-Fact

_____

MERRILL LYNCH CREDIT CORPORATION

Al Dimoush
Vice President

-7-

**CONTRACTOR'S CONSENT:** The undersigned hereby certifies to MLCC that it is the Contractor for OWNER named herein above for the construction of the Improvements, that the total contract price for said construction covered by this Agreement is $6,181,732.05 and in consideration of the making of the Loan by MLCC to OWNER, the undersigned consents to the assignment by the OWNER to MLCC of the Construction Contract and all permits, Plans and Specifications concerning the Improvements. The undersigned hereby subordinates its lien on the Property, now existing or hereafter arising, to the lien of the Security Documents. Any loan funds received by the undersigned will be used only to pay for costs that are authorized hereunder. The undersigned agrees that in the event of default by OWNER under this Agreement, it will at MLCC's request continue performance of the Construction Contract in accordance with its terms, provided it is reimbursed in accordance with the Construction Contract for all work, labor and materials provided by the undersigned. By executing this consent, Contractor will not be deemed in privity with MLCC.

Dated this 7th day of December, 1999.

CONTRACTOR:
CONDON BROWN BUILDERS INC

By:

Name: Keith Brown
     Authorized Signatory

# CONSTRUCTION LOAN AGREEMENT

### EXHIBIT A

As described in exhibit "A" attached hereto and made a part thereof.

EXHIBIT "A"

All those certain tracts or parcels of land together with the
buildings and improvements thereon, situated in the Town of
Norwalk, County of Fairfield and State of Connecticut known and
designated as lots 520, 521, 522 and 523 on a certain map
entitled, "Wilson's Point Situated At Norwalk Fairfield County
Connecticut Harris-Vought & Co. Inc. Agents 6 East 46th St. New
York City, Map of Section 5 May 1922 Scale 1"-60' the Samuel W.
Hoyt, Jr. Co. Inc. Civil Engineers," which map is on file in the
office of the Town Clerk of said Norwalk as Map No. 496;

Together with the right to use "The Common" so-called at Wilson's
Point in accordance with the terms and subject to the conditions
and provisions of that certain trust deed from The Wilson Point
Company, Incorporated, to Duncan G. Harris, Franklin D. Vought
and Reed G. Haviland, Trustees, dated June 29, 1920 and recorded
in volume 163 at page 491 of the Norwalk Land Records, as such
terms and conditions and provisions may have been amended or
extended by a deed from said Trustees to Wilson Point Beach,
Incorporated, dated September 25, 1933 and recorded in volume 248
at page 292 of said Owner's Association, Incorporated, the said
Trustees, and the Wilson Point Company, Incorporated, and
recorded in volume 342 at page 7 of the Norwalk Land Records.

Exhibit D

Merrill Lynch
Credit Corporation

Private Client Group

4802 Deer Lake Drive East
Jacksonville, Florida 32246-6484
904 218 6000
800 443 6184

 **Merrill Lynch**

November 12, 2001

Julie D. Miller
21 Point Road
Norwalk, Connecticut 06854

Dear Mrs. Miller:

I am pleased to inform you that your application for a Merrill Lynch mortgage has been conditionally approved, as follows:

| | |
|---|---|
| Loan Product: | PrimeFirst® |
| Loan Amount: | $4,900,000.00 |
| Loan Term: | 300 months |
| Origination Fee: | 0.000% |
| Discount Point(s): | 0.000 |
| Margin: | 2.3750% |
| 1% Periodic Rate Cap: | No |
| Private Mortgage Insurance Required: | No |
| Fixed-Rate Conversion Option: | No |
| Rate Adjustment Option: | one month |

The index you have selected is the average of interbank offered rates for one-month dollar deposits in the London market based on quotations of major banks as published in The Wall Street Journal "Money Rates" table. Your mortgage is to be secured by property located at 21 Point Rd, Norwalk, Connecticut 06854. For additional information about your mortgage, please see the enclosed Important Information document.

Our commitment to you is, of course, conditioned upon there being no material adverse changes in your circumstances between the time we received your application and the time of closing, and upon your satisfaction of the requirements listed below, if any, prior to closing.

Satisfaction of the attached requirements must be completed by December 31, 2001. If not completed by such date, this commitment will expire. This commitment may only be extended by Merrill Lynch Credit Corporation in writing. Such an extension may result in delays in the closing of your loan and significant additional costs to you (e.g., new appraisal, etc.) to finalize this transaction.

You and any co-applicant and any other titleholder must attend the loan closing unless you provide us in advance of your scheduled closing with Power(s) of Attorney acceptable to us and the title insurance company. We do not make exceptions to this policy.

PrimeFirst Cond.
(05/24/00) PFSTCAP (A)
6020457

*(page 1 of 2 pages)*

JDRM 003482

If you have questions concerning your loan, please call me at (800) 443-6184, extension 46027. For hearing impaired only, please call (800) 833-5383 TTY. Thank you for selecting Merrill Lynch for your home financing needs.

Sincerely,

*Robert Williams*

Robert Williams
Loan Officer

Note: Final approval is not guaranteed, and may be subject to additional review.

(page 2 of 2 pages)

JDRM 003483

6020457

Open boxes indicate items to be completed by you. Darkened boxes indicate items to be completed by Merrill Lynch.

REQUIREMENTS TO BE MET PRIOR TO CLOSING:

☐ The clients are required to confirm "No" answers to credit related questions # 1,4 on the back of the application.

☐ For loans under the Mortgage 100/Parent Power programs, a fully funded pledge account at MLPF&S must be established prior to closing.

■ Receipt of final approval from Securities Based Lending for the pledge account.

☐ In addition to any conditions stated above, MLCC may impose additional requirements necessary to perfect the security interest in the subject property.

■ Receipt of a Flood Zone Certification, to be ordered by Merrill Lynch. (Note: Flood insurance will be required if shown that the improvements are in flood zone A or V. The client is to verify the premium cost if flood insurance is required).

■ Receipt of a satisfactory preliminary title report, to be ordered by Merrill Lynch. The title company may require that a copy of a new or existing survey for the subject property be provided prior to closing. If a survey is required in order to omit the survey exception, obtain the same from the client and verify it is acceptable to the title company, if applicable.

REQUIREMENTS TO BE MET AT CLOSING:

☐ The clients are required to complete the application confirming "No" answers to credit related questions # 1,4 on the back of the application.

■ Loan must close on or before the documentation expiration date or updated documentation will be required.

☐ Payoff and release of record your Merrill Lynch loan #4312716 in the approximate balance of $7500000.

Conditions
(12/10/98) CONDCOMM

JDRM 003484

TOTAL P.04

## CERTIFICATE OF SERVICE

This is to certify that on this 1st day of August 2005, a copy of the foregoing

SUPPLEMENTAL AFFIDAVIT OF TARA STEWART was delivered via first class U.S. mail

to:

Patrick W. Begos, Esq.
BEGOS & HORGAN, LLP
327 Riverside Avenue
Westport, CT 06880

Jonathan S. Bowman, Esq.
COHEN AND WOLF
1115 Broad Street
Bridgeport, CT 06604

Matthew R. Paul

STM/300838.1