UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JULIE DILLON RIPLEY MILLER, | CIVIL ACTION NO. |
| Plaintiff and Counterclaim Defendant, | 3:03-CV-1016 (RNC) (DFM) |
| - against - | |
| MERRILL LYNCH CREDIT CORPORATION, | AUGUST 1, 2005 |
| Defendant and Counterclaimant. | |

## DEFENDANT'S MOTION TO STRIKE AND OBJECTIONS TO AFFIDAVITS OF RICHARD HOMBERGER AND MARC SEIFER AND RELATED ARGUMENTS SUBMITTED BY PLAINTIFF

Merrill Lynch Credit Corporation ("MLCC") respectfully submits its objections, and related motion to strike, to certain assertions and submissions made by Plaintiff Miller in opposition to MLCC's summary judgment on the grounds they lack proper foundation, are inadmissible as a matter of law, and are not probative as to any issue properly before this Court in connection with MLCC's pending summary judgment motion.

## PRELIMINARY STATEMENT

In late 1997, Plaintiff purchased a piece of property in Connecticut for $1,350,000 (the "Premises"). She then hired a general contractor, architect and a designer to undertake a massive reconstruction of the Premises. In late 1999, Mrs. Miller applied for and received a $7,500,000 loan from MLCC. The proceeds of the Loan were disbursed as follows: $1,350,000 (representing the original loan amount for the purchase of the Premises), $2,350,000 (representing the amount needed to complete the construction), and the remainder applied to the margin loan facilities provided by MLPF&S which had been used to fund interim construction costs for the renovation as well as Mrs.

Miller's chosen lifestyle. She now presents herself as an alleged victim of improper loan origination, and offers Affidavits of Richard Homberger and Marc Seifer as purported experts in support of that claim. As proffered to the Court, without citation of a single pertinent legal authority, neither of those Affidavits is admissible.

## I.    INTRODUCTION – CLAIMS BASED ON MR. HOMBERGER'S AFFIDAVIT

It is important to define what this case does not involve. It is not an action by a secondary market purchaser of existing mortgages such as the FNMA complaining that loans purchased by it from MLCC were underwritten in violation of their guidelines and that they are entitled to relief. It is not a case in which Mrs. Miller can, or does, claim she was told her loan complied with such guidelines. There is no indication these guidelines were ever even discussed here, with her or Mr. Falini. In fact, she claims she never dealt with MLCC before the loan was approved. Nor is this situation equivalent to cases where an accounting firm's internal guidelines are pertinent because of shareholders' claims for securities violations on the theory they may constitute the firm's interpretations of the Generally Accepted Auditing Standards ("GAAS") or Generally Accepted Accounting Principles ("GAAP") which govern financial statements certified by accounting firms pursuant to Rules and Regulations promulgated by the S.E.C. Viewed in this context, and applying governing case law and the Federal Rules of Evidence, Mr. Homberger's Affidavit and attached reports violate almost every evidentiary principle applicable to expert testimony.

Mr. Homberger's Affidavit and attached reports, ignoring applicable law and the Rules of Evidence, focus on numerous levels of criticism:

1.    Despite his own admission that he is not an expert on "predatory lending" practices, which he relies on a small portion of a 2001 FDIC press release dealing with subprime lending to define in a conclusory reference, and the fact that no such claim is made in the complaint,

2

or the affirmative defenses to the counterclaim filed in April 2005, long after his initial report, he continues to opine, as he has since 2003, that the MLCC loan to Mrs. Miller constituted "predatory lending" which he has arbitrarily expanded to also define as "predatory origination, sales and servicing processes."

2.     In disregard of the applicable law, he opines that MLCC's loan underwriting process failed to adhere to what he believed were standard secondary marketing underwriting guidelines and practices for mortgages as reflected in "guidelines" promulgated by two purchasers of secondary mortgages (FHLMA or FNMA) and his own unfettered opinion based on methods he evidently believes are better practices. He further opines that in some instances the loan parameters exceeded MLCC's own internal underwriting guidelines (Homberger Aff., Exh. B);

3.     He also opines Merrill Lynch, Pierce, Fenner & Smith (MLPF&S) and its employee, Mr. Falini, acted improperly in arranging margin loans that pre-dated the 1999 MLCC loans. Again, tellingly, Mr. Homberger claims no expertise in the securities business and compounds this defect by attributing this alleged earlier misconduct to MLCC.

4.     Additional opinions are offered on what closing attorneys or title insurance companies would have done. This is, again, without any foundation since Mr. Homberger is not a closing attorney and has never worked for a title insurance company.

Mr. Homberger's Report is also both methodologically flawed, and should also be rejected, for these additional reasons.

5.     Mr. Homberger's methodology is defective because it employs standards applicable to so-called "conforming" loans sold in the secondary mortgage market that, unlike this

3

"portfolio" Loan, can not exceed $337,000 and are not underwritten to also be secured by the pledge of securities or other forms of collateral other than the mortgage itself.

6.    As will be detailed, the Homberger Affidavit is also littered, indeed fatally infected, with unsubstantiated claims, commentary and legal conclusions that are either not the proper subject of expert testimony or for which Mr. Homberger has admitted he is not an expert. For example, the November 26, 2002 Report (Exhibit "A" to Mr. Homberger's Affidavit) states that "In good conscience, the lender should have informed the borrower of [an alleged] appraisal discrepancy[.]" (Exh. A at 7). As detailed hereinafter, Mr. Homberger also responds to a number of questions *drafted by Mrs. Miller's counsel,* using improper phraseology replicating legal standards, with respect to none of which he even asked for clarification of what was encompassed in the legal phraseology used by counsel. The responses to the vast bulk of these questions can only be properly determined by the trier of fact, based on appropriate legal determinations by the Court. For example, the questions include whether the Loan was "unconscionable" (Exh. A at 12) or, repeating the language of the CUTPA statute as alleged in the Complaint in this Action, whether certain actions were "immoral, unethical, oppressive or unscrupulous" (Exh. A at 13).

7.    Furthermore, even though the pleadings in this case are devoid of any claims of fraud in MLCC's underwriting or origination process, Mr. Homberger's reports go so far as to not only assume such claims are framed by the pleadings, but, based on that assumption, he reaches conclusions which again improperly usurp the fact-finder's function,  (Exh. A at 3) ("Fraud is an act of intentional misrepresentation, concealment or omission of the truth for the purposes of deception or manipulation with the intention of taking advantage of another"). He also describes certain actions as "fraudulent," using such terms as "fraudulently concealed" (Homberger Aff., paragraph

4

5) and asserts they "potentially open the door to fraud" (Homberger Aff., paragraph 4). These are just a few of many such examples.

       Because the Report submitted by Mr. Homberger fails to satisfy any of the threshold standards set forth in Rule 702, Mr. Homberger is not qualified to offer testimony concerning Mrs. Miller's loan or her relationship with either MLPF&S or MLCC. For the other reasons stated herein the Report should also be rejected, and those portions of the Opposition predicated upon it rejected.

### A.    Governing Principles As Set Forth In Rule 56(e) And The Applicable Case Law

       The Second Circuit has regularly delineated the governing standards for evidentiary submissions in opposition to motions for summary judgment. As noted in ABB Industrial Systems, Inc. v. Prime Technology, Inc., 120 F.3d 351, 357 (2d Cir. 1997), Rule 56(e) specifically contemplates that affidavits "shall set forth such facts as would be admissible in evidence."

       Similarly, in Raskin v. The Wyatt Company, 125 F.3d 55, 66-67 (2d Cir. 1997) the Court noted that, among the purposes behind this rule, was conserving "the resources of the parties, the court, and the jury," citing, approvingly, Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985), cert. denied 474 U.S. 829 (1985). More recently, in Rubens v. Mason, 387 F.3d 183, 189 (2d Cir. 2004), the Court dealt with objections made to admission of an affidavit and stated: "On a motion for summary judgment, a district court may rely only on material that would be admissible at trial" and went on to preclude an affidavit pursuant to Federal Rules of Evidence 402 (relevancy) and 403. Similarly, in Nora Beverages, Inc. v. Perrier Group of America, 164 F.3d 736, 746 (2d Cir. 1998), the Court found it proper that the district court had found an experts' opinion not relevant because

5

he did not meet the requirements of Evidence Rule 702 based on his experience as a marketer in the beverage industry, which was not relevant to the question of contract formation before the Court.

To be admissible, an expert report must be reliable and assist the trier of fact. Specifically, Rule 702 of the Federal Rules of Evidence provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  None of those criteria are met in Mr. Homberger's Affidavit and the attached Reports.

**B.     By His Own Admission, Mr. Homberger Is Not An Expert On "Predatory Lending" And, Additionally, In Stating His Opinion Relies Only On A Press Release Issued By The FDIC In 2003**

While the Homberger Affidavit and appended reports are pervaded with improper unstated assumptions as to guiding principles for expert reports and applicable law, one of the many flagrant violations of settled principles is contained in the body of the Affidavit itself, which makes repeated references to "predatory lending" or "predatory origination, sales and servicing processes..." (Homberger Affidavit, pages 5-6).

The plaintiff's opposition seizes on this concept and invokes the "predatory" mantra on numerous occasions.  (See Opposition Memorandum at 10-11, 18).  It does so in total disregard of the following facts:

A.    Mr. Homberger has candidly admitted that he does not regard himself as an expert on "predatory lending" (Second Supplemental Conroy Affidavit ("Sec. Supp. Conroy. Aff."), Ex. B - Homberger Deposition Excerpts, (hereafter "Homberger Dep."), page 163, lines 12-14).

B.    He bases his understanding of "predatory lending," as defined by him, and arbitrarily amplified to include his reference to "predatory origination, sales and servicing," on one press release issued by the FDIC in 2001 (two years after Mrs. Miller's $7,500,000 loan was underwritten), which discusses the subject in the context of its oversight of the financial soundness of institutions regulated by the FDIC – and which is also hearsay (Homberger Dep. pages 213-17; Sec. Supp. Conroy Aff., Ex. D).

C.    He has never sought to review any underlying regulations promulgated by the FDIC dealing with this subject matter (Homberger, p. 213, lines 18-21).

D.    He professes ignorance as to whether MLCC is even subject to FDIC regulation (Homberger, p. 214, lines 10-17).

E.    He had no real understanding of the purpose of the press release but testified "one of the results was to provide background information that, in particular, with respect to predatory lending and subprimlending that could have an impact on the bank's solvency." (Homberger, p. 215, lines 8-20).

It is axiomatic, in treating the admissibility of expert testimony on a given subject, that the expert be an expert on the subject as to which he is expressing opinions. In Trademark Research Corp. v. Maxwell Online, Inc., 995 F.2d 326, 338 (2d. Cir. 1993), the Court found that the district court had properly precluded such opinions when the witness conceded his own lack of expertise on the subject.  A similar result was reached in Berkovich v. Hicks, 922 F.2d 1018, 1025 (2d Cir.

7

1991).  In <u>United States v. Booth</u>, 669 F.2d 1231, 1240 (9th Cir. 1982), the Court noted, in agreeing

that the government had failed to show a witness' training qualified him as an expert in the subject

at hand:  "Federal Rule of Evidence 702 requires that a witness qualify as an expert 'by knowledge,

skill, experience, training, or education. . .'"  *See also* <u>Kennedy v. Baxter Healthcare Corp.</u>, 348

F.3d 1073, 1075 (8th Cir. 2003); <u>Smith v. Ford Motor Co.</u>, 215 F.3d 713, 717 (7th Cir. 2000);

<u>Wilson v. Woods</u>, 163 F.3d 935, 937 (5th Cir. 1999).

Although we submit the Court need go no further in considering this proffered testimony as

worthless and striking or disregarding it (and the related opposition argument, see Opposition

Memorandum at 10-11, 18), there are two additional reasons for rejecting this proffered opinion:

1.      Absolutely no claim of predatory lending has been made in the complaint in this

action, which has now been through two amendments.  We submit that absence is deliberate since

there is no authority for such a claim in Connecticut and pertinent Connecticut authority, as

discussed <u>infra</u>, Part IC, is inconsistent with the existence of such a cause of action.  *See, e.g.,*

<u>Security Pac. Nat. Bank v. Robertston</u>, No. CV 920124622S, 1997 WL 561235, at *3 (Aug. 28,

1997 Conn. Super.).

2.      Even if such a claim had been asserted, and withstood a motion to dismiss, the

opinion is improperly couched, as are other opinions by Mr. Homberger, in the form of improper

legal conclusions.  See discussion, <u>infra</u>.

**C.      <u>Any Alleged Failure By MLCC To Comply With Its Own Internal Guidelines
Or Standard Industry Practices Is Also Not Pertinent And, Under Controlling
Second Circuit Law, Is Not Admissible</u>**

Mr. Homberger's analysis assumes, improperly, that MLCC's failure to adhere to its own

internal guidelines, or his purported industry standards for secondary market sales violates Mrs.

8

Miller's rights.  Under applicable Second Circuit law, and other authorities cited approvingly by the Second Circuit, any claimed violation of MLCC's own internal guidelines or alleged industry practices or "guidelines" cannot form the basis for a cause of action by Mrs. Miller.

In <u>DeKwiatkowski v. Bear, Stearns & Co., Inc.</u>, 306 F.3d 1293 (2d Cir. 2002), the Court was faced with an appeal from a judgment in plaintiff's favor in the sum of $111.5 million.  It found that judgment improper because it was predicated upon a finding that, in extending various accommodations to the plaintiff which allegedly enabled him to incur huge trading losses, the Court below had allowed evidence on various industry standards or rules issued by various self-regulatory organizations and Bear Stearn's own internal standards tracking some of those rules.  The Court refused to find liability, citing numerous cases from the Eighth Circuit and elsewhere.

Although the situation before it involved an ongoing relationship between a securities brokerage firm and a client, the Court rejected plaintiff's efforts to invoke both "industry standards" including the New York Stock Exchange's "know your customer" rule (which Bear Stearns admitted to adhering to for commodities transactions although not required to do so) and various standards promulgated by other entities such as the National Futures Association ("NFA"), as well as decisions by the Commodities Future Trading Commission.  The Court rejected reliance on both the CFTC cases and alleged "industry" rules or standards or internal Bear Stearns standards for evaluating risk and suitability.  <u>Id</u>. at 1311.  Citing a series of cases, the Court concluded:

> As a policy matter, it makes no sense to discourage the adoption of higher standards than the law requires by treating them as predicates for liability.  Courts therefore have sensibly declined to infer legal duties from internal "house rules" or industry norms that advocate greater vigilance than otherwise required by law.

Given that these industry guidelines or standards in a highly-regulated industry, in many cases promulgated by the Commodity Futures Trading Commission, or self-regulatory

organizations subject to oversight by the CFTC or SEC, such as the NFA and NYSE, are not admissible to establish a standard of conduct for "risk" or "suitability," by definition "guidelines" of the type issued by FNMA to prospective sellers of mortgages to FNMA are not admissible, irrespective of what other facts might be alleged. The Court went on to note that plaintiff had also argued that non-compliance was evidence of an overall failure to exercise due care and also rejected this claim, finding no independent basis in the case law or otherwise for a more comprehensive duty to be imposed on Bear Stearns, even though it was a brokerage firm with an ongoing client relationship. Id.

Similarly, in J.E. Hoetgere & Co. v. Ascencio, 572 F.Supp. 814 (E.D. Mich. 1983), one of the cases cited approvingly in DeKwiatkowski, the investor had sued a broker and his firm for breach of fiduciary duties. The Court found for defendants in part because the brokerage firm could not be held liable for violating its own in-house rules. The court outlined "sound practical reasons" for not holding companies liable for violating their internal guidelines.

> Michigan cases "in no way hold that a broker can be held liable for violation of its own internal operating rules which are not known of or relied upon by investors. . .The trading limits imposed upon Hoetger were never intended to protect him from his own greed, as plaintiff seems to suggest. Such limits are designed to protect the broker from being saddled with losses which the investor is not able to cover[.]" Id. at 822.
>
> "[S]ound practical reasons for not allowing a private cause of action predicated upon violation of internal rules or policies" include imposing greater liability on the most diligent firms; pushing firms to adopt more lax policies; and requiring the court to determine violations of complicated, often convoluted policies with which it is not familiar. Id. at 822-23.

As to the possible existence of a more comprehensive duty under Connecticut law, it is well-settled that banks, acting as lenders, have no heightened duty of care to their borrowers. Numerous cases

have made it clear that banks have no duty to concern themselves with a borrower's ability to repay a loan. See Security Pac. Nat. Bank v. Robertson, No. CV 920124622S, 1997 WL 561235, at *3 (Aug. 28, 1997 Conn. Super.) ("Research has not revealed any law supporting the proposition that a lender has any duty to investigate the financial stability of a borrower . . . and independent research has not revealed any authority to support the proposition that a lender has a duty to a borrower to inquire into the ability to repay a loan."); Great County Bank v. Kiely, No. CV 94 047460S, 1995 WL 625917, at *3 (Jan. 19, 1995 Conn. Super.) ("no court has recognized a duty to inquire into a borrower's ability to repay, even if the lender was a commercial bank.").

While there are indications in the cases cited in DeKwiatkowski that exceptions to its policies as to broker/client relationship may be made based on "independent facts establishing fraud," see Farmland Indus. v. Frazier – Parrott Commodities, Inc., 871 F.2d 1402, 1407 (8th Cir. 1989), neither the facts of this case, pleadings or the recitations by Mr. Homberger before this Court frame any such exception.

Nor have the pleadings or evidence adduced such a claim in any event. Attached to the Second Supplemental Conroy Affidavit as, respectively Exhibits "E" and "F" are Mrs. Miller's Second Amended Complaint, as filed in November 2003, and her Reply to MLCC Counterclaims, dated April 4, 2005, long after completion of depositions and document production in this action. MLCC was not Mrs. Miller's broker and, therefore, its relationship with Mrs. Miller did not rise to the level where a possible exception to DeKwiatkowski need even be considered. In fact, she has continually asserted she had no contact with MLCC prior to the 1999 loan closing. As a result, she cannot claim representations were made to her concerning as to how the underwriting and origination were to be conducted.

11

The Second Amended Complaint contains one count, Count II, labeled "Fraudulent Nondisclosure" and attacks only the Power of Attorney (POA) as "invalid" and asserts the Pledge Agreement was not authorized because of the allegedly invalid POA. <u>That is the only claim of fraud made in the Complaint</u>. This claim has been shown to be groundless. The admitted facts with respect to Mrs. Miller's actual knowledge of the changes in the POA and existence of the pledge agreement have also been discussed at length in MLCC's Opposition to the Miller Motion for Summary Judgment. (MLCC's Opposition Memorandum at 5, 12-20). Mrs. Miller also makes a point, in her Respondeat Superior Count (Count XI) based on allegations of Falini's non-existent agency (as to which plaintiff has also elicited no evidence), to allege only that Falini otherwise acted negligently or recklessly. (Second Amended Complaint, Count XI, paragraph 47). In her Reply and Defenses to the counterclaims filed on April 5, 2005, long after she had access to MLCC witnesses and files, while she asserts generally that the note and mortgage were fraudulently procured, and are otherwise unenforceable, she asserts that is so "for the reasons set forth in plaintiff's complaint in this action." Reply To Counterclaims, First Defense, page 2. However, the charging allegations of the twice amended complaint allege nothing about the loan underwriting and origination and servicing process now criticized in such detail in Miller's opposition. They assert, in paragraphs 1-15 and again, in later paragraphs, claims for damages flowing from the allegedly improper Power of Attorney and pledge. Such a claim is nowhere even framed by the pleadings, let alone by the various unsupported assertions made by Mr. Homberger.

> **D.** **<u>Similarly, Mr. Homberger, Who Does Not Even Purport To Be An Expert In Any Aspect Of The Brokerage Business, Improperly Opines As To The Propriety Of Merrill, Lynch, Pierce, Fenner & Smith ("MLPF&S") Funding Of Mrs. Miller's Construction Project Through Margin Loans And Attempts To Attribute These Activities To MLCC</u>**

At several junctures of his Affidavit, Mr. Homberger makes disparaging remarks about the relationship between Mr. Falini and Mrs. Miller as it related to the pre-December 1999 funding of her grandiose construction project through margin loans and tries to attribute those actions to MLCC.

For example, he opines as to an "ongoing breakdown in the loan origination process when the MLPF&S FA [Falini] began funding the Miller construction loan with MLPF&S margin loans ..." (emphasis added) (Homberger Aff. ¶ 6), ignoring that this use of margin was in place for two years before the 1999 loan was "originated." Further on in the same screed he opines as to the "lack of voluntariness due to the fact that the MLPFS FA had facilitated a series of margin loans to an unsuspecting borrower to initiate the construction process which culminated in this unaffordable obligation. . . ."

These are yet further examples of unsupported assertions by Mr. Homberger. Although he is purportedly an expert in mortgage origination, underwriting and servicing as to FNMA qualified loans, he has never claimed to be, nor does he qualify as, an expert on what obligations, if any, MLPFS or Mr. Falini owed to Mrs. Miller as a result of the separate relationship arising from maintenance of her brokerage accounts at MLPF&S. As noted in MLCC's moving papers, Mrs. Miller has a separate arbitration claim pending challenging Mr. Falini's activities. (See MLCC Memorandum of Law in Support of Summary Judgment, footnote 2). There is a total lack of an appropriate foundation for these assertions of impropriety. Furthermore, even if the relationship somehow created, as they stretch to ridiculous lengths to argue, some responsibility by Mr. Falini to somehow stop Mrs. Miller from spending her wealth, it cannot be argued that any such illusory obligation can be attributed to MLCC, which became involved after the indebtedness had already been incurred.

13

Mr. Homberger's unsubstantiated assertions also ignore the truly salient evidence in this case as admitted by Mrs. Miller, his own client:

1.     She was adamantly against selling her inherited stocks.  (Sec. Supp. Conroy Aff., Ex. A at 49-50).  Absent margin loans, how was she to pursue this project since she has never claimed there was adequate cash to do so?

2.     She intended from the beginning to build her mansion based on her desire to replicate her parents and grandparents' residences in Litchfield, Georgia, and Washington, D.C. (Id. at 425).

3.     She knew how much she was spending and also knew Falini had no expertise as to construction-related decisions.  She never asked Falini in advance if or what she should spend on any aspect of the construction project, and never even had budgets to share with him prior to the MLCC construction loan.  (Sec. Supp. Conroy Aff., Ex. A at 43-46, 59-74).

4.     The only evidence claimed by Mrs. Miller of Falini's involvement in attempting to help her check her spending, at her request, all post-dated the closing of the December, 1999 loan as part of the conditions of which she finally had, for the first time, a budget and related completion estimate of $2,000,000 plus from her contractor.  (Begos Declaration, Exs. 25, 26, 27).

**E.     <u>Mr. Homberger's Reliance Or What He Thinks Closing Attorneys Or Title Insurers Might Do Or What He And His Employers Did, As A Matter Of Internal Better Practice, Is Equally Improper As Well As Irrelevant</u>**

Where Mr. Homberger finds the FNMA underwriting "guidelines" or MLCC's own and internal practices silent, he substitutes his own totally unfettered opinion – based on what he

believes closing attorneys or title insurers might do or his experience at various banks selling loans to FNMA. By definition, using such assertions to bolster his claims of impropriety fall even further down the scale than his alleged reliance on industry standards or the FNMA guidelines and are, a fortiori, inadmissible. Among these improper opinions are the following:

1.    His extensive discussion (Homberger Aff., Exh. A, pages 8-9), under the heading Power of Attorney, about what a closing process should or should not involve with respect to the Power of Attorney are without foundation. He opines as to what the title insurance company should have done in reviewing the Power of Attorney, saying it should have been rejected although he has not ever worked for or represented a title insurance company. Although he is not an attorney, he boldly states that "most closing attorneys will contact the borrower on the day of the closing to clarify the borrower's intention to mortgage the property." (emphasis added)  In fact, when asked about this statement, he at least admitted Mrs. Miller's absence in Africa would have made this difficult and that he could not say "all" attorneys do so.  (Homberger Dep. p. 197-199).

2.    His criticism of the whiting-out of the power of attorney and speculation concerning Mrs. Miller's intent/knowledge on executing the power of attorney (Homberger Aff., Exh. A, page 9) are totally inconsistent with his own admission that he is not a lawyer, and has no experience whatsoever with "whited out" powers of attorneys.  (Homberger Dep. pp. 195-96).  Nor has he read the text of the Connecticut statute dealing with Powers of Attorney for purposes of his opinion and cannot recall if he ever has (pp. 195-196).  Again, as with his earlier assertions, he opines, without any title insurance company experience:  "I cannot conceive of a Title Insurer knowingly issuing a Title Policy with such documentation."

15

3.    Under the heading Other Matters, Mr. Homberger continues this pattern of alluding to matters as somehow "improper" without foundation. Two examples of this will suffice:

a.    Especially egregious is his criticism of the alleged failure of MLCC to decline to "finance this debt due to insufficient income and credit history." (Homberger Aff., Ex. A, page 9). This totally ignores the documents in his own client's files evidencing an offer to refinance the mortgage on 21 Point Road for $4,900,000 and her deposition admission she declined the offer (Sec. Supp. Conroy Aff., Exh. A, page 234, 241; Supp. Stewart Aff., Ex. D).

b.    He complains that a commitment letter was not signed by the borrower, indicating "prudent closing procedures require prior receipt of a fully executed Commitment Letter. . . ." (Homberger Aff., Exh. A, page 9). When asked about this, he admitted there was no regulation, law or FNMA guideline which required it and that the purpose behind receiving a signed copy was really to minimize disputes, at the closing, over the terms  (Homberger Dep. pp. 204-06).

c.    His references to "Payment Shock" as a problem (Homberger Aff., Exh. A, page 8) fail to reveal that concept is not referenced in the FNMA guidelines on which he relies. In fact, he has also admitted that it is <u>only</u> "taken into account by <u>most underwriters and most investors</u> [in mortgages]" (emphasis added).  (Homberger Dep. p. 180, lines 4-14).

**F.    <u>Testimony As To Applicable Fannie Mae Or Freddie Mae Standards For Purchasing Conforming Mortgages Is Also Independently Inadmissible</u>**

Plaintiff has also not proffered a single argument or legal authority which would make Mrs. Homberger's description of FNMA or FHLMC "guidelines" or "standard secondary mortgage market requirements" pertinent, even if fraud had been alleged with respect to the origination and underwriting process. As shown by his own admissions, those "guidelines" or "practices" are

16

descriptive of what a "purchaser" of loans to a borrower generated by a local bank or mortgage broker should do to qualify to have that loan purchased by FNMA or the FHLMC. They do not have the force of law or create the basis for a "duty" here although, arguably, they might form the basis of a later contractual or breach of warranty claim in another case by FNMA or FHLMC against the seller of that mortgage. There is no basis, in this case, to assume Mrs. Miller's loan had to be so evaluated at any juncture. It was maintained in MLCC's portfolio and, indeed, is a "nonconforming" loan under either FHLMC or FNMA guidelines.

The Report fails to meet the standards set forth in Rule 702 because it attempts to apply principles applicable to the origination of loans intended to be sold on the secondary market that do not exceed $337,000 and do not include the pledge of securities or other independent collateral. Mr. Homberger openly admits that "[f]or purposes of this report [Exhibit A to his present affidavit], I have relied on FNMA/FHLMC guidelines and standard secondary mortgage market requirements in order to examine procedures of Merrill Lynch Credit Corporation (MLCC) in terms of general conformity with standard secondary market practices." (Homberger Aff., Ex. A, page 1) (emphasis added.)

MLCC did not need to adhere to the "guidelines" published by Fannie Mae, Freddie Mac or any other secondary mortgage purchaser because MLCC carried this loan on its books. Whenever or not Mr. Homberger specifically refers to the Fannie Mae or Freddie Mac guidelines at each step of his "analysis", he explains his own methodology as a comparison of MLCC's practice with secondary market practices – a standard for loans to be sold to investors such as the FNMA.

True to Mr. Homberger's characterization of the methodology used, his Report is littered with references to secondary market mortgage standards and most often to Fannie Mae/Freddie Mac guidelines:

17

- In discussing collateral, the report states: "The mortgage industry standard for residential real estate is the completion of at least one appraisal by a certified and licensed appraiser on the specific appraisal form (i.e. Freddie Mae or Freddie Mac) . . . [.]" (Report at 2.)

- The Report defines "Full Documentation" loans, as "loans that document credit information using standard Fannie Mae/Freddie Mac forms[.]"  (Report at 2.)

- Discussing Mrs. Miller's capacity to repay the Loan, the Report states "[s]tandard secondary mortgage market procedures require that a borrower "'must have a history of receiving stable income from employment or other sources and a reasonable expectation that the income will continue to be received in the foreseeable future (usually three years).' (FNMA Section 401.)." (emphasis added).

- The Report concludes that Mrs. Miller's $2.5 million in capital gains in 1998 should not have been considered in its underwriting of the 1999 Loan because it was not "stable monthly income" as defined by "FNMA Section 503.04." (Report at 5.)

- In critiquing MLCC's Debt-to-Income calculations, the Report states "Industry standards (i.e. FNMA and FHLMC) typically refer to an acceptable total Debt-to-Income ratio in the range of 35% to 38%."  (Report at 7.)

At deposition, Mr. Homberger reaffirmed that his analysis was predicated on

"secondary market procedures":

Q   At any point during these discussions with Mr. Begos did you acquire an understanding as to what issues you were to provide an opinion on?

A   I'm sorry.  Can you rephrase that?

Q   Experts are usually asked to opine on a specific subject or subjects, and I'm asking you if you acquired as a result of your conversations with Mr. Begos an understanding as to what issues or subjects he wanted you to opine on.

MR. BEGOS:  Object to the form.  You can answer.

A   He asked me to express my opinion with respect to whether or not this was a loan that I would make as a lender, if this is something that I've ever seen other lenders do, is this in accordance with secondary market procedures.  (Homberger Dep. at 27, lines 5-22. (emphasis added).)

18

In the course of this deposition testimony, Mr. Homberger admitted that Fannie Mae and Freddie Mac guidelines apply (i) when the lender enters into a contract to abide by them and (ii) the loan amount does not exceed $333,700:

> Q  And in that connection, do Fannie Mae and Freddie Mac require that the loans be what's known as investment quality?
>
> A  Yes.
>
> Q  And for purposes of gauging investment quality, do Freddie Mac and Fannie Mae provide guidelines to the institutions which sell them loans?
>
> A  Yes.
>
> Q  And, in fact, do Fannie Mae and Freddie Mac have to authorize an institution to sell them loans?
>
> A  The institution has to be an approved seller to sell them.
>
> Q  And it has to apply for that designation, correct?
>
> A  Yes.
>
> Q  And in the process of doing so, the institution agrees to comply with the guidelines promulgated by either Freddie Mac or Fannie Mae?
>
> A  Yes.
>
> Q  Do you know what the present Fannie Mae lending limit is?
>
> A  I believe it just changed.  I believe it's $333,700.  (Homberger Dep. at 38, line 6 to 39, line 6)

Both the Report and the Homberger Deposition make clear that the methodology employed by Mr. Homberger was a comparison of these secondary mortgage market practices with the procedures used by MLCC.  (Report at 1.)  When citing to Fannie Mae/Freddie Mac guidelines, Mr. Homberger does not indicate that they are *examples* of industry practice (in other words, "e.g."), he states that they are standard industry practice (using the syntax "i.e.").  And when asked "And by 'secondary market standards' you mean Freddie Mac or Fannie Mae?,'"  Mr. Homberger

simply responded "Yes." (Homberger Dep. at 58, lines 22-24.) But, regardless of the moniker used, they are not the industry standards for originating "non-investment grade" loans, and there is, in addition, no evidence offered of standards applicable to such loans. (Homberger Dep. at 54-55.)

Fannie Mae and Freddie Mac guidelines are, in any event, inapplicable for an additional reason – they contain no guidelines regarding the origination of loans involving the pledge of collateral such as securities. Mr. Homberger testified as much:

> Q []Is it fair to say that what Fannie Mae is trying to do in these guidelines is tell you what criteria it needs to be satisfied if as an institution you were going to sell mortgage loans to Fannie Mae?
>
> MR. BEGOS: Object to the form. You can answer it.
>
> THE WITNESS: Yes.
>
> BY MR. CONROY:
>
> Q Okay. Do you know if Fannie Mae or Freddie Mac buy loans that are secured not only by a mortgage on the property but by additional collateral?
>
> A I'm not aware that they do. Not in my experience.

The Loan at issue exceeded Freddie Mae's $337,000 threshold by $7,163,000 and was not written for sale in the secondary market. It was designed to be secured by a mortgage, a note and a pledge of securities. During Mr. Homberger's deposition, he was asked: "I'm going to ask you, in the interest of being as complete as possible, whether you have ever been involved in the processing, underwriting or closing of a residential real estate loan that involved the pledge of collateral other than the real estate itself?" Mr. Homberger responded "I don't believe I have been." (Homberger Dep. at 60, lines 2-8. (emphasis added).)

**G.    Mr. Homberger's Affidavit and Reports Contain Expressions Of Opinions In Areas Where He Has Never Claimed Any Expertise Or Has Never Established A Foundation.  The Questions And His Answers Also Usurp The Roles Of The Finder of Fact And The Jury And Are Therefore Inadmissible On That Additional Ground**

The Second Circuit has long held that "in reviewing the use of expert testimony [under Rule 702], we also look to see if 'it will usurp either the role of the trial judge as to the applicable law or the role of the [trier of fact] in applying that law to the facts before it." United States v. Lumpkin, 192 F.3d 280, 289 (2d Cir. 1999) ; see also United States v. Duncan, 42 F.3d 97, 101 (2d Cir. 1994) (same); United States v. Bilzerian, 926 F.2d 1285, 1294 (2d. Cir 1991) (same), cert. denied 502 U.S. 813 (1991).  In this instance, Mr. Homberger's Affidavit and attached Reports do both at innumerable junctures.

Rule 704 of the Federal Rules now allows witnesses, if appropriately qualified, and if their opinion is based on a legally appropriate foundation, to testify in the form of an opinion or inference which may embrace an ultimate issue to be decided by the trier of fact.  However, the cases are consistently hold that "Rule 704 was not intended to allow experts to offer opinions embodying legal conclusions." United States v. Scop, 846 F.2d 135, 139, rev'd in part and rehearing on other grounds 856 F.2d 5 (2d Cir. 1988).  See also Hugh v. Jacobs, 961 F.2d 359,364 (2d Cir. 1992) (improper admission of testimony defining legal phrase "deadly physical force").  The discussion in Scop went on to condemn an opinion drawing directly "upon the language of the statute and accompanying regulations concerning "manipulation and 'fraud.'" Id. at 140.  It also went on to cite approvingly the earlier decision in Marx & Co. v. Diners' Club, Inc., 550 F.2d 505, 510 (2d Cir.), cert. denied, 434 U.S. 861 (1977) for the reasoning behind this rule, as follows:

> The admission of such testimony would give the appearance that the court was shifting to witnesses the responsibility to decide the case.

Similar results were reached as to expert testimony in <u>United States v. Articles of Banned Hazardous Substances</u>, 34 F.3d 91, 96-97 (2d Cir. 1994) and <u>DiBella v. Hopkins</u>, 403 F.3d 102, 121 (2d Cir. 2005). In the latter case, the Court noted:

> Hopkins sought to have Hoffman testify that it was <u>unethical</u> for DiBella to solicit a $50,000 payment from Hopkins while still employed by HBO. (emphasis added)

The Court affirmed the exclusion of this testimony on two separate and independent bases that are pertinent here. It held:

> Hoffman also inappropriately drew a legal conclusion by opining that DiBella's actions amounted to extortion (citation omitted).
>
> In addition, the district court correctly concluded that Hoffman's testimony would unnecessarily confuse the jury because the real issue in the case was not whether DiBella acted ethically, but rather what actually transpired between DiBella and Hopkins – *i.e.,* whether the $50,000 was or was not a bribe and whether Hopkins did or did not believe it was a bribe. <u>Id</u>.

In her ultimate flouting of the basic Rules of Evidence, plaintiff has also attempted, based on the house of cards erected through Mr. Homberger's unwarranted opinions, to justify a series of conclusions which directly violate Rule 704.

1.    <u>References to Predatory Lending</u>

As mentioned earlier (pages 1-8), both the body of the Affidavit and Exhibit "A" thereto, Mr. Homberger's first report, repeatedly use the word "predatory" in the context of his admittedly non-expert understanding of a 2001 FDIC press release. Indeed, he also purports to be telling a finder of fact, without any appropriate foundation, what he believes the elements of predatory lending are, based on the same inadmissible FDIC press release. (Sec. Supp. Conroy Aff., Ex. D.) Even if a cause of action for predatory lending existed and had been pleaded, these

22

types of conclusions are improper under the Circuit standards.  See In re Rezulin Products Liability Litigation, 309 F. Supp. 2d 531, 547-49 (S.D.N.Y. 2004) (rejecting testimony about FDA regulations and related submissions, including testimony they were "minimal" standards).

      2.      References to Fraud

At numerous junctures of his Affidavit and Report, Mr. Homberger not only defines fraud (e.g., Aff., Ex. A at p. 3) but proceeds to opine that certain acts by Mr. Falini were fraudulent or that certain purported failures of oversight opened the door to fraud (Id. at p. 9).  Under the guiding principles in this Circuit, such conclusions are also manifestly improper.

      3.      The Improper Conclusions in Response to Counsel's Leading Questions

In the answers to a series of ten questions posed to Mr. Homberger by counsel after receipt of a draft of his report, referred to at length in Exhibit "A" of his Affidavit, he again repeatedly violates the strictures of Rule 704 and the cases construing that Rule, as well as assuming yet another inappropriate mantle, that of a psychiatrist.

To place these questions and answers in context for the Court, Mr. Homberger admitted that he received the questions and a letter from Mr. Begos promising to send him "a few cases that illustrate how the courts analyze 'unconscionability' and 'unclean hands' in connection with the mortgage loan transactions" (Homberger Dep., pp. 237-38).  He received the cases, at least one of which was a Connecticut case (Homberger Dep., p. 238).

As to Questions 5, 7, 8, 9 and 10, he did not ask Mr. Begos as to what was meant by the following usages in these questions.:

      a.      "Fair, equitable and honest"  (Question 5);

      b.      "So one-sided as to be unconscionable"  (Question 7);

      c.      "Honest and fair"  (Question 8);

      d.      "Unfair" (Question 9);

      e.      "Immoral, unethical, oppressive or unscrupulous" (Question 10);

(Homberger Dep., pp. 242-55).

Other than reading the cases sent to him, the hearsay FDIC press release, and possibly some other undefined material, he read nothing bearing on his notions of what was meant by these phrases. By the time of his deposition, he admitted the only material in any of these categories he maintained and could identify and produce was the FDIC press release (Homberger Dep., pp. 237-255). In effect, through his answers to this series of questions, Mr. Homberger took it upon himself to assume the role of a juror in this case. In addition to these improprieties, the questions propounded and responses thereto are also improper for other reasons, as follows:

### 3.  Was it appropriate to close the loan on December 7, 1999?

In response to Question 3, Mr. Homberger states that the power of attorney was "altered in material ways" and that "either the lender or the closing agent should have postponed the closing until Mrs. Miller's return." (Report at 11-12. (emphasis added).) He bases his opinion, as indicated earlier, on ungrounded speculation as to what a title insurance company or closing attorney would do. He also admitted that he has never dealt with a whited-out POA. (Homberger Dep. at 195-196). Mr. Homberger is not a legal expert, has not even reviewed the Connecticut Power of Attorney statute (Id.), has never worked for a title insurance company and cannot offer this type of opinion testimony. His answers to this question in effect state a legal opinion as to whether it was legally "appropriate," and what constituted "material" changes in the power of attorney, neither of

24

which is admissible.  For these reasons, this portion of the Report and opinion is inadmissible under Rules 702 and 704.

**5.  Was MLCC's conduct in connection with the 1999 loan (including underwriting, approval and workout) fair, equitable and honest?**

With pending claims under the Connecticut Unfair Trade Practices Act, the use in Question 5 of the phrase "fair, equitable and honest" is another attempt to (i) convey a legal standard, which is within the sole province of the trial court, and (ii) reach a legal conclusion, which is within the sole province of the trier of fact.  "Fair and equitable" is a phrase similar to the testimony as to whether something was "unethical" which was found properly precluded in <u>Bella</u>, <u>supra</u>.  Similarly, "fair and equitable," in this context implies a legal standard, given the CUTPA title encompassed in four counts of the Complaint.

**7.  In light of the general commercial background of the parties, and the commercial needs of the mortgage industry, were the terms of the 1999 loan so one-sided as to be unconscionable under the circumstances existing at the time the loan was made?**

Question Number 7 seeks precisely the type of opinion predicated on legal terms (e.g., "unconscionable") that the Second Circuit has held to be inadmissible.  One of plaintiff's alleged defenses to the Mortgage and Note is unconscionability.  Further, at no time in his various reports has Mr. Homberger testified to the "commercial needs of the mortgage industry."  The response also includes a reference to MLCC's "obligation to the borrower." (Report at 13.)  In fact, he has admitted that, because he is not a lawyer, he does not know the legal nature of either a bank's obligation to a borrower or a broker to its customers.  (Homberger Dep., pp. 253-54).  Once again, Mr. Homberger is not qualified to opine on legal questions as to these obligations.  For all these reasons, this portion of the Report is inadmissible under Rules 702 and 704, even assuming other requirements of the Rules were satisfied, which they are not.

25

**8.    Was the 1999 loan a transaction that no person in her senses and not under a delusion would make, and no honest and fair person would accept?**

Question No. 8 is inadmissible for the reasons stated in MLCC's argument regarding Question No. 7.  This question and the response are simply another effort to reach the issue of "unconscionability."  If unconscionability is a defense, it is up to the Court to define it properly, not for any expert, let alone this purported expert, to define it using either unconscionability or related and undefined shorthands.  The use of the word "honest" implies a legal standard and a related opinion that either a criminal law or civil fraud standard was violated.  The use of the word "fair" is a not so subtle attempt to elicit Mr. Homberger's opinion on the CUTPA claims by having Mr. Homberger assert the dealings were "unfair within the meaning of CUTPA."  We also note the Question was inadvertently inverted; one can only imagine that counsel was trying to coax his witness into stating that the 1999 was one that no honest and fair person would *offer*, and that no person "not under a delusion" would accept.  In any event, the Question clearly calls for both legal and psychological opinion which Mr. Homberger is not qualified to provide.  In addition, it improperly calls for Mr. Homberger's view on MLCC's "intent, motives, or state of mind." In re Rezulin Products Liability Litigation, 309 F. Supp. 2d at 546-47.  For all these reasons, this portion of the Report is inadmissible under Rules 702 and 704.

**9.    Was MLCC's conduct unfair?**

The comments made with respect to the impropriety of the other questions, including Question 8 and Mr. Homberger's responses, apply with similar force here to Question 9.  The use of the word "unfair" appears in four counts alleging violations of CUTPA.  See Second Amended Complaint, Counts IV, V, VI and VII.  See also In re Rezulin Products Liability Litigation, 309 F. Supp. 2d at 543-44.

26

**10. Was MLCC's conduct immoral, unethical, oppressive or unscrupulous?**

Question No. 10 is particularly noteworthy in that it explicitly parrots the language of the Connecticut Unfair Trade Practices Act and tracks Counts IV (paragraph 32) and VI (paragraph 40) of the Second Amended Complaint in doing so. By definition it and Mr. Homberger's reply violate Rule 704. Furthermore, Mr. Homberger's views on such subjects do not meet the requirements of Rule 702 that expert testimony be based on "knowledge." See In re Rezulin Products Liability Litigation, 309 F. Supp. 2d at 543-44 (rejecting expert's views on "ethics").

## II.    MR. SEIFER'S AFFIDAVIT AND ANY ARGUMENTS BASED THEREON SHOULD ALSO BE EITHER STRICKEN OR DISREGARDED

Plaintiff has submitted an Affidavit of Marc Seifer, in his capacity as a purported handwriting expert. In a nutshell, Mr. Seifer's Affidavit opines that certain handwriting on an original Power of Attorney used on December 12, 1999 at Mrs. Miller's loan closing is not Mrs. Miller's but, rather, is Mr. Falini's.

This testimony is inadmissible and/or irrelevant on at least two separate and distinct grounds:

1.    It seeks to contradict Mrs. Miller's own admissions, in an Affidavit submitted to this Court while seeking a Prejudgment Remedy (PJR), that the handwriting is hers. A prejudgment remedy was, in fact, ordered by Magistrate Judge Martinez as a result of Mrs. Miller's initiating this demand. (Original Conroy Aff., Ex. M). Under settled federal authorities, Mrs. Miller's statements of fact, under oath, for this purpose, constitute binding judicial admissions. (MLCC's Memorandum in Opposition at 14-15).

2.    Given Mrs. Miller's acknowledgement of the changes in the Power of Attorney which she admits were made in her presence, her later receipt of the Power of Attorney and other

27

admissions she has made, any questions as to the handwriting are irrelevant.  (See MLCC's

Memorandum in Opposition at 12-20).



Dated: August ___/___ 2005
Stamford, Connecticut


PAUL, HASTINGS, JANOFSKY & WALKER LLP


By:    _____
       Douglas C. Conroy, ct11555
       1055 Washington Boulevard
       Stamford, CT  06901-2217
       Telephone:  (203) 961-7400
       Facsimile:  (203) 359-3031
       Email:   douglasconroy@paulhastings.com

       Counsel for Defendant and Counterclaimant
       MERRILL LYNCH CREDIT CORPORATION

## CERTIFICATE OF SERVICE

This is to certify that on this 1st day of August 2005, a copy of the foregoing

DEFENDANT'S  MOTION TO STRIKE AND OBJECTIONS TO TESTIMONY AND

RELATED ARGUMENTS SUBMITTED BY JULIE MILLER was delivered via U.S. first class

mail to:

Patrick W. Begos, Esq.
BEGOS & HORGAN, LLP
327 Riverside Avenue
Westport, CT 06880


Douglas C. Conroy

STM/270077.8 11413.00021

29