Page 61

1  getting crazy.  They were just very high.
2      Q    Did you invite him to this meeting and say
3  we are trying to figure out what to do with the mortgage
4  payments?
5      A    I asked him to come because I wanted to have
6  a financial cash flow analysis of my situation.
7      Q    So this meeting took place where you had the
8  phone conversation when you told him you did not want to
9  follow him?
10     A    I basically -- I don't remember if I told
11 him on the phone that I wasn't following him or I told him
12 at that meeting.  I don't remember.
13     Q    Okay.  And Mr. Vaughn-Flam is based where?
14     A    He's in New York.
15     Q    And how long had he been representing you at
16 this point in time?
17     A    He wasn't representing me.  He didn't know
18 about Merrill Lynch, or I don't know if he met Jay Falini
19 or not.
20     Q    That's not my question.  How long had you
21 been using Mr. Vaughn-Flam as your lawyer?
22     A    I'm trying to remember.  I believe since
23 '98.
24     Q    He is with a firm?
25     A    Yes, and I can't -- let's see, Rubin,

Page 62

1   Bertoli, -- he's actually on his own, but he's -- I can get
2   that information for you. I don't have it in my head. I
3   know it's a long name, long firm.
4       Q    Most law firms have long names.
5       A    Bertoli is one.
6       Q    That may be enough.
7       A    I can get you his phone number if you need
8   it.
9       Q    And was this the first occasion you had used
10  Mr. Vaughn-Flam in connection with your mortgage loan?
11      A    Yes.
12      Q    And how long did the meeting last?
13      A    Maybe an hour, hour and a half.
14      Q    Other than Mr. Newman, Mr. Falini, and Mr.
15  Vaughn-Flam, who else was present? And yourself, I'm
16  sorry.
17      A    That's all.
18      Q    And tell me, to the best your recollection,
19  what was discussed during the meeting?
20      A    Well, we basically were trying to figure out
21  how we could refinance to get a better rate for the
22  mortgage, arrangement for the mortgage, and that was about
23  it. That was very depressing.
24      Q    Well, did anybody make any suggestions as to
25  how you could refinance to get a better arrangement for the

1  mortgage?
2      A    Not at that meeting.
3      Q    Did somebody who was present at the meeting
4  make such suggests later on?
5      A    Mr. Vaughn-Flam wanted to sue Mr. Falini
6  and --
7          MR. BEGOS: He was your lawyer. You don't
8  want to talk about what he advised you. That is
9  privileged.
10 BY MR. CONROY:
11     Q    If Mr. Vaughn-Flam gave you advice where
12 there were no third parties present, I'm not entitled to
13 that information.
14     A    Okay.
15     Q    That is not subject to attorney/client
16 privilege.
17     A    Okay.
18     Q    But I'm talking about subsequent to the
19 meeting. Let's confine ourselves for the moment to Mr.
20 Falini and Mr. Newman. Did either of them, after the
21 meeting, give you my suggestions for how to resolve the
22 problems?
23     A    Mr. Falini, I didn't talk to after that
24 meeting.
25     Q    How about Mr. Newman?

Miller vs Merrill Lynch
10/20/2003                                                    Julie Dillon Ripley Miller

Page 64

1    A    Mr. Newman thought I should sell the house.
2    Q    Did he say that at the meeting?
3    A    Yes.
4    Q    What did Mr. Falini say, if anything, at the
5    meeting?
6    A    He didn't say very much. I remember he was
7    very sick. He had a very bad cold.
8    Q    Do you recall him ever suggesting to you
9    that you sell the house?
10   A    He had said that before as a worse case
11   scenario, but I don't remember if he said it that the
12   particular time.
13   Q    Did anybody at the meeting make suggestions
14   as to refinancing alternatives?
15   A    I don't remember, no. At that meeting, I
16   don't remember.
17   Q    You don't remember either way?
18   A    No.
19   Q    What did Mr. Vaughn-Flam say at the meeting?
20   A    He said he wished that he had known more
21   about the whole mortgage situation with Merrill Lynch.
22   Q    And that's all he said?
23   A    Yes.
24   Q    After that meeting, did you ever have any
25   meetings with Mr. Vaughn-Flam to discuss your mortgage

5b39f20e-6470-438f-8eda-eed63b9530d3

1   situation where third parties were present?
2       A    No.
3       Q    Do you recall anything else being said
4   during the meeting that we haven't already talked about?
5       A    No.
6       Q    And as you sit here today, you believe it
7   may have been at the meeting that you told Mr. Falini you
8   didn't want to have anything more to do with him?
9       A    Yes.
10      Q    Whether it was at that meeting or in a
11  subsequent telephone call, do you recall Mr. Falini's
12  reaction to your statement?
13      A    I believe he was disappointed.
14      Q    Did you tell him why you didn't want
15  anything more to do with him, whether it was at that
16  meeting or a telephone conversation?
17      A    I told him I was disappointed in the
18  situation that we had gotten into.
19      Q    That situation being your mortgage loan?  Is
20  that a yes?
21      A    Yes, sorry.
22      Q    That's okay.  As I said, we have to --
23      A    Can I get some ice?
24      Q    Sure.
25      A    Yes, I understand I have to say yes, so that

Page 66

1   you can --

2       Q       I just don't want you to think I'm being

3   impolite when I prompt you. Let's back up. You had said

4   that Mr. Falini had suggested selling the house before as a

5   worse case scenario; is that correct?

6       A       That's correct. Sorry.

7       Q       Told you that they are hard to break, those

8   habits. About when do you recall him first suggesting that

9   to you?

10      A       The first time that happened would have been

11  when we were trying to put together the construction loan

12  in 1999, the end of 1999.

13      Q       So it would have been during the process of

14  trying to put that loan together that he had said this to

15  you?

16      A       Yes.

17      Q       And to the best of your recollection, tell

18  me everything that he said on that subject at the time?

19      A       Well, let's see. My questions were that

20  seven and a half million seemed like a lot of money for the

21  final completion of this house; and, you know, how is all

22  of that going to happen? He said, worst case scenario

23  quote/unquote, You can always sell the house. And I

24  remember saying, but Jay, I don't want to sell the house.

25  I don't want to have gone through all of this and then have

Page 67

1   to sell the house. He said that, I just said that is a
2   worst case scenario.
3       Q    You --
4       A    I'm not saying that would happen.
5       Q    Was he suggesting to you to sell the house
6   at that point as opposed to putting money into it?
7       A    No, he said we can always sell the house if
8   it didn't work out. We couldn't sell it at that point. It
9   was half a house. It was basic --
10      Q    That was going to be my next question.
11      A    Sorry.
12      Q    You knew at that point in time that the
13  house had to be finished, correct?
14      A    Correct. That's why we went for a
15  construction loan.
16      Q    And did you go for a construction loan at
17  that point in time because you understood from Mr. Falini
18  that you didn't have sources of funds to finish it
19  otherwise?
20      A    We went for the construction loan so that we
21  had more of a control on expenses. That was the idea.
22      Q    Did Mr. Falini suggest that as a control on
23  expenses?
24      A    Yes.
25      Q    And how did he tell you he would be able to

Page 68

1  control expenses through a construction loan?
2     A    Because there would be disbursements from --
3  regular disbursements from Merrill Lynch for the
4  contractor.
5     Q    And did he tell you that as part of this
6  process the contractor would be required to adhere to
7  completion --
8     A    Yes, schedules.
9     Q    -- schedules, correct?
10    A    Correct.
11    Q    And to your knowledge, no such thing had
12 existed prior to that time, correct?
13    A    Correct.
14    Q    And did he tell that you, As part of this
15 process the contract would also be required to come up with
16 a --
17    A    Budget.
18    Q    -- budget for the completion?
19    A    Correct.
20    Q    And up to this point in time, no such thing
21 had existed, correct?
22    A    Correct.
23    Q    Did he tell you any other advantages of
24 having a construction loan would bring to the process?
25    A    No, not really. That was the main

Page 69

1   advantage.
2       Q    Mrs. Miller, we've talked about Mr. Falini's
3   visits during the construction process down through October
4   or thereabouts of 1999. We've talked about the meeting he
5   had with you in January '01.
6            And, again, taking you down through October
7   of 1999, were there any other occasions when you had
8   meetings with Mr. Falini?
9       A    No.
10      Q    So through that period of time, all of his
11  meetings up here would take place in the context of the
12  on-going construction?
13      A    Yes.
14      Q    Okay. When you told Mr. Falini that seven
15  and a half million dollars seemed like a lot of money, what
16  did he say to you?
17      A    He said that that was the figure that Keith
18  Brown, the contractor, had told him was needed to complete
19  the construction.
20      Q    Well, did you understand that this was going
21  to pay for an additional seven and a half million dollars
22  on top of what you'd already paid? You already said you
23  spent three to four million dollars on the project at that
24  point in time.
25      A    Um-huh.

Miller vs Merrill Lynch

10/20/2003

Julie Dillon Ripley Miller

Page 70

```
 1      Q      Did you understand that seven and a half
 2   million dollars was going to be on top of that?
 3      A      Yes.
 4      Q      So that the entire construction project was
 5   going to be $1,500,000?
 6             MR. BEGOS:  Ten million.
 7             MR. CONROY:  $10,500,000.
 8             MR. BEGOS:  Are you asking her understanding
 9   in October of --
10   BY MR. CONROY:
11      Q      -- of 1999, yes.
12      A      Yes, that's why I asked him how, you know,
13   it seemed like a lot of money.
14      Q      Did Mr. Falini tell you that, in fact, the
15   $7,500,000 was going to be used, number one, to pay off
16   your earlier mortgage?
17      A      No.
18      Q      Did he tell you that, number two, it was
19   going to be used to pay off the loan had you taken on
20   margin at Merrill Lynch?
21      A      No.
22      Q      And did he tell that you the remainder was
23   going to be used to pay Mr. Brown for the completion of the
24   construction?
25      A      No, he did not.
```