Page 226

```
 1                    MR. CONROY:  Not in this form.
 2                    MR. BEGOS:  Okay.  You changed a couple
 3    words, but it is the same question.  You can answer it.
 4                    MRS. MILLER:  I, again, trusted Mr. Falini
 5    to keep everything straight for me.  He would usually tell
 6    me if we needed to transfer money from one account to
 7    another.
 8    BY MR. CONROY:
 9         Q     Did you call Mr. Falini when you were
10    writing checks and say, I need "X" dollars in this account?
11         A     I don't remember.  I don't know if I did
12    that or not.
13         Q     Did you ever have discussions with Mr.
14    Falini, as you just referenced, about transferring funds
15    from one account to another?
16         A     Yes, I believe I did.
17         Q     Okay.  And would you call him about that?
18         A     Yes, sometimes he would call me and tell me
19    that I needed to get more money into this checking account
20    versus that checking account.
21         Q     Because a check had come in?
22         A     Right.
23         Q     And would you --
24         A     Or unless it was Sue Leopold who would do
25    that in his office.
```

1      Q      In those instances when he told you money
2  needed to be transferred to cover checks, you would
3  authorize a transfer?
4      A      Correct.
5      Q      But you never inquired as to how Mr. Falini
6  was generating these funds?
7      A      No.
8      Q      Did you ever, before writing a check to pay
9  the expenses on the renovations and upgrades of 21 Point
10 Road, call Mr. Falini and ask whether you should make a
11 payment in a specific amount?
12     A      I don't remember.
13     Q      Did you ever send him down copies of a bill
14 before you were going to pay it and ask him, should I pay
15 this?
16     A      No, I don't think I ever did.
17     Q      Okay.
18     A      He never asked me to.
19     Q      But you never did, in any event, correct,
20 on your own?
21     A      No, he never asked me to, either.
22     Q      Okay. Did you expect him to ask you to?
23     A      I -- as I said yesterday, I trusted him and
24 expected him to give me guidelines and help me.
25     Q      Did he give you guidelines?

Page 234

```
 1              MR. CONROY:  I'm going to ask the reporter
 2   the mark the exhibit next in order, another document
 3   evidently from your files.  It's dated November 12, 2001.
 4   Has various attachments and bears numbers JDRM 3479 through
 5   3484.
 6              Just for the record, there appear to be two
 7   copies of this document.  The last three pages appear to be
 8   the document as it was originally sent.  First three pages
 9   appears to be the document as marked up with handwritten
10   notations.
11              (Defendant's Exhibit 28 was marked for
12              identification)
13   BY MR. CONROY:
14        Q     Do you recognize Exhibit 28?
15        A     I recognize it.
16        Q     Do you recognize this document?  Have you
17   seen it before?
18        A     Yes.
19        Q     And did you receive the last three pages of
20   Exhibit 28, which is the unmarked portion of the exhibit,
21   at some point in time?
22        A     Aren't they the same?
23        Q     One has a lot of handwriting on it.  So I'm
24   asking you, initially, do you recall receiving JDRM 3482
25   through 3484 from Merrill Lynch?
```

Page 241

1   Q   And what is your recollection, as you sit
2   here today, as to why it wasn't finalized?
3   A   The same reason I just gave you, because we
4   didn't want to sell securities.
5   Q   "We" being you?
6   A   Yes.
7   Q   Did you understand that as part of this, you
8   would end up selling securities?
9   A   Yes.
10  Q   And end up pledging other securities?
11  A   Correct.
12  Q   Did you have an understanding as to how much
13  you would have to sell by way of securities?
14  A   Somewhere between one and a half to two
15  million.
16  Q   Did these discussions about the $4.9 million
17  loan follow your discussions about a possible swap, which
18  would allow you to defer paying --
19  A   Yes.
20  Q   -- capital gains?
21  A   Yes.
22  Q   So was that the first alternative explored
23  with Laurie Kamhi and Mr. Crowe?
24  A   Correct.
25  Q   Were there any other alternatives you can

Page 273

1  or believed past tense?
2              MR. CONROY: Believed.
3              MR. BEGOS: We are talking about November of
4  1999?
5              MR. CONROY: Correct.
6              MR. BEGOS: Okay.
7              MRS. MILLER: I, again, I think I stated
8  before, I thought we were applying for a construction loan
9  period. There was never any mention of any other loan, and
10 there was never any mention of paying off that loan.
11 BY MR. CONROY:
12     Q    Did you understand that the construction
13 loan was going to convert to what is called a permanent
14 loan at the conclusion of the construction?
15     A    I was under the impression or understanding
16 from Mr. Falini that we were going to have a formal closing
17 upon the end of construction for a review to see if we
18 wanted a permanent loan or not. That's what I understood.
19 There was no -- this closing that I wasn't even privy to go
20 to, because I was out of the country, was for construction,
21 solely. That's what I was told.
22     Q    So you understand the sole purpose of the
23 loan was construction?
24     A    Correct.
25     Q    And we've already covered that you thought

Page 274

1    that meant another $7.5 million was going to be spent on
2    renovations and improvements, correct?
3        A    Correct.
4        Q    Did you have an understanding that there
5    would be some need for Merrill Lynch to have a securities
6    interest which protected it with respect to the loan of
7    $7.5 million?
8        A    No.
9        Q    Did Mr. Falini tell you that the loan was
10   being made without any security interest being provided?
11       A    I don't remember.
12       Q    Would you look at page 406 of the exhibit,
13   please?
14       A    (Witness complies)
15       Q    The top of the page it says, "The loan
16   documents must be signed by February 1, 2000." Do you see
17   that reference?
18       A    I do.
19       Q    And you were out of the country on your trip
20   to Africa from when to when?
21       A    We left on December 2, 1999, and we returned
22   on -- we were scheduled to return on December 22, 1999; but
23   we did, indeed, return earlier, on December 19, 1999.
24       Q    You were back in the country before February
25   1, 2000, correct?

```
 1       A      I was, yes.
 2       Q      Do you recognize the handwriting on the
 3  first page of Exhibit 40, by the way?
 4       A      No, I do not.
 5       Q      Okay.  When did you learn -- strike that.
 6              Documents I've shown you basically talk
 7  about a loan of $6,020,000; and I believe you indicated
 8  earlier you never heard that figure mentioned, correct?
 9       A      Correct.
10       Q      When did you first learn that the proposed
11  construction loan was $7.5 million?
12       A      That was the figure I heard all along from
13  the beginning when we started talking about it in October
14  of 1999.
15       Q      And you've talked about this meeting with
16  Mr. Vaughn-Flam and Mr. Davino and your follow up with Mr.
17  Falini.  And then there was some sort of time period that
18  lapsed, and then Mr. Falini got back to you about a
19  construction loan?
20       A      Correct.
21       Q      And at that point, did he mention $7.5
22  million as the amount of the proposed loan?
23       A      Yes, he did.
24       Q      Did you question him as to why the loan was
25  that large?
```