UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

--------------------------------------------------------------------x

JULIE DILLON RIPLEY MILLER,       :

                             :     Case No.03-CV-1016 (RNC)(DFM)

        Plaintiff,       :

                             :

    – against –       :     August 22, 2005

                             :

MERRILL LYNCH CREDIT CORPORATION,  :

                             :

        Defendant.      :

--------------------------------------------------------------------x

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S "MOTION TO STRIKE
AND OBJECTIONS TO" EXPERT AFFIDAVITS**

BEGOS & HORGAN, LLP
Attorneys for Plaintiff
327 Riverside Avenue
Westport, CT 06880
(203) 226-9990

## TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    I.    IF THE COURT CONSIDERS THE MERITS OF MLCC'S "OBJECTIONS"
        AT ALL, IT SHOULD NOT MAKE FINDINGS ON DISPUTED FACTS,
        AND SHOULD DRAW ALL INFERENCES IN PLAINTIFF'S FAVOR . . . . . . . . 2

    II.    THERE IS NO BASIS TO STRIKE RICHARD HOMBERGER'S AFFIDAVIT . . 5

        A.    Mr. Homberger Is Qualified to Provide Expert Testimony on the Matters
              Set Forth in His Affidavit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        B.    Mr. Homberger's Conclusions are Relevant . . . . . . . . . . . . . . . . . . . . . . . . . 11

        C.    Mr. Homberger's Opinions Are Not Improper Legal Conclusions . . . . . . . . 17

    III.    THERE IS NO BASIS TO STRIKE MARC SEIFER'S AFFIDAVIT . . . . . . . . . . 19

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

i

Plaintiff, Julie Dillon Ripley Miller, by her attorneys, Begos & Horgan, LLP, submits this brief in opposition to Merrill Lynch Credit Corporation's ("MLCC") "motion to strike and objections to affidavits of Richard Homberger and Marc Seifer and related arguments submitted by plaintiff" ("Objections").

## PRELIMINARY STATEMENT

MLCC has submitted an improper, twenty-eight page, brief in connection with its summary judgment motion. The parties' summary judgment motions have been fully, and extensively, briefed. Particularly, MLCC has served and filed its Reply Brief and supplemental affidavits, in which it had a full opportunity to respond to the "affidavits of Richard Homberger and Marc Seifer and related arguments submitted by plaintiff." Specifically, though MLCC has retained its own experts to opine on the same subjects that Mr. Homberger and Dr. Seifer have addressed, MLCC chose not to rely on its experts in support of its summary judgment motion.

Instead, and apparently feeling unduly constrained by the ten-page limit placed on reply briefs, MLCC has crafted these "objections." MLCC should not be permitted to circumvent the Court's limitations on summary judgment briefing, and its Objections should be disregarded. Moreover, MLCC impermissibly asks the Court to make factual determinations about plaintiff's experts' affidavits; because those affidavits were submitted in opposition to MLCC's summary judgment motion, they are entitled to a presumption of correctness (*see* Point I, *infra*).

In any event, the Objections lack any merit. Mr. Homberger, plaintiff's lending expert, plainly has sufficient expertise to offer opinion testimony about industry-standard lending practices in general, MLCC's underwriting of the loan to Ms. Miller in particular, and the other matters on which he reached conclusions (*see* Point II.A, *infra*).

1

Mr. Homberger's conclusions are also relevant to the issues presented in this case. A central issue is whether MLCC's mortgage loan underwriting was unconscionable, deceptive and/or unfair. MLCC cannot suggest that lay fact-finders would have sufficient knowledge about the mortgage loan underwriting process to make those determinations without expert explanation of how the mortgage lending process works. Moreover, despite MLCC's effort to eliminate *any* standard by which its actions can be judged, the claims and defenses Ms. Miller has asserted permit – indeed require – evidence regarding the industry's and MLCC's underwriting practices (*see* Point II. B, *infra*).

Finally, MLCC's claim that Mr. Homberger has improperly reached legal conclusions is devoid of merit. MLCC's motion in this regard is best characterized by its assertion that Mr. Homberger should be precluded from using words like "fair" or "honest," because they suggest legal standards. Plainly, the notion is nonsensical (*see* Point II.C, *infra*).

After devoting twenty-six pages of its brief to Mr. Homberger's report, MLCC inserts a throw-away, one-page argument that the Court should strike or disregard the affidavit and report of Dr. Marc Seifer. MLCC does not challenge his qualifications, and cannot legitimately dispute the relevance of his testimony that Jay Falini altered the power of attorney MLCC relied on to close the loan (*see* Point III, *infra*).

## ARGUMENT

## I.    IF THE COURT CONSIDERS THE MERITS OF MLCC'S "OBJECTIONS" AT ALL, IT SHOULD NOT MAKE FINDINGS ON DISPUTED FACTS, AND SHOULD DRAW ALL INFERENCES IN PLAINTIFF'S FAVOR

MLCC has not provided any authority suggesting that a party seeking summary judgment can assert, in a twenty-nine page brief separate from its reply brief, "objections" to affidavits submitted in opposition to its summary judgment motion, or to "related arguments submitted by plaintiff." We

2

have not found any such authority. Therefore, the Court can, and should, reject these "objections" as an improper attempt to circumvent the Court's limits on permissible briefing (*see* L. Civ. R. 7(d)).

It must also be emphasized that MLCC's Objections are made *only* in connection with its summary judgment motion. Accordingly, the Court must give the affidavits of the non-movant, plaintiff, every reasonable benefit of the doubt. Specifically, in denying a motion to exclude the testimony of the non-movant's expert on a summary judgment motion, *Ulico Cas. Co. v. Clover Capital Mgt., Inc.*, 217 F.Supp.2d 311, 318-319 (N.D.N.Y. 2002), held:

> Rule 56 "contemplates a rudimentary, almost one dimensional, exercise geared to determining whether the nonmovant's most favorable evidence and the most flattering inferences which can reasonably be drawn therefrom are sufficient to create an authentic question of material fact. Among other things, apart from that which may be inherently incredible, the non moving party is entitled 'to have the credibility of the evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in [the evidence] resolved favorable to him ...' " *Greenburg v. Puerto Rico Maritime Shipping Authority*, 835 F.2d 932, 936 (1st Cir.1987)(quoting, *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir.1979)).
>
> "[W]hen the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." *Coyne v. Taber Partners I*, 53 F.3d 454, 460 (1st Cir.1995); *(United States v. Kayne*, 90 F.3d 7, 12 (1st Cir.1996))(stating that disagreement among experts are "properly the subject of searching cross-examination" at trial), *cert. denied,*519 U.S. 1055, 117 S.Ct. 681, 136 L.Ed.2d 607 (1997).

MLCC bases a significant portion of its Objections on the assertion that Mr. Homberger's discussion and analysis of various underwriting guidelines is irrelevant because its underwriting of the Miller loan cannot be challenged for violating any of those standards. Even if that position were correct – and it is not, as we will discuss in Point II.B, *infra* – that is a conclusion the Court could reach only *after* ruling on the summary judgment motion, which it could only do after decided

3

whether or not to consider Mr. Homberger's affidavit (assuming the Court entertains the merits of MLCC's objections at all).

These underwriting standards, and Mr. Homberger's conclusions about them, concern a core dispute in this case: where does the underwriting of a residential mortgage loan cross the line from appropriate to unconscionable, deceptive and/or unfair? MLCC necessarily, though implicitly, argues that the line should be drawn at a point of MLCC's choosing. That is improper. *Primavera Familienstifung v. Askin*, 130 F.Supp.2d 450, 524 (S.D.N.Y. 2001) ("Merrill's contention that Campbell's methodology is unreliable because he did not use the resale prices as data inputs for his calculations, similarly, is flawed. Since the Funds question the legitimacy of these prices, and have some evidentiary grounds for doing so, there is a logical basis for Campbell to exclude these data").

In general, a court will exercise caution in excluding evidence prior to trial: "Evidence should be excluded on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds. A court considering a motion *in limine* may reserve judgment until trial, so that the motion is placed in the appropriate factual context." *Wechsler v. Hunt Health Systems, Ltd.*, 2003 WL 22358807, *2 (S.D.N.Y. 2003). *See Baxter Diagnostics, Inc. v. Novatek Medical, Inc.*, 1998 WL 665138, at *3 (S.D.N.Y. Sept. 25, 1998) (denying a motion *in limine* to preclude presentation of evidence regarding a potential punitive damages claim because the motion was too sweeping in scope to be considered prior to trial).

The same reasoning should apply even more forcefully on a summary judgment motion. For example, MLCC's Objections go so far as to suggest that particular statements by Ms. Miller's experts are irrelevant or otherwise inadmissible. We submit that a summary judgment motion is not the appropriate forum in which to make the fine evidentiary rulings MLCC seeks. Especially where

4

MLCC has not claimed that any conclusions are unfairly prejudicial (nor could it make such a claim on a summary judgment motion), there is no basis to exclude this evidence at this juncture. As the court in *Levy v. Bessmer Trust Co., N.A.*, 2000 WL 1300402, *2 (S.D.N.Y. 2000) held: "My reading of the Crawford report ... leads to my considered opinion that it does not state legal conclusions. If, during his testimony at trial, Mr. Crawford begins to render legal conclusions the defense may object and the Court will not permit its role to be usurped. However, on the present state of the record, the defense motion to preclude the Crawford testimony and the conclusions of his report is denied."

## II.    THERE IS NO BASIS TO STRIKE RICHARD HOMBERGER'S AFFIDAVIT

### A.    Mr. Homberger Is Qualified to Provide Expert Testimony on the Matters Set Forth in His Affidavit

Richard Homberger has *thirty* years of experience in the residential mortgage lending business. His curriculum vitae (*see* Homberger Declaration in Opposition to MLCC's summary judgment motion, Ex. A) confirms that has originated residential mortgage loans, managed mortgage loan departments, and established new mortgage loan origination departments (*id.*). In particular, he spent two years originating mortgage loans for MLCC's predecessor within the Merrill Lynch Family – Merrill Lynch Mortgage Corporation, and is therefore has experience dealing with Merrill Lynch brokers with respect to loans they want for their customers (*id.*). During his career, his responsibilities have included managing all loan origination activities for banks, "including processing, underwriting, closings, secondary market sales, post-closing audit, regulatory compliance including compliance with FNMA/FHLMC [Fannie Mae/Freddie Mac], State and federal and private investor guidelines." (*Id.*).

5

For the last three years, he has developed residential mortgage procedures for a regional bank, which included implementing and overseeing the following functions: processing mortgage applications in accordance with Fannie Mae/Freddie Mac and private investor guidelines; closing procedures; post-closing audits; regulatory compliance and quality assurance.

He reviewed substantially every document produced by either party in the action (Homberger Report, p. 14), and has rendered extensive reports regarding his review (Homberger Aff., Exs. A and B). Among other things, Mr. Homberger described the residential mortgage loan underwriting process, including industry standard underwriting guidelines; he reviewed MLCC's own underwriting guidelines, comparing them to industry standards; and he reviewed MLCC's underwriting of the loan at issue in this case, presenting his conclusions regarding improprieties in that underwriting process.

MLCC does not contend that Mr. Homberger lacks expertise to testify about industry standards for residential mortgage underwriting, to analyze MLCC's underwriting guidelines, or to determine whether MLCC complied with those standards or guidelines. Instead, MLCC challenges Mr. Homberger's qualifications only to reach certain specific conclusions, such as the characterization of MLCC's loan to Ms. Miller as predatory. These challenges are flawed.

The Federal Rules of Evidence permit opinion testimony by experts when the witness is "qualified as an expert by knowledge, skill, experience, training, or education," Fed. R. Evid. 702. This standard is intended to be liberally applied. *United States v. Brown,* 776 F.2d 397, 400 (2d Cir.1985), *cert. denied,* 475 U.S. 1141 (1986) (qualification requirements of Rule 702 "must be read in light of the liberalizing purpose of the rule"); *TC Sys. Inc. v. Town of Colonie,* 213 F.Supp.2d 171, 174 (N.D.N.Y.2002) (courts within the Second Circuit "have liberally construed expert qualification

requirements" when determining if a witness can be considered an expert); *Canino v. HRP, Inc.,* 105 F.Supp.2d 21, 27 (N.D.N.Y.2000) ("liberality and flexibility in evaluating qualifications should be the rule").

It is also well established that "[o]ne knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in order to offer an opinion." *Sullivan v. Ford Motor Co.*, 2000 WL 343777, at *4 (S.D.N.Y.2000). *See also Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 82 (2d Cir. 1997) (admitting expert testimony from witness who lacked specific experience with airport baggage delivery systems because witness had general experience with the "interaction between people and machinery").

There is no question that Mr. Homberger is knowledgeable about, and has experience and training in, the field of residential mortgage lending in general, and originating, underwriting and closing mortgage loans in particular. MLCC's objections about Mr. Homberger's qualification to testify about predatory lending, or the duties of a closing agent, or similar aspects of residential mortgage lending, are merely "quibble[s] ... [that are] properly explored on cross-examination and [go] to his testimony's weight and credibility – not its admissibility." *McCullock v. H.B Fuller Co.* 61 F.3d 1038, 1043 (2d Cir. 1995).

In *McCullock*, the defendant challenged the qualifications of plaintiff's expert, an engineer, to testify that the plaintiff worked within the "breathing zone" of fumes from defendant's glue. Specifically, the defendant argued that "the consulting engineer is unqualified because (1) he has no formal education related to fume dispersal patterns, and (2) he has no experience performing or interpreting air quality studies. ... [Additionally, he] did not know the chemical constituents of the

hot-melt glue, the chemical constituents of any fume emitted by the glue, or the concentration level

of the fumes." *McCullock, supra,* 61 F.3d at 1042-43.

The Second Circuit rejected these contentions out of hand:

> We find that Woolley's testimony ***easily qualifies for admission*** under *Daubert.*
> Fuller's argument ignores Woolley's extensive practical experience. ... Fuller's quibble
> with Woolley's academic training in fume dispersal and air quality studies, and his other
> alleged shortcomings (lack of knowledge regarding the chemical constituents of the
> fumes or the glue vapor's concentration level), were properly explored on
> cross-examination and went to his testimony's weight and credibility – not its
> admissibility [emphasis added].

61 F.3d at 1043.

In that same case, the Second Circuit rejected the defendant's claim that plaintiff's doctor was

unqualified to opine that the glue caused plaintiff's injuries: "Fuller's suggestion that Fagelson had

to be a specialist in environmental medicine to provide expert testimony in this case is an

unwarranted expansion of the gatekeeper role announced in *Daubert.*" *Id.*

In *Cary Oil Co., Inc. v. MG Refining & Marketing, Inc.,* 2003 WL 1878246, *2 (S.D.N.Y.

2003), the court rejected similar objections to expert qualifications:

> Plaintiffs argue[d] that because Verleger has not actually run the day-to-day operations
> of a small fuel distributor, he is therefore incapable of opining in the case at bar.
> However, "lack of extensive practical experience directly on point does not necessarily
> preclude [an] expert from testifying." *Valentin v. New York City,* No. 94 CV 3911, 1997
> WL 33323099, at *15 (E.D.N.Y. Sept.9, 1997). ... Verleger is clearly not new to the
> world of petroleum distribution, and his area of expertise certainly enables him to
> provide an opinion that would assist a jury in understanding the issues relevant in the
> instant case.

MLCC's objections to Mr. Homberger's qualifications are similarly meritless. For example,

MLCC argues that Mr. Homberger is not an expert on predatory lending, and should not be permitted

8

to describe the loan at issue as "predatory." Thus, MLCC appears to argue that this particular adjective may be used only by a select few.[1]

MLCC also attacks Mr. Homberger's expertise by claiming, inaccurately, that he bases his entire understanding of predatory lending on a single press release (MLCC Obj., p. 7). What MLCC derogates as a "press release" is, in fact, a document issued jointly by the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation, and Office of Thrift Supervision, entitled *Expanded Guidance for Subprime Lending Programs* ("Guidance")(Conroy Supp. Aff., Ex. D).

To be sure, Mr. Homberger cited the Guidance, but *not* to supply the sole basis for his conclusions. Rather, he plainly cited it to confirm that there is a wide consensus concerning his understanding of what makes a loan predatory. As Mr. Homberger concluded, before referring to the Guidance:

> It is clear to me that an objective review of the borrower's financial condition, as evidenced by Ms. Miller's tax returns and MLPFS Priority Client Services monthly statements, indicates that MLCC knew or should have known that Ms. Miller could not make the scheduled payments required by the loan. *My analysis of the "Three C's" indicate clear evidence of lending practices which are beyond the realm of standard industry lending practices and which are demonstrably unsound and predatory.*

(Homberger Aff., Ex. A; emphasis added). Thus, his conclusions, and his understanding of the term predatory, plainly are based on his decades of experience in the mortgage lending industry. To the extent MLCC disagrees with Mr. Homberger's understanding or use of the term, it can and should explore that in cross-examination.

---

[1] This is a perfect example of the type of "objection" that can and should be deferred to trial. With Mr. Homberger on the stand, having fully described his qualifications, and the issues in the case having been crystalized to a far greater extent, the Court can much more accurately determine whether a particular question is appropriate or not.

Given Mr. Homberger's extensive experience and his reasoned conclusion, the fact that he stated that he didn't regard himself as an expert in predatory lending is irrelevant. Significantly, he did not testify that he was inexperienced or unknowledgeable with regard to predatory lending, or that he did not understand the term; rather, he merely stated that he did not regard himself as an expert. This is not a sufficient basis to exclude his testimony on this subject. As *Wechsler v. Hunt Health Systems, Ltd., supra,* 2003 WL 22358807, *4, held: "Nor does Prague's reluctance to categorize his opinions as 'expert' cause this Court to exclude his testimony. 'Expert' and 'lay' testimony are legal distinctions, of which no witness need be aware to qualify as an expert whose testimony is admissible."

Similarly, plaintiff argues that Mr. Homberger is unqualified to render conclusions regarding the propriety of MLPFS's funding of Ms. Miller's construction project before the MLCC loan. However, MLCC's own banking expert has linked together the MLPFS funding and the MLCC loan in to a single transaction for purposes of his analysis, calling the MLCC loan a "consolidation" of MLPFS's earlier margin loans. In any event, because Mr. Homberger discusses MLPFS's activities as a lender to Ms. Miller for the construction of a house, his conclusions fall well within his expertise.

MLCC also asserts that Mr. Homberger is not qualified to opine about shortcomings in the pre-closing and closing procedures followed by MLCC and its agents. (Objections, pp. 14-15). But, as discussed above, Mr. Homberger has extensive experience in establishing, managing and auditing mortgage loan closing procedures (Homberger Aff., Ex. A).

In sum, Mr. Homberger has sufficient experience in, and knowledge of, the residential mortgage lending industry to be qualified to render the opinions set forth in his reports and affidavit.

10

MLCC's objections to these qualifications, to the extent they have any merit at all, go to the weight to be given to Mr. Homberger's conclusions, rather than to its admissibility: "The fact that a witness's qualifications are not unassailable does not mean the witness is incompetent to testify; rather it is for the jury, with the assistance of vigorous cross-examination, to measure the worth of the opinions." *Cary Oil Co., Inc., supra*, 2003 WL 1878246, at *3 (internal quotes and citations omitted).

### B.    Mr. Homberger's Conclusions are Relevant

MLCC's primary relevance argument concerns Mr. Homberger's analysis of mortgage industry underwriting practices and MLCC's own underwriting guidelines. MLCC incorrectly argues that MLCC's violation of such guidelines cannot form the basis for any claim by Ms. Miller. Though that is manifestly incorrect, as we will discuss below, it also ignores a major reason why this subject is relevant.

Mr. Homberger's discussion of standard mortgage industry practices, and MLCC's internal guidelines, is essential to give the fact-finders the necessary background about how the mortgage lending process works, in order to judge the transactions and claims at issue in this case. In *Marx & Co., Inc. v. Diners' Club Inc.*, 550 F.2d 505, 509 (2d Cir.), *cert. denied*, 434 U.S. 861 (1977), the court found admissible "testimony concern[ing] the practices of lawyers and others engaged in the securities business[,]" holding that it was: "admissible under the same theory as testimony concerning the ordinary practices of physicians or concerning other trade customs: to enable the jury to evaluate the conduct of the parties against the standards of ordinary practice in the industry."

As *Cary Oil Co., Inc.*, *supra*, 2003 WL 1878246, at *4, held:

11

Gay's testimony as a whole serves the reasonable purpose of offering a general overview of derivative instruments, the CFTC, its regulation of futures trading and other such general economic background to a laymen jury which will have to confront complex questions involving the motivation of petroleum marketing companies in entering into the Contracts. While Defendants contend that such an overview is unnecessary because the jury must simply determine each Plaintiff's underlying purpose in entering into its Contract with Defendant, the Court is not persuaded that the jury will understand the nature of the Contracts or the complex issues inherent in the formation of such a Contract without understanding the regulatory scheme that structures those Contracts or common economic terms such as "hedge" or "derivative."

As the same court observed in rejecting a similar objection to another expert witness's testimony: "to ask the jury to render a verdict in this matter without allowing the Plaintiffs to explain what a flexie contract is and why companies like their own would ever enter into one would result in an uninformed and perhaps confused jury lacking sufficient background information to understand accurately the complex issues involved in this matter." 2003 WL 1878246, at *7.[2]

MLCC thus argues that Ms. Miller should be forced to pursue her claims that MLCC's loan was unconscionable, unfair and deceptive without being able to explain to the fact-finders matters such as: the purpose of underwriting, how it is done, what factors are examined, what calculations are performed, and how loans can be classified as sound or unfair. For example, to fully explain the conclusion that MLCC knew that Ms. Miller could not make the payments on the loan at issue, it will be necessary for Mr. Homberger to explain important underwriting concepts regarding how a borrower's payment capacity is measured. Such an explanation cannot possibly be divorced from industry standards or MLCC's own internal guidelines.

---

[2] *See also Wechsler v. Hunt Health Systems, Ltd.*, 2003 WL 22358807, *6 ("Prague's proffered testimony relates to a complicated series of transactions and to Hunt Health's records for those transactions. ... Plaintiff offers Prague to testify about records that might confuse the trier of fact in the absence of such testimony.").

Moreover, MLCC's underwriting guidelines, in particular, are relevant to explain how MLCC went about underwriting this loan. As the court stated in *Fields v. Oliver's Stores, Inc.*, 1991 WL 44845, *1 (S.D.N.Y. 1990): auditing "manuals are the single best source of information available to plaintiffs on how Touche conducted audits. Even if Roe did not specifically turn to the manuals in the course of the audits at issue here, the way in which he did his work must have been informed by the procedures outlined therein."[3]

In any event, MLCC is simply wrong when it argues that its violation of its own, or industry standard, guidelines, can have no bearing on its liability to Ms. Miller. MLCC relies extensively on *de Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293 (2d Cir. 2002). However, *de Kwiatkowski* merely held that, in a *negligence* action, the standard of care to which a corporation is held may be lower than the standards set forth in its internal procedures manual. MLCC, in contrast, essentially argues that there is *no* standard by which its conduct should be judged: not the industry-wide standard, not its internal standard.

To be sure, Ms. Miller has asserted claims against MLCC going far beyond negligence. For example, Ms. Miller has asserted that the loan is unconscionable, the basic test for which is: "whether, *in the light of the general commercial background and the commercial needs of the particular trade* or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract. The determination of

---

[3] It is worth noting that MLCC's underwriter testified that he did specifically rely on MLCC's guidelines in the course of underwriting this loan: Andrew Jones testified that he typically referred to them when underwriting a loan (Jones Tr. at 44). When asked about many of the underwriting calculations and decisions on the loan, he repeatedly referred to the contents of the guidelines (*see, e.g. id.* at 71, 87, 130-31, 158). Most significantly, Mr. Jones confirmed that these guidelines permitted him to calculate an income figure for Ms. Miller that, in his opinion, was a made-up number (*id.* 167-72).

13

unconscionability is to be made on a case-by-case basis, *taking into account all of the relevant facts and circumstances*." *Cheshire Mortg. Service, Inc. v. Montes*, 223 Conn. 80, 88-89, 612 A.2d 1130,1135 (1992) (citations omitted; emphasis added).

The cases discussed in plaintiff's opposition to MLCC's summary judgment motion (at pp. 27-29), are filled with findings in which the loan under litigation was compared to what a reasonable lender would have done, and findings in which the lender's intentional imposition of unfair terms is critical. Yet MLCC apparently contends that the fact-finders in this case are not entitled to *any* explanation of what the mortgage industry in general, or MLCC in particular, considers a fair and equitable loan. MLCC is free to argue that violating its own guidelines, or industry-standard guidelines, does not render the loan unconscionable or unfair; the fact that it may so argue does not make Mr. Homberger's conclusions on the subject irrelevant.

Similarly, Ms. Miller has asserted a defense of unclean hands against MLCC, which makes relevant the issue whether MLCC knew or should have known Ms. Miller was unable to comply with the terms of the loan. *See Monetary Funding Group, Inc. v. Pluchino,* 87 Conn. App. 401, 410, 867 A.2d 841, 848 (2005). Though MLCC cannot dispute that the underwriting process is where a bank determines whether a borrower can comply with the terms of the loan, it unrealistically contends that Ms. Miller cannot explain the relevant underwriting standards to the fact-finders.

Ms. Miller has also asserted unfair and deceptive trade practices claims against MLCC, which raise questions whether MLCC's conduct "was unfair, oppressive and unscrupulous." *Monetary Funding Corp. v. Pluchino*, *supra*, 87 Conn. App. at 413, 867 A.2d at 850. In particular, Mr. Homberger's conclusions that MLCC "cooked the books" to make it appear that the Miller loan

14

came closer to conforming to its own guidelines, is highly probative that it acted in a deceptive and unfair manner.

MLCC attempts to argue that underwriting standards issued by Fannie Mae and Freddie Mac are irrelevant to evaluating MLCC's lending decision, because they concern only loans that are far smaller than the loan at issue. It goes so far as to misrepresent Mr. Homberger's conclusions, claiming that he relied *solely* on those external guidelines to analyze MLCC's conduct. As MLCC knows perfectly well, Mr. Homberger's initial report was served at a time when MLCC was **refusing** to produce its guidelines; Mr. Homberger made clear in that report that he reserved the right to analyze MLCC's guidelines when they were produced (Homberger Aff., Ex. A). After MLCC was ordered to produce its guidelines, Mr. Homberger prepared a supplemental report, discussing them (*id.*, Ex. B).

Though MLCC argues that Fannie Mae and Freddie Mac guidelines are not industry standard, that argument is clearly one for cross-examination. Mr. Homberger has stated that they *are* industry standard, and he is plainly qualified to draw that conclusion (indeed, MLCC does not challenge his qualifications in this respect).

More disingenuously, however, MLCC willfully confounds the point Mr. Homberger has made regarding industry standards. Mr. Homberger has never stated, for example, that all mortgage banks must adhere to the loan value limits imposed on "conforming" Fannie Mae or Freddie Mac loans. What is "industry standard" about Fannie Mae/Freddie Mac guidelines, according to Mr. Homberger, is their "recommendations and requirements regarding the underwriting *process*" (Homberger Aff., Ex. A, p. 1). Thus, the Fannie Mae/Freddie Mac guidelines provide the procedural ground rules that

15

most mortgage lenders follow; many lenders then modify those guidelines to suit their particular needs, by, *inter alia*, modifying permissible loan-to-value ratios or limits on loan amounts (*id.*).

Indeed, MLCC's own guidelines demonstrate the pervasive, industry-wide influence of the Fannie Mae/Freddie Mac guidelines on the manner in which mortgage loans are underwritten. As Mr. Homberger stated in his supplemental report (Homberger Aff., Ex. B):

> In many respects the MLCC Underwriting [manual] is similar to Fannie Mae Guidelines and *for some products it directly references Fannie Mae Guidelines as the primary source for the required documentation and analysis* of the credit file. Based on my review of the MLCC Underwriting manual, I conclude that *while there are differences between MLCC and Fannie Mae guidelines, the underlying risk evaluation and analysis processes are quite similar* [emphasis added]."

Thus, the notion that Fannie Mae guidelines (or perhaps more precisely, the risk evaluation procedures established in those guidelines) have no bearing on loans that could not qualify for a Fannie Mae guarantee, disregards the way the industry, including MLCC, actually works.

Finally, MLCC, in its rush to argue that neither its own guidelines nor industry standard guidelines are relevant, forgets to state by what standard it believes its actions should be judged. Thus, the expressed concern in *deKwiatkowski*, if that case were relevant at all (which it is not), was that companies should not be discouraged from adopting internal standards that are stricter than the law allows. MLCC does not claim however, nor could it, that its internal underwriting guidelines are stricter than industry standards. *deKwiatkowski* makes clear that someone must fix the standard by which a party's actions are to be judged. Whether the standard is to be determined by the Court or by the fact-finder, both are entitled to expert testimony on the subject. But MLCC wishes to prevent anyone from talking at all about *any* standards, internal or industry-wide. That is patently improper.

16

### C.     Mr. Homberger's Opinions Are Not Improper Legal Conclusions

The Federal Rules of Evidence were amended over twenty years ago to allow expert witnesses

to render opinions even if they "embrace[ ] an ultimate issue to be decided by the trier of fact." Fed.

R. Evid. 704. "This amendment provided trial courts with more latitude to allow experts to testify

about issues that would help the jury understand concepts it needed to know to render a verdict

despite the fact that the opinions may encroach on matters of law." *Cary Oil Co., Inc., supra*, 2003

WL 1878246, *5 (emphasis added).

The Second Circuit has specifically held that "[e]xperts may testify on ... mixed questions of

fact and law." *Fiataruolo v. U.S.,* 8 F.3d 930, 941 (2d Cir.1993).

MLCC complains that Mr. Homberger offers impermissible legal opinions in answering, at

the end of his report, a series of questions posed by counsel. Those questions do not concern legal

conclusions at all, but, rather, factual matters (or, at most mixed questions of fact and law), such as

whether MLCC's conduct was unfair, or unscrupulous, or whether the loan was "a transaction that

no person in her sense and not under a delusion would make, and no honest and fair person would

accept." Mr. Homberger's answers to these questions are precisely the type of conclusions that Rule

704 permits.

As *Cary Oil Co., Inc., supra*, 2003 WL 1878246, at *5-6 reported:

[T]he Advisory Committee to the Federal Rules (the "Committee") when distinguishing
permissible opinions on ultimate facts from inadmissible legal conclusions [wrote]:
> [T]he question, "Did T have capacity to make a will?" would be excluded, while
> the question, "Did T have sufficient mental capacity to know the nature and extent
> of his property and the natural objects of his bounty and to formulate a rational
> scheme of distribution?" would be allowed.
(Fed.R.Evid. 704, Advisory Committee Notes (1972 Proposed Rules) (West 2001).)

17

Through this example, the Committee intended to demonstrate that an opinion which told the jury whether or not a party had the capacity to make a will would be inadmissible because the answer was a conclusion of law that is reserved for the jury to decide, but an opinion which discussed whether the evidence showed the party had met the three requirements necessary to adjudge that party capable of making a will was admissible because it involved questions of fact that could be established based on the expert's opinion.[4]

*Cary Oil* used the Committee's example to explain its holding that "Kahan's analysis of the evidence in this case – and his identification of how such evidence may indicate that the relation between the Defendants exceeded the control a parent ordinarily exercises over its subsidiary so as to justify veil-piercing – does not cross the boundaries into an opinion that would tell the jury what decision to reach[.]" *Id.*

Similarly, in *Fiataruolo v. U.S.*, 8 F.3d at 942, the Second Circuit held that it was appropriate for the defendant's expert to testify that the defendant was not a "responsible person" under section 6672 of the Internal Revenue Code, explaining:

When viewed in isolation, Cohen's testimony on Fiataruolo's responsibility lies near the border, close to a prohibited invasion. But when examined in the proper context, it does not cross the line. The testimony was offered as part of a longer exposition on Dian Cifuni's violation of established accounting principles. Expert Cohen went through and explained in some detail the payroll checks and bank account statements, providing factual explanations for those procedures that were being followed at C & C Security. Then he offered his opinion based on those procedures as to whether Fiataruolo was responsible under § 6672. ***Cohen's testimony gave the jury helpful information beyond a simple statement on how its verdict should read. He couched his opinion specifically "on the evidence that I looked at and the work that I did."*** ... ***Cohen's opinion was not a simple bald assertion of the law and was not designed to invade the province of the trial court.*** *Cf. Karns v. Emerson Elec. Co.,* 817 F.2d 1452, 1459 (10th Cir.1987)

---

[4] This example from the Committee shows that many of MLCC's objections border on frivolous. For example, MLCC claims that Mr. Homberger should be precluded from using the word "honest", because it allegedly "implies a legal standard," and that he should be precluded from using words like "fair" or "unfair," because they appear in the legal elements of some of the claims against it (MLCC Objections at 26). Mr. Homberger is entitled to offer conclusions regarding whether the evidence shows that the elements of particular claims have been met.

(finding admissible testimony of expert who "explained the bases for his opinions in sufficient detail to permit the jury to independently evaluate his conclusions"); *United States v. Milton,* 555 F.2d 1198, 1204 (5th Cir.1977) (finding admissible similar testimony that combined factual explanations and legal conclusions) [emphasis added].

Mr. Homberger's testimony does not even come close to the "border" identified in *Fiataruolo.* His conclusions, to the extent they are legal in nature at all, come after, and are couched in terms of, the conclusions he reached from reviewing the evidence. Mr. Homberger, like the expert in *Fiataruolo*, does not baldly tell the fact-finder what to conclude; rather, he provides information that will help the fact-finders to form the conclusions necessary to resolve this action.

Therefore, there is no basis to strike Mr. Homberger's affidavit.

## III.   THERE IS NO BASIS TO STRIKE MARC SEIFER'S AFFIDAVIT

MLCC does not challenge Dr. Seifer's qualifications as a handwriting expert. Rather, MLCC merely claims that, if one accepts its view of the evidence and the law, Mr. Seifer's conclusions that Jay Falini altered the power of attorney are irrelevant.

MLCC claims that certain statements by Ms. Miller constitute "binding judicial admissions." However, whatever statement Ms. Miller may have made in a deposition, or an affidavit, does not foreclose further evidence on the subject. For example, Ms. Miller's initial recollection of events could have been wrong. If, *arguendo*, Ms. Miller stated in a deposition or affidavit that all of the writing on the power of attorney was hers, there is nothing to preclude her from changing that testimony. MLCC certainly can use any such change in testimony to cross-examine Ms. Miller or Dr. Seifer, but it does not provide a basis to exclude Dr. Seifer's testimony.[5]

---

[5] To be sure, the conclusions of MLCC's own handwriting expert confirm that Jay Falini authored the questioned writing on the power of attorney (*see* Plaintiff Br. Opposing Summary Judgment at 20). Thus, it is irrelevant that Ms. Miller initially may have thought all of the handwriting on the document was hers.

19

Similarly, MLCC argues that Ms. Miller acknowledged the changes were made in her presence, and it argues that, if the Court accepts that fact, it would make irrelevant the question whether Ms. Miller actually wrote them. Mr. Falini has denied that he made any changes to the power of attorney in Ms. Miller's presence, so there is a question of fact as to who was there when the changes were made. It is also entirely plausible that some changes (such as some of the white-out) were made in Ms. Miller's presence, while others (the handwritten additions) were made later. Mr. Falini's faxes of versions of the power of attorney bear this out.

In sum, MLCC is engaging in circular argument, because, to rule that the Seifer affidavit is irrelevant to MLCC's summary judgment motion, the Court must first accept MLCC's substantive arguments on the summary judgment motion.

Therefore, there is no basis to exclude Dr. Seifer's affidavit.

## CONCLUSION

For the reasons set forth above, MLCC's Objections should be overruled.

BEGOS & HORGAN, LLP

By: _____

     Patrick W. Begos (ct 19090)
     Christopher G. Brown (ct18216)
Attorneys for Plaintiff
327 Riverside Avenue
Westport, CT 06880
(203) 226-9990
(203) 222-4833 (fax)
Email:    pwb@begoshorgan.com

20

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was served via first class mail, postage prepaid, on August 22, 2005 to:

Douglas C. Conroy, Esq.
Paul, Hastings, Janofsky & Walker, LLP
1055 Washington Boulevard
Stamford, CT 06901-2217

Patrick W. Begos