UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JULIE DILLON RIPLEY MILLER,<br><br>       Plaintiff and Counterclaim<br>       Defendant,<br><br>  - against -<br><br>MERRILL LYNCH CREDIT CORPORATION,<br><br>       Defendant and Counterclaimant. | NO. 3:03-CV-1016 (WWE)<br><br><br><br><br>OCTOBER 24, 2006 |

## DEFENDANT'S MOTION FOR CONTINUANCE OF TRIAL DATE

Merrill Lynch Credit Corporation ("MLCC") respectfully moves that the trial of this matter, currently scheduled to commence on January 3, 2007, be continued until April 2007 or to such date thereafter as the Court's trial calendar permits.

In support of this motion, MLCC states as follows:

1.     Following a telephonic scheduling conference on September 12, 2006, the Court issued a Pretrial Order dated September 25, 2006 (the "Pretrial Order"). The Pretrial Order set a jury selection date of January 3, 2007, with trial to begin thereafter. The Pretrial Order also required that trial memoranda be exchanged and filed by December 1, 2006.

2.     During the September 12, 2006 conference, counsel advised the Court that hearings were scheduled to start later that week in a New York Stock Exchange, Inc. arbitration brought by Plaintiff Julie Dillon Ripley Miller against Merrill Lynch, Pierce, Fenner & Smith ("MLPF&S") and Jay Falini, Ms. Miller's former stockbroker. At the time of the conference, counsel had understood that the NYSE arbitration hearings would conclude later in September with

**ORAL ARGUMENT NOT REQUESTED**

a decision likely to be rendered approximately thirty days thereafter. Since that time, however, the arbitration hearings have gone longer than represented by Ms. Miller's counsel, having already consumed eight hearing days without Ms. Miller having completed her case. Additional hearing dates are scheduled tentatively for November 15 and 16 (depending on resolution of a conflict one arbitrator has because of prior arbitral commitments), and for December 8, 11, 12, and 13. The ongoing nature of the arbitration was highlighted by its status at the end of the most recent hearing on October 10, leading to the submission of this motion. The hearings are likely to conclude, at the earliest, during hearing days presently scheduled for mid-December, and could conceivably continue into 2007. Even if the arbitration hearings were actually to conclude by mid-December, a final decision from the arbitration panel would still not be anticipated until approximately thirty days thereafter, which would be mid-January 2007. Consequently, the trial of this matter would be well under way before a decision would customarily have been filed in the arbitration.

3.      Resolution of the NYSE arbitration prior to commencement of the trial of this action is warranted and advisable in a number of respects.

i.      First, although this action and the arbitration involve separate and independent Merrill Lynch entities, the gravamen of Ms. Miller's claim in each instance is nearly identical. Compare Miller's NYSE Statement of Claim (Exhibit A attached hereto) with Miller's Third Amended Complaint in this action (Exhibit B attached hereto). Given the similarity of many of the facts at issue in the two proceedings, it is possible that the parties may settle this action without the need for trial depending on the results of the arbitration. It would be a considerable waste of time and resources for the Court and the parties to prepare for and conduct a lengthy jury

trial before the arbitration is concluded, when the arbitration result could serve to materially alter either the scope of or need for a trial.

        ii.     Second, Ms. Miller is apparently seeking the same damages in the arbitration that she seeks in this action. The very existence of two separate proceedings seeking the same damages risks inconsistent judgments and, specifically, a result that is inconsistent with the single recovery rule. The Connecticut Supreme Court has described the single recovery rule as a "simple and time-honored maxim that a plaintiff may be compensated only once for his just damages for the same injury.... Plaintiffs are not foreclosed from suing multiple defendants, either jointly or separately, for injuries for which each is liable, nor are they foreclosed from obtaining multiple judgments against joint tortfeasors.... The possible rendition of multiple judgments does not, however, defeat the proposition that a litigant may recover just damages only once." See Haynes v. Yale-New Haven Hospital, 243 Conn. 17, n. 6 (1997) (quoting Gionfriddo v. Gartenhaus Cafe, 211 Conn. 67, 71-73 (1989)). Putting off the trial until after the arbitration (assuming such a trial will even be necessary after the arbitration) reduces the risk that the single recovery rule will be compromised.

        iii.     Third, given that the arbitration will ultimately consume close to three weeks of hearings, it is now abundantly clear that this trial will require more time than the two and one-half weeks currently allotted. The trial of this matter will involve additional claims by MLCC for foreclosure and equitable subrogation, and Ms. Miller's alleged defenses thereto, which are not before the arbitrators. The need reflected by the course of the arbitration for a longer period of trial days is another reason warranting a continuance.

- 3 -

4.     The requested continuance until the Court is again available in April will not unduly or substantially delay the resolution of this matter.  A continuance will not prejudice Plaintiff, who continues to reside in the residence which is the subject of the foreclosure counterclaim.

5.     In summary, a continuance of this trial is necessary to allow sufficient time for the ongoing related arbitration to conclude, for an arbitral decision to be rendered, and for the parties and the Court to take into account the legal and practical effect of any decision prior to expending the time and resources on this trial.

WHEREFORE, for the foregoing reasons, MLCC respectfully moves the Court for a continuance of the January 2007 trial date to April 2007 or to such date thereafter as the Court's calendar permits. MLCC further moves that the deadline for trial memoranda be adjusted to one month prior to the new trial date.

Respectfully submitted,

PAUL, HASTINGS, JANOFSKY &
WALKER LLP

By: _Douglas C. Conroy_

Douglas C. Conroy (ct 11555)
Matthew R. Paul (ct 21036)
1055 Washington Boulevard
Stamford, CT  06901-2217
Telephone:  (203) 961-7400
Facsimile:  (203) 359-3031
Email:  douglasconroy@paulhastings.com
        matthewpaul@paulhastings.com

COHEN AND WOLF
Jonathan S. Bowman (ct 08526)
Ari Hoffman (ct 22516)
1115 Broad Street
Bridgeport, CT  06604
Tel: 203-368-0211
Fax: 203-576-8504
Email: jbowman@cohenandwolf.com
        ahoffman@cohenandwolf.com

Counsel for Defendant and Counterclaimant
MERRILL LYNCH CREDIT CORPORATION

## CERTIFICATE OF SERVICE

This is to certify that on this 24th day of October 2006, a copy of the foregoing was delivered via first class United States mail to:


        Patrick W. Begos, Esq.
        Christopher Brown, Esq.
        BEGOS & HORGAN, LLP
        327 Riverside Avenue
        Westport, CT 06880

        Jonathan S. Bowman, Esq.
        Ari Hoffman, Esq.
        COHEN AND WOLF
        1115 Broad Street
        Bridgeport, CT  06604


                        *Douglas C. Conroy*
                        Douglas C. Conroy

LEGAL_US_E # 72320425.3

# EXHIBIT A

NEW YORK STOCK EXCHANGE, INC.

--------------------------------------------------x

JULIE DILLON RIPLEY MILLER                    :

           Claimant,                  :        Case No.

      – against –                            :        **STATEMENT OF CLAIM**

                                   :

MERRILL LYNCH, PIERCE, FENNER & SMITH,        :
INC., JAY K. FALINI, and BRANCH MANAGERS 1    :
and 2,                                         :
                                   :

         Respondents.                      :

--------------------------------------------------x

        Claimant, Julie Dillon Ripley Miller, by her attorneys, Begos & Horgan, LLP, for her statement of claim in this matter, alleges as follows:

**The Parties**

        1.    Julie Dillon Ripley Miller is a resident of the state of Connecticut, residing at 21 Point Road, Norwalk, Connecticut.

        2.    At all relevant times, Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") was and is a member of the New York Stock Exchange.

        3.    At all relevant times, Jay K. Falini (CRD No. 2505077) was a registered representative of Merrill Lynch in its office at 455 S. Gulph Road, King of Prussia, PA ("King of Prussia Branch").

        4.    At all relevant times, Branch Managers 1 and 2, whose names are not known by Claimant at this time, were branch managers of the King of Prussia Branch.

**Background**

        5.    Ms. Miller was born in 1951. Though her parents had substantial assets, Ms. Miller's assets and income were, for most of her adult life, modest. She was a Registered Nurse, and her

husband owned a bait shop. At all times relevant to this action, Ms. Miller had stopped working to raise her five children. Ms. Miller and her family lived in a modest house with a mortgage of approximately $100,000, and had few investment assets.

6.      Ms. Miller's financial circumstances changed dramatically in 1996 with the death of her mother, following which she inherited various assets and trust interests. Most significantly, Ms. Miller received securities valued at approximately $10 million ("Inherited Securities"), as a distribution of a trust that had been established by her grandfather.

7.      The bulk of the Inherited Securities were blue-chip stocks, such as Coca-Cola, DuPont, Kodak, Exxon, Johnson & Johnson, and Weyerhauser, and were held in an account at PaineWebber. Due to the manner in which Ms. Miller inherited them, her cost basis in many of the Inherited Securities was very low. For example, as of August 1997, PaineWebber reported that Ms. Miller's cost basis in Inherited Securities with a market value of more than $8 million was less than $200,000.

8.      Despite her significant inherited wealth, Ms. Miller was, and remains, very unsophisticated regarding investments. Virtually her only operating principal with regard to the Inherited Securities was something that had been repeated to her since she was a child: don't sell the stock. At no time did Ms. Miller knowingly pursue, or direct anyone to pursue, any course of conduct that she understood would result in the sale of any of the Inherited Securities.

9.      In or about the summer of 1997, Ms. Miller began exploring the possibility of buying a new house. In that context, she spoke to Mr. Falini. Mr. Falini attempted to interest Ms. Miller in the possibility of letting Merrill Lynch finance the purchase of her new home. Specifically, Mr.

2

Falini discussed various financing options offered by Merrill Lynch Credit Corp. ("MLCC"), which was, like Merrill Lynch, a subsidiary of Merrill Lynch & Co., Inc.

10.     At Mr. Falini's urging, Ms. Miller submitted a loan application, and MLCC approved a loan in the amount of $1,375,000. One of the conditions of the loan was that Ms. Miller pledge a specified amount of securities, which securities would be held by Merrill Lynch. It was through this loan provision that Mr. Falini was able to convince Ms. Miller to transfer all of the Inherited Securities from PaineWebber to Merrill Lynch.

11.     Merrill Lynch has coined the marketing phrase "Liability Management" to refer to the alleged ability of its brokers to assist customers in planning and structuring their borrowing, much the same as they would plan and structure investing. As subsequent events show, however, Merrill Lynch and Mr. Falini used this concept merely to advance their own interests, to the financial devastation of Ms. Miller.

12.     In or about September 1997, Ms. Miller opened account 881-32512 at Merrill Lynch, which Merrill Lynch styled as a "Master CMA" account. At various times, Mr. Falini and/or Merrill Lynch opened and/or closed various sub-accounts, and transferred funds and/or assets from one account to another. Also at various times, Merrill Lynch changed its account numbering system for the accounts, and/or "unlinked" the various accounts. For purposes of this Statement of Claim, references to the "Account" will include the master CMA account, any and all sub-accounts, and any other accounts Ms. Miller may have had at Merrill Lynch.

13.     From the outset of the parties' relationship, Merrill Lynch considered Ms. Miller to be a "Key" Client, also known as a "Priority" Client. This was Merrill Lynch's designation for a client with significant assets held by Merrill Lynch. The facts demonstrate that Merrill Lynch's goals with

3

respect to such clients included: making it difficult for the clients to move their securities away from

Merrill Lynch; and attempting to convince them to move to Merrill Lynch securities held elsewhere.

14.    In pursuit of these, and other goals, Mr. Falini quickly set about to translate his initial

broker-client relationship with Ms. Miller into something much more. The combination of Ms.

Miller's inheritance of millions of dollars of assets and her lack of sophistication managing assets

of that magnitude, made her an easy target. Mr. Falini advised Ms. Miller about real estate purchases;

he advised her about borrowing funds; he advised her about the construction of her new house; he

recommended an accountant for her; he traveled frequently from his office in Pennsylvania to Ms.

Miller's house in Connecticut. As an example of the degree to which Mr. Falini insinuated himself

into Ms. Miller's life, Ms. Miller and her husband asked Mr. Falini to be Godfather to their twins.

15.    As a result of Mr. Falini's efforts, Ms. Miller reasonably came to repose special trust and

confidence in him, and a fiduciary relationship arose. As will be discussed below, Mr. Falini

breached Ms. Miller's trust and confidence, by placing his own interests, and/or the interests of

Merrill Lynch and its affiliates, first.

## RESPONDENTS' WRONGDOING

### The 1998 Sale of Inherited Securities

16.    There is no question that the Inherited Securities, properly managed, should have been

sufficient to allow Ms. Miller and her family a comfortable lifestyle for many years, and most likely

for the rest of her life. For example, in January 1998, Merrill Lynch estimated that the Inherited

Securities, if left alone, would produce annual income of almost $175,000.

17.    Because of the extraordinarily low cost basis in most of the Inherited Securities,

Respondents knew, or should have known, that great care had to be taken before any decision could

4

be made to reallocate any of those Assets. In general, however, Respondents completely ignored the tax consequences of their advice to Ms. Miller, and generally made no effort to maximize Ms. Miller's after-tax income.

18.    One of Mr. Falini's first major steps in "managing" Ms. Miller's Inherited Securities was to sell approximately $2.5 million in low-cost-basis securities, and shift most of the proceeds into municipal bonds. As a result of those sales, Ms. Miller incurred $2.4 million in capital gains in 1998. Mr. Falini did not adequately consider the tax consequences of his actions before advising Ms. Miller to sell, or ordering those sales himself.  As a result, any benefit flowing from redistributing that portion of the Inherited Securities was swallowed by taxes.

19.    But Mr. Respondents' real wrongdoing incurred in connection with the house purchased by Ms. Miller with the mortgage loan given by MLCC.

**The Construction Loan**

20.    When Ms. Miller began looking for a house, she discussed with Mr. Falini what she could afford. Mr. Falini advised her that she could afford a house costing as much as $10 million. Of course (though Ms. Miller did not realize it), there is no way that she could have afforded a $10 million house when the only funds she had were approximately $10 million in securities earning about $200,000 a year. Neither Ms. Miller, nor her husband, had any significant income outside of the income generated by the Inherited Securities. Had Mr. Falini been responsible, he would have determined the mortgage Ms. Miller could afford to pay with the interest and dividends the Inherited Securities were earning, and advised Ms. Miller accordingly.

21.    As a result of Mr. Falini's bad advice, he encouraged Ms. Miller to purchase a house for $1,350,000 that would have to be torn down and/or substantially renovated.

22.     After Ms. Miller bought the house, Mr. Falini advised, encouraged, and assisted, Ms. Miller to fund the demolition and rebuilding through borrowing against the Inherited Securities. Specifically, Mr. Falini set up a special sub-account for work on the house ("House Account"). The House Account had check-writing privileges attached. Mr. Falini managed the House Account as follows:

A.     Mr. Falini instructed Ms. Miller that, whenever she needed to pay an expense associated with the house, she should write a check against the House Account.

B.     Mr. Falini transferred into the House Account funds sufficient to pay the checks drawn by Ms. Miller.

C.     Mr. Falini would get the funds by borrowing against the Inherited Securities in the main Account, and/or in one of the other sub-accounts he had set up.

23.     The monthly statements Ms. Miller received from Merrill Lynch were "consolidated," and ran to more than fifty pages in length. The summary of the Account did not show this borrowing, or these transfers. It would only be by closely examining the detail buried in the "consolidated" statements that Ms. Miller would have seen what Mr. Falini was doing.

24.     Ms. Miller relied on Mr. Falini to advise her as to the status of her finances, and what she could and could not afford. She also sought, and received, advice and input from Mr. Falini about the actual construction process. Throughout 1998 and 1999, Mr. Falini routinely traveled to Connecticut for meetings with Ms Miller, her architects, contractor, decorator and others involved in the renovation project.

25.     By the end of November 1999, as a result of Mr. Falini's "management," Ms. Miller was deeply in debt to Merrill Lynch. Her assets in the Account totaled $10.6 million, but her margin debt was $5.8 million. Almost $4 million of that margin had been used for the construction project,

6

though the house was not nearly finished. Merrill Lynch was charging her approximately $40,000 a month in interest on the margin debt.

26. There can be no question that, in structuring Ms. Miller's finances so that the house construction was funded by margin, Respondents created a substantial risk that some or all of the Inherited Securities would be sold, contrary to Ms. Miller's instructions.

27. Upon information and belief, Mr. Falini began to realize, in the Fall of 1999, that the construction project was going to exhaust the borrowing capacity in the Account. The "best" case scenario was that Ms. Miller would be unable to spend any more money on the half-finished house. The worst case scenario was that margin and/or maintenance calls would begin to be issued against the Account. In either case, Ms. Miller would quickly understand that Mr. Falini's advice and management had been terrible.

28. It was at this time, and in response to these developments, that Mr. Falini advised and encouraged Ms. Miller to seek a new loan from MLCC. He completed an application, for Ms. Miller's signature, seeking a construction loan in the amount of $6,200,000. In discussing the "need" for this loan, Mr. Falini never mentioned that Ms. Miller was about to run out of money. Instead, he told her that MLCC's oversight of the construction process would assist her in completing the project in a timely and cost-effective manner.

29. When Mr. Falini submitted the application to MLCC, he did so with a note instructing MLCC: "No calls directly to client. ... Client highly sensitive." In an introductory conversation with MLCC's loan officer, Mr. Falini reiterated: "Do not call client."

30. MLCC, which saw its role as assisting Merrill Lynch in obtaining and keeping "Key" clients like Ms. Miller, followed Mr. Falini's instruction.

7

31.     MLCC's underwriting process demonstrated that it completely ignored both industry-standard underwriting procedures, as well as its own procedures, in its efforts to "qualify" Ms. Miller for the loan Mr. Falini wanted for her. Among other things:

MLCC quickly learned, through Ms. Miller's tax returns and Merrill Lynch records, that Ms. Miller's income was nowhere near sufficient to make the payments that would be due on a $6,200,000 construction loan   (MLCC estimated those payments to be approximately $42,000 a month).  The total income Ms. Miller received in dividends and interest in 1998 was approximately $290,000, or an average of less than $25,000 a month. Even if Ms. Miller and her family had no expenses other than the payments due on the construction loan, she was generating only enough income to make roughly half of the payment that would be due if the loan closed.

Rather than denying the loan for insufficient income, MLCC made up a higher income number by assuming that Ms. Miller was earning a return of 6.1% per year on all of her Inherited Securities, and further assuming that she would sell the Inherited Securities not pledged to MLCC as security in equal installments over a fifteen year period. In this manner, MLCC's underwriters concluded that Ms. Miller had a hypothetical income of almost $70,000 a month.

Even worse, MLCC obtained two appraisals showing that Ms. Miller's house, when finished, would be worth less than $4 million. When it received those appraisals, MLCC knew that Ms. Miller had already spent $1,350,000 on the property, and almost $4 million on construction. MLCC concluded that an additional $2.3 million would be needed to finish the house.

32.     Despite these problems, MLCC nonetheless "approved" a $6.2 million construction loan.

33.     By naming himself sole contact for MLCC in connection with the loan, Mr. Falini insured that no one from MLCC told Ms. Miller that the house she was building was going to be worth far less than the cost; that she did not have sufficient income to make the payments on the loan Mr. Falini was seeking for her; that she would inevitably default on the loan; and that the end result would be the forced sale of her Inherited Securities.

34.     Neither Mr. Falini, nor any other respondent, told Ms. Miller any of these facts either.

8

35.  After MLCC approved the loan, it determined  that a $6.2 million loan would not provide enough money to finish the house. MLCC therefore increased the amount of the loan to $7.5 million. Neither MLCC, nor any respondent, informed Ms. Miller of this change.

36.  Increasing the loan amount to $7.5 million had a significant effect. The income that MLCC had made up – by assuming, contrary to reality, that Ms. Miller was earning 6.1% on her assets – was insufficient to make the monthly payments MLCC calculated for this new loan amount. Specifically, MLCC's loan officer calculated that Ms. Miller's total monthly obligations if the loan closed would be $63,826 and her total "income" would be $63,576. In other words, he calculated a "disposable income" that was a *negative* $250 a month. In reality, as discussed above, Ms. Miller's actual income was only about $22,000 a month. Using Ms. Miller's actual income, the disposable income MLCC should have calculated was a *negative* $41,000 a month.

37.  Respondents knew, or should have known, all of these facts.

38.  In sum, MLCC and Respondents knew that, if the loan closed, Ms. Miller would quickly default, and MLCC would foreclose. Naturally, MLCC did not want to have to recover a $7.5 million loan out of a house that it expected to be worth less than $4 million, so MLCC advised respondents that it would require a first priority security interest in more than $5 million of the Inherited Securities.

39.  In approving a $7.5 million loan, neither MLCC, nor any respondent, disclosed any of these facts or assumptions to Ms. Miller. Therefore, though respondents knew that Ms. Miller could never make the payments on the loan, she was not told. Though respondents knew that Ms. Miller's house would not be worth the money being put into it, she was not told.  Though respondents knew

9

that the inevitable default on the loan would result in a liquidation of the majority of her Inherited
Securities, with huge capital gains tax liability, Ms. Miller was not told.

40.     Though no reputable bank would make such a loan, MLCC was not a normal bank. Its
executives have testified that one of MLCC's primary jobs was to assist Merrill Lynch brokers in
attracting and keeping customers. As MLCC's Senior Vice President recognized, making loans to
customers would advance that interest; denying loans would not. This executive confirmed that
MLCC preferred loans where it could insist on a pledge of securities, as that would make it more
difficult for a Merrill Lynch client to move accounts. In this executive's words, MLCC could help
to make the relationship between Merrill Lynch and a customer "sticky."

**The Power of Attorney**

41.     The approval of a construction loan that MLCC and respondents knew would end in
default was, unfortunately, only the first act of the real misconduct. When MLCC approved the loan
in late November 1999, it notified Mr. Falini that the loan could be closed at any time up to February
1, 2000.

42.     As Mr. Falini knew, Ms. Miller had plans to be out of the country from December 2,
1999 through the end of the year. This was not a problem for MLCC, nor was it a problem for Ms.
Miller, as none of the people involved in the construction of the house needed any substantial funds
before January 2000. Therefore, there was every reason for the loan to be closed in January, upon
Ms. Miller's return.

43.     Mr. Falini apparently saw things differently. He advised MLCC that the loan *had* to close
before the end of December 1999. The only reason we can conjecture for Mr. Falini's insistence is

10

Case 3:03-cv-01016-WWE    Document 182    Filed 10/25/2006    Page 18 of 31

that he wanted to receive, before the end of the year, the production credits that he knew he was going to get when the loan closed.

44.    MLCC advised Mr. Falini that Ms. Miller would need to sign a power of attorney for the loan to close before the end of the year. Mr. Falini obtained a Statutory Short Form Power of Attorney, and forwarded it to Ms. Miller. Ms. Miller completed the form, signed it before two witnesses, and had it acknowledged by a notary, as the statute requires. She did this on December 2, 1999, the day she was leaving the country.

45.    Unfortunately for Mr. Falini's plans, the power of attorney Ms. Miller signed did not authorize the attorney-in-fact to enter into real estate transactions. Rather than ask Ms. Miller to sign a new document (which might have made closing in December impossible, as Ms. Miller was leaving the country the day she signed the power of attorney), Mr. Falini altered the power of attorney until it was acceptable to MLCC. Among other things, Mr. Falini whited out portions of the form where Ms. Miller withheld authority, and added language to other portions of the power of attorney.

46.    Mr. Falini's changes to the power of attorney can be seen on the original, and also by reviewing a series of faxes that Mr. Falini sent to the title agent. Expert handwriting analysis of the power of attorney confirm that a significant portion of the writing on the form was not by Ms. Miller, and the faxes show that the alterations were made by Mr. Falini or someone acting on his behalf.

47.    After Ms. Miller left the country, Mr. Falini attended the closing, along with Barry Newman, who was purportedly Ms. Miller's attorney-in-fact pursuant to the altered – and invalid – power of attorney. Ms. Miller had never spoken to Mr. Newman about any loan.

48.    Mr. Falini – who knew Mr. Newman – did not tell him that the papers he was signing would obligate Ms. Miller to pay $7.5 million to MLCC, or to pledge Inherited Assets to MLCC. Instead, Mr. Falini told Mr. Newman that he was needed to review contractors' bills and approve disbursements while Ms. Miller was away. Mr. Falini did, in fact, arrange to have Mr. Newman review contractors' bills at the closing. Mr. Newman has testified that he never saw even a copy of the power of attorney, much less the original showing Mr. Falini's white-outs.

49.    Even if the power of attorney, as altered by Mr. Falini, authorized Mr. Newman to sign a mortgage and note on Ms. Miller's behalf (which it did not), it expressly, and clearly, withheld authority for anyone to pledge Ms. Miller's securities. Nonetheless, Mr. Falini had Mr. Newman sign a Pledge Agreement purporting to do exactly that. Moreover, Merrill Lynch, despite knowing the pledge was ineffective, considered it valid and granted MLCC rights in the Inherited Securities superior to Ms. Miller's rights.

50.    It must be emphasized that, prior to the closing, Mr. Falini had specifically instructed MLCC not to communicate with Ms. Miller. Accordingly, she had no idea about the true terms of the loan Mr. Falini had pursued. Moreover, because Mr. Falini arranged for the loan to close while Ms. Miller was out of the country, she did not even have an opportunity to understand the commitments that respondents were insisting she make. Had any respondent told Ms. Miller, at any time before the loan closed, that the end result of the loan would be a sale of some or all of the Inherited Securities, Ms. Miller would have rejected it out of hand.

51.    Finally, Mr. Falini had advised Ms. Miller that she did not need to be represented by counsel in connection with the loan. Following his advice, Ms. Miller had no independent representation at the closing.

**Post Closing**

52.   After the loan closed, Mr. Falini continued insulating Ms. Miller from information about the terms of the loan. Though he had a copy of (or the original) "closing package," he never forwarded it to Ms. Miller.

53.   He also asked MLCC to tell him directly what payments were due each month, so he could wire the payments directly from the Account to MLCC without having to discuss the amount with Ms. Miller. As Mr. Falini told MLCC : "I do not want to get behind on this. There are many moving parts which I need to juggle." In fact, several months after the closing, Mr. Falini confirmed that Ms. Miller had never received monthly interest statements on the loan.

54.   Mr. Miller also asked MLCC to keep him advised about draws against the loan: "The reason that I am requesting this is so that I can converse with the client intelligently regarding this loan and the progress of construction and dollars outlayed." By this request, Mr. Falini confirmed that he was providing Ms. Miller with advice and guidance far beyond the role of a traditional broker.

55.   The monthly payments on the construction loan were in excess of $40,000 a month. Mr. Falini "juggled" this payment by, once again, borrowing against whatever Inherited Securities were available. He had to borrow even more because, as with any construction loan, there are costs that MLCC did not pay. Thus, in addition to the monthly payment to MLCC, Ms. Miller continued to spend money on the construction project.

56.   Now, however, Ms. Miller had less "borrowing power," because more than $6 million in her Inherited Securities had been transferred into a "Pledge Account" controlled by MLCC. Within months after the construction loan closed, Ms. Miller was in default.

13

**The Phantom Liquidation and Repurchase**

57.    Following Ms. Miller's initial default on the construction loan, there ensued a months-long "workout process" among Ms. Miller, MLCC and respondents.

58.    At one time, in April 2002, MLCC mistakenly directed Merrill Lynch to liquidate all of the Inherited Securities in the Pledge Account. MLCC followed that direction, even though MLCC did not have any legitimate right to do so.

59.    MLCC's vice president has confirmed that the direction was a mistake, and he has testified that MLCC promptly acted to "correct" it. For purposes of this proceeding, what is most disturbing about this event is that, according to Merrill Lynch's monthly statements, *it never happened*.

60.    More specifically, MLCC's documents confirm that the liquidation occurred on or about May 3, 2002. This was the forced sale of more than $6 million in Inherited Securities. MLCC's executive testified that MLCC realized its error within days, and directed Merrill Lynch to reverse the sale. The monthly statement Ms. Miller received from Merrill Lynch for May 2002, however, shows none of this activity (with the exception of a sale of Weyerhauser stock, which MLCC, or respondents, apparently forgot to reverse until several weeks later).

61.    It is difficult to imagine how $6 million in securities can be liquidated by Merrill Lynch and then repurchased, all on instructions from another entity, without there being any indication of these activities in the account records. Clearly, Merrill Lynch did not notify Ms. Miller about what was being done with her assets.

14

**The Default**

62.    In February 2003, MLCC again directed Merrill Lynch to liquidate Ms. Miller's Inherited Securities in February 2003. This time, MLCC did not reverse the sale. As a result of that sale, Ms. Miller has suffered significant damage. She incurred a capital gains tax liability of $1,150,924.14. Merrill Lynch paid itself $23,667.43 in commissions. Between the date of liquidation and November 17, 2003, the Inherited Securities would have increased in value by $485,000, and would have earned dividends of more than $80,000. Thus, Ms. Miller's direct loss from this improper liquidation exceed $1.7 million.

63.    Moreover, MLCC has commenced proceedings to foreclose upon Ms. Miller's house.

64.    As a result of respondents' misconduct, Ms. Miller has been financially devastated. If MLCC succeeds on its attempt to foreclose on the mortgage, and if MLCC's valuation of the house is upheld, Ms. Miller will be left with no house; with little, if any, funds left from her $10 million in Inherited Securities; and with a capital gains tax liability of more than $1 million. Ms. Miller's total damages for respondents' misconduct is estimated to be at least $9,000,000.

65.    All of these actions taken by MLCC are a direct result of respondents' breaches of their obligations to Ms. Miller. Instead of giving her legitimate advice about how to manage and invest her Inherited Securities, they gave her advice aimed at preventing her from taking her assets elsewhere. Instead of giving an unsophisticated investor who had inherited a large block of assets assistance in using those assets responsibly for herself and her children, respondents put their own interests first.

**Failure to Supervise**

66.    It is apparent that no one at Merrill Lynch, particularly Mr. Falini's branch manager(s),

engaged in any effective supervision. It is not possible for a properly supervised broker to engage

in the type of wrongdoing that Mr. Falini committed.

67.    Additionally, Merrill Lynch has advised that they cannot locate the "branch file" which,

in theory, should have copies of Mr. Falini's communications with, and about, Ms. Miller. For

example, Mr. Falini's faxes to MLCC's title agent were produced by the title agent, not by Merrill

Lynch.

68.    Mr. Falini's branch manager(s), who had primary responsibility for supervising Mr.

Falini, were in the best position to prevent him from injuring Ms. Miller, and had they fulfilled their

obligation to supervise him, Ms. Miller's losses could have been avoided.

**Claims and Damages**

69.    As a result of the foregoing, respondents have engaged in misconduct in violation of

numerous statutes, rules and common-law duties owed to Ms. Miller, including, but not limited to:

(a) violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and rules of the

Securities Exchange Commission; (b) violations of the rules of the New York Stock Exchange, the

National Association of Securities Dealers, and other applicable organizations; (c) violations of the

Connecticut Unfair Trade Practices Act; (d) breach of fiduciary duty; (e) common law fraud; (f)

negligence and recklessness; (g) unauthorized trading; and (h) failure to supervise.

70.    Respondents' actions have severely damaged Ms. Miller, in an amount to be determined,

but in excess of $9,000,000 plus interest, and attorneys' fees.

16

71.   Moreover, respondents' misconduct warrants an award of punitive damages.

Dated:     Westport, Connecticut
           March 23, 2004

                                    BEGOS & HORGAN, LLP

                                    By: _____
                                        Patrick W. Begos
                                    Attorneys for Claimant
                                    25 Ford Road
                                    Westport, CT 06880
                                    (203) 226-9990

17

# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT

---------------------------------------------------------------x

JULIE DILLON RIPLEY MILLER,                    :

             Plaintiff,                    :    Case No. 03-CV-1016 (WWE)

                            :    **THIRD AMENDED**
      – against –                    :    **COMPLAINT**

                            :

MERRILL LYNCH CREDIT CORPORATION,              :

             Defendant.                    :

---------------------------------------------------------------x

     Plaintiff, Julie Dillon Ripley Miller, by her attorneys, Begos & Horgan, LLP, hereby amends her complaint to conform to the Court's ruling on the parties' summary judgment motions, as directed in the Court's December 6, 2005 Order:

## COUNT I - CONVERSION

**The Parties**

     1.    Plaintiff is a natural person residing at 21 Point Road, Norwalk, Connecticut.

     2.    Upon information and belief, Defendant, Merrill Lynch Credit Corporation ("MLCC") is, and at all relevant times was, a corporation duly organized and existing under and by virtue of the laws of the State of Delaware and authorized to transact and transacting the business of lending money in the State of Connecticut.

**The Account**

     3.    This action arises out of MLCC's conversion of approximately $5 million of Plaintiff's stocks held by MLCC's affiliate, Merrill Lynch, Pierce, Fenner & Smith ("MLPFS"). MLCC has claimed that its sale of those assets and seizure of the proceeds was authorized pursuant to a Pledge Agreement executed as part of a $7.5 million construction loan transaction (the "Loan"). However,

plaintiff never executed that Pledge Agreement, and, specifically withheld authority from her purported attorney-in-fact to sign it on her behalf.

4.      Plaintiff has a brokerage account with MLPFS (the "Account") and the bulk of the stocks in the Account were acquired by Plaintiff's family before 1950. When Plaintiff inherited these stocks in 1996, she acquired her ancestors' cost basis in them for capital gains tax purposes.

5.      Plaintiff's MLPFS stock broker, Jay Falini ("Falini"), knew that the Account was Plaintiff's primary source of income and that liquidating the stocks would expose Plaintiff to substantial capital gains tax liability.

**The Loan**

6.      Plaintiff began renovating a house on a piece of property that she owns on Wilson Point on the Norwalk waterfront. In or about the Fall of 1999, Falini arranged for Plaintiff to take the Loan from MLCC. Falini never disclosed to Plaintiff that the Loan involved a pledge of Plaintiff's Account. Falini's actions in arranging the Loan, obtaining documents necessary to close, and orchestrating the closing demonstrate that, at all relevant times, he had actual, implied and/or apparent authority to act as MLCC's agent.

7.      Thereafter, Falini advised Plaintiff that the Loan had been scheduled to close on December 7, 1999. Falini knew that Plaintiff was going to be in Africa from December 2 through December 22, 1999 but advised her that she did not need to have a lawyer present at the closing. Falini later asked Plaintiff to sign a document waiving her right to have a lawyer at the closing.

**The Power of Attorney**

8.      Falini advised Plaintiff that, because her contractors purportedly needed to be paid while she was away, she needed to give Barry Newman ("Newman") (the accountant to whom Falini

- 2 -

had referred Plaintiff in 1998) power of attorney to use the Loan money to pay them. Falini sent

Plaintiff a blank Connecticut Statutory Short Form Power of Attorney ("POA") form and told her

that he would come up from his office in Philadelphia to pick it up on December 2, 1999, the day

she was leaving for Africa.

9.    On or about December 2, 1999, Plaintiff took the blank POA form that she received

from Falini to her local bank to have it notarized. The POA as signed by Miller, and as witnessed

and acknowledged, did not identify an attorney in fact, and did not authorize anyone to borrow

money or pledge securities.

10.    After Plaintiff signed the power of attorney in front of two witnesses and a notary

public at the bank, she gave it to Falini, who "whited out" some of Plaintiff's markings on the form.

The changes made by Falini after the POA had been signed and acknowledged, which purported to

expand the authority delegated by Plaintiff, left it not in compliance with the Connecticut Statutory

Short Form Power of Attorney Act, and invalidated it.

11.    Falini did not alter Plaintiff's elimination of the power to act with respect to "bond,

share and commodity transactions" because, he said, Newman should not have authority to sell

Plaintiff's stock. Therefore, to the extent the POA is a valid document, it specifically withholds from

Plaintiff's purported attorney-in-fact, Barry Newman, the power to act for the Plaintiff with respect

to, *inter alia*, "bond, share and commodity transactions".

12.    The POA specifically provides that the definitions of the Connecticut Statutory Short

Form Power of Attorney Act apply to the subdivisions of the POA. Thus, as executed, the POA

specifically withheld authority to "pledge . . . any bond, share [or] instrument of similar character,"

CGS § 1-46.

- 3 -

**The Closing**

13. Upon information and belief, the Loan purportedly closed on or about December 7,1999 and Newman, Falini, a closing agent and other as-yet-unidentified representative or representatives of MLCC were in attendance. Newman purported to obligate Plaintiff on an agreement with MLCC whereby Newman purportedly pledged Plaintiff's Account as security for the Loan ("Pledge Agreement"). MLCC accepted the POA as evidencing Newman's authority to enter the Pledge Agreement on behalf of Plaintiff and ignored the changes to the document and Plaintiff's clear and unambiguous withholding of authority to pledge securities.

**The Conversion**

14. In or about February 2003, pursuant to a right it claimed by virtue of the Pledge Agreement, MLCC had the Account, which at the time had a value of approximately $5,000,000, liquidated and the proceeds frozen to the exclusion of Plaintiff.

15. In addition to the loss of the stocks and cash in the Account, the liquidation damaged the Plaintiff including exposure to substantial tax liability.

16. Newman was not authorized to enter into the Pledge Agreement for Plaintiff. Therefore, MLCC was not authorized to assume and exercise the right of ownership over the Account to the exclusion of Plaintiff.

17. Plaintiff has been damaged by MLCC's conversion of Plaintiff's Account, in an amount to be determined at trial, but in excess of $7 million.

WHEREFORE, Plaintiff demands:

(i)     Money Damages;

(ii)    Punitive Damages;

- 4 -

(iii)    Attorney's Fees;

(iv)    Statutory Interest; and

(v)    Costs of Suit.

THE PLAINTIFF
JULIE DILLON RIPLEY MILLER

By: _____

Patrick W. Begos (ct19090)
Christopher G. Brown, Esq. (ct 18216)
Begos & Horgan, LLP
327 Riverside Avenue
Westport, CT 06880
(203) 226-9990

## CERTIFICATE OF SERVICE

This certifies that on January 4, 2006, a copy of the foregoing Third Amended Complaint was delivered via first-class mail to:

Douglas C. Conroy, Esq.
Paul, Hastings, Janofsky & Walker LLP
1055 Washington Boulevard
Stamford, CT 06901-2217

Jonathan Bowman, Esq.
Cohen and Wolf, P.C.
115 Broad Street
Bridgeport, CT 06604

Christopher G. Brown