UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JULIE DILLON RIPLEY MILLER,<br><br>Plaintiff,<br><br>- against -<br><br>MERRILL LYNCH CREDIT<br>CORPORATION,<br><br>Defendant. | NO. 3:03-CV-1016 (WWE)<br><br><br><br><br>May 18, 2007 |

## DEFENDANT MERRILL LYNCH
## CREDIT CORPORATION'S MEMORANDUM OF LAW
## IN OPPOSITION TO PLAINTIFF'S MOTIONS *IN LIMINE*

Defendant Merrill Lynch Credit Corporation ("MLCC") respectfully submits this memorandum of law in opposition to plaintiff's motions *in limine.*[1]

### PRELIMINARY STATEMENT

This action involves a $7.5 million loan transaction plaintiff entered into in 1999 for the purpose of financing the remaining construction on her 9,300 square foot mansion in Norwalk, Connecticut. In ruling on all motions *in limine*, we ask the Court to keep in mind the following undisputed facts: (1) plaintiff intended to, and did in fact, borrow all of the $7.5 million, (2) plaintiff spent all of the $7.5 million on her home and other personal discretionary expenses, (3) plaintiff intended to, and did in fact, give MLCC a mortgage on

---

[1] MLCC recently assigned the note and mortgage at issue in this case to Merrill Lynch Bank USA ("MLBUSA"). Accordingly, MLCC and MLBUSA will shortly file a motion for leave to amend the answer to include the substitution of MLBUSA as the counterclaim-plaintiff on all counterclaims, including the counterclaim for foreclosure and the counterclaim to recover under the note. In addition, MLCC and MLBUSA will shortly file their own motions *in limine.*

**ORAL ARGUMENT REQUESTED**

her home as security for the loan, and (4) plaintiff intended to, and did in fact, pledge certain securities to MLCC as additional collateral for the loan.

The Court may find surprising MLCC's characterization of the fourth allegation as an undisputed fact given plaintiff's repeated sworn testimony over the course of four years that she (1) *never* intended to pledge securities and (2) had no idea her attorney-in-fact had signed a pledge agreement on her behalf until well after the loan closing. In fact, this sworn testimony was pivotal to the Court's decision not to grant summary judgment dismissing plaintiff's claim for conversion.[2] Though plaintiff has repeatedly alleged both in affidavits and at her deposition that she did not know anything about the pledge account until some time *after* the closing in December 1999, we now know that each of those statements was false. As the Court is aware, plaintiff commenced an arbitration proceeding against Merrill, Lynch Pierce Fenner & Smith, Incorporated ("MLPFS") which was settled after nine days of hearings. At the hearing, plaintiff finally admitted under oath on cross-examination that she did, of course, understand *prior to entering into the loan transaction* that she would be required to pledge securities as collateral for her $7.5 million loan:

> Q.    You testified this morning with respect to the 1999 loan that you never understood there was going to be a, and I'm using your word, quote/unquote, you never understood there was going to be a *major* pledge account. What did you mean by that?
>
> A.    For the amount of securities that were tied up in my account to do with the 7.5 million.

---

[2] The Court granted summary judgment dismissing all of plaintiff's claims, with the exception of the conversion claim. Plaintiff alleges in her conversion claim that MLCC had no right to liquidate her securities pursuant to the Pledge Agreement when she defaulted on the loan in February 2003 because, among other reasons, plaintiff allegedly (1) did not know her attorney-in-fact had entered into the Pledge Agreement on her behalf and (2) she *"never"* would have entered into the loan agreement had she known she would be required to pledge securities.

Q.    So when you didn't think it was going to be major, how much in your mind was major?

A.    Well, the other pledge account was around 600,000 out of my eight; seven, $8 million account.

Q.    So what were you anticipating would be the pledge account for the 1999 loan, 7.5 million?

A.    I really didn't know, but I remember being shocked that I had no access to my securities.

Q.    Do you have any recollection how much you expected that pledge account to be?

A.    No.

Q.    But it was true that you expected it to be somewhat more than the pledge that you did for the $1.3 million loan, correct?

A.    I really didn't think about it. But that would make sense.

Arbitration Hearing Transcript, p. 1011, line 13 – p. 1012, line 11 (emphasis added). A copy of these pages is annexed to the Declaration of Barry S. Gold, Esq., dated May 18, 2007, in Opposition to Plaintiff's Motions *In Limine* ("Gold Dec.") as Exhibit A.

Thus, it is now undisputed plaintiff knew *prior to the closing of the loan transaction* that she would be required to pledge securities as additional collateral for her $7.5 million MLCC "Mortgage 100" loan -- just as she had been required to do in connection with the $1,350,000 "Mortgage 100" loan she had obtained from MLCC just two years earlier to purchase the home.

Based upon what we now know was plaintiff's *false* sworn testimony, the Court found there were issues of fact regarding plaintiff's alleged intent not to pledge her securities, which precluded the Court from granting summary judgment dismissing the conversion claim. We wonder whether the Court's decision with respect to the conversion claim would have been different had plaintiff not repeatedly misstated the truth to the

Court. Further, exactly how large the pledge account would be hardly matters. Plaintiff testified she knew it would be large but most importantly, she testified she knew she would be required to pledge securities. Given the obvious questions about plaintiff's credibility in light of her four years of false testimony as to whether she even knew she had pledged securities, there is no reason to believe she did not know the exact amount she was required to pledge.

There are additional facts not in dispute relevant to the ratification issue which we ask the Court to consider in ruling on the parties' motions *in limine*, including the following: (1) plaintiff made *37* monthly mortgage payments from December 1999 through January 2003 without objection and without even a hint there was anything improper about the loan or her repayment obligations and (2) plaintiff received *37* monthly account statements showing millions of dollars of securities *in the pledge account* and made the monthly mortgage payments for *37* months without objection and without even a hint there was anything improper about the pledge of her securities.

At the end of the day, we come back to the same unremarkable, undisputed facts. Plaintiff borrowed the money; plaintiff spent the money and, like anyone else who has ever borrowed money, she has an obligation to repay it.

Plaintiff, of course, does not deny that she borrowed and spent all of the $7.5 million MLCC loaned her. Nevertheless -- and incredibly -- it appears to be plaintiff's position that she should be able to simply keep the money and walk away from her obligations. Why, even if plaintiff were correct (which she is not) that the loan transaction should be set aside because of defects in the power of attorney or for some other reason, should she be able to walk away without paying a dime? If the loan transaction were set

aside, the parties should be returned to their respective positions prior to the transaction. Were that to happen, among other things, (1) plaintiff would be obligated to return the $7.5 million she borrowed and spent and (2) plaintiff's prior $1.35 million loan and her multi-million dollar margin debt to MLPFS would be reinstated, along with MLCC's mortgage on the house and MLPFS's security interest in plaintiff's securities collateralizing the margin debt. Plaintiff's request to be let "off the hook" is truly presumptuous.

## RESPONSE TO MOTIONS

### MOTION 1

#### Plaintiff's Contention That The Burden Of Proof
#### Regarding The Scope Of Barry Newman's Agency Is On MLCC

MLCC agrees that, as a general principle, a party asserting an agency has the burden of proving the scope of the agency. However, where as here, the party who executed the power of attorney and consented to changes made thereafter challenges the validity of the instrument, the burden should shift to that party.

### MOTION 2

#### Plaintiff's Contention That MLCC Cannot Establish
#### Newman's Authority By Evidence Extrinsic To The Power Of Attorney

It is well-settled that the rules governing the interpretation of written instruments generally also govern the interpretation of powers of attorney. *Gerardo v. Laraia*, 2001 Conn. Super. LEXIS 674 (Superior Court, judicial district of New Britain). "First and foremost the intention of the parties as it existed at the time the powers were granted is to be ascertained. Next, and when ascertained, that intention is to be given effect. The

intention is to be ascertained from the writing alone *if possible.*"  *Id* at *6 (emphasis added).  Thus, *where possible,* the intention of the parties should be discerned from the power of attorney itself, but, *where that is not possible*, the intent of the parties may be deduced from other evidence.  Accordingly, plaintiff is incorrect that evidence extrinsic to the power of attorney may not be offered to establish the scope of the authority of her designated attorney-in-fact, Barry Newman ("Newman").  While the power of attorney is certainly the beginning of the inquiry, it is not necessarily the end -- particularly if it is determined there is some ambiguity in the instrument itself.

Ironically, we agree with plaintiff that there is no need to go beyond the power of attorney at issue in this case (the "Power of Attorney") to discern the parties' intent.  As we discuss at length in the Response to Motion 4 below, by authorizing Newman to enter into both banking and real estate transactions, plaintiff expressly authorized him to, among other things, (1) borrow money by giving a promissory note, (2) convey a mortgage and (3) give security out of the principal's assets necessary to facilitate the desired borrowing of money. Thus, the Power of Attorney, *on its face*, expressly gave Newman precisely the authority he needed to enter into the loan transaction at issue in this lawsuit.

However, should it be determined there is any ambiguity in the Power of Attorney, then, as is the case with all written instruments, parol evidence would be admissible to explain the parties' intent.  *HLO Land Ownership Associates Limited partnership v. City of Hartford*, 248 Conn. 350, 727 A.2d 1260 (1998); *See also Gerardo, supra.*  Such evidence of plaintiff's intent to empower Newman to execute the mortgage, note and pledge agreement on her behalf is unequivocal:

- Plaintiff has testified under oath she knew she was entering into a $7.5 million loan transaction that included a promissory note, a mortgage and a pledge agreement.

- By traveling to a bank and signing a short form power of attorney before a notary and two witnesses, plaintiff manifested an unambiguous intent to confer certain authority upon her attorney-in-fact in connection with the loan transaction.

- Plaintiff's mistaken implementation of the rules for completing the power of attorney form (striking out the subdivisions as to which she did not intend to confer authority but initialing the subdivisions as to which she did intend to confer authority when, in fact, she should have placed her initials next to the same subdivisions she was striking) manifests the unmistakable intent to confer upon Newman the authority to enter into "banking" and "real estate" transactions as those terms are defined in the Connecticut Short Form Power of Attorney Act.

- As explained in detail in our Response to Motion 4, the authority to enter into "banking" and "real estate" transactions, includes the authority to pledge assets.

- Plaintiff ratified the agreements by making mortgage payments without complaint for 37 months.

Plaintiff's reliance on *Long v. Schull*, 184 Conn. 252, 439 A.2d 975 (1981) for the proposition that the legal effect of a power of attorney cannot be altered by proof of what the parties intended is misplaced. In *Long*, the agent designated in a power of attorney gave away assets of the principal to a third party *after* the principal's death. When the executrix of the principal's estate challenged the gift, the donee argued that the power of attorney manifested an intent on the part of the principal to create an agency relationship with the attorney-in-fact that would survive the principal's death. The power of attorney, however, was not a *durable* power of attorney and, accordingly, it terminated on the principal's death. The court correctly found that the donee's argument as to the supposed intent of the principal (that the agency should survive the principal's death) could not alter the legal effect of the power of attorney (which was that the agency would terminate upon

her death). In fact, such an interpretation of the principal's intent was clearly incorrect because she had executed a will wherein she specifically appointed an executrix (who was *not* the agent appointed under the power of attorney) to administer her assets after her death. *Long* is inapposite because there the argument being made was clearly contrary to the intent expressed by the principal in the power of attorney, whereas here any parol evidence of plaintiff's intent would merely support the intent expressed in the power of attorney. *See* discussion above and in the Response to Motion 4.

Plaintiff's reliance on *Hooshang v. Ferrante,* 1992 Conn. Super. LEXIS (Superior Court) is similarly misplaced. There, the alleged principals absolutely denied executing a power of attorney, their signatures were found to have been forged on the power of attorney, and they received zero benefit from the transaction at issue as the alleged agent used the forged power of attorney to sign their names to guaranties which enabled a third party – not the principals -- to receive hundreds of thousands of dollars in loan proceeds. Here, in contrast, plaintiff admittedly intended to and did sign the Power of Attorney and she received (and spent) all of the $7.5 million loan proceeds.

Thus, in the event the Court does not issue a ruling prior to trial that (1) the scope of Newman's authority is clear from the face of the Power of Attorney, as executed, and (2) the authority conferred upon Newman included the authority to execute the note, the mortgage and the pledge agreement on behalf of plaintiff, Motion 2 should be denied and extrinsic evidence should be admitted to prove the scope of the authority plaintiff conferred upon Newman. MLCC will make a motion *in limine* seeking such relief.

## MOTION 3

### Plaintiff's Contention That The Power Of Attorney Is Not Valid If It Was Altered After It Was Signed, Witnessed And Acknowledged

Plaintiff contends that the Power of Attorney was defective because plaintiff did not reexecute the Power of Attorney before a notary after certain changes were made. The contention should be rejected for a multitude of reasons discussed below.

In evaluating plaintiff's motion, the Court must keep in mind those facts it found to be *undisputed* in its decision on the parties' motions for summary judgment. (A copy of the Ruling on Pending Motions, dated December 6, 2005 ("Summary Judgment Decision"), is annexed as Exhibit B to the Gold Dec.) In that decision, the Court found *as a matter of undisputed fact that each and every one of the changes to the Power of Attorney was made in plaintiff's presence and with her knowledge and consent*. First the Court found that Jay Falini, plaintiff's broker at MLPFS, had discussed with plaintiff the concept of a power of attorney and having Barry Newman as the attorney-in-fact:

> The loan was scheduled to close in December 1999 when plaintiff planned to be in Africa with her family. Therefore, Falini advised her to execute a power of attorney. *Miller and Falini discussed a plan to have Barry Newman, plaintiff's accountant, serve as her attorney-in-fact for the closing.*

Summary Judgment Decision, Gold Dec., Exh. B, p. 4 (emphasis added).

Next the Court found that plaintiff had intended to confer certain powers on Newman but made an error in filling out the short form power of attorney form:

> On December 2, plaintiff executed a Statutory Short Form Power of Attorney, which instructed:
>
>> Strike out and initial in the opposite box any one or more of the subdivisions as to which the

> principal does NOT desire to give the agent authority.
>
> *Plaintiff had initialed the boxes for real estate and banking transactions signed the form before two witnesses, and acknowledged it before a notary. She gave the executed Short Form Power of Attorney to Falini.*
>
> Harvey Rosenblum, MLCC's loan officer, informed Falini that the power of attorney did not authorize the appropriate powers for closing on the loan. The closing required execution of a note to evidence the debt, a mortgage to secure MLCC's interest in the real property, and a pledge agreement as additional security. Accordingly, the power of attorney needed to authorize banking and real estate transactions. As Kevin Huben, MLCC's closing agent, informed Falini, the power of attorney was "initialed where it should not have been and not initialed where it should have been initialed." Further, the form failed to indicate who was to be the attorney-in-fact.

*Id.* at pp. 4-5 (emphasis added).

Critically, the Court found that Mr. Falini had explained the mistake to plaintiff and made the needed corrections to the Power of Attorney at plaintiff's home, in her presence, and with her knowledge and consent:

> *Falini informed plaintiff that the attorney-in-fact did not need authority to sell her stock, but that he needed more authority to close the loan. At her house and in her presence, Falini "whited out" plaintiff's markings and initials next to real estate and banking transactions, and wrote in her initials next to the other powers required to close on the loan. The name of Barry Newman was also written onto the form.*

*Id.* at 5 (emphasis added).

Finally, Barry Newman, acting as plaintiff's attorney-in-fact pursuant to the Power of Attorney, entered into the $7.5 million loan transaction on plaintiff's behalf:

> This version of the power of attorney (the "Altered Power of Attorney") was then faxed to Rosenblum, who found it sufficient for closing the loan. Subsequently, on behalf of the plaintiff, Newman as attorney-in-fact executed a construction loan agreement, an adjustable rate promissory note for a loan of $7,500,000, a mortgage on the 21 Point Road residence, and a Mortgage 100 Pledge Agreement for Securities Account.

*Id.* at pp. 5-6 (emphasis added).

In short, the Court has found *as a matter of undisputed fact* that there was nothing nefarious about the changes to the Power of Attorney and, moreover, that the final version of the Power of Attorney (with alterations) exactly reflected plaintiff's intent. Accordingly, the Court should not be distracted by plaintiff's crafty legal argument that her failure to reexecute the Power of Attorney before a notary should somehow allow her to walk away -- "scot-free" -- from repaying the millions of dollars she borrowed.

As support for its position on this motion, plaintiff relies upon two Connecticut cases, neither of which is any assistance to her. The first case -- *J.C. Penny Properties, Inc. v. Peter M. Santella Company*, 210 Conn. 511, 555 A.2d 990 (1989) -- merely holds that a certificate of mechanic's lien which is not notarized (as required by statute) is not valid. The Power of Attorney at issue in this case, however, was, as the Court found, indisputably notarized by plaintiff with the intention of conveying to her attorney-in-fact authority to enter into banking and real estate transactions. The second case, *Coit v. Starkweather*, 8 Conn. 289 (1830) is equally unavailing because it merely holds that a *deed* (not a power of attorney) which is altered after it has been acknowledged must be reacknowledged *if the alteration is material.* Inasmuch as the changes to the Power of Attorney were -- as the Court found as a matter of undisputed fact -- made in plaintiff's presence and with her knowledge and consent, those alterations cannot be

11

deemed to be *material*.    Accordingly, even assuming this ancient case which has barely been cited since the decision was rendered 177 years ago is even good law, and is applicable to powers of attorney (as opposed to deeds), no reacknowledgment was necessary.

Plaintiff also cites a New York case -- *Kurman v. Kurman*, 11 Misc.2d 1035, 174 N.Y.S.2d 128 (Sup. Ct. Monroe County 1958) -- in which the plaintiff husband sought to set aside a Mexican divorce on the ground that the power of attorney he signed was invalid because it had been altered after he signed it. The specific alteration he alleged was the naming and insertion in the document *by the defendant wife's attorney* of the name of an attorney-in-fact he did not know and had not approved. The court quickly rejected the notion that such a power of attorney could be valid where the husband did not know the attorney, the husband's attorney-in-fact had *de facto* been appointed by the wife, not by him, and what was at stake was the dissolution of a marriage:

> In our case the choice of an attorney was not only not the independent, uncontrolled choice of the husband, there was not even an attorney named in the so-called power of attorney when he signed it. To hold that an attorney thus appointed is authorized to represent one in an action involving the dissolution of a marriage would be a travesty on justice and repugnant to our public policy. The plaintiff [husband] is entitled to a decree, declaring that the so-called Mexican divorce is invalid.

11 Misc. 2d at 1038, 174 N.Y.S.2d at 131. In our case, of course, the Court has found as a matter of undisputed fact that Mr. Falini discussed with plaintiff the choice of Barry Newman as her attorney-in-fact and that his name was inserted on the Power of Attorney in plaintiff's home, in her presence, and with her knowledge and consent.

Most importantly, under the circumstances present in this case -- where there is no doubt plaintiff knew exactly the deal she was entering into -- allowing plaintiff to walk

away from her obligations under the loan transaction by reason of an alleged, minor, technical defect in a power of attorney would be grossly unfair and, in effect, an unwarranted triumph of form over substance that would leave MLCC "holding" what will amount to more than a $10 million "bag." Quoting the language from *Kurman*, such a result would be a "travesty on justice and repugnant to our public policy." The Court should not assist plaintiff's attempts at legal trickery, and this motion should be denied.

## MOTION 4

### Plaintiff's Contention That MLCC Should Be Precluded From Arguing That The Altered Power Of Attorney Authorized Newman To Pledge Securities

Plaintiff contends, based upon the Connecticut Short Form Powers of Attorney Act, that the Power of Attorney did not confer upon Newman authority to pledge her assets because, even after the changes to the document, still no authority was given Newman to enter into "bond, share and commodity" transactions. Plaintiff's statutory analysis is plainly wrong because the power to pledge assets does not arise solely from the power to enter into "bond, share and commodity" transactions. As we explain below, the authority given Newman to enter into "banking" and "real estate" transactions was more than sufficient to enable him to enter into the Pledge Agreement on behalf of plaintiff. In addition, plaintiff seems to be arguing that the alleged failure of the Power of Attorney to confer authority to pledge securities is consistent with plaintiff's intent not to pledge her securities. As we now know, however, plaintiff's years of sworn statements to this Court that she never knew she would be required to pledge securities, and never would have entered into the loan transaction had she known, were false.

The Connecticut Statutory Short Form Power of Attorney Act (CGSA § 1-42 *et seq.*) is structured so that each power listed on the short form power of attorney form has a corresponding statute explaining what authority is conferred by that power. It is clear from the statutory language that the authority granted by each of the powers is quite expansive and that the legislature's intent was to make certain an agent appointed under a power of attorney had *all* of the powers he/she might possibly need to carry out the principal's intent. Indeed, CGSA § 1-43 and the short form power of attorney form itself expressly state: "Notice: The powers granted by this document are broad and sweeping. They are defined in Connecticut Statutory Short Form Power of Attorney Act, sections 1-42 to 1-56, inclusive, of the general statutes." Moreover, not only does each section of the statute describe the specific authority being conferred, it also includes general "catch-all" provisions authorizing the agent to take whatever steps are necessary to complete the transaction successfully.

For example, CGSA § 1-44, which governs real estate transactions, provides at subparagraph (8) that the agent is authorized "to agree and to contract, in any manner, and with any person and on any terms, which the agent may select, for the accomplishment of any of the purposes enumerated in this section" and, at subparagraph (9), that the agent is authorized "to execute, to acknowledge, to seal and to deliver any . . . instrument which the agent may think useful for the accomplishment of any of the purposes enumerated in this section." One of the many "purposes" enumerated in the section is the conveyance of a mortgage. Of course, plaintiff would never have been able to convey a mortgage to MLCC in return for a $7.5 million loan unless Newman, on behalf of plaintiff, executed the pledge agreement. CGSA § 1-44 authorized him to do just that.

14

Similarly, CGSA § 1-47, which governs banking transactions, provides at subparagraph (14) that the agent is authorized "to execute, acknowledge, seal and deliver any instrument of any kind, in the name of the principal or otherwise, which the agent deems useful for the accomplishment of any of the purposes enumerated in this section" and, at subparagraph (17), that the agent is authorized "in general, and in addition to all the specific acts in this section enumerated, to do any other act or acts, which the principal can do through an agent, in connection with any banking transaction which does or might in any way affect the financial or other interests of the principal." One of the many "purposes" and "banking transactions" enumerated in the section is the borrowing of money. Of course, plaintiff would never have been able to borrow $7.5 million from MLCC unless Newman, on behalf of plaintiff, executed the pledge agreement. CGSA § 1-47 authorized him to do just that. As further evidence of the legislature's intent to cloak an agent with *all* the powers he/she might need, other sections of the Short Form Power of Attorney Act contain similar "catch-all" provisions. *See, e.g.,* CGSA § 1-45(10) (chattel and goods transactions); CGSA § 1-48(10) (business operating transactions); CGSA § 1-49(13) (insurance transactions).

Plaintiff correctly notes that CGSA § 1-46, entitled "Bond, share and commodity transactions," provides that in a Connecticut short form power of attorney, "the language conferring general authority with respect to bond, share and commodity transactions shall be construed to mean that the principal authorizes the agent: . . . (2) to . . . pledge, . . . any bond, share . . . ." However, as explained above, that is *not* the only power which authorizes an agent to pledge assets. Lest there be any doubt about this, however, the Court need only look a bit more closely at CGSA § 1-47, which governs banking

15

transactions, because the *express* powers spelled out in subparagraph (7) of that section include the powers "to borrow money . . . by promissory note of the principal" and *"to give such security out of the assets of the principal as the agent deems desirable or necessary for any such borrowing"* (emphasis added).

In short, consistent with the legislature's intent as reflected in the statutory language, the power to enter into banking and real estate transactions clearly, and expressly, conferred upon Newman the authority to pledge plaintiff's assets.

Plaintiff references in her motion the well-known maxim of statutory construction that when two statutes conflict, the more specific statute governs over the more general statute. The reference is inapposite. First, CGSA § 1-46's use of the word "pledge" is no more specific than CGSA § 1-47's use of the words "to give such security out of the assets of the principal as the agent deems desirable or necessary for any such borrowing." Second, and more importantly, this rule of statutory construction is irrelevant for the simple reason that *there is no conflict between the statutes.* That the same act -- pledging assets -- may be authorized in two or more statutes does not mean the statutes are in conflict. To the contrary, it demonstrates a legislative intent to make certain the agent has all the authority he/she needs to successfully complete the transaction.

Plaintiff's citation to *Wisniowski v. Planning Commission of the Town of Berlin,* 37 Conn.App. 303, 655 A.2d 1146 (1995) and *McKinley v. Musshorn*, 185 Conn. 616, 441 A.2d 600 (1981) to support its position that when two statutes conflict, the specific legislation governs over the general legislation is no help to plaintiff. In each of those cases, there was an actual conflict between or among statutes, but there is no such conflict among the various sections of the Short Form Power of Attorney Act.

In *Wisniowski*, the conflict was between (1) a statute setting forth a specific, narrow standard a planning commission must meet on appeal to explain its denial of an affordable housing subdivision application and (2) two other statutes that do not mention affordable housing subdivision applications, but set forth broader and more numerous standards a planning commission must meet to explain the denial subdivision applications generally. The developer-plaintiff argued that the denial of his application should be reversed because, while the planning commission may have been able to satisfy the requirements of the specific affordable housing subdivision application statute, it could not meet the more exacting standards of the more general statutes. Thus, the planning commission's denial of the application would be affirmed under one statute and denied under the other; in other words, there was an *actual conflict*.

In *McKinley,* the conflict was between (1) a statute immunizing state employees from personal liability to fellow employees for injury caused in the performance of their duties as state employees and (2) a statute specifically providing that employees entitled to receive workers' compensation cannot sue fellow employees for damages unless the injury is due the negligent operation of a motor vehicle. The plaintiff was a state employee who had been injured by an automobile driven by a fellow state employee. Thus, the plaintiff would be barred from suing the personal employee under one of the statutes, but free to commence the action under the other; again, there was an *actual conflict.*

As discussed above, however, there is *no* conflict among the various sections of the Short Form Power of Attorney Act with respect to an agent's authority to pledge assets. In order for there to be such a conflict, one of the statutes would have to expressly permit the agent to pledge the assets while another would have to expressly preclude the agent from

17

pledging the assets.  There are no such conflicting statutes.

Accordingly, this motion should also be denied.[3]


## MOTION NO. 5

### The Contention That MLCC Cannot
### Establish A Ratification Defense Without Proving That It
### Gave Plaintiff The Opportunity To Unwind The Transaction

Plaintiff relies on *Russell v. Dean Witter Reynolds, Inc.*, 200 Conn. 172, 510 A.2d

972 (1986) in support of her argument that she cannot be found to have ratified the loan

transaction without proof she was given the opportunity to unwind the transaction without

any cost or damage to her.  In *Russell*, the plaintiff-customer instructed his stockbroker to

purchase 1,000 shares of a particular stock, only to learn later that 2,000 shares had been

purchased.   The plaintiff-customer repeatedly called the broker demanding that the

purchase of the additional 1,000 shares be reversed and, although the broker repeatedly

told him the error would be corrected, the broker failed to make the correction.  When the

defendant argued at trial that the plaintiff customer had ratified the purchase, the court held

there could be no ratification unless the defendant could prove that the plaintiff-customer

had been given an opportunity to repudiate the transaction which, of course, it could not.

Plaintiff's reliance on *Russell* is futile for the simple reason that she *never* asked

MLCC to unwind the $7.5 million loan transaction.  Had plaintiff contended throughout

this lawsuit that she repeatedly asked MLCC to unwind the loan transaction but MLCC,

like the defendant in *Russell*, had refused that request, plaintiff's motion might have some

---

[3] MLCC is submitting its own motion *in limine* asking the Court to (1) hold, as a matter of law, that the Power of Attorney, with the approved changes, conferred upon Newman the authority to enter into the Pledge Agreement and (2) bar plaintiff from offering any evidence to the contrary.

merit. That, however, never happened and plaintiff has never contended she asked MLCC to "unwind" the transaction and MLCC refused. Accordingly, *Russell* has no relevance here.[4]

It seems that plaintiff would like to extrapolate from *Russell* that there is a new element of the ratification defense -- namely, that the party asserting the defense must first demonstrate that it affirmatively reached out to the other party and "extended an invitation" to unwind. That is not, and has never been, the law and *Russell* does not hold to the contrary. Moreover, while "unwinding" for the plaintiff-customer in *Russell* merely meant giving back the additional 1,000 shares, "unwinding" for plaintiff would mean, among other things, returning the $7.5 million to MLCC, which she could not do because she had already spent it. Even if such an "invitation to unwind" were an additional element of the ratification defense -- which it is not -- surely the law would require plaintiff to demonstrate first that she, like the plaintiff-customer in *Russell,* was ready, willing and able to "unwind" before finding that MLCC's failure to extend the invitation was actionable.

Accordingly, this motion -- which asks the Court to add an element to the ratification defense that has never before existed -- should be denied.

---

[4] We note also that we have not found any subsequent Connecticut case requiring a party asserting a ratification defense to prove that the other party was given an opportunity to unwind the transaction, much less any case where the party against whom the ratification defense is asserted admits she *never* asked that the transaction be unwound.

## MOTION NO. 6

### Plaintiff's Contention that MLCC Should Be Precluded From
### Introducing Evidence Or Argument Regarding Plaintiff's Spending

Plaintiff's final motion *in limine* asks the Court to exclude from the trial any evidence regarding her excessive spending habits. According to plaintiff, such evidence has no probative value. While it is certainly understandable that plaintiff would like to keep evidence of her wealth and wildly excessive spending habits from the jury, there is no basis on which to do so.

Plaintiff has asserted several *equitable* defenses to MLCC's counterclaims for foreclosure and judgment on the promissory note -- specifically, that the counterclaims are barred by MLCC's alleged unclean hands (Fourth Defense) and the note and mortgage are "unconscionable" (Sixth Defense). Plaintiff explained these defenses in her opposition to MLCC's motion for summary judgment, where she alleged that the $7.5 million loan was unconscionable and constituted "predatory lending" because (1) her income was limited to the approximately $250,000 per year she received in dividends and interest from her securities, (2) she -- allegedly -- had no prospect of any additional, significant income and, accordingly, (3) the required loan payments were "unconscionably" high and well beyond her means. Because it is a fundamental principle of equity jurisprudence that a party asserting equitable defenses must establish that she has acted equitably and comes into court with her own clean hands, plaintiff has that burden of proof here. *Thompson v. Orcutt*, 257 Conn. 301, 777 A.2d 670 (2001).

Evidence of plaintiff's wealth and her own irresponsible spending habits is directly relevant to this inquiry of whether she has acted equitably in representing to this Court that she could not, in fact, make the mortgage payments as she claims. For example, it appears

-- and MLCC will offer evidence at trial -- that during the approximately three year period from December 1999 (when the loan closed) and January 2003 (when plaintiff ceased making all payments to MLCC), plaintiff spent on average more than $750,000 per year on various expenses, ***above and beyond the millions spent on construction and the mortgage***. These expenses included, among other things, safaris and numerous other first-class, international vacations, lavish home decorations, and other, "over the top" discretionary expenses. Surely, evidence of plaintiff's uncontrolled spending is relevant to whether plaintiff did not, in fact, have sufficient funds to repay the loan as she claims and, if so, why.

Additionally, MLCC will offer evidence at trial that plaintiff's income was, substantially higher than what she has repeatedly told this Court. For example, while plaintiff claims her annual income has been in the $200-250,000 range, MLCC will offer evidence that her income was, apparently, more than ***$750,000*** (post-tax) in each of 2002 and 2003.[5] This evidence is likewise indisputably relevant to whether she had sufficient funds to make the loan payments and avoid the liquidation of her pledge account and foreclosure on the loan. Significantly, while plaintiff's income during 2002 and 2003 averaged not less than $62,500 per month, the loan payments averaged just $25-30,000 per month (down from $50,000 per month before the conversion from a "construction" loan to a "permanent" loan). It is imperative that this evidence be placed before the jury because it refutes plaintiff's claim that she could not afford to repay the loan and demonstrates that plaintiff chose to use her substantial wealth to support a lavish lifestyle, rather than paying

---

[5] Because plaintiff apparently has not filed *any* tax returns *since 2001*, her actual income could only be determined after laborious reconstruction of her personal financial records (which plaintiff fought hard not to produce) in connection with the arbitration proceeding.

her debts. It is no wonder plaintiff wants to keep evidence of her income and spending from the jury.

Not only is this evidence probative of plaintiff's credibility, it is also directly relevant to the issue of how clean plaintiff's hands are. The jury will need to decide whether a borrower who owes in excess of $10 million to her lender *and is looking to walk away from that obligation without paying a dime,* is deserving of equity when she has spent millions of dollars on lavish construction, decorations and vacations and has been living in her mansion for the past four years without making a single payment her lender or for taxes.[6] In addition, with respect to plaintiff's conversion claim, it must be remembered that MLCC directed that the pledge account be liquidated in February 2003 because plaintiff failed to deposit money into the account to bring it up to the minimum level required by the Pledge Agreement. Plaintiff alleges she did not have the money to deposit into the account. Evidence of plaintiff's income and uncontrolled spending is relevant to issue of whether plaintiff truly was unable to deposit the needed amount and, if so, why.

As the Court is well aware, the unconscionablility and predatory lending defenses typically apply to (1) borrowers who are poor, uneducated and have difficulty speaking English, (2) induced to enter into loan agreements where the monthly payments spike upwards as time goes on. Here, we have (1) a Duke and Yale-educated borrower with more than $10 million in a securities account at the time the loan closed and (2) a loan where the payments had *dropped by 50%* by the time she ceased making her payments to

---

[6] We remind the Court that plaintiff's home is a 9,300 square foot mansion (complete with seven bedrooms, eight full bathrooms, six fireplaces, an elevator, and a pool and pool house) overlooking Long Island Sound in the gated community of Wilson Point in Norwalk, Connecticut.

MLCC.   Under these circumstances, plaintiff's assertion of the unconscionability and predatory lending defenses here is quite revolutionary.

## CONCLUSION

For the reason set forth above, MLCC respectfully requests that this Court issue an order denying plaintiff's motions *in limine* in their entirety.

Dated:  May 18, 2007

KREBSBACH & SNYDER, P.C.
Attorneys for Defendant


Theodore A. Krebsbach, Esq. (ct 04917)
Barry S. Gold, Esq. (phv 01650)
One Exchange Plaza
55 Broadway, Suite 1600
New York, NY 10006
212-825-9811
212-825-9828 (fax)
E-Mail:  tkrebsbach@krebsbach.com
         bgold@krebsbach.com

COHEN AND WOLF
Jonathan S. Bowman (ct 08526)
Ari Hoffman (ct 22516)
1115 Broad Street
Bridgeport, CT 06604
203-368-0211
203-576-8504 (fax)
E-Mail:  jbowman@cohenandwolf.com
         ahoffman@cohenandwolf.com

## CERTIFICATE OF SERVICE

This is to certify that on this 18th day of May, 2007, a copy of the foregoing was

delivered via e-mail and first class United States mail to:

> Patrick W. Begos, Esq.
> Christopher Brown, Esq.
> BEGOS & HORGAN, LLP
> 327 Riverside Avenue
> Westport, CT 06880
>
> Jonathan S. Bowman, Esq.
> Ari Hoffman, Esq.
> COHEN AND WOLF
> 1115 Broad Street
> Bridgeport, CT  06604

_____
Barry S. Gold