UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JULIE DILLON RIPLEY MILLER, | NO. 3:03-CV-1016 (WWE) |
| Plaintiff, | |
| - against - | |
| MERRILL LYNCH CREDIT CORPORATION, | June 4, 2007 |
| Defendant. | |

## DECLARATION OF BARRY S. GOLD, ESQ.
## IN SUPPORT OF DEFENDANT MERRILL LYNCH
## CREDIT CORPORATION'S MOTIONS *IN LIMINE*

BARRY S. GOLD declares the following to be true under penalty of perjury:

1.    I am a member of the firm of Krebsbach & Snyder, P.C., attorneys for defendant Merrill Lynch Credit Corporation ("MLCC") in this action. I submit this declaration in support of defendant Merrill Lynch Credit Corporation's motions *in limine*.

2.    Submitted herewith as Exhibit A is a true copy of pages 1011-12 of the transcript of plaintiff's testimony at the hearing of the arbitration captioned Julie Miller v. Merrill Lynch, Pierce, Fenner & Smith, Incorporated – New York Stock Exchange Case No. 2004-015205.

3.    Submitted herewith as Exhibit B is a true copy of the Court's Ruling on Pending Motions, dated December 6, 2005.

4.    Submitted herewith as Exhibit C is a true copy of the recorded Power of Attorney reflecting the recording date on page 3 of the exhibit.

5.      Submitted herewith as Exhibit D is a true copy of the Third Amended Complaint.

6.      Submitted herewith as Exhibit E is a redacted copy of the Release section (Section 2) of the settlement agreement between and among plaintiff, Merrill, Lynch Pierce Fenner & Smith, Incorporated and Jay Falini.

7.      For all of the reasons set forth in MLCC's Memorandum of Law in Opposition to Plaintiff's Motions *in Limine*, which is submitted herewith, I respectfully request that this Court issue an Order denying plaintiff's motion in its entirety.

Dated:  June 4, 2007

Barry S. Gold, Esq. (phv 01650)
KREBSBACH & SNYDER, P.C.
One Exchange Plaza
55 Broadway, Suite 1600
New York, NY 10006
212-825-9811
212-825-9828 (fax)
E-Mail:  bgold@krebsbach.com

## CERTIFICATE OF SERVICE

This is to certify that on this 4th day of June, 2007, a copy of the foregoing was delivered via e-mail and first class United States mail to:

Patrick W. Begos, Esq.
Christopher Brown, Esq.
BEGOS & HORGAN, LLP
327 Riverside Avenue
Westport, CT 06880

Jonathan S. Bowman, Esq.
Ari Hoffman, Esq.
COHEN AND WOLF
1115 Broad Street
Bridgeport, CT  06604

_____
Barry S. Gold

# EXHIBIT A

779

1   NYSE REGULATION, INC.
    HEARING BEFORE THE ARBITRATORS                COPY
2
    JULIE DILLON RIPLEY MILLER,        :    CASE NO.
3                                      :
         Claimant,                     :    2004-015205
4                                      :
    vs.                                :
5                                      :
    MERRILL LYNCH, PIERCE, FENNER      :    VOLUME 4
6   & SMITH, INC.; JAY K. FALINI;      :
    AND BRANCH MANAGERS 1 and 2,       :
7                                      :
         Respondents.                  :
8

9

10

11

12      ARBITRATORS:      Bennett Hall
                          Jeffrey Sommers
13                        David Denison

14

15

16      DATE:             September 19, 2006

17      HELD AT:          New Haven Hotel
                          229 George Street
18                        New Haven, CT  06510

19

20

21      REPORTER:  Peggy McKie, RPR, LSR No. 175

22

23

24

25

1    A.    No, I really wouldn't have called it a

2    vacation, because I was worried about my daughter.

3        Q.    Who did you book the trip through?

4        A.    Abercrombie & Kent, I believe.

5        Q.    That's a pretty well-known safari outfit,

6    right?

7        A.    Yes.

8        Q.    And do you recall how much you paid for

9    the trip?

10        A.    No, I don't remember.

11        Q.    More than $20,000?

12        A.    I don't remember.

13        Q.    You testified this morning with respect

14    to the 1999 loan that you never understood there was

15    going to be a, and I'm using your word,

16    quote/unquote, you never understood there was going

17    to be a major pledge account.

18            What did you mean by that?

19        A.    For the amount of securities that were

20    tied up in my account to do with the 7.5 million.

21        Q.    So when you didn't think it was going to

22    be major, how much in your mind was major?

23        A.    Well, the other pledge account was around

24    600,000 out of my eight; seven, $8 million account.

25        Q.    So what were you anticipating would be

1  the pledge account for the 1999 loan, 7.5 million?

2       A.    I really didn't know, but I remember

3  being shocked that I had no access to my securities.

4       Q.    Do you have any recollection how much you

5  expected that pledge account to be?

6       A.    No.

7       Q.    But it was true that you expected it to

8  be somewhat more than the pledge that you did for

9  the $1.3 million loan, correct?

10      A.    I really didn't think about it.  But that

11 would make sense.

12      Q.    Was Mr. Eric Vaughn-Flam your attorney in

13 December 1999?

14      A.    Yes, he was.

15      Q.    With respect to the power of attorney,

16 the first time the power of attorney was filled out,

17 who did it?

18      A.    As I've testified before, on

19 December 2nd -- December 1st, I'll correct that -- I

20 received in the mail a power of attorney form that

21 Mr. Falini had sent to me.

22      Q.    Was it completed?

23      A.    No, it was blank.

24      Q.    It was blank?

25      A.    It was blank.  And I took it the next

# EXHIBIT B



**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

| JULIE DILLON RIPLEY MILLER, | : | No. 3-03-cv-1016(WWE) |
|---|---|---|
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MERRILL LYNCH CREDIT | : | |
| CORPORATION, | : | |
| Defendant. | : | |

## RULING ON PENDING MOTIONS

This action concerns loans made to plaintiff Julie Dillon Ripley Miller by Merrill Lynch Credit Corporation ("MLCC"). Plaintiff has filed this action, alleging conversion, fraudulent nondisclosure, recklessness, respondeat superior and violation of the Connecticut Unfair Trade Practices Act, Connecticut General Statutes section 42-110b. Defendant asserts counterclaims of foreclosure, judgment on the note, and equitable subrogation.

Now pending are cross motions for summary judgment and defendant's motion to strike. Upon review, the Court will deny the plaintiff's motion for summary judgment; and will grant the defendant's motion for summary judgment in part. The motion to strike will be denied as moot.

## BACKGROUND

Plaintiff and defendant have submitted statements of facts supported by affidavits and exhibits. These submissions reveal the following undisputed facts.

Plaintiff is a resident of Norwalk, Connecticut. In 1997, plaintiff inherited approximately $11 million dollars in trust

assets, which comprised mostly low basis securities and a small amount of cash. Thereafter, she decided to purchase a house for $1,350,000 on Long Island Sound. She obtained a loan from MLCC in the amount of $1,350,000 through MLCC's Mortgage 100 Program. The Mortgage 100 Program offered qualified borrowers 100% financing through a mortgage of the property that is to be purchased and a pledge of eligible securities in an account at Merrill Lynch Pierce Fenner & Smith ("MLPFS"). Throughout this transaction and subsequent financing arrangements, plaintiff relied upon her financial advisor, Jay Falini, a stock broker at MLPFS.

On the cover of the application, a box marked "Pledged securities" was checked under the section entitled "Source of Funds for Down Payment and/or Closing Costs." In a supplemental application section, plaintiff listed the ticker symbols and current market values of four different stocks in her MLPFS account. Miller does not dispute that she signed this special supplement.

By letter dated October 3, 1997, MLCC notified Miller that it had approved her loan application. Attached was a letter entitled "Important Information," which stated:

> If your loan is being made in connection with the Mortgage 100 program, your loan will also be secured by assets deposited in a special brokerage account at Merrill Lynch, Pierce, Fenner & Smith Incorporated. The account must be opened and the securities delivered at least seven (7) business days prior to your closing. Failure to do so may cause a delay in your mortgage closing. You may request a copy of the Mortgage 100 Pledge Agreement for Securities Account and Mortgage 100 Securities Account Agreement which you will be required to sign when you open your brokerage account.

2

On November 13, 1997, plaintiff closed on the 1997 Mortgage 100 loan, executing a mortgage, note and pledge agreement. Approximately $400,000 worth of Miller's securities were transferred to a segregated pledge account at MLPFS to serve as collateral for the loan. Plaintiff was sent her Pledge Account statement reflecting the transfer of securities into the segregated account.

During the following two years, plaintiff made the required interest payments on the 1997 loan. However, in 1999, Miller sought to undertake a major construction project to create a 9,300 square foot mansion with a pool that reflected the architecture of her grandfather's and father's residences. This residence was to be located at 21 Point Road, Norwalk, Connecticut.

Plaintiff funded a part of the construction project by writing checks against her MLPFS accounts. Each check was posted by MLPFS as a margin debit against plaintiff's securities.

In Fall 1999, plaintiff met Mr. Falini at the office of her real estate attorney, Eric Vaughn-Flam. Mr. Vaughn-Flam observed that he felt the costs related to the construction at plaintiff's property were too high. A few days later, Mr. Vaughn-Flam informed plaintiff that she might have a cause of action against Mr. Falini or "Merrill Lynch" concerning their handling of her financing of 21 Point Road.

Thereafter, Mr. Falini proposed the possibility of a construction loan with MLCC. Plaintiff applied for a construction

3

loan that would consolidate her existing indebtedness and the funds
necessary to complete her home.

On the cover of the application, a box marked "Pledged
securities" was checked under the section titled "Source of Funds
for Down payment and/or Closing Costs." Plaintiff also signed the
supplement that required her to "[c]omplete this section or attach
a copy of a current statement from your securities brokerage
firm indicating the securities to be pledged as additional
collateral."

A letter dated November 17, 1999 indicated that plaintiff was
approved for the loan. Attached to the approval letter was a
document disclosing that the Mortgage 100 loan was secured by her
securities in a MLPFS account. Plaintiff claims that she never
received these documents, although a copy of the Truth-in-Lending
Statement that had been attached to the documents was found in a
file forwarded by one of plaintiff's real estate attorneys.

The loan was scheduled to close in December 1999 when
plaintiff planned to be in Africa with her family. Therefore,
Falini advised her to execute a power of attorney. Miller and
Falini discussed a plan to have Barry Newman, plaintiff's
accountant, serve as her attorney-in-fact for the closing. On
December 2, plaintiff executed a Statutory Short Form Power of
Attorney, which instructed:

> Strike out and initial in the opposite box any one or more of
> the subdivisions as to which the principal does NOT desire to
> give the agent authority.

Plaintiff had initialed the boxes for real estate and banking

4

transactions, signed the form before two witnesses, and acknowledged it before a notary. She gave the executed Short Form Power of Attorney to Falini.

Harvey Rosenblum, MLCC's loan officer, informed Falini that the power of attorney did not authorize the appropriate powers for closing on the loan. The closing required execution of a note to evidence the debt, a mortgage to secure MLCC's interest in the real property, and a pledge agreement as additional security. Accordingly, the power of attorney needed to authorize banking and real estate transactions. As Kevin Huben, MLCC's closing agent, informed Falini, the power of attorney was "initialed where it should not have been and not initialed where it should have been initialed". Further, the form failed to indicate who was to be the attorney-in-fact.

Falini informed plaintiff that the attorney-in-fact did not need authority to sell her stock, but that he needed more authority to close on the loan. At her house and in her presence, Falini "whited out" plaintiff's markings and initials next to real estate and banking transactions, and wrote in her initials next to the other powers required to close on the loan. The name of Barry Newman was also written onto the form.

This version of the power of attorney (the "Altered Power of Attorney") was then faxed to Rosenblum, who found it sufficient for closing the loan. Subsequently, on behalf of the plaintiff, Newman as attorney-in-fact executed a construction loan agreement, an adjustable rate promissory note ("Note") for a loan of $7,500,000,

5

a mortgage on the 21 Point Road residence, and a Mortgage 100 Pledge Agreement for Securities Account.

The construction loan agreement provided that construction was to be completed not later than December 31, 2000. In Section 616, the agreement stated:

Time is considered of the essence of this Agreement and the satisfaction of the obligations of MLCC and owner hereunder.

Paragraph 1 of the Note stated: "In return for a loan that I have received, I promise to pay U.S. $7,500,000 . . . plus interest, to the order of the Lender." Paragraph 2 of the Note provided:

Interest will be charged on unpaid principal until the full amount of principal has been paid. Until January 1, 2001, which is the date my permanent loan interest rate commences (the "Commencement Date"), I will pay interest at the yearly rate set forth in paragraph 1 of the Addendum to Note Construction/Permanent Loans attached to this Note. Beginning on the Commencement Date, I will pay interest at a yearly rate based upon the Index (as defined in Section 4(B) below) plus or minus, as the case may be, the margin set forth in Section 4(C) below.

Section 4(C) provided that the interest rate would be calculated based on the LIBOR index plus 3.125%.

The mortgage provided that in the event of default, MLCC would be entitled to collect all costs and reasonable attorneys fees incurred by MLCC as a result of the default.

The Pledge Agreement was substantially identical to the pledge that plaintiff signed in connection with the 1997 loan. The securities pledged to secure the loan (approximately $6 million) were transferred to the same MLPFS segregated account.

6

After the closing, plaintiff was sent a statement from MLPFS showing this transfer and monthly account statements listing those securities subject to the pledge agreement. Michael Grohman, one of plaintiff's attorneys, possessed copies of the mortgage and pledge agreement stamped as "borrower's copy."

During the next two years, plaintiff made the required interest payments on the 1999 loan.

Upon completion of her home, MLCC sent plaintiff an agreement modifying her loan from a construction to a permanent loan ("Modification Agreement"). The accompanying "Welcome to Permanent Financing" letter mistakenly identified the rate basis as LIBOR plus 2.375% rather than LIBOR plus 3.125% as had been previously stated in the 1999 Note.

On January 15, 2001, plaintiff had a meeting with Mr. Falini and Mr. Vaughn-Flam in which she informed Mr. Falini that she had not liked the way he handled her account, and in particular, that she did not like having a pledge account.

On February 7, 2001, plaintiff entered into the Modification Agreement that converted the 1999 loan from a construction loan to a permanent 25 year loan. The Modification Agreement reflected that MLCC had honored the lower rate of LIBOR plus 2.375% and had granted a two month extension for payments on the permanent loan to commence on March 1, 2001 rather than January 1, 2001. The Modification Agreement provided further that 1) the unpaid principal balance due under the Note was $7.5 million, 2) plaintiff had no existing right of offset, counterclaim or other defenses

7

against enforcement of the Note and Security Instrument, and plaintiff waived any such right or defense if it did exist, and 3) the Note and Security Agreement evidenced her indebtedness and remained in full force until her obligations were paid in full.

Plaintiff failed to make the interest payments due on February 1, 2003. That month, MLCC liquidated the securities in plaintiff's account. To date, the proceeds of that liquidation have not been applied to the loan and remain in the pledge account.

Since plaintiff had also failed to pay her property taxes for the years of 2000 and 2001 in the amount of \$26,533.77 and \$39,854.24, respectively, MLCC paid the City of Norwalk \$67,733.96 in costs and fees to satisfy plaintiff's property tax obligations and to prevent foreclosure.

MLCC sent plaintiff a "Notice of Default" dated May 16, 2003 that notified her that she was "in default under the terms of the Note and Mortgage" by reason of her "failure to pay real estate taxes due to the City of Norwalk" and her failure to make her "monthly payments due on the first days of February, March, April and May, 2003. The "Notice of Default" also informed plaintiff that in order to "cure all defaults, payment in the amount of \$174,521.19" had to be made by June 18, 2003, and that failure to pay the past amount due could require payment of the entire indebtedness.

On June 6, 2003, plaintiff instituted this action in state superior court. She also has brought a superior court action

8

against her accountant, Barry Newman, and an arbitration against
MLPF&S and Falini before the New York Stock Exchange.

## DISCUSSION

_____A motion for summary judgment will be granted where there is
no genuine issue as to any material fact and it is clear that the
moving party is entitled to judgment as a matter of law. Celotex
Corp. v. Catrett, 477 U.S. 317, 322 (1986). "Only when
reasonable minds could not differ as to the import of the
evidence is summary judgment proper." Bryant v. Maffucci, 923 F.
2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849 (1991).

The burden is on the moving party to demonstrate the absence
of any material factual issue genuinely in dispute. American
International Group, Inc. v. London American International Corp.,
664 F. 2d 348, 351 (2d Cir. 1981). In determining whether a
genuine factual issue exists, the court must resolve all
ambiguities and draw all reasonable inferences against the moving
party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255
(1986). If a nonmoving party has failed to make a sufficient
showing on an essential element of her case with respect to which
she has the burden of proof, then summary judgment is
appropriate. Celotex Corp., 477 U.S. at 323. If the nonmoving
party submits evidence which is "merely colorable," legally
sufficient opposition to the motion for summary judgment is not
met. Anderson, 477 U.S. at 249.

This standard applies equally to counterclaims.

Plaintiff argues that summary judgment is appropriate on her

9

claim of conversion due to the alleged invalidity of the Altered
Power of Attorney relied upon to execute the 1999 Note, Mortgage,
and Pledge. Defendant cross moves for summary judgment on its
counterclaims for compensation in excess of $9,609,134.30,
arguing that 1) plaintiff is in default on the Note and Mortgage,
2) she ratified the 1999 loan agreement, and 3) her claims for
conversion, fraudulent nondisclosure, recklessness, negligence,
and CUTPA are without merit.

Plaintiff asserts that MLCC committed conversion "by
exercising the right of ownership" over the securities in her
pledge account. Specifically, she argues that summary judgment
should enter in her favor because the imperfect execution of the
power of attorney in favor of Newman renders the 1999 loan
agreement a nullity. Defendant counters that the Altered Power
of Attorney is consistent with plaintiff's intent and, further,
that her acts and conduct have served to ratify any invalidity of
the Altered Power of Attorney. Accordingly, defendant argues
that it is entitled to a judgment of foreclosure or, in the
alternative, for judgment on the Note.

Conversion "occurs when one, *without authorization*, assumes
and exercises ownership over property belonging to another, to
the exclusion of the owner's rights." Hi-Ho Tower, Inc. v. Com-
Tronics, Inc., 255 Conn. 20, 44 (2000). Thus, whether
ratification occurred represents the threshold inquiry to the
competing motions for summary judgment.

Ratification is the affirmance by a person of a prior non-

10

binding act which was performed for that person's benefit.  Il
Giardino, LLC v. The Belle Haven Land Co., 254 Conn. 502, 530
(2000).  It requires acceptance of the results of the act with an
intent to ratify, and with full knowledge of all the material
circumstances.  Russell v. Dean Witter Reynolds, Inc., 200 Conn.
172, 185 (1986).  Whether an individual intended to ratify an
agreement is a question of fact.  Hartford Accident and Indemnity
Co. v. South Windsor Bank and Trust, 171 Conn.63, 81 (1976).

     To ratify an "unauthorized act of an agent and make it
effectual and obligatory upon the principal, the general rule is
that the ratification must be made by the principal with a full
and complete knowledge of all the material facts connected with
the transaction to which it relates. . . ."  Cohen v. Holloways',
Inc., 158 Conn. 395, 408 (1969).  Silence as well as affirmative
acts may serve as evidence of an intent to ratify an action.
Hartford Accident & Indemnity Co. v. South Windsor Bank & Trust
Co., 171 Conn. 63, 72 (1976).  Ratification results if there is
acceptance of the benefits or acquiescence to the contract for
any considerable length of time after the opportunity is afforded
to annul or void it.  DiMartino v. City of Hartford, 636 F.Supp.
1241, 1252 (D.Conn. 1986).

     In this instance, plaintiff knew the loan was scheduled to
close while she was in Africa and needed an executed power of
attorney to close on the loan.  She had previously discussed
Newman serving as her attorney-in-fact to close the loan for her,
although she disputes that she actually wrote his name onto the

11

form. She was present when Falini applied the white-out and initialed the form for her so that the loan could close. She never voiced an objection to Falini's application of white-out and never disputed the validity of the Altered Power of Attorney after she received a recorded copy of the form. It is undisputed that she accepted the benefits the loan, using it to fund the multi-million dollar construction of her home.

At the same time, plaintiff's deposition testimony suggests that she did not understand the terms or amount of the pledge account securing the 1999 loan until at least January 2001, when she had already incurred significant indebtedness and her construction was completed.[1] Plaintiff claims that she would never have entered into the 1999 loan agreement had she fully comprehended the terms of the loan and pledge account. The evidence also indicates that plaintiff did not know that the 1999 loan could potentially be invalidated due to the allegedly defective Power-of-Attorney until shortly before this action was filed in 2003.

Pursuant to this evidence, the Court cannot find as a matter of law that plaintiff ratified the agreement. To make such a

---

[1]In her deposition, plaintiff stated that she became aware of the pledge account sometime in the latter part of 2000. However, she explained that she learned of the pledge account when "they sent a letter saying congratulations, you now have a permanent loan." In her Local Rule 56(a)(2) statement, plaintiff asserts that she was referring to the letter received in February 2001 regarding conversion of the loan from construction to permanent. The record also indicates that plaintiff had a conversation about the pledge account in January, 2001. Accordingly, whether plaintiff became aware of the terms of the pledge account prior to 2001 represents a disputed issue of fact.

12

ruling, the undisputed facts would have to demonstrate that plaintiff was aware of all the material facts concerning the loan and the Altered Power of Attorney. Here, construing the inferences of fact most favorably to the plaintiff, as is required on summary judgment, disputed issues of fact exist as to whether plaintiff properly received documents regarding information about the loan, the date in which plaintiff became aware of certain material terms of the loan, and whether plaintiff would have challenged the transaction if she had understood the terms of the loan and the alleged defects of the Altered Power of Attorney. Thus, plaintiff's failure to object to the terms of 1999 loan and acceptance of its proceeds do not in this instance constitute ratification as a matter of law.

It is undisputed that plaintiff signed the Modification Agreement in February, 2001, which agreement provided that the Note and Mortgage "shall continue to evidence and secure the Borrower's indebtedness thereunder as modified. . ." and that plaintiff had waived and released all "defenses against enforcement of the Note and Mortgage."  However, the evidence does not establish that plaintiff's waiver of her rights was an "intentional relinquishment or abandonment of a known right or privilege. . . ." AFSCME, Council 4, Local 704 v. Dept. of Public Health, 272 Conn. 617, 623 (2005).  MLCC asserts that plaintiff executed a knowing waiver of her rights, since she had been notified by Mr. Vaughn-Flam in Fall 1999, prior to signing the waiver, that she had a potential claim against Mr. Falini and

13

Merrill Lynch relative to the financing of her home construction. This evidence indicates that plaintiff intentionally relinquished claims against the Merrill Lynch entities and Falini based on the loan transactions prior to execution of the 1999 loan agreement. However, based on this evidence, the Court cannot draw a conclusion that plaintiff knowingly waived her right to challenge the 1999 loan executed with the Altered Power of Attorney. Nor, as previously discussed above, can the Court find that the waiver is valid based on prior ratification of the 1999 loan agreement.

In light of the disputed inferences of fact, a jury must resolve the issues of fact and credibility as to whether plaintiff's acts demonstrate intention to ratify the agreement, and whether plaintiff knowingly waived her defenses.

Accordingly, the Court will deny plaintiff's motion for summary judgment on the claim of conversion, and will deny defendant's motion for summary judgment on the claims for judgment of foreclosure or, in the alternative, for judgment on the Note.

## Defendant's Motion for Summary Judgment On Plaintiff's Complaint

Defendant argues that summary judgment should enter in its favor on plaintiff's counts of conversion, fraudulent nondisclosure, recklessness, negligence, violation of CUTPA, and respondeat superior based on the statute of limitations and the merits of the claims. Since plaintiff provides no opposition to arguments against the fraudulent nondisclosure, recklessness,

14

negligence claims, the Court will grant summary judgment in
defendant's favor on these claims.

Plaintiff has, however, provided counterargument relative to
the conversion and CUTPA claims.

### Conversion

Defendant argues that the plaintiff's claim of conversion is
time barred by the relevant three-year statute of limitations for
intentional torts, Connecticut General Statutes section 52-57,
since the basis of the conversion is the execution of the 1999
loan agreement pursuant to the allegedly defective Altered Power
of Attorney. Plaintiff counters that conversion occurred upon
the 2003 liquidation of the pledge account when MLCC excluded
plaintiff from her right to the securities. Prior to that time,
plaintiff assets that she was permitted to withdraw cash or
securities from the account or to buy or sell securities in the
account so long as the value of the securities did not fall below
a certain level. For purposes of ruling on this motion, the
Court finds that the alleged unauthorized ownership over the
securities did not occur until 2003. Accordingly, the Court
finds that the conversion claim is not time-barred.

Defendant also argues that the claim is without merit since
plaintiff ratified the agreement. As previously discussed above,
the Court finds that disputed inferences of fact bar summary
judgment on that issue.

15

CUTPA

In Counts IV, V, VI and VII, plaintiff alleges that MLCC's conduct was unfair and/or deceptive pursuant to CUTPA.  The conduct alleged includes the alteration of the power of attorney, the execution of the 1999 pledge agreement pursuant to the allegedly defective Altered Power of Attorney, and the liquidation of the securities in the pledge account in 2003.

Defendant asserts that plaintiff's claims are time-barred by the relevant three year statute of limitations, Connecticut General Statutes section 42-110g(f).  Defendant argues that the alteration of the power of attorney and the execution of the loan agreement pursuant to allegedly defective Altered Power of Attorney in 1999 form the basis of the CUTPA claims.  Plaintiff counters that her claims are not barred because MLCC engaged in a continuing course of misconduct.

The three-year statute of limitations runs from the date of the actual violation rather from the date of its discovery. Fichera v. Mine Hill Corp., 207 Conn. 204, 212 (1988).  However, pursuant to the continuing course of conduct doctrine, "the statute does not begin until that course of conduct is completed."  Id. at 208.  To support a finding of a continuing course of conduct, there must be "evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto. . . ."  Sherwood v. Danbury Hospital, 252 Conn. 193, 203 (2000).  Connecticut superior courts have noted that the continuing conduct doctrine applies where the parties

16

have a fiduciary relationship or a relationship of trust. <u>McKeon v. Rinaldi</u>, 2005 WL 1331641 (Conn. Super 2005) (citing cases). A fiduciary relationship exists where "there is a justifiable trust confided on one side and a resulting superiority and influence on the other." <u>Alaimo v. Royer</u>, 188 Conn. 36, 41 (1982). In this instance, MLCC was the lender in the 1999 loan transaction at-issue. "Generally there exists no fiduciary relationship merely by virtue of a borrower lender relationship between a bank and its customer." <u>Southbridge Associates, LLC v. Garofalo</u>, 53 Conn. App. 11, 19 (1999). Plaintiff has adduced no evidence that gives rise to a fiduciary duty or trust relationship owed to plaintiff by defendant. The Court finds that plaintiff's CUTPA claims are time-barred and will grant summary judgment in defendant's favor on counts IV, V, VI and VII.

## Motion to Strike

Defendant's motion to strike attacks the affidavits of Richard Homberger and Marc Seifer submitted in support of plaintiff's opposition to defendant's motion for summary judgment. Mr. Homberger is offered as an expert on underwriting standards, MLCC's compliance with such standards, and the fairness of the loan transaction. Mr. Homberger's affidavit appears to be offered in support of plaintiff's CUTPA claim and her defenses of unconscionability and unclean hands. Since the Court has dismissed the CUTPA claims and did not reach the merits of plaintiff's defenses, Mr. Homberger's affidavit is irrelevant to the Court's consideration of the motion for summary judgment.

17

The affidavit of Marc Seifer, a handwriting expert, offers the opinion that plaintiff did not make certain writings on the Altered Power of Attorney. In his deposition, Mr. Falini identified the writing on the Altered Power of Attorney as his own. Accordingly, Mr. Seifer's opinion that the handwriting was not that of plaintiff's proved irrelevant to the Court's consideration of the motion for summary judgment and finding of disputed facts. Accordingly, the motion to strike is moot.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary Judgment [#139] is DENIED. Defendant's motion for summary judgment [#132] is GRANTED in part and DENIED in part in accordance with this Ruling. The motion to strike [#157] is MOOT. The plaintiff is instructed to amend her complaint consistent with this Ruling within thirty days of this Ruling's filing date.

SO ORDERED.

_____/s/_____
Warren W. Eginton
Senior United States District Judge

Dated the 6th  day of December, 2005 in Bridgeport, Connecticut.

18